DUANE MORRIS LLP
Hyman L. Schaffer
Fran M. Jacobs
Gregory P. Gulia
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

SOFTWARE AG, INC. and SOFTWARE AG,           :
                                             :     08 CV 00389 (CM) (FM)
                          Plaintiffs,        :
                                             :
          -against-                          :
                                             :     **DECLARATION OF HYMAN L.**
CONSIST SOFTWARE SOLUTIONS, INC.,            :     **SCHAFFER IN OPPOSITION**
f/k/a CONSIST INTERNATIONAL, INC.            :     **TO MOTION FOR A**
and NATALIO FRIDMAN,                         :     **PRELIMINARY INJUNCTION**
                                             :
                          Defendants.        :
-------------------------------------------------------------------x

HYMAN L. SCHAFFER declares:

1.      I am a member of the law firm of Duane Morris LLP, attorneys for defendants

Consist Software Solutions, Inc. f/k/a Consist International, Inc. ("Consist") and Natalio Fridman

in the above-captioned action. I submit this Declaration in opposition to Plaintiffs' motion for

preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65.

2.      The purpose of this Declaration is to put before the Court the documents which

establish that Plaintiffs' motion should be denied in its entirety.

3.      A true and correct copy of the 1998 Exclusive Distribution Agreement between

Consist and SAGA is annexed hereto as Exhibit A.

4.    A true and correct copy of Consist's Second Corrective Notice dated January 18, 2008 in both Portuguese and English is annexed hereto as Exhibit B.

5.    A true and correct copy of a letter from James D. Jacobs, Esq. to Judge Colleen McMahon dated January 18, 2008 is annexed hereto as Exhibit C.

6.    True and correct copies of Brazilian Trademark Registration Certificates for ADABAS and NATURAL bearing bates numbers CSS2-00001 to 00005, are annexed hereto as Exhibit D.

7.    A true and correct copy of relevant sections of Natalio Fridman's deposition transcript from the First Litigation dated November 28, 2007 is annexed hereto as Exhibit E.

8.    A true and correct copy of Plaintiff's Responses and Objection to Defendant's First Request for the Production of Documents dated January 20, 2008 is annexed hereto as Exhibit F.

9.    A true and correct copy of Consist's First Corrective Notice dated January 18, 2007 in both Portuguese and English is annexed hereto as Exhibit G.

10.    A true and correct copy of the Expert Report of David A. MacSwain filed in the First Litigation and dated November 9, 2007 is annexed hereto as Exhibit H.

11.    A copy of a version of the 1986 Exclusive Distribution Agreement between PACS (Consist predecessor) and Software AG produced by Plaintiffs herein and signed by SAGA is annexed hereto as Exhibit I.

12.    True and correct copies of an e-mail from Natalio Fridman to Karl-Heinz Streibich dated January 10, 2008 and a letter from Natalio Fridman to Karl-Heinz Streibich dated January 14, 2008 annexed hereto as Exhibit J.

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing is true and correct.

Dated: New York, New York
      January 22, 2008

                                    /s/ Hyman L. Schaffer
                                    Hyman L. Schaffer

# EXHIBIT A

## DISTRIBUTORSHIP AGREEMENT

THIS AGREEMENT with the effective date of 1st day of January 1998.

between      SOFTWARE AG AMERICAS, INC.
11190 Sunrise Valley Drive
Reston, VA 22091 USA

(hereinafter called "SAGA")

and      CONSIST INTERNATIONAL, INC.
10 East 53rd Street
27th Floor
New York, NY 10022

(hereinafter called "CONSIST," which term shall include all CONSIST subsidiaries and affiliates)

WITNESSETH,

WHEREAS, SAGA is the exclusive distributor of certain software packages in the Territory, as set forth in Annex A herein "SAGA Products," being updated from time to time, and offers certain products, as set forth in Annex B, for which SAGA pays royalties herein "SPECIAL PRODUCTS," being updated from time to time both of which are collectively referred to herein as "SYSTEMS".

and

WHEREAS, CONSIST wants to market the SYSTEMS and to provide assistance to users of the SYSTEMS in Argentina, Brazil, Chile, Bolivia, Paraguay, Uruguay, and Peru, hereinafter called the "TERRITORY."

Now therefore, the parties hereto agree as follows:

**Paragraph 1**

SAGA appoints CONSIST the exclusive distributor of the SYSTEMS in the TERRITORY for the period of January 1, 1998 through December 31, 2007. The parties understand and agree that at the end of the first ten (10) year period of this Agreement, this Agreement shall automatically renew for successive five (5) year periods, unless either party shall decide to terminate this Agreement upon the giving of eighteen (18) months prior written notice to the other party.

28

9/9/97 4:10 PM

**Paragraph 2**

SAGA hereby authorizes CONSIST to enter into customer agreements in the TERRITORY for licensing, installing, technical assistance, training and maintenance of the SYSTEMS.

However, CONSIST is only authorized to give non-transferable use-licenses for SYSTEMS to customers. Giving any form of sublicense or distribution rights, such as a direct or indirect OEM arrangements, to any third party will require the prior written consent of SAGA.

Contracts for installations of the SYSTEMS outside the TERRITORY shall require the prior written consent of SAGA.

**Paragraph 3**

For the right to grant perpetual or time-limited licenses, and/or maintenance agreements, CONSIST agrees to make payments to SAGA as provided in Exhibit A hereto.

Payments will be made within ten (10) days of the end of each quarter.

Any quarterly payment not received within the due date period above mentioned, shall bear interest at a rate of 3% p.a. above the prime commercial rate of Citibank in effect at that time.

SAGA will provide invoices to CONSIST for all payments made by CONSIST.

**Paragraph 4**

SAGA agrees at no additional costs to provide the following services to CONSIST:

1.  Training in public classes held by SAGA for CONSIST staff (up to 5 persons) per class;

2.  Ten (10) copies of the latest version of the SYSTEMS stored on magnetic tape;

3.  Ten (10) copies of complete sets of SYSTEMS documentation in English, including Reference Manuals and Utilities Manuals.

4.  Prompt correction or any errors in the SYSTEMS detected at the user's site and forwarded to SAGA.

9/9/97 4:10 PM                                    2

**Paragraph 5**

(1)    CONSIST agrees to take all necessary and reasonable measures to ensure that the proprietary nature and integrity of the SYSTEMS are safeguarded against unauthorized use, duplication or modification.

CONSIST has the right to reproduce and, as necessary, translate SYSTEMS, documentation, Manuals, etc. for use in the TERRITORY. Written material used by CONSIST for marketing or support to users of the SYSTEMS will refer to authorship of SAGA and will show copyright and trademark of SAGA.

CONSIST acknowledges the SYSTEMS and all documentation or information as trade secrets of SAGA and undertakes to oblige its personnel to protect the SYSTEMS as well as their copyrights and trademarks and to prevent them from unauthorized use.

CONSIST agrees to refrain from implementing, or permitting the implementation of any modification to the SYSTEMS without the written notice to SAGA.

(2)    CONSIST agrees to refrain from installing the SYSTEMS at a user's site without having obtained a written agreement from the user calling for safeguarding of the proprietary nature of the SYSTEMS. Such written agreement must be either a right of use license agreement, or a non-disclosure agreement for demonstration.

(3)    CONSIST agrees to make all reasonable efforts to successfully market the SYSTEMS in the TERRITORY.

CONSIST shall, at its expense, provide SAGA with a written quarterly report of all installations and de-installations of the Special Products contained on Annex B in the TERRITORY, made in the quarter, including product name, operating system, hardware class or machine type, customer name, customer address, and installation/de-installation date. All installations will be considered perpetual licenses unless later reported as de-installed.

Within sixty (60) days of the execution of the Amendment, the parties will meet and specify the format of the required quarterly reports. Both parties understand and agree that the meeting and the specification of the format of the required quarterly reports are a material condition of this Agreement.

Both parties understand and agree that the required quarterly royalty reports are a material requirement of this Agreement, and that the failure of CONSIST to provide quarterly reports may be deemed by SAGA to be a material breach condition of this Agreement.

9/9/97 4:10 PM                                              3

(4)   CONSIST agrees to be responsible for all technical assistance and support activities in the TERRITORY including maintenance services for both present and future users. This obligation of CONSIST will continue until termination of the agreement including any extension thereof.

(5)   CONSIST shall be responsible for supplying SAGA with all pertinent information concerning any software errors and will forward promptly all documentation to SAGA with an explanation of the circumstances causing the problem and SAGA will correct any errors in the SYSTEMS.

(6)   In no case shall SAGA be held liable by CONSIST or any of CONSIST customers in the TERRITORY for any damages, indirect or consequential, derived from the use of the SYSTEMS.

(7)   SAGA shall not be held liable for any taxes arising out of the activities of CONSIST, such as sales tax, income tax, import tax, value added tax or alike.

(8)   CONSIST shall abide by all U.S. Export Administration Regulations which may apply to the SYSTEMS and their exportation and/or re-exportation.

(9)   CONSIST agrees that SAGA has the right to make multinational agreements with end-user customers which may result in installations in the TERRITORY at discounts negotiated by SAGA. CONSIST will accept all such agreements and discounts as valid in the TERRITORY with compensation to CONSIST according to SAGA's published worldwide multinational policy.

(10)   CONSIST agrees to cooperate with SAGA in establishing international Value Added Remarketers (VARs). The terms of specific VAR agreements will be agreed to between CONSIST and SAGA on a case-by-case basis.

(11)   CONSIST (including CONSIST and Natalio Fridman or any subsidiary or affiliated business entity) agrees not to act as agent, partner, distributor, reseller or marketing representative for any systems software products which compete with the SAGA SYSTEMS without an approval of SAGA unless the competing product is already being sold by CONSIST. The approval of specific competitive products will be agreed to between CONSIST and SAGA on a case-by-case basis.

(12)   When requested by CONSIST, SAGA will execute the documents required by government authorities in the TERRITORY for remittance of royalties for SAGA products by the CONSIST affiliates. All payment by CONSIST affiliates will be credited as payment under this Agreement.

Total CONSIST obligations to SAGA are solely those specified in the Agreement.



9/9/97 4:10 PM                                        4

In the case of any conflict between this Agreement and any document executed by SAGA with any CONSIST affiliate, this Agreement shall prevail.

**Paragraph 6**

None of the parties hereto shall be entitled to assign this contract without prior written consent of the other party.

**Paragraph 7**

Before any termination of this Agreement shall become effective, the terminating party shall give written notice to the other party describing in detail what material conditions the other party has failed to perform, and the other party shall have sixty (60) days in which to perform such conditions.

**Paragraph 8.**

All legal notices hereunder shall be in writing and shall be deemed properly delivered and effective when duly sent by Certified Mail, Postage Prepaid, telex or cable, or delivered by hand:

to CONSIST at:     CONSIST INTERNATIONAL, INC.
10 East 53rd Street
27th Floor
New York, NY 10022
Attn: Mr. Natalio S. Fridman

and to SAGA at:     SOFTWARE AG AMERICAS, INC.
11190 Sunrise Valley Drive
Reston, Virginia 20191
Attn: International Operations

or to such other address as the receiving party may by written notice designate to the other. All operational correspondence and quarterly reports (technical assistance, sales and marketing support) will be directed to the SAGA address shown above.

**Paragraph 9**

This Agreement, including Annexes and Exhibits, constitutes the entire Agreement between the parties; and supersedes and merges all previous communications, representations or agreements, either written or orally, with respect to the subject matter hereof, so that this Agreement may only be changed or modified by another Agreement sighed by the parties hereto.

9/9/87 4:10 PM                5

**Paragraph 10**

This contract shall be subject to, and interpreted in accordance with, the laws of the State of New York, USA without regard to the New York provisions governing conflict of laws. SAGA agrees to defend or at its option settle any claim, suit or proceeding brought against CONSIST from the third parties for patent or copyright infringement and indemnify CONSIST against any claims for infringement of any patent or copyright by the SYSTEMS. CONSIST will promptly notify SAGA in writing of any such claims, suits or proceedings and give SAGA full information and assistance to settle and/or exclusive of any judicial and administrative awards, incurred without SAGA's written authorization.

**Paragraph 11**

CONSIST agrees to indemnify SAGA from any liability that may be incurred by SAGA because CONSIST either overstated the performance of any SYSTEMS or part thereof, or failed to exercise the due care to resolve any problems of which CONSIST was notified by SAGA and/or any end-user.

Agreement Accepted:
SOFTWARE AG AMERICAS, INC.

By: _____

Name: _JAMES H. DALY_

Title: _V.P. - International Ops._

Date: _9/9/97_

Agreement Accepted:
CONSIST INTERNATIONAL, INC.

By: _____

Name: _Natalio Fridman_

Title: _President_

Date: _____

9/9/97  4:10 PM                                                              6

ANNEX A

1.    All the system software packages offered for distribution by Software AG of Darmstadt, Germany and SAGA, including their subsidiaries and affiliates now and in the future including, but not limited to, those shown on the attached list, and to include BOLERO and ODYSSEY.  SAGA is the perpetual, exclusive distributor in the TERRITORY for all the products of Software AG of Darmstadt, Germany.

2.  . All application packages, except for PRODIS, are excluded from this agreement.

3.    The SAGA Year2000 Toolkit is not included in this Agreement.  The parties understand and agree that it is the subject of a separate Agreement.

9/17/97                                                          7

## ANNEX B

Special Products are those products listed below, and any additions to this list, as made by SAGA, from time to time. Additions may include new products or new versions or releases of existing Special Products. For new Special Products which require that royalties be paid to third-parties, CONSIST will reimburse SAGA for all costs associated payable to the thirds party with respect to all such Special Products.

1.    ESPERANT

2.    PASSPORT



## EXHIBIT A

1.    CONSIST agrees to pay SAGA a fixed cash lump sum payment quarterly according to the following table using the annual increase/decrease in the Audited SAGA Product/License Revenue as the basis for the adjustment to the quarterly fixed cash lump sum payment made by CONSIST to SAGA. In any year the maximum increase or decrease will be no greater than twenty percent (20%); however, in any year in which one or more products have been specifically declined by CONSIST (as per paragraph 2) then the maximum decrease will be ten percent (10%).

### ANNUAL ADJUSTMENT TABLE BASED ON INCREASE/DECREASE IN SAGA PRODUCT/LICENSE REVENUE

| Change to CONSIST Annual Royalty | Annual % Change in SAGA Product/License Revenue |
|---|---|
| Not to go below 10% or 20% Annually (See Paragraph 1) | |
| Decrease to -10% | Actual % Decrease |
| 0 | 0 |
| Up to 20% Increase | Actual % Increase |
| Not to exceed 20% Annually | |

2.    The baseline SAGA Product List will be the SAGA Product List in effect as of December 31, 1997. Any new SAGA Products developed or acquired over the term of this Agreement shall be added to the SAGA Product List unless specifically declined in writing by CONSIST, and the quarterly fixed cash lump sum payments will be adjusted as appropriate. Appropriate adjustments will be made for acquisition of entities by SAGA which effect this calculation and such adjustments will be mutually agreed upon by both parties.

3.    The Baseline Year is established at an annual royalty of $7,500,000. (US DOLLARS), cash only, with no credit for tax receipts. All transfers of cash payments to take place within the United States of America. When a separate agreement is entered into between CONSIST and SAGA for the Year 2000 Toolkit, CONSIST will receive a one-time credit of $500,000 towards any amounts due from CONSIST to SAGA under such Year 2000 Toolkit agreement.

4.    Payments must be made quarterly, by the 10th day at the end of each quarter. The payments shall commence on January 1, 1998.

5.    The new royalty calculation for each year of the Agreement will be presented to CONSIST at the completion of the SAGA Annual Audit, which is scheduled for completion in April of each year (unless otherwise amended by SAGA). Until the calculation is completed, CONSIST will make the first quarterly payment using the prior year's quarterly payment schedule. The parties agree to reconcile the payments, by adjusting the amounts proportionally over the remaining three quarters of that year.

9/9/97 4:10 PM        9

# EXHIBIT B



🖨 Imprimir

18 de Janeiro de 2008

# Notícias

## CONSIST ESCLARECE Nro. 2 (CORRIGIDO)

**Continuidade da Atualização Técnica e Suporte**

É nossa firme opinião que todas as obrigações contratuais assumidas pela CONSIST com seus clientes, incluindo a continuidade da Atualização Técnica e a prestação dos serviços de suporte de produtos da Software AG, devem ser plenamente cumpridas, independentemente da nossa expectativa de reverter a decisão da primeira instância.

Nesse sentido, tais obrigações estão claramente respaldadas pelo contrato assinado entre a CONSIST e a SAGA/Software AG, o qual autoriza a CONSIST a outorgar tanto Licenças de Uso de softwares quanto Atualização Técnica por prazos temporários ou perpétuos (parágrafo 3 do contrato: *"... to grant perpetual or time-limited licenses, and/or maintenance agreements ..."* ).

Dessa forma, todas as atualizações dos softwares que sejam liberadas internacionalmente pela Software AG, esta deverá disponibilizá-las à CONSIST para atender nossos clientes de Atualização Técnica, tal como tem sido feito ao longo dos 33 anos de distribuição exclusiva dos softwares da Software AG.

Assim sendo, solicitamos a todos nossos clientes que, se eventualmente receberem informações divergentes do acima exposto, que me comuniquem por escrito, ou ao Sr. Pablo A. Kipersmit ( vpe@consist.com.br ), indicando também sua origem com todas as informações necessárias para sua identificação, para que possamos tomar as providências necessárias.

Esclarecemos ainda, que a Software AG diverge da interpretação da CONSIST quanto ao parágrafo 3 do contrato mencionado, fato este que está em litígio na Corte de Nova York. O entendimento da Software AG pode ser lido em seu site.

Novamente agradecemos a nossos clientes pelo apoio e confiança que sempre nos depositam.

**Natalio S. Fridman**
*Presidente*
Grupo CONSIST do Brasil
natalio.fridman@consist.com.br





**CONSIST CLARIFIES No. 2**

**Technical Updates and Support Continue Performance**

It is our strong understanding that all our contractual obligations with our clients, including the Technical Updates and the performance of support services for Software AG products, will still be performed regardless of our expectations with the appeal.

Such obligations are guaranteed by the agreement between CONSIST and Software AG, which authorizes CONSIST to give both software licenses and technical support for a limited period of time or perpetually (clause 3 of the agreement: ... to grant perpetual or time-limited licenses, and/or maintenance agreements...).

As such, all software updates released internationally by Software AG, must be available to CONSIST in order for CONSIST to able to help our technical update clients, in the same manner as we have done for the past 33 years of exclusive distributorship of the software of Software AG.

Therefore, we kindly request all our client if they receive any contradicting information, to communicate me by writing, or to Mr. Pablo A. Kipersmit (vpe@consist.com.br), informing of the origin of such information and all other information necessary to its identification, so we can take the necessary steps.

We further clarify that Software AG disagrees with CONSIST's interpretation of paragraph 3 of the agreement, which has been subject of their judicial dispute before the New York court.  Software AG's position is available at its website.

Again, we thank you for all the trust and support always given.

Natalio Friedman.

3

# EXHIBIT C

**BAKER & MCKENZIE**

Baker & McKenzie LLP
1114 Avenue of the Americas
New York, New York 10036, USA

Tel: +1 212 626 4100
Fax: +1 212 310 1600
www.bakernet.com

James David Jacobs
Tel: +1 212 891 3951
James.D.Jacobs@bakernet.com

Asia
Pacific
Bangkok
Beijing
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur
Manila
Melbourne
Shanghai
Singapore
Sydney
Taipei
Tokyo

Europe &
Middle East
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Bologna
Brussels
Budapest
Cairo
Dusseldorf
Frankfurt / Main
Geneva
Kyiv
London
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

North & South
America
Bogota
Brasilia
Buenos Aires
Caracas
Chicago
Chihuahua
Dallas
Guadalajara
Houston
Juarez
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre
Rio de Janeiro
San Diego
San Francisco
Santiago
Sao Paulo
Tijuana
Toronto
Valencia
Washington, DC

BY FACSIMILE

January 18, 2008

The Honorable Colleen McMahon
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 640
New York, NY 10007

RE:    *Software AG, Inc. v. Consist Software Solutions, Inc.*
Case No. 08 CV 00389

Dear Judge McMahon:

We are in receipt of the letter sent today by Consist Software Solutions, Inc. and Natalio Fridman ("Defendants") to Your Honor. Defendants' willingness to stipulate to the removal of various misrepresentations on their web site addresses only a small, albeit important, part of Defendants' misrepresentations and other wrongful acts that required expedited relief. Defendants' offer entirely omits reference to all their other written and oral misrepresentations, often made directly to end-users, and that they can provide SAG Software Products Level 2 Support, Level 3 Support, System Maintenance Releases, New Software Releases, or New Software Versions.

Furthermore, our contract claims and claims of false statements are not limited to Consist's web publications, but include Consist's representations to customers orally, in person and in agreements in which Consist offers to provide post-expiration maintenance services. *Register.com, Inc. v. Domain Registry of America*, 2002 U.S. Dist. LEXIS 24795, at *43-44 (S.D.N.Y. Dec. 27, 2002) (Lanham Act § 43(a) misrepresentations include "informal type 'promotion', such as the *mailer*, emails, and telephone calls....").

If Defendants' position is that all issues in Plaintiffs' Order to Show Cause are moot except for conveying to SAG the trademarks that Consist wrongfully registered, Defendants should have no objection to this Court entering a preliminary injunction proposed in our Order to Show Cause with the exception of the trademark issues, *i.e.*, enjoining Defendants, their employees, their agents, their attorneys and all others acting in concert with them from:

(i) Representing or implying that Consist has continuing rights pursuant to the Agreement or that Defendants' rights under the Agreement may be or will be reinstated;

(ii) Offering or representing that Defendants can provide for SAG Software Products Level 2 Support, Level 3 Support, System Maintenance Releases; New Software Releases; or New Software Versions;

Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein.

BAKER & MCKENZIE

(iii) Representing, promoting, advertising, or implying that Plaintiffs have authorized or otherwise falsely designating that Plaintiffs have authorized Consist to provide maintenance services for SAG Software Products, including Level 2 Support, Level 3 Support, System Maintenance Releases; New Software Releases; or New Software Versions;

(iv) Asserting any rights in Software AG's SAG Software Products;

and ordering Defendants to:

(i) Include in any offers, advertisements, promotions or agreements to render to customers or potential customers maintenance services for SAG Software Products in type no less prominent in face and in size than the type in which offers or statements of service are made the disclaimer that "Software Ag Does Not Authorize Consist's Maintenance Services And In No Event Can Consist Provide Level 3 Support, Software Updates Or New Software Releases".

If Defendants, however, are not willing to stipulate to such a preliminary injunction, the hearing scheduled for next Thursday should proceed on all issues set forth in Plaintiffs' Order to Show Cause. Nor should Defendants use their letter as a basis for withholding discover pending Your Honor's ruling.

Very truly yours,

James David Jacobs

cc: Hyman Schaffer (By e-mail)

The Honorable Colleen McMahon
Very truly yours,

# EXHIBIT D



REPÚBLICA FEDERATIVA DO BRASIL
Ministério do Desenvolvimento, da Indústria e do Comércio Exte
Instituto Nacional da Propriedade Industrial

**Certificado de Registro de Marca No. 811798313**

**ADABAS - (BR)**

O Instituto Nacional da Propriedade Industrial, para garantia da propriedade e do uso exclusivo , certifica que , nos termos das normas legais e regularmente em vigor , efetuou a PRORROGAÇÃO do registro da marca acima reproduzida, mediante as seguintes características e condições :

\* 3o.DECÊNIO \*

Especificação dos Produtos/Serviços :

Livros, álbuns, moldes de papel e impressos em geral.

Classe Produtos/Serviços :  16.20

Observações : Marca Nominativa.

PRORROGADA

Registro Anterior: Número  811798313

Prazo de Validade: 10(dez) anos a partir de 25/11/2006

Data da Concessão :   25/11/1986

Titular : CONSIST CONSULTORIA SISTEMAS E REPRESENTAÇÕES LTDA

CGC/CPF/No. INPI : 43211630000118

Endereço : AV DAS NAÇÕES UNIDAS 20727

       SÃO PAULO

       CEP : 04795-100  -  SP  -  BR

Rio de Janeiro, 22 de maio de 2007.

Diretor de Marcas

CONFIDENTIAL
CSS2-00001



REPÚBLICA FEDERATIVA DO BRASIL
Ministério do Desenvolvimento, Indústria e Comércio Exterior
Instituto Nacional da Propriedade Industrial.

Certificado de Registro de Marca No.    816316970

**ADABAS**

O Instituto Nacional da Propriedade Industrial, para garantia da propriedade
e do uso exclusivo, certifica que, nos termos das normas legais e
regularmente em vigor, efetuou a PRORROGAÇÃO do registro da marca acima
reproduzida, mediante as seguintes características e condições :

* 2o.DECÊNIO *

Especificação dos Produtos/Serviços :

Serviços auxiliares ao comércio de mercadorias, inclusive à importação e à exportação.
Serviços de agenciamento, treinamento e fornecimento de mão-de-obra em geral. Serviços de
análise e processamento de dados.

Classe Produtos/Serviços :   40.15 e 25 e 34

Observações : Marca Nominativa.

Registro Anterior: Número  816316970

Prazo de Validade: 10(dez) anos a partir de 11/05/2003

Data da Concessão :   11/05/1993

Titular : CONSIST CONSULTORIA SISTEMAS E REPRESENTACOES LTDA

CGC/CPF/No. INPI : 43211630000118

Endereço : AV DAS NACOES UNIDAS    20727

          SANTO AMARO - SÃO PAULO

          CEP : 04795  -  SP  -  BR

                                    Rio de/Janeiro, 2 de maio de 2006.

                                    Diretor de Marcas

CONFIDENTIAL
CSS2-00002



REPÚBLICA FEDERATIVA DO BRASIL
Ministério do Desenvolvimento, da Indústria e do Comércio Exterior
Instituto Nacional da Propriedade Industrial



Certificado de Registro de Marca No.  811798283

### NATURAL - (BR)

O Instituto Nacional da Propriedade Industrial, para garantia da propriedade
e do uso exclusivo , certifica que , nos termos das normas legais e
regularmente em vigor , efetuou a PRORROGAÇÃO do registro da marca acima
reproduzida, mediante as seguintes características e condições :

\* 3o.DECÊNIO \*

Especificação dos Produtos/Serviços :

Livros, álbuns, moldes de papel e impressos em geral.

Classe Produtos/Serviços :  16.20

Observações : Marca Nominativa.

PRORROGADA

Registro Anterior: Número  811798283

Prazo de Validade: 10(dez) anos a partir de 09/09/2006

Data da Concessão :   09/09/1986

Titular : CONSIST CONSULTORIA SISTEMAS E REPRESENTAÇÕES LTDA

CGC/CPF/No. INPI : 43211630000118

Endereço : AV DAS NAÇÕES UNIDAS 20727

     SÃO PAULO

     CEP : 04795-100  -  SP  -  BR

Rio de Janeiro, 22 de maio de 2007.

Diretor de Marcas

CONFIDENTIAL
CSS2-00003



REPÚBLICA FEDERATIVA DO BRASIL
Ministério do Desenvolvimento, da Indústria e do Comércio Exterior
Instituto Nacional da Propriedade Industrial

Certificado de Registro de Marca No.  811798291


NATURAL - (BR)


O Instituto Nacional da Propriedade Industrial, para garantia da propriedade
e do uso exclusivo , certifica que , nos termos das normas legais e
regularmente em vigor , efetuou a PRORROGAÇÃO do registro da marca acima
reproduzida, mediante as seguintes caracteristicas e condições :


* 3o.DECÊNIO *

Especificação dos Produtos/Serviços :

Serviços auxiliares ao comércio de mercadorias, inclusive à importação e à exportação.
Serviços de agenciamento, treinamento e fornecimento de mão-de-obra em geral. Serviços de
análise e processamento de dados.

Classe Produtos/Serviços :  40.15 e 25 e 34

Observações : Marca Nominativa.

PRORROGADA

Registro Anterior: Número  811798291

Prazo de Validade: 10(dez) anos a partir de 25/03/2006

Data da Concessão :  25/03/1986

Titular : CONSIST CONSULTORIA SISTEMAS E REPRESENTAÇÕES LTDA

CGC/CPF/No. INPI : 43211630000118

Endereço : AV DAS NAÇÕES UNIDAS 20727

     SÃO PAULO

     CEP : 04795-100  -  SP  -  BR


                    Rio de Janeiro, 22 de maio de 2007.


                    Diretor de Marcas

CONFIDENTIAL
CSS2-00004



REPÚBLICA FEDERATIVA DO BRASIL
Ministério do Desenvolvimento, da Indústria e do Comércio Exter
Instituto Nacional da Propriedade Industrial

Certificado de Registro de Marca No.  811798305

**NATURAL - (BR)**

O Instituto Nacional da Propriedade Industrial, para garantia da propriedade e do uso exclusivo , certifica que , nos termos das normas legais e regularmente em vigor , efetuou a PRORROGAÇÃO do registro da marca acima reproduzida, mediante as seguintes características e condições :

\* 3o.DECÊNIO \*

Especificação dos Produtos/Serviços :

Discos e fitas em geral. Aparelhos e instrumentos de reprodução, fotográficos, cinematográficos, óticos e de ensino. Máquinas de calcular, contar, registrar, escrever, grampear, computar e equipamentos periféricos.

Classe Produtos/Serviços :  09.40 e 45 e 55

Observações : Marca Nominativa.

PRORROGADA

Registro Anterior: Número . 811798305

Prazo de Validade: 10(dez) anos a partir de 25/03/2006

Data da Concessão :   25/03/1986

Titular : CONSIST CONSULTORIA SISTEMAS E REPRESENTAÇÕES LTDA

CGC/CPF/No. INPI : 43211630000118

Endereço : AV DAS NAÇÕES UNIDAS 20727

SÃO PAULO

CEP : 04795-100  -  SP  -  BR

Rio de Janeiro, 22 de maio de 2007.

Diretor de Marcas

CONFIDENTIAL
CSS2-00005

# EXHIBIT E

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒x

5

CONSIST SOFTWARE SOLUTIONS, INC.,

6

Plaintiff,

7

vs.

8

SOFTWARE AG, INC. and SOFTWARE AG

9

Defendant.

10

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒x

11

12            November 28, 2007

13            11:00 a.m.

14

15    H I G H L Y   C O N F I D E N T I A L

16        ATTORNEYS' EYES ONLY

17

18      Deposition of NATALIO S. FRIDMAN, held

19    at the offices of Baker & McKenzie, 1114

20    Avenue of the Americas, New York, New York

21    10036, before David Henry, a Certified

22    Shorthand Reporter and Notary Public of the

23    State of New York.

24

25

1

2    A P P E A R A N C E S:

3

4      DUANE MORRIS, LLP

5      Attorneys for Plaintiff

6         1540 Broadway

7         New York, New York 10036

8      BY:  HYMAN L. SCHAFFER, ESQ.

9

10     BAKER & McKENZIE, LLP

11     Attorneys for Defendants

12        1114 Avenue of the Americas

13        New York, New York 10036

14     BY:  JAMES DAVID JACOBS, ESQ.

15

16

17

18

19   ALSO PRESENT:

20      THOMAS DEVINE, Videographer

21

22

23

24

25

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    notice from you, I think, no? That this is

3    a company product, and you took off the

4    approval, you removed the approval, even

5    the contract didn't say you can do that,

6    but was not so important for us, so we said

7    suspend it, any sale of the product.

8        Q.   You understand that Adabas SQL

9    gateway provides the same functionality as

10   Attunity connect?

11       A.   Yes, and the connection between

12   Adabas and SQL. And we have a situation

13   that was another product of Software AG,

14   owned by Software AG did the function

15   before, okay? And afterwards the product

16   was discontinued and became a Special

17   Product, and according to the contract, the

18   report, something like that, they don't

19   have to pay because it was replacing from

20   before. But we have not replaced it yet.

21   The client have not replaced it, because we

22   have primary functionability of the

23   product, and the people trying to fix the

24   old system with the help of Software AG,

25   owned by Software AG product, to the

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    client.  But we have a lot of product like

3    that.  They say one day, the product Adabas

4    SQL will be fixed, will be able to do what

5    before we did with the product.

6        Q.  Is it correct to say that at the

7    present, Adabas, that Consist is having

8    difficulties getting Adabas SQL Gateway to

9    work?

10       A.  For that client.

11       Q.  For a client?

12       A.  A client.

13       Q.  And is it also correct --

14       A.  The client have the product from

15   before, that was hundred percent Software

16   AG.

17       Q.  And is it also correct to say

18   with respect to that client that Software

19   AG is attempting to help you solve the

20   problem?

21       A.  I think so.  Our technical people

22   work very close with Software AG technical

23   people in general, okay?  But a lot of

24   work.  As a matter of fact, before Software

25   AG making the deal with our company, that

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    owns the product called Adabas SQL, no?

3    They were thinking with Attunity people,

4    and was putting both together in touch, but

5    Attunity didn't accept the conditions for

6    them, and no deal. So too the other one.

7    That's all. I want to help always.

8        Q. I will hand the witness another

9    exhibit which was marked Exhibit 59 during

10    the prior deposition. I ask you to look at

11    the last paragraph on page 59, I mean

12    Exhibit 59, on the first page. Let me

13    rephrase it.

14        Please direct your attention to

15    the last paragraph on the first page of

16    Exhibit 59.

17        A. On the first page, I'm sorry.

18    Yes.

19        Q. Has Consist registered with the

20    Brazilian government the trademark Adabas?

21        A. Yes, I think so.

22        Q. And has Consist registered with

23    the Brazilian government the trademark

24    Natural?

25        A. I think so.

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2        Q.  Has Consist registered the

3    trademark Adabas?

4        A.  I think so.  I think from

5    somewhere.

6        Q.  Has Consist registered the

7    trademark Adabas with any country other

8    than Brazil?

9        A.  I don't recall it.

10       Q.  Okay.

11       A.  Maybe Uruguay, I don't know.  Let

12   me explain why we registered the name.

13       Q.  Go ahead.  Why don't you go ahead

14   and explain why Consist registered the

15   names Adabas and Natural.

16       A.  Software AG never was interested

17   in any registration.  But we knew that we

18   cannot use the name Adabas, if some pirate

19   over there uses Adabas for something else.

20   So you cannot register the copyright in

21   somebody's name, and Software AG was not

22   interested in doing, in spending any money

23   on that, so we did it to protect our

24   market, our market in the territory.  So I

25   would like – I checked after maybe

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    Software AG reached other names, I don't

3    know, but this at the beginning was very,

4    very important to register the name.

5        Q.  When did the register the name?

6        A.  I don't recall it.

7        Q.  Would you deny that it was in

8    1986?

9        A.  Could be.  I don't deny it.

10       Q.  Now, 1986 was not at the

11   beginning of your relationship?

12       A.  No.

13       Q.  For what reason did you do it in

14   1986?

15       A.  Because 1986, the first client we

16   have in 1975, more clients 1976, three more

17   clients, when the name became more popular,

18   okay, we find the reason to do it, you

19   know.  Even though Consist were not

20   registered in the beginning, a copyright

21   name.  And Software AG was not interested,

22   and I think still are not interested in

23   protecting the copyright.  I asked our

24   people to check it, and some product don't

25   have copy protection.  Maybe also to use a

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    name of a product, have to be registered

3    the name, and we register.  At that time

4    the government was very anti-foreign, okay,

5    and we register the name, okay?

6        Q.  Do you have any objection as you

7    sit here today of assigning those marks to

8    Software AG?

9        MR. SCHAFFER:    Objection.

10    Calls for speculation.

11        MR. JACOBS:    No, I'm asking if

12    he has any objection today.  But your

13    objection is noted.

14        MR. SCHAFFER:    And it has no

15    relevance.

16        MR. JACOBS:    Well, that's

17    another issue.

18        A.  I don't know, I have to check

19    with my counsel what implication there is.

20        Q.  Is it your understanding that the

21    name Natural belongs to Software AG?

22        MR. SCHAFFER:    Objection.

23        A.  In each country, to the one that

24    register the name, I don't know.  In

25    Brazil, we are the exclusive distributors

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    in the country, we own the name.

3        Q.  But is it your understanding that

4    Software AG is the owner of the name Adabas

5    in Brazil?

6        A.  We register, I think.  Who

7    register it?

8        Q.  Consist, is our understanding.

9        A.  Yes.  The propriety of the

10    product is by Software AG.  Consist

11    registered the name for its own protection

12    against local pirating, you know, and

13    because of required of the government to

14    have it registered.  So we did it.

15        Q.  Did you tell Software AG that you

16    registered --

17        A.  I'm sure we talk about, yeah,

18    Mr. Schnell, yeah.

19        Q.  Do you recall when you told

20    Mr. Schnell?

21        A.  Do you recall what you were doing

22    in 1986?  Come on.  I'm sure that I check

23    with him.  I don't know if in 86 we have a

24    conversation with him, yes, in 86 we have a

25    very fluid conversation with him, before 82

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    was not fluid, but after 83, 84, it was

3    fluid, so I'm sure, I'm sure.

4        Q.  Why are you sure?

5        A.  Because we have a fluid

6    conversation with him.  As a matter of fact

7    for example, one day the old man said they

8    don't want more foreign software.  We have

9    to have software for local made computers.

10   So I asked permission to maybe modify a

11   contract, the product, you know, if he

12   agree with me, and afterwards the

13   government changed things and was free, you

14   know.  But my point, we would lose all the

15   clients at the time already because

16   competitors already committed to do it,

17   okay?  And we committed also, because of

18   Software AG of North America, independent

19   company at the time, have bought a product,

20   have bought a product that, we call it

21   Adabas AM, like meaning, and they will give

22   you the sources, but in the meantime things

23   have changed in Brazil.

24       Q.  Is it correct to say that you

25   asked Software AG to register the mark

1      Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2      Adabas?

3          A.  Of course.

4          Q.  And Software AG refused?

5          A.  They said you do it, something

6      like that, you do it.  We have to do it, is

7      our territory, you do it.

8          Q.  If and when, as you see it today,

9      that you have a duty to assign the

10     registration for the mark Adabas back to

11     Software AG when your distributorship ends?

12         MR. SCHAFFER:    Objection.

13         A.  I never considered that.

14         Q.  Do you have a -- do you consider

15     that you have to reassign the registration

16     for the mark Natural back to --

17         A.  The same thing as before.

18         Q.  Give me a chance to ask the

19     question so I can put it on the record.

20         A.  I'm sorry.

21         Q.  Do you consider that as you sit

22     here today, that you have an obligation to

23     assign the mark Natural back to Software AG

24     when your distributorship ends?

25         MR. SCHAFFER:    Objection.

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2        A.  I said that?

3        Q.  No, that's a question.

4        A.  I don't know.  I don't know.  I

5    have to check with counsel, I have to

6    check.  I never thought about that because

7    my counsel was Evergreen, is Evergreen.

8        Q.  Have you ever, and I mean

9    Consist, has Consist ever told its

10   customers that the 98 agreement has been

11   renewed for five years?

12       A.  Only after the -- I didn't want

13   to, you know that, I told before, I didn't

14   want to get in conflict with Software AG

15   when they officially formalize that they

16   want to get rid of us, so I told the

17   company that when they are negotiating or

18   discussing, I never wanted to, but our

19   contract, I taught them always, we are,

20   according to our -- to us, the contract had

21   been renewed automatically.

22       Q.  The question, Mr. Fridman --

23       A.  According to them, Software AG,

24   the contract have been finished December

25   31, 2007.

1    Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2        Q.   I move to strike the answer. The

3    question was have you ever told customers,

4    not Software AG, have you ever told

5    customers that the 98 agreement was renewed

6    for five years?

7        A.   I told all my people, and they

8    told the customers, I'm sure.

9        Q.   And when did you tell your

10   people?

11       A.   When negotiations were not going

12   so well maybe, no, let me explain you. We

13   have a problem, I told them, for us the

14   contract would be automatically renewed for

15   five years. For Software AG the contract,

16   they have given the notice of no renewal,

17   so who is going to decide who is right? It

18   will be the court. But we try to avoid the

19   court, I told them. We tried to negotiate

20   not to go to court because it will affect

21   our market, okay? And we tried to

22   negotiate. And then we didn't come to an

23   agreement, so we went to court. But this

24   is work that, you know, I repeat what I

25   said to the people in the auditorium more

# EXHIBIT F

James David Jacobs
Frank M. Gasparo
Marcella Ballard
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036

Attorneys for Plaintiffs
Software AG, Inc. and Software AG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOFTWARE AG, INC. and SOFTWARE AG,<br><br>                              Plaintiffs,<br><br>          -against-<br><br>CONSIST SOFTWARE SOLUTIONS, INC. f/k/a CONSIST INTERNATIONAL, INC. and NATALIO FRIDMAN,<br><br>                              Defendants. | Case No. 08 CV 00389 (CM) (FM)<br><br><br>RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS |

## **GENERAL OBJECTION**

Plaintiffs Software AG, Inc. and Software AG (together "Software AG") object to

the document requests as a whole because Software AG only received Defendants' First

Request for the Production of Documents at 10:07 pm on Thursday, January 17, 2008 and

are being requested to collect and produce documents located in three continents over the

course of one working day and a United States holiday weekend (on or before Sunday,

January 20, 2008).

Software AG further objects to each and every request to the extent they seek documents protected by attorney-client, work product or other applicable privileges and protections.

## INSTRUCTIONS

1.    Respondents object to the Instructions to the extent they seek to impose burdens greater than those imposed by the Federal Rules.

## DOCUMENTS TO BE PRODUCED

1.    All documents concerning the basis for the claims alleged in the Complaint.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.  Software AG will produce responsive, non-privileged documents it intends to rely on at the preliminary injunction hearing and if necessary will supplement that production if additional documents exist and are located prior to the hearing.

2.    All documents concerning the Agreement, including but not limited to Paragraphs 2, 3 and 4 thereof.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.  To the extent this request seeks information relating to "the right to grant perpetual or time-limited licenses, and/or maintenance agreements," Software AG will produce responsive, non-privileged documents it intends to rely on at

2

the preliminary injunction hearing and if necessary will supplement that production if additional documents exist and are located prior to the hearing.

3.    All documents concerning the intended meaning of Paragraph 3 of the Agreement.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance. To the extent this request seeks information relating to "the right to grant perpetual or time-limited licenses, and/or maintenance agreements," Software AG will produce responsive, non-privileged documents it intends to rely on at the preliminary injunction hearing and if necessary will supplement that production if additional documents exist and are located prior to the hearing.

4.    All documents concerning any communications between SOFTWARE AG and CONSIST concerning Paragraph 3 of the Agreement.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance. To the extent this request seeks information relating to "the right to grant perpetual or time-limited licenses, and/or maintenance agreements," Software AG will produce responsive, non-privileged documents it intends to rely on at the preliminary injunction hearing and if necessary will supplement that production if additional documents exist and are located prior to the hearing.

5.    All documents concerning any communications between SOFTWARE AG and CONSIST regarding CONSIST's right to grant perpetual or time-limited licenses under the Agreement.

3

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG specifically incorporates into its production all documents produced in the prior litigation. Software AG will supplement that production if additional documents exist and are located prior to the hearing.

6.    All documents concerning any communications between SOFTWARE AG and CONSIST regarding CONSIST's right to grant perpetual or time-limited maintenance agreements under the Agreement.

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG specifically incorporates into its production all documents produced in the prior litigation. Software AG will supplement that production if additional documents exist and are located prior to the hearing.

7.    All documents concerning any communications between or among SOFTWARE AG and any other third party regarding Paragraph 3 of the Agreement.

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG specifically incorporates into its production all documents produced in the prior litigation. Software AG will supplement that production if additional documents exist and are located prior to the hearing.

8.    All documents concerning any communications between or among SOFTWARE AG and any other third party regarding CONSIST's right to grant perpetual or time-limited licenses under the Agreement.

4

RESPONSE:

Software AG will produce responsive, non-privileged documents. Software AG specifically incorporates into its production all documents produced in the prior litigation. Software AG will supplement that production if additional documents exist and are located prior to the hearing.

9.    All documents concerning any communications between or among SOFTWARE AG and any other third party regarding CONSIST's right to grant perpetual or time-limited maintenance agreements under the Agreement.

RESPONSE:

Software AG will produce responsive, non-privileged documents. Software AG specifically incorporates into its production all documents produced in the prior litigation. Software AG will supplement that production if additional documents exist and are located prior to the hearing.

10.    All documents concerning any communications between SOFTWARE AG and CONSIST regarding Paragraphs 2 or 4 of the Agreement.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance. Software AG will produce responsive, non-privileged documents it intends to rely on at the preliminary injunction hearing and if necessary will supplement that production if additional documents exist and are located prior to the hearing.

11.    All documents concerning the allegation in Paragraph 28 of the Complaint that "Defendants have made several representations through the Consist website and to

5

customers concerning the status of the Agreement, the Court case, [and] the position of

Consist now that the Agreement has expired and Consist's supposed continuing rights

under the Agreement to provide 'Software Maintenance Agreements' to end-users of

SAG Software Products."

RESPONSE:

Software AG will produce responsive, non-privileged documents. Software AG

will supplement that production if additional documents exist and are located prior to the

hearing.

12.    All documents concerning any subsequent representations made by

CONSIST through its website or otherwise regarding the allegations referenced in

Paragraph 28 of the Complaint.

RESPONSE:

Software AG will produce responsive, non-privileged documents. Software AG

will supplement that production if additional documents exist and are located prior to the

hearing.

13.    All documents concerning the allegation in Paragraph 45 of the Complaint

that "[s]ince Consist no longer has the right to grant updates, it is not true that 'updates

granted by Consist...shall remain unaffected' after The First Litigation."

RESPONSE:

Software AG will produce responsive, non-privileged documents. Software AG

will supplement that production if additional documents exist and are located prior to the

hearing.

6

14.    All documents concerning the allegation in Paragraph 84 of the Complaint that "Defendants have issued statements in violation of Section 43(a) of the Lanham Act. . . that are literally and demonstrably false."

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG will supplement that production if additional documents exist and are located prior to the hearing.

15.    All documents concerning the allegation in Paragraph 86 of the Complaint that "Defendants' false and misleading representations . . . have a substantial effect on U.S. commerce."

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG will supplement that production if additional documents exist and are located prior to the hearing.

16.    All documents concerning the allegation in Paragraph 91 of the Complaint that "Defendants have interfered with prospective business relations between Plaintiffs and PRODESP and other unknown parties by dishonest, unfair or improper means."

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG will supplement that production if additional documents exist and are located prior to the hearing.

7

17.    All documents concerning the allegation in Paragraph 109 of the Complaint that "[t]he public interest in New York is affected by Defendants' false and deceptive statements."

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG will supplement that production if additional documents exist and are located prior to the hearing.

18.    All documents, regardless of when generated or created, concerning all of the allegations in Count VI of the Complaint.

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG specifically incorporates into its production all documents produced in the prior litigation. Software AG will supplement that production if additional documents exist and are located prior to the hearing.

19.    All documents, regardless of when generated or created, concerning SOFTWARE AG's claimed ownership of, right to, pursuit of or maintenance of any intellectual property in the Territory, including but not limited to the trademarks ADABAS and NATURAL.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.  Software AG will produce responsive, non-privileged documents it intends to rely on at the preliminary injunction hearing and if necessary will

8

supplement that production if additional documents exist and are located prior to the hearing.

20.    All documents, regardless of when generated or created, concerning SOFTWARE AG's knowledge of CONSIST's use of any intellectual property in the Territory.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.  Software AG will produce responsive, non-privileged documents it intends to rely on at the preliminary injunction hearing and if necessary will supplement that production if additional documents exist and are located prior to the hearing.

21.    All documents, regardless of when generated or created, concerning all trademark searches, clearances or other inquiries conducted by or on behalf of SOFTWARE AG regarding the Territory.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.

22.    All documents, regardless of when generated or created, concerning any trademark applications, filed by SOFTWARE AG in the Territory.

RESPONSE:

After a diligent search, Software AG was unable to locate any responsive, non-privilege documents.

23.    All documents, regardless of when generated or created, concerning any market research or surveys conducted by SOFTWARE AG regarding any intellectual property rights at issue in this lawsuit in the United States or in the Territory.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.

24.    All documents, regardless of when generated or created, concerning any communications between SOFTWARE AG and CONSIST regarding the intellectual property of CONSIST or SOFTWARE AG in the Territory.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.  Software AG will produce responsive, non-privileged documents it intends to rely on at the preliminary injunction hearing and if necessary will supplement that production if additional documents exist and are located prior to the hearing.

25.    All documents, regardless of when generated or created, concerning SOFTWARE AG's enforcement of its alleged rights to use the trademarks ADABAS and NATURAL in the Territory, including but not limited to any cease and desist letters sent, lawsuits filed, opposition proceedings, and cancellation actions.

RESPONSE:

Software AG objects to this request on the grounds of overbreadth, vagueness, undue burden and relevance.

10

26.    All documents, regardless of when generated or created, concerning the manner in which SOFTWARE AG first became aware of CONSIST's intellectual property rights in the Territory.

RESPONSE:

Software AG will produce responsive, non-privileged documents.  Software AG specifically incorporates into its production all documents produced in the prior litigation. Software AG will supplement that production if additional documents exist and are located prior to the hearing.

Dated: New York, New York
January 20, 2008

Respectfully submitted,


_____/s/ Frank M. Gasparo_____

James David Jacobs
Frank M. Gasparo
Marcella Ballard
BAKER & MCKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 626-4100 (Telephone)
(212) 310-1600 (Facsimile)

ATTORNEYS FOR PLAINTIFFS
Software AG, Inc. and Software AG

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the 20th day of January 2008, I served the foregoing "Objections to Defendants' First Request for the Production of Documents" by emailing a copy to Defendants' attorneys of record as follows:

Hyman L. Schaffer
Fran M. Jacobs
Gregory P. Gulia
Brian Damiano
DUANE MORRIS LLP
1540 Broadway
New York, NY 10036

___/s/ Frank M. Gasparo__

12

**EXHIBIT G**



🖨 Imprimir

18 de Janeiro de 2008

# Notícias

### CONSIST ESCLARECE Nro. 1 (CORRIGIDO)

**Compromissos da CONSIST**

Como provavelmente seja de conhecimento de V.Sa., foi encerrado na primeira instância o processo judicial que tramitou na Corte de Nova York - Estados Unidos, a qual interpretou que o contrato assinado entre CONSIST e Software AG Americas (SAGA), referente à distribuição exclusiva dos softwares da SAGA pela CONSIST, se daria por rescindido em 31/12/2007, após 33 anos de relacionamento entre as partes.

Como a CONSIST está convicta de que essa interpretação está equivocada, a CONSIST entrou com recurso judicial de segunda instância nos Estados Unidos perante o Tribunal de Apelações, na expectativa de reverter esse entendimento, visando dar assim continuidade à relação de mais de 33 anos de sucesso.

O contrato em questão assinado entre a CONSIST e a Software AG foi redigido em 1997 pelo Assessor Jurídico da SAGA, e assinado pelo mesmo na qualidade de Vice Presidente Internacional da SAGA naquela ocasião. Na sua trajetória como advogado, ele já havia elaborado mais de 500 contratos, o que avaliza sua larga experiência na matéria.

O referido contrato indica que o mesmo poderá ser rescindido por qualquer uma das partes, mediante notificação prévia não inferior a 18 meses. O contrato também estabelece que, em caso de rescisão, a parte rescindente deverá notificar por escrito a outra parte detalhando quais condições fundamentais do contrato a outra parte não executou. Esta, por sua vez, tem um prazo de 60 dias para cumprir as obrigações não atendidas, antes de lhe ser aplicada qualquer penalidade.

De fato, a SAGA comunicou a CONSIST a intenção de rescindir o contrato; porém, não apontou nenhuma condição contratual não cumprida pela CONSIST. Não obstante a cláusula contratual que exige a parte rescindente dê a oportunidade a outra parte de sanar a quebra de cláusula contratual, a Corte de primeira instância interpretou que tal requerimento não se aplica à cláusula que trata da notificação prévia de 18 meses.

A Corte da primeira instância e os demais participantes das audiências constataram, todavia, que a CONSIST queria na verdade que o contrato fosse perpétuo ou, alternativamente, por um prazo bastante extenso. Ademais, sabiam que a CONSIST não teve, em momento algum, a intenção de rescindir o contrato. Apesar disto, a SAGA admitiu que houve uma fundamental e inexplicável alteração de última hora no texto da referida cláusula contratual, somente porque a CONSIST queria ter os mesmos direitos da SAGA para rescindir o contrato por eventual inadimplência da contra-parte, após 60 dias sem ter regularizado a inadimplência oportunamente notificada.

A CONSIST acredita que a decisão da Corte com relação ao término do contrato foi equivocada, e também que ignorou alguns pontos fundamentais do contrato.

Assim, a CONSIST está convicta que pode e deve fazer valer seus direitos, com o objetivo de manter a continuidade do contrato de distribuição exclusiva dos softwares da Software AG.

Agradecemos o apoio e a confiança que sempre temos de nossos clientes.

**Natalio S. Fridman**
*Presidente*
Grupo CONSIST do Brasil
natalio.fridman@consist.com.br

## CONSIST CLARIFICATIONS No. 1  ( Corrected)

As you may know, the judicial proceeding that was filed in the NY Court in the United States has been extinguished in the first instance.  The court decided that the exclusive Software Distributorship Agreement between CONSIST and Software AG Americas (SAGA) was to be terminated in December 31, 2007, after 33 years of relationship between the parties.

Because CONSIST vehemently believes that such court interpretation of the agreement is mistaken, CONSIST filed an appeal in the second instance before the Court of Appeals the United States. CONSIST hopes and expects to reverse the judgment and therefore be able to give continuance to this successful relationship of over 33 years.

The agreement signed between CONSIST and Software AG and that is the subject of the above-mentioned litigation was drafted in 1997 by SAGA's legal consultant and signed by the same person, as SAGA's International Vice-President at the time.  Over the years as an attorney, he had already drafted over 500 agreements, which reassures his large experience with the subject.

Such agreement states that it may be terminated by any of the parties, upon 18 months notice. The agreement also establishes, in the case of termination, the terminating party must notify by writing the other party, stating in details what substantial part of the agreement was not performed.  The other party has 60 days to cure the alleged breach, before any other penalties may apply.

It is true, SAGA communicated CONSIST of its intention to terminate the agreement; however SAGA did not state any breach by CONSIST.  Despite of such contractual requirement, the Court understood that such requirement was not necessary under the 18 months notice.

The District Court and the other hearing participants understood that CONSIST wanted to have a perpetual agreement or, in the alternative, a long-term agreement. They knew that CONSIST had no intentions of terminating the agreement. However, SAGA admitted that many inexplicable and substantial alterations were made to the agreement, pointing that CONSIST would want to have the same termination rights for breach of the agreement as SAGA; and giving CONSIST the same 60 day notice of termination for breach of the agreement, if such breach would not be cured.

CONSIST believes that the court interpretations of the agreement are mistaken and that the court ignored some fundamental points of the agreement.

Therefore, CONSIST is convinced to its rights to maintain the exclusive software distributorship agreement with Software AG.

Thank you for your support and trust.

Natalio Friedman.

2

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONSIST SOFTWARE SOLUTIONS,
INC. f/k/a CONSIST INTERNATIONAL,
INC.,

                Plaintiff,

      -against-

SOFTWARE AG, INC. and SOFTWARE
AG,

                Defendants.

Case No. 07-cv-7047 (CM)(FM)

DEFENDANTS' SOFTWARE AG, INC. AND
SOFTWARE AG'S EXPERT REPORT OF
DAVID A. MacSWAIN

1.    **Engagement**

I have been retained by Baker & McKenzie LLP in connection with the lawsuit "Consist Software Solutions, Inc. f/k/a Consist International, Inc. against Software AG, Inc. and Software AG", Case No. 07-7047 (CM) (FM) to review certain documents and materials in anticipation of offering testimony and opinions in this case.

I anticipate being called as an expert witness to opine on five issues: (1) standard industry practices in software distribution agreements; (2) the market for Special Products throughout the Territory from 1998 until present; (3) whether Attunity Connect is competitive to SAGA's products; (4) brand confusion in the Territory; and (5) life after the Distribution Agreement for SAGA and Consist.

I am intimately familiar with Software AG's systems (*i.e.*, ADABAS and NATURAL) and the third party Special Products at issue in this case. Adabas is Software AG's database management system and Natural is its proprietary programming language. Special Products are third party products that when sold require Software AG to pay royalties to those third parties.

2.    **Qualifications**

My professional career since 1972 has been in the computer industry focusing on database technology and associated software applications. I have experience in providing sales, marketing, and software development services to customers in industries such as financial services, government, higher education, and manufacturing. Since 1985 I have worked on worldwide product and market requirements in the area of legacy database technology. My job duties included designing, developing, and bringing to market many successful software industry products. In this capacity I have conducted and sponsored more than 100 studies and analyses of the legacy database market.

1

I have worked with all the major legacy database vendors at the technical, sales and marketing levels. Since 1985, I have initiated, supervised and been a party to many worldwide software partnership and distribution agreements involving my companies' products as well as products sold either with a partner's brand name or under a "private label". My experience includes both exclusive and non-exclusive software distribution agreements. I am familiar with the revenue streams included in these agreements including royalty structures, pre-payments and other forms of revenue sharing and revenue distribution.

In 2003, I founded and operated Zulu Software Inc. ("Zulu") where I focused on assisting clients with the automatic conversion of Software AG's Natural/Adabas systems to the Java/Oracle platform. Our target market was North America, Brazil and Venezuela. We conducted intensive market research in the South American territory in order to identify the customer base and visited many database customers in Brazil and Venezuela. In this capacity we ran numerous customer seminars in this territory and partnered with Oracle's South American operations.

My qualifications, background and experience are further outlined on my *curriculum vitae* attached hereto as Exhibit A.

**3.** **Publications Authored Within Preceding Ten Years**

I recall authoring and co-authoring some case studies in trade and industry publications in the late 1990s. I have attempted to locate copies of these publications, but have been unsuccessful.

**4.** **Other Cases In Which I Have Testified At Trial Or By Deposition Within The Preceding Four Years**

None.

**5.** **Documents Reviewed In Forming My Opinions**

   a) Distribution Agreement between Software AG Americas, Inc. and Consist International, Inc. effective January 1, 1998 (Exh. B hereto).
   b) Updated Annex B to the Distribution Agreement (Exh. C hereto).
   c) Transcript of Natalio S. Fridman deposition on November 5, 2007 (not attached because confidential).
   d) Exhibit 6 from Mr. Fridman deposition (Exh. D hereto).
   e) Consist websites (www.consist.com, www.consist.com.br, www.e-consist.com, www.printfos.com, www.maxdata.com).
   f) Internet publication entitled "Consist Solutions and Services" (Exh. E hereto).
   g) Attunity website (www.attunity.com) and Attunity Connect product datasheet (Exh. F hereto).
   h) Software AG websites (www.softwareag.com and www.softwareagusa.com).

2



    i)   Adabas SQL Gateway product datasheet
        (http://www.softwareag.com/Corporate/products/adabas/sql/default.asp) (Exh. G
        hereto).

    j)   CONNX product datasheet (http://www.connx.com/products/adabas.html) (Exh. H
        hereto).

**6.**    <u>**Opinion**</u>

<u>*Overview of Database Industry*</u>

The software industry is best represented as a multi-layered stack or cake:

| LAYER 5 | packaged applications | customized applications | integration software (middleware) |
|---------|-----------------------|-------------------------|-----------------------------------|
| **LAYER 4** | programming language | | |
| **LAYER 3** | database technology | | |
| **LAYER 2** | operating system | | |
| **LAYER 1** | hardware | | |

Layer 1 is hardware which is essentially a "box" of physical computer components. For example, hardware includes integrated circuits and memory.

Layer 2 is the operating system layer which is the overall software management facility for the hardware. The operating system layer is an interface to the hardware which governs how the hardware is used. Microsoft Windows® is an example of an operating system.

Layer 3 is a database technology layer which is a datastore that enables data storage and management. For example, database technology operates as a repository for storing legal documents and providing a user access and retrieval capabilities to those documents.

Layer 4 is the programming language which is expressed as a collection of formulas and algorithms that allow the user to store and manipulate data in a database. There are many programming languages being used in the world today such as Basic, Fortran, C++, JAVA, Cobol and Natural.

Layer 5 is the application layer which is comprised of three sub layers –
(i) packaged applications, (ii) customized applications, and (iii) integration software:

    (i) <u>Packaged applications</u> are standard products that are widely available and typically referred to by the industry as COTS ("Commercial Off The Shelf"). The Google® search engine or Quicken® is considered a packaged application.

    (ii) <u>Customized applications</u> are typically "one off" applications. For example, a software engineer could write a custom application for searching

3



and sorting legal documents stored in a database that fits the needs of an individual entity. This Court's electronic filing system is such a custom application.

(iii) Integration software is the "glue" that sticks applications together. Integration software is designed to couple multiple applications, either packaged applications or customized applications, together in a way that they can communicate such as by sharing data and transactions. For example, integration software could enable communication between a billing application and a database storage application to monitor the use of stored legal documents and based on that usage generate and distribute an invoice to the user as is done by the Lexis® legal service.

The software industry also refers to certain types of software as a "tools application". A tool is software technology with which a software engineer designs and constructs packaged or customized applications. For example, a compiler that translates source into object code is a tool.

Software AG is a database vendor who provides database management systems (known as Adabas) and programming tools, including a compiler for its proprietary programming language known as Natural, and integration software. Examples of Software AG's integration software are EntireX and CrossVision. Each of Software AG's products are intended for customers and partners that design and construct packaged applications and customized applications. Software AG thus operates in Layers 3 and 4 of the multi-layered stack.

Database technology can be broken down into relational databases and non-relational databases. Non-relational databases are often referred to in the software industry as legacy technology. Adabas is non-relational legacy technology. Example of vendors that sell relational databases include Oracle, Microsoft and IBM. Depending on the hardware used by the customer, legacy databases may be superior to relational databases because they offer greater speed and efficiencies. Mission critical applications tend to run on Adabas and other legacy databases as opposed to relational databases. For certain large volume customers, legacy databases may be the only viable business option.

The main players in the database industry, e.g., Software AG, Oracle, IBM and Microsoft, develop, sell and service products in one or more of the five layers to varying degrees. Many well-established companies have business restricted to the development and distribution of packaged applications or alternatively database technology. There is a major exception to the rule and that exception is Oracle. Oracle's business is quite diverse and comprises an amalgam of the third, fourth and fifth layers of the multi-layered stack.

SAP, which is an ISV ("Independent Software Vendor"), develops and sells packaged applications, but does not develop and sell databases and a programming language. That means SAP is not a database or programming language vendor. Software AG's business, on the other hand, is essentially an inverse of SAP's business –developing and selling its

4



legacy database (Adabas) and proprietary programming language (Natural). Software AG does not develop or sell packaged software applications for the most part.

SAP's packaged application products work with third party database management systems and the Oracle database is the most popular selection based on market share. Oracle also sells packaged application products that compete directly with SAP packaged application products. Oracle and SAP thus coexist in the marketplace, although at times they compete. This is sometimes referred to in the industry as "coopetition".

This five-layer database industry breakdown is equally applicable throughout the world, including Brazil and the United States. The database industry almost uniformly recognizes, and has for the last 30 years, that separating the database platform business from the application business is mutually beneficial to the respective companies. By separating these two parts, database vendors do not compete with the ISVs that develop and sell packaged and customized applications that use the database vendors' software, and thus encourage the ISV to develop applications for the vendors' databases.

### *The Software AG/Consist Distribution Agreement*

I have reviewed the Distribution Agreement between Software AG Americas, Inc. ("SAGA") and Consist International, Inc. ("Consist") effective January 1, 1998 and attached as Exhibit B ("Agreement"). The Agreement includes Annex A and Annex B. Annex A references certain software products of SAGA, including Bolero and Odyssey, ("SAGA Products") and Annex B sets forth certain products for which SAGA pays royalties to third parties ("Special Products"). My understanding is that Consist has exclusive distribution rights to the SAGA Products and Special Products in Argentina, Brazil, Chile, Bolivia, Paraguay, Uruguay and Peru ("Territory"). Annex B of the Agreement lists two Special Products –Esperant and Passport. My understanding, however, is that Annex B was updated during the term of the Agreement. I have reviewed the updated Annex B which is attached as Exhibit C.

### *Standard Industry Terms*

The Agreement is an exclusive distribution agreement in the Territory. I understand that Consist's interpretation of this Agreement effectively causes the term to be perpetual. A distribution agreement that is perpetual as Consist is proposing is unknown in the software industry. The industry practice in any distribution relationship is to have both (1) an expiration of the Term with the ability to provide notice to the other party by a date certain of the intent not to renew, and (2) the right to terminate the relationship for cause at any time during the Term.

It is standard software industry practice to treat (1) and (2) as separate and distinct reasons to exit a relationship. My understanding is that Consist's position is that the above reasons for termination do not exist separately in the Agreement, but rather must be read together – SAGA can only terminate the relationship if on the 18 month date there is also a breach by Consist. This is contrary to standard industry practice. In my 35 years in the software

5  

business, I have never seen an agreement that does not treat (1) and (2) above as separate and distinct reasons to exit a relationship.

I believe the Agreement would not be considered perpetual pursuant to standard industry practices for the following additional reasons.

In my experience it is very unlikely that SAGA, a sophisticated database vendor, would choose to enter into a perpetual agreement and not leave itself a way out of the relationship after a discrete term. Exclusive distributorship agreements typically set forth that the manufacturer is paid the greater of an annual flat fee or the actual annual total license revenue which is a performance-based metric giving the manufacturer an upside if the distributor performs better than expected. In the Agreement SAGA has no such upside. It is highly unusual to grant a distributor exclusive rights in a territory with the financial arrangement set forth in the Agreement, that is, payment of an annual flat fee for licensing, maintenance and other rights. Generally, the industry favors non-exclusive relationships because a manufacturer wants to have as many companies as possible distributing its products.

Critically, at the time that this Agreement was being negotiated, SAGA was in the process of executing an initial public offering on the New York Stock Exchange. In my experience, when an IPO is in the works, a company is highly motivated to obtain a long term distribution contract with a predictable, sizable annual revenue stream. The fixed revenue stream would drop right to SAGA's bottom line and therefore have a very favorable impact on the IPO process. However, for the long term financial growth of the business, SAGA would want to more fully recognize the revenue its software generated in the Territory and thus revert to a standard performance based metric. Accordingly, SAGA would for this reason insist on a fixed term license agreement.

I am also experienced with the level of involvement in an IPO by sophisticated business people including investment bankers. With IPO's the investment bankers typically closely review every contract prior to the initial public offering. It would be highly unusual for these sophisticated bankers to sign off on a "perpetual" distribution agreement because of the financial penalty over the long term to SAGA, the company seeking the IPO.

Finally, the Agreement includes an 18 month notice period to exit the relationship. Based on my experience, a 12 month notice period is more typical for an enterprise software distributorship; an 18 month period is a very generous time period. This long exit period leads me to conclude that the parties contemplated ceasing the relationship at some point. It is standard industry practice to allow an "exit period" so that the distributor (here, Consist) has sufficient time to develop alternate business strategies and resolve any pending deals.

### *"All Reasonable Efforts" in the Territory*

It is typical for a distributor to get rights in multiple countries if those countries have similarities in language, culture, market size and proximity. I am therefore not surprised to

6



see the seven countries comprising the Territory to have been grouped together under the Agreement.

It is customary in the industry that an exclusive distributor must use its best efforts to distribute that database technology throughout the entire territory. When "best efforts" are required, it is standard for the exclusive distributor to have a country-specific plan for each country within the defined territory that it has exclusive rights. The manufacturer would expect nothing less, as the exclusive distributor was entrusted with developing, expanding and otherwise exploiting the technology in those countries.

It would be contrary to industry practice for Consist to be allowed to "cherry pick" which countries to focus on and which countries to neglect. Based upon the deposition testimony of Consist's President Mr. Fridman, Consist has effectively blocked SAGA from the Paraguay, Uruguay and Peru markets, as only Consist has the right to do business in those markets both as a database reseller and an application vendor.

### Market Demand for Special Products Inside the Territory

The list of Special Products includes a number of products and product families. The majority of these Special Products are integration software and programming tools. For example, one such integration software product listed in Annex B is EntireX XML Adapter which has a product family of thirty three different interface options. Indeed, I am quite familiar with many of these products and product families based on my expertise.

I refer to Mr. Fridman's testimony at page 45, lines 13-15 and page 31, lines 9-22 of his deposition. Special Products are clearly relevant to his customers because they are value added enhancements to the core Software AG database platform (Natural/Adabas).

I am not only familiar with the functionality of many of the Special Products, but I have expertise with the sales and marketing of some of the Special Products and similar products and the effort and expense that needs to be undertaken to successfully penetrate the marketplace. My sales and marketing expertise extends inside and outside the Territory. As the former VP of worldwide product marketing at Software AG I was aware and responsive to global market requirements and routinely rolled out products, including Special Products, throughout the world, including the very same countries in Consist's Territory. I was never made aware of any territory-specific requirements from the Consist Territory that would prevent them from being viable products within that Territory. At the very least, Consist should have been pushing the Special Products to its current customer base in the Territory given the brand loyalty and the complimentary nature of these add-on products. In addition to working the existing customer base, a second strategy would be to use this product set to gain new customers throughout the Territory. I have no reason to believe that Consist would not have been successful with these endeavors.

The Special Products are considered "horizontal products" by the software industry and used by large enterprises that have in excess of $100M in annual revenue, *i.e.*, they are not vertical products or industry specific products. The fact that these Products are not industry

7 

specific products provides an unlimited customer base that extends throughout all industries ranging from government to financial services institutions. These are additional reasons why Consist could have successfully marketed at least some of these Special Products in each and every one of the seven countries comprising the Territory.

Consist apparently maximized its income from its packaged and customized application business at the expense of marketing Software AG products. Consist may not have invested in rolling out Special Products in certain countries in order to save Consist the cost of doing that work. I refer to Mr. Fridman's testimony at pages 209, line 22 – 210, line 17. As explained above, what is good for Consist is not necessarily good for SAGA.

In sum, although the market demand for Special Products may vary from one country to another within Consist's Territory, there would be with appropriate marketing and promotion, a reasonable demand for at least some of these Special Products throughout the Territory since 1998.

### *Competitive Products*

Not surprisingly, there are various third party products that compete with SAGA Products and Special Products. One such product is Attunity Connect which is offered by Attunity Ltd. I understand the Agreement forbids Consist from selling competitive products.

Attunity Connect is integration software which adds a relational layer on top of a non-relational database (such as Adabas) to give a customer relational database functionality. Attunity Connect enables relational tools such as an SQL application to access the non-relational database. A general description of Attunity Connect is attached as Exhibit F.

Software AG has had a product for the last four years that competes with Attunity Connect. The products are known as the Adabas SQL Gateway and CONNX. A brief description of these products is attached as Exhibits G and H.

### *Confusion In The Territory*

The Natural/Adabas brands are internationally known. In my experience however, the source of these brands is a matter of confusion in the Territory. For example, throughout the world, with the exception of Consist's Territory, the Natural/Adabas brands are typically associated with Software AG. Yet in the Territory in my experience these brands are solely associated with Consist. I have been privy to numerous reports from Consist customers in Brazil that they were unaware that Natural/Adabas is a Software AG brand. I have also conducted an Internet search and reviewed a number of public Consist documents which do not contain any reference to Software AG being the brand owner of Natural/Adabas. I attach as Exhibit E one such public document which is replete with Natural/Adabas references but no indication that these brands are owned by Software AG. In my opinion, therefore, most if not all of the customers in the Territory have no basis to conclude that these brands are owned by Software AG.

8



### *Life After the Distribution Agreement*

Like Oracle, Consist is a company that currently operates within the top three layers of the stack, *i.e.*, operating as both a database platform reseller and an application vendor. If the Consist relationship ends with Software AG, Consist can continue developing, selling/licensing and servicing all of its software applications, including all packaged applications and customized applications, much like SAP. Consist can even continue developing and selling such applications using Software AG's programming language Natural. For Consist, the top layer of the stack is virtually unchanged.

Restricting its business to applications is an extremely viable business for Consist. It should be able to retain its present application customers, even if its existing customers switch from Adabas to third party databases. Consist is free to seek new customers with no existing database technology. Thus, in the event the Consist distributorship of Software AG ends, Consist's business begins to conform to the industry standard model of ISVs and database platform vendors.

Based on my understanding of Consist's business and without the benefit of having reviewed any financial data of Consist, the termination of the distributorship of Software AG's products would have minimal business effect on Consist and may even be beneficial to Consist's future business. Without having to support Software AG's products, Consist would then be able to focus solely on packaged and customized applications without the burden and overhead of providing direct database and programming language support.

It is very important for Software AG, a database platform vendor, to have direct contact with Consist's database customers. Software AG could thus learn its customers' needs and develop new products that solve those needs. Furthermore, Software AG could provide meaningful support and maintenance of the database technology to those customers. Further, upon the termination of the relationship with Consist, Software AG can enter the Territory and sell the Special Products which based on my understanding have been historically neglected by Consist.



9

7. **_Conclusion_**

For the reasons set forth above, it is my opinion that:

(1) (a) The Agreement was not perpetual. It is not industry practice to have perpetual distribution agreements. SAGA, as a sophisticated database vendor, would not have entered into a perpetual agreement and not leave itself a way out of the relationship, *i.e.*, in the event Consist was underperforming or even over-performing. SAGA would want to maintain the ability to once again have direct contact with Consist's database customers and provide meaningful support and maintenance of the database technology (the bread and butter of SAGA's business) to those customers. Finally, an 18 month notice and exit period cuts against the Agreement being perpetual as it evidences an intent of the parties to provide sufficient time for the distributor to develop alternate business strategies and resolve any pending deals;

(b) Consist's interpretation of the Agreement regarding termination is totally contrary to industry practice. It does not make business sense to allow a party to only have the right to terminate a distribution relationship if on the date certain there must also be a breach of the agreement. In my 35 years in the software business, I have never seen an agreement that would not treat non-renewal and material breaches as separate and distinct reasons to exit a relationship;

(c) It is customary in the industry that an exclusive distributor must use its best efforts to distribute that database technology throughout the entire territory. When "best efforts" are required, it is standard for the exclusive distributor to have a country-specific plan for each country within the defined territory that it has exclusive rights. The manufacturer would expect nothing less, as the exclusive distributor was entrusted with developing, expanding and otherwise exploiting the technology in those countries. It would be contrary to industry practice for Consist to be allowed to "cherry pick" which countries to focus on and which countries to neglect.

(2) Although the market demand for Special Products may vary from one country to another within Consist's Territory, with appropriate marketing and promotion, there would be a reasonable demand for at least some of the Special Products throughout the Territory since 1998;

(3) Attunity Connect competes with Software AG products; and

(4) Customers in the Territory do not recognize that Natural/Adabas is owned by Software AG.

(5) If the Consist relationship ends with Software AG, Consist can continue developing, selling/licensing and servicing all of its software applications, including all packaged applications and customized applications, much like SAP. Consist can even continue

10



developing and selling such applications using Software AG's programming language Natural. For Consist, the top layer of the stack is virtually unchanged.

I am being compensated for this case at my normal hourly billing rate of $300 per hour and have no interest in the outcome of this matter. Prior to this request from Baker & McKenzie LLP for consulting services, I have not worked for or had a prior working or personal relationship with Baker & McKenzie LLP.

I declare that the opinions and information set forth above are true to the best of my knowledge and information. Dated November 9, 2007.

*[signature]*

11

# EXHIBIT I

DISTRIBUTORSHIP AGREEMENT

THIS AGREEMENT made as of                          day of

between                     SOFTWARE AG
                            Dehmelstraße 3
                            6100 Darmstadt
                            W. Germany

                            and

                            SOFTWARE AG OF NORTH AMERICA, INC.
                            11800 Sunrise Valley Drive
                            Reston, Virginia 22091
                            USA

                            (hereinafter called "SAG")

and                         PAN AMERICAN COMPUTER SYSTEMS, INC.
                            150 Broad Hollow Road
                            Melville, New York 11747
                            USA                          *Tele Informati-*

                            (hereinafter called "PACS")      *Consist*

WITNESSETH, That

WHEREAS, SAG is the sole proprietor of certain software packages accord-
ing to attachment 1 (being upgraded from time to time), hereinafter refer-
red to as the "SYSTEMS";
and
WHEREAS, PACS wants to market the SYSTEMS and to provide assistance
to users of the SYSTEMS in Argentina, Brazil, Chile, Colombia and Uru-
guay, hereinafter called the "TERRITORY".

*[Ecuador ?*
*NF wants it.*

CONFIDENTIAL                                          SAG 014511

- 2 -

**Paragraph 1**

SAG appoints PACS exclusive distributor of SAG in the TERRITORY for
the period of January 1, 1984 thru December 31, 1986.

**Paragraph 2**

SAG hereby authorizes PACS to enter into customer agreements in the
TERRITORY for licensing, installing, technical assistance, training and
maintenance of the SYSTEMS.

However PACS is only authorized to give single use-licenses for SYSTEMS
to customers and not to give any form of sublicense or distribution rights
to a contract partner.

**Paragraph 3**

Upon the execution by PACS of a license purchase or license lease for
SYSTEMS in the TERRITORY PACS agrees to pay SAG a percentage
of the published SAG U.S. Price Schedule ("SCHEDULE") (attachment
2) as follows:

- 20 % (Twenty percent) of the license purchase or then available
  longest term license lease, as PACS shall select for type 1 SYSTEMS
  according to attachment 1

CONFIDENTIAL

SAG 014512

- 3 -

- 40 % (Fourty percent) of the license purchase or then available longest term license lease, as PACS shall select for type 2 SYSTEMS according to attachment 1

- For Maintenance and Technical services performed by PACS in the TERRITORY subsequent to the first 12 (twelve) months of each license whether purchase or lease: 25 % (Twenty Five percent) of the Maintenance fees published by SAG according to attachment 2.

Payments by PACS to SAG Darmstadt shall be made in US-Dollars on the following basis:

Commencing March 1, 1984 and on each March 1, June 1, September 1, and December 1 thereafter during the term of this agreement PACS will pay as and advance payment for royalties due to SAG

250.000 US-$ each quarter during 1984
325.000 US-$ each quarter during 1985
400.000 US-$ each quarter during 1986

During the first calendar quarter of the years 1985, 86 etc. the balance will be computed by SAG for the previous calendar year using the figures due to SAG from the signed license agreements in the territory.

In case of an overpayment by PACS
(fees due to SAG are    less than 1.000.000 US-$ in 1984,
                        less than 1.300.000 US-$ in 1985,
                        less than 1.600.000 US-$ in 1986)
the amount overpaid will be carried forward and credited towards the March 1 -payment following the balance date.

CONFIDENTIAL

SAG 014513

- 4 -

In case of an underpayment by PACS

(fees due to SAG more than 1.000.000 US-$ in 1984,
more than 1.300.000 US-$ in 1985,
more than 1.600.000 US-$ in 1986)

the additional amount will be paid by PACS within the first quarter following the balance date (Dec.31).

Payment not received on the due rate shall bear interest at a rate of 3 % /above the prime commercial rate of Citibank existing from time to time.

Any lease license for a period of 59 (Fifty Nine) months or more shall be deemed, at PAC's option, to be a license purchase, and royalties due SAG thereon shall be payable by PACS and calculated at the same published financing rates charged by SAG. Maintenance fees related to such contracts shall not be subject to such a financing procedure.

Should PACS desire to consider a lease license as a license purchase, PACS shall give SAG written notice to this effect within the first 12 (twelve) month period of the lease license contract.

SCHEDULE (attachment 2) will be updated from time to time according to the published US price schedule. The price changes should become effective for the computation of the amounts to be paid to SAG for license agreements in the TERRITORY three months after the publication of a new US price schedule.

Paragraph 4

SAG agrees to provide the following services to PACS:

1.      Training in public classes held by SAG for PACS staff (up to 5 persons) how to use the SYSTEMS in public classes held by SAG

2.      latest version of the SYSTEMS stored on magnetic tape;

CONFIDENTIAL

- 5 -

3.    complete set of SYSTEMS documentation in English, including Reference Manual and Utilities Manual (one copy for each user);

4.    prompt correction of any errors in the SYSTEMS detected at a user's site and forwarded to SAG

Paragraph 5

(1)    PACS agrees to take all necessary and reasonable measures to ensure that the proprietary nature and integrity of the SYSTEMS are safeguarded against unauthorized use, duplication or modification.

PACS has the right to reproduce and, as necessary, translate SYSTEMS documentation, Manuals, etc., for use in the TERRITORY. Written material used by PACS for marketing or support to users of the SYSTEMS will refer to authorship of SAG and will show copyright and trademark of SAG.

PACS acknowledges the SYSTEMS and all documentation or information as a trade secret of SAG and undertakes to oblige also its own personnel to protect the SYSTEMS as well as their copyrights and trade-marks and to prevent it from unauthorized use.

(2)    PACS agrees to refrain from implementing, or permitting the implementation of any modification to the SYSTEMS without the approval of SAG.

CONFIDENTIAL

SAG 014515

- 6 -

(3) PACS agrees to refrain from installing the SYSTEMS at a user's site without having obtained a written agreement from the user calling for safeguarding of the proprietary nature of the SYSTEMS. Such written agreement must be either a right of use agreement, or a non-disclosure agreement for demonstration.

(4) PACS agrees to make all reasonable efforts to successfully market the SYSTEMS in the TERRITORY. PACS has to send written quarterly reports concerning all contracts, containing kind of computer, operating system, customer name and address, terms and conditions esp. term of payment no later than 8 weeks after the end of a calendar quarter.

(5) PACS agrees to be responsible for all technical assistance and support activities in the TERRITORY including maintenance services for both present and future users. This obligation of PACS will continue until termination of this agreement including any extension thereof.

(6) PACS will be responsible for supplying SAG with all pertinent information concerning any software errors and will forward promptly all documentation along to SAG with an explanation of the circumstances causing the problem and SAG will correct any errors in the SYSTEMS.

(7) In no case shall SAG be held liable by PACS or any of PACS customers in this territory for any damages direct or consequential derived from the use of the SYSTEMS. PACS shall include a corresponding clause in its license agreements which makes sure that SAG cannot be held liable in this above sense by a customer.

(8) SAG shall not be held liable for any taxes arising out of the activities of PACS, like sales tax, income tax, import tax or alike.

CONFIDENTIAL                                                        SAG 014516

- 7 -

Paragraph 6

None of the parties hereto shall be entitled to assign this contract without prior written consent of the other party.

Paragraph 7

SAG reserves the right to terminate this Agreement should PACS fail to perform any of the stated conditions of this Agreement.

Before any such termination shall become effective, SAG shall give written notice to PACS describing in detail what conditions PACS has failed to perform, and PACS shall have 60 (sixty) days in which to perform such conditions.

Paragraph 8

All notices hereunder shall be in writing and shall be deemed properly delivered and effective when duly sent by Certified Mail, Postage Prepaid, telex or cable, or delivered by hand:

to PACS at: PAN AMERICAN COMPUTER SYSTEMS, INC.
     150 Broad Hollow Road
     Melville, New York 11747
     U.S.A.
     attention: Mr. Natalio S. Fridman

to CONSIST at: CONSIST
     CONSULTORIA, SISTEMAS E REPRES. LTDA.
     Peixoto Gomide 1174
     Sao Paulo - SP
     Brazil
     attention: Mr. Natalio S. Fridman

CONFIDENTIAL

SAG 014517

- 8 -

Paragraph 8 (cont.)

and to SAG at:    SOFTWARE AG
                  Dehmelstraße 3
                  6100 Darmstadt
                  W. Germany
                  attention: Mr. P. Schnell

or to such other address as the receiving party may by written notice
designate to the other.

Paragraph 9

In the event PACS pays SAG *the* quota of 1.000.000 (One Million) US-Dollars
for the year ending December 31,1984 and during the 3-year-period ending
December 31,1986 payments totaling US-$ 3.900.000 (Three Million Nine
Hundred Thousand) this contract shall be automatically extended until
December 31,1989 ~~with a new mutually agreed quota.~~

*( or until end of  )  What about  Post 1989 ?*
*( outstanding use licences )  NF with a auto*
*  entertain. (new quota )*

Paragraph 10

PACS and Mr. Natalio S. Fridman and CONSIST - CONSULTORIO, SIS-
TEMAS E REPRESENTACOES LTDA., warrant fulfillment of PACS obli-
gations.

Paragraph 11

This agreement may not be amended except by another instrument in
writing signed by the parties, made subsequent to the date of this agree-
ment, and which is expressly stated to be an amendment to this agree-
ment.

CONFIDENTIAL                                                 SAG 014518

- 9 -

Paragraph 12

This contract shall be subject to and interpreted in accordance with German Law.

SAG agrees to defend or at its option to settle any claim, suit or proceeding brought against PACS from third parties and to indemnify PACS against any costs derived from claims of infringement of any patent or copyright of the SYSTEMS provided.

PACS notifies SAG within a week in writing of any such claim, suit or proceeding and gives SAG full information and assistance to settle and/or defend. SAG shall not be liable for any defense costs or expenses, exclusive of any judicial and administrative awards, incurred without SAG's written authorization.

PACS agrees to indemnify SAG from any liability that may have been generated because PACS either overstated the performance of any part of SYSTEM or failed to handle properly.

| Agreement Accepted: | Agreement Accepted: |
|---|---|
| SOFTWARE AG SOFTWARE AG<br>DEHMELSTRASSE 3<br>6100 DARMSTADT | PAN AMERICAN COMPUTER SYSTEMS, INC. |
| By _____<br>Authorized Signature | By _____<br>Authorized Signature |
| Name Typed  Peter Schnell | Name Typed  Natalio Fridman |
| Title         President and CEO | Title  _____ |
| Date _____ | Date |
| SOFTWARE AG OF NORTH AMERICA, INC. | MR. NATALAIO FRIDMAN AND CONSIST-CONSULTORIA, SISTEMAS E REPRESENTACOES LTDA. |
| By _____<br>Authorized Signature | By _____<br>Authorized Signature |
| Name Typed  Stu Miller | Name Typed  Natalio Fridman |
| Title         President and CEO | Title  _____ |

CONFIDENTIAL

SAG 014519

## MEMORANDUM OF AGREEMENT

SOFTWARE AG, Darmstadt, Germany
and
SOFTWARE AG OF NORTH AMERICA, Reston, Virginia, USA
(together hereinafter called SAG)
and
Mr. NATALIO S. FRIDMAN
CONSIST - CONSULTORIA, SISTEMAS E REPRESENTACOES LTD,
Sao Paulo, Brazil
and
PAN AMERICAN COMPUTER SYSTEMS, INC., Melville, New York, USA
(together hereinafter called PACS)

agree in order to settle and resolve outstanding claims arising from the
marketing, leasing, sale and distribution of ADABAS, NATURAL and COM-
PLETE (the 'SYSTEMS') in South America (the "TERRITORY") by PACS
with a view to establishing a sound relationship and understanding and
to assure the continuation and performance of the prior relationship,
the parties hereto acknowledge and undertake to perform and carry out
the following terms and conditions:

1.    Upon the execution and delivery of the annexed Distributorship
      Agreement, PACS agrees to pay SAG the sum of

                          US-$ 318.000

           (Three Hundred and Eighteen Thousand  )
      in full payment and settlement of all amounts due to SAG up to
      December 31, 1983 resulting out of the reported contracts based
      on the Distributor Agreement dated July 1st, 1980.

CONFIDENTIAL

SAG 014520

MEMORANDUM OF AGREEMENT 

2.    SAG and SAGNA agree to waive all claims against PACS ~~for fees~~
~~due through December 31,1983~~ arising out of contracts, for sale,
lease or maintenance, entered into in Venezuela for the Systems.
PACS agrees to waive all claims against SAG and SAGNA and
against any third party (esp. APS (Analysis Programmacion y Soft-
ware)) resulting out of contracts, for sale, lease or maintenance,
entered into in Venezuela on or prior to December 31,1983.

3.    The amounts set forth herein in Paragraph 1 are not considered
to be a payment against the quota established in Paragraph 3 and
9 of the Distributorship Agreement, annexed hereto as Exhibit
A. However, other license and maintenance fees paid by PACS
for the period January 1,1984 and thereafter upon contracts, for
sale, lease or maintenance, executed before or after January 1,1984
shall be a credit against said quota.

4.    Except as specifically set forth in this Memorandum of Agreement,
the Distributor Agreement ~~as of~~ dated July 1,1980 is terminated and
each of the parties hereto discharges the other parties for claims,
obligations and liabilities arising out of said Distributor Agreement.

Agreement Accepted:                    Agreement Accepted:

SOFTWARE AG                           PAN AMERICAN COMPUTER

SYSTEMS, INC.

By _____            By _____
    Authorized Signature                   Authorized Signature

Name Typed _Peter Schnell_             Name Typed _Natalio Fridman_

Title        _President and CEO_        Title _____

Date _____          Date _____

SOFTWARE AG OF NORTH                   MR. NATALIO FRIDMAN AND
AMERICA, INC.                          CONSIST-CONSULTORIA, SISTEMAS
                                       E REPRESENTACOES LTDA.

By _____            By _____
    Authorized Signature                   Authorized Signature

Name Typed _Stu Miller_                Name Typed _Natalio Fridman_

Title        _President and CEO_        Title _____

CONFIDENTIAL                            SAG 014521

Attachment 1

Type 1 SYSTEMS

| | |
|---|---|
| ADABAS | for DOS, OS, MVS |
| ADAMINT | |
| NATURAL | |
| COM-PLETE | Tp-System |

Type 2 SYSTEMS

ADABAS          for VMS
NATURAL         for VMS
ADABAS VSAM TRANSPARENCY
ADABAS REFLECTIVE DATABASE
NATURAL VSAM COMMUNICATION
NATURAL SECURITY
NATURAL GRAPHICS
NATURAL ADVANCED FACILITIES
SUPERNATURAL
NATURAL CONNECTION
CONNECTION COMPASS PC
PREDICT 1
PREDICT 2
COM-POSE
COM-POSE T/F
CTCS SOFTWARE
VM COMMUNICATION
VTAM COMMUNICATION
ACCESS

CONFIDENTIAL

SAG 014522

# EXHIBIT J

**Von:** Natalio S. Fridman [mailto:natalio.fridman@consist.com]
**Gesendet:** Donnerstag, 10. Januar 2008 19:18
**An:** Streibich, Karl-Heinz
**Cc:** Deuse, Jochen; Zinnhardt, Arnd; Schwab, Christine
**Betreff:** Distribution Agreement

Dear Karl-Heinz:

I refer to the Distribution Agreement between SAGA and Consist International, Inc. effective as of January 1, 1998. Paragraph 2 of that Agreement authorized Consist to enter into customer agreements in its Territory for licensing, installing, technical assistance, training and maintenance of Software AG Systems. Paragraph 3 of the Agreement states that, for the right to grant "perpetual or time-limited licenses, and/or maintenance agreements" Consist was required to make specified payments. All of those payments have been made.

In order for Consist to fulfill agreements it has with customers for perpetual maintenance, as was expressly permitted by Paragraph 3, Consist requires confirmation from Software AG that Software AG will continue to provide Consist with all new product versions, updates, upgrades and fixes to products, together with all associated materials and training, promptly upon release.

I would appreciate receiving confirmation of Software AG's intention to honor its commitment to Consist as soon as possible, as enormous harm could be caused to Consist's customers and Consist itself should Software AG fail to perform.

My best wishes for a good New Year.

Sincerely, Natalio

Natalio S. Fridman
Natalio.Fridman@Consist.com

**CONSIST SOFTWARE SOLUTIONS Inc.**
10 East 53rd St. • New York, New York 10022 • Tel: (212) 759-2100 • Fax: (212) 751-3643



Mr. Karl-Heinz Streibich                              January 14, 2008
Chief Executive Officer
Software AG
Uhlandstrasse 12
64297 Darmstadt
Germany

Re: Consist Software Solutions Inc. / Software AG

I refer to the Distribution Agreement between SAGA and Consist International Inc. effective as of
January 1, 1998.
Paragraph 2 of the agreement authorized Consist to enter into customer agreements in its territory for
licensing, installing, technical assistance and maintenance of Software AG Systems. Paragraph 3 of the
agreement states that for the right to grant "perpetual or time-limited licenses, and /or maintenance
agreements" Consist was required to make specified payments. All of those payments have been made.

As permitted pursuant to the Distribution Agreement, Consist entered into agreements with customers
that obligate Consist to provide maintenance of Software AG products beyond December 31, 2007.

Consist has recently come into possession of a copy of a letter dated January 1, 2008 from Software AG,
copy enclosed, in which Software AG states that its wholly owned subsidiary, Software AG Brasil
Informatica and Servicios Ltda is " currently the sole provider of a number of specific services relating
to the support and maintenance of Software AG products including: new versions of products, error
corrections for these products and access to Software AG's Global Support Network and R & D
organisation in the territory of Brasil."

Additionally, since December 2007, several Consist customers have requested software fixes, some
urgent, and license keys which until the beginning of this year were handled through Software AG USA
Technical Support in Denver.

After having received no response from Denver, Consist contacted Linda Kibblewhite of Software AG
USA, and was referred to Software AG Brasil. Your representatives in Brasil had no information as to
how Consist was to be supported or how customer requests from Consist customers were to be
submitted to Software AG. Although your representative stated that he would pursue answers to these
questions, Consist has yet to receive responses.

Finally, last Thursday Consist sent an e-mail to you, copy enclosed, requesting confirmation from
Software AG that it intended to honor its commitments to Consist and warning of the enormous harm

that could be caused to Consist customers and Consist itself if Software AG did not fulfill its obligations. We received no response.

The combined effect of Software AG's January 1, 2008 letter and its failure to respond to Consist's requests for information makes a response from Software AG as to its intentions urgent. If Software AG intends to perform its obligations, Consist requests that Software AG address the issues referred to it by Consist and its customers as soon as possible. If Software AG believes that it has no obligations to assist Consist in performing agreements that Consist properly entered into with customers during the term of the Distribution Agreement, we would like to know that immediately.

Given the potential magnitude of the harm that Software AG's refusal to perform would have on Consist and its customers, as well as the fact that prior requests have been unanswered, I ask that Software AG state its intentions no later than the close of business on Thursday January 17, 2008. If we do not hear from you by then, we will assume that you intend not to perform and will be guided accordingly.

Sincerely,

Natalio S Fridman
CEO


cc via e-mail:  Jochen Deuse
                Arnd Zinnhardt
                Christian Schwab
                Hyman L. Schaffer, Esq.