DUANE MORRIS LLP
Hyman L. Schaffer
Fran M. Jacobs
Gregory P. Gulia
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

SOFTWARE AG, INC. and SOFTWARE AG,

                    Plaintiffs,

     -against-

CONSIST SOFTWARE SOLUTIONS, INC.,
f/k/a CONSIST INTERNATIONAL, INC.
and NATALIO FRIDMAN,

                    Defendants.

------------------------------------------------------------X

08 CV 00389 (CM) (FM)

DEFENDANTS' PROPOSED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

       Defendants Consist Software Solutions, Inc. f/k/a Consist International, Inc. and Natalio

Fridman, by their attorneys Duane Morris LLP, submit the following proposed findings of fact

and conclusions of law relating to plaintiffs' pending motion for preliminary injunctive relief:

## I. PROPOSED FINDINGS OF FACT

A.    The Parties

     1.    Plaintiff Software AG, Inc. ("SAGA") is a Virginia corporation with its principal

place of business at 11700 Plaza America Drive, Suite 700, Reston, Virginia 20190.

     2.    Plaintiff Software AG ("SAG") is a foreign corporation with headquarters in

Darmstadt, Germany.  SAG is the parent corporation of SAGA.  (SAG and SAGA are together

referred to as "Software AG" or "Plaintiffs").

3.      Defendant Consist Software Solutions, Inc. f/k/a Consist International, Inc. ("Consist") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Delaware.  It maintains a New York office at 10 East 53rd Street, New York, New York, 10022.

4.      Defendant Natalio S. Fridman is the President of Consist and resides in New York.  ("Consist" and "Fridman" are together referred to as "Defendants").

B.    Non-Parties

5.      Consist Consultoria Sistemas e Representacoes Ltda. and Consist Software Ltda. (together referred to as "Consist Brazil") are Brazilian entities which are affiliated with Consist. Neither is a party to this lawsuit, and this Court lacks jurisdiction over them.

C.    Jurisdiction and Venue

6.      Software AG bases jurisdiction on 28 U.S.C. §§ 1331 and 1338(a) on the theory that it has asserted a claim under the Lanham Act which raises a federal question.  It also claims that the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.

7.      Venue is predicated on the residence of Consist and Fridman in this district.

D.    The Relationship Between Software AG and Consist

8.      Consist and Software AG entered into a series of software distribution, licensing, and maintenance agreements dating back to 1975 under which Consist was the exclusive distributor of Software AG's technology products in a number of countries in South America

(the "Territory"). (See PX 5, 6.[1]) The most recent distributorship agreement became effective on January 1, 1998 (the "1998 Agreement") and its initial term ran through December 31, 2007. (See the January 22, 2008 declaration of Hyman L. Schaffer (the "Schaffer Decl.") at Ex. A.). The 1998 Agreement was governed by New York law. (Schaffer Decl. Ex. A at ¶ 10.)

9.    The distribution agreement in effect from January 1, 1984 through December 31, 1986 between Consist's predecessor and Software AG (the "1984 Agreement") was governed by German law. (Schaffer Decl. Ex. I at ¶ 12). Consist's affiliate, Consist Brazil, registered the trademarks "Adabas" and "Natural" in Brazil during the time period when the 1984 Agreement was in effect. The 1984 Agreement is entitled "Distribution Agreement" as opposed to "Trademark License Agreement." The 1984 Agreement does not have provisions regarding quality control of any trademarks. The Brazilian IP Code, in effect from December 12, 1971 until May 15, 1997, provided in its Article 90 that a license agreement had to specify the licensor's obligation to exercise quality control over the licensed products. (See the January 21, 2008 Declaration of Ricardo Do Nascimento (the "Do Nascimento Decl.") at ¶ 9.)

10.    The record is devoid of evidence concerning German law.

11.    Paragraph 5.1 of the 1984 Agreement provides, in relevant part:

> [Consist] has the right to reproduce and, as necessary, translate SYSTEMS documentation, Manuals, etc., for use in the TERRITORY. Written material used by [Consist] for marketing or support to users of the SYSTEMS will refer to authorship of SAG and will show copyright and trademark of SAG.

---

[1]    References to hearing exhibits are cited as either "PX ____" or "DX ____." References to other materials submitted in the form of motion papers or pleadings are also cited parenthetically. References to the transcripts of the January 16, 2008 hearing on Plaintiffs' Order to Show Cause and the January 24, 2008 preliminary injunction hearing are cited, respectively, as follows: (1-16 Tr. [p.]) and (1-24 Tr. [p.]).

> [Consist] acknowledges the SYSTEMS and all
> documentation or information as a trade secret of SAG and
> undertakes to oblige also its own personnel to protect the
> SYSTEMS as well as their copyrighted trade-marks and to prevent
> it from unauthorized use.

(Schaffer Decl. Ex. I at p. 5.)

12.    Neither the 1984 Agreement nor any other agreement between Consist and

Software AG contained a provision requiring Consist or its affiliates to relinquish to Software

AG at the end of the term any trademarks they registered to Software AG at the end of the term.

(Schaffer Decl. Exs. A, J; PX 5, 6.).

13.    Paragraph 2 of the 1998 Agreement sets forth the scope of Consist's authority

under the Agreement. It states, in relevant part:

> SAGA hereby authorizes CONSIST to enter into customer
> agreements in the TERRITORY for licensing, installing, technical
> assistance, training and maintenance of the SYSTEMS.

14.    Paragraph 3 of the 1998 Agreement gave Consist the right to grant licenses and

maintenance agreements that extended beyond the term of the Agreement. It provides in

relevant part:

> For the right to grant perpetual or time-limited licenses, and/or
> maintenance agreements, CONSIST agrees to make payments to
> SAGA as provided in Exhibit A hereto.

15.    Pursuant to Paragraph 3 of the 1998 Agreement, Consist entered into both

licenses and maintenance agreements with terms that extended past December 31, 2007.

16.    There is no evidence that, after December 31, 2007, either Consist or Consist

Brazil has attempted to enter into any new licenses involving Software AG products in Brazil (or

anywhere else in the Territory), or that they have attempted to enter into any new maintenance

agreements for Software AG products. Consist acknowledges that it cannot now enter into new

license or maintenance agreements for Software AG products. Thus, to the extent that Consist or

-4-

Consist Brazil entered into any agreements relating to Software AG products or maintenance, all such agreements were made prior to December 31, 2007. (See CSS2-01555 to CSS2-01779; CSS2-00006 to CSS2-00222.)

17.    All of Consist's Brazil's licensing or maintenance agreements are with customers located in Brazil. Software AG is not a party to any of these agreements. (See id.)

E.    Brazilian Trademarks

18.    As of the mid-1980s, when Consist had already been a distributor of Software AG products for a decade, Software AG had not registered any trademarks in Brazil. (See Schaffer Decl. Ex. D.)

19.    Because the trademarks "Adabas" and "Natural" (collectively, "Consist's Brazilian Trademarks") had never been registered in South America, Fridman advised Software AG's then-Chairman, Peter Schnell ("Schnell"), that he was concerned about piracy. (Schaffer Decl. Ex. E at pp. 69: 19-25.) Schnell told Fridman that, if he wanted "Adabas" and "Natural" registered in the Territory, he should do it himself. (Ibid.)

20.    Following Fridman's discussion with Schnell, Consist Brazil registered Consist's Brazilian Trademarks in accordance with Brazilian law. (PX 11.)

21.    Fridman's testimony about the circumstances surrounding Consist Brazil's registration of "Adabas" and "Natural" in Brazil has never been rebutted. Indeed, Fridman initially testified about his discussion with Schnell concerning Consist's Brazilian Trademarks on November 28, 2007. (Schaffer Decl. Ex. E at pp. 69:19-25; 70:13-75:7.) Plaintiffs have thus had ample time to confirm Fridman's account and their failure to submit any evidence on the issue gives rise to an inference that no contrary evidence exists.

22.    Consist Brazil registered Consist's Brazilian Trademarks in Brazil in 1986. (See Schaffer Decl. Ex. D.) "Adabas" was first registered as a trademark in Brazil on May 11, 1986. "Natural" was first registered as a trademark in Brazil on March 25, 1986.

23.    Software AG did not oppose Consist Brazil's application for registration of Consist's Brazilian Trademarks within the sixty-day period after publication in Brazil. (See Do Nascimento Decl. at ¶ 5.)

24.    Software AG did not file any cancellation action against any of Consist Brazil's registrations during the five-year period after the registrations issued in Brazil. (Do Nascimento Decl. ¶ 6.)

25.    Consist Brazil's registration of "Adabas" and "Natural" has been a matter of public record for more than two decades. (Do Nascimento Decl. ¶ 4.)

26.    Consist and Software AG have entered into at least four distribution agreements in the more than twenty years since Schnell told Fridman himself to register "Adabas" and "Natural" in the Territory and since Consist Brazil's registration of Consist's Brazilian Trademarks has been a matter of public record. (PX 5, 6; Schaffer Decl. Ex. A.[2]) Even though Software AG knew or should have known that Consist Brazil had registered "Adabas" and "Natural" in Brazil, none of the distribution agreements entered into subsequent to 1986 includes a provision which requires Consist to convey Consist's Brazilian Trademarks to Software AG under any circumstances. (See PX 5, 6; Schaffer Decl. Ex. A.)

27.    If Software AG was, as it alleges in its complaint (Complaint ¶ 63), unaware that Consist Brazil had registered "Adabas" and "Natural" in Brazil in 1986, its failure to do anything about these registrations was negligent, at best. There is no evidence that Software AG itself

---

[2]    No distribution agreement for the period from 1987 to 1991 has been produced.

attempted to register the trademarks "Adabas" and "Natural" in Brazil at any time, and it produced no evidence that it had ever conducted a trademark search or otherwise policed its Marks. (Schaffer Decl. Ex. F at ¶ 21.)

28.    The only Software AG representative who gave live testimony at the January 24, 2008 preliminary injunction hearing was Mark Edwards ("Edwards"), the Chief Operating Officer of Software AG's largest division. (1-24 Tr. 52.) Edwards was unable to identify a single thing Software AG had done over the past 25 years to assert rights in and/or attempt to police "Adabas" or "Natural" in Brazil. (1-24 Tr. 85.)

29.    The evidence strongly suggests that Software AG has known for at least twenty years that Consist Brazil registered "Adabas" and "Natural" in Brazil. Plaintiffs failed to present any evidence that they owned any rights to "Adabas" or "Natural" in Brazil, or attempted to assert rights in these marks against Consist Brazil or any third parties. Nor is there any evidence that Plaintiffs took any steps -- contractually or otherwise -- to assert ownership rights to "Adabas" and "Natural" in Brazil.

F.    The First Litigation

30.    After the parties failed to resolve a dispute about whether the 1998 Agreement had been renewed, Consist filed suit against Software AG in New York State Supreme Court, New York County, which action was removed to the Southern District of New York as Case No. 07-CV-07047 (the "First Litigation"). Consist's complaint alleged, *inter alia*, breach of contract and breach of the implied covenant of good faith and fair dealing. In addition, Consist sought specific performance of the 1998 Agreement, a permanent injunction enjoining Software AG from abrogating the terms of that agreement, and a declaratory judgment that the 1998 Agreement had been automatically renewed for another 5-year term. Consist maintained that the

1998 Agreement was an evergreen contract which was automatically renewed based on Software AG's failure to comply with the conditions for termination set forth in Paragraphs 1 and 7 of the 1998 Agreement.

31.    Software AG asserted a counterclaim in the First Litigation. Among other things, the counterclaim sought relief for breach of contract and a declaratory judgment that the 1998 Agreement was set to expire on December 31, 2007.

32.    This Court entered a Final Judgment and Order on December 26, 2007 based on its finding that the 1998 Agreement would expire on December 31, 2007. On January 16, 2008, Consist filed a Notice of Appeal of this Court's Final Judgment and Order.

G.    The Notices

33.    Following the Court's determination in the First Litigation, Consist Brazil posted two notices on its website in Brazil setting forth its understanding of the effect of the ruling. The notices were written in Portuguese and appeared on Consist's Brazil website, in Portuguese. The notices first appeared on January 8, 2008.

34.    Consist sent two written communications to Software AG, one on January 10, 2008 and a second on January 14, 2008 each time asking Software AG to confirm that it would provide the support Consist needed so that Consist Brazil could fulfill its contractual obligations to customers in Brazil after December 31, 2007. (See Complaint Ex. 8 and 9.) Software AG never responded to these requests (1-24 Tr. 83), and instead commenced this action on January 15, 2008.

35.    Prior to commencing this action, Software AG did not advise Defendants that it took issue with any of the statements on Consist Brazil's website or any other putative oral statements. (1-24 Tr. 82.)

36.    At the hearing before this Court on January 16, 2008, Plaintiffs stated that they were proceeding on the theory that the notices on Consist Brazil's website were "literally false advertising" which should be enjoined by this Court because the Brazilian website, although written in Portuguese, was accessible by New York residents. (1-16 Tr. 42).

37.    When Consist finally became aware of Plaintiffs' objections to the notices after the commencement of this action, it voluntarily removed them in their entirety[3] and replaced them with revised notices. (Schaffer Decl. Ex. G and Ex. B.) The first notice was revised by deleting any reference to Consist's belief that it could, if it obtained reversal of the judgment, retroactively reinstate the 1998 Agreement to January 1, 2008, and to remove statements that "at no moment in the process of the [First Litigation] was the validity of the use licenses and the perpetual technical updates granted by CONSIST to its customers questioned, such licenses and services are to continue unaffected because they are legitimate and, consequently, will not be interrupted." (Complaint, Ex. 5). As revised then, the first Notice simply sets forth, as relevant here, Consist's beliefs as to its prospective rights should it obtain reversal of this Court's judgment.

38.    To eliminate any doubt that Consist Brazil's views about its ability to provide maintenance to existing customers simply reflected its belief and to make clear that Software AG disagreed, the revised second Notice stated, as here relevant:

---

[3]    While the Court directed Consist to add some language to the notices (1-16 Tr. 37), Consist went beyond that directive and replaced the notices altogether.

It is our strong understanding that all our contractual obligations with our clients, including the Technical Updates and the performance of support services for Software AG products, will still be performed regardless of our expectations with the appeal. Such obligations are guaranteed by the agreement between CONSIST and Software AG, which authorizes CONSIST to give both software licenses and technical support for a limited period of time or perpetually (clause 3 of the agreement: . . . to grant perpetual or time-limited licenses; and/or maintenance agreements . . . .).

As such, all software updates released internationally by Software AG, must be available to CONSIST in order for CONSIST to be able to help our technical update clients, in the same manner as we have done for the past 33 years of exclusive distributorship of the software of Software AG . . . .

We further clarify that Software AG disagrees with CONSIST's interpretation of paragraph 3 of the agreement, which has been subject of their judicial dispute before the New York court. Software AG's position is available at its website.

(Schaffer Decl. Ex. B; see also Id. at Ex. G.)

39.    Both the original notices and the revised notices were written in Portuguese. (See Complaint Ex. 5 and 6; Schaffer Decl. Ex. B and G.)

40.    Since Consist has made clear in its revised notices that Plaintiffs disagree with its view about whether it had a right to enter into maintenance agreements prior to December 31, 2007 which provide for maintenance after December 31, 2007, Consist's statements are not literally (or otherwise) false -- regardless of which party's interpretation of Paragraph 3 is correct.

41.    Karl-Heinz Streibich, Software AG's CEO, posted a notice to "customers" on Software AG's own website setting forth Software AG's belief that only it would be able to render maintenance services to Consist's former customers after December 31, 2007. (DX 1; see also 1-24 Tr. at 84-85.)

42.    While Software AG did not agree that Consist Brazil's revised notices rendered their false advertising claim completely moot, they acknowledged that it addressed an important

-10-

part of their application for emergency relief. (See Letter from Plaintiffs' counsel at Schaffer
Decl. Ex. C.)

H.    Plaintiffs' New Action

    43.    Software AG filed its complaint in this action on January 15, 2008. The
complaint purports to state seven claims.

    44.    The first claim seeks a declaratory judgment that "Consist is no longer authorized
to "use in any manner whatsoever the SAG Software Products." (Complaint ¶ 82.) Counsel for
Software AG has conceded that this claim is not relevant to its motion for preliminary injunctive
relief. (1-24 Tr. 129-130.)

    45.    The second claim alleges false advertising under 15 U.S.C. § 1125(a), Lanham
Act § 43(a). (Complaint ¶¶ 83-89.) Software AG contends that Defendants "have issued
statements . . . that are literally and demonstrably false, including Defendants' misrepresentations
that they are able to reinstate the Agreement, can continue to provide maintenance in perpetuity
for SAG Software Products, and can provide technical updates to the SAG Software Products
uninterrupted by the expiration of the Agreement." (Complaint ¶ 84.) In asserting this claim,
Plaintiffs allege that "Defendants' false and misleading representations were made in commerce
[and] have a substantial effect on U.S. commerce." (Complaint ¶ 86.)

    46.    Plaintiffs' third claim alleges that Defendants tortiously interfered with
prospective business relations between Software AG and PRODESP, and "other unknown
parties." (Complaint ¶¶ 90-98.)

    47.    Software AG's fourth cause of action alleges that Defendants "made bad faith
representations in public, to customers on their website" that are "likely to cause confusion or
deceive the public as to the origin or sponsorship of goods or services." (Complaint ¶¶ 99-104.)

-11-

48.    Plaintiffs' fifth claim alleges false advertising under New York General Business Law § 349. (Complaint ¶¶ 105-111.)  For purposes of Plaintiffs' application for a preliminary injunction, this Court stated that the claim under the General Business Law is "out." (1-24 Tr. 125.)

49.    Software AG's sixth claim purports to seek the "return of Software AG's intellectual property." (Complaint ¶¶ 112-120.)  The core of the claim is that "Software AG is, and always has been the owner of all intellectual property rights in the SAG Software Products, including both trademarks and copyrights related to those products." (Complaint ¶ 113.)  No legal theory is articulated in the Complaint for the relief Plaintiffs seek; the claim merely states the nature of the relief requested.

50.    Plaintiffs' final claim asserts that Defendants breached the implied covenant of good faith and fair dealing by entering into maintenance agreements prior to December 31, 2007 that extended beyond December 31, 2007. Even though maintenance agreements – and not Consist's Brazilian Trademarks – are the express subject of Plaintiffs' seventh claim (Complaint ¶¶ 121-130), the claim was reframed at the January 24 hearing and transformed into a claim that, "at the end of the contract, New York's principle of good faith and fair dealing fairly implied that the trademark rights had to be relinquished so that Software AG could then take up the protection of its own trademarks in Brazil." (1-24 Tr. 4.)

I.    Plaintiffs' Motion for a Preliminary Injunction

51.    When Software AG filed its complaint on January 15, 2008, it also filed an Order to Show Cause seeking a temporary restraining order and preliminary injunction. Software AG sought emergency relief with respect to its claims for, *inter alia*, breach of the implied covenant of good faith and fair dealing, unfair competition, and false advertising under the Lanham Act.

-12-

At the TRO hearing, the Court noted that counsel for Software AG "just told [counsel for Consist] he is going to go forward on a literal falseness theory. And it seems to me that the literal falseness theory is a function of the contract claim, that once the contract expired, you have the obligation to reassign the trademark rights to them." (1-16 Tr. 42.)

J.    The Evidence Plaintiffs Offered of Likelihood of Success

      (1)    Extraterritorial Application of the Lanham Act

52.    Software AG has not established that Consist Brazil's conduct in Brazil would have a substantial effect on United States commerce. Software AG's conclusory observation that we live in "a global economy" (1-24 Tr. 112) certainly does not provide the necessary evidentiary support for its claim that Consist Brazil's conduct in Brazil has an effect, let alone a substantial one, on United States commerce. Software AG failed to offer any evidence that United States consumers have been misled or confused by Consist Brazil's conduct in Brazil. (1-24 Tr. 112-113). Instead of presenting concrete evidence of consumer confusion in the United States, Software AG offered nothing except speculation and anecdotal hearsay in an effort to attempt to demonstrate that a few Brazilian consumers could possibly be confused by Consist Brazil's conduct, and that a small number of these Brazilian consumers may have offices in New York. (1-24 Tr. 77-78).

53.    Software AG has not offered any evidence that Consist has used either of Consist's Brazilian Trademarks in connection with any products or services or advertising or promotional materials that have entered or will enter the United States. (See generally Complaint; 1-16 Tr.; 1-24 Tr.). Indeed, under the Agreement, Consist never had any rights to distribute, maintain or license Software AG products outside of the Territory, which included only seven countries in South America. (Schaffer Decl. Ex. A at p. 1.) Nor has Software AG

-13-

demonstrated that any of its products are manufactured or distributed from the United States. In fact, Software AG itself has noted its intent to be the "only distributor of various [of] Software AG's specific services related to technical support and product maintenance" in the Brazilian market. (See DX1).

54.    Further, Software AG has not presented any evidence to show that its reputation has been harmed in the United States as a result of Consist Brazil's alleged conduct in Brazil. (1-24 Tr. 116). Software AG offered only speculation and hearsay to support its claim of reputational harm stemming from Conduct Brazil's actions in Brazil. (1-24 Tr. 77:16-19). The hypothesized prospect of reputational harm in the future or in countries outside of the United States does not constitute the substantial effect on United States commerce that must be established before a United States court can apply the Lanham Act extraterritorially.

55.    As support for their claim that the statements about Consist's ability to provide maintenance to customers in Brazil have a substantial effect on U.S. commerce, Plaintiffs alleged that (a) some of the Brazilian customers are part of global organizations that may also have offices in the United States (1-24 Tr. 54) and (b) Software AG has a call center in Denver which provides maintenance support (1-24 Tr. 72).

56.    With respect to the allegation that a substantial effect on United States commerce can be shown based on the existence of some Brazilian customers which also have offices in the United States, Plaintiffs offered no evidence that a single customer had taken any action in the United States on account of the representations Defendants supposedly made in Brazil. (1-24 Tr. 77-78.)

57.    Plaintiffs also offered nothing to support their bald assertion that, because Software AG has a call center in Denver, Defendants' purported representations in Brazil to

Brazilian customers had a substantial effect on United States commerce. Plaintiffs presented no evidence establishing that Defendants' alleged representations in Brazil had any effect whatsoever on the call center, or what any such harm could be. On the contrary, the only evidence on the subject was the bare statement that Plaintiffs have 125 employees in Denver who are part of their North American operation and are available to answer calls. (1-24 Tr. 72.[4]) Thus, nothing in the record suggests any connection between Plaintiffs' operation of a call center in Denver and the alleged misrepresentations in Brazil, or any articulable harm or effect in the United States therefrom. (Ibid.)

58.    Software AG also has failed to establish that Consist Brazil's ownership of two valid Brazilian trademark registrations or its expressions of good faith opinion, in Portuguese, to Brazilian customers on Consist Brazil's website or by its sales force (although there is no cognizable proof of such oral statements) concerning its ability to perform agreements with Brazilian entities in Brazil would have any effect, let alone a substantial one, on United States commerce.

59.    Software AG did not prove that the application of the Lanham Act to the allegedly false statements on the website of Consist Brazil would not conflict with Brazilian false advertising law. (1-24 Tr. 134:17-21). Software AG has offered absolutely no competent proof of the content of any foreign law.

60.    Software AG has also failed to establish that applying the Lanham Act to Consist Brazil's conduct in Brazil would not conflict with Brazilian trademark law. Since Consist's

---

[4]      While the 1998 Agreement was in effect, there was no correlation between the number of Brazilian customers whose questions were directed to the Denver call center and the amount Consist paid Software AG. The payment Software AG received from Consist was not linked to the number of customers Consist had or the number of calls Consist placed to the call center, but rather to SAGA's own annual revenues. (Schaffer Decl. Ex. A.)

valid Brazilian trademark registrations are governed by Brazilian law and were issued pursuant to Brazil's trademark statutes, any type of mandatory injunctive relief attempting to compel the Brazilian Trademark Office to assign Consist's Brazilian Trademarks to Software AG would by definition conflict with Brazilian law, pursuant to which "Adabas" and "Natural" trademarks belong to Consist Brazil. (See Do Nascimento Decl. at ¶¶ 4, 11; 1-24 Tr. 33:1-8).

61.    The only evidence in the record establishes that the goodwill associated with Consist's Brazilian Trademarks and the products and services sold in connection with those Marks resided and continue to reside with Consist. Indeed, this Court has recognized that "Adabas" and "Natural" "are associated in Brazil, with Mr. Fridman's company." (1-24 Tr. 33:9-13). In addition, Software AG's expert witness in the First Litigation, David MacSwain, conceded that, in Brazil, the "Adabas" and "Natural" brands "are solely associated with Consist" and that there is "no indication that these brands are owned by Software AG." (Schaffer Decl. Ex. H at p. 8).

62.    In fact, the only thing that Software AG conclusively established is that it failed to assert rights in Consist's Brazilian Trademarks, nor did it ever attempt to police the names "Adabas" and "Natural" against third party use in Brazil for over twenty years. (1-24 Tr. 19:13-22; 85:9-12). Despite Software AG's conclusory assertions to the contrary, there is evidence that Plaintiffs were aware of Consist's applications to register "Adabas" and "Natural," which were, in any event, a matter of public record. (Schaffer Decl. Ex. E at 70:13-75:7). In addition, Software AG did not oppose Consist Brazil's applications to register "Adabas" and "Natural" during the sixty (60) day opposition period provided under Brazilian law, nor did they seek to cancel the registrations during the five (5) year period mandated by Brazilian law. (See Lei 9.279/96, Article 158; Do Nascimento Decl. ¶¶ 5, 6.)

(2)    Citizenship of the Parties

63.    Software AG has failed to demonstrate that the Defendants are the proper parties
for purposes of analyzing its claim of extraterritorial application of the Lanham Act. While
Software AG is a foreign company headquartered abroad, and its subsidiary SAGA is a Virginia
corporation headquartered in Virginia, and the named Defendants are located in New York, the
evidence shows that the extraterritorial conduct and statements sought to be enjoined are those of
Consist Brazil, an entity which is not even a named party.

(3)    Literal Falsity

64.    The Lanham Act cannot properly be applied extraterritorially in this case.
Furthermore, Software AG has not established the literal falsity of the written statements now on
the Consist Brazil website or oral statements purportedly made in Brazil to customers in Brazil.
These statements are not "literally false," but mere good faith expressions of opinion. (1-24 Tr.
59:16-17; 62:12-15). On this record, it is clear that Consist and Consist Brazil believe that
Paragraph 3 of the 1998 Agreement gave them a right to enter into maintenance agreements
extending beyond December 31, 2007. While Consist or Consist Brazil may be incorrect in their
views, that does not make their statements about their belief false.

65.    Moreover, Plaintiffs are not asking the Court simply to enjoin Defendants from
making statements Plaintiffs believe are false; under the guise of a false advertising claim, they
are asking the Court to enjoin Consist's Brazilian affiliates from performing under maintenance
agreements which, by Plaintiffs' own admission, encompass services that Consist Brazil can
properly perform because they do not require access to Software AG or its proprietary
information. (See Complaint ¶ 31.)

(4)    Contract Interpretation

66.    Consist and Software AG disagree about the meaning of Paragraph 3 of the 1998 Agreement. Under Software AG's interpretation, Consist was authorized to enter into license agreements prior to December 31, 2007 that extended past December 31, 2007, but could not do the same with respect to maintenance agreements because, in Software AG's view, the adjectives "perpetual" and "time-limited" in Paragraph 3 modify "licenses," but not "maintenance agreements." Consist, on the other hand, believes that Paragraph 3 authorized it to enter into both perpetual and time-limited licenses and perpetual and time-limited maintenance agreements. At the very least, the provision is ambiguous as to what was intended. For purposes of this motion, however, the question of whose interpretation or construction is correct is unnecessary to decide. Rather, the question is whether Consist Brazil's statements of opinion constitute literally false advertising.

67.    While Plaintiffs dispute the existence of "perpetual" maintenance agreements, they do not discuss "time-limited" maintenance agreements that extend beyond the end of the Term. The maintenance agreements annexed to their Complaint are, in fact, for limited terms. (See, for example, Complaint at Ex. 7 ¶ 6.1.)

68.    The 1998 Agreement makes no provision for the transition of customers in the Territory to Software AG for purposes of maintenance. Indeed, it does not require Consist to provide Software AG with any information about Consist's customers, either before or following termination. (See Schaffer Decl. Ex. A.[5]) Since customers would continue to have maintenance needs once the 1998 Agreement ended, if Consist could not continue to provide maintenance pursuant to Paragraph 3, Software AG's interpretation of the Agreement creates a gap. Allowing

---

[5]    Software AG appears to have tried to give Consist's customers the impression that they were to become customers of Software AG. To this end, Software AG posted a notice addressed to "Clients" in South America at a time when it had no clients there. (DX 1.)

such a gap could not have been the intent of the parties, since Software AG knew that Consist Brazil's customers included Brazilian governmental bodies and its largest banks, which depend on the availability of around-the-clock, year-round maintenance.

## II.  CONCLUSIONS OF LAW

A.    The Legal Standard

1.    A preliminary injunction is an "extraordinary and drastic remedy which should not be routinely granted." Medical Soc. of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977) (citations omitted).

2.    To obtain a preliminary injunction, the moving party "must establish that: (1) absent injunctive relief, it will suffer an irreparable injury; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant." Alliance Bond Fund v. Grupo Mexicano de Desarrollo, S.A., 143 F.3d 688, 696 (2d Cir. 1998), rev'd on other grounds, 527 U.S. 308, 119 S. Ct. 1961 (1999).

3.    The showing that must be made to obtain a preliminary injunction is even higher where, as in this case, the moving party is seeking mandatory injunctive relief that will provide it "with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits." Brewer v. West Irondequoit Cent. Sch. Dist., 212 F.3d 738, 744 (2d Cir. 2000). In such cases, "the moving party must make a clear or substantial showing of a likelihood of success." Ibid.

4.    The "single most important prerequisite" in satisfying the preliminary injunction standard is irreparable injury. Alliance Bond Fund, Inc., supra, 143 F.3d at 696; see also Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (recognizing that "'irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction'") (quoting Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 44 (2d Cir. 1983)); Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) ("Irreparable harm is the

single most important prerequisite for the issuance of a preliminary injunction. . . . Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered") (emphasis added, quotations omitted, and ellipses in original); . Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) ("The showing of irreparable harm is 'perhaps the single most important prerequisite for the issuance of a preliminary injunction,' and the moving party must show that injury is likely before the other requirements for an injunction will be considered" (emphasis added and citation omitted).

5.    In order to satisfy its burden of establishing irreparable injury, the moving party "must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." National Association for Advancement of Colored People, Inc. (NAACP) v. Town of East Haven, 70 F.3d 219, 224 (2d Cir. 1995) (emphasis added), vacated on other grounds, 259 F.3d 113 (2d Cir. 2001) (citing Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)).

6.    Where the only harm the movant would face, absent a preliminary injunction, is speculative, the "injury" is not irreparable. For example, in Marcy Playground, Inc. v. Capitol Records, 6 F. Supp. 2d 277 (S.D.N.Y. 1998), plaintiffs sought a preliminary injunction enjoining the distribution of an album on which they had not been given production credits. They claimed that their reputations would be irreparably injured if the album were distributed without proper credits. In finding that plaintiffs had not sustained their burden of establishing irreparable injury, the court held (6 F. Supp. 2d at 282-283):

> the movant for a preliminary injunction must show not only that
> irreparable injury is possible, but that it is likely. Plaintiffs'
> showing certainly does not rise to that level. The most that can be

said is that they have <u>advanced a speculative theory</u>.

(Emphasis added.)

7.    Preliminary injunctive relief was denied for the same reason in <u>Marisa Christina,</u> <u>Inc.</u> v. <u>Bernard Chaus, Inc.</u>, 808 F. Supp. 356 (S.D.N.Y. 1992), even though the court found that plaintiff had shown a likelihood of success on the merits. The court explained (808 F.Supp. at 359):

> Plaintiff's chief argument seems to be that a customer who bought one of the plaintiff's sweaters from last year may see one of defendant's substantially similar copies selling at half price and feel that they were ripped off by the plaintiff. . . . The plaintiff has presented no evidence in the record to support what is <u>a wholly</u> <u>speculative claim of injury</u>. Plaintiff's theory of irreparable harm standing on its own is <u>too hypothetical</u> to form the basis for a preliminary injunction.

(Emphasis added.)

8.    Likewise, a delay in seeking injunctive relief undercuts a claim of irreparable injury. As the Second Circuit held in <u>Citibank, N.A.</u> v. <u>Citytrust</u>, 756 F.2d 273, 275-76 (2d Cir. 1985), "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the [movant's] rights." A "delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action" and may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction." <u>Ibid.</u> Accord <u>Majorica</u> v. <u>R.H. Macy & Co.</u>, 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief").

B.    <u>Plaintiffs Have Not Sustained Their Burden of Establishing Irreparable Injury</u>

9.    Plaintiffs offered no proof that they faced any non-speculative injury during the pendency of this action. (1-24 Tr. 77-78.)

10.    There is no legal support for Software AG's position that the mere possibility of some future injury – which is all Software AG showed – can satisfy the requirement of irreparable injury (1-24 Tr. 111), and the law in this Circuit is clearly contrary to Software AG's position. NAACP v. Town of E. Haven, supra, 70 F.3d at 224; Marcy Playground, Inc. v. Capitol Records, supra, 6 F. Supp. 2d at 282-283; Marisa Christina, Inc. v. Bernard Chaus, Inc., supra, 808 F.Supp. at 359.

11.    Plaintiffs have not established irreparable injury with respect to either their request for a preliminary injunction directing Consist to convey Consist's Brazilian Trademarks to them or enjoining Consist from making statements relating to, or performing, maintenance contracts in Brazil.

(1)    Irreparable Injury and the Claim for Transfer of Consist's Brazilian Trademarks

12.    Plaintiffs' delay in asserting a claim to Consist's Brazilian Trademarks in Brazil is wholly at odds with their claim that preliminary injunctive relief is urgently needed. It is undisputed that Consist Brazil registered "Adabas" and "Natural" in 1986 and that Consist Brazil's registration of Consist's Brazilian Trademarks in Brazil has thus been a matter of public record for more than two decades. (PX 11.)

13.    In addition, Plaintiffs' current counsel sent a letter on October 10, 2007 claiming to have learned that Software AG had only recently found out that Consist Brazil had registered "Adabas" and "Natural" in Brazil, but took no action at that time.

14.    · Having delayed in taking any action with respect to Consist's Brazilian Trademarks, Software AG cannot claim that it will now suffer irreparable harm if Consist (which does not even own Consist's Brazilian Trademarks) is not immediately ordered to convey

Consist's Brazilian Trademarks to Software AG. The relief Software AG seeks by way of a motion for a preliminary injunction is the same as the ultimate relief it seeks in this case.

(2)    Irreparable Injury and the Maintenance Contracts

15.    With respect to Plaintiffs' application for a preliminary injunction barring Consist from making representations concerning or performing any pre-December 31, 2007 license or maintenance agreements in South America, Consist is not offering any new licenses or maintenance agreements, nor is it representing to current or potential customers that it now has any exclusive distribution rights to Software AG technologies in South America, or the ability to enter into new maintenance agreements which rely on Software AG's performance. Consist Brazil is merely continuing to honor those contracts entered into while the 1998 Agreement was still in effect.

16.    In effect, Plaintiffs are seeking a preliminary injunction barring Consist from engaging in conduct which, at least as adapted at the hearing on this motion, they believe breaches the 1998 Agreement's continuing covenant of good faith and fair dealing. (1-24 Tr. 11). Such injury is compensable in money damages and therefore does not constitute irreparable injury. JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) ("it is settled law that when an injury is compensable through money damages there is no irreparable harm.").

17.    Plaintiffs have not shown that, if they were ultimately to prevail, their claim could not be compensated in money damages. General Textile Printing & Processing Corp. v. Expromtorg In, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994) ("since the damages caused by defendant's alleged breach [of contract] can be remedied at law, injunctive relief is inappropriate") (emphasis added).

18.    Software AG offered no concrete, non-speculative evidence that Consist's alleged misrepresentations in Brazil have damaged, or will damage, its reputation. Since the only harm Software AG identified is remote and speculative, it has not sustained the burden of showing that it faces irreparable injury without a preliminary injunction and is not entitled to injunctive relief.

C.    Software AG is Not Likely to Succeed on the Merits

19.    Plaintiffs have not demonstrated a likelihood of success on either their claim under the Lanham Act or for conveyance of Consist's Brazilian Trademarks.

(1)    Plaintiffs Have Not Shown a Likelihood of Success on Their Lanham Act Claim

(a)    The Statute

20.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, provides in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(b)    Software AG has failed to demonstrate that the Lanham Act should be applied extraterritorially here.

21.    Software AG's argument that extraterritorial application of the Lanham Act is appropriate in this instance is without merit. Software AG has offered no cognizable proof

-25-

regarding Brazilian law in support of its argument that the Lanham Act should be applied to Consist's activities in Brazil. Defendants, in contrast, have submitted proof of that law by a Brazilian trademark lawyer which is credited and, in any event, unrebutted.

22.    In the Second Circuit, the exercise of extraterritorial jurisdiction over Lanham Act violations occurring abroad is determined by an examination of three factors set forth in Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633, 642 (2d Cir. 1956): 1) whether the defendant is a United States citizen; 2) whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's trademark rights under domestic law; and 3) whether the defendant's conduct had a substantial effect on United States commerce. Id., 234 F.2d at 642 (2d Cir. 1956) (emphasis added).

23.    While the court in Vanity Fair wrote that "the absence of one of the [first two] factors might well be determinative and that the absence of both is certainly fatal," Id. at 643, the Second Circuit subsequently made clear in Totalplan Corp. of Am. v. Colborne that the absence of any two of the Vanity Fair factors is fatal. Id., 14 F.3d 824, 831 (2d Cir. 1994). In this instance, two of the factors – a substantial effect on commerce in the United States and the lack of a conflict with foreign law – are absent.[6]

---

[6]    It is not even clear that the first Vanity Fair factor can be satisfied here. While Defendants are present in the United States, the statements to which plaintiffs object are being made in Brazil by a Brazilian affiliate.

The Second Circuit has made clear that the mere presence in the United States of some decision-making regarding foreign activities is not a sufficient substantial effect on United States commerce to trigger an extraterritorial application of the Lanham Act. See Atlantic Richfield Co. v. Arco Globus Int'l Co., 150 F.3d 189 (2d Cir. 1998). In the ARCO decision, the Second Circuit found that the presence in the United States of Arco Globus International, a New York company with offices in New York that directed activity in searching for petroleum products in Russia and other nations, was not sufficient for jurisdiction over plaintiff's claim of infringement of its ARCO gasoline trademark. The court stated that "[a]t best, Arco has shown that [defendant] AGI has a geographic presence in the United States and, by inference from that fact, that some decision-making regarding AGI's foreign activities has taken place on American soil. We do not think that such a presence suffices to trigger an extraterritorial
(Continued...)

24.    As for the third <u>Vanity Fair</u> factor, the Second Circuit has made clear that the Lanham Act may reach conduct that occurs outside of the United States only when necessary to prevent harm to commerce in the United States. <u>See Atl. Richfield Co.</u> v. <u>ARCO Globus Int'l. Co.</u>, 150 F.3d 189, 192 n.4 (2d Cir. 1998) ("[W]e have never applied the Lanham Act to extraterritorial conduct absent a <u>substantial</u> effect on United States commerce.") (emphasis added); <u>Total Plan</u>, 14 F.3d at 830-31 (stating that lack of evidence that infringing goods re-entered United States commerce supported finding that plaintiff failed to demonstrate that defendant's conduct had substantial effect on United States commerce); <u>see also</u> J. Thomas McCarthy, <i>McCarthy on Trademarks and Unfair Competition</i>, § 29:58 (4th Ed. 2007) ("[U]nless the U.S. federal courts are willing to take on the task of being the global court of commerce, local impact alone [i.e., in Brazil] cannot be sufficient for jurisdiction in a U.S. court.").

25.    In this case, Software AG has failed to establish that Consist Brazil's ownership of two valid Brazilian trademark registrations or certain expressions of good faith opinion in Portuguese on the Brazilian website or made to Brazilian consumers in connection with maintenance contracts entered into with its Brazilian customers would have any effect, let alone a substantial one, on United States commerce. <u>See Piccoli A/S</u> v. <u>Calvin Klein Jeanswear Co.</u>, 19 F. Supp. 2d 157, 170 (S.D.N.Y. 1998) (stating that "the absence of a substantial effect on domestic commerce [is] fatal to a plaintiff's attempt to apply the Lanham Act to extraterritorial conduct.").

(Continued...)

application of the Lanham Act"), <u>Id.</u> at 193-94. <u>See also</u> World Book, Inc. v. IBM Corp., 354 F. Supp. 2d 451 (S.D.N.Y. 2005) (stating that where the only United States activity is the authorization of allegedly infringing actions in the United Kingdom, there is no jurisdiction in a United States court under the Lanham Act). Here, Software AG has failed to establish any cognizable harm to it or any consumer in the United States predicated upon alleged misstatements by Consist Brazil's personnel or on its website.

26.     There is no evidence that American consumers would even understand the statements written in Portuguese on the website of Consist Brazil, much less be substantially affected by such statements in the United States. See McBee v. Delica Co., 417 F.3d 107, 124 (1st Cir. 2005) (stating that because the defendant's website was in Japanese, it was unlikely that any American consumers would be confused about plaintiff's connection with the defendant). In McBee, the court specifically observed that there is no U.S. judicial policy interest in protecting Japanese consumers from being confused. Id. at 126. Additionally, plaintiff in McBee presented no evidence that allegedly infringing garments sold in Japan would subsequently enter the United States in substantial quantities. Id.

27.     Software AG failed to offer any evidence that United States consumers have been misled by the statements of good faith opinion in Portuguese on the Brazilian website or by oral statements made in Brazil in connection with maintenance contracts entered into by Consist Brazil with its Brazilian customers. See Atlantic Richfield Co., supra, 150 F.3d at193-94 (denying extraterritorial application of the Lanham Act where plaintiff presented no evidence that U.S. consumers were misled or came to view plaintiff's U.S. trademarks less favorably as a result of defendants' infringing foreign conduct).

28.     The existence of a Software AG call center in Denver does not satisfy Software AG's burden of demonstrating a substantial effect on United States commerce. There was no testimony that anything said or done in Brazil by Consist Brazil's employees has harmed Software AG's call center in Denver, nor was there any proof whatsoever that any customer in the United States was not doing business with Software AG as a result of Consist Brazil's alleged misconduct. The mere fact that the Plaintiffs have a presence in the United States, such

as Software AG's Denver call center, is insufficient to demonstrate substantial effect on United States commerce by Defendants' extraterritorial conduct.

29.    Plaintiffs' position is not supported by A.V. by Versace, Inc. v. Gianni Versace, S.p.A, 126 F. Supp. 2d 328 (S.D.N.Y. 2001), where the court found a substantial effect on U.S. commerce based upon undisputed evidence that, unlike here, defendant sold infringing products in the United States, thereby confusing U.S. customers (stating that "alleged importation, as well as sales [of infringing products] within the U.S. and likely consumer confusion" contributed to finding of substantial effect on U.S. commerce); see also Steele v. Bulova Watch Co., 344 U.S. 280, 286-87 (1952) (holding that substantial effect on U.S. commerce stemmed from the fact that fake watches with BULOVA trademark filtered back into the U.S. and caused numerous customer complaints). Here, Software AG has not and cannot possibly provide any evidence establishing that Consist has any products bearing "Adabas" or "Natural" which Consist sends into the U.S. market, let alone cause confusion among U.S. consumers.

30.    Software AG based its motion for injunctive relief, at least in part, upon unsupported allegations of reputational harm and consumer confusion stemming from Consist Brazil's 1986 registration of "Adabas" and "Natural" in Brazil and the alleged misrepresentations on its website in Brazil and to certain Brazilian customers. (Plaintiffs' Memorandum at 11). There is, however, no evidence in the record to show that Software AG's reputation has been harmed in the United States as a result of Consist Brazil's registration of "Adabas" and "Natural" in Brazil, its expressions of opinion in Portuguese on the Consist Brazil website or its statements of opinion concerning its ability to perform certain service contracts with Brazilian customers to which Software AG is not even a party. While Software AG relies on cases involving reputational harm to major world-wide, and world famous, companies such as

Calvin Klein and Philip Morris, the evidence of reputational harm in those cases was overwhelming. There is no remotely comparable evidence in this case.

31.    Similarly, because of, inter alia, Software AG's failure to offer any evidence, including survey evidence, in support of its claim of consumer confusion, no evidentiary basis exists for its claim. To the contrary, the only evidence in the record is that in Brazil, the names "Adabas" and "Natural" are associated with Consist, which has been the registered holder of those Marks in Brazil for over 20 years. (1-24 Tr. 134:17-21).

32.    As for the second Vanity Fair factor, since Consist's valid Brazilian trademark registrations are governed by Brazilian law and were issued pursuant to Brazil's trademark statutes, any type of mandatory injunctive relief compelling an assignment of the two marks at issue or issuance of new Marks in the name of Software AG conflicts with Brazilian law. See Do Nascimento Decl. at ¶¶ 4, 11; see also Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., 511 F. Supp. 486 (S.D.N.Y. 1981) (court declined to issue out-of-U.S. injunction where it would be difficult to secure compliance with the court's injunction in the foreign country); Star Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir. 1985) (court denies request for injunction regarding Philippine trademark registration where "[a]pplication of the Lanham Act to wholly foreign Philippine commerce could create a conflict with Philippine patent and trademark law and with pending proceedings in that country."); Int'l Cafe v. Hard Rock Cafe, Int'l, 252 F.3d 1274, 1279 (11th Cir. 2001) (court dismisses plaintiff's request for injunctive relief regarding defendant's use of marks in Lebanon since use of the marks in Lebanon was governed by Lebanese law); Thomas & Betts Corp. v. Panduit Corp., 71 F. Supp. 2d 838, 843 (N.D. Ill. 1999) (stating that the "crucial issue" in declining to exercise jurisdiction under the Lanham Act is the existence of defendant's foreign trademark registration); Person's Co. v.

-30-

Christman, 900 F.2d 1565, 1569 (Fed. Cir. 1990) ("trademark rights exist in each country solely according to that country's statutory scheme."); Steele, 344 U.S. at 285 (plaintiff succeeded in cancelling defendant's Mexican trademark registration prior to the Supreme Court's decision, thereby avoiding any conflict with established foreign rights). In addition, a leading trademark treatise notes that "courts applying the *Vanity Fair* test have taken a narrow view of the reach of extraterritorial jurisdiction." 3-11 Gilson on Trademarks, § 11.03 (2007).[7]

33.    Article 175 of the Brasilian IP Law provides that any judicial cancellation action, as well as judicial proceeding involving Brasilian intellectual property rights, must be filed before the Brasilian Federal Court of Justice and in those cases in which the Brasilian Trademark Office is not a plaintiff, the Brasilian Trademark Office shall participate in the proceedings. Article 175 states:

> "Nullity proceedings shall be filed before the Federal Courts and in those cases in which INPI is not the plaintiff INPI shall participate in the proceedings."

(See Do Nascimento Decl. ¶ 10.)

34.    Further, Brazil has its own unique set of laws regarding what constitutes false advertising. (Do Nascimento Decl. ¶ 3). These laws would govern the statements on Consist Brazil's website and any oral statements made in Brazil. Even if the statements at issue here were made in the United States, and were they false, they are no longer being made. Software

---

[7]    At the TRO hearing, Plaintiffs claimed that they were not seeking a mandatory preliminary injunction for conveyance of the trademarks under the Lanham Act, but rather under the 1998 Agreement. There is nothing in that agreement that would support such relief. As noted, Consist's Brazilian Trademarks were registered over 20 years ago by Consist Brazil, when the parties' relationship apparently was governed by German law. Under Brazilian law, which governs the Brazilian trademarks at issue, they were registered rightfully by Consist Brazil and are now uncontestibly its to use. (Do Nascimento Decl. ¶ 12.)

AG has failed to offer any support for its claim that false advertising law under the Lanham Act does not differ from Brazilian false advertising law.

35.    The second Vanity Pair factor – conflict with foreign law – thus favors Consist. Since both the second and third factors are absent there is no Lanham Act jurisdiction over Consist's actions in Brazil. See Space Imaging Eur., Ltd. v. Space Imaging L.P., 1999 U.S. Dist. LEXIS 10898, *8-9 (S.D.N.Y. July 15, 1999) ("The absence of one of the [Vanity Fair] factors might well be determinative, and the absence of two factors is certainly fatal."). Moreover, since the trademarks belong to a Brazilian entity which is not a United States citizen, not proven to be subject to personal jurisdiction here, and not even a named party, Software AG cannot even satisfy the first Vanity Fair factor. Indeed, on the face of the record, it would appear that Consist Brazil is clearly a necessary and, likely, an indispensable party. Accordingly, the extraterritorial application of the Lanham Act to Consist's conduct in Brazil would be inappropriate.

(2)    Plaintiffs Have Failed to Demonstrate a Likelihood of Success on their False Advertising Claim Under Lanham Act § 43(a)

36.    Even if this Court were to apply the Lanham Act extraterritorially in Brazil in this case – and it cannot – Software AG would not be entitled to preliminary injunctive relief on its false advertising claims under the Lanham Act because it failed to prove that the statements underlying the false advertising claim are "literally false." At the TRO hearing, Software AG asserted that some written statements on Consist Brazil's website and some oral statements supposedly made in connection with certain service contracts by Consist Brazil's Brazilian sales force were "literally false." As to the latter, there is no cognizable proof of any such oral statements. (1-16 Tr. 42:12-13.) Since Consist Brazil corrected the statements on its website to address those aspects of the statements that Software AG characterized as "literally false," Software AG can no longer claim that this Court needs to issue a preliminary injunction to

prevent false statements from being made on the Brazilian website. (Schaffer Decl. Exs. B and G.) Thus, Software AG has failed even to identify in any cogent way any extant false statements on the Consist Brazil website or otherwise.

37.    The statements to which Plaintiffs object are not, in any event, "literally false," but mere good faith expressions of opinion. The statements reflect Consist's belief concerning its prospects for relief on appeal as well as its beliefs concerning its rights under the 1998 Agreement. Consist believes that Paragraph 3 gave it the right to enter into maintenance agreements extending beyond December 31, 2007. Whether Consist Brazil is right or wrong as to its rights has yet to be determined – but its belief is a matter of opinion, not fact and, as such, cannot be literally false.

38.    Statements of opinion are not covered by the Lanham Act since, to fall within § 43(a) of the Lanham Act, an alleged misrepresentation must be one of "fact." Groden v. Random House, 61 F.3d 1045, 1051 (2d Cir. 1995) ("Statements of opinion are generally not the basis for Lanham Act liability . . . ample leeway must be accorded to statements that [express] . . . opinions, no matter how extravagantly worded"); Randa Corp. v. Mulberry Thai Silk, Inc., 2000 U.S. Dist. LEXIS 17014, *8 (S.D.N.Y. Nov. 22, 2000) (stating that subjective claims or opinions regarding a possible future event are not actionable under § 43(a)); Dial A Car v. Transportation, Inc., 884 F. Supp. 584, 592 (D.D.C. 1995) (holding that defendant taxi cab company's statements that it has legal authority to offer corporate account transportation services in the District of Columbia are not within § 43(a); because the local D.C. authorities had not yet determined the legality of such actions by defendant, the statements were opinions, not "verifiably false representations of fact").

-33-

39.    Moreover, oral statements generally are not covered by Lanham Act § 43(a). See, e.g., Licata & Co. v. Goldberg, 812 F. Supp. 403, 408 (S.D.N.Y. 1993) (stating that oral remarks to customers by former employee that plaintiff is not qualified to serve their business needs is not within § 43(a); "oral comments about competitors are at the opposite pole from clearly definable media advertising.").

(3)    Plaintiffs' Unpleaded Claim for Conveyance of Consist's Brazilian Trademarks Based on the Implied Covenant of Good Faith and Fair Dealing

40.    The complaint in this action does not allege that Consist Brazil should be required to convey its registered Marks to Plaintiffs based on a purported breach of the implied covenant of good faith and fair dealing. (Complaint ¶¶ 113-120.) Had such a claim been made, it would have been baseless because the covenant of good faith and fair dealing, which is implied in contracts under New York law, cannot be used to add terms that the parties failed to include.

41.    New York law does not, however, even govern the 1984 Agreement, which was in effect when Consist Brazil registered its trademarks. (Schaffer Decl. Ex. H.) The 1984 Agreement was governed by German law and no showing has been made that German law recognizes a claim for breach of the implied covenant of good faith and fair dealing, much less what the elements of such a claim, if it exists, are.

42.    A party asserting a claim for breach of the implied covenant of good faith and fair dealing under New York law bears a heavy burden. As the New York Court of Appeals held in Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 831 (1978), "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists. Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed

promise sought to be enforced is in fact implicit in the agreement viewed as a whole."

(Emphasis added.) See also M/A-Com Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)

("In general, courts enforce the implied covenant where an implied promise was 'so interwoven

in the whole writing' of a contract as to be necessary for effectuation of the purposes of the

contract"); Warner Theatre Assocs. Ltd. Pshp v. Metropolitan Life Ins. Co., 1997 U.S. Dist.

LEXIS 17217, at *17 (S.D.N.Y. Oct. 31, 1997) ("The duty of good faith 'cannot add to, detract

from, or alter the terms of the contract itself").

43.    In Roli-Blue, Inc. v. 69/70th Street Associates., 119 A.D.2d 173, 506 N.Y.S.2d

159 (N.Y. App. Div. 1st Dep't 1986), where the parties entered into a commercial lease which

permitted plaintiff to operate a restaurant in the premises, defendant failed to maintain a current

certificate of occupancy which prevented the tenant from operating its restaurant.  Although the

lease did not explicitly obligate the landlord to keep its certificate of occupancy, the Appellate

Division held that "[a]n obligation on the part of a landlord . . . will be implied if it may

rightfully be assumed that the parties would themselves have imposed such an obligation had

their attention been drawn to it, and their conduct inspired by principles of justice."  Id., 119

A.D.2d at 177, 506 N.Y.S.2d at 161.

44.    By contrast, in Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F.Supp.

1504, 1516 (S.D.N.Y. 1989), vacated on other grounds, 906 F.2d 884 (2d Cir. 1990), where

bondholders alleged that defendant's indentures imposed an implied obligation on the issuer to

limit the new debt incurred, the court rejected their claim.  After noting that the provision the

bondholders were asking the court to imply was sometimes expressly bargained-for, the court

explained:  "While the Court stands ready to employ an implied covenant of good faith to ensure

that such bargained-for rights are performed and upheld, it will not, however, permit an implied

covenant to shoehorn into an indenture additional terms plaintiffs now wish had been included."
Id. at 1519.

45.    In this case, the parties could have included a trademark license in their
distribution agreements and specified what was to happen upon termination of the distributorship
relationship. No such provisions appear in any of the distribution agreements, and no such
agreement should be implied since it would add a new term – rather than effectuate the express
purpose of the agreements. This is particularly true here, where rights to Consist's Brazilian
Trademarks have inured to the benefit of Consist Brazil under Brazilian law. Thus, by the time
the Parties' exclusive distribution relationship became subject in any way to New York law,
Consist's Brazilian Trademarks were already owned by Consist Brazil pursuant to Brazilian law
and well past the deadline for cancellation actions.

46.    Moreover, "'the implied covenant does not extend so far as to undermine a party's
'general right to act on its own interests in a way that may incidentally lessen the other party's
anticipated fruits from the contract.'" Ferguson v. Lion Holding, Inc., 478 F. Supp. 2d 455, 469
(S.D.N.Y. 2007) (citation omitted).

47.    In any event, the remedy for a breach of the implied covenant of good faith and
fair dealing is money damages – not equitable relief. See Goldblatt v. Englander Communs.,
L.L.C., 431 F. Supp. 2d 420, 424 (S.D.N.Y. 2006) (where a claim was raised for breach of the
implied covenant of good faith and fair dealing, noting that "[w]here monetary damages are
adequate compensation, a preliminary injunction will not issue.") (emphasis added).

48.    The relief Software AG seeks by way of a motion for a preliminary injunction –
the conveyance of Consist's Brazilian Trademarks to Software AG – is the same as the ultimate
relief sought in this case. As such, Software AG has a heightened burden, and it has not

-36-

sustained its burden of showing a clear likelihood of success on this claim. Accordingly, it is not entitled to the remedy of a mandatory preliminary injunction which would change the status quo.

49.    Consist Brazil — which neither is nor could be a defendant in this action — owns valid Brazilian trademark registrations for "Adabas" and "Natural," and has owned them, under Brazilian law, since the 1980's. (Do Nascimento Decl. at ¶ 4). Aerogroup Int'l. v. Marlboro Footworks, 955 F. Supp. 220, 229 (S.D.N.Y. 1997) ("One method by which a conflict with foreign trademark law may be found . . . is where the defendant is operating under a presumptively valid trademark in its home country."). Since trademark rights are undeniably territorial in nature, Consist Brazil's valid Brazilian trademark registrations for Consist's Brazilian Trademarks are subject to Brazilian trademark laws.

50.    As Judge Leval explained in Osawa & Co. v. B & H Photo, "a trademark has a separate legal existence under each country's laws." 589 F. Supp. 1163, 1171-72 (S.D.N.Y. 1984). "Precisely because a trademark has a separate legal existence under each country's laws, ownership of a mark in one country does not automatically confer upon the owner the exclusive right to use that mark in another country." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 155 (2d Cir. 2007). Instead, the owner of a mark in the United States must take all appropriate steps to ensure that its rights to that mark are protected in any country in which it seeks to assert them. See Id. at 155-56.

51.    Consist Brazil had and continues to have valid trademark rights in Consist's Brazilian Trademarks pursuant to its Brazilian trademark registrations governed by Brazilian law. (Do Nascimento Decl. ¶ 4). Since the exclusive distribution relationship between Consist's predecessor and Software AG was governed by German law at the time Consist secured registration of Consist's Brazilian Trademarks, there is no legal or factual basis for Software

AG's reliance on United States law for the proposition that "trademark rights licensed to an exclusive distributor revert back to the trademark owner at the end of the contractual relationship and any registration by the distributor is valid." (Plaintiffs' Memorandum at 12).

52.    In any event, even under United States law, a distributor may own the trademark in goods it does not manufacture where, as here, the reputational goodwill in the mark rests with the distributor. See, e.g., Tactica Int'l v. Atl. Horizon Int'l., 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) (stating that distributor, rather than manufacturer, owned trademark where "goods pass[ed] through [the distributor's] hands in the course of trade and [the distributor] gives them the benefit of [its] reputation or of [its] name and business style") (internal quotations and citations omitted)); IMAF, S.P.A. v. J.C. Penney Co., 806 F. Supp. 449 (S.D.N.Y. 1992) (stating that distributor, rather than manufacturer, of clothing owns trademark rights where distributor sold products bearing the mark at its stores and backed the products with its reputation). Accordingly, contrary to Software AG's contention, the law makes clear that an exclusive distributor can acquire trademark ownership rights in a trademark even when the mark was initially used by a manufacturer.

53.    Brazil is a registration based country in which trademark rights flow solely from registration of a trademark. In the United States, by contrast, the trademark system is use-based. Empressa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 468 (2d Cir. 2005) ("[T]he standard test for ownership of a mark is priority of use").

54.    At the time that the marks were registered, Brazilian law explicitly required license agreements to contain a quality control provision. (Do Nascimento Decl. ¶ 9). The 1984 Agreement did not provide that Software AG owns the marks. (Schaffer Decl. Ex. i). It did not provide that use of the marks inured to the benefit of Software AG. The 1984 Agreement was

not entitled "License Agreement" and contained no quality control provisions. Under the law of both Brazil and this Circuit, the lack of these standard provisions used by trademark owners in distribution and license agreements defeats Software AG's ownership claim.

55.    Thus, this case is distinguishable from all of the cases Software AG cites in support of its argument that all rights in Consist's Brazilian Trademarks should be transferred to Software AG at the end of its contractual relationship with Consist. For example, in Blue Planet Software, Inc. v. Games Int'l, LLC, 331 F. Supp. 2d 273 (S.D.N.Y. 2004), the court ultimately denied the parties' requests for injunctive relief as on the issue of trademark ownership because of the ambiguity in the agreements between the parties regarding trademark ownership.

56.    Another of Software AG's cases – Omag Optik Und Mechanik A.G. v. Weinstein, 85 F. Supp. 631 (S.D.N.Y. 1949) – is distinguishable because the defendant distributor's use of the mark was not legitimate and defendant's advertising expenditures to promote the mark took place when defendant was in violation of his agreement with the plaintiff manufacturer.

57.    A third case – Major-Prodotti Dentari-Societa v. Shimer, 161 U.S.P.Q. (T.T.A.B. 1968) – is distinguishable because, unlike here, the agreement between the parties in that case contained provisions explicitly providing that any rights in the mark at issue reverted back to the petitioner manufacturer upon expiration of the agreement.

(4)    Plaintiffs Failed to Establish a Likelihood of Success on their Unfair Competition Law Claim

58.    For purposes of their preliminary injunction application, Plaintiffs appear to have abandoned their claim for unfair competition under New York law. They clearly did not establish a likelihood of success on this claim.

59.    As a preliminary matter, the exact same activities underlying Software AG's federal Lanham Act claim also underlie its New York common law unfair competition claim –

namely Consist Brazil's registration of its Marks in Brazil and its good faith expressions of
opinion on its website and in certain maintenance contracts. Since the federal Lanham Act is
clearly broader in scope than New York common law and, as discussed above, it would be
inappropriate to apply the Lanham Act extraterritorially, it follows that New York common law
should not be applied extraterritorially to Consist Brazil's conduct in Brazil. See Atlantic
Richfield Co., 150 F.3d at 194 n.5.

60. New York unfair competition law does not apply to extraterritorial conduct. See,
e.g., C.A. Westel de Venez. v. American Tel. & Tel. Co., 1992 U.S. Dist. LEXIS 12301, *35-36
(S.D.N.Y. Aug. 17, 1992) (holding that no cause of action existed for unfair competition under
New York common law where allegedly unfair competition occurred within Venezuela).

61. Further, New York unfair competition law is intended to protect New York
consumers and address activity that adversely affects the New York customer. See, e.g.,
Aerogroup Int'l. v. Marlboro Footworks, 956 F. Supp. 427, 433-434 (S.D.N.Y. 1996). No such
activity is alleged here.

62. Finally, Software AG offers no support for issuing an order pursuant to New York
law by a court in New York governing oral statements that were made -- if at all -- outside the
United States to other individuals outside the United States concerning transactions outside the
United States governed by foreign law.

(5) Plaintiffs have Not Established a Likelihood of Success on their Tortious
Interference with Prospective Business Relations Claim.

63. Plaintiffs also failed to establish a likelihood of success on their claim for
injunctive relief against tortious interference with prospective business relations. Moreover, any
such claim, if it could be sustained, would be compensable in money damages.

64.    To establish a claim for tortious interference with prospective business relations under New York law, "a plaintiff must prove four elements: (1) there was a business relationship with a third party; (2) defendants knew of that relationship and intentionally interfered with it; (3) defendants either acted solely out of malice or used wrongful means; and (4) defendants' interference caused injury to the relationship with the third party. " Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 2007 U.S. Dist. LEXIS 504, at **65-66 (S.D.N.Y. Jan. 8, 2007) ("But Plaintiffs present absolutely no evidence that [defendant] acted 'solely with malice' or through the use of wrongful conduct, and therefore Plaintiffs' tortious interference with prospective business relations claim fails as a matter of law.") (citing Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)).

65.    "Under New York law, proof that a defendant was motivated by 'self-interest or other economic considerations' will not suffice to make out a claim for tortious interference with prospective business relations." Reading Int'l, Inc., 2007 U.S. Dist. LEXIS 504, at * 65 (citing Shared Communications Services of ESR, Inc. v. Goldman Sachs & Co., 23 A.D.3d 162, 163, 803 N.Y.S.2d 512 (NY App. Div. 1st Dep't 2005). "In fact, evidence of self-interest serves to rebut any allegation of malice." Reading Int'l, Inc., 2007 U.S. Dist. LEXIS 504, at *66.

66.    Here, Software AG failed to establish that Consist intentionally interfered with PRODESP solely out of malice or through improper means. Indeed, the Court has already pointed out the utter lack of evidence regarding malice at the January 24, 2008 hearing, stating: "I think you'd have a tough row to hoe on malice, let me put it that way. And that's unfortunately for you the linchpin of a prospective business advantage, prospective commercial relations claim." (1-24 Tr. 139: 7-11.) Moreover, the moving papers do not establish that Consist knew about Software AG's "prospective" relationship with PRODESP, nor could they.

Since Consist entered into its agreement with PRODESP while the Agreement was in effect, Plaintiffs themselves had no right to enter into agreements of their own in Brazil. Indeed, the only extant relationship was that between PRODESP and Consist – a relationship that goes back over 30 years.

67.    Moreover, Software AG failed to establish any harm – much less irreparable harm from the PRODESP relationship. Software AG simply states that "[Consist's] actions have damaged Software AG and have caused actual confusion." (Plaintiff's Memorandum at 17). In his moving declaration, Karl-Heinz Streibich states: "I am informed that a SAG sales representative, who visited PRODESP after January 1, 2008, PRODESP is confused by Consist's representations to it regarding ongoing rights Consist supposedly has." See Streibich Decl. at ¶ 39. Significantly, however, Software AG does not identify any personnel at PRODESP who are confused, and more importantly, it does not articulate how Plaintiffs have allegedly been harmed – irreparably or otherwise.

68.    Even if some level of harm could be established, it would be fully compensable in money damages. "Because monetary loss may be estimated and compensated, such harm is not considered irreparable harm, unless the movant can show the monetary loss cannot be compensated, for example, because it will probably result in bankruptcy." Freedom Calls Found. v. Bukstel, 2006 U.S. Dist. LEXIS 19685, at *15-16 (E.D.N.Y. Mar. 3, 2006).

69.    Since Plaintiffs cannot establish each of the elements of a claim for tortious interference with prospective business relations, they cannot show a likelihood of success on the merits.

D.    Plaintiffs Have Not Sustained Their Burden of Establishing Irreparable Injury

70.    Plaintiffs offered no proof that they faced any non-speculative injury during the pendency of this action. (1-24 Tr. 77-78.)

71.    There is no legal support for Software AG's position that the mere possibility of some future injury -- which is all Software AG showed -- can satisfy the requirement of irreparable injury (1-24 Tr. 111), and the law in this Circuit is clearly contrary to Software AG's position. NAACP v. Town of E. Haven, supra, 70 F.3d at 224; Marcy Playground, Inc. v. Capitol Records, supra, 6 F. Supp. 2d at 282-283; Marisa Christina, Inc. v. Bernard Chaus, Inc., supra, 808 F.Supp. at 359.

72.    Plaintiffs have not established irreparable injury with respect to either their request for a preliminary injunction directing Consist to convey Consist's Brazilian Trademarks to them or enjoining Consist from making statements relating to, or performing, maintenance contracts in Brazil.

(1)    Irreparable Injury and the Claim for Transfer of Consist's Brazilian Trademarks

73.    Plaintiffs' delay in asserting a claim to Consist's Brazilian Trademarks in Brazil is wholly at odds with their claim that preliminary injunctive relief is urgently needed. It is undisputed that Consist Brazil registered the "Adabas" and "Natural" trademarks in 1986 and that Consist Brazil's registration of "Adabas" and "Natural" in Brazil has thus been a matter of public record for more than two decades. (PX 11.)

74.    In addition, Plaintiffs' current counsel sent a letter on October 10, 2007 claiming to have learned that Software AG had only recently found out that Consist Brazil had registered Consist's Brazilian Trademarks in Brazil, but took no action at that time.

75.    Having delayed in taking any action with respect to Consist's Brazilian Trademarks, Software AG cannot claim that it will now suffer irreparable harm if Consist (which

does not even own the "Adabas" and "Natural" trademarks) is not immediately ordered to convey Consist's Brazilian Trademarks to Software AG. The relief Software AG seeks by way of a motion for a preliminary injunction is the same as the ultimate relief it seeks in this case.

(2)    Irreparable Injury and the Maintenance Contracts

76.    With respect to Plaintiffs' application for a preliminary injunction barring Consist from making representations concerning or performing any pre-December 31, 2007 license or maintenance agreements in South America, Consist is not offering any new licenses or maintenance agreements, nor is it representing to current or potential customers that it now has any exclusive distribution rights to Software AG technologies in South America, or the ability to enter into new maintenance agreements which rely on Software AG's performance. Consist Brazil is merely continuing to honor those contracts entered into while the 1998 Agreement was still in effect.

77.    In effect, Plaintiffs are seeking a preliminary injunction barring Consist from engaging in conduct which, at least as adapted at the hearing on this motion, they believe breaches the 1998 Agreement's continuing covenant of good faith and fair dealing. (1-24 Tr. 11). Such injury is compensable in money damages and therefore does not constitute irreparable injury. JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) ("it is settled law that when an injury is compensable through money damages there is no irreparable harm.").

78.    Plaintiffs have not shown that, if they were ultimately to prevail, their claim could not be compensated in money damages. General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994) ("since the damages caused by defendant's alleged breach [of contract] can be remedied at law, injunctive relief is inappropriate") (emphasis added).

-44-

79.    Software AG offered no concrete, non-speculative evidence that Consist's alleged misrepresentations in Brazil have damaged, or will damage, its reputation. Since the only harm Software AG identified is remote and speculative, it has not sustained the burden of showing that it faces irreparable injury without a preliminary injunction and is not entitled to injunctive relief.

E.    The Balance of Hardships Favors Consist

80.    In addition to its other infirmities, Plaintiffs' putative claim for breach of the covenant of good faith and fair dealing, as it relates to conveyance of Consist's Brazilian Trademarks, suffers from an additional defect. For over 20 years, Consist Brazil has been registered as owner of the "Adabas" and "Natural" trademarks. Plaintiffs did nothing to police these Marks in the Territory because they did not and do not own the "Adabas" and "Natural" trademarks in the Territory. The reputational goodwill in these Marks has rested, for over 20 years, with Consist Brazil. Software AG's expert recognized as much in the First Litigation, when he testified that users of Adabas or Natural associated those names with Consist, not Software AG. (Schaffer Decl. Ex. H at p. 10.)

81.    Even if Schnell's admitted knowledge that Consist Brazil registered the trademarks were not imputed to Plaintiffs – and it should be – Plaintiffs clearly should have known about the trademark registrations that were registered by Consist Brazil for more than 20 years if for no other reason than they were publicly registered.

82.    Even in October, 2007, when Plaintiffs' U.S. counsel claimed that Software AG first learned of the registrations, they did not amend their counterclaims to include a trademark claim or take any other step to enforce their purported rights. These actions belie Plaintiffs' claim that emergency relief is now warranted.

-45-

83.    Plaintiffs' laches in bringing these trademark claims further tilts the balance of hardships against them. See Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2d Cir. 1985) (preliminary injunction denied where there was ten-week delay in seeking preliminary injunction after plaintiff learned of defendant's allegedly infringing use, with court holding that delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury").

84.    In this case, there is no hardship to Software AG if the Court were to preserve the status quo as it has existed since at least 1986. Accordingly, the balance of equities tips in favor of Consist.

Dated: New York, New York
     January 28, 2008

DUANE MORRIS LLP

By:  /s / Hyman L. Schaffer
       Hyman L. Schaffer
       Fran M. Jacobs
       Gregory P. Gulia
       Brian Damiano
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
Facsimile: (212) 692-1020
*Attorneys for Defendants*