James David Jacobs
Frank M. Gasparo
Marcella Ballard
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel: 212-626-4100
Fax: 212-310-1600

Attorneys for Software AG, Inc.
and Software AG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOFTWARE AG, INC. and SOFTWARE AG,<br><br>                              Plaintiffs,<br><br>            -against-<br><br>CONSIST SOFTWARE SOLUTIONS, INC. f/k/a CONSIST INTERNATIONAL, INC. and NATALIO FRIDMAN,<br>                              Defendants. | Case No.<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiffs Software AG, Inc. ("SAGA") and Software AG ("SAG") (collectively

"Software AG" or "Plaintiffs"), by their attorneys Baker & McKenzie LLP, for their

proposed findings of fact and conclusions of law submit the following:

**Table of Contents**

Page

FINDINGS OF FACT ................................................................................................. 1

    The Agreement Has Expired ................................................................................ 2

    The 1998 Distributorship Agreement .................................................................. 3

    Prior Agreements Between The Parties Stem Back to 1975 ................................. 4

    Perpetual Or Time-Limited Licenses And/Or Maintenance
        Agreements ................................................................................................. 6

    Defendants' Misrepresentations .......................................................................... 6

    The Website Notices........................................................................................... 7

    The Correspondence from Fridman to SAG......................................................... 8

    The PRODESP Agreement.................................................................................. 9

    Software AG Trademarks ADABAS and NATURAL........................................... 12

    IRREPARABLE HARM...................................................................................... 13

CONCLUSIONS OF LAW ........................................................................................ 16

Consist Breached The Agreement In Agreeing to Provide Maintenance
    After The Agreement's Termination .................................................................. 16

    Plaintiffs Are Likely to Succeed........................................................................ 16

    Plaintiffs Are Entitled to Injunctive Relief......................................................... 18

CONSIST BREACHED THE AGREEMENT IN REFUSING TO
    ASSIGN THE TRADEMARK REGISTRATIONS TO SOFTWARE
    AG ..................................................................................................................... 20

    Plaintiffs Are Likely To Establish That Consist Breached the
        Express Provisions of the Agreement............................................................ 20

    Plaintiffs Are Likely to Establish that Consist Breached The
        Implied Covenant Of Good Faith And Fair Dealing ....................................... 32

    Plaintiffs Are Entitled to Injunctive Relief......................................................... 34

DEFENDANTS FALSELY ADVERTISED IN VIOLATION OF THE
    LANHAM ACT................................................................................................... 36

Plaintiffs Are Likely to Succeed..............................................................36

Applying the Vanity Fair Test to the Facts of This Case .....................................39

The Lanham Act Applies Extraterritorially in This Case......................................40

DEFENDANTS TORTIOUSLY INTERFERED IN PLAINTIFFS'
PROSPECTIVE BUSINESS RELATIONS.................................................................48

Plaintiffs Are Likely To Succeed .......................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.T.Cross v. Sunil Trading Corp.,*
467 F.Supp. 47 (S.D.N.Y. 1979) ................................................................................39

*Apex Pool Equipment Corp. v. Lee,*
419 F.2d 556 (2d Cir. 1969) .....................................................................................17

*Coca-Cola v. Tropicana Products, Inc.*
690 F.2d 312 (2d Cir. 1982) ...............................................................................36, 37

*Gordon & Breach Science Publrs., S.A. v. American Inst. of Physics,* 905 F. Supp.
169 (S.D.N.Y. 1995)................................................................................................46

*Gordon & Breach Science Publrs., S.A. v. American Inst. of Physics,* 905 F. Supp.
169, 181-82 (S.D.N.Y. 1995) ..................................................................................46

*Major-Prodotti Dentari-Societa In Nome Collettivo Di Renaldo Giovanni & Figli*
*v. Shimer,*
161 USPQ 437 (TTAB 1968) ....................................................................................21

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,*
938 F.2d 1544 (2d Cir. 1991) ..................................................................................37

*Omag Optik UND Mechanik A.G. v. Weinstein,*
85 F.Supp. 631 (SDNY 1949) .............................................................................22, 23

*Register.com, Inc. v. Domain Registry of Am. Inc.,*
No. 02 Civ. 6915, 2002 U.S. Dist. LEXIS 24795 (S.D.N.Y. Dec. 27, 2002) ...............36, 38

*Smithkline Beecham L.P. v. Johnson & Johnson-Merck Co.,*
906 F. Supp. 178 (S.D.N.Y. 1995), aff'd 100 F.3d 943 (2d Cir. 1996)............................36, 37

*Steele v. Bulova Watch Co.,*
334 U.S. 280 (1952) ................................................................................................39

*Telebrands Corp. v. Wilton Indus., Inc.*
983 F.Supp. 471 (S.D.N.Y. 1997) ............................................................................39

*Vanity Fair Mills, Inc. v. T. Eaton Co.,*
234 F.2d 633 (2d Cir. 1956), cert. denied, 352 U.S. 871 (1956)..........................39, 40, 41, 46

*Vidal Sassoon, Inc. v. Bristol-Myers Co.,*
661 F.2d 272 (2d Cir. 1981) .....................................................................................39

*Warnaco Inc. v. VF Corp.,*
    844 F. Supp. 940 (2d Cir. 1994) .................................................................................39, 40

**STATUTES**

Both the Lanham Act and the Industrial Property Law....................................................41

Property Law ....................................................................................................................41

**OTHER AUTHORITIES**

MacSwain Dec. ¶ 22.........................................................................................................18

Streibich Dec. ¶ ¶ 35-40 ..................................................................................................39

## FINDINGS OF FACT

1.  This is an action for a declaratory judgment, temporary, preliminary and permanent injunctive relief and compensatory damages filed by Software AG against Consist Software Solutions, Inc. ("Consist") and Natalio Fridman ("Fridman") (collectively "Defendants").

2.  The court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) as this action involves a federal question pursuant to the Lanham Act, 15 U.S.C. 1051 *et seq.* This court also has jurisdiction over the claims pursuant to 28 U.S.C. § 1332, diversity of citizenship, and 28 U.S.C. § 1367.

3.  Venue is proper under 28 U.S.C. § 1391, Fed. R. Civ. P. 13 and the parties' Agreement, which was negotiated in New York and expressly provides that it shall be subject to and interpreted in accordance with New York law. Consist and Fridman reside in this district. January 24, 2008 Preliminary Injunction Hearing Transcript "Tr." at 87.

## THE PARTIES

4.  SAGA is a corporation organized and existing under the laws of Virginia with its principal place of business in Virginia at 11700 Plaza America Drive, Suite 700, Reston, Virginia 20190. Complaint ¶ 3.

5.  SAG is SAGA's parent and is a corporation organized and existing under the laws of Germany with its principal place of business at Uhlandstrasse 12, 64297 Darmstadt, Germany. Complaint ¶ 4.

6.  Consist has its principal place of business in New York, NY 10022. Tr. 87.

7.  Since 1988 Natalio Fridman is and has been a resident of New York, New York. Tr. 87.

1

8.    During all relevant times Fridman had the authority to bind Consist and Consist's affiliates, including the Consist affiliates in Brazil. Tr. 88-89, 91; 96; *see also* Trial exhibit of Plaintiffs ("Pls. Ex.") 7.

### *The Agreement Has Expired*

9.    In an agreement effective January 1, 1998 (the "Agreement") SAGA granted exclusive distribution rights for SAG Software Products to Consist within a 7-country territory in South America (the "Territory") for a 10-year term ("Term"), renewable only if either party did not give a notice of non-renewal 18 months prior to the end of the Term. Complaint Ex. 1.

10.    After receiving Software AG's timely notice not to renew, and only 4 months before the end of the Term, Consist sued to enjoin Software AG from terminating the Agreement, and sought specific performance to force Software AG to perform the Agreement for five years beyond the initial Term ("The First Litigation").

11.    By stipulated order on October 31, 2007, the court, *inter alia*, dismissed with prejudice Consist's claims for an injunction, specific performance and damages in Counts I, III, IV, VI, VIII, IX, X, XI and XII of Consist's complaint in The First Litigation, reserving only Counts II and VII of Consist's complaint seeking a declaratory judgment. The parties waived their rights to trial by jury agreeing that all issues remaining would be tried by the court. Complaint Ex. 2.

12.    This Court tried The First Litigation in December 2007 and in a decision dictated from the bench on December 17, 2007 issued a verdict ("December 17, 2007 Verdict") in Software AG's favor and made Findings of Fact and Conclusions of Law, *inter alia*, that the Agreement expired in accordance with Paragraph 1 as of December 31, 2007. Complaint Ex. 3.

13.   On December 21, 2007, the parties stipulated that the December 17, 2007 Ruling, Findings of Fact and Conclusions of Law, Verdict and December 21, 2007 Stipulation constituted a "Final Judgment" from which an appeal may lie. Complaint Ex. 4.

### *The 1998 Distributorship Agreement*

14.   Paragraph 1 of the Agreement provides that SAGA appointed Consist during the Term to be its exclusive distributor of the "SYSTEMS". Complaint Ex. 1.

15.   The term "Consist" in the Agreement includes all of Consist's subsidiaries and affiliates, including the Consist companies in Brazil: Consist Ltd., Grupo Consist do Brasil and Consist Consultoria (hereafter "Consist Brazil").

16.   Fridman testified that he is President of Consist and has a broad power of attorney to appoint the officers of Consist Brazil. Tr. 91,ll. 15-17.

17.   Fridman signed many of the representations at issue in this lawsuit as "Natalio Fridman, President CONSIST GROUP" and "President Grupo Consist do Brasil". Pls. Ex. 1, 2, 3 and 4.

18.   When he executed the Agreement, Fridman bound not only Consist, but also Consist Brazil regarding any rights that Defendants contend stem from the Agreement.

19.   In the Agreement the "SYSTEMS" include products manufactured in whole or in part by Software AG, including but not limited to ADABAS, the database technology, and NATURAL, the proprietary programming language (both ADABAS and NATURAL are referred to as "SAG Software Products").

20.   Paragraph 2 of the Agreement provides that SAGA authorized Consist during the Term to enter into customer agreements in the Territory for licensing,

installing, technical assistance, training and maintenance of the software packages for which SAGA granted it exclusive distribution rights.

21. Paragraph 3 of the Agreement provides that SAGA granted Consist during the Term of the Agreement the "right to grant both perpetual or time-limited licenses, and/or maintenance agreements" in exchange for quarterly payments to SAGA.

22. Paragraph 5(1) of the Agreement provides in pertinent part that "CONSIST acknowledges the SYSTEMS and all documentation or information as trade secret of SAGA and undertakes to oblige its personnel to protect the SYSTEMS as well as their copyrights and trademarks and to prevent them from unauthorized use."

23. Paragraph 5(4) of the Agreement provides that:

> "CONSIST agrees to be responsible for all technical assistance and support activities in the TERRITORY including maintenance services for both present and future users. This obligation of CONSIST will continue until termination of the Agreement including any extension thereof."

24. The Agreement does not convey any license, either during the Term or thereafter, to Consist to copy or use the SYSTEMS for its own business.

### Prior Agreements Between The Parties Stem Back to 1975

25. The Agreement was preceded by another distributorship agreement for the period January 1, 1995 through December 31, 1997 between Consist's predecessor Pan American Computer Systems, Inc. ("PACS") on the one hand and SAG and SAGA on the other hand. Pls. Ex. 6.

26. PACS and SAGA executed a distributorship agreement dated January 1, 1992 though December 31, 1994 (the "95 Agreement"). Pls. Ex. 5.

27.    Distributorship agreements between the parties exist going back to 1975 and were submitted to the Court prior to the Hearing. *See* Jan. 17, 2008 Letter and exhibits from Plaintiffs.

28.    An unexecuted copy of the distributorship agreement between the parties exists for the period January 1, 1984 though December 31, 1986 ("the 1984 Agreement ") and was submitted to the Court before and at the Hearing. *Id.*

29.    All known Agreements since 1975 between the parties include a provision substantially identical to Paragraph 5(1) of the Agreement quoted above in which Consist shall protect the trademarks of the SYSTEMS. *Id.*

30.    During the period from 1984 and 1993 Consist applied for and was granted 6 trademark registrations on for the trademarks ADABAS and NATURAL in Brazil. Pls. Ex. 11.

31.    At the time Consist applied for and obtained trademark registrations for the marks ADABAS and NATURAL the 1984 Agreement was in effect.

32.    The third paragraph of Paragraph 5(1) in the 1984 Agreement is identical to the same paragraph in the Agreement.

33.    SYSTEMS is defined in the first Whereas clause of the 1984 Agreement as "certain software packages according to attachment 1 (being upgraded from time to time)".

34.    Among the SYSTEMS listed in Attachment 1 to the 1984 Agreement are ADABAS and NATURAL.

**Perpetual Or Time-Limited Licenses And/Or Maintenance**
**Agreements**

35.    Paragraph 3 of the Agreement is identical to the preceding 1995 Agreement

between the parties and includes a comma, *i.e.* it reads that during the Term Consist has

the right to grant: "perpetual or time-limited licenses, and/or maintenance agreements".

Complaint Ex. 1; Pls. Ex. 6.

36.    Paragraph 3 of the 1992 Agreement did not have a comma, *i.e.*, it read that

during the Term Consist had the right to grant: "perpetual or time-limited licenses and/or

maintenance agreements". Pls. Ex. 5.

37.    Upon the expiration of the Agreement on December 31, 2007 Consist no

longer has the right under Paragraph 2 to enter into customer agreements in the Territory

for licensing, installing, technical assistance, training and maintenance of the SAG

Software Products.

38.    Upon the expiration of the Agreement on December 31, 2007 Consist no

longer had the right under Paragraph 3 to grant for SAG Software Products (1) perpetual

or time-limited licenses or (2) maintenance agreements.

39.    Paragraph 5(4) provides that Consist's obligation to provide maintenance

services to end-users of SAG Software Products expires at the end of the Term.

40.    Consist is not able to offer maintenance services it previously offered

related to SAG Software Products now that the Agreement has expired. Tr. 72,ll. 12-13;

MacSwain Dec. ¶¶ 32-33.

**Defendants' Misrepresentations**

41.    Since the Final Judgment entered December 21, 2007, Defendants have

made several representations through the Consist website and to customers concerning

6

the status of the Agreement, the Court case, the position of Consist now that the Agreement has expired and Consist's supposed continuing rights under the Agreement to provide "Software Maintenance Agreements" to end-users of SAG Software Products.

### The Website Notices

42.    The representations include postings on the Consist website signed by Natalio Fridman and addressed to customers *e.g.,* Notice #1 (Pls. Ex. 1); Notice #2 (Pls. Ex. 2); Amended Notice #1 (Pls. Ex. 3); and Amended Notice #2 (Pls. Ex. 4).

43.    Notice #1 is false because it states, *inter alia,* that Consist may give "retroactive validity to January of 2008" to the Agreement and "thus giv[e] uninterrupted continuity to th[e] successful relationship [between SAG and Consist] of more than 33 years."

44.    As a result of the October 31, 2001 Stipulation, even if Consist were to prevail entirely on appeal it could not reestablish the Agreement, or force Software AG to perform under the Agreement. *See* Complaint Ex. 2.

45.    Thus Consist may not give "uninterrupted" continuity or "retroactive validity" to the Agreement. Consist may bring a new claim. Consist may sue for damages if it prevails on appeal. But Consist may not get the Agreement back. *See id.*

46.    Notice #2 is false because it states, *inter alia,* that Consist may continue to "fully accomplish[]" all support services for SAG Software Products including Technical Updating" (*i.e.,* maintenance services) despite the December 17 Verdict.

47.    The December 17 Verdict ruled that the Agreement terminated or expired as of December 31, 2007. Paragraph 5(4) of the Agreement provides in pertinent part that Consist's "maintenance services" for SAG Software Products continue only "until termination of the agreement…" Consist may no longer provide maintenance services to

SAG Software Product end-users because the Agreement has expired and thus Consist may not "fully accomplish" all support services including Technical Updating.

48.    Amended Notice #1 is signed by Fridman, who resides in New York. It is false because it states that Fridman expects to give "continuance to th[e] successful relationship" between SAG and Consist and that Consist is convinced it may "maintain the exclusive distributorship agreement with Software AG".

49.    As noted above, there is no set of circumstances after The First Litigation – even if Defendants were entirely successful on appeal -- in which Fridman can win back or "maintain" the Agreement or force SAG to perform under the Agreement. *See* Complaint Ex. 2.

50.    Amended Notice #2 is false because it states that all software updates "must be" available to Consist "in the same manner as we have done for the past 33 years…" Upon the expiration of the Agreement Software AG has no obligation to provide Consist with software updates or deliver maintenance services to Consist. Complaint Ex. 1, ¶¶ 3, 5(4).

### *The Correspondence from Fridman to SAG*

51.    The Fridman January 2008 correspondence to the SAG CEO contains statements that are not supported by the plain language of the Agreement. Paragraph 3 does not provide for Consist to grant "perpetual" maintenance agreements. Nor does Paragraph 3 oblige Software AG after the Term to "continue to provide Consist with all new product versions, updates, upgrades and fixes to products, together with all associated materials and training…" free of charge.

52.    In addition this Court finds that the January 14, 2008 correspondence in which Consist asserts that it "properly" entered into maintenance agreements obligating

itself to provide maintenance services beyond the Term to end-users of SAG Software Products is contrary to the plain language of Paragraphs 3 and 5(4) of the Agreement. Consist is not authorized to offer maintenance services beyond the Term.

53.   Nor is Software AG obligated under either Paragraph 3 or 5(4) after the Term to deliver maintenance support services to Consist in the form of upgrades, new versions, maintenance releases, "patches" for software bugs, new versions, online database support, software specialists or access to the source code.

### The PRODESP Agreement

54.   Since the December 17, 2007 Verdict Consist has also executed a number of agreements with end-users of SAG Software Products that post-date the expiration of the Agreement and promise those end-users that Consist will provide various maintenance services for a hefty monthly fee.

55.   Consist entered into two such maintenance service agreements on December 28, 2007, just days before its exclusive distributorship expired, with Companhia De Processamento De Dados Do Estado De Sao Paulo ("PRODESP"). Complaint Ex. 7.

56.   The PRODESP Agreement entered into between Consist Brazil and PRODESP on December 28, 2007 (3 days before the end of the Term) oblige Consist to provide maintenance services for SAG Software Products to PRODESP for 24 months (Section 10.1) for a monthly fee of $177,057 Reals (about $85,000 USD) (Section 3.1.2) which is over $1M USD per year.

57.   The PRODESP Agreement is one example of a Consist Brazil maintenance agreement that extends well beyond the Term, and in which Consist makes false representations.

58.   Mr. Fridman testified at the January 24, 2007 Hearing that there are 179 other similar maintenance agreements extant in the Territory which extend beyond the Term of the Agreement.  Tr. 101 ll. 20-25.

59.   In the PRODESP Agreement, Section 5, Warranty of Technical Updating, and in particular Sections 5.1.2.1 Consist agrees to provide PRODESP new versions of 8 of Software AG's computer programs, including ADABAS and NATURAL.

60.   In the PRODESP Agreement Section 6, Consist's Obligations, Consist Warranty of Technical Updating, and in particular in Section 6.1, Consist assumes an obligation to communicate to PRODESP, in writing, at least 3 times a year, all the alterations and improvements that are made in the computer programs ADABAS and NATURAL.

61.   In Section 7.1.5 Consist represents that Consist has all right, title and interest in those 8 SAG computer programs, including ADABAS and NATURAL.

62.   Consist never had "all" title in the programs and Consist never had the ability on its own to render full maintenance services for SAG Software Products without referring maintenance queries above basic "Level 1 Support" to Software AG's North American support facility located in Denver, Colorado.

63.   Without access to the SAG North American support facility, Consist may not offer or continue to provide maintenance services for SAG Software Products.  Tr. 69 l. 23-73,l. 12.

64.   The Software AG North American support facility has about 125 employees who are available 24/7 to field maintenance requests from end-users of SAG Software Systems.  Tr. 72,ll. 2-6.

65.    During the Term, Consist utilized this SAG facility when the maintenance query from the SAG Software Product end-user was more than a simple "Level 1" request.

66.    Software AG paid during the Term and continues to pay now for the entirety of the operational expenses involved in running the North American support facility.  Tr. 72,ll. 14-21; Tr. 73,ll. 8-12.

67.    Without access to this facility, SAG's online database or the SYSTEMS source code, Defendants may not offer anything other than Level 1 Support (as defined below) to end-users of SAG Software Products.  Tr. 72,ll. 17-21; MacSwain Dec.

68.    Contrary to Defendants' representations, Consist no longer has the ability, rights nor the authorization from Software AG to offer or carry out services under "Software Maintenance Agreements" to end-users of SAG Systems.

69.    Defendants are directly making to customers in addition to PRODESP the same or similar misrepresentations regarding their ability to furnish maintenance services for SAG Software Products that they published on the Consist website and make in the PRODESP agreements.  Tr. 67,ll. 6-8.

70.    A SAG sales representative, who visited PRODESP after January 1, 2008, informed SAG that PRODESP is confused by Consist's representations to it regarding the alleged ongoing rights Consist supposedly has.

71.    PRODESP informed SAG that it will not pay Consist if it becomes convinced that Consist does not have the ability to provide full maintenance.  Thus PRODESP will likely need to enter into a maintenance agreement with Software AG. Streibich Dec. ¶ 39.

11

72.    Contrary to the representations in Plaintiffs' Exhibits 1 and 2, the PRODESP agreements and its oral representations to customers, Consist does not possess or have any longer access to the necessary information and products, including source code, product versions, updates, upgrades and fixes, updated associated materials and training, and revisions to provide maintenance, updates, and licenses to its customers. Complaint Exs. 8, 9; Tr. 72,ll. 14-21.

73.    Fridman testified that he knew of no perpetual maintenance agreements that Consist ever granted.  Tr. 99.

### Software AG Trademarks ADABAS and NATURAL

74.    During the course of The First Litigation Plaintiffs learned for the first time that Consist had registered in Brazil the trademarks for ADABAS and NATURAL (the "SAG Trademarks"), which are, respectively, SAG's trademarks for its database and proprietary programming language.

75.    At no time did SAG transfer or assign the rights to those marks to Consist.

76.    In the Agreement Consist agreed to protect SAG's intellectual property. Paragraph 5(1) provides:

> CONSIST acknowledges the SYSTEMS and all documentation or information as trade secrets of SAGA and undertakes to oblige its personnel to protect the SYSTEMS as well as their copyrights and trademarks and to prevent them from unauthorized use.

77.    Software AG has been using the marks ADABAS and NATURAL since 1972. Tr. 75.

78.    ADABAS and NATURAL are a globally known worldwide brands.  Tr. 74.

79.    Without the ability to use the marks ADABAS and NATURAL Software AG would be without the name for its two core products.   Tr. 75.

12

80. Consist's own literature recognizes that the marks ADABAS and NATURAL are marks of Software AG. On its marketing literature Consist imprints a legend that "Software AG and/or all Software AG products are commercial marks or registered commercial mark of Software AG." Pls. Ex. 10.

81. Fridman testified on deposition that the word "marks" in that legend refers to ADABAS and NATURAL. Tr. 106-107.

**IRREPARABLE HARM**

82. Mr. Mark Edwards, the chief operating officer of the Enterprise Transaction Systems ("ETS") portion of SAG, testified on behalf of plaintiffs.

83. I found Mr. Edwards to be a credible witness and accept his testimony as fact.

84. Mr. Edward established that Software AG operates in 70 countries and that it has offices in 50 countries and customers worldwide. Tr. 54.

85. Software AG prides itself on being customer-centric, whereby the customer and Software AG are closely in touch regarding service and even product development. Tr. 54-55.

86. Mr. Edwards established that Consist's representations regarding its ability to provide maintenance for SAG Software, both written and oral, caused customers to be confused as to whom they should look for maintenance services. Tr. 55.

87. For example, Consist employees had told one customer, Bradesco, that it was the real provider going forward for SAG Software Products, not Software AG. Bradesco also saw Plaintiffs' Exhibits 1 and 2 on Consist's web site that contradicted Software AG's representation that it was now the provider of maintenance services in Brazil.

13

88.   Bradesco did not accept Software AG's representation, referred the matter to its legal department, and did not enter into a maintenance services agreement with Software AG. Tr 65.

89.   Software AG is aware of about 20 additional customers in Brazil who are confused regarding the proper provider of maintenance service for Software AG SYSTEMS including ABN AMBRO, Banco do Brazil, Telefonica, Brazil Telecom, and the Federal Police. Tr. 66, 76.

90.   Many of the end-users of Software AG's SYSTEMS are large multinational organizations that have senior individuals who have global responsibilities. For example, Banco Santander owns ABN AMRO, which is located here in New York, and the senior individuals in that company are learning about the confusion in the marketplace in Brazil.

91.   Although these organization have not yet ceased doing business with Software AG, their present purchasing decisions for future products may well be affected. These organizations would rather err on the side of caution and, because of the confusion that Consist has caused, buy products elsewhere. Tr. 69.

92.   The customers who use the SAG Software Products at issue in this case typically enter into costly maintenance agreements to support that software. *See e.g.,* PRODESP Agreement. Complaint Ex. 7 § 3.1.2. The resources involved in providing maintenance services are huge, because the services involve labor costs and require 24/7 vigilance.

93.   For example, Software AG has 125 experts in its North American support facility in Denver, Colorado (which provides maintenance services to Brazil) devoted to providing support to end-users. The Denver support facility was accessed by and

available to Consist during the Term to be able to properly provide maintenance to its

customers, the end-users of SAG Software Products. Tr. 72. Consist may no longer

access the Denver facility, which is fully owned, operated and paid for by Software AG.

94.    The SAG North American support facility is located to provide support to

SAG Software Product end-users in the United States, Canada and South America.

95.    The customers in the Territory who had access to the facility during the

Term are presumably aware of its existence and are being told now by Consist that it may

offer services and SAG will provide services from this facility to Consist "uninterrupted

by" and "regardless" of the December 17, 2007 Verdict and expiration of the Agreement

on December 31, 2007.

# CONCLUSIONS OF LAW

## Consist Breached The Agreement In Agreeing to Provide Maintenance After The Agreement's Termination

### *Plaintiffs Are Likely to Succeed*

96.    Under New York law, "to establish a claim for breach of contract, a plaintiff must prove the following elements: (1) the existence of a contract; (2) a breach by the other party; and (3) damages suffered as a result of the breach." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).

97.    Software AG asserts a valid claim for breach of contract because (1) the Agreement is a contract that (2) was breached by Defendants, who are continuing to disregard the termination of their right to provide maintenance, and (3) they have caused Software AG damages in the form of harm to its reputation and loss of customers in Brazil, in the U.S. and worldwide.

98.    The terms of the written Agreement are not in dispute.  Under New York law, whether a contract is unambiguous is a question of law for the Court.  *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350 (1998).  Ambiguity is determined from within the four corners of the agreement. *Id.*

99.    Where a contract is unambiguous parole evidence is not permitted. "Where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]" and should seek a sensible meaning. *Kass, supra,* 91 N.Y.2d at 566-67 (quotation marks and citations omitted).

100.  Nevertheless, "evidence of trade usage, course of dealing, and course of performance" may be considered, even where the contract's language is unambiguous. *Cibro Petroleum Prods. Inc. v. Sohio Alaksa Petroleum Co.*, 602 F. Supp. 1520, 1545 n. 32 (N.D.N.Y. 1985) (quoting U.C.C. § 2-202); *see also Apex Pool Equipment Corp. v. Lee*, 419 F.2d 556 (2d Cir. 1969).

101.  Accordingly, the Court takes notice of the testimony of Mark Edwards, Natalio Fridman and the declaration of David MacSwain regarding industry custom and usage as to the meaning of that term and corresponding obligations that it may entail.

102.  The Agreement is unambiguous and clear that the parties intended that the termination of the Agreement brought to an end Software AG's executory obligations to provide maintenance support services to Consist.

103.  Paragraph 5(4) states that Consist is obligated to perform maintenance activities in the Territory "until the termination of the Agreement". A fair reading of that phrase dictates that after termination Consist has no further rights to provide maintenance and Software AG had no obligation to support Consist.

104.  Paragraph 3 of the Agreement further bolsters that interpretation. That paragraph gave Consist the "right to grant perpetual and time limited licenses, and/or maintenance agreements".

105.  That clause is unambiguous, both grammatically because of the comma and in light of both industry practice and Consist's own practices in never granting perpetual maintenance agreements. "Form should not prevail over substance and a sensible meaning of words should be sought." *Atwater & Co. v Panama R. R. Co.,* 246 N.Y. 519, 524, *quoted in Kass v. Kass*, 91 N.Y.2d 554, 566 (1998).

106.  The word "perpetual" modifies only licenses, not maintenance agreements. Thus, Paragraph 3 does not suggest that Consist could agree to maintenance agreements that extended beyond the expiration of the Agreement.

107.  Additional support for this interpretation is found in the 18-month notice requirement set forth in Paragraph 1 of the Agreement. The 18 month time period set forth in Paragraph 1 provided Consist ample opportunity to insure that it did not commit to providing maintenance services after December 31, 2007 or to notify customers that they would thereafter have to look to Software AG for such services.

108.  The MacSwain Declaration also reinforces this interpretation. Industry custom dictates that Paragraph 3 only grants to Consist the right to issue maintenance agreements that obligate Consist to provide maintenance during the Term. MacSwain Dec. ¶ 22.

109.  Consist's activities in entering into maintenance agreements that bound it to provide maintenance to end-users beyond the expiration of the Agreement violated the rights that the Agreement granted to Consist. Each such maintenance agreement is a material breach of the Agreement.

### Plaintiffs Are Entitled to Injunctive Relief

110.  Software AG asserts a valid claim that Consist breached the Agreement in offering and providing maintenance after December 31, 2007 in violation of Paragraph 5(4) of the Agreement. Injunctive relief is available to prevent Defendants' continued breach of this express provision. E. Allen Farnsworth, CONTRACTS § 12.5 (1982) ("If the performance due under the contract consists simply of forbearance, the effect of an injunction is to order specific performance. Often, however, an injunction is used as an indirect means of enforcing a duty to act. Instead of ordering that the act be done, as a

court would in granting specific performance, the court orders forbearance from inconsistent action.") *See e.g., The Brannock Device Co., Inc. v. ABC Industries et al.,* 2006 U.S. Dist. LEXIS 64661 (N.D.N.Y. 2006)(granting injunction where defendants were found to have breached the parties' agreement found in a Stipulated Final Judgment and Order).

111.   To establish irreparable harm, the party seeking injunction must demonstrate "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Carla Woods et al.* v. *Boston Scientific Corp.*, 2006 U.S. dist. LEXIS 96050 at *72 (S.D.N.Y. 2006).

112.   In *Carla Woods* this court issued an injunction to prevent a continuing breach of a contract. Plaintiffs represented shareholders of a corporation that had been merged into defendant's wholly owned subsidiary  They sued to prevent defendant from unilaterally replacing Mann and Greiner, co-CEO's of that subsidiary, without consulting Mann. Plaintiffs alleged that such unilateral action violated the joint control provisions in the merger agreement. Finding that plaintiffs would likely succeed on their breach claim and that defendant's unilateral appointment of a new CEO would strip plaintiffs of their joint control, *Id.* at *41, and would cause irreparable harm, the court preliminarily enjoined defendant to obtain Mann's consent to any new CEO. *Id.* at *77-78.

113.   Injury to business reputation falls within the definition of "irreparable harm." *The American Law Book Co., v. The Edward Thompson Co.*, 41 Misc. 396, 397 (N.Y. Spec. Term., 1903) (granting preliminary injunction, reasoning, in part, that there was "irreparable harm" that could not be compensated in money damages because the loss of business and the injury to business reputation resulting from a competitor's

19

intentional false statements that divert business from the plaintiff "could not be estimated nor proven with any degree of certainty for the purposes of a recovery...").

114.  Defendants' continuing breach of the Agreement is not compensable by money damages because their continued insistence that the Agreement may be reinstated, coupled with their offering of services that they no longer have the ability to deliver is causing confusion in the marketplace and is likely to injure Software AG's reputation for customer service.  This type of injury on a breach of contract claim is appropriate for injunctive relief.

## CONSIST BREACHED THE AGREEMENT IN REFUSING TO ASSIGN THE TRADEMARK REGISTRATIONS TO SOFTWARE AG

### *Plaintiffs Are Likely To Establish That Consist Breached the Express Provisions of the Agreement*

115.  Consistent with the uniform law of the United States (and other countries), absent an express provision to the contrary an exclusive distributor must transfer any trademark registrations for its supplier's products upon conclusion of the distributorship.

116.  Although the case law often does not express the particular theory upon which this well-settled doctrine is founded,  it may be best explained as a  term implied by law in exclusive distributorship agreements.  Although the facts of each case differ from each other and the present case, the principle is uniformly applied.

117.  *Ushodaya Enterprises, Ltd. v. V.R.S. International, Inc.*, 63 F.Supp.2d 329 (S.D.N.Y. 1999), well illustrates the principle.  Ushodaya brought suit to cancel VRS's trademark registration for the mark PRIYA.  Ushodays had appointed VRS its exclusive distributor of its PRIYA brand pickles for the U.S.A. market.  Pursuant to Ushodaya's written authorization VRS applied for a trademark registration in its own name.  After the

application to register had been filed in VRS name, but prior to the issuance of the registration Ushodaya requested that VRS insure that the registration reflect that Ushodaya was the owner. Nevertheless, VRS continued to represent to the Trademark Office that it was the "owner" of the mark. Relying on VRS's registration the United States Customs Service issued a notice of detention of Ushodaya's PRIYA pickles. Judge Cederbaum directed cancellation of VRS's registration stating, among other reasons, "[A]s between a foreign manufacturer and its exclusive United States Distributor, the foreign manufacturer is presumed to be the owner of the mark unless an agreement between them provides otherwise."

118. Similarly, in *Global Maschinen, GmbH*, 227 U.S.P.Q. 862, 866 (T.T.A.B 1985), a case upon which Judge Cedarbaum relied, an exclusive distributor surreptitiously registered its foreign supplier's mark. The Board cancelled the distributor's registration relying both on the foreign supplier's prior sales of the trademarked goods in the US and the principle that "between a foreign manufacturer and its exclusive United States Distributor, the foreign manufacturer is presumed to be the owner of the mark unless an agreement between them provides otherwise."

119. In *Major-Prodotti Dentari-Societa In Nome Collettivo Di Renaldo Giovanni & Figli v. Shimer*, 161 USPQ 437 (TTAB 1968), petitioner, a foreign manufacturer, granted an exclusive "agency or dealership" to sell its product in the U.S. to respondent and prescribed respondent's use of the mark on the goods. The dealership agreement apparently had no express provision regarding ownership of the mark. After termination of that dealership agreement, respondent applied for and obtained a registration on the mark. The Board canceled the mark stating, "In view of the express provisions of the

21

contract governing the relationships between petitioner and respondent, it is clear that when the agreement expired, any right which respondent may have had in the mark during the life of the agency immediately reverted to petitioner."    Here, however, contrary to Defendants attempts to "distinguish" *Major-Prodott* (Defendants' Opp. Brief, at 16, fn 8), the Agreement contains express provisions explicitly providing that Consist is to protect Software AG's marks.

120.  *Omag Optik UND Mechanik A.G. v. Weinstein*, 85 F.Supp. 631 (SDNY 1949), is yet another case applying the same principle.  During the course of defendant's exclusive distributorship of plaintiff's trademarked filters, defendant applied with plaintiff's knowledge for a trademark registration.  Although the registration was apparently to issue in plaintiff's name, it in fact issued in defendant's name.  Plaintiff later consented to that arrangement, albeit after defendant's false justification and defendant's agreement to cover the entire cost ($200) of the registration.  The court held that plaintiff was the rightful owner of the mark and enjoined defendant's further use.  In so doing it stated, "Where, as here, the rights prior to the registration were in the manufacturer, which the distributor conceded at the time, and the distributor registered the mark in his own name, contrary to the wishes of the manufacturer, the distributor, before he can claim the full benefits of the registration, must show a clear intention on the part of the manufacturer to transfer the mark to the distributor." *Id.* at 635.  Here, Software AG never intended or manifested an intent to transfer the Trademarks to Consist.  Quite the contrary, it extracted Consist's promise to "protect" Software AG's marks.  Therefore, Defendants did "not acquire a proprietary interest in the mark that

will serve to extinguish the rights of Software AG." *Omag Optik*, 85 F.Supp. at 637 (S.D.N.Y. 1949).

121.  Neither party cited a case in which a U.S. court ruled upon the ownership of a foreign trademark registration.  However, the parties agreed to the application of New York law, and unless that law conflicts strongly with the foreign law it governs.

122.  Further, Defendants' musings on the nuances of Brazilian trademark law are wholly irrelevant and serve only to distract from the fact that Defendants reduced to a single footnote the only relevant legal analysis on this point.  Defendants agreed that New York law applied to Consist's exclusive distributorship.  Indeed, at the time the law governing the distributorship changed from German to New York law, only defendants were in New York.  SAG was located in Germany and SAGA was in Virginia.

123.  Even if Brazilian law was applicable or in conflict, defendants do not claim that the Brazilian law of *assignment* differs from the law of New York.  "The law of the forum state governs where ... no party alleges that the law of a different state controls and differs from that of the forum." *In re Parmalat*, 375 F.Supp2d 278, 290 n63 (S.D.N.Y. 2005) (emphasis added) (applying New York law); see also *Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 133 (S.D.N.Y. 2000), aff'd, 2 Fed. Appx. 81 (2d Cir. 2001) (finding that New York governs in the absence of persuasive evidence that foreign law differs).

124.  Further, "[t]he choice between the law of New York and that of another state [or country] is a consideration only where a conflict exists between New York and foreign law. " *Employers Ins. of Wausau v. Duplan Corp.*, 899 F. Supp. 1112, 1118 (S.D.N.Y. 1995) (emphasis in original); see also *Zurich Insurance v. Shearson Lehman*

*Hutton*, 84 N.Y.2d 309 642 N.E.2d 1065 (1994). *In Employers*, the court held that New York law governed the action because there was no conflict between New York law and the law of the Virgin Islands concerning the operation of a pollution exclusion clause on which the dispute focused. *Id.*

125.  Plaintiffs asked the Court to order Defendants to "*Assign* over to Software AG the Brazilian trademark registrations for the marks NATURAL and ADABAS." Order to Show Cause, filed January 15, 2008 (Emphasis Added).  Defendants also clearly recognize that an assignment is the relief that Software AG seeks.  Defendants Opp. Br., p. 12 ("The ADABAS and NATURAL Brazilian Trademarks ... Must Not be *Transferred*." (Emphasis added).  Yet Defendants have not submitted any authority that either Brazilian or German law prevents Defendants from assigning those marks to Software AG or that this Court may order that assignment.

126.  Rather, Defendants' only substantive submission goes to a totally different point.  The declaration of Ricardo Do Nacimento, a Brazilian attorney, that defendants submitted does not pose a "conflict" with well-settled U.S. or New York law.  Mr. Nacimento attests that Brazilian law requires that "any judicial *cancellation* action, as well as judicial proceeding involving Brazilian intellectual property rights, must be filed before the Brazilian Federal Court of Justice."  The only support for that proposition is a statute that deals solely with cancellations:  "Nullity proceedings shall be filed before the Federal Courts and in those cases in which INPI is not the plaintiff INPI shall participate in the proceedings."

127.  Plaintiffs in this proceeding do not ask that this Court cancel the registrations for NATURAL and ADABAS (a nullity proceeding), but ask that it direct

Defendants' to assign the marks to Software AG. Despite Defendants' recognition of the relief that Software AG seeks, Mr. Nacimento's declaration is devoid of any discussion regarding Brazilian law regarding assignment of registrations.

128. Defendants' failure to cite either German or Brazilian authority on point is not surprising. The law of both countries, if anything, mirror that of the United States.

129. Pursuant to Fed.R.Civ.P. 44.1 this Court "In determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." That Rule further provides that "The court's determination must be treated as a ruling on a question of law." Accordingly, the Court may rely on public documents, including web sites and treatises.

130. Brazilian law expressly permits that registrations may be freely assigned, that the government will register notations of such (record) assignments, and that the government will recognize court orders regulating the private parties' rights to trademarks.

- Article 134 of the Brazilian Industrial Property Law recites "Applications for registration and registrations may be assigned provided that the assignee meets the legal requirements for requesting such registrations". *See* Brazilian Industrial Property Law No. 9279/96 of May 14, 1996 (as amended by Law No. 10196 of February 14, 2001) (http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/LEI9279INGLES.pdf/download (English version); http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/lei_9279_1996_html (Portuguese version)). (Attached hereto as Annex A).

- Article 135 of the Brazilian Industrial Property Law recites "An assignment must include all the registrations or applications, in the name of the assignee, for identical or similar marks relating to a product or service that is identical, similar or akin, on the pain of cancellation of the registrations or shelving of the unassigned applications". *See* Brazilian Industrial Property Law No. 9279/96 of May 14, 1996 (as amended by Law No. 10196 of February 14, 2001) (http://www.inpi.gov.br/menu-

esquerdo/marca/dirma_legislacao/oculto/LEI9279INGLES.pdf/download (English version); http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/lei_9279_1996_html (Portuguese version)). (Attached hereto as Annex A).

- Article 137 of the Brazilian Industrial Property Law recites "Notations will produce effect with respect to third parties as from the date of their publication". *See* Brazilian Industrial Property Law No. 9279/96 of May 14, 1996 (as amended by Law No. 10196 of February 14, 2001) (http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/LEI9279INGLES.pdf/download (English version); http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/lei_9279_1996_html (Portuguese version)). (Attached hereto as Annex A).

- Article 138 of the Brazilian Industrial Property Law recites "Appeals may be filed against a decision which: I. rejects the notation of assignment; and II. cancels the registration or shelves the application under the terms of article 135." *See* Brazilian Industrial Property Law No. 9279/96 of May 14, 1996 (as amended by Law No. 10196 of February 14, 2001) (http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/LEI9279INGLES.pdf/download (English version); http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/lei_9279_1996_html (Portuguese version)). (Attached hereto as Annex A).

- The Brazilian National Institute of Industrial Property has indicated that a court order is considered a valid document to show and evidence that a trademark has been assigned and thereby confirms the general understanding of Article 134 of the Brazilian Industrial Property Law: "[T]he assignment can be proved by any document which demonstrates the transfer of the ownership of the trademark application or registration, such as merger, spin-off, legal or testamentary succession; *or court order*". Translation of Section 10 of Normative Act no. 083/2001 (emphasis added) (issued by the Brazilian National Institute of Industrial Property on January 2, 2002) (www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/resolucao083_2001 (Portuguese version)). (Attached hereto as Annex B).

- A United States court order requiring a party to assign its Brazilian trademarks to another party will not run afoul of any Brazilian laws or statutes and the Brazilian trademark office is not a party to such actions. *See, e.g., Massa Falida de O Alquimista Cosméticos Ltda. and G Brasil Industria e Comercio Ltda. v. Massa Falida de Giovanna Fábrica Ltda. e Notec Comercial Ltda. Appeal*, No. 448.414-4/1/00, March 13, 2007 (State Court of São Paulo) (ruling by State Court between two private parties to determine the effective of a trademark assignment and declaring void the recordal of the assignment by the Brazilian trademark office without the trademark office being a party) (*see* http://cjo.tj.sp.gov.br/esaj/jurisprudencia/consultaCompleta.do (enter case number "448.414-4/1-00" in the field "Número do Processo")). (Attached hereto as Annex C).

131. Rather, the Brazilian Trademark Office, like the United States Patent and Trademark Office, has the mere role of recording assignments. See Articles 134, 135 of the Brazilian Industrial Property Law No. 9279/96 of May 14, 1996 (as amended by Law No. 10196 of February 14, 2001) (http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/LEI9279INGLES.pdf/download (English version); http://www.inpi.gov.br/menu-esquerdo/marca/dirma_legislacao/oculto/lei_9279_1996_html (Portuguese version)). (Attached hereto as Annex A).

132. German law also is no different that United States law. Indeed, if anything, the cases more explicitly rule that a distributor holding registrations for his supplier's product must assign those registrations to his supplier when the relationship ends.

133. The German Trademark Act contains two provisions specifically related to trademark registrations in the name of "agents":

§ 11 Agentenmarken

Die Eintragung einer Marke kann gelöscht werden, wenn die Marke ohne die Zustimmung des Inhabers der Marke für dessen Agenten oder Vertreter eingetragen worden ist.

**English Translation:**
Section 11 Trademarks in the Name of an Agent

Registration of a trademark may be cancelled if the trademark was registered without the consent of the proprietor of the trademark in favor of the proprietor's agent or representative.

§ 17 Ansprüche gegen Agenten oder Vertreter

(1)Ist eine Marke entgegen § 11 für den Agenten oder Vertreter des Inhabers der Marke ohne dessen Zustimmung angemeldet oder eingetragen worden, so ist der Inhaber der Marke berechtigt, von dem Agenten oder Vertreter die Übertragung des durch die Anmeldung oder Eintragung der Marke begründeten Rechts zu verlangen.

27

*(2)Ist eine Marke entgegen § 11 für einen Agenten oder Vertreter des Inhabers der Marke eingetragen worden, so kann der Inhaber die Benutzung der Marke im Sinne des § 14 durch den Agenten oder Vertreter untersagen, wenn er der Benutzung nicht zugestimmt hat. Handelt der Agent oder Vertreter vorsätzlich oder fahrlässig, so ist er dem Inhaber der Marke zum Ersatz des durch die Verletzungshandlung entstandenen Schadens verpflichtet. § 14 Abs. 7 ist entsprechend anzuwenden.*

**English Translation:**
Section 17 Claims against Agents or Representatives

(1) If, in contravention of section 11, a trademark was applied for or registered in favor of an agent or representative of the proprietor of the trademark without the proprietor's consent, the proprietor of the trademark shall be entitled to demand from the agent or representative the assignment of the right established by the application or registration of the trademark.

(2) If, in contravention of section 11, a trademark was registered in favor of an agent or representative of the proprietor of the trademark, the proprietor can prohibit his agent or representative from using his trademark within the meaning of section 14 unless he consented to such use. If the agent or representative acts willfully or negligently, he shall be liable to compensate the proprietor of the trademark for damage resulted from the infringing act. Section 14, subsection 7, shall apply mutatis mutandis.

*See* http://www.gesetze-im-internet.de/markeng/index.html (in German) (effective October 25, 1994, last amended December 17, 2006) (Attached hereto as Annex D).

134.   According to Section 152 of the 1994 German Trademark Act, Sections 11 and 17 of that Act also apply to trademarks filed for or registered prior to 1994, *e.g.*, during the period from 1984 through 1991:

*§ 152 Anwendung dieses Gesetzes*

*Die Vorschriften dieses Gesetzes finden, soweit nachfolgend nicht anders bestimmt ist, auch auf Marken, die vor dem 1. Januar 1995 angemeldet oder eingetragen oder durch Benutzung im geschäftlichen Verkehr oder durch notorische Bekanntheit erworben worden sind, und auf geschäftliche Bezeichnungen Anwendung, die vor dem 1. Januar 1995 nach den bis dahin geltenden Vorschriften geschützt waren. "*

28

**English Translation:**
Section 152 Application of this Law

Except as otherwise provided herein below, the provisions of this Law shall also apply to trademarks which were applied for or registered prior to 1 January 1995 or which were acquired prior to this date through use in the course of trade or through the fact that they were well-known trademarks, and to trade designations which were protected prior to 1 January 1995 according to the provisions which were in force up to this date.

*See* http://www.gesetze-im-internet.de/markeng/index.html (in German) (Attached hereto as Annex D).

135.   German case law establishes that an "agency" must not be understood in a technical sense. Rather, the term needs to be interpreted economically and thus includes not only commission agents, but also distributors, per article 6 septies Paris Convention,. *See Ingerl/Rohnke, Markengesetz,* 2nd edition 2003, § 11, Notes.  (Attached hereto as Annex E).

136.   Sections 11 and 17 of the German Trademark Act apply when a trademark registration occurred with the consent of the trademark owner, for example, because at the time of the registration there was an existing agency or distribution relationship which not only allowed the use of the trademark but also its registration by the distributor, and that consent is later withdrawn with the termination or lapse of the agreement.  Therefore, such consent is not in perpetuity and may be revoked by the principal or manufacturer *See Fezer, Markenrecht,* 3rd edition, 2001, § 11, note 12. (Attached hereto as Annex F). Also, the withdrawal of a consent is deemed a "registration without the consent of the proprietor" pursuant to § 11 German Trademark Act.  *Id.*, § 11, note 12. (Attached hereto as Annex F).

137.   For example, the Court of Appeals Hamburg expressly stated that consent can be revoked by implied conduct and that a request for assignment of a trademark

needs to be considered such a revocation. The court declared that a principal or manufacturer particularly deserves protection in those cases that arise with termination of the agency relationship. The court stated that it is immaterial that there is no express contractual provision requiring the assignment. Further, the court stated that implementation of § 11 of German Trademark Act would not have been necessary if the legislator had considered the possibility of contractual provisions as a sufficient remedy. See Docket no. 3 U 34/01, published in GRUR-RR 2003, 269 et seq., dated February 27, 2003 (Attached hereto as Annex G).

138. Defendants' defense of laches is irrelevant because Software AG's claim did not ripen until January 1, 2008, immediately upon expiration of Defendants' rights to distribute Software AG's trademarked SYSTEMS.

139. *Omag Optik UND Mechanik A.G. v. Weinstein*, 85 F.Supp. 631 (SDNY 1949), is on point. In that case plaintiff knew of defendant's application for and registration of the trademark no later than December 1937. However, not until June 1945 did defendant first overtly claim that he owned the mark. Plaintiff did not bring suit until May 1947. Although approximately 10 years had passed since plaintiff first knew and consented to the registration in defendant's name and two years had passed since defendant asserted the registration against plaintiff Judge Knox held that there was no laches. He held that "The law seems to be that mere delay, even though protracted, will not necessarily create an estoppel against the enforcement of trade-mark rights." *Id.* at 636.

140. Similarly, not until the termination of the Agreement did Consist's rights to use the marks ADABAS and NATURAL end. Until then Consist had the right to use and

possibly even the duty to register Software AG's trademarks. Only upon the Agreement's termination did the period in which Software AG had to seek return of the registrations commence. That was a mere 15 days before suit was brought. Accordingly, Software AG has not been guilty of laches.

141. Therefore, because allowing Defendants to assert any rights in the Trademarks would breach the Agreement, which is unambiguous as a matter of law, this Court should grant Software AG's injunction enjoining Defendants from asserting any rights in the Trademarks by ordering them to assign the Trademarks to Software AG.

142. "A contractual provision "may not be interpreted in a manner which would render it an absurdity." *Saffire Corp. v. Newkidco., LLC.*, 286 F. Supp. 2d 302, 308 (S.D.N.Y. 2003). Likewise, unfair and anomalous results are to be avoided. *See, e.g.*, *In re National Basketball Ass'n*, 630 F. Supp. 136, 140 (S.D.N.Y. 1986) (citing *Browning-Ferris Industries of New York, Inc. v. County of Monroe*, 103 A.D.2d 1040, 1041, 478 N.Y.S.2d 428, 430 (4th Dep't 1984), *aff'd*, 64 N.Y. 2d 1046, 489 N.Y.S.2d 902, 479 N.E.2d 247 (1985)). A chief objective of interpretation is "to avoid a result which places one party at the mercy of the other." *Id. Lee v. Marvel Enters., Inc.*, 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005).

143. Consist's rights in Software AG's intellectual property stem only from the Agreement. Without the Agreement and Consist's consequent access to the SYSTEMS, including ADABAS and NATURAL, Consist would have no reason to have obtained the trademark registrations.

144. Neither the Agreement nor any other act of Software AG transferred or was intended to transfer permanent ownership in Software AG trademarks.

31

145. It is consistent with the express language of Paragraph 5(1), which requires Consist to "protect" the Trademarks of Software AG and to relinquish to Software AG the registrations in those trademarks when the Term expires. The term "protect" necessarily includes returning the property to Software AG. "Protect" literally means to foster or shield from infringement. Without a corresponding implied obligation to return the marks, the duty to protect the Trademarks during the Term means nothing.

**Plaintiffs Are Likely to Establish that Consist Breached The Implied Covenant Of Good Faith And Fair Dealing**

146. Under New York law, a covenant of good faith and fair dealing is implied in all contracts. *See Carla Woods et al. v. Boston Scientific Corp.*, 2006 U.S. dist. LEXIS 96050 at *42-43 (S.D.N.Y. 2006)(granting preliminary injunction on contract claims based on likelihood of irreparable harm if terminated CEO was not allowed to participate in the selection of his successor).

147. "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 773 N.E.2d 496, 746 N.Y.S.2d 131, 135 (2002) (citations and internal quotation marks omitted); *see also Chemical Bank v. Stahl,* 272 A.D.2d 1, 14, 712 N.Y.S.2d 452, 462 (1st Dep't 2000).

148. This duty goes beyond the mere words of a contract to encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 West 232nd Owners Corp., 98 N.Y.2d at 153, 746 N.Y.S.2d at 131* (quoting *Rowe v. Great Atl. and Pac. Tea Co., 46 N.Y.2d 62, 69, 385 N.E.2d 566, 412 N.Y.S.2d 827, 831 (1978)*.)

149. *Carla Woods, supra,* is on point. In addition to their claim of literal breach of contract noted above plaintiffs claimed that defendant's plan to terminate Mann and Greiner and to unilaterally appoint a successor violated the implied duty of good faith and fair dealing in the merger agreement. *Id.* at *41. Because defendant's action to replace the CEO "goes to the fundamental clash of interests created by the parties' [agreement], this Court concluded that that defendant had violated the implied covenant of good faith and fair dealing." *Id.* at *45.

150. The instant case is no different. Implying a covenant in the Agreement that the Paragraph 5(1) duty to "protect" and recognize the intellectual property rights of Software AG also encompasses an implied duty to "return" the intellectual property upon expiration of the Term is a "promise which a reasonable person in the position of the promisee would be justified in understanding were included" in the Agreement. *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y. 2d 144 (2002) (finding defendant breached the implied covenant of good faith and fair dealings, in the course of performance where defendant failed to dispose of his shares, as required by the agreement, within a *reasonable* time, reasoning that timeliness was a promise which was necessarily understood).

151. Consist's recognition and protection of the SAG Software Product trademarks necessarily includes the corresponding obligation upon the expiration of the Term to return the property back to Software AG when the Agreement expires. Indeed, with termination of the Agreement Consist's executory duty to "protect" Software AG's trademark ends and Software AG's duty to protect those mark commences.

152. Consist's obligation to protect Software AG's marks would have no purpose if that provision did not also include Consist's obligation to return the marks to Software AG upon termination of Consist's exclusive distributorship.

153. This relinquishment by Consist does not add a provision to the contract not included by the parties, nor require the court to re-write the agreement. *See e.g., Carla Woods* at *44 (and cases cited therein).

154. It does not nullify any other express term of the contract, or create any new or independent contractual rights to read into Paragraph 5(1) the implied duty for Consist to relinquish the rights it derived solely from the Agreement. *Carla Woods* at *42-3.

155. Software AG had the reasonable expectation and understanding that any trademark rights that Defendants enjoyed during the term of the Agreement terminated on December 31, 2007.

156. Because Defendants continue to assert the Trademarks and refuse to assign them to Software AG, they have a likelihood of succeeding on their claim that Defendants have breached the covenant of good faith and fair dealing implied in the Agreement.

### *Plaintiffs Are Entitled to Injunctive Relief*

157. Plaintiffs are entitled to injunctive relief if they demonstrate (1) irreparable harm in the absence of an injunction; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in their favor. *See, e.g., Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir. 2004). Plaintiffs have demonstrated irreparable harm and both a likelihood of success and a balance of hardships tipping decidedly in their favor.

34

158.  Injunctive relief is available in implied covenant cases to assure that a defendant will not evade the rights and obligations created by a contract, when irreparable harm will occur if the defendant is allowed to continue breaching the implied covenant. *Carla Wood* at \*83 (enjoining defendants' continuing breach and prohibiting defendant from selecting a successor to the CEO without plaintiff's input); *see also The Southland Corp. v. Froelich*, 41 F.Supp. 2d 227 (E.D.N.Y. 1999)(granting preliminary injunction enjoining defendant franchisee, whose trademark rights were created by the franchise agreement, from using the trademarks because franchisor had properly terminated agreement).

159.  Plaintiffs have shown a likelihood of success on the merits.

160.  Furthermore, in the absence of an injunction Software AG will suffer irreparable harm.  In the absence of an injunction Defendants will control the trademarks for ADABAS and NATURAL, two products that they no longer have the right to distribute and for which they are unable to offer maintenance services.  However, Defendants will be able to harass plaintiffs and possibly totally frustrate plaintiffs' marketing of NATURAL and ADABAS and the maintenance services for those products. There is no way to calculate the sales that Software AG will lose because it will not be able to properly identify its products and services, both to existing and potential new customers.

161.  Furthermore, in the absence of an injunction Software AG may be forced to use different names for its products and services:  one name in the entire world except for Brazil and another different name in Brazil.  Again the cost and lost opportunities of this

dual naming to Software AG is not fully identifiable and thus not calculable in money damages.

162. Even if Software AG had not established a likelihood of success, since the balance of hardships tip decidedly in its favor, it is still entitled to an injunction requiring Consist to assign the registrations for ADABAS and NATURAL to Software AG. The irreparable harm that Software AG suffers in the absence of an injunction requiring Consist to assign the registrations is detailed in the preceding paragraphs. On the other hand Consist suffers no legitimate harm if the registrations are assigned to Software AG. Now that its distributorship has terminated Consist has absolutely no need for the registrations for NATURAL and ADABAS—it can no longer offer licenses or maintenance on those products. Indeed, Consist concedes in its papers that it will no longer offer such products or maintenance in new agreements. And, in the unlikely event that Software AG does not prevail at the end of this case, Software AG can transfer the registration back to Consist.

## DEFENDANTS FALSELY ADVERTISED IN VIOLATION OF THE LANHAM ACT

### *Plaintiffs Are Likely to Succeed*

163. To prevail on a Lanham Act false advertising claim a plaintiff must prove a representation is (1) literally false, or (2) true, but nevertheless in context has a tendency to mislead or deceive consumers regarding the nature and characteristics of the defendant's products or service. *See Register.com, Inc. v. Domain Registry of Am. Inc.*, No. 02 Civ. 6915, 2002 U.S. Dist. LEXIS 24795, at \*28 (S.D.N.Y. Dec. 27, 2002); *see also Coca-Cola v. Tropicana Products, Inc.* 690 F.2d 312, 317 (2d Cir. 1982); *Smithkline*

*Beecham L.P. v. Johnson & Johnson-Merck Co.,* 906 F. Supp. 178, 181 (S.D.N.Y. 1995), *aff'd* 100 F.3d 943 (2d Cir. 1996).

164.  Where the advertisement is literally false it may be enjoined without reference to its impact on the consumer. *See McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir. 1991); *Coca-Cola,* 690 F.2d at 317; *Smithkline Beecham,* 906 F.Supp. at 181.

165.  In the Second Circuit, a plaintiff seeking a preliminary injunction under the Lanham Act must persuade the court that it is ***likely*** to suffer irreparable harm in the absence of immediate relief. *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 161(2d Cir. 2007)(emphasis added).  Because "[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement," the Second Circuit has resolved that a plaintiff "need not . . . point to an actual loss or diversion of sales" to satisfy this requirement. *Id, citing Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316 (2d Cir. 1982).

166.  Thus, the rule in this Circuit is that a plaintiff "must submit proof which provides a reasonable basis" for believing that the false advertising will *likely* cause it injury. *Id.*(emphasis added).

167.  Defendants' subjective or good faith "belief" or "opinion" the advertisement is true is no defense to a literally false misrepresentation claim.

168.  A defendant's subjective belief or opinion about the validity of his own misrepresentation is irrelevant under the Lanham Act.  The courts distinguish statements of fact from statements of opinion by characterizing "opinion" as mere "puffery," *i.e.*, a general expression of opinion about a product that is not "capable of objective

verification." *Robert Groden v. Random House, Inc. et al.*, 1994 U.S. Dist. LEXIS 11794 at *17, 21 (S.D.N.Y. August 22, 1994). *See also Time Warner Cable, Inc. v. DirecTV, Inc.* 397 F.3d 144,160 (2d Cir. 2007)(adopting definition of "puffery" as "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying.").

169. False statements, particularly those issued by the President of a company in personalized letters on the internet directed to consumers, about who may validly offer the costly and important maintenance services for SAG Software Products are statements of (misleading) fact, not mere puffery, because (1) they are "capable of verification," as the issue had been adjudicated and resolved in an enforceable judgment, and (2) such statements would induce reasonable buyers to rely on their validity to inform their purchasing decisions regarding maintenance of Software AG products.

170. Thus, Mr. Fridman's contention that he "truly believes" that he will reinstate the Agreement or obtain through an appeal an "uninterrupted continuity" to the Consist/Software AG relationship is not relevant to Plaintiffs' claim that the communications to consumers were literally false.

171. Defendants representations on the Internet, made directly to customers and found within representative maintenance agreements (*e.g.,* PRODESP §7.1.5) are all subject to the Lanham Act's prohibition on false advertisements, as Section 43(a) "does not apply merely to false advertising traditional media channels, but to a broad range of deceptive statements made in connection with the sale of goods or services," including mailers, emails, and telephone calls. *Register.com*, 2002 U.S. Dist. LEXIS 24795, at *43-44.

38

172. In the Second Circuit false or misleading statements are material if they pertain to an "inherent quality or characteristic" of the product. *See Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272, 278 (2d Cir. 1981).

173. In this case, Defendants' misrepresentations are "material" in that they already have had and will continue to have an impact on the consumer's decision whether or not to purchase the product, *i.e.,* maintenance services for SAG SYSTEMS. *See* Tr. 69-70; *Telebrands Corp. v. Wilton Indus., Inc.,* 983 F.Supp. 471, 475 (S.D.N.Y. 1997).

174. Defendants' continuing false representations that Consist can provide maintenance and support services to SAG Software Products after December 31, 2007, when Consist has no such rights, clearly pertains to an inherent characteristic of a product, *i.e.,* the manufacturer's ability – here Software AG – to enter into and fulfill maintenance agreements with its end-users of SAG SYSTEMS.

175. Not only are Defendants *not* granted those rights in perpetuity under the Agreement, but Defendants are also *not* able to even represent that they are able to provide only such services (except possibly Level 1 Support) after December 31, 2007.

### *Applying the Vanity Fair Test to the Facts of This Case*

176. It is beyond dispute that the Lanham Act may be applied to conduct outside of the United States. *Warnaco Inc. v. VF Corp.,* 844 F. Supp. 940 (2d Cir. 1994), citing *Steele v. Bulova Watch Co.,* 334 U.S. 280, 282-283 (1952) ("The Lanham Act . . . confers broad jurisdictional powers upon the courts of the United States."); *A.T.Cross v. Sunil Trading Corp.,* 467 F.Supp. 47, 50 (S.D.N.Y. 1979)(stating that legislative intent behind the Lanham Act was for broad jurisdictional reach).

177. The *Vanity Fair* test considers: (1) whether the defendant's conduct has a substantial effect on United States commerce, (2) whether the defendant is a citizen of the

United States, and (3) whether there exists a conflict with foreign law. *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956), *cert. denied*, 352 U.S. 871 (1956).

### The Lanham Act Applies Extraterritorially in This Case

178.    There are several factors that warrant extraterritorial application of the Lanham Act in this case.  The Agreement was negotiated in New York between a Reston, Virginia plaintiff (SAGA) and a New York resident (Fridman) and a New York corporation (Consist).  The Agreement expressly provides in ¶ 10 that New York law is to be applied.

179.    The misrepresentations of which Plaintiffs complain concern the offering and providing of maintenance services (including updates, new versions, fixes, new releases, maintenance releases, etc.) by Consist's Brazilian affiliate, of which Fridman is President and which he controls.  Indeed, Fridman personally signed Notices #1 and 2, both original and corrected.

180.    The maintenance services are being offered by Consist Brazil to customers who are worldwide conglomerates typically having a single Chief Information Officer (CIO) and a single Manager of Procurement.  These officers drive the purchasing decisions worldwide for these companies, many of whom reside both in Brazil and the United States.  Tr. 67-73.  ABN Amro was one such example provided by Software AG's COO of ETS, Mark Edwards.  Tr. 68,ll. 11-21.

181.    None of the three *Vanity Fair* factors is dispositive – a court must employ a balancing test to determine whether the "contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction." *Warnaco Inc.*, 844 F. Supp. at 950.

182.   The second *Vanity Fair* factor asks whether Defendants are U.S. citizens. Consist is a U.S. corporation and Fridman resides in this district.  Therefore, this factor is satisfied.

183.   The third Vanity Fair factor asks whether there is a conflict with foreign law. There is no conflict with Brazilian law if this court were to enjoin false representations in commerce by a competitor.  Defendants have posed no conflict with foreign law that is relevant to this case.  The declaration submitted by Defendants' Brazilian law expert pertains only to the trademark laws of Brazil and is inapposite.

184.   Like Section 43(a) of the Lanham Act, which prohibits false and misleading descriptions and representations of fact in commerce which are likely to cause confusion or mistake, or to deceive the relevant purchasing public, Sections I and II of Article 195 of Brazil's Industrial Property Law prohibits the publication of a "false affirmation" in "detriment to a competitor with a view to obtaining advantage" and "false information" with "respect to a competitor," "with a view to obtaining advantage." *See* Industrial Property Law of Brazil, no. 9279/96 (May 14, 1996), as amended by Law 10.196 (February 14, 2001).

185.   Both the Lanham Act and the Brazilian Industrial Property Law aim to protect consumers and competitors alike from deceitful behavior in the market.  There is no conflict with Brazilian law on this point, and Defendants have failed to assert there is one.

### *Defendants' Activities Have a Substantial Effect on U.S. Commerce*

186.   The very services of "technical updating" offered by Defendants includes the obligation by Consist to provide correction of mistakes, new versions, correction of

errors, and technical support via telephone by a specialist in the software. *See e.g.,* PRODESP Agreement Section V: Warranty of Technical Updating, Complaint Ex. 7.

187.  Those "technical updating" services by definition include Level 2 and Level 3 Support, System Maintenance Releases, New Software Releases and New Versions as defined in the MacSwain Declaration.

188.  During the Term of the Agreement, the support services (beyond basic Level 1 Support) were handled at SAG's North American support facility located in Denver, Colorado.  That SAG facility employs around 125 full time software specialists who have access to Software AG's online database and source code to the SAG Software Products.

189.  Software AG pays for the substantial operational costs in running this facility.  Consist at no time had access to the source code for the SAG Software Products. Consist no longer has access to the SAG online database.  Consist no longer has access to new versions, new releases or updates.

190.  Consist was a major user of the North American support facility during the Term. Now that the Agreement has expired, Consist does not have access to this facility. The very services being misrepresented by Consist Brazil are the maintenance services that are provided in the United States through Software AG, at the Denver support facility, *i.e.*, the Level 2 Support and Level 3 Support that requires access to SAG's online database or source code.  Tr. 72,ll. 14-21.

191.  The representations that Consist is making, and the 179 maintenance agreements that Consist has executed and that post-date the expiration of the Term all implicate SAG's North American support facility.

192. Customers who are Software AG customers in both Brazil and the United States (*e.g.*, ABN Amro) use this facility. Software AG's inability to assure customers that they are the party providing the maintenance services (and not Consist), as in the case of Bradesco, has an impact on U.S. commerce.

193. Consist's conduct also has a "substantial effect" on U.S. commerce because Defendants' public announcement that it will provide "uninterrupted continuity" in licensing and maintaining SAG Software Products is creating confusion among Software AG's end-users worldwide. *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 126 F. Supp. 2d 328, 336-341 (S.D.N.Y. 2001)(noting that foreign imports used to further the allegedly infringing scheme, the orchestration of foreign activities from the United States, and the high probability of consumer confusion in the United States and abroad "clearly establish a substantial effect on U.S. commerce.")

194. Many of the Brazilian end-users of the SAG Software Products are worldwide conglomerates, resident not only throughout the world, but also in the United States and specifically, New York City. See Tr. 68,ll. 5-21.

195. Assessing the existence of a "substantial effect on U.S. commerce" should be analyzed differently for the trademark infringement and false advertising progeny of *Vanity Fair*. False advertising laws are concerned with protecting consumers from misinformation, while trademark laws are concerned with protecting consumers from misinformation and the dissemination of infringing products to the public.

196. Therefore, cases applying the Vanity Fair factors to a false advertising claim, as in this case, rather than a trademark infringement claim, should not use the absence of goods being "us[ed] in the stream of American commerce" against the

43

plaintiff when analyzing whether there exists a "substantial impact in U.S. commerce." *See, e.g., Atlantic Ritchfield Co. v. Arco Globus Int'l Co.*, 150 F.3d 189, 193-94 (2d Cir. 1998)(rejecting extraterritorial application because the alleged infringer did not "physically use the stream of American commerce to compete with the trademark owner by, for example, manufacturing, processing, or transporting the competing product in United States commerce.")

197.    Second Circuit cases applying the Vanity Fair factors to a false advertising claim, rather than a trademark infringement claim, are sparse but not non-existent. One such case, *Space Imaging Europe, Ltd. v. Space Imaging L.P.*, 1999 U.S. Dist. LEXIS 10898 (S.D.N.Y. July 15, 1999), ruled that a substantial effect on U.S. commerce "exists where a defendant's conduct results in consumer confusion or harm to the plaintiff's goodwill in the United States."

198.    The *Space Imaging* case noted that the Second Circuit has not yet taken a position on whether the substantial effect on U.S. commerce factor is satisfied merely where "the defendant's activities are supported by or related to conduct in United States commerce." *Space Imaging Europe*, 1999 U.S. Dist. LEXIS 10898 at *10.   But in this case, there is evidence of consumer confusion and resulting harm to Software AG's reputation in the U.S. and Consist's U.S. activities are related to the misrepresentations abroad. *Id.* Thus, this Court need not consider whether only the latter factor exists, the substantial effect on commerce test is satisfied.

199.    The SAG end-users for whom Consist performs maintenance services pay millions of dollars annually for such services, and because of the high price, may reasonably expect that these services will be performed without interruption.

Defendants' representations impugn Software AG because customers are likely to lose faith in SAG's ability to provide support through its North American facility. Thus, in this case Defendant's activities are both harming Software AG's goodwill in the U.S. and supported by or related to conduct in United States commerce. *Space Imaging Europe*, 1999 U.S. Dist. LEXIS 10898 at *10.

200.  Evidence of customer confusion is strong in this case, given Software AG's global expanse, and the fact that the very services misrepresented by Defendants (*i.e.*, their ability to provide maintenance services post-expiration), are and would be rendered here in the United States at a Denver support facility owned and operated by Software AG. *See Space Imaging Europe*, 1999 U.S. Dist. LEXIS 10898, at *13 (finding a "substantial effect on U.S. commerce" factor was satisfied where evidence of reputation harm is "overwhelming," such as to major world-wide companies such The Gap, Calvin Klein and Warnaco, Inc.).

201.  Software AG's global size and breadth as well as its major presence in the U.S. through its North American support facility weighs heavily in favor of finding a "substantial effect" on U.S. commerce. Unlike the plaintiff company in *Space Imaging*, which was a mere shell corporation managed by one person, Software AG is an established global data management software company that has customers in 70 countries and has offices in 50 countries. Its customers are also of global reach and breadth, including Morgan Stanley, JP Morgan Chase, ABN Amro and Nissan. Tr. 54:3-11, 66:23.

202.  Software AG's reputation is harmed in the United States by Defendants' false representations that Consist Brazil is authorized to perform maintenance services for

45

SAG Software Products because those services are and have been performed out of the Denver facility for years. Tr. 72:2 to 73:7.

203. The facts in this case are also analogous to those in *Gordon & Breach Science Publrs., S.A. v. American Inst. of Physics,* 905 F. Supp. 169 (S.D.N.Y. 1995), where both defendants and plaintiffs published scientific journals. Defendants disseminated mailings and advertisements to potential customers worldwide containing allegedly false and deceptive statements about the plaintiffs.

204. In rejecting the defendants' motion for summary judgment, the court held that the defendants' misleading publications and mailings--even those sent abroad--that "directly . . . target relevant consumers [was] precisely the type of promotional activity that the Lanham Act seeks to regulate." *Gordon & Breach Science Publrs., S.A. American Inst. of Physics,* 905 F. Supp. at 180.

205. In applying the Vanity Fair factors, the court held that "the extraterritorial application of the Lanham Act" was warranted, given (1) the mailing of the letters from New York City and the promotion of journals of American corporations; (2) the American citizenship of [the defendants]; and (3) the absence of any interference with foreign sovereignty . . ." *Gordon & Breach Science Publrs., S.A. v. American Inst. of Physics*, 905 F. Supp. at 181-82.

206. Specifically, with respect to the "substantial effect on U.S. commerce" factor, Gordon & Breach found that the mailing often letters to France mentioning an article that contained false advertising, an unknown number of letters to Japan, and one letter to England containing a reprint of the article "significantly impact[ed] United States

commerce" and was sufficient to apply the Lanham Act extraterritorially. *Gordon &*
*Breach Science Publrs., S.A. v. American Inst. of Physics*, 905 F. Supp. at 181-82.

207. Here, the Notices composed by Fridman are analogous to the "mailings" in
*Gordon & Breach*. Both communications contain false misrepresentations that were
composed and created in the U.S. and circulated in a way that "directly targeted relevant
consumers," which is exactly- the type of promotional activity that the Lanham Act seeks
to regulate." *Gordon & Breach*, 905 F. Supp. at 180.

208. Because the materials were mailed from the United States the activity was
found to be within the American borders, regardless of the fact the representations were
all mailed outside the U.S. border. Judge Sand therefore found extraterritorial application
"plainly appropriate" because the activities were not confined to outside our borders and
took place both in the U.S. and abroad. *Id*. at 182.

209. Likewise in this case, Fridman is directing and controlling the Internet
postings from here in New York. *See* Pls. Ex. 1, 2, 3, and 4. In addition he is the
President of Consist Brazil. Fridman, from New York, directs the representations and
conduct of the Consist companies entering into maintenance agreements with end-users
of SAG Software Products.

210. Therefore an injunction is warranted in this case to stop Defendants from
continuing to represent that they have continuing rights after the expiration of the
Agreement to offer and supply maintenance services for SAG Software Products.
Software AG is likely to suffer immediate irreparable harm if it cannot enter the market
and offer maintenance service unimpeded by Consist's false statements. There is a
substantial effect on U.S. commerce since Software AG is a global company, the

customers are global entities and the very services that will be rendered are performed out of a North American support facility located in Denver, Colorado funded by Software AG that employs 125 software specialists who are available 24/7 to SAG Software Product end-users. The presence of this facility in the United States, along with the fact that the customers at issue are global companies with a single CIO and single procurement agent makes the confusion and harm to Software AG's reputation likely to occur not only in Brazil, but here in the United States.

## DEFENDANTS TORTIOUSLY INTERFERED IN PLAINTIFFS' PROSPECTIVE BUSINESS RELATIONS

### *Plaintiffs Are Likely To Succeed*

211.  To establish tortuous interference with prospective business relations New York law requires that a plaintiff establish: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, *or used dishonest, unfair, or improper means*; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (emphasis added), citing *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003).

212.  The uncontradicted testimony of Mark Edwards establishes that Software AG has business relationships with third parties (PRODESP and others) and that Defendants knew of those relationships. Tr. 65. Indeed, it is clear from the testimony of Mr. Edwards and Mr. Fridman that Consist knew exactly the parties with which Software AG had business relationships, as Consist had installed the Software AG SYSTEMS and looked to Software AG to provide maintenance services for the customers, even after the termination of Consist's Distributorship Agreement. *See* Complaint Exs. 8, 9.

48

213.    The testimony of Mr. Edwards and Mr. Fridman make clear that Defendants intentionally interfered with Software AG's prospective relations, making representations to customers to prevent them from signing maintenance contracts with Software AG. Mr. Edwards testified that one such customer – instead of entering into a maintenance agreement with Software AG – kicked the matter to its legal department, and did not accept Software AG's representations that it was the true provider of maintenance services now the Agreement has expired. Tr. 65.

214.    Consist disputes that it acted solely out of malice, citing its economic interest in providing the maintenance services. However, Consist's efforts to secure contracts and thereafter keep those contracts for maintenance services that Consist clearly could not provide upon the termination of the Agreement do not constitutes a valid economic interest. Consist's actions could only serve to confuse consumers and cause harm to consumers seeking maintenance.

215.    Moreover, malice is not required to support a cause of action for tortious interference with prospective business relations where the defendant's conduct is independently tortious. *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 785 N.Y.S.2d 359 (2004) ("The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort." Where the conduct is not "independently tortious [the plaintiff] cannot recover unless an exception to the general rule is applicable. Such an exception has been recognized where a defendant engages in conduct 'for the sole purpose of inflicting emotional harm on plaintiffs.'" *Id.* at 190, quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group Inc.*, 215 A.D.2d 990, 628 N.Y.S.2d 408 [3d Dept. 1995], aff'd 87 N.Y.2d 614, 641 N.Y.S.2d 581 (1996)). *See also Hannex Corp. v. GMI,*

*Inc.*, 140 F.3d 194, 206 (2d Cir. 1998) (identifying "wrongful conduct" for purposes of tortious interference with prospective business relations and holding that allegations of fraud by breach of fiduciary duty). The conduct constituting the tortious interference with business relations is conduct directed not at the plaintiff, but at the party with which the plaintiff seeks a business relationship. *Carvel, supra*, 3 N.Y.2d at 192.

216.   Fraud or misrepresentations to consumers are recognized among the torts that support a claim for tortious interference with prospective business relations independent of a showing of malice. *See Carvel, supra*, 3 N.Y.2d at 191-92 (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628 (1980) and Restatement (Second) of Torts § 768 cmt. e and § 767 cmt. c). *See also Hannex Corp., supra,* 140 F.3d at 206.

217.   In *Unique Sports Generation, Inc. v. LGH III, LLC,* 2005 U.S. Dist. LEXIS 22133 (S.D.N.Y. Sept. 30, 2005), defendant argued that plaintiff had failed to adequately allege fraudulent or criminal conduct to satisfy the third element of tortious interference. The court held that plaintiff had adequately alleged improper means where defendant made misrepresentations about plaintiff's business to its customers and potential customers and thereby defamed plaintiff. Id. at *24.

218.   Software AG has satisfied each of the elements to establish a likelihood of success on the merit on their claim of tortious interference with prospective business relations.

219.   Defendants's misrepresentations clearly establish that they used dishonest, unfair, or improper means to interfere with Software AG's business relations. Defendants do not dispute that they are able to provide full maintenance services for

Software AG products – including updates, upgrades, bug fixes, Level 3 Support and some Level 2 Support – but nevertheless represent to customers that they can do so in order to prevent Software AG from obtaining maintenance contracts.

220.  Consist's misrepresentations to customers regarding its ability to provide full maintenance services constitute an independent tort.  Under New York law, fraud requires (1) the defendant made a false representation of a material fact; (2) with knowledge of its falsity; (3) with scienter, namely, an intent to defraud; (4) and upon which the defrauded party justifiably relied; (5) thereby causing damage. *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 239 (2d Cir. 1999).

221.  The evidence adduced at the preliminary injunction hearing establishes a likelihood that Software AG can show (1) that Consist made false representations of material fact to consumers by asserting that Consist could perform all maintenance services, when in fact, it cannot; (2) Consist knew it could not provide all maintenance services beyond December 31, 2007 when it made the representations; (3) Consist intended to defraud the customers by securing annual or longer term contracts and revenue for services it knew it was unable to provide; (4) the customers, having long dealt with Consist, justifiably relied on Consist's representations, and therefore entered into contracts – in PRODESP's case, on December 28, 2007; and (5) the customers have been damaged thereby, having been without the contracted services since January 1, 2008.

222.  The uncontradicted testimony of Mr. Edwards established that PRODESP and others have deferred entering maintenance agreements with Software AG based upon

Consist's representations, and that Software AG is damaged in lost maintenance fees, goodwill and reputation.

223. Accordingly, Software AG has established the fourth element of a claim for tortious interference with prospective business relations.

224. Software AG has thus established a likelihood of success on the merit on their claim of tortious interference with prospective business relations.

Dated: New York, New York
        January 28, 2008

Respectfully submitted,

By:

James David Jacobs
Frank M. Gasparo
Marcella Ballard
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel: 212-626-4100
Fax: 212-310-1600

52

# A – Part I

# Lei 9279/96 (versão em inglês)

LAW N° 9279

OF 14th MAY 1996

(published on 15th of May 1996)

Regulating rights and obligations relating to industrial property.

PRELIMINARY PROVISIONS

Article 1 - This law regulates rights and obligations relating to industrial property.

Article 2 - The protection of rights relating to industrial property, taking into account the interests of society and the technological and economic development of the country, is effected by means of:

I - the grant of patents of invention and utility model patents;

II - the grant of industrial design registrations;

III - the grant of trademark registrations;

IV - the repression of false geographical indications; and

V - the repression of unfair competition.

Article 3 - The provisions of this law also apply:

I - to an application for a patent or registration originating from abroad and filed in this country by a person having protection guaranteed by a treaty or convention in force in Brazil; and

II - to nationals or persons domiciled in a country that guarantees reciprocity of identical or equivalent rights to Brazilians or persons domiciled in Brazil.

Article 4 - The provisions of treaties in force in Brazil, are applicable, in equal conditions, to natural and legal persons that are nationals or domiciled in this country.

Article 5 - For all legal effects, industrial property rights are considered to be chattels

TITLE I

PATENTS

CHAPTER I

OWNERSHIP

Article 6 - The author of an invention or of a utility model will be assured the right to obtain a patent that guarantees to him the property, under the terms established by this law.

§ 1 - In the absence of proof to the contrary, the applicant is presumed to have the right to obtain a patent.

§ 2 - A patent may be applied for   by the author, his heirs or successors, by the assignee or by whoever the law or a work or service contract determines to be the owner.

§ 3 - When an invention or utility model is created jointly by two or more persons, the patent may be applied for   by all or any one of them, by naming and qualifying the others to guarantee their respective rights.

§ 4 - The author will be named and qualified, but may request his authorship not to be divulged.

Article 7 - If two or more authors have independently devised   the same invention or utility model, the right to obtain a patent will be assured to whoever proves the earliest filing, independently of the dates of invention or creation.

*Sole Paragraph* - The withdrawal of an earlier filing without producing any efects will give priority to the first later filing.

CHAPTER II

PATENTABILITY

Section I

Patentable Inventions and Utility Models

Article 8 - To be patentable an invention must meet the requirements of novelty, inventive activity and industrial application.

Article 9 - An object of practical use, or part thereof, is patentable as a utility model, when it is susceptible of industrial application, presents a new shape or arrangement and involves an inventive act that results in a functional improvement in its use or manufacture.

Article 10 - The following are not considered to be inventions or utility models:

I - discoveries, scientific theories and mathematical methods;

II - purely abstract concepts;

III - schemes, plans, principles or methods of a commercial, accounting, financial, educational, publishing, lottery or fiscal nature;

IV - literary, architectural, artistic and scientific works or any aesthetic creation;

V - computer programmes per se;

VI - the presentation of information;

VII - rules of games;

VIII - operating or surgical techniques and therapeutic or diagnostic methods, for use on the human or animal body; and

IX - natural living beings, in whole or in part, and biological material, including the genome or germ plasm of any natural living being, when found in nature or isolated therefrom, and natural biological processes.

Article 11 - Inventions and utility models are considered to be new when not included in the state of the art.

§ 1 - The state of the art comprises everything made accessible to the public before the date of filing of a patent application, by written or oral description, by use or any other means, in Brazil or abroad, without prejudice to the provisions of articles 12, 16 and 17.

§ 2 - For the purpose of determining novelty, the whole contents of an application filed in Brazil, but not yet published, will be considered as state of the art from the date of filing, or from the priority claimed, provided that it is published, even though subsequently.

§ 3 - The provisions of the previous paragraph will be applied to an international patent application filed in accordance with a treaty or convention in force in Brazil, provided that there is national processing.

Article 12 - The disclosure of an invention or utility model which occurs during the twelve months preceding the date of filing or priority of the patent application will not be considered as part of the state of the art, provided such disclosure is made:

I - by the inventor;

II - by the National Institute of Industrial Property - INPI, by means of the official publication of a patent application filed without the consent of the inventor and based on information obtained from him or as a result of his acts; or

III - by third parties, on the basis of information received directly or indirectly from the inventor or as the result of his acts.

*Sole Paragraph* - INPI may require the inventor to provide a declaration relating to the disclosure, accompanied or not by proof, under the conditions established in the rules.

Article 13 - An invention shall be taken to involve inventive activity when, for a person skilled in the art, it does not derive in an evident or obvious manner from the state of the art.

Article 14 - A utility model shall be taken to involve an inventive act when, for a person skilled in the art, it does not derive in a common or usual manner from the state of the art.

Article 15 - Inventions and utility models are considered to be susceptible of industrial application when they can be made or used in any kind of industry.

Section II

Priority

Article 16 - Priority rights will be guaranteed to a patent application filed in a country that maintains an agreement with Brazil or in an international organisation, that produces the effect of a national filing, within the time limits established in the agreement, the filing not being invalidated nor prejudiced by facts that occur within such time limits.

§ 1 - Priority claims must be made at the time of filing, but may be supplemented within 60 (sixty) days by other priorities earlier than the date of filing in Brazil.

§ 2 - A priority claim must be proved by means of a suitable document of origin, containing the number, date, title, specification and, when they exist, claims and drawings, accompanied by a simple translation of the certificate of filing or equivalent document containing data identifying the application, the contents of which will be of the entire responsibility of the applicant.

§ 3 - If not effected at the time of filing, the proof must be presented within 180 (one hundred and eighty) days from filing.

§ 4 - For international applications filed in virtue of a treaty in force in Brazil, the translation provided for in § 2 must be filed within the period of 60 (sixty) days from the date of entry into national processing.

§ 5 - When the application filed in Brazil is completely contained in the document of origin, a declaration by the applicant in this respect will be sufficient to substitute the simple translation.

§ 6 - When the priority is obtained by virtue of assignment, the corresponding document must be filed within 180 (one hundred and eighty) days from filing or, in the case of entry into national processing, within 60 (sixty) days from the date of such entry, consular legalisation in the country of origin not being required.

§ 7 - Failure to file proof within the time limits established in this article will result in loss of the priority.

§ 8 - In the case of an application filed with a priority claim, any request for early publication must be made with proof of the priority having been filed.

Article 17 - An application for a patent of invention or for a utility model originally filed in Brazil, without a priority claim and not yet published, will guarantee a right of priority to a later application in respect of the same subject matter filed in Brazil by the same applicant or by his successors, within the period of 1 (one) year.

§ 1 - Priority will only be recognised for subject matter that is disclosed in the earlier application and will not extend to any new matter that is introduced.

§ 2 - The pending earlier application will be considered as definitively shelved.

§ 3 - A patent application resulting from the division of an earlier application cannot serve as the basis for a priority claim.

Section III

Non-patentable Inventions and Utility Models

Article 18 - The following are not patentable:

I - that which is contrary to morals, good customs and public security, order and health;

II - substances, matter, mixtures, elements or products of any kind, as well as the modification of their physical-chemical properties and the respective processes of obtaining or modifying them, when they result from the transformation of the atomic nucleus; and

III - living beings, in whole or in part, except transgenic micro-organisms meeting the three patentability requirements - novelty, inventive activity and industrial application - provided for in article 8 and which are not mere discoveries;

*Sole Paragraph* - For the purposes of this law, transgenic micro-organisms are organisms, except the whole or part of plants or animals, that exhibit, due to direct human intervention in their genetic composition, a characteristic that can not normally be attained by the species under natural conditions.

CHAPTER III

PATENT APPLICATIONS

Section I

Filing of the Application

Article 19 - A patent application, in accordance with the conditions established by INPI, will contain:

I - a request;

II - a specification;

III - claims;

IV - drawings, if any;

V - an abstract; and

VI - proof of payment of the filing fee.

Article 20 - Once presented, the application will be submitted to a formal preliminary examination and, if in due order, will be protocolled, the date of presentation being considered as the filing date.

Article 21 - An application that does not formally meet the requirements of article 19, but which does contain data relating to the subject matter, the applicant and the inventor, may be delivered to INPI against a dated receipt which will establish the requirements to be met within a period of 30 (thirty) days, on pain of return or shelving of the documentation.

*Sole Paragraph* - Once the requirements have been met, filing will be considered to have been made on the date of the receipt.

Section II

Conditions of the Application

Article 22 - An application for a patent of invention must refer to a single invention or to a group of inventions so interrelated as to comprise a single inventive concept.

Article 23 - An application for a utility model must refer to a single principal model that may include a plurality of distinct additional elements or structural or configurative variations, provided that technical-functional and corporeal unity of the object is maintained.

Article 24 - The specification must describe the subject matter clearly and sufficiently so as to enable a person skilled in the art to carry it out and to indicate, when applicable, the best mode of execution.

*Sole Paragraph* - In the case of biological material essential for the practical execution of the subject matter of the application, which cannot be described in the form of this article and which has not been accessible to the public, the specification will be supplemented by a deposit of the material in an institution authorised by INPI or indicated in an international agreement.

Article 25 - The claims must be based on the specification, characterising the particularities of the application and defining clearly and precisely the subject matter to be protected.

Article 26 - A patent application may, until the end of examination, be divided, *ex officio* or on request of the applicant, into two or more applications, provided that the divisional application:

I - makes specific reference to the original application; and

II - does not exceed the matter disclosed in the original application.

*Sole Paragraph* - A request for division not in accordance with the provisions of this article will be shelved.

Article 27 - Divisional applications will have the filing date of the original application and the benefit of the priority of the latter, if any.

Article 28 - Each divisional application will be subject to payment of the corresponding fees.

Article 29 - A patent application which is withdrawn or abandoned will be published.

§ 1 - A request for withdrawal must be filed within 16 (sixteen) months counted from the date of filing or of the earliest priority.

§ 2 - Withdrawal of an earlier application without producing any effect will confer priority on the first later application.

Section III

Prosecution and examination of an application

Article 30 - A patent application will be kept secret during 18 (eighteen) months counted from the date of filing or of the earliest priority, if any, after which it will be published, with the exception of the case provided for in article 75.

§ 1 - Publication of the application may be anticipated on request by the applicant.

§ 2 - The publication must include data identifying the patent application, a copy of the specification, claims, abstract and drawings being made available to the public at INPI.

§ 3 - In the case provided for in the sole paragraph of article 24, the biological material will be made available to the public at the time of the publication to which this article refers.

Article 31 - Documents and information for aiding examination may be filed by interested parties between the publication of the application and the termination of examination.

*Sole Paragraph* - Examination will not be initiated prior to 60 (sixty) days from publication of the application.

Article 32 - In order better to clarify or define a patent application, the applicant may effect alterations up to the request for examination, provided that they be limited to the subject matter initially disclosed in the application.

Article 33 - Examination of a patent application must be requested by the applicant or by any interested party, within 36 (thirty six) months counted from the date of filing, under pain of shelving of the application.

*Sole Paragraph* - The patent application may be reinstated, on request by the applicant, within 60 (sixty) days counted from the shelving, on payment of a specific fee, under pain of definitive shelving.

Article 34 - Once examination has been requested and whenever so requested, the following should be filed within 60 (sixty) days, on pain of shelving of the application:

I - objections, prior art searches and the results of examination for the grant of corresponding applications in other countries, when there is a priority claim;

II - documents necessary to regularise the proceedings and examination of the application; and

III - a simple translation of the suitable document mentioned in § 2 of article 16, should it have been substituted by the declaration provided for in § 5 of that same article.

Article 35 - At the time of the technical examination, a search report and an opinion will be prepared with respect to:

I - the patentability of the application;

II - the adaptation of the application to the nature of protection claimed;

III - the reformulation of the application or the division thereof; or

IV - technical requirements.

Article 36 - When the opinion is for non-patentability or for the inadequacy of the application for the nature of protection claimed or formulates any requirement, the applicant will be notified to reply within a period of 90 (ninety) days.

§ 1 - If no reply to a requirement is filed, the application will be definitively shelved.

§ 2 - If a reply to a requirement is filed, but the latter is not met or its formulation is contested, and independently of arguments being filed regarding patentability or adequacy, examination will be continued.

Article 37 - Once examination is concluded, a decision will be issued, allowing or rejecting the patent application.

CHAPTER IV

PATENT GRANT AND TERM

Section I

Patent Grant

Article 38 - A Patent will be granted after the application is allowed and, after proving payment of the corresponding fee, the respective letters-patent will be issued.

§ 1 - Payment of the fee and the respective proof thereof must be effected within 60 (sixty) days from allowance.

§ 2 - The fee provided for in this article may also be paid and proved within 30 (thirty) days after the time limit provided for in the previous paragraph, independently of any notification, by payment of a specific fee, on pain of definitive shelving of the application.

§ 3 - The patent will be considered granted as of the date of publication of the respective act.

Article 39 - The letters-patent will include the respective number, title and nature of protection, the name of the inventor, observing the provisions of article 6, § 4, the qualification and domicile of the patentee, the term, the specification, the claims and the drawings, as well as data relating to the priority.

Section II

Patent Term

Article 40 - A Patent of invention will have a term of 20 (twenty) years and a utility model patent a term of 15 (fifteen) years, counted from the filing date.

*Sole Paragraph* - The term will not be less than 10 (ten) years for patents of invention and 7 (seven) years for utility model patents, counted from grant, except when INPI is prevented from proceeding with the examination as to the merit of the application, due to a proven *pendente lite* or for reasons of "force majeure".

CHAPTER V

PROTECTION CONFERRED BY A PATENT

Section I

The Rights

Article 41 - The extension of the protection conferred by a patent will be determined by the content of the claims, interpreted in the light of the specification and drawings.

Article 42 - A patent confers on its proprietor the right to prevent third parties from manufacturing, using, offering for sale, selling or importing for such purposes without his consent:

I - a product that is the subject of a patent;

II - a process, or product directly obtained by a patented process;

§ 1 - The patentee is further guaranteed the right to prevent third parties from contributing to the practice by other parties of the acts referred to in this article.

§ 2 - The rights in a process patent will be violated, insofar as item II is concerned, when the holder or owner of a product fails to prove, through specific judicial ruling, that it was obtained by a manufacturing process different from that protected by the patent.

Article 43 - The provisions of the previous article do not apply:

I - to acts practised by unauthorised third parties privately and without commercial ends, provided they do not result in prejudice to the economic interests of the patentee;

II - to acts practised by unauthorised third parties for experimental purposes, related to studies or to scientific or technological research;

III - to the preparation of a medicine according to a medical prescription for individual cases, executed by a qualified professional, as well as to a medicine thus prepared;

IV - to a product manufactured in accordance with a process or product patent that has been placed on the internal market directly by the patentee or with his consent;

V - to third parties who, in the case of patents related to living matter, use, without economic ends, the patented product as the initial source of variation or propagation for obtaining other products; and

VI - to third parties who, in the case of patents related to living matter, use, place in circulation or commercialise a patented product that has been introduced lawfully onto the market by the patentee or his licensee, provided that the patented product is not used for commercial multiplication or propagation of the living matter in question.

Article 44 - A patentee is guaranteed the right to obtain compensation for the unauthorised exploitation of the subject matter of the patent, including exploitation that occurred between the date of publication of the application and that of grant of the patent.

§ 1 - If the infringer obtains, by any means, knowledge of the contents of a filed application, prior to publication, the period of undue exploitation, for the effect of compensation, will be counted from the date of commencement of the exploitation.

§ 2 - When the subject matter of a patent application relates to biological material, deposited under the terms of the sole paragraph of article 24, the right to compensation will only be conferred when the biological material has been made available to the public.

§ 3 - The right to obtain compensation for unauthorised exploitation, including with respect to the period prior to grant of the patent, is limited to the contents of the subject matter of the patent, under the terms of article 41.

Section II

Prior User

Article 45 - A person who in good faith, prior to the date of filing or of priority of a patent application, exploits its object in this country, will be guaranteed without onus the right to continue the exploitation, in the previous form and conditions.

§ 1 - The right conferred under the terms of this article can only be ceded by transfer or leasing, together with the business of the undertaking, or the part thereof that has direct relation with the exploitation of the subject matter of the patent.

§ 2 - The right to which this article refers will not be guaranteed to a person who had knowledge of the subject of the patent due to disclosure under the terms of article 12, provided that the application was filed within 1 (one) year from the disclosure.

CHAPTER VI

PATENT NULLITY

Section I

General Provisions

Article 46 - A patent is null when granted contrary to the provisions of this law.

Article 47 - Nullity may not be applicable to all of the claims, a condition for partial nullity being that the subsisting claims constitute subject matter that is patentable per se.

Article 48 - Nullity of a patent will produce effects as from the filing date of the application.

Article 49 - In the case of the provisions of article 6 not having been observed, the inventor may alternatively claim, in a court action, the adjudication of the patent.

Section II

Administrative Nullity Procedure

Article 50 - Nullity of a patent will be declared administratively when:

I - any of the legal requisites have not been met;

II - the specification and the claims do not meet the provisions of articles 24 and 25, respectively;

III - the subject of protection of the patent extends beyond the contents of the application as originally filed; or

IV - any of the essential formalities indispensable for grant were omitted during prosecution.

Article 51 - The nullity procedure may be instituted *ex officio* or at the request of any person having legitimate interest, within 6 (six) months counted from the grant of the patent.

*Sole Paragraph* - The nullity procedure will continue even if the patent is extinct.

Article 52 - The patentee will be notified to respond within a period of 60 (sixty) days.

Article 53 - Independently of a reply having been filed, once the period determined in the previous article has passed, INPI will issue an opinion, notifying the patentee and the applicant to reply within a common period of 60 (sixty) days.

Article 54 - Once the period determined in the previous article has passed, even if no replies have been presented, the process will be decided by the President of INPI, terminating the administrative instance.

Article 55 - The provisions of this Section apply, where appropriate, to certificates of addition.

Section III

Nullity Actions

Article 56 - A nullity action can be filed at any time during the term of a patent by INPI or by any legitimately interested party.

§ 1 - Nullity of a patent may be argued, at any time, as matter for defence.

§ 2 - The judge may, as a preventive or incidental measure, determine the suspension of the effects of a patent, provided the relevant procedural requirements are met.

Article 57 - Nullity actions will be adjudged in the forum of the Federal Courts, and INPI, when not plaintiff, will participate in the action.

§ 1 - The period for the defendant to reply will be 60 (sixty) days.

§ 2 - Once the decision on a nullity action becomes *res judicata*, INPI will publish a notice to inform third parties.

CHAPTER VII

ASSIGNMENT AND NOTATIONS

Article 58 - A patent application or patent, the contents of which are indivisible, may be assigned in whole or in part.

Article 59 - INPI will make the following notations:

I - assignments, mentioning the complete qualification of the assignee;

II - any limitation or onus applied to the application or patent; and

III - alterations of name, headquarters or address of the applicant or patentee.

Article 60 - Notations will produce effect with regard to third parties as from the date of their publication.

CHAPTER VIII

LICENSES

Section I

Voluntary Licenses

Article 61 - A patentee or applicant may execute a license contract for exploitation.

*Sole Paragraph* - The licensee may be invested by the patentee with all powers to act in defence of the patent.

Article 62 - A license contract must be recorded at INPI to produce effect with regard to third parties.

§ 1 - The recordal will produce effect with regard to third parties as from the date of its publication.

§2 - A license contract need not be recorded at INPI for it to have effect for validating proof of use.

Article 63 - Any improvement to a licensed patent belongs to the person who made it, the other contracting party being guaranteed the right of preference with respect to a license.

Section II

Offer to License

Article 64 - A patentee may request INPI to place his patent under offer with a view to its exploitation.

§ 1 - INPI will promote publication of the offer.

§ 2 - No exclusive voluntary license contract will be recorded by INPI without the patentee having withdrawn the offer.

§ 3 - No patent subject to an exclusive voluntary license may be made the subject of an offer.

§ 4 - The patentee may withdraw the offer at any time prior to the express acceptance of its terms by an interested party, whereby the provisions of article 66 will not apply.

Article 65 - In the absence of an agreement between the patentee and the licensee, the parties may request INPI to arbitrate the remuneration.

§ 1 - For the effects of this article, INPI will observe the provisions of § 4 of article 73.

§ 2 - The remuneration may be reviewed after 1 (one) year of it being established.

Article 66 - A patent under offer will have its annuities reduced by one half during the period between the offer and the grant of the first license of any type.

Article 67 - The patentee may request cancellation of the license if the licensee does not initiate effective exploitation within 1 (one) year of the grant of the license, interrupts exploitation for a period longer than 1 (one) year or, further, if the conditions for exploitation are not obeyed.

Section III

Compulsory Licenses

Article 68 - A patentee will be subject to have his patent licensed compulsorily if he exercises the rights resulting therefrom in an abusive manner or by means of it practices abuse of economic power that is proven under the terms of the law by an administrative or court decision.

§ 1 - The following may also result in a compulsory license:

I - the non-exploitation of the subject matter of the patent in the territory of Brazil, by lack of manufacture or incomplete manufacture of the product or, furthermore, by lack of complete use of a patented process, except in the case of non-exploitation due to economic inviability, when importation will be admitted; or

II - commercialisation that does not meet the needs of the market.

§ 2 - The license can only be requested by a party with legitimate interest and that has the technical and economic capacity to carry out the efficient exploitation of the subject matter of the patent, that should be destined predominantly for the internal market, suppressing, in this case, the exception provided for in item I of the previous paragraph.

§ 3 - In the case that a compulsory license is granted due to abuse of economic power, a period of time, limited to that provided for in article 74, will be guaranteed to the licensee proposing to manufacture locally, to proceed with the importation of the subject matter of the license, provided it has been placed on the market directly by the patentee or with his consent

§ 4 - In the case of importation for exploitation of a patent and in the case of importation provided for in the previous paragraph, the importation by third parties of a product manufactured according to a process or product patent will equally be allowed, provided it has been placed on the market directly by the patentee or with his consent.

§ 5 - A compulsory license, to which § 1 relates, may only be requested after 3 (three) years from grant of the patent.

Article 69 - A compulsory license will not be granted if, at the date of the request, the patentee:

I - justifies non-use for legitimate reasons;

II - proves that serious and effective preparations for exploitation have been carried out; or

III - justifies lack of manufacture or commercialisation due to legal obstacles.

Article 70 - A compulsory license will also be granted when the following hypotheses are shown to exist cumulatively:

I - a situation of dependency of one patent on another is characterised;

II - the subject matter of the dependent patent constitutes a substantial technical advance in relation to the earlier patent; and

III - the patentee does not come to an agreement with the patentee of the dependent patent for the exploitation of the earlier patent.

§ 1 - For the purposes of this article, a dependent patent is considered to be one the exploitation of which depends obligatorily on the use of the subject matter of the earlier patent.

§ 2 - For the purposes of this article, a process patent may be considered as dependent on a patent for the respective product, as also a product patent may be dependent upon a process patent.

§ 3 - The proprietor of a patent licensed under the terms of this article will have the right to a compulsory cross license under the dependent patent.

Article 71 - In cases of national emergency or public interest, declared in an act of the Federal Executive Authorities, insofar as the patentee or his licensee does not meet such necessity, a temporary *ex officio* non-exclusive compulsory license for the exploitation of the patent may be granted, without prejudice to the rights of the respective patentee.

*Sole Paragraph* - The act of grant of the license will establish its term of validity and the possibility of extension.

Article 72 - Compulsory licenses will always be granted without exclusivity, sublicensing not being permitted.

Article 73 - An application for a compulsory license must be formulated by indicating the conditions offered to the patentee.

§ 1 - Once the application for a license has been filed, the patentee will be notified to respond within a period of 60 (sixty) days, at the end of which, in the absence of a response from the patentee, the proposal will be considered as accepted under the conditions offered.

§ 2 - An applicant for a license who alleges abuse of patent rights or abuse of economic power must file documentary proof.

§ 3 - If a compulsory license is requested on the basis of lack of exploitation, it will rest with the patentee to prove exploitation.

§ 4 - If there is a contestation, INPI may take the necessary steps, including the establishment of a committee that may include specialists that are not part of INPI, with a view to arbitrating the remuneration that will be paid to the patentee.

§ 5 - The organs and entities of the direct or indirect, federal, state and municipal public administration will provide INPI with such information as is requested with a view to assisting the arbitration of remuneration.

§ 6 - In arbitrating remuneration, the circumstances of each case will be considered, taking into account obligatorily the economic value of the license granted.

§ 7 - Once the process is duly filed, INPI will come to a decision regarding the grant and the conditions of the compulsory license within a period of 60 (sixty) days.

§ 8 - Appeals against decisions granting a compulsory license will not have suspensive effects.

Article 74 - In the absence of legitimate reasons, the licensee must initiate exploitation of the subject matter of the patent within a period of 1 (one) year from the grant of the license, interruption for an equal period being permitted.

§ 1 - The patentee may request revocation of the license if the provisions of this article are not met.

§ 2 - The licensee will be vested with all powers to act in defence of the patent.

§ 3 - After grant of a compulsory license, the assignment thereof will only be permitted when effected together with the assignment, transfer or leasing of that part of the undertaking that exploits it.

CHAPTER IX

PATENTS OF INTEREST TO NATIONAL DEFENCE

Article 75 - A patent application originated in Brazil the object of which is of interest to national defence will be processed in secrecy and will not be subject to the publications provided for in this law.

§ 1 - INPI will send the application immediately to the competent organ of the Executive Authorities for the purpose of providing, within 60 (sixty) days, an opinion regarding secrecy. After such period has passed without any opinion by the competent organ, the application will be processed normally.

§ 2 - Excepting express authorisation by the competent organ, the filing abroad of a patent application the subject matter of which is considered to be of interest to national defence, as well as any disclosure thereof, is prohibited.

§ 3 - The exploitation and the assignment of an application or patent of interest to national defence are conditioned to prior authorisation by the competent organ, due compensation being guaranteed whenever this implies a restriction to the rights of the applicant or patentee.

CHAPTER X

CERTIFICATE OF ADDITION OF AN INVENTION

Article 76 - On payment of a specific fee, the applicant or patentee of a patent of invention may request a certificate of addition to protect an improvement or development introduced in the subject matter of the invention, even if lacking inventive activity, provided that it shares the same inventive concept.

§ 1 - If publication of the main application has already taken place, the application for the certificate of addition will be published immediately.

§ 2 - Examination of the application for a certificate of addition will be in accordance with the provisions of articles 30 to 37, without prejudice to the provisions of the previous paragraph.

§ 3 - An application for a certificate of addition will be rejected if its subject matter does not involve the same inventive concept.

§ 4 - The applicant may, within the period for appeal, by payment of the corresponding fee, request the conversion of an application for a certificate of addition into a patent application benefiting from the date of filing of the application for the certificate.

Article 77 - A certificate of addition is accessory to the patent, has the same expiry date and accompanies it for all legal effects.

*Sole Paragraph* - In a nullity process, the patentee may request that the subject matter contained in the certificate of addition be examined to verify the possibility of its subsistence, without prejudice to the term of protection of the patent.

CHAPTER XI

EXTINCTION OF PATENTS

Article 78 - A patent shall become extinct:

I - on expiry of the term of protection;

II - on waiver by the patentee, without prejudice to the rights of third parties;

III - on forfeiture;

IV - on non-payment of the annual fee, within the periods provided for in § 2 of article 84 and in article 87; and

V - on non-observance of the provisions of article 217.

*Sole Paragraph* - Once a patent becomes extinct, its object falls within the public domain.

Article 79 - Waiver will only be permitted if it does not prejudice the rights of third parties.

Article 80 - A patent becomes forfeit, *ex officio,* or at the request of any party with a legitimate interest if, after 2 (two) years from the grant of the first compulsory license, such period has not been sufficient to prevent or correct abuse or disuse, excepting legitimate reasons.

§ 1 - A patent will become forfeit when, on the date of application for forfeiture or of the *ex officio* commencement of the respective process, its exploitation has not been initiated.

§ 2 - In the process for forfeiture commenced at the request of any party with a legitimate interest, INPI may continue the process on desistment by that party.

Article 81 - The patentee will be notified to respond to the forfeiture request within a period of 60 (sixty) days, the onus of proof regarding exploitation falling on him.

Article 82 - A decision will be pronounced within 60 (sixty) days counted from the end of the period mentioned in the previous article.

Article 83 - A decision of the forfeiture process will produce effect as from the day of the request or of the publication of the commencement of the *ex officio* process.

CHAPTER XII

ANNUAL FEES

Article 84 - The applicant and patentee are subject to the payment of annual fees, as from the beginning of the third year from the date of filing.

§ 1 - Advance payment of the annual fees will be regulated by INPI.

§ 2 - The payment should be effected within the first 3 (three) months of each annual period, but may still be effected within the following 6 (six) months, independently of notification, by payment of an additional fee.

Article 85 - The provisions of the previous article apply to international applications filed in virtue of a treaty in force in Brazil, the payment of annual fees due before the date of entry into national processing having to be effected within a period of 3 (three) months from that date.

Article 86 - Failure to pay an annual fee, under the terms of articles 84 and 85, will result in the shelving of the application or extinction of the patent.

CHAPTER XIII

RESTORATION

Article 87 - A patent application and patent may be restored, if the applicant or patentee so requests, within 3 (three) months counted from notification of shelving of the application or extinction of the patent, on payment of a specific fee.

CHAPTER XIV

INVENTIONS AND UTILITY MODELS MADE BY EMPLOYEES OR SUPPLIERS OF SERVICES

Article 88 - An invention or utility model will belong exclusively to the employer when it results from a work contract being executed in Brazil and the object of which is research or the exercise of inventive activity or when such results from the nature of the services for which the employee was contracted.

§1 - Except when there are express contractual provisions to the contrary, remuneration for the work to which this article refers will be limited to the salary agreed upon.

§ 2 - In the absence of proof to the contrary, an invention or utility model for which a patent is requested by an employee within 1 (one) year from the extinction of the contract of employment will be considered as having been developed while the contract was in force.

Article 89 - An employer, who is the proprietor of a patent, may grant the employee, who is the author of the invention or improvement, participation in the economic gains resulting from the exploitation of the patent, as a result of negotiation with the interested party or as provided for by a norm of the undertaking.

*Sole Paragraph* - The participation referred to in this article will not in any way be incorporated into the salary of the employee.

Article 90 - An invention or utility model developed by an employee will belong exclusively to the employee provided that it is unconnected to his work contract and when it does not result from the use of resources, means, data, materials, installations or equipment of the employer.

Article 91 - The ownership of an invention or utility model will be common, in equal parts, when it results from the personal contribution of the employee and from resources, data, means, materials, installations or equipment of the employer, without prejudice to express contractual provisions to the contrary.

§ 1 - When there is more than one employee, the part due to them will be divided equally between all of them, except when agreed to the contrary.

§ 2 - The employer will be guaranteed the right to an exclusive license for exploitation and the employee will be guaranteed fair remuneration.

§ 3 - Exploitation of the subject matter of the patent, in the absence of an agreement, must be initiated by the employer within 1 (one) year counted from the date of grant, under pain of the property in the patent being transferred to the exclusive ownership of the employee, without prejudice to the hypothesis of lack of exploitaion for legitimate reasons.

§ 4 - In the case of assignment, any of the co-owners may exercise the right of preference under identical conditions.

Article 92 - The provisions of the preceding articles, as far as they are applicable, apply to the relationship between an autonomous worker or a trainee and the contracting undertaking and between contracting and contracted undertakings.

Article 93 - The provisions of this Chapter, as far as they are applicable, apply to entities of the direct or indirect and foundational, federal, state or municipal, Public Administration.

*Sole Paragraph* - In the hypothesis of article 88, a reward corresponding to part of the value of the advantages obtained as a result of the application or the patent will be guaranteed to the inventor, under the terms and conditions provided for in the statutes or internal regulations of the entity to which this article refers.

TITLE II

INDUSTRIAL DESIGNS

CHAPTER I

OWNERSHIP

Article 94 - The author is assured the right to obtain a registration of an industrial design that guarantees to him the property, under the terms established by this law.

*Sole Paragraph* - As far as they are applicable, the provisions of articles 6 and 7 will apply to the registration of industrial designs.

CHAPTER II

REGISTRABILITY

Section I

Registrable Industrial Designs

Article 95 - An industrial design is considered to be any ornamental plastic form of an object or any ornamental arrangement of lines and colours that may be applied to a product, that provides a new and original visual result in its external configuration, and that may serve as a type for industrial manufacture.

Article 96 - An industrial design is considered to be new when not comprised by the state of the art.

§ 1 - The state of the art comprises everything made accessible to the public before the date of filing of the application, in Brazil or abroad, by use or any other means, without prejudice to the provisions of § 3 of this article and of article 99.

§ 2 - For the sole purpose of determining novelty, the whole contents of an application for a patent or a registration filed in Brazil, but not yet published, will be considered as included in the state of the art from the date of filing, or from the priority claimed, provided that it is published, even though subsequently.

§ 3 - An industrial design of which disclosure occurred within the 180 (one hundred and eighty) days preceding the date of filing the application or of the priority claimed will not be considered as included in the state of the art, provided such disclosure is made in accordance with the situations provided for in items I to III of article 12.

Article 97 - An industrial design is considered original when it results in a distinctive visual configuration in relation to other prior objects.

Sole Paragraph - The original visual result may be the result of the combination of known elements.

Article 98 - Works of a purely artistic nature are not considered to be industrial designs.

Section II

Priority

Article 99 - As far as they are applicable, the provisions of article 16, except for the time limit provided for in § 3 of that article, which will be 90 (ninety) days, apply to applications for registration.

Section III

Non-Registrable Industrial Designs

Article 100 - An industrial design is not registrable for:

I - that which is contrary to morals and good customs or which offends the honour or image of people or is contrary to the liberty of conscience, belief, religious cults or ideas and feelings worthy of respect and veneration.

II - the necessary common or ordinary shape of an object or, further, that which is determined essentially by technical or functional considerations.

CHAPTER III

APPLICATIONS FOR REGISTRATION

Section I

Filing of the application

Article 101 - An application for registration, in accordance with conditions established by INPI, will contain:

I - a request;

II - a specification, if applicable;;

III - claims, if applicable;

IV - drawings or photographs;

V - the field of application of the object; and

VI - proof of payment of the filing fee.

*Sole Paragraph* - The documents that comprise an application for registration must be filed in the Portuguese language.

Article 102 - Once presented, the application will be submitted to a formal preliminary examination and, if in due order, will be protocolled, the filing date being considered to be the date of presentation.

Article 103 - An application that does not formally meet the requirements of article 101, but which does contain sufficient data relating to the applicant, to the industrial design and to the author, may be delivered to INPI against a dated receipt which will establish the requirements to be met within a period of 5 (five) days, on pain of being considered non-existent.

*Sole Paragraph* - Once the requirements have been met, filing will be considered to have been made on the date of presentation of the application.

Section II

Conditions of the Application

Article 104 - An application for an industrial design registration must refer to a single object, a plurality of variations being permitted, provided that they are destined for the same purpose and maintain between them the same preponderant distinctive characteristic, each application being limited to a maximum of 20 (twenty) variations.

*Sole Paragraph* - The drawing must clearly and sufficiently represent the object and its variations, if they exist, so as to allow its reproduction by a person skilled in the art.

Article 105 - When secrecy is requested under the terms of article 106, § 1, the application may be withdrawn up to 90 (ninety) days counted from the date of filing.

*Sole Paragraph* - Withdrawal of an earlier application without producing any effect will confer priority on the first later application.

Section III

Prosecution and examination of an application

Article 106 - Once an application for an industrial design registration has been filed and the provisions of articles 100, 101 and 104 have been observed, it will be published automatically and the registration will be simultaneously granted, the respective certificate being issued.

§ 1 - On request by the applicant at the time of filing, the application may be kept secret for a period of 180 (one hundred and eighty) days counted from the filing date, after which it will be processed.

§ 2 - If the applicant avails himself of the provisions of article 99, processing of the application will await presentation of the priority document.

§ 3 - If the provisions of articles 101 and 104 are not met, a requirement will be made to which a response should be filed within 60 (sixty) days, on pain of definitive shelving.

§ 4 - If the provisions of article 100 are not met, the application for registration will be rejected.

CHAPTER IV

GRANT AND TERM OF THE REGISTRATION

Article 107 - The certificate must include the number and title, the name of the author, observing the provisions of § 4 of article 6, the name, nationality and domicile of the registrant, the term, the drawings, data relating to any foreign priority and, when applicable, the specification and claims.

Article 108 - The registration will have a term of 10 (ten) years counted from the date of filing and will be renewable for three successive periods of 5 (five) years each.

§ 1 - An application for renewal must be made during the last year of the term of the registration and be accompanied by proof of payment of the respective fee.

§ 2 - If an application for renewal has not been requested prior to the end of the term of the registration, the registrant may make such request within the subsequent 180 (one hundred and eighty) days, on payment of an additional fee.

CHAPTER V

PROTECTION CONFERRED BY A REGISTRATION

Article 109 - The property in an industrial design is acquired by a validly granted registration.

*Sole Paragraph* - As far as applicable, the provisions of article 42 and of items I, II and IV of article 43, will apply.

Article 110 - A person who in good faith, prior to the date of filing or of the priority of an application for registration, exploited the subject matter in this country, will be guaranteed the right to continue the exploitation in the previous manner and conditions, without onus.

§ 1 - The right conferred under the terms of this article can only be ceded, by transfer or leasing, together with the business or undertaking, or part thereof that has direct relation with the exploitation of the object of the registration.

§ 2 - The right to which this article refers will not be guaranteed to a person who had knowledge of the object of the registration due to disclosure under the terms of § 3 of article 96, provided that the application was filed within 6 (six) months from the disclosure.

CHAPTER VI

EXAMINATION ON MERIT

Article 111 - A registrant of an industrial design may, at any time during the term of registration, request examination as to novelty and originality of the object of the registration.

*Sole Paragraph* - INPI will issue an opinion on merit that will serve as the basis for the *ex officio* institution of nullity proceedings of the registration if it is concluded that at least one of the requirements provided for in articles 95 to 98 are absent.

CHAPTER VII

Nullity of RegistrationS

Section I

General Provisions

Article 112 - A registration is null if granted contrary to the provisions of this law.

§ 1 - Nullity of a registration will produce effects as from the date of filing of the application.

§ 2 - In the case of inobservance of the provisions of article 94, the author may alternatively claim adjudication of the registration.

Section II

Administrative Nullity Proceedings

Article 113 - Nullity of a registration will be declared administratively when it has been granted contrary to articles 94 to 98.

§ 1 - Nullity proceedings may be instituted *ex officio* or at the request of any person having a legitimate interest within 5 (five) years from grant of the registration, without prejudice to the hypothesis provided for in the sole paragraph of article 111.

§ 2 - A request or *ex officio* institution will suspend the effects of grant of a registration if presented or published within 60 (sixty) days from grant.

Article 114 - The registrant will be notified to respond within 60 (sixty) days counted from the date of the publication.

Article 115 - INPI will issue an opinion after the period specified in the previous article, whether there is a response or not, notifying the registrant and the applicant to respond within 60 (sixty) days.

Article 116 - After the period specified in the previous article, even if no responses have been made, the process will be decided by the president of INPI, thereby bringing to a close the administrative instance.

Article 117 - Nullity proceedings will be continued even when the registration is extinct.

Section III

Nullity Action

Article 118 - As far as they are applicable, the provisions of articles 56 and 57 will apply to actions for nullity of a registration for an industrial design.

CHAPTER VIII

Extinction of RegistrationS

Article 119 - A registration will become extinct:

I - on expiry of the term of protection;

II - on waiver by the registrant, without prejudice to the rights of third parties;

III - on non-payment of the fee, provided for in articles 108 and 120; or

IV - on non-observance of the provisions of article 217.

CHAPTER IX

Quinquennial Fee

Article 120 - The proprietor of a registration is subject to the payment of a quinquennial fee as of the second quinquennium from the filing date.

§ 1 - Payment of the second quinquennium will be made during the 5th (fifth) year of the term of the registration.

§ 2 - Payment of the following quinquennial fees will be presented together with the application for renewal referred to in article 108.

§ 3 - Payment of quinquennial fees may still be made within the 6 (six) months following the period established in the previous paragraph, by payment of an additional fee.

CHAPTER X

Final Provisions

Article 121 - As far as they are applicable, the provisions of articles 58 to 63 apply to subject matter covered by the present Title, the rights of the employee or supplier of services being governed by the provisions of articles 88 to 93.

TITLE III

MARKS

CHAPTER I

REGISTRABILITY

Section I

Signs Registrable as Marks

Article 122 - Any visually perceptive distinctive sign, when not prohibited under law, is susceptible of registration as a mark.

Article 123 - For the effects of this law, the following definitions apply:

I - product or service mark: that used to distinguish a product or service from one having a different origin, that is identical, similar or akin;

II - certification mark: that used to attest that a product or service conforms with determined technical norms or specifications, notably with reference to its quality, its nature, the material used and the methodology employed; and

III - collective mark: that used to identify products or services originated by members of a given entity.

Section II

Signs Not Registrable as Marks

Article 124 - The following are not registrable as marks:

I - crests, armorial bearings, medals, flags, emblems, official public distinctions and monuments, be they national, foreign or international, as well as any respective designations, figures or imitations;

II - an isolated letter, digit or date, except when sufficiently distinctive;

III - expressions, figures, drawings or any other sign contrary to morals and good customs or which offend a person's honour or image or are an affront to the liberty of conscience, beliefs, religious cults or to ideas and sentiments worthy of respect and veneration;

IV - designations or acronyms of a public entity or establishment, when registration is not requested by that public entity or establishment;

V - reproductions or imitations of a characteristic or differentiating element of a title of establishment or the name of an undertaking belonging to a third party, which are likely to cause confusion or association with such distinctive signs;

VI - signs of a generic, necessary, common, usual or simply descriptive character, when related to the product or service to be distinguished, or those commonly used to designate a characteristic of the product or service with respect to its nature, nationality, weight, value, quality and moment of production or of giving a service, except when presented in a sufficiently distinctive manner;

VII - signs or expressions used only as a means of advertising;

VIII - colours and their names, except when arranged or combined in an unusual and distinctive manner;

IX - geographic indications, imitations thereof likely to cause confusion or signs that might falsely suggest a geographic indication;

X - signs that suggest a false indication with respect to origin, source, nature, quality or utility of the product or service to which the mark is directed;

XI - reproductions or imitations of oficial seals, normally adopted for the guarantee of a standard of any type or nature;

XII - reproductions or imitations of signs that have been registered as a collective or a certification mark by a third party, without prejudice to the provisions of article 154;

XIII - names, prizes or symbols of sporting, artistic, cultural, social, political, economic or technical official or officially recognised events, as well as imitations likely to cause confusion, except when authorised by the competent authority or entity promoting the event;

XIV - reproductions or imitations of titles, bonds, coins and bank notes of the Union, the States, the Federal District, the Territories, the Municipalities or of any country;

XV - personal names or signatures thereof, family or patronymic names and images of third parties, except with the consent of the owner, his heirs or his successors;

XVI - well-known pseudonyms or nicknames and singular or collective artistic names, except with the consent of the owner, his heirs or his successors;

XVII - literary, artistic or scientific works, as well as titles protected by copyright and likely to cause confusion or association, except with the consent of the author or owner;

XVIII - technical terms used in the industry, science or art that is related to the product or service to be distinguished;

XIX - reproductions or imitations, in whole or in part, even with additions, of a mark registered by a third party, to distinguish or certify a product or service that is identical, similar or akin, and which are likely to cause confusion or association with the third party's mark;

XX - duplications of marks of a single proprietor for the same product or service, except when, in the case of marks of the same nature, they are presented in a sufficiently distinctive manner;

XXI - necessary, common or usual shapes of a product or of its packaging, or, furthermore, shapes that cannot be disassociated from a technical effect;

XXII - objects that are protected by industrial design registrations in the name of third parties; and

XXIII - signs that imitate or reproduce, wholly or in part, a mark of which the applicant could obviously not fail to have knowledge in view of his activity, and of which the proprietor is established or domiciled in the national territory or in a country with which Brazil maintains an agreement or guarantees reciprocity of treatment, if the mark is intended to distinguish a product or service that is identical, similar or akin, and is likely to cause confusion or association with such third party mark.

Section III

Famous Marks

Article 125 - Marks registered in Brazil and considered to be famous will be guaranteed special protection, in all fields of activity.

Section IV

Well-Known Marks

Article 126 - Marks that are well-known in their field of activity in the terms of article 6 bis (1) of the Paris Convention for the Protection of Industrial Property will enjoy special protection, independently of whether they have been previously filed or registered in Brazil.

§ 1 - The protection to which this article refers is also applicable to service marks.

§ 2 - INPI may reject *ex officio* an application to register a mark that wholly or partially reproduces or imitates a well-known mark.

CHAPTER II

PRIORITY

Article 127 - Priority rights will be guaranteed to an application for the registration of a mark filed in a country that maintains an agreement with Brazil or in an international organisation, that produces the effect of a national filing, within the time limits established in the agreement, the filing not being invalidated nor prejudiced by facts that occur within such time limits.

§ 1 - The priority claim must be made at the time of filing, but may be supplemented within 60 (sixty) days by other priorities earlier than the date of filing in Brazil.

§ 2 - A priority claim must be proved by means of a suitable document of origin, containing the number, date and reproduction of the application or of the registration, accompanied by a simple translation, the contents of which will be of the entire responsibility of the applicant.

§ 3 - If not effected at the time of filing, the proof must be presented within 4 (four) months from filing, under pain of loss of the priority.

§ 4 - When the priority is obtained by virtue of assignment, the corresponding document must be filed together with the priority document itself.

CHAPTER III

APPLICANTS FOR REGISTRATION

Article 128 - Private individuals or private or public legal entities may apply for the registration of a mark.

§1 - Private legal entities may only request the registration of a mark relating to the activity that they effectively and licitly exercise directly or through undertakings that they control directly or indirectly, such condition having to be declared on the actual request, subject to the penalties of the law.

§2- The registration of a collective mark may only be requested by a legal entity representing a group and able to exercise an activity different from that of its members.

§3 - The registration of a certification mark can only be requested by a person without any direct commercial or industrial interest in the product or service being certified.

§4 - A priority claim does not exempt the application from the provisions of this Title.

CHAPTER IV

RIGHTS RELATING TO A MARK

Section I

Acquisition

Article 129 - The property in a mark is acquired by a validly granted registration, in accordance with the provisions of this law, the owner being guaranteed exclusive use thereof throughout the national territory, without prejudice to the provisions of articles 147 and 148 with respect to collective and certification marks.

§1 - Any person who in good faith at the date of priority or of the application was using an identical or similar mark for at least 6 (six) months in the country, to distinguish or certify a product or service that is identical, similar or akin, will have preferential right to registration.

§2 - The preferential right can only be ceded, by transfer or leasing, together with the business of an undertaking, or part thereof, that has a direct relation to the use of the mark.

Section II

Protection afforded by a Registration

Article 130 - The registrant of, or applicant for, a mark is also guaranteed the right to:

I - assign his registration or application for registration;

II - license its use;

III - care for its material integrity or reputation.

Article 131 - The protection afforded by this law extends to the use of the mark on papers, printed matter, advertisements and documents related to the activity of the owner.

Article 132 - The owner of a mark may not:

I - prevent tradesmen or distributors from using distinctive signs that belong to them, together with the mark of the product for its promotion and commercialisation;

II - prevent manufacturers of accessories from using the mark to indicate the use of the product, provided they obey fair competition practices;

III - prevent the free circulation of products placed on the internal market by himself or by another with his consent, without prejudice to the provisions of §§ 3 and 4 of article 68; and

IV - prevent the mention of the mark in speeches, scientific or literary works or in any other type of publication, provided that it is without any commercial connotation and without prejudice to its distinctive character.

CHAPTER V

TERM, ASSIGNMENT AND NOTATIONS

Section I

Term

Article 133 - The registration of a mark will have a term of 10 (ten) years counted from the date of its grant, it being renewable for equal and successive periods.

§ 1 - An application for renewal must be made during the last year of the term of the registration and must be accompanied by proof of payment of the respective fee.

§ 2 - If the request for renewal has not been made by the end of the registration, the proprietor may make such request within the following 6 (six) months on payment of an additional fee.

§ 3 - Renewal will not be granted if the provisions of article 128 are not met.

Section II

Assignment

Article 134 - Applications for registration and registrations may be assigned, provided that the assignee meets the legal requirements for requesting such registration.

Article 135 - An assignment must include all the registrations or applications, in the name of the assignee, for identical or similar marks relating to a product or service that is identical, similar or akin, on the pain of cancellation of the registrations or shelving of the unassigned applications.

Section III

Notations

Article 136 - INPI will make a note of the following:

I - assignments, indicating the complete qualification of the assignee;

II - any limitation or onus on the application or registration; and

III - alterations of the name, headquarters or address of the applicant or registrant.

Article 137 - Notations will produce effect with respect to third parties as from the date of their publication.

Article 138 - Appeals may be filed against a decision which:

I - rejects the notation of assignment; and

II - cancels the registration or shelves the application under the terms of article 135.

Section IV

Licence of Use

Article 139 - The proprietor of a registration or the applicant of an application for registration may enter into a licence contract for use of the mark, without prejudice to his right to exercise effective control over the specifications, nature and quality of the respective products or services.

*Sole Paragraph* - The licensee may be invested by the registrant with full powers to act in defence of the mark, without prejudice to his own rights.

Article 140 - Licence contracts must be recorded at INPI in order to produce effect with respect to third parties.

§ 1 - Recordals will produce effect with respect to third parties as from the date of their publication.

§ 2 - In order to validate proof of use, licence contracts need not be recorded at INPI.

Article 141 - An appeal may be filed against a decision rejecting the recordal of a license agreement.

CHAPTER VI

LOSS OF RIGHTS

Article 142 - The registration of a mark will become extinct:

I - on expiry of the term of protection;

II - on waiver, which may be total or partial with respect to the products or services indicated by the mark;

III - by forfeiture; or

IV - for failure to observe the provisions of article 217.

Article 143 - A registration will become forfeit, on the request of any person with a legitimate interest, if, after 5 (five) years from its grant, on the date of such request:

I - use of the mark in Brazil has not been initiated; or

II - use of the mark has been interrupted for more than 5 (five) consecutive years or if, within that time, the mark has been used in a modified form that implies alteration in its original distinctive character, as found on the certificate of registration.

§ 1 - The mark will not become forfeit if the registrant justifies the lack of use for legitimate reasons.

§ 2 - The registrant will be notified to reply within a period of 60 (sixty) days, the onus falling on him to prove the use of the mark or justify its lack of use for legitimate reasons.

Article 144 - Use of the mark must include products or services mentioned on the certificate, under penalty of partial forfeiture of the registration with respect to those products or services not similar or akin to those for which use of the mark has been proved.

Article 145 - No recognition will be given to requests for forfeiture if use of the mark has been proved or if its lack of use has been justified in an earlier procedure requested less than 5 (five) years previously.

Article 146 - An appeal may be filed against a decision which either declares or rejects forfeiture.

CHAPTER VII

COLLECTIVE AND CERTIFICATION MARKS

Article 147 - An application for the registration of a collective mark must include regulations of use, determining the conditions and prohibitions for use of the mark.

*Sole Paragraph* - The regulations of use, when they do not accompany the application, must be protocolled within a period of 60 (sixty) days from filing, under pain of definitive shelving of the application.

Article 148 - An application for the registration of a certification mark must include:

I - the characteristics of the product or the service to be certified; and

II - the measures of control that are to be adopted by the registrant.

*Sole Paragraph* - The documentation foreseen in items I and II of this article, when not accompanying the application, must be protocolled within a period of 60 (sixty) days, under pain of definitive shelving of the application.

Article 149 - Any alteration in the regulations of use must be communicated to INPI, by means of a duly protocolled petition, containing all the altered conditions, under pain of it not being considered.

Article 150 - Use of the mark will be independent of a license, it being sufficient for its authorisation to be contained in the regulations of use.

Article 151 - Apart from the grounds for extinction established in article 142, registrations for collective and certification marks will become extinct when:

I - the entity ceases to exist; or

II - the mark is used under conditions that differ from those foreseen in the regulations of use.

Article 152 - Waiver of a registration for a collective mark will only be admitted when requested in accordance with the terms of the articles of association or statutes of the entity itself or, further, in accordance with the regulations of use.

Article 153 - Forfeiture of the registration will be declared if the collective mark is not used by more than one authorised person, without prejudice to the provisions of articles 143 to 146.

Article 154 - Collective marks and certification marks that have already been used and the registrations of which have become extinct may not be registered in the name of a third party, prior to the expiry of a period of 5 (five) years counted from the extinction of the registration.

CHAPTER VIII

FILING

Article 155 - The application must refer to a single distinctive sign and, in accordance with the conditions established by INPI, must contain:

I - a request

II - prints, when applicable; and

III - proof of payment of the filing fee.

*Sole Paragraph* - the request and any documents that accompany it must be presented in the Portuguese language and, whenever there is a document in a foreign language, a simple translation must be presented at the time of filing the application or within the following 60 (sixty) days, on pain of the document not being taken into consideration.

Article 156 - Once the application has been filed, it will be submitted to a preliminary formal examination and, if in due order, will be protocolled, the filing date being considered to be the date of its presentation.

Article 157 - Applications that do not formally meet the provisions of article 155, but which contain sufficient data relating to the applicant, the sign of the mark and the class, may be delivered to INPI, against a dated receipt which will establish the

requirements to be met by the applicant within 5 (five) days, on pain of being considered non-existent.

*Sole Paragraph* - Once the requirements have been met, the filing will be considered as having been made on the date of presentation of the application.

CHAPTER IX

EXAMINATION

Article 158 - Once protocolled, the application will be published for the filing of oppositions within a period of 60 (sixty) days.

§ 1 - The applicant will be notified of the opposition and may respond within a period of 60 (sixty) days.

§ 2 - Oppositions, administrative nullity procedures and nullity actions based on item XXIII of article 124, or article 126 will not be recognised if proof of the filing of an application for the registration of the mark in accordance with this law is not provided within 60 (sixty) days after filing the opposition or nullity procedure or action.

Article 159 - Once the period for opposition has passed or, if such has been filed, after the period for reply, examination will be conducted during which requirements may be formulated, which must be responded to within a period of 60 (sixty) days.

§ 1 - If no response to a requirement is filed, the application will be definitively shelved.

§ 2 - Once a response has been filed, even if the requirement has not been met or the formulation thereof has been contested, examination will continue.

Article 160 - Once examination has been concluded, a decision will be issued, allowing or rejecting the application for registration.

CHAPTER X

ISSUANCE OF CERTIFICATES OF REGISTRATIONS

Article 161 - A certificate of registration will be granted after the application has been allowed and payment of the corresponding fees has been proved.

Article 162 - The payment of the fees and the respective proof thereof, relating to the issuance of the certificate of registration and the first ten year period of protection, must be effected within 60 (sixty) days counted from allowance.

*Sole Paragraph* - The fees may still be paid and proved within 30 (thirty) days after the period mentioned in this article, independently of notification, by payment of a specific fee, on pain of definitive shelving of the application.

Article 163 - The certificate of registration will be considered to have been granted on the date of publication of the corresponding act.

Article 164 - The certificate will mention the mark, the number and date of the registration, the name, nationality and domicile of the registrant, the products or services, the characteristics of the registration and the foreign priority.

CHAPTER XI

NULLITY OF REGISTRATIONS

Section I

General Provisions

Article 165 - A registration is null if granted contrary to the provisions of this law.

*Sole Paragraph* - Nullity of a registration may be total or partial, it being a condition for partial nullity that the remaining part can be considered registrable.

Article 166 - The proprietor of a mark registered in a country that is signatory to the Paris Convention for the Protection of Industrial Property may, alternatively, by means of a court action, claim adjudication of the registration, in accordance with the terms of article 6 "septies"(1) of the Convention.

Article 167 - A declaration of nullity will produce effect as from the date of filing of the application.

Section II

Administrative Nullity Procedure

Article 168 - Nullity of a registration may be declared administratively if it was granted in conflict with the provisions of this law.

Article 169 - A nullity procedure may be commenced *ex officio* or on the request of any person with a legitimate interest, within 180 (one hundred and eighty) days counted from the date of issuance of the certificate of registration.

Article 170 - The registrant will be notified to respond within a period of 60 (sixty) days.

Article 171 - Once the period referred to in the previous article has passed and even if no response has been presented, the procedure will be decided by the President of INPI, thereby terminating the administrative instance.

Article 172 - The nullity proceedings will be continued even if the registration is extinct.

Section III

Nullity Actions

Article 173 - A nullity action may be filed by INPI or by any person with a legitimate interest.

*Sole Paragraph* - The judge may, in the course of the proceedings, grant an injunction suspending the effects of the registration and of the use of the mark, provided the appropriate procedural requirements are met.

Article 174 - The limitation for bringing an action for declaring the nullity of a registration is 5 (five) years counted from the date of registration.

Article 175 - Nullity actions must be brought before the Federal Courts of Justice and INPI, when it is not the plaintiff, will participate in the action.

§ 1 - The period for reply by a defendant that is a registrant will be 60 (sixty) days.

§ 2 - Once the decision in a nullity action is *res judicata*, INPI will publish a note for the information of third parties.

TITLE IV

GEOGRAPHICAL INDICATIONS

Article 176 - A geographical indication is constituted by an indication of source or an appellation of origin.

Article 177 - An indication of source is considered to be the geographical name of a country, city, region or locality of its territory, which has become known as a centre of extraction, production or manufacture of a determined product or for providing a determined service.

Article 178 - An appellation of origin is considered to be the geographical name of a country, city, region or locality of its territory, which designates a product or service, the qualities or characteristics of which are exclusively or essentially due to the geographical environment, including natural and human factors.

Article 179 - Protection is extended to the graphical or figurative representation of a geographical indication, as well as to the geographical representation of the country, city, region or locality of its territory of which the name is a geographical indication.

Article 180 - When a geographical name comes into common use, with respect to a given product or service, it will not be considered as a geographical indication.

Article 181 - A geographical name that does not constitute an indication of source or an appellation of origin may serve as a characteristic element of a product or service mark, provided that it does not suggest a false source.

Article 182 - The use of a geographical indication is restricted to the producers and providers of services established in the locality, quality requirements also having to be met in relation to appellations of origin.

*Sole Paragraph* - INPI will establish the conditions of registration for geographical indications.

TITLE V

CRIMES AGAINST INDUSTRIAL PROPERTY

CHAPTER I

CRIMES AGAINST PATENTS

Article 183 - A crime is committed against a patent of invention or a utility model patent by he who:

I - manufactures a product that is the subject matter of a patent of invention or a utility model patent, without authorisation of the patentee; or

II - uses a means or process that is the subject matter of a patent of invention, without authorisation of the patentee.

Penalty - detention of 3 (three) months to 1 (one) year, or a fine.

Article 184 - A crime is committed against a patent of invention or a utility model patent by he who:

I - exports, sells, exhibits or offers for sale, maintains in stock, hides or receives, with a view to use for economic purposes, a product manufactured in violation of a patent of invention or of a utility model patent, or that is obtained by a patented means or process; or

II - imports a product that is the subject matter of a patent of invention or of a utility model patent or is obtained by a means or process patented in this country, for the purposes mentioned in the previous item, and that has not been placed on the external market directly by the proprietor or with his consent.

Penalty - detention of 1 (one) to 3 (three) months, or a fine.

Article 185 - Supplying a component of a patented product, or material or equipment for carrying out a patented process, provided that the final application of the component, material or equipment necessarily leads to the exploitation of the subject matter of the patent.

Penalty - detention of 1 (one) to 3 (three) months or a fine.

Article 186- The crimes of this Chapter are committed even if the violation does not affect all the claims of the patent or if it is restricted to the use of means equivalent to the subject matter of the patent.

CHAPTER II

CRIMES AGAINST INDUSTRIAL DESIGNS

Article 187 - Manufacturing, without the authorisation of the registrant, a product that incorporates a registered industrial design, or a substantial imitation thereof that may lead to error or confusion.

Penalty - detention of 3 (three) months to 1 (one) year, or a fine.

Article 188 - A crime is committed against an industrial design registration by he who:

I - exports, sells, exhibits or offers for sale, maintains in stock, hides or receives, with a view to use for economic purposes, an object that illicitly incorporates a registered industrial design, or a substantial imitation thereof that may lead to error or confusion; or

II - imports a p roduct that incorporates an industrial design registered in this country, or a substantial imitation thereof that may lead to error or confusion, for the purposes provided for in the previous item, and which was not placed on the external market directly by the registrant or with his consent.

Penalty - detention of 1 (one) to 3 (three) months, or a fine.

CHAPTER III

CRIMES AGAINST MARKS

Article 189 - A crime is committed against the registration of a mark by he who:

I - reproduces a registered mark wholly or in part, without the authorisation of the registrant, or imitates it in a manner that may induce confusion; or

II - alters the registered mark of a third party already applied to a product placed on the market.

Penalty - detention of 3 (three) months to 1 (one) year, or a fine.

Article 190 - A crime is committed against the registration of a mark by he who imports, exports, sells, offers or exhibits for sale, hides or maintains in stock:

I - a product branded with an illicitly, wholly or partially, reproduced or imitated mark of a third party; or

II - a product from his industry or commerce, held in a vessel, container or package carrying a legitimate mark of a third party.

Penalty - detention of 1 (one) to 3 (three) months, or a fine.

CHAPTER IV

CRIMES COMMITTED BY MEANS OF MARKS, TITLES OF ESTABLISHMENT AND ADVERTISING SIGNS

Article 191 - Reproducing or imitating wholly or in part, in a manner that may lead to error or confusion, armorial bearings, crests or official public distinctions, be they national, foreign or international, without the necessary authorisation, in a mark, title of establishment, commercial name, insignia or advertising sign, or using such reproductions or imitations for economic purposes.

Penalty - detention of 1 (one) to 3 (three) months, or a fine.

*Sole Paragraph* - He who sells or exhibits or offers for sale products branded with such marks are subject to the same penalty.

CHAPTER V

CRIMES AGAINST GEOGRAPHICAL AND OTHER INDICATIONS

Article 192 - Manufacturing, importing, exporting, selling, exhibiting or offering for sale or maintaining in stock a product that presents a false geographical indication.

Penalty - detention of 1 (one) to 3 (three) months, or a fine.

Article 193 - Using, on a product, container, casing, belt, label, invoice, circular, poster or on any other means of disclosure or advertisement, indicative terms, such as "type", "species", "kind", "system", "similar", "substitute", "identical", or the equivalent, without making clear the true source of the product.

Penalty - detention of 1 (one) to 3 (three) months, or a fine.

Article 194 - Using a mark, commercial name, title of establishment, insignia, advertising expression or sign or any other form that indicates a source other than the true one, or selling or exhibiting for sale a product carrying such signs.

Penalty - detention of 1 (one) to 3 (three) months, or a fine.

CHAPTER VI

CRIMES OF UNFAIR COMPETITION

Article 195 - A crime of unfair competition is committed by he who:

I - publishes, by any means, a false affirmation, in detriment to a competitor, with a view to obtaining advantage;

II - provides or divulges, with respect to a competitor, false information, with a view to obtaining advantage;

III - uses fraudulent means to divert, for his own or a third party's benefit, another's clientele;

IV - uses another's advertising expression or sign, or imitates it, in a manner to cause confusion between the products or establishments;

V - unduly uses another's commercial name, title of establishment or insignia or sells, exhibits or offers for sale or maintains in stock a product with such references;

VI - substitutes, with his own name or company name, on a product of another party, the name or company name of such other party, without his consent.

VII - claims, as a means of advertising, to have received a prize or distinction that he did not obtain;

VIII - sells, exhibits or offers for sale, in another's container or package, an adulterated or falsified product, or uses it to do business with a product of the same type, even if not adulterated or falsified, if the fact does not constitute a more serious crime;

IX - gives or promises money or other utility to the employee of a competitor, whereby that employee, in failing in his duty in his employment, provides him with an advantage;

X - receives money or other utility, or accepts a promise of payment or reward, for, in failing in his duty in his employment, providing a competitor with an advantage;

XI - discloses, exploits or uses, without authorisation, confidential knowledge, information or data, usable in industry, commerce or the providing of services, excepting that which is of public knowledge or which is obvious to a person skilled in the art, to which he has had access by means of a contractual or employment relationship, even after the termination of the contract;

XII - discloses, exploits or uses, without authorisation, knowledge or information as mentioned in the previous item, when obtained directly or indirectly by illicit means or to which he has had access by fraud;

XIII - sells, exhibits or offers for sale a product which he declares to be subject of a patent filed or granted or of a registered industrial design, when it is not, or mention it, in a commercial announcement or paper, as filed or patented or registered, when it is not; or

XIV - divulges, exploits or uses, without authorisation, the results of tests or other undisclosed data the elaboration of which involved considerable effort and which has been presented to government entities as a condition for approving the commercialisation of products.

Penalty - detention of 3 (three) months to 1 (one) year, or a fine.

§ 1 - The employer, partner or administrator of an undertaking that commits an act falling within the types of crime established in items XI and XII of this article are included in the hypotheses to which such items refer.

§ 2 - The provisions of item XIV do not apply with respect to disclosure by a government entity competent to authorise commercialisation of a product, when necessary to protect the public.

CHAPTER VII

GENERAL PROVISIONS

Article 196 - The penalties of detention provided for in Chapters I, II and III of this Title will be increased by one third to one half when:

I - the party is or was a representative, proxy, agent, partner or employee of the patentee or registrant or, further, of his licensee; or

II - the altered, reproduced or imitated mark is famous, is well-known or is a certification or collective mark.

Article 197 - The penalties of fines provided for in this Title will be fixed at a minimum of 10 (ten) and a maximum of 360 (three hundred and sixty) days-fine, in accordance with the Criminal Code system.

*Sole Paragraph* - The fine may be increased or reduced by up to 10 (ten) times in view of the personal conditions of the agent and of the magnitude of the advantage obtained, independently of the provisions established in the previous article.

Article 198 - The customs authorities, *ex officio* or at the request of an interested party, may seize, at the time of checking, any products carrying falsified, altered or imitated marks or a false indication of source.

Article 199 - An action against crimes provided for in this Title will be brought through the filing of a complaint, except in the case of the crime of article 191, in which case the criminal action will be public.

Article 200 - Criminal actions and preliminary measures of search and seizure, in the case of crimes against industrial property, will be regulated by the provisions of the Criminal Process Code, with the modifications present in the articles of this Chapter.

Article 201 - During execution of a search and seizure measure, with respect to a crime against a patent relating to a process, the bailiff will be accompanied by an expert who will verify, preliminarily, the existence of the illicit act, the judge being able to order the seizure of products obtained by the infringer using the patented process.

Article 202 - Apart from the preliminary measures of search and seizure, the interested party may request:

I - seizure of a falsified, altered or imitated mark at its place of preparation or where it is found, prior to use for criminal purposes; or

II - destruction of a falsified mark on packets or products that contain it, before they are distributed, even if the packages or even the products themselves are destroyed.

Article 203 - In the case of legally organised and publicly functioning industrial or commercial establishments, the preliminary measures will be limited to the inspection and seizure of the products, when so ordered by the judge, it not being permitted to paralyse their legally exercised activity.

Article 204 - Once a search and seizure measure has been carried out, he who requested it in bad faith, in a spirit of rivalry, mere caprice or gross error will be liable for losses and damages.

Article 205 - An allegation of nullity of the patent or registration on which the action is based may constitute matter of defence in a criminal action. Absolution of the defendant, however, will not signify nullity of the patent or registration which can only be requested in an action before the competent courts.

Article 206 - If, in the course of a court action, information is revealed that is of a confidential nature, be it an industrial or a trade secret, the judge must determine that the action continues "in camera", the use of such information by the other party for other purposes also being forbidden.

Article 207 - Independently of the criminal action, the aggrieved party may file civil actions that he considers suitable, as laid down in the Civil Process Code.

Article 208 - Compensation will be determined by the benefits that the injured party would have gained had the violation not occurred.

Article 209 - The aggrieved party is reserved the right to receive losses and damages in compensation for losses caused by acts of violation of industrial property rights and acts of unfair competition that are not provided for in this law but which tend to prejudice another's reputation or business or to cause confusion between commercial or industrial establishments or providers of services, or between products and services placed on the market.

§ 1 - The judge may, in the formal record of the same action, so as to avoid irreparable damages or damages that would be difficult to recover, grant an injunctive order to suspend the violation or act that has such in view, before

summonsing the defendant, against, if he judges necessary, monetary caution or a fiduciary guarantee.

§ 2 - In the case of flagrant reproduction or imitation of a registered mark, the judge may determine the seizure of all the merchandise, products, objects, packages, labels and others that carry the falsified or imitated mark.

Article 210 - Loss of profits will be determined by the most favourable to the injured party of the following criteria.

I - The benefits that would have been gained by the injured party if the violation had not occurred;

II - The benefits gained by the author of the violation of the rights; or

III - The remuneration that the author of the violation would have paid to the proprietor of the violated rights for a granted license which would have legally permitted him to exploit the subject of the rights.

TITLE VI

TRANSFER OF TECHNOLOGY AND FRANCHISING

Article 211- INPI will effect the recordal of contracts that involve transfer of technology, franchising contracts and the like so that they may produce effect with respect to third parties.

*Sole Paragraph* - A decision with respect to applications for the recordal of contracts of the type to which this article refers will be given within a period of 30 (thirty) days counted from the date of the application for recordal.

TITLE VII

GENERAL PROVISIONS

CHAPTER I

APPEALS

Article 212 - In the absence of express provisions to the contrary, appeals may be filed against decisions provided for in this law, within a period of 60 (sixty) days.

§ 1 - Appeals will be received with suspensive and full devolutive effects, all provisions pertinent to examination in the first instance, in so far as they are applicable, being applied.

§ 2 - An appeal can not be filed against a decision which determines the definitive shelving of an application for a patent or for a design registration or against that which allows an application for a patent, a certificate of addition or the registration of a mark.

§ 3 - The appeals will be decided by the President of INPI, thus ending the administrative instance.

Article 213 - Interested parties will be notified to file counter-arguments to the appeal, within a period of 60 (sixty) days.

Article 214 - For the purposes of complementing the arguments of the appeal brief, INPI can make requirements, which should be met within the period of 60 (sixty) days.

*Sole paragraph* - Once the period defined in the "caput" has passed, a decision on the appeal will be given.

Article 215 - An appeal decision is final with no right to appeal in the administrative instance.

CHAPTER II

ACTS OF THE PARTIES

Article 216- The acts provided for in this law will be practised by the parties or by their attorneys who should be duly qualified.

§ 1 - Powers of attorney, in the form of an original, an official copy or an authenticated photocopy, must be in the Portuguese language, consular legalisation and notarial recognition being waived.

§ 2 - The power of attorney must be filed within 60 (sixty) days counted from the practice of the first act by the party in the process, independently of notification or requirement, on pain of shelving, the shelving of a patent application, an application for registration of an industrial design or an application for the registration of a mark being definitive.

Article 217 - A person domiciled abroad must maintain permanently a duly qualified attorney resident in the country, with powers to represent him administratively and judicially, including for receiving summons.

Article 218 - Petitions will not be recognised:

I - when presented after the legal deadline; or

II - when they are not accompanied by proof of payment of the respective fee having the value in force at the date of their presentation.

Article 219 - Petitions, oppositions and appeals shall not be recognised when:

I - presented after the period provided for in this law;

II - not having legal basis; or

III - not accompanied by proof of payment of the respective fee.

Article 220 - INPI will make use of the acts of the parties, whenever possible, making any applicable requirements.

CHAPTER III

TIME LIMITS

Article 221 - The time limits established in this law are continuous, the right to carry out the act becoming automatically extinct on their termination, unless the party proves that it was not carried out for legitimate reasons.

§ 1 - A legitimate reason is considered to be an unforeseen event, outside the control of the party and which prevented the party from carrying out the act.

§ 2 - When legitimate reasons are recognised, the party will carry out the act within the period granted by INPI.

Article 222 - In calculating time limits, the first day should be excluded and the last day included.

Article 223 - Time limits only begin to run from the first working day after notification which will be made by publication in the official means of communication of INPI.

Article 224 - In the absence of express stipulation in this law, time limits for practising acts will be 60 (sixty) days.

CHAPTER IV

LIMITATIONS

Article 225 - The limitation for actions for repairing damages caused to industrial property rights is 5 (five) years.

CHAPTER V

ACTS OF INPI

Article 226 - Acts of INPI in administrative processes relating to industrial property will only produce effect as from their publication in the respective official means of communication, except:

I - those which expressly do not depend on notification or publication by virtue of the provisions of this law;

II - administrative decisions when notification is made by post or knowledge is given  to the party interested in the process; and

III - internal opinions and despatches that do not need to be known by the parties.

CHAPTER VI

CLASSIFICATIONS

Article 227 - Classifications relative to the subject matter of Titles I, II and III of this law will be established by INPI, when they are not determined in an international treaty or agreement in force in Brazil.

CHAPTER VII

FEES

Article 228 - Fees will be charged for the services provided for in this law, the values and manner of collection of which will be established by act of the head officer of the federal public administrative entity to which INPI is bound.

TITLE VIII

TRANSITORY AND FINAL PROVISIONS

Article 229 - The provisions of this law will be applied to all pending applications, except with respect to the patentability of substances, matter or products obtained by chemical means or processes and alimentary and chemical-pharmaceutical substances, matter, mixtures or products and medicaments of any type, as well as the respective processes of obtaining or modifying them, which will only be patentable under the conditions established in articles 230 and 231.

Article 230 - A patent application may be filed relating to substances, matter or products obtained by chemical means or processes and alimentary and chemical-pharmaceutical substances, matter, mixtures or products and medicaments of any type, as well as the respective processes of obtaining or modifying them, by he who has protection guaranteed by treaty or convention in force in Brazil, the date of

the first foreign filing being recognised, provided that its subject matter has not been placed on any market on the direct initiative of the proprietor or by third parties with his consent, nor have third parties carried out, in this country, serious and effective preparations for exploiting the subject matter of the application or patent.

§ 1 - The application must be filed within the period of 1 (one) year from the publication of this law and must indicate the date of the first application filed abroad.

§ 2 - Patent applications filed on the basis of this article will be published automatically, interested parties having the right to intervene, within a period of 90 (ninety) days, with respect to whether the conditions of the "caput" of this article have been met.

§ 3 - Without prejudice to articles 10 and 18 of this law, and once the conditions established in this article have been met and grant of a patent in the country where the first application was filed has been proved, the patent will be granted in Brazil, exactly as granted in the country of origin.

§ 4 - A patent granted on the basis of this article will be guaranteed the remainder of the term of protection in the country where the first application was filed, counted from the date of filing in Brazil and limited to the term defined in article 40, the provisions of the sole paragraph thereof not being applicable.

§ 5 - An applicant that has a pending application, relating to substances, matter or products obtained by chemical means or processes and alimentary and chemical-pharmaceutical substances, matter, mixtures or products and medicaments of any type, as well as the respective processes of obtaining or modifying them, may file a new application, within the time period and under the conditions established in this article, submitting proof of desistance of the pending application.

§ 6 - The provisions of this law will apply, where applicable, to applications filed and to patents granted in accordance with this article.

Article 231 - A patent application may be filed relating to the matter to which the previous article refers by a national or a person domiciled in the country, the date of disclosure of the invention being guaranteed, provided that its subject matter has

not been placed on any market on the direct initiative of the owner or by third parties with his consent, nor have third parties carried out, in this country, serious and effective preparations for exploiting the subject matter of the application.

§ 1 - The application must be filed within the period of 1 (one) year from the publication of this law.

§ 2 - Patent applications filed on the basis of this article will be processed in accordance with the terms of this law.

§ 3 - A patent granted on the basis of this article will be guaranteed the remainder of the term of protection of 20 (twenty) years from the date of disclosure of the invention, counted from the date of filing in Brazil.

§ 4 - An applicant that has a pending application, relating to the matter to which the previous article refers, may file a new application, within the time period and under the conditions established in this article, submitting proof of desistance of the pending application.

Article 232 - The production or use, under the terms of the previous legislation, of substances, matter or products obtained by chemical means or processes and alimentary and chemical-pharmaceutical substances, matter, mixtures or products and medicaments of any type, as well as the respective processes of obtaining or modifying them, even when protected by product or process patents in another country, in accordance with a treaty or convention in force in Brazil, may continue under the same conditions existing prior to the approval of this law.

§ 1 - No retroactive or future claim, of any value or on any grounds, will be admitted relating to products produced or processes used in Brazil in conformity with this article.

§ 2 - Equally, no claim in the terms of the previous paragraph will be admitted when, during the period prior to the entry into force of this law, significant investments have been made for the exploitation of a product or of a process as referred to in this article, even if they are protected by product or process patents in another country.

Article 233 - Applications for the registration of advertising expressions and signs and for declarations of notoriety will be definitively shelved whereas such

registrations and declarations will remain in force for the remainder of their terms but may not be renewed.

Article 234 - Guarantees of priority, as provided for in article 7 of Law N° 5772 of 21st December 1971 , are guaranteed to the applicant until the end of any current time limit.

Article 235 - All current time limits granted under Law N° 5772 of 21st December 1971 are guaranteed.

Article 236 - Applications for industrial model and industrial design patents that were filed when Law N° 5772 of 21st December 1971 was in force, will automatically be named as applications for the registration of an industrial design and, for all legal effects, publication will be considered as already having been effected.

*Sole Paragraph* - In such adapted applications, payments will be considered for the effect of calculation of the quinquennial fee.

Article 237 - The provisions of article 111 will not apply to appications for industrial model or industrial design patents that have already been examined in accordance with Law N° 5772 of 21st December 1971.

Article 238 - Appeals filed when Law N° 5772 of 21st December 1971 was in force, will be decided in accordance therewith.

Article 239 - The Government is authorised to promote any changes in INPI that are necessary to ensure financial and administrative autonomy thereto, INPI being able to:

I - contract technical and administrative personnel by way of public competition;

II - establish a table of salaries for its employees, which will be subject to approval by the ministry to which INPI is bound; and

III - propose a basic structure and internal regulations that will be subject to approval by the ministry to which INPI is bound.

*Sole Paragraph* - Expenses resulting from the application of this article will be at the cost of the funds of INPI itself.

Article 240 - Article 2 of Law N° 5.648 of 11th December 1970 will be altered to have the following wording:

"Article 2 - The principal purpose of INPI is the execution, nationally, of the norms that regulate industrial property, taking into account its social, economic, juridical and technical function, as well as making pronouncements regarding the convenience of signature, ratification and termination of conventions, treaties, pacts and agreements relating to industrial property".

Article 241 - The Judiciary is authorised to create special courts to settle questions relating to intellectual property.

Article 242 - The Government will submit to the National Congress a bill with a view to promoting, whenever necessary, the harmonisation of this law with the policy for industrial property adopted by the other countries that are members of the MERCOSUL.

Article 243- This law will enter into force on the date of its publication with respect to the matter contained in articles 230, 231 and 239, and 1 (one) year after its publication with respect to the remaining articles.

Article 244 - Law N° 5,772 of 21st December 1971, Law N° 6,348 of 7th July 1976, articles 187 to 196 of Decree-Law N° 2,848 of 7th December 1940, articles 169 to 189 of Decree-Law N° 7,903 of 27th August 1945 and other contrary provisions are repealed.

Translator's note: movable goods as opposed to real estate.

# A – Part II

**O Instituto**
**Ouvidoria**
**Procuradoria**
**Serviços**
**Articulação**
**Institucional**
**Patentes**
**Marcas**
Quem somos
O que é marca?
O que mudou com
o e-MARCAS?
e-MARCAS
Sobre seu pedido
Como registrar a
sua marca passo a
passo
Manual do
Usuário
Busca
Classificações de
Marcas
Custos dos
serviços
Legislação
Downloads
Dúvidas
Links
Perguntas
Freqüentes
**Contrato de**
**Tecnologia**
**Desenho**
**Industrial**
**Indicação**
**Geográfica**
**Programa de**
**Computador**
**Topografia de**
**Circuitos**
**Informação**
**Tecnológica**
**Centro de**
**Treinamento**
**Academia de**
**Inovação e**
**Propriedade**
**Intelectual**

# Lei 9279/96

**Lei nº 9.279 de 14 de maio de 1996**

Regula direitos e obrigações relativos à propriedade industrial.

DISPOSIÇÕES PRELIMINARES

**TÍTULO I - DAS PATENTES**

CAPÍTULO I - DA TITULARIDADE

CAPÍTULO II - DA PATENTEABILIDADE

Seção I - Das Invenções e dos Modelos de Utilidade Patenteáveis

Seção II - Da Prioridade

Seção III - Das Invenções e dos Modelos de Utilidade não
Patenteáveis

CAPÍTULO III - DO PEDIDO DE PATENTE

Seção I - Do Depósito do Pedido

Seção II - Das Condições do Pedido

Seção III - Do Processo e do Exame do Pedido

CAPÍTULO IV - DA CONCESSÃO E DA VIGÊNCIA DA PATENTE

Seção I - Da Concessão da Patente

Seção II - Da Vigência da Patente

CAPÍTULO V - DA PROTEÇÃO CONFERIDA PELA PATENTE

Seção I - Dos Direitos

Seção II - Do Usuário Anterior

CAPÍTULO VI - DA NULIDADE DA PATENTE

Seção I - Das Disposições Gerais

Seção II - Do Processo Administrativo de Nulidade

Seção III - Da Ação de Nulidade

Lei 9279/96 — Portal INPI

**Biblioteca
Economista
Cláudio
Treiguer
Fórum
Chat**



CAPÍTULO VII - DA CESSÃO E DAS ANOTAÇÕES

CAPÍTULO VIII - DAS LICENÇAS

    Seção I - Da Licença Voluntária

    Seção II - Da Oferta de Licença

    Seção III - Da Licença Compulsória

CAPÍTULO IX - DA PATENTE DE INTERESSE DA DEFESA NACIONAL

CAPÍTULO X - DO CERTIFICADO DE ADIÇÃO DE INVENÇÃO

CAPÍTULO XI - DA EXTINÇÃO DA PATENTE

CAPÍTULO XII - DA RETRIBUIÇÃO ANUAL

CAPÍTULO XIII - DA RESTAURAÇÃO

CAPÍTULO XIV - DA INVENÇÃO E DO MODELO DE UTILIDADE
REALIZADO POR EMPREGADO OU PRESTADOR DE SERVIÇO

**TÍTULO II - DOS DESENHOS INDUSTRIAIS**

CAPÍTULO I - DA TITULARIDADE

CAPÍTULO II - DA REGISTRABILIDADE

    Seção I - Dos Desenhos Industriais Registráveis

    Seção II - Da Prioridade

    Seção III - Dos Desenhos Industriais Não Registráveis

CAPÍTULO III - DO PEDIDO DE REGISTRO

    Seção I - Do Depósito do Pedido

    Seção II - Das Condições do Pedido

    Seção III - Do Processo e do Exame do Pedido

CAPÍTULO IV - DA CONCESSÃO E DA VIGÊNCIA DO REGISTRO

CAPÍTULO V - DA PROTEÇÃO CONFERIDA PELO REGISTRO

CAPÍTULO VI - DO EXAME DE MÉRITO

CAPÍTULO VII - DA NULIDADE DO REGISTRO

Seção I - Das Disposições Gerais

Seção II - Do Processo Administrativo de Nulidade

Seção III - Da Ação de Nulidade

CAPÍTULO VIII - DA EXTINÇÃO DO REGISTRO

CAPÍTULO IX - DA RETRIBUIÇÃO QUINQUENAL

CAPÍTULO X - DAS DISPOSIÇÕES FINAIS

**TÍTULO III - DAS MARCAS**

CAPÍTULO I - DA REGISTRABILIDADE

Seção I - Dos Sinais Registráveis como Marca

Seção II - Dos Sinais Não Registráveis como Marca

Seção III - Marca de Alto Renome

Seção IV - Marca Notoriamente Conhecida

CAPÍTULO II - PRIORIDADE

CAPÍTULO III - DOS REQUERENTES DE REGISTRO

CAPÍTULO IV - DOS DIREITOS SOBRE A MARCA

Seção I - Aquisição

Seção II - Da Proteção Conferida pelo Registro

CAPÍTULO V - DA VIGÊNCIA, DA CESSÃO E DAS ANOTAÇÕES

Seção I - Da Vigência

Seção II - Da Cessão

Seção III - Das Anotações

Seção IV - Da Licença de Uso

CAPÍTULO VI - DA PERDA DOS DIREITOS

CAPÍTULO VII - DAS MARCAS COLETIVAS E DE CERTIFICAÇÃO

CAPÍTULO VIII - DO DEPÓSITO

CAPÍTULO IX - DO EXAME

CAPÍTULO X - DA EXPEDIÇÃO DO CERTIFICADO DE REGISTRO

CAPÍTULO XI - DA NULIDADE DO REGISTRO

    Seção I - Disposições Gerais

    Seção II - Do Processo Administrativo de Nulidade

    Seção III - Da Ação de Nulidade

**TÍTULO IV - DAS INDICAÇÕES GEOGRÁFICAS**

**TÍTULO V - DOS CRIMES CONTRA A PROPRIEDADE INDUSTRIAL**

CAPÍTULO I - DOS CRIMES CONTRA AS PATENTES

CAPÍTULO II - DOS CRIMES CONTRA OS DESENHOS INDUSTRIAIS

CAPÍTULO III - DOS CRIMES CONTRA AS MARCAS

CAPÍTULO IV - DOS CRIMES COMETIDOS POR MEIO DE MARCA, TÍTULO DE ESTABELECIMENTO E SINAL DE PROPAGANDA

CAPÍTULO V - DOS CRIMES CONTRA INDICAÇÕES GEOGRÁFICAS E DEMAIS INDICAÇÕES

CAPÍTULO VI - DOS CRIMES DE CONCORRÊNCIA DESLEAL

CAPÍTULO VII - DAS DISPOSIÇÕES GERAIS

TÍTULO VI - DA TRANSFERÊNCIA DE TECNOLOGIA E DA FRANQUIA

TÍTULO VII - DAS DISPOSIÇÕES GERAIS

CAPÍTULO I - DOS RECURSOS

CAPÍTULO II - DOS ATOS DAS PARTES

CAPÍTULO III - DOS PRAZOS

CAPÍTULO IV - DA PRESCRIÇÃO

CAPÍTULO V - DOS ATOS DO INPI

CAPÍTULO VI - DAS CLASSIFICAÇÕES

CAPÍTULO VII - DA RETRIBUIÇÃO

TÍTULO VIII - DAS DISPOSIÇÕES TRANSITÓRIAS E FINAIS

## DISPOSIÇÕES PRELIMINARES

Art. 10.- Esta lei regula direitos e obrigações relativos à propriedade industrial.

Art. 20.- A proteção dos direitos relativos à propriedade industrial, considerado o seu interesse social e o desenvolvimento tecnológico e econômico do País, efetua-se mediante:

I - concessão de patentes de invenção e de modelo de utilidade;
II - concessão de registro de desenho industrial;
III - concessão de registro de marca;
IV - repressão às falsas indicações geográficas; e
V - repressão à concorrência desleal.

Art. 30.- Aplica-se também o disposto nesta lei:

I - ao pedido de patente ou de registro proveniente do exterior e depositado no País por quem tenha proteção assegurada por tratado ou convenção em vigor no Brasil; e
II - aos nacionais ou pessoas domiciliadas em país que assegure aos brasileiros ou pessoas domiciliadas no Brasil a reciprocidade de direitos iguais ou equivalentes.

Art. 40.- As disposições dos tratados em vigor no Brasil são aplicáveis, em igualdade de condições, às pessoas físicas e jurídicas nacionais ou domiciliadas no País.

Art. 50.- Consideram-se bens móveis, para os efeitos legais, os direitos de propriedade industrial.

## TÍTULO I - DAS PATENTES CAPÍTULO I - DA TITULARIDADE

Art. 60.- Ao autor de invenção ou modelo de utilidade será assegurado o direito de obter a patente que lhe garanta a propriedade, nas condições estabelecidas nesta lei.

Parágrafo 10.- Salvo prova em contrário, presume-se o requerente legitimado a obter a patente.

Parágrafo 20.- A patente poderá ser requerida em nome próprio, pelos herdeiros ou sucessores do autor, pelo cessionário ou por aquele a quem a lei ou o contrato de trabalho ou de prestação de serviços determinar que pertença a titularidade.

Parágrafo 30.- Quando se tratar de invenção ou de modelo de utilidade realizado conjuntamente por duas ou mais pessoas, a patente poderá ser requerida por todas ou qualquer delas, mediante nomeação e qualificação das demais, para ressalva dos respectivos direitos.

Lei 9279/96 — Portal INPI

Parágrafo 4o.- O inventor será nomeado e qualificado, podendo requerer a não divulgação de sua nomeação.

Art. 7o.- Se dois ou mais autores tiverem realizado a mesma invenção ou modelo de utilidade, de forma independente, o direito de obter patente será assegurado àquele que provar o depósito mais antigo, independentemente das datas de invenção ou criação.

Parágrafo único - A retirada de depósito anterior sem produção de qualquer efeito dará prioridade ao depósito imediatamente posterior.

## CAPÍTULO II - DA PATENTEABILIDADE SEÇÃO I - DAS INVENÇÕES E DOS MODELOS DE UTILIDADE PATENTEÁVEIS

Art. 8o.- É patenteável a invenção que atenda aos requisitos de novidade, atividade inventiva e aplicação industrial.

Art. 9o.- É patenteável como modelo de utilidade o objeto de uso prático, ou parte deste, suscetível de aplicação industrial, que apresente nova forma ou disposição, envolvendo ato inventivo, que resulte em melhoria funcional no seu uso ou em sua fabricação.

Art. 10 - Não se considera invenção nem modelo de utilidade:

I - descobertas, teorias científicas e métodos matemáticos;
II - concepções puramente abstratas;
III - esquemas, planos, princípios ou métodos comerciais, contábeis, financeiros, educativos, publicitários, de sorteio e de fiscalização;
IV - as obras literárias, arquitetônicas, artísticas e científicas ou qualquer criação estética;
V - programas de computador em si;
VI - apresentação de informações;
VII - regras de jogo;
VIII - técnicas e métodos operatórios, bem como métodos terapêuticos ou de diagnóstico, para aplicação no corpo humano ou animal; e
IX - o todo ou parte de seres vivos naturais e materiais biológicos encontrados na natureza, ou ainda que dela isolados, inclusive o genoma ou germoplasma de qualquer ser vivo natural e os processos biológicos naturais.

Art. 11 - A invenção e o modelo de utilidade são considerados novos quando não compreendidos no estado da técnica.

Parágrafo 1o.- O estado da técnica é constituído por tudo aquilo tornado acessível ao público antes da data de depósito do pedido de patente, por descrição escrita ou oral, por uso ou qualquer outro meio, no Brasil ou no exterior, ressalvado o disposto nos arts. 12, 16 e 17.

Parágrafo 2o.- Para fins de aferição da novidade, o conteúdo completo de pedido depositado no Brasil, e ainda não publicado, será considerado estado da técnica a partir da data de depósito, ou da prioridade reivindicada, desde que venha a ser publicado, mesmo que subseqüentemente.

Parágrafo 3o.- O disposto no parágrafo anterior será aplicado ao pedido internacional de patente depositado segundo tratado ou convenção em vigor no Brasil, desde que haja processamento nacional.

Art. 12 - Não será considerada como estado da técnica a divulgação de invenção ou modelo de utilidade, quando ocorrida durante os 12 (doze) meses que precederem a data de depósito ou a da prioridade do pedido de patente, se promovida:

I - pelo inventor;

II - pelo Instituto Nacional da Propriedade Industrial - INPI, através de publicação oficial do pedido de patente depositado sem o consentimento do inventor, baseado em informações deste obtidas ou em decorrência de atos por ele realizados; ou

III - por terceiros, com base em informações obtidas direta ou indiretamente do inventor ou em decorrência de atos por este realizados.

Parágrafo único - O INPI poderá exigir do inventor declaração relativa à divulgação, acompanhada ou não de provas, nas condições estabelecidas em regulamento.

Art. 13 - A invenção é dotada de atividade inventiva sempre que, para um técnico no assunto, não decorra de maneira evidente ou óbvia do estado da técnica.

Art. 14 - O modelo de utilidade é dotado de ato inventivo sempre que, para um técnico no assunto, não decorra de maneira comum ou vulgar do estado da técnica.

Art. 15 - A invenção e o modelo de utilidade são considerados suscetíveis de aplicação industrial quando possam ser utilizados ou produzidos em qualquer tipo de indústria.

## SEÇÃO II - DA PRIORIDADE

Art. 16 - Ao pedido de patente depositado em país que mantenha acordo com o Brasil, ou em organização internacional, que produza efeito de depósito nacional, será assegurado direito de prioridade, nos prazos estabelecidos no acordo, não sendo o depósito invalidado nem prejudicado por fatos ocorridos nesses prazos.

Parágrafo 1o.- A reivindicação de prioridade será feita no ato de depósito, podendo ser suplementada dentro de 60 (sessenta) dias por outras prioridades anteriores à data do depósito no Brasil.

Parágrafo 2o.- A reivindicação de prioridade será comprovada por documento hábil da origem, contendo número, data, título, relatório descritivo e, se for o caso, reivindicações e desenhos, acompanhado de tradução simples da certidão de depósito ou documento equivalente, contendo dados identificadores do pedido, cujo teor será de inteira responsabilidade do depositante.

Parágrafo 3o.- Se não efetuada por ocasião do depósito, a comprovação deverá ocorrer em até 180 (cento e oitenta dias) contados do depósito.

Parágrafo 4o.- Para os pedidos internacionais depositados em virtude de tratado em vigor no Brasil, a tradução prevista no parágrafo 2o.deverá ser apresentada no prazo de 60 (sessenta) dias contados da data da entrada no processamento nacional.

Parágrafo 5o.- No caso de o pedido depositado no Brasil estar fielmente contido no documento da origem, será suficiente uma declaração do depositante a este respeito para substituir a tradução simples.

Parágrafo 6o.- Tratando-se de prioridade obtida por cessão, o documento correspondente deverá ser apresentado dentro de 180 (cento e oitenta) dias contados do depósito, ou, se for o caso, em até 60 (sessenta) dias da data da entrada no processamento nacional, dispensada a legalização consular no país de origem.

Parágrafo 7o.- A falta de comprovação nos prazos estabelecidos neste artigo acarretará a perda da prioridade.

Parágrafo 8o.- Em caso de pedido depositado com reivindicação de prioridade, o requerimento para antecipação de publicação deverá ser instruído com a comprovação da prioridade.

Art. 17 - O pedido de patente de invenção ou de modelo de utilidade depositado originalmente no Brasil, sem reivindicação de prioridade e não publicado, assegurará o direito de prioridade ao pedido posterior sobre a mesma matéria depositado no Brasil pelo mesmo requerente ou sucessores, dentro do prazo de 1 (um) ano.

Parágrafo 1o.- A prioridade será admitida apenas para a matéria revelada no pedido anterior, não se estendendo a matéria nova introduzida.

Parágrafo 2o.- O pedido anterior ainda pendente será considerado definitivamente arquivado.

Parágrafo 3o.- O pedido de patente originário de divisão de pedido anterior não poderá servir de base a reivindicação de prioridade.

## SEÇÃO III - DAS INVENÇÕES E DOS MODELOS DE UTILIDADE NÃO PATENTEÁVEIS

Art. 18 - Não são patenteáveis:

I - o que for contrário à moral, aos bons costumes e à segurança, à ordem e à saúde públicas;
II - as substâncias, matérias, misturas, elementos ou produtos de qualquer espécie, bem como a modificação de suas propriedades físico-químicas e os respectivos processos de obtenção ou modificação, quando resultantes de transformação do núcleo atômico; e
III - o todo ou parte dos seres vivos, exceto os microorganismos transgênicos

que atendam aos três requisitos de patenteabilidade - novidade, atividade inventiva e aplicação industrial - previstos no art. 8o.e que não sejam mera descoberta.

Parágrafo único - Para os fins desta lei, microorganismos transgênicos são organismos, exceto o todo ou parte de plantas ou de animais, que expressem, mediante intervenção humana direta em sua composição genética, uma característica normalmente não alcançável pela espécie em condições naturais.

## CAPÍTULO III - DO PEDIDO DE PATENTE SEÇÃO I - DO DEPÓSITO DO PEDIDO

Art. 19 - O pedido de patente, nas condições estabelecidas pelo INPI, conterá:

I - requerimento;
II - relatório descritivo;
III - reivindicações;
IV - desenhos, se for o caso;
V - resumo; e
VI - comprovante do pagamento da retribuição relativa ao depósito.

Art. 20 - Apresentado o pedido, será ele submetido a exame formal preliminar e, se devidamente instruído, será protocolizado, considerada a data de depósito a da sua apresentação.

Art. 21 - O pedido que não atender formalmente ao disposto no art. 19, mas que contiver dados relativos ao objeto, ao depositante e ao inventor, poderá ser entregue, mediante recibo datado, ao INPI, que estabelecerá as exigências a serem cumpridas, no prazo de 30 (trinta) dias, sob pena de devolução ou arquivamento da documentação.

Parágrafo único - Cumpridas as exigências, o depósito será considerado como efetuado na data do recibo.

## SEÇÃO II - DAS CONDIÇÕES DO PEDIDO

Art. 22 - O pedido de patente de invenção terá de se referir a uma única invenção ou a um grupo de invenções inter-relacionadas de maneira a compreenderem um único conceito inventivo.

Art. 23 - O pedido de patente de modelo de utilidade terá de se referir a um único modelo principal, que poderá incluir uma pluralidade de elementos distintos, adicionais ou variantes construtivas ou configurativas, desde que mantida a unidade técnico-funcional e corporal do objeto.

Art. 24 - O relatório deverá descrever clara e suficientemente o objeto, de modo a possibilitar sua realização por técnico no assunto e indicar, quando for o caso, a melhor forma de execução.

Parágrafo único - No caso de material biológico essencial à realização prática do objeto do pedido, que não possa ser descrito na forma deste artigo e que não estiver acessível ao público, o relatório será suplementado por depósito do

material em instituição autorizada pelo INPI ou indicada em acordo internacional.

Art. 25 - As reivindicações deverão ser fundamentadas no relatório descritivo, caracterizando as particularidades do pedido e definindo, de modo claro e preciso, a matéria objeto da proteção.

Art. 26 - O pedido de patente poderá ser dividido em dois ou mais, de ofício ou a requerimento do depositante, até o final do exame, desde que o pedido dividido:

I - faça referência específica ao pedido original; e
II - não exceda à matéria revelada constante do pedido original.

Parágrafo único - O requerimento de divisão em desacordo com o disposto neste artigo será arquivado.

Art. 27 - Os pedidos divididos terão a data de depósito do pedido original e o benefício de prioridade deste, se for o caso.

Art. 28 - Cada pedido dividido estará sujeito a pagamento das retribuições correspondentes.

Art. 29 - O pedido de patente retirado ou abandonado será obrigatoriamente publicado.

Parágrafo 1o.- O pedido de retirada deverá ser apresentado em até 16 (dezesseis) meses, contados da data do depósito ou da prioridade mais antiga.

Parágrafo 2o.- A retirada de um depósito anterior sem produção de qualquer efeito dará prioridade ao depósito imediatamente posterior.

## SEÇÃO III - DO PROCESSO E DO EXAME DO PEDIDO

Art. 30 - O pedido de patente será mantido em sigilo durante 18 (dezoito) meses contados da data de depósito ou da prioridade mais antiga, quando houver, após o que será publicado, à exceção do caso previsto no art. 75.

Parágrafo 1o.- A publicação do pedido poderá ser antecipada a requerimento do depositante.

Parágrafo 2o.- Da publicação deverão constar dados identificadores do pedido de patente, ficando cópia do relatório descritivo, das reivindicações, do resumo e dos desenhos à disposição do público no INPI.

Parágrafo 3o.- No caso previsto no parágrafo único do art. 24, o material biológico tornar-se-á acessível ao público com a publicação de que trata este artigo.

Art. 31 - Publicado o pedido de patente e até o final do exame, será facultada a apresentação, pelos interessados, de documentos e informações para subsidiarem o exame.

Parágrafo único - O exame não será iniciado antes de decorridos 60 (sessenta) dias da publicação do pedido.

Art. 32 - Para melhor esclarecer ou definir o pedido de patente, o depositante poderá efetuar alterações até o requerimento do exame, desde que estas se limitem à matéria inicialmente revelada no pedido.

Art. 33 - O exame do pedido de patente deverá ser requerido pelo depositante ou por qualquer interessado, no prazo de 36 (trinta e seis) meses contados da data do depósito, sob pena do arquivamento do pedido.

Parágrafo único - O pedido de patente poderá ser desarquivado, se o depositante assim o requerer, dentro de 60 (sessenta) dias contados do arquivamento, mediante pagamento de uma retribuição específica, sob pena de arquivamento definitivo.

Art. 34 - Requerido o exame, deverão ser apresentados, no prazo de 60 (sessenta) dias, sempre que solicitado, sob pena de arquivamento do pedido:

I - objeções, buscas de anterioridade e resultados de exame para concessão de pedido correspondente em outros países, quando houver reivindicação de prioridade;
II - documentos necessários à regularização do processo e exame do pedido; e
III - tradução simples do documento hábil referido no Parágrafo 2o.do art. 16, caso esta tenha sido substituída pela declaração prevista no Parágrafo 5o.do mesmo artigo.

Art. 35 - Por ocasião do exame técnico, será elaborado o relatório de busca e parecer relativo a:

I - patenteabilidade do pedido;
II - adaptação do pedido à natureza reivindicada;
III - reformulação do pedido ou divisão; ou
IV - exigências técnicas.

Art. 36 - Quando o parecer for pela não patenteabilidade ou pelo não enquadramento do pedido na natureza reivindicada ou formular qualquer exigência, o depositante será intimado para manifestar-se no prazo de 90 (noventa) dias.

Parágrafo 1o.- Não respondida a exigência, o pedido será definitivamente arquivado.

Parágrafo 2o.- Respondida a exigência, ainda que não cumprida, ou contestada sua formulação, e havendo ou não manifestação sobre a patenteabilidade ou o enquadramento, dar-se-á prosseguimento ao exame.

Art. 37 - Concluído o exame, será proferida decisão, deferindo ou indeferindo o pedido de patente.

## CAPÍTULO IV - DA CONCESSÃO E DA VIGÊNCIA DA PATENTE
## SEÇÃO I - DA CONCESSÃO DA PATENTE

Lei 9279/96 — Portal INPI

Art. 38 - A patente será concedida depois de deferido o pedido, e comprovado o pagamento da retribuição correspondente, expedindo-se a respectiva carta-patente.

Parágrafo 1o.- O pagamento da retribuição e respectiva comprovação deverão ser efetuados no prazo de 60 (sessenta) dias contados do deferimento.

Parágrafo 2o.- A retribuição prevista neste artigo poderá ainda ser paga e comprovada dentro de 30 (trinta) dias após o prazo previsto no parágrafo anterior, independentemente de notificação, mediante pagamento de retribuição específica, sob pena de arquivamento definitivo do pedido.

Parágrafo 3o.- Reputa-se concedida a patente na data de publicação do respectivo ato.

Art. 39 - Da carta-patente deverão constar o número, o título e a natureza respectivos, o nome do inventor, observado o disposto no Parágrafo 4o.do art. 6º, a qualificação e o domicílio do titular, o prazo de vigência, o relatório descritivo, as reivindicações e os desenhos, bem como os dados relativos à prioridade.

## SEÇÃO II - DA VIGÊNCIA DA PATENTE

Art. 40 - A patente de invenção vigorará pelo prazo de 20 (vinte) anos e a de modelo de utilidade pelo prazo 15(quinze) anos contados da data de depósito.

Parágrafo único - O prazo de vigência não será inferior a 10 (dez) anos para a patente de invenção e a 7 (sete) anos para a patente de modelo de utilidade, a contar da data de concessão, ressalvada a hipótese de o INPI estar impedido de proceder ao exame de mérito do pedido, por pendência judicial comprovada ou por motivo de força maior.

## CAPÍTULO V - DA PROTEÇÃO CONFERIDA PELA PATENTE SEÇÃO I - DOS DIREITOS

Art. 41 - A extensão da proteção conferida pela patente será determinada pelo teor das reivindicações, interpretado com base no relatório descritivo e nos desenhos.

Art. 42 - A patente confere ao seu titular o direito de impedir terceiro, sem o seu consentimento, de produzir, usar, colocar à venda, vender ou importar com estes propósitos:

I - produto objeto de patente;
II - processo ou produto obtido diretamente por processo patenteado.

Parágrafo 1o.- Ao titular da patente é assegurado ainda o direito de impedir que terceiros contribuam para que outros pratiquem os atos referidos neste artigo.

Parágrafo 2o.- Ocorrerá violação de direito da patente de processo, a que se refere o inciso II, quando o possuidor ou proprietário não comprovar, mediante determinação judicial específica, que o seu produto foi obtido por processo de

fabricação diverso daquele protegido pela patente.

Art.43 - O disposto no artigo anterior não se aplica:

I - aos atos praticados por terceiros não autorizados, em caráter privado e sem finalidade comercial, desde que não acarretem prejuízo ao interesse econômico do titular da patente;

II - aos atos praticados por terceiros não autorizados, com finalidade experimental, relacionados a estudos ou pesquisas científicas ou tecnológicas;

III - à preparação de medicamento de acordo com prescrição médica para casos individuais, executada por profissional habilitado, bem como ao medicamento assim preparado;

IV - a produto fabricado de acordo com patente de processo ou de produto que tiver sido colocado no mercado interno diretamente pelo titular da patente ou com seu consentimento;

V - a terceiros que, no caso de patentes relacionadas com matéria viva, utilizem, sem finalidade econômica, o produto patenteado como fonte inicial de variação ou propagação para obter outros produtos; e

VI - a terceiros que, no caso de patentes relacionadas com matéria viva, utilizem, ponham em circulação ou comercializem um produto patenteado que haja sido introduzido licitamente no comércio pelo detentor da patente ou por detentor de licença, desde que o produto patenteado não seja utilizado para multiplicação ou propagação comercial da matéria viva em causa.

VII - aos atos praticados por terceiros não autorizados, relacionados à invenção protegida por patente, destinados exclusivamente à produção de informações, dados e resultados de testes, visando à obtenção do registro de comercialização, no Brasil ou em outro país, para a exploração e comercialização do produto objeto da patente, após a expiração dos prazos estipulados no art. 40. (Incísio inclúido pela Lei nº 10.196, de 14.2.2001)

Art. 44 - Ao titular da patente é assegurado o direito de obter indenização pela exploração indevida de seu objeto, inclusive em relação à exploração ocorrida entre a data da publicação do pedido e a da concessão da patente.

Parágrafo 1o.- Se o infrator obteve, por qualquer meio, conhecimento do conteúdo do pedido depositado, anteriormente à publicação, contar-se-á o período da exploração indevida para efeito da indenização a partir da data de início da exploração.

Parágrafo 2o.- Quando o objeto do pedido de patente se referir a material biológico, depositado na forma do parágrafo único do art. 24, o direito à indenização será somente conferido quando o material biológico se tiver tornado acessível ao público.

Parágrafo 3o.- O direito de obter indenização por exploração indevida, inclusive com relação ao período anterior à concessão da patente, está limitado ao conteúdo do seu objeto, na forma do art. 41.

## SEÇÃO II - DO USUÁRIO ANTERIOR

Art. 45 - À pessoa de boa fé que, antes da data de depósito ou de prioridade de pedido de patente, explorava seu objeto no País, será assegurado o direito de

efeitos em relação a terceiros.

Parágrafo 1o.- A averbação produzirá efeitos em relação a terceiros a partir da data de sua publicação.

Parágrafo 2o.- Para efeito de validade de prova de uso, o contrato de licença não precisará estar averbado no INPI.

Art. 63 - O aperfeiçoamento introduzido em patente licenciada pertence a quem o fizer, sendo assegurado à outra parte contratante o direito de preferência para seu licenciamento.

## SEÇÃO II - DA OFERTA DE LICENÇA

Art. 64 - O titular da patente poderá solicitar ao INPI que a coloque em oferta para fins de exploração.

Parágrafo 1o.- O INPI promoverá a publicação da oferta.

Parágrafo 2o.- Nenhum contrato de licença voluntária de caráter exclusivo será averbado no INPI sem que o titular tenha desistido da oferta.

Parágrafo 3o.- A patente sob licença voluntária, com caráter de exclusividade, não poderá ser objeto de oferta.

Parágrafo 4o.- O titular poderá, a qualquer momento, antes da expressa aceitação de seus termos pelo interessado, desistir da oferta, não se aplicando o disposto no art. 66.

Art. 65 - Na falta de acordo entre o titular e o licenciado, as partes poderão requerer ao INPI o arbitramento da remuneração.

Parágrafo 1o- Para efeito deste artigo, o INPI observará o disposto no Parágrafo 4o.do art. 73.

Parágrafo 2o.- A remuneração poderá ser revista decorrido 1 (um) ano de sua fixação.

Art. 66 - A patente em oferta terá sua anuidade reduzida à metade no período compreendido entre o oferecimento e a concessão da primeira licença, a qualquer título.

Art. 67 - O titular da patente poderá requerer o cancelamento da licença se o licenciado não der início a exploração efetiva dentro de 1 (um) ano da concessão, interromper a exploração por prazo superior a 1 (um) ano ou, ainda, se não forem obedecidas as condições para a exploração.

## SEÇÃO III - DA LICENÇA COMPULSÓRIA

Art. 68 - O titular ficará sujeito a ter a patente licenciada compulsoriamente se exercer os direitos dela decorrentes de forma abusiva, ou por meio dela praticar

abuso de poder econômico, comprovado nos termos da lei, por decisão administrativa ou judicial.

Parágrafo 1o.- Ensejam, igualmente, licença compulsória:

I - a não exploração do objeto da patente no território brasileiro por falta de fabricação ou fabricação incompleta do produto, ou, ainda, a falta de uso integral do processo patenteado, ressalvados os casos de inviabilidade econômica, quando será admitida a importação; ou
II - a comercialização que não satisfizer às necessidades do mercado.

Parágrafo 2o.- A licença só poderá ser requerida por pessoa com legítimo interesse e que tenha capacidade técnica e econômica para realizar a exploração eficiente do objeto da patente, que deverá destinar-se, predominantemente, ao mercado interno, extinguindo-se nesse caso a excepcionalidade prevista no inciso I do parágrafo anterior.

Parágrafo 3o.- No caso de a licença compulsória ser concedida em razão de abuso de poder econômico, ao licenciado, que propõe fabricação local, será garantido um prazo, limitado ao estabelecido no art. 74, para proceder à importação do objeto da licença, desde que tenha sido colocado no mercado diretamente pelo titular ou com o seu consentimento.

Parágrafo 4o.- No caso de importação para exploração de patente e no caso da importação prevista no parágrafo anterior, será igualmente admitida a importação por terceiros de produto fabricado de acordo com patente de processo ou de produto, desde que tenha sido colocado no mercado diretamente pelo titular ou com o seu consentimento.

Parágrafo 5o.- A licença compulsória de que trata o Parágrafo 1o. somente será requerida após decorridos 3 (três) anos da concessão da patente.

Art. 69 - A licença compulsória não será concedida se, à data do requerimento, o titular:

I - justificar o desuso por razões legítimas;
II - comprovar a realização de sérios e efetivos preparativos para a exploração; ou
III - justificar a falta de fabricação ou comercialização por obstáculo de ordem legal.

Art. 70 - A licença compulsória será ainda concedida quando, cumulativamente, se verificarem as seguintes hipóteses:

I - ficar caracterizada situação de dependência de uma patente em relação a outra;
II - o objeto da patente dependente constituir substancial progresso técnico em relação à patente anterior; e
III - o titular não realizar acordo com o titular da patente dependente para exploração da patente anterior.

Parágrafo 1o.- Para os fins deste artigo considera-se patente dependente aquela

cuja exploração depende obrigatoriamente da utilização do objeto de patente anterior.

Parágrafo 2o.- Para efeito deste artigo, uma patente de processo poderá ser considerada dependente de patente do produto respectivo, bem como uma patente de produto poderá ser dependente da patente do processo.

Parágrafo 3o.- O titular da patente licenciada na forma deste artigo terá direito a licença compulsória cruzada da patente dependente.

Art. 71 - Nos casos de emergência nacional ou interesse público, declarados em ato do Poder Executivo Federal, desde que o titular da patente ou seu licenciado não atenda a essa necessidade, poderá ser concedida, de ofício, licença compulsória, temporária e não exclusiva, para a exploração da patente, sem prejuízo dos direitos do respectivo titular.

Parágrafo único - O ato de concessão da licença estabelecerá seu prazo de vigência e a possibilidade de prorrogação.

Art. 72 - As licenças compulsórias serão sempre concedidas sem exclusividade, não se admitindo o sublicenciamento.

Art. 73 - O pedido de licença compulsória deverá ser formulado mediante indicação das condições oferecidas ao titular da patente.

Parágrafo 1o.- Apresentado o pedido de licença, o titular será intimado para manifestar-se no prazo de 60 (sessenta) dias, findo o qual, sem manifestação do titular, será considerada aceita a proposta nas condições oferecidas.

Parágrafo 2o.- O requerente de licença que invocar abuso de direitos patentários ou abuso de poder econômico deverá juntar documentação que o comprove.

Parágrafo 3o.- No caso de a licença compulsória ser requerida com fundamento na falta de exploração, caberá ao titular da patente comprovar a exploração.

Parágrafo 4o.- Havendo contestação, o INPI poderá realizar as necessárias diligências, bem como designar comissão, que poderá incluir especialistas não integrantes dos quadros da autarquia, visando arbitrar a remuneração que será paga ao titular.

Parágrafo 5o.- Os órgãos e entidades da administração pública direta ou indireta, federal, estadual e municipal, prestarão ao INPI as informações solicitadas com o objetivo de subsidiar o arbitramento da remuneração.

Parágrafo 6o.- No arbitramento da remuneração, serão consideradas as circunstâncias de cada caso, levando-se em conta, obrigatoriamente, o valor econômico da licença concedida.

Parágrafo 7o.- Instruído o processo, o INPI decidirá sobre a concessão e condições da licença compulsória no prazo de 60 (sessenta) dias.

Parágrafo 8o.- O recurso da decisão que conceder a licença compulsória não terá

efeito suspensivo.

Art. 74 - Salvo razões legítimas, o licenciado deverá iniciar a exploração do objeto da patente no prazo de 1 (um) ano da concessão da licença, admitida a interrupção por igual prazo.

Parágrafo 1o.- O titular poderá requerer a cassação da licença quando não cumprido o disposto neste artigo.

Parágrafo 2o.- O licenciado ficará investido de todos os poderes para agir em defesa da patente.

Parágrafo 3o.- Após a concessão da licença compulsória, somente será admitida a sua cessão quando realizada conjuntamente com a cessão, alienação ou arrendamento da parte do empreendimento que a explore.

## CAPÍTULO IX - DA PATENTE DE INTERESSE DA DEFESA NACIONAL

Art. 75 - O pedido de patente originário do Brasil cujo objeto interesse à defesa nacional será processado em caráter sigiloso e não estará sujeito às publicações previstas nesta lei.

Parágrafo 1o.- O INPI encaminhará o pedido, de imediato, ao órgão competente do Poder Executivo para, no prazo de 60 (sessenta) dias, manifestar-se sobre o caráter sigiloso. Decorrido o prazo sem a manifestação do órgão competente, o pedido será processado normalmente.

Parágrafo 2o.- É vedado o depósito no exterior de pedido de patente cujo objeto tenha sido considerado de interesse da defesa nacional, bem como qualquer divulgação do mesmo, salvo expressa autorização do órgão competente.

Parágrafo 3o.- A exploração e a cessão do pedido ou da patente de interesse da defesa nacional estão condicionadas à prévia autorização do órgão competente, assegurada indenização sempre que houver restrição dos direitos do depositante ou do titular.

## CAPÍTULO X - DO CERTIFICADO DE ADIÇÃO DE INVENÇÃO

Art. 76 - O depositante do pedido ou titular de patente de invenção poderá requerer, mediante pagamento de retribuição específica, certificado de adição para proteger aperfeiçoamento ou desenvolvimento introduzido no objeto da invenção, mesmo que destituído de atividade inventiva, desde que a matéria se inclua no mesmo conceito inventivo. Parágrafo 1o.- Quando tiver ocorrido a publicação do pedido principal, o pedido de certificado de adição será imediatamente publicado.

Parágrafo 2o.- O exame do pedido de certificado de adição obedecerá ao disposto nos arts. 30 a 37, ressalvado o disposto no parágrafo anterior.

Parágrafo 3o.- O pedido de certificado de adição será indeferido se o seu objeto não apresentar o mesmo conceito inventivo.

Lei 9279/96 —— Portal INPI

Parágrafo 4o.- O depositante poderá, no prazo do recurso, requerer a transformação do pedido de certificado de adição em pedido de patente, beneficiando-se da data de depósito do pedido de certificado, mediante pagamento das retribuições cabíveis.

Art. 77 - O certificado de adição é acessório da patente, tem a data final de vigência desta e acompanha-a para todos os efeitos legais. Parágrafo único - No processo de nulidade, o titular poderá requerer que a matéria contida no certificado de adição seja analisada para se verificar a possibilidade de sua subsistência, sem prejuízo do prazo de vigência da patente.

## CAPÍTULO XI - DA EXTINÇÃO DA PATENTE

Art. 78 - A patente extingue-se:

I - pela expiração do prazo de vigência;
II - pela renúncia de seu titular, ressalvado o direito de terceiros;
III - pela caducidade;
IV - pela falta de pagamento da retribuição anual, nos prazos previstos no Parágrafo 2o.do art. 84 e no art. 87; e
V - pela inobservância do disposto no art. 217.

Parágrafo único - Extinta a patente, o seu objeto cai em domínio público.

Art. 79 - A renúncia só será admitida se não prejudicar direitos de terceiros.

Art. 80 - Caducará a patente, de ofício ou a requerimento de qualquer pessoa com legítimo interesse, se, decorridos 2 (dois) anos da concessão da primeira licença compulsória, esse prazo não tiver sido suficiente para prevenir ou sanar o abuso ou desuso, salvo motivos justificáveis.

Parágrafo 1o.- A patente caducará quando, na data do requerimento da caducidade ou da instauração de ofício do respectivo processo, não tiver sido iniciada a exploração.

Parágrafo 2o.- No processo de caducidade instaurado a requerimento, o INPI poderá prosseguir se houver desistência do requerente.

Art. 81 - O titular será intimado mediante publicação para se manifestar, no prazo de 60 (sessenta) dias, cabendo-lhe o ônus da prova quanto à exploração.

Art. 82 - A decisão será proferida dentro de 60 (sessenta) dias, contados do término do prazo mencionado no artigo anterior.

Art. 83 - A decisão da caducidade produzirá efeitos a partir da data do requerimento ou da publicação da instauração de ofício do processo.

## CAPÍTULO XII - DA RETRIBUIÇÃO ANUAL

Art. 84 - O depositante do pedido e o titular da patente estão sujeitos ao pagamento de retribuição anual, a partir do início do terceiro ano da data do depósito.

Parágrafo 1o.- O pagamento antecipado da retribuição anual será regulado pelo INPI.

Parágrafo 2o.- O pagamento deverá ser efetuado dentro dos primeiros 3 (três) meses de cada período anual, podendo, ainda, ser feito, independente de notificação, dentro dos 6 (seis) meses subsequentes, mediante pagamento de retribuição adicional.

Art. 85 - O disposto no artigo anterior aplica-se aos pedidos internacionais depositados em virtude de tratado em vigor no Brasil, devendo o pagamento das retribuições anuais vencidas antes da data da entrada no processamento nacional ser efetuado no prazo de 3 (três) meses dessa data.

Art. 86 - A falta de pagamento da retribuição anual, nos termos dos arts. 84 e 85, acarretará o arquivamento do pedido ou a extinção da patente.

## CAPÍTULO XIII - DA RESTAURAÇÃO

Art. 87 - O pedido de patente e a patente poderão ser restaurados, se o depositante ou o titular assim o requerer, dentro de 3 (três) meses, contados da notificação do arquivamento do pedido ou da extinção da patente, mediante pagamento de retribuição específica.

## CAPÍTULO XIV - DA INVENÇÃO E DO MODELO DE UTILIDADE REALIZADO POR EMPREGADO OU PRESTADOR DE SERVIÇO

Art. 88 - A invenção e o modelo de utilidade pertencem exclusivamente ao empregador quando decorrerem de contrato de trabalho cuja execução ocorra no Brasil e que tenha por objeto a pesquisa ou a atividade inventiva, ou resulte esta da natureza dos serviços para os quais foi o empregado contratado.

Parágrafo 1o.- Salvo expressa disposição contratual em contrário, a retribuição pelo trabalho a que se refere este artigo limita-se ao salário ajustado.

Parágrafo 2o.- Salvo prova em contrário, consideram-se desenvolvidos na vigência do contrato a invenção ou o modelo de utilidade, cuja patente seja requerida pelo empregado até 1 (um) ano após a extinção do vínculo empregatício.

Art. 89 - O empregador, titular da patente, poderá conceder ao empregado, autor de invento ou aperfeiçoamento, participação nos ganhos econômicos resultantes da exploração da patente, mediante negociação com o interessado ou conforme disposto em norma da empresa.

Parágrafo único - A participação referida neste artigo não se incorpora, a qualquer título, ao salário do empregado.

Art. 90 - Pertencerá exclusivamente ao empregado a invenção ou o modelo de utilidade por ele desenvolvido, desde que desvinculado do contrato de trabalho e não decorrente da utilização de recursos, meios, dados, materiais, instalações ou equipamentos do empregador.

Art. 91 - A propriedade de invenção ou de modelo de utilidade será comum, em partes iguais, quando resultar da contribuição pessoal do empregado e de recursos, dados, meios, materiais, instalações ou equipamentos do empregador, ressalvada expressa disposição contratual em contrário.

Parágrafo 1o.- Sendo mais de um empregado, a parte que lhes couber será dividida igualmente entre todos, salvo ajuste em contrário.

Parágrafo 2o.- É garantido ao empregador o direito exclusivo de licença de exploração e assegurada ao empregado a justa remuneração.

Parágrafo 3o.- A exploração do objeto da patente, na falta de acordo, deverá ser iniciada pelo empregador dentro do prazo de 1(um) ano, contado da data de sua concessão, sob pena de passar à exclusiva propriedade do empregado a titularidade da patente, ressalvadas as hipóteses de falta de exploração por razões legítimas.

Parágrafo 4o.- No caso de cessão, qualquer dos co-titulares, em igualdade de condições , poderá exercer o direito de preferência.

Art. 92 - O disposto nos artigos anteriores aplica-se, no que couber, às relações entre o trabalhador autônomo ou o estagiário e a empresa contratante e entre empresas contratantes e contratadas.

Art. 93 - Aplica-se o disposto neste Capítulo, no que couber, às entidades da Administração Pública, direta, indireta e fundacional, federal, estadual ou municipal.

Parágrafo único - Na hipótese do art. 88, será assegurada ao inventor, na forma e condições previstas no estatuto ou regimento interno da entidade a que se refere este artigo, premiação de parcela no valor das vantagens auferidas com o pedido ou com a patente, a título de incentivo.

## TÍTULO II - DOS DESENHOS INDUSTRIAIS CAPÍTULO I - DA TITULARIDADE

Art. 94 - Ao autor será assegurado o direito de obter registro de desenho industrial que lhe confira a propriedade, nas condições estabelecidas nesta lei.

Parágrafo único - Aplicam-se ao registro de desenho industrial, no que couber, as disposições dos arts. 6o.e 7º.

## CAPÍTULO II - DA REGISTRABILIDADE SEÇÃO I - DOS DESENHOS INDUSTRIAIS REGISTRÁVEIS

Art. 95 - Considera-se desenho industrial a forma plástica ornamental de um objeto ou o conjunto ornamental de linhas e cores que possa ser aplicado a um produto, proporcionando resultado visual novo e original na sua configuração externa e que possa servir de tipo de fabricação industrial.

Art. 96 - O desenho industrial é considerado novo quando não compreendido no estado da técnica.

Parágrafo 1o.- O estado da técnica é constituído por tudo aquilo tornado acessível ao público antes da data de depósito do pedido, no Brasil ou no exterior, por uso ou qualquer outro meio, ressalvado o disposto no Parágrafo 3o. deste artigo e no art. 99.

Parágrafo 2o.- Para aferição unicamente da novidade, o conteúdo completo de pedido de patente ou de registro depositado no Brasil, e ainda não publicado, será considerado como incluído no estado da técnica a partir da data de depósito, ou da prioridade reivindicada, desde que venha a ser publicado, mesmo que subseqüentemente.

Parágrafo 3o.- Não será considerado como incluído no estado da técnica o desenho industrial cuja divulgação tenha ocorrido durante os 180 (cento e oitenta) dias que precederem a data do depósito ou a da prioridade reivindicada, se promovida nas situações previstas nos incisos I a III do art. 12.

Art. 97 - O desenho industrial é considerado original quando dele resulte uma configuração visual distintiva, em relação a outros objetos anteriores.

Parágrafo único - O resultado visual original poderá ser decorrente da combinação de elementos conhecidos.

Art. 98 - Não se considera desenho industrial qualquer obra de caráter puramente artístico.

## SEÇÃO II - DA PRIORIDADE

Art. 99 - Aplicam-se ao pedido de registro, no que couber, as disposições do art. 16, exceto o prazo previsto no seu Parágrafo 3º, que será de 90 (noventa) dias.

## SEÇÃO III - DOS DESENHOS INDUSTRIAIS NÃO REGISTRÁVEIS

Art. 100 - Não, são registráveis como desenho industrial:

I - o que for contrário à moral e aos bons costumes ou que ofenda a honra ou imagem de pessoas, ou atente contra liberdade de consciência, crença, culto religioso ou idéia e sentimentos dignos de respeito e veneração;
II - a forma necessária comum ou vulgar do objeto ou, ainda, aquela determinada essencialmente por considerações técnicas ou funcionais.

## CAPÍTULO III - DO PEDIDO DE REGISTRO SEÇÃO I - DO DEPÓSITO DO PEDIDO

Art. 101 - O pedido de registro, nas condições estabelecidas pelo INPI, conterá:

I - requerimento;
II - relatório descritivo, se for o caso;
III - reivindicações, se for o caso;
IV - desenhos ou fotografias;
V - campo de aplicação do objeto; e
VI - comprovante do pagamento da retribuição relativa ao depósito.

Lei 9279/96 — Portal INPI

Parágrafo único - Os documentos que integram o pedido de registro deverão ser apresentados em língua portuguesa.

Art. 102 - Apresentado o pedido, será ele submetido a exame formal preliminar e, se devidamente instruído, será protocolizado, considerada a data do depósito a da sua apresentação.

Art. 103 - O pedido que não atender formalmente ao disposto no art. 101, mas que contiver dados suficientes relativos ao depositante, ao desenho industrial e ao autor, poderá ser entregue, mediante recibo datado, ao INPI, que estabelecerá as exigências a serem cumpridas, em 5 (cinco) dias, sob pena de ser considerado inexistente.

Parágrafo único - Cumpridas as exigências, o depósito será considerado como efetuado na data da apresentação do pedido.

## SEÇÃO II - DAS CONDIÇÕES DO PEDIDO

Art. 104 - O pedido de registro de desenho industrial terá que se referir a um único objeto, permitida uma pluralidade de variações, desde que se destinem ao mesmo propósito e guardem entre si a mesma característica distintiva preponderante, limitado cada pedido ao máximo de 20 (vinte) variações.

Parágrafo único - O desenho deverá representar clara e suficientemente o objeto e suas variações, se houver, de modo a possibilitar sua reprodução por técnico no assunto.

Art. 105 - Se solicitado o sigilo na forma do Parágrafo 1o.do art.106, poderá o pedido ser retirado em até 90 (noventa) dias contados da data do depósito.

Parágrafo único - A retirada de um depósito anterior sem produção de qualquer efeito dará prioridade ao depósito imediatamente posterior.

## SEÇÃO III - DO PROCESSO E DO EXAME DO PEDIDO

Art. 106 - Depositado o pedido de registro de desenho industrial e observado o disposto nos arts. 100, 101 e 104, será automaticamente publicado e simultaneamente concedido o registro, expedindo-se o respectivo certificado. Parágrafo 1o.- A requerimento do depositante, por ocasião do depósito, poderá ser mantido em sigilo o pedido, pelo prazo de 180 (cento e oitenta) dias contados da data do depósito, após o que será processado.

Parágrafo 2o.- Se o depositante se beneficiar do disposto no art. 99, aguardar-se-á a apresentação do documento de prioridade para o processamento do pedido.

Parágrafo 3o.- Não atendido o disposto nos arts. 101 e 104, será formulada exigência, que deverá ser respondida em 60 (sessenta) dias, sob pena de arquivamento definitivo.

Parágrafo 4o.- Não atendido o disposto no art. 100, o pedido de registro será indeferido.

## CAPÍTULO IV - DA CONCESSÃO E DA VIGÊNCIA DO REGISTRO

Art. 107 - Do certificado deverão constar o número e o título, nome do autor - observado o disposto no Parágrafo 40.do art. 6º, o nome, a nacionalidade e o domicílio do titular, o prazo de vigência, os desenhos, os dados relativos à prioridade estrangeira, e, quando houver, relatório descritivo e reivindicações .

Art. 108 - O registro vigorará pelo prazo de 10 (dez) anos contados da data do depósito, prorrogável por 3 (três) períodos sucessivos de 5 (cinco) anos cada.

Parágrafo 1o.- O pedido de prorrogação deverá ser formulado durante o último ano de vigência do registro, instruído com o comprovante do pagamento da respectiva retribuição.

Parágrafo 2o.- Se o pedido de prorrogação não tiver sido formulado até o termo final da vigência do registro, o titular poderá fazê-lo nos (180) cento e oitenta dias subsequentes, mediante o pagamento de retribuição adicional.

## CAPÍTULO V - DA PROTEÇÃO CONFERIDA PELO REGISTRO

Art. 109 - A propriedade do desenho industrial adquire-se pelo registro validamente concedido.

Parágrafo único - Aplicam-se ao registro do desenho industrial, no que couber, as disposições do art. 42 e dos incisos I, II e IV do art. 43.

Art. 110 - À pessoa que, de boa fé, antes da data do depósito ou da prioridade do pedido de registro explorava seu objeto no País, será assegurado o direito de continuar a exploração, sem ônus, na forma e condição anteriores.

Parágrafo 1o.- O direito conferido na forma deste artigo só poderá ser cedido juntamente com o negócio ou empresa, ou parte deste, que tenha direta relação com a exploração do objeto do registro, por alienação ou arrendamento.

Parágrafo 2o.- O direito de que trata este artigo não será assegurado a pessoa que tenha tido conhecimento do objeto do registro através de divulgação nos termos do Parágrafo 3o.do art. 96, desde que o pedido tenha sido depositado no prazo de 6 (seis) meses contados da divulgação.

## CAPÍTULO VI - DO EXAME DE MÉRITO

Art. 111 - O titular do desenho industrial poderá requerer o exame do objeto do registro, a qualquer tempo da vigência, quanto aos aspectos de novidade e de originalidade.

Parágrafo único - O INPI emitirá parecer de mérito, que, se concluir pela ausência de pelo menos um dos requisitos definidos nos arts. 95 a 98, servirá de fundamento para instauração de ofício de processo de nulidade do registro.

## CAPÍTULO VII - DA NULIDADE DO REGISTRO SEÇÃO I - DAS DISPOSIÇÕES GERAIS

Art. 120 - O titular do registro está sujeito ao pagamento de retribuição qüinqüenal, a partir do segundo quinquênio da data do depósito.

Parágrafo 1o.- O pagamento do segundo quinquênio será feito durante o 5o. (quinto) ano da vigência do registro.

Parágrafo 2o.- O pagamento dos demais quinquênios será apresentado junto com o pedido de prorrogação a que se refere o art. 108.

Parágrafo 3o.- O pagamento dos quinquênios poderá ainda ser efetuado dentro dos 6 (seis) meses subsequentes ao prazo estabelecido no parágrafo anterior, mediante pagamento de retribuição adicional.

## CAPÍTULO X - DAS DISPOSIÇÕES FINAIS

Art. 121 - As disposições dos arts. 58 a 63 aplicam-se, no que couber, à matéria de que trata o presente Título, disciplinando-se o direito do empregado ou prestador de serviços pelas disposições dos arts. 88 a 93.

TÍTULO III - DAS MARCAS CAPÍTULO I - DA REGISTRABILIDADE SEÇÃO I - DOS SINAIS REGISTRÁVEIS COMO MARCA

Art. 122 - São suscetíveis de registro como marca os sinais distintivos visualmente perceptíveis, não compreendidos nas proibições legais.

Art. 123 - Para os efeitos desta lei, considera-se:

I - marca de produto ou serviço: aquela usada para distinguir produto ou serviço de outro idêntico, semelhante ou afim, de origem diversa;
II - marca de certificação: aquela usada para atestar a conformidade de um produto ou serviço com determinadas normas ou especificações técnicas, notadamente quanto à qualidade, natureza, material utilizado e metodologia empregada; e
III - marca coletiva: aquela usada para identificar produtos ou serviços provindos de membros de uma determinada entidade.

## SEÇÃO II - DOS SINAIS NÃO REGISTRÁVEIS COMO MARCA

Art. 124 - Não são registráveis como marca:

I - brasão, armas, medalha, bandeira, emblema, distintivo e monumento oficiais, públicos, nacionais, estrangeiros ou internacionais, bem como a respectiva designação, figura ou imitação;
II - letra, algarismo e data, isoladamente, salvo quando revestidos de suficiente forma distintiva;
III - expressão, figura, desenho ou qualquer outro sinal contrário à moral e aos bons costumes ou que ofenda a honra ou imagem de pessoas ou atente contra liberdade de consciência, crença, culto religioso ou idéia e sentimento dignos de respeito e veneração;
IV - designação ou sigla de entidade ou órgão público, quando não requerido o registro pela própria entidade ou órgão público;
V - reprodução ou imitação de elemento característico ou diferenciador de título

o½⌐⌐↓↑=#—#→=#—▲¶#——#'¶—'¶''—#°»¿à⌐⌐►MS PCLXLFont 002°¿R⌐7°ô⌐N®°

de estabelecimento ou nome de empresa de terceiros, suscetível de causar confusão ou associação com estes sinais distintivos;

VI - sinal de caráter genérico, necessário, comum, vulgar ou simplesmente descritivo, quando tiver relação com o produto ou serviço a distinguir, ou aquele empregado comumente para designar uma característica do produto ou serviço , quanto à natureza, nacionalidade, peso, valor, qualidade e época de produção ou de prestação do serviço, salvo quando revestidos de suficiente forma distintiva;

VII - sinal ou expressão empregada apenas como meio de propaganda;

VIII - cores e suas denominações , salvo se dispostas ou combinadas de modo peculiar e distintivo;

IX - indicação geográfica, sua imitação suscetível de causar confusão ou sinal que possa falsamente induzir indicação geográfica;

X - sinal que induza a falsa indicação quanto à origem, procedência, natureza, qualidade ou utilidade do produto ou serviço a que a marca se destina;

XI - reprodução ou imitação de cunho oficial, regularmente adotada para garantia de padrão de qualquer gênero ou natureza;

XII - reprodução ou imitação de sinal que tenha sido registrado como marca coletiva ou de certificação por terceiro, observado o disposto no art. 154;

XIII - nome, prêmio ou símbolo de evento esportivo, artístico, cultural, social, político, econômico ou técnico, oficial ou oficialmente reconhecido, bem como a imitação suscetível de criar confusão , salvo quando autorizados pela autoridade competente ou entidade promotora do evento;

XIV - reprodução ou imitação de título, apólice, moeda e cédula da União, dos Estados, do Distrito Federal, dos Territórios, dos Municípios, ou de país;

XV - nome civil ou sua assinatura, nome de família ou patronímico e imagem de terceiros, salvo com consentimento do titular, herdeiros ou sucessores;

XVI - pseudônimo ou apelido notoriamente conhecidos, nome artístico singular ou coletivo, salvo com consentimento do titular, herdeiros ou sucessores;

XVII - obra literária, artística ou científica, assim como os títulos que estejam protegidos pelo direito autoral e sejam suscetíveis de causar confusão ou associação, salvo com consentimento do autor ou titular;

XVIII - termo técnico usado na indústria, na ciência e na arte, que tenha relação com o produto ou serviço a distinguir;

XIX - reprodução ou imitação, no todo ou em parte, ainda que com acréscimo, de marca alheia registrada, para distinguir ou certificar produto ou serviço idêntico, semelhante ou afim, suscetível de causar confusão ou associação com marca alheia;

XX - dualidade de marcas de um só titular para o mesmo produto ou serviço, salvo quando, no caso de marcas de mesma natureza, se revestirem de suficiente forma distintiva;

XXI - a forma necessária, comum ou vulgar do produto ou de acondicionamento, ou, ainda, aquela que não possa ser dissociada de efeito técnico;

XXII - objeto que estiver protegido por registro de desenho industrial de terceiro; e

XXIII - sinal que imite ou reproduza, no todo ou em parte, marca que o requerente evidentemente não poderia desconhecer em razão de sua atividade, cujo titular seja sediado ou domiciliado em território nacional ou em país com o qual o Brasil mantenha acordo ou que assegure reciprocidade de tratamento, se a marca se destinar a distinguir produto ou serviço idêntico, semelhante ou afim, suscetível de causar confusão ou associação com aquela marca alheia.

## SEÇÃO III - MARCA DE ALTO RENOME

Lei 9279/96 — Portal INPI



Art. 125 - À marca registrada no Brasil considerada de alto renome será assegurada proteção especial, em todos os ramos de atividade.

## SEÇÃO IV - MARCA NOTORIAMENTE CONHECIDA

Art. 126 - A marca notoriamente conhecida em seu ramo de atividade nos termos do art. 6o.bis (I), da Convenção da União de Paris para Proteção da Propriedade Industrial, goza de proteção especial, independentemente de estar previamente depositada ou registrada no Brasil.

Parágrafo 1o.- A proteção de que trata este artigo aplica-se também as marcas de serviço.

Parágrafo 2o.- O INPI poderá indeferir de ofício pedido de registro de marca que reproduza ou imite, no todo ou em parte, marca notoriamente conhecida.

## CAPÍTULO II - PRIORIDADE

Art. 127 - Ao pedido de registro de marca depositado em país que mantenha acordo com o Brasil ou em organização internacional, que produza efeito de depósito nacional, será assegurado direito de prioridade, nos prazos estabelecidos no acordo, não sendo o depósito invalidado nem prejudicado por fatos ocorridos nesses prazos.

Parágrafo 1o.- A reivindicação da prioridade será feita no ato de depósito, podendo ser suplementada dentro de 60 (sessenta) dias, por outras prioridades anteriores à data do depósito no Brasil.

Parágrafo 2o.- A reivindicação da prioridade será comprovada por documento hábil da origem, contendo o número, a data e a reprodução do pedido ou do registro, acompanhado de tradução simples, cujo teor será de inteira responsabilidade do depositante.

Parágrafo 3o.- Se não efetuada por ocasião do depósito, a comprovação deverá ocorrer em até 4 (quatro) meses, contados do depósito, sob pena de perda da prioridade.

Parágrafo 4o.- Tratando-se de prioridade obtida por cessão, o documento correspondente deverá ser apresentado junto com o próprio documento de prioridade.

## CAPÍTULO III - DOS REQUERENTES DE REGISTRO

Art. 128 - Podem requerer registro de marca as pessoas físicas ou jurídicas de direito público ou de direito privado.

Parágrafo 1o.- As pessoas de direito privado só podem requerer registro de marca relativo à atividade que exerçam efetiva e licitamente, de modo direto ou através de empresas que controlem direta ou indiretamente, declarando, no próprio requerimento, esta condição, sob as penas da lei.

Parágrafo 2o.- O registro de marca coletiva só poderá ser requerido por pessoa

jurídica representativa de coletividade, a qual poderá exercer atividade distinta da de seus membros.

Parágrafo 3o.- O registro da marca de certificação só poderá ser requerido por pessoa sem interesse comercial ou industrial direto no produto ou serviço atestado.

Parágrafo 4o.- A reivindicação de prioridade não isenta o pedido da aplicação dos dispositivos constantes deste Título.

## CAPÍTULO IV - DOS DIREITOS SOBRE A MARCA SEÇÃO I - AQUISIÇÃO

Art. 129 - A propriedade da marca adquire-se pelo registro validamente expedido, conforme as disposições desta lei, sendo assegurado ao titular seu uso exclusivo em todo o território nacional, observado quanto às marcas coletivas e de certificação o disposto nos arts. 147 e 148.

Parágrafo 1o.- Toda pessoa que, de boa fé, na data da prioridade ou depósito, usava no País, há pelo menos 6 (seis) meses, marca idêntica ou semelhante, para distinguir ou certificar produto ou serviço idêntico, semelhante ou afim, terá direito de precedência ao registro.

Parágrafo 2o.- O direito de precedência somente poderá ser cedido juntamente com o negócio da empresa, ou parte deste, que tenha direta relação com o uso da marca, por alienação ou arrendamento.

## SEÇÃO II - DA PROTEÇÃO CONFERIDA PELO REGISTRO

Art. 130 - Ao titular da marca ou ao depositante é ainda assegurado o direito de:

I - ceder seu registro ou pedido de registro;
II - licenciar seu uso;
III - zelar pela sua integridade material ou reputação.

Art. 131 - A proteção de que trata esta lei abrange o uso da marca em papéis, impressos, propaganda e documentos relativos à atividade do titular.

Art. 132 - O titular da marca não poderá:

I - impedir que comerciantes ou distribuidores utilizem sinais distintivos que lhes são próprios, juntamente com a marca do produto, na sua promoção e comercialização;
II - impedir que fabricantes de acessórios utilizem a marca para indicar a destinação do produto, desde que obedecidas as práticas leais de concorrência;
III - impedir a livre circulação de produto colocado no mercado interno, por si ou por outrem com seu consentimento, ressalvado o disposto nos Parágrafo 3o.e 4o.do art. 68; e
IV - impedir a citação da marca em discurso, obra científica ou literária ou qualquer outra publicação, desde que sem conotação comercial e sem prejuízo para seu caráter distintivo.

## CAPÍTULO V - DA VIGÊNCIA, DA CESSÃO E DAS ANOTAÇÕES
### SEÇÃO I - DA VIGÊNCIA

Art. 133 - O registro da marca vigorará pelo prazo de 10 (dez) anos, contados da data da concessão do registro, prorrogável por períodos iguais e sucessivos.

Parágrafo 1o.- O pedido de prorrogação deverá ser formulado durante o último ano de vigência do registro, instruído com o comprovante do pagamento da respectiva retribuição.

Parágrafo 2o.- Se o pedido de prorrogação não tiver sido efetuado até o termo final da vigência do registro, o titular poderá fazê-lo nos 6 (seis) meses subsequentes, mediante o pagamento de retribuição adicional.

Parágrafo 3o.- A prorrogação não será concedida se não atendido o disposto no art. 128.

### SEÇÃO II - DA CESSÃO

Art. 134 - O pedido de registro e o registro poderão ser cedidos, desde que o cessionário atenda aos requisitos legais para requerer tal registro.

Art. 135 - A cessão deverá compreender todos os registros ou pedido , em nome do cedente, de marcas iguais ou semelhantes, relativas a produto ou serviço idêntico, semelhante ou afim, sob pena de cancelamento dos registros ou arquivamento dos pedidos não cedidos.

### SEÇÃO III - DAS ANOTAÇÕES

Art. 136 - O INPI fará as seguintes anotações:

I - da cessão, fazendo constar a qualificação completa do cessionário;
II - de qualquer limitação ou ônus que recaia sobre o pedido ou registro; e
III - das alterações de nome, sede ou endereço do depositante ou titular.

Art. 137 - As anotações produzirão efeitos em relação a terceiros a partir da data de sua publicação.

Art. 138 - Cabe recurso da decisão que:

I - indeferir anotação de cessão;
II - cancelar o registro ou arquivar o pedido, nos termos do art. 135.

### SEÇÃO IV - DA LICENÇA DE USO

Art. 139 - O titular de registro ou o depositante de pedido de registro poderá celebrar contrato de licença para uso da marca, sem prejuízo de seu direito de exercer controle efetivo sobre as especificações, natureza e qualidade dos respectivos produtos ou serviços.

Parágrafo único - O licenciado poderá ser investido pelo titular de todos os

podenes para gine defea da marea, sent preuiuo dos seus próprios direitos

Art. 140 - O contrato de licença deverá ser averbado no INPI para que produza efeitos em relação a terceiros.

Parágrafo 1o.- A averbação produzirá efeitos em relação a terceiros a partir da data de sua publicação.

Parágrafo 2o.- Para efeito de validade de prova de uso, o contrato de licença não precisará estar averbado no INPI.

Art. 141 - Da decisão que indeferir a averbação do contrato de licença cabe recurso.

## CAPÍTULO VI - DA PERDA DOS DIREITOS

Art. 142 - O registro da marca extingue-se:

I - pela expiração do prazo de vigência;
II - pela renúncia, que poderá ser total ou parcial em relação aos produtos ou serviços assinalados pela marca;
III - pela caducidade; ou
IV - pela inobservância do disposto no art. 217.

Art. 143 - Caducará o registro, a requerimento de qualquer pessoa com legítimo interesse se, decorridos 5 (cinco) anos da sua concessão, na data do requerimento:

I - o uso da marca não tiver sido iniciado no Brasil; ou
II - o uso da marca tiver sido interrompido por mais de 5 (cinco) anos consecutivos, ou se, no mesmo prazo, a marca tiver sido usada com modificação que implique alteração de seu caráter distintivo original, tal como constante do certificado de registro.

Parágrafo 1o.- Não ocorrerá caducidade se o titular justificar o desuso da marca por razões legítimas.

Parágrafo 2o.- O titular será intimado para se manifestar no prazo de 60 (sessenta) dias, cabendo-lhe o ônus de provar o uso da marca ou justificar seu desuso por razões legítimas.

Art. 144 - O uso da marca deverá compreender produtos ou serviços constantes do certificado, sob pena de caducar parcialmente o registro em relação aos não semelhantes ou afins daqueles para os quais a marca foi comprovadamente usada.

Art. 145 - Não se conhecerá do requerimento de caducidade se o uso da marca tiver sido comprovado ou justificado seu desuso em processo anterior, requerido há menos de 5 (cinco) anos.

Art. 146 - Da decisão que declarar ou denegar a caducidade caberá recurso.

## CAPÍTULO VII - DAS MARCAS COLETIVAS E DE CERTIFICAÇÃO

Art. 147 - O pedido de registro de marca coletiva conterá regulamento de utilização, dispondo sobre condições e proibições de uso da marca.

Parágrafo único - O regulamento de utilização, quando não acompanhar o pedido, deverá ser protocolizado no prazo de 60 (sessenta) dias do depósito, sob pena de arquivamento definitivo do pedido.

Art. 148 - O pedido de registro da marca de certificação conterá:

I - as características do produto ou serviço objeto de certificação; e
II - as medidas de controle que serão adotadas pelo titular.

Parágrafo único - A documentação prevista nos incisos I e II deste artigo, quando não acompanhar o pedido, deverá ser protocolizada no prazo de 60 (sessenta) dias, sob pena de arquivamento definitivo do pedido.

Art. 149 - Qualquer alteração no regulamento de utilização deverá ser comunicada ao INPI, mediante petição protocolizada, contendo todas as condições alteradas, sob pena de não ser considerada.

Art. 150 - O uso da marca independe de licença, bastando sua autorização no regulamento de utilização.

Art. 151 - Além das causas de extinção estabelecidas no art. 142, o registro da marca coletiva e de certificação extingue-se quando:

I - a entidade deixar de existir; ou
II - a marca for utilizada em condições outras que não aquelas previstas no regulamento de utilização.

Art. 152 - Só será admitida a renúncia ao registro de marca coletiva quando requerida nos termos do contrato social ou estatuto da própria entidade, ou, ainda, conforme o regulamento de utilização.

Art. 153 - A caducidade do registro será declarada se a marca coletiva não for usada por mais de uma pessoa autorizada, observado o disposto nos arts. 143 a 146.

Art. 154 - A marca coletiva e a de certificação que já tenham sido usadas e cujos registros tenham sido extintos não poderão ser registradas em nome de terceiro, antes de expirado o prazo de 5 (cinco) anos, contados da extinção do registro.

## CAPÍTULO VIII - DO DEPÓSITO

Art. 155 - O pedido deverá referir-se a um único sinal distintivo e, nas condições estabelecidas pelo INPI, conterá:

I - requerimento;
II - etiquetas, quando for o caso; e

III - comprovante do pagamento da retribuição relativa ao depósito.

Parágrafo único - O requerimento e qualquer documento que o acompanhe deverão ser apresentados em língua portuguesa e, quando houver documento em língua estrangeira, sua tradução simples deverá ser apresentada no ato do depósito ou dentro dos 60 (sessenta) dias subsequentes, sob pena de não ser considerado o documento.

Art. 156 - Apresentado o pedido, será ele submetido a exame formal preliminar e, se devidamente instruído, será protocolizado, considerada a data de depósito a da sua apresentação.

Art. 157 - O pedido que não atender formalmente ao disposto no art. 155, mas que contiver dados suficientes relativos ao depositante, sinal marcário e classe, poderá ser entregue, mediante recibo datado, ao INPI, que estabelecerá as exigências a serem cumpridas pelo depositante, em 5 (cinco) dias, sob pena de ser considerado inexistente.

Parágrafo único - Cumpridas as exigências, o depósito será considerado como efetuado na data da apresentação do pedido.

## CAPÍTULO IX - DO EXAME

Art. 158 - Protocolizado, o pedido será publicado para apresentação de oposição no prazo de 60 (sessenta) dias.

Parágrafo 1o.- O depositante será intimado da oposição, podendo se manifestar no prazo de 60 (sessenta) dias.

Parágrafo 2o.- Não se conhecerá da oposição, nulidade administrativa ou de ação de nulidade se, fundamentada no inciso XXIII do art. 124 ou no art. 126, não se comprovar, no prazo de 60 (sessenta) dias após a interposição, o depósito do pedido de registro da marca na forma desta lei.

Art. 159 - Decorrido o prazo de oposição ou, se interposta esta, findo o prazo de manifestação, será feito o exame, durante o qual poderão ser formuladas exigências, que deverão ser respondidas no prazo de 60 (sessenta) dias.

Parágrafo 1o.- Não respondida a exigência, o pedido será definitivamente arquivado.

Parágrafo 2o.- Respondida a exigência, ainda que não cumprida, ou contestada a sua formulação, dar-se-á prosseguimento ao exame.

Art. 160 - Concluído o exame, será proferida decisão, deferindo ou indeferindo o pedido de registro.

## CAPÍTULO X - DA EXPEDIÇÃO DO CERTIFICADO DE REGISTRO

Art. 161 - O certificado de registro será concedido depois de deferido o pedido e comprovado o pagamento das retribuições correspondentes.

Lei 9279/96 — Portal INPI

Art. 162 - O pagamento das retribuições , e sua comprovação, relativas à expedição do certificado de registro e ao primeiro decênio de sua vigência, deverão ser efetuados no prazo de 60 (sessenta) dias contados do deferimento.

Parágrafo único - A retribuição poderá ainda ser paga e comprovada dentro de 30 (trinta) dias após o prazo previsto neste artigo, independentemente de notificação, mediante o pagamento de retribuição específica, sob pena de arquivamento definitivo do pedido.

Art. 163 - Reputa-se concedido o certificado de registro na data da publicação do respectivo ato.

Art. 164 - Do certificado deverão constar a marca, o número e data do registro, nome, nacionalidade e domicílio do titular, os produtos ou serviços, as características do registro e a prioridade estrangeira.

## CAPÍTULO XI - DA NULIDADE DO REGISTRO SEÇÃO I - DISPOSIÇÕES GERAIS

Art. 165 - É nulo o registro que for concedido em desacordo com as disposições desta lei.

Parágrafo único - A nulidade do registro poderá ser total ou parcial, sendo condição para a nulidade parcial o fato de a parte subsistente poder ser considerada registrável.

Art. 166 - O titular de uma marca registrada em país signatário da Convenção da União de Paris para Proteção da Propriedade Industrial poderá, alternativamente, reivindicar, através de ação judicial, a adjudicação do registro, nos termos previstos no art. 6o.septies (1) daquela Convenção.

Art. 167 - A declaração de nulidade produzirá efeito a partir da data do depósito do pedido.

## SEÇÃO II - DO PROCESSO ADMINISTRATIVO DE NULIDADE

Art. 168 - A nulidade do registro será declarada administrativamente quando tiver sido concedida com infringência do disposto nesta lei.

Art. 169 - O processo de nulidade poderá ser instaurado de ofício ou mediante requerimento de qualquer pessoa com legítimo interesse, no prazo de 180 (cento e oitenta) dias contados da data da expedição do certificado de registro.

Art. 170 - O titular será intimado para se manifestar no prazo de 60 (sessenta) dias.

Art. 171 - Decorrido o prazo fixado no artigo anterior, mesmo que não apresentada a manifestação, o processo será decidido pelo Presidente do INPI, encerrando-se a instância administrativa.

Art. 172 - O processo de nulidade prosseguirá ainda que extinto o registro.

## SEÇÃO III - DA AÇÃO DE NULIDADE

Art. 173 - A ação de nulidade poderá ser proposta pelo INPI ou por qualquer pessoa com legítimo interesse.

Parágrafo único - O juiz poderá, nos autos da ação de nulidade, determinar liminarmente a suspensão dos efeitos do registro e do uso da marca, atendidos os requisitos processuais próprios.

Art. 174 - Prescreve em 5 (cinco) anos a ação para declarar a nulidade do registro, contados da data da sua concessão.

Art. 175 - A ação de nulidade do registro será ajuizada no foro da justiça federal e o INPI, quando não for autor, intervirá no feito.

Parágrafo 1o.- O prazo para resposta do réu titular do registro será de 60 (sessenta) dias.

Parágrafo 2o.- Transitada em julgado a decisão da ação de nulidade, o INPI publicará anotação, para ciência de terceiros.

## TÍTULO IV - DAS INDICAÇÕES GEOGRÁFICAS

Art. 176 - Constitui indicação geográfica a indicação de procedência ou a denominação de origem.

Art. 177- Considera-se indicação de procedência o nome geográfico de país, cidade, região ou localidade de seu território, que se tenha tornado conhecido como centro de extração, produção ou fabricação de determinado produto ou de prestação de determinado serviço.

Art. 178 - Considera-se denominação de origem o nome geográfico de país, cidade, região ou localidade de seu território, que designe produto ou serviço cujas qualidades ou características se devam exclusiva ou essencialmente ao meio geográfico, incluídos fatores naturais e humanos.

Art. 179 - A proteção estender-se-á à representação gráfica ou figurativa da indicação geográfica, bem como à representação geográfica de país, cidade, região ou localidade de seu território cujo nome seja indicação geográfica.

Art. 180 - Quando o nome geográfico se houver tornado de uso comum, designando produto ou serviço, não será considerado indicação geográfica.

Art. 181 - O nome geográfico que não constitua indicação de procedência ou denominação de origem poderá servir de elemento característico de marca para produto ou serviço, desde que não induza falsa procedência.

Art. 182 - O uso da indicação geográfica é restrito aos produtores e prestadores de serviço estabelecidos no local, exigindo-se, ainda, em relação às denominações de origem, o atendimento de requisitos de qualidade.

Parágrafo único - O INPI estabelecerá as condições de registro das indicações geográficas.

## TÍTULO V -DOS CRIMES CONTRA A PROPRIEDADE INDUSTRIAL
## CAPÍTULO I - DOS CRIMES CONTRA AS PATENTES

Art. 183 - Comete crime contra patente de invenção ou de modelo de utilidade quem:

I - fabrica produto que seja objeto de patente de invenção ou de modelo de utilidade, sem autorização do titular; ou
II - usa meio ou processo que seja objeto de patente de invenção, sem autorização do titular.

Pena - detenção, de 3 (três) meses a 1 (um) ano, ou multa.

Art. 184 - Comete crime contra patente de invenção ou de modelo de utilidade quem:

I - exporta, vende, expõe ou oferece à venda, tem em estoque, oculta ou recebe, para utilização com fins econômicos, produto fabricado com violação de patente de invenção ou de modelo de utilidade, ou obtido por meio ou processo patenteado; ou
II - importa produto que seja objeto de patente de invenção ou de modelo de utilidade ou obtido por meio ou processo patenteado no País, para os fins previstos no inciso anterior, e que não tenha sido colocado no mercado externo diretamente pelo titular da patente ou com seu consentimento.

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

Art.185 - Fornecer componente de um produto patenteado, ou material ou equipamento para realizar um processo patenteado, desde que a aplicação final do componente, material ou equipamento induza, necessariamente, à exploração do objeto da patente.

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

Art. 186 - Os crimes deste capítulo caracterizam-se ainda que a violação não atinja todas as reivindicações da patente ou se restrinja à utilização de meios equivalentes ao objeto da patente.

## CAPÍTULO II - DOS CRIMES CONTRA OS DESENHOS INDUSTRIAIS

Art. 187 - Fabricar, sem autorização do titular, produto que incorpore desenho industrial registrado, ou imitação substancial que possa induzir em erro ou confusão .

Pena - detenção, de 3 (três) meses a 1 (um) ano, ou multa.

Art. 188 - Comete crime contra registro de desenho industrial quem:

I - exporta, vende, expõe ou oferece à venda, tem em estoque, oculta ou recebe, para utilização com fins econômicos, objeto que incorpore ilicitamente desenho industrial registrado, ou imitação substancial que possa induzir em erro ou confusão; ou

II - importa produto que incorpore desenho industrial registrado no País, ou imitação substancial que possa induzir em erro ou confusão, para os fins previstos no inciso anterior, e que não tenha sido colocado no mercado externo diretamente pelo titular ou com seu consentimento.

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

## CAPÍTULO III - DOS CRIMES CONTRA AS MARCAS

Art. 189 - Comete crime contra registro de marca quem:

I - reproduz, sem autorização do titular, no todo ou em parte, marca registrada, ou imita-a de modo que possa induzir confusão; ou

II - altera marca registrada de outrem já aposta em produto colocado no mercado.

Pena - detenção, de 3 (três) meses a 1 (um) ano, ou multa.

Art. 190 - Comete crime contra registro de marca quem importa, exporta, vende, oferece ou expõe à venda, oculta ou tem em estoque:

I - produto assinalado com marca ilicitamente reproduzida ou imitada, de outrem, no todo ou em parte; ou

II - produto de sua indústria ou comércio, contido em vasilhame, recipiente ou embalagem que contenha marca legítima de outrem.

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

## CAPÍTULO IV - DOS CRIMES COMETIDOS POR MEIO DE MARCA, TÍTULO DE ESTABELECIMENTO E SINAL DE PROPAGANDA

Art. 191 - Reproduzir ou imitar, de modo que possa induzir em erro ou confusão , armas, brasões ou distintivos oficiais nacionais, estrangeiros ou internacionais, sem a necessária autorização, no todo ou em parte, em marca, título de estabelecimento, nome comercial, insígnia ou sinal de propaganda, ou usar essas reproduções ou imitações com fins econômicos.

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

Parágrafo único - Incorre na mesma pena quem vende ou expõe ou oferece à venda produtos assinalados com essas marcas.

## CAPÍTULO V - DOS CRIMES CONTRA INDICAÇÕES GEOGRÁFICAS E DEMAIS INDICAÇÕES

Art. 192 - Fabricar, importar, exportar, vender, expor ou oferecer à venda ou ter em estoque produto que apresente falsa indicação geográfica.

♣

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

Art. 193 - Usar, em produto, recipiente, invólucro, cinta, rótulo, fatura, circular, cartaz ou em outro meio de divulgação ou propaganda, termos retificativos, tais como "tipo", "espécie", "gênero", "sistema", "semelhante", "sucedâneo", "idêntico", ou equivalente, não ressalvando a verdadeira procedência do produto.

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

Art. 194 - Usar marca, nome comercial, título de estabelecimento, insígnia, expressão ou sinal de propaganda ou qualquer outra forma que indique procedência que não a verdadeira, ou vender ou expor à venda produto com esses sinais.

Pena - detenção, de 1 (um) a 3 (três) meses, ou multa.

## CAPÍTULO VI - DOS CRIMES DE CONCORRÊNCIA DESLEAL

Art. 195 - Comete crime de concorrência desleal quem:

I - publica, por qualquer meio, falsa afirmação, em detrimento de concorrente, com o fim de obter vantagem;
II - presta ou divulga, acerca de concorrente, falsa informação, com o fim de obter vantagem;
III - emprega meio fraudulento, para desviar, em proveito próprio ou alheio, clientela de outrem;
IV - usa expressão ou sinal de propaganda alheios, ou os imita, de modo a criar confusão entre os produtos ou estabelecimentos;

V - usa, indevidamente, nome comercial, título de estabelecimento ou insígnia alheios ou vende, expõe ou oferece à venda ou tem em estoque produto com essas referências;
VI - substitui, pelo seu próprio nome ou razão social, em produto de outrem, o nome ou razão social deste, sem o seu consentimento;
VII - atribui-se, como meio de propaganda, recompensa ou distinção que não obteve;
VIII - vende ou expõe ou oferece à venda, em recipiente ou invólucro de outrem, produto adulterado ou falsificado, ou dele se utiliza para negociar com produto da mesma espécie, embora não adulterado ou falsificado, se o fato não constitui crime mais grave;
IX - dá ou promete dinheiro ou outra utilidade a empregado de concorrente, para que o empregado, faltando ao dever do emprego, lhe proporcione vantagem;
X - recebe dinheiro ou outra utilidade, ou aceita promessa de paga ou recompensa, para, faltando ao dever de empregado, proporcionar vantagem a concorrente do empregador;
XI - divulga, explora ou utiliza-se, sem autorização, de conhecimentos, informações ou dados confidenciais, utilizáveis na indústria, comércio ou prestação de serviços, excluídos aqueles que sejam de conhecimento público ou que sejam evidentes para um técnico no assunto, a que teve acesso mediante relação contratual ou empregatícia, mesmo após o término do contrato; XII -

divulga, explora ou utiliza-se, sem autorização, de conhecimentos ou informações a que se refere o inciso anterior, obtidos por meios ilícitos ou a que teve acesso mediante fraude; ou

XIII - vende, expõe ou oferece à venda produto, declarando ser objeto de patente depositada, ou concedida, ou de desenho industrial registrado, que não o seja, ou menciona-o, em anúncio ou papel comercial, como depositado ou patenteado, ou registrado, sem o ser;

XIV - divulga, explora ou utiliza-se, sem autorização, de resultados de testes ou outros dados não divulgados, cuja elaboração envolva esforço considerável e que tenham sido apresentados a entidades governamentais como condição para aprovar a comercialização de produtos.

Pena - detenção, de 3 (três) meses a 1 (um) ano, ou multa.

Parágrafo 1o.- Inclui-se nas hipóteses a que se referem os incisos XI e XII o empregador, sócio ou administrador da empresa, que incorrer nas tipificações estabelecidas nos mencionados dispositivos.

Parágrafo 2o.- O disposto no inciso XIV não se aplica quanto à divulgação por órgão governamental competente para autorizar a comercialização de produto, quando necessário para proteger o público.

## CAPÍTULO VII - DAS DISPOSIÇÕES GERAIS

Art. 196 - As penas de detenção previstas nos Capítulos I, II e III deste Título serão aumentadas de um terço à metade se:

I - o agente é ou foi representante, mandatário, preposto, sócio ou empregado do titular da patente ou do registro, ou, ainda, do seu licenciado; ou
II - a marca alterada, reproduzida ou imitada for de alto renome, notoriamente conhecida, de certificação ou coletiva.

Art. 197 - As penas de multa previstas neste Título serão fixadas, no mínimo, em 10 (dez) e, no máximo, em 360 (trezentos e sessenta) dias-multa, de acordo com a sistemática do Código Penal.

Parágrafo único - A multa poderá ser aumentada ou reduzida, em até 10 (dez) vezes, em face das condições pessoais do agente e da magnitude da vantagem auferida, independentemente da norma estabelecida no artigo anterior.

Art. 198 - Poderão ser apreendidos, de ofício ou a requerimento do interessado, pelas autoridades alfandegárias, no ato de conferência, os produtos assinalados com marcas falsificadas, alteradas ou imitadas ou que apresentem falsa indicação de procedência.

Art. 199 - Nos crimes previstos neste Título somente se procede mediante queixa, salvo quanto ao crime do art. 191, em que a ação penal será pública.

Art. 200 - A ação penal e as diligências preliminares de busca e apreensão, nos crimes contra a propriedade industrial, regulam-se pelo disposto no Código de Processo Penal, com as modificações constantes dos artigos deste Capítulo.

Lei 9279/96 — Portal INPI

!!

Art. 201 - Na diligência de busca e apreensão, em crime contra patente que tenha por objeto a invenção de processo, o oficial do juízo será acompanhado por perito, que verificará, preliminarmente, a existência do ilícito, podendo o juiz ordenar a apreensão de produtos obtidos pelo contrafator com o emprego do processo patenteado.

Art. 202 - Além das diligências preliminares de busca e apreensão, o interessado poderá requerer:

I - apreensão de marca falsificada, alterada ou imitada onde for preparada ou onde quer que seja encontrada, antes de utilizada para fins criminosos; ou
II - destruição de marca falsificada nos volumes ou produtos que a contiverem, antes de serem distribuídos, ainda que fiquem destruídos os envoltórios ou os próprios produtos.

Art. 203 - Tratando-se de estabelecimentos industriais ou comerciais legalmente organizados e que estejam funcionando publicamente, as diligências preliminares limitar-se-ão à vistoria e apreensão dos produtos, quando ordenadas pelo juiz, não podendo ser paralisada a sua atividade licitamente exercida.

Art. 204 - Realizada a diligência de busca e apreensão, responderá por perdas e danos a parte que a tiver requerido de má-fé, por espírito de emulação, mero capricho ou erro grosseiro.

Art. 205 - Poderá constituir matéria de defesa na ação penal a alegação de nulidade da patente ou registro em que a ação se fundar. A absolvição do réu, entretanto, não importará a nulidade da patente ou do registro, que só poderá ser demandada pela ação competente.

Art. 206 - Na hipótese de serem reveladas, em juízo, para a defesa dos interesses de qualquer das partes, informações que se caracterizem como confidenciais, sejam segredo de indústria ou de comércio, deverá o juiz determinar que o processo prossiga em segredo de justiça, vedado o uso de tais informações também à outra parte para outras finalidades.

Art. 207 - Independentemente da ação criminal, o prejudicado poderá intentar as ações cíveis que considerar cabíveis na forma do Código de Processo Civil.

Art. 208 - A indenização será determinada pelos benefícios que o prejudicado teria auferido se a violação não tivesse ocorrido.

Art. 209 - Fica ressalvado ao prejudicado o direito de haver perdas e danos em ressarcimento de prejuízos causados por atos de violação de direitos de propriedade industrial e atos de concorrência desleal não previstos nesta Lei, tendentes a prejudicar a reputação ou os negócios alheios, a criar confusão entre estabelecimentos comerciais, industriais ou prestadores de serviço, ou entre os produtos e serviços postos no comércio.

Parágrafo 1o.- Poderá o juiz, nos autos da própria ação, para evitar dano irreparável ou de difícil reparação, determinar liminarmente a sustação da violação ou de ato que a enseje, antes da citação do réu, mediante, caso julgue

necessário, caução em dinheiro ou garantia fidejussória. Parágrafo 2o.- Nos casos de reprodução ou de imitação flagrante de marca registrada, o juiz poderá determinar a apreensão de todas as mercadorias, produtos, objetos, embalagens, etiquetas e outros que contenham a marca falsificada ou imitada.

Art. 210 - Os lucros cessantes serão determinados pelo critério mais favorável ao prejudicado, dentre os seguintes:

I - os benefícios que o prejudicado teria auferido se a violação não tivesse ocorrido; ou
II - os benefícios que foram auferidos pelo autor da violação do direito; ou
III - a remuneração que o autor da violação teria pago ao titular do direito violado pela concessão de uma licença que lhe permitisse legalmente explorar o bem.

## TÍTULO VI - DA TRANSFERÊNCIA DE TECNOLOGIA E DA FRANQUIA

Art. 211 - O INPI fará o registro dos contratos que impliquem transferência de tecnologia, contratos de franquia e similares para produzirem efeitos em relação a terceiros.

Parágrafo único - A decisão relativa aos pedidos de registro de contratos de que trata este artigo será proferida no prazo de 30 (trinta) dias, contados da data do pedido de registro.

## TÍTULO VII - DAS DISPOSIÇÕES GERAIS CAPÍTULO I - DOS RECURSOS

Art. 212 - Salvo expressa disposição em contrário, das decisões de que trata esta Lei cabe recurso, que será interposto no prazo de 60 (sessenta) dias.

Parágrafo 1o.- Os recursos serão recebidos nos efeitos suspensivo e devolutivo pleno, aplicando-se todos os dispositivos pertinentes ao exame de primeira instância, no que couber.

Parágrafo 2o.- Não cabe recurso da decisão que determinar o arquivamento definitivo de pedido de patente ou de registro e da que deferir pedido de patente, de certificado de adição ou de registro de marca.

Parágrafo 3o.- Os recursos serão decididos pelo Presidente do INPI, encerrando-se a instância administrativa.

Art. 213 - Os interessados serão intimados para, no prazo de 60 (sessenta) dias, oferecerem contra-razões ao recurso.

Art. 214 - Para fins de complementação das razões oferecidas a título de recurso, o INPI poderá formular exigências, que deverão ser cumpridas no prazo de 60 (sessenta) dias.

Parágrafo único - Decorrido o prazo do caput, será decidido o recurso.

Art. 215 - A decisão do recurso é final e irrecorrível na esfera administrativa.

## CAPÍTULO II - DOS ATOS DAS PARTES

Art. 216 - Os atos previstos nesta Lei serão praticados pelas partes ou por seus procuradores, devidamente qualificados.

Parágrafo 1o.- O instrumento de procuração, no original, traslado ou fotocópia autenticada, deverá ser em língua portuguesa, dispensados a legalização consular e o reconhecimento de firma.

Parágrafo 2o.- A procuração deverá ser apresentada em até 60 (sessenta) dias contados da prática do primeiro ato da parte no processo, independente de notificação ou exigência, sob pena de arquivamento, sendo definitivo o arquivamento do pedido de patente, do pedido de registro de desenho industrial e de registro de marca.

Art. 217 - A pessoa domiciliada no exterior deverá constituir e manter procurador devidamente qualificado e domiciliado no País, com poderes para representá-la administrativa e judicialmente, inclusive para receber citações.

Art. 218 - Não se conhecerá da petição:

I - se apresentada fora do prazo legal; ou
II - se desacompanhada do comprovante da respectiva retribuição no valor vigente à data de sua apresentação.

Art. 219 - Não serão conhecidos a petição, a oposição e o recurso, quando:

I - apresentados fora do prazo previsto nesta Lei;
II - não contiverem fundamentação legal; ou
III - desacompanhados do comprovante do pagamento da retribuição correspondente.

Art. 220 - O INPI aproveitará os atos das partes, sempre que possível, fazendo as exigências cabíveis.

## CAPÍTULO III - DOS PRAZOS

Art. 221 - Os prazos estabelecidos nesta Lei são contínuos, extinguindo-se automaticamente o direito de praticar o ato, após seu decurso, salvo se a parte provar que não o realizou por justa causa.

Parágrafo 1o.- Reputa-se justa causa o evento imprevisto, alheio à vontade da parte e que a impediu de praticar o ato.

Parágrafo 2o.- Reconhecida a justa causa, a parte praticará o ato no prazo que lhe for concedido pelo INPI.

Art. 222 - No cômputo dos prazos, exclui-se o dia do começo e inclui-se o do vencimento.

Art. 223 - Os prazos somente começam a correr a partir do primeiro dia útil após a intimação, que será feita mediante publicação no órgão oficial do INPI.

Art. 224 - Não havendo expressa estipulação nesta Lei, o prazo para a prática do ato será de 60 (sessenta) dias.

## CAPÍTULO IV - DA PRESCRIÇÃO

Art. 225 - Prescreve em 5 (cinco) anos a ação para reparação de dano causado ao direito de propriedade industrial.

## CAPÍTULO V - DOS ATOS DO INPI

Art. 226 - Os atos do INPI nos processos administrativos referentes à propriedade industrial só produzem efeitos a partir da sua publicação no respectivo órgão oficial, ressalvados:

I - os que expressamente independerem de notificação ou publicação por força do disposto nesta Lei;

II - as decisões administrativas, quando feita notificação por via postal ou por ciência dada ao interessado no processo; e
III - os pareceres e despachos internos que não necessitem ser do conhecimento das partes.

## CAPÍTULO VI - DAS CLASSIFICAÇÕES

Art. 227 - As classificações relativas às matérias dos Títulos I, II e III desta Lei serão estabelecidas pelo INPI, quando não fixadas em tratado ou acordo internacional em vigor no Brasil.

## CAPÍTULO VII - DA RETRIBUIÇÃO

Art. 228 - Para os serviços previstos nesta Lei será cobrada retribuição, cujo valor e processo de recolhimento serão estabelecidos por ato do titular do órgão da administração pública federal a que estiver vinculado o INPI.

## TÍTULO VIII - DAS DISPOSIÇÕES TRANSITÓRIAS E FINAIS

Art. 229. Aos pedidos em andamento serão aplicadas as disposições desta Lei, exceto quanto à patenteabilidade dos pedidos depositados até 31 de dezembro de 1994, cujo objeto de proteção sejam substâncias, matérias ou produtos obtidos por meios ou processos químicos ou substâncias, matérias, misturas ou produtos alimentícios, químico-farmacêuticos e medicamentos de qualquer espécie, bem como os respectivos processos de obtenção ou modificação e cujos depositantes não tenham exercido a faculdade prevista nos arts. 230 e 231 desta Lei, os quais serão considerados indeferidos, para todos os efeitos, devendo o INPI publicar a comunicação dos aludidos indeferimentos. (Redação dada pela Lei nº 10.196, de 14.2.2001)

Parágrafo único. Aos pedidos relativos a produtos farmacêuticos e produtos químicos para a agricultura, que tenham sido depositados entre 1o de janeiro de

1995 e 14 de maio de 1997, aplicam-se os critérios de patenteabilidade desta Lei, na data efetiva do depósito do pedido no Brasil ou da prioridade, se houver, assegurando-se a proteção a partir da data da concessão da patente, pelo prazo remanescente a contar do dia do depósito no Brasil, limitado ao prazo previsto no caput do art. 40. (Parágrafo único inclúido pela Lei nº 10.196, de 14.2.2001)

Art. 229-A. Consideram-se indeferidos os pedidos de patentes de processo apresentados entre 10 de janeiro de 1995 e 14 de maio de 1997, aos quais o art. 9o, alínea "c", da Lei no 5.772, de 21 de dezembro de 1971, não conferia proteção, devendo o INPI publicar a comunicação dos aludidos indeferimentos. (Artigo inclúido pela Lei nº 10.196, de 14.2.2001)

Art. 229-B. Os pedidos de patentes de produto apresentados entre 1º de janeiro de 1995 e 14 de maio de 1997, aos quais o art. 9º, alíneas "b" e "c", da Lei no 5.772, de 1971, não conferia proteção e cujos depositantes não tenham exercido a faculdade prevista nos arts. 230 e 231, serão decididos até 31 de dezembro de 2004, em conformidade com esta Lei. (Artigo inclúido pela Lei nº 10.196, de 14.2.2001)

Art. 229-C. A concessão de patentes para produtos e processos farmacêuticos dependerá da prévia anuência da Agência Nacional de Vigilância Sanitária - ANVISA. (Artigo inclúido pela Lei nº 10.196, de 14.2.2001)

Art. 230 - Poderá ser depositado pedido de patente relativo às substâncias, matérias ou produtos obtidos por meios ou processos químicos e as substâncias, matérias, misturas ou produtos alimentícios, químico-farmacêuticos e medicamentos de qualquer espécie, bem como os respectivos processos de obtenção ou modificação, por quem tenha proteção garantida em tratado ou convenção em vigor no Brasil, ficando assegurada a data do primeiro depósito no exterior, desde que seu objeto não tenha sido colocado em qualquer mercado, por iniciativa direta do titular ou por terceiro com seu consentimento, nem tenham sido realizados, por terceiros, no País, sérios e efetivos preparativos para a exploração do objeto do pedido ou da patente.

Parágrafo 1o.- O depósito deverá ser feito dentro do prazo de 1 (um) ano contado da publicação desta Lei, e deverá indicar a data do primeiro depósito no exterior.

Parágrafo 2o.- O pedido de patente depositado com base neste artigo será automaticamente publicado, sendo facultado a qualquer interessado manifestar-se, no prazo de 90 (noventa) dias, quanto ao atendimento do disposto no caput deste artigo.

Parágrafo 3o.- Respeitados os arts. 10 e 18 desta Lei, e uma vez atendidas as condições estabelecidas neste artigo e comprovada a concessão da patente no país onde foi depositado o primeiro pedido, será concedida a patente no Brasil, tal como concedida no país de origem.

Parágrafo 4o.- Fica assegurado à patente concedida com base neste artigo o prazo remanescente de proteção no país onde foi depositado o primeiro pedido, contado da data do depósito no Brasil e limitado ao prazo previsto no art. 40, não se aplicando o disposto no seu parágrafo único.

Parágrafo 5o.- O depositante que tiver pedido de patente em andamento, relativo às substâncias, matérias ou produtos obtidos por meios ou processos químicos e as substâncias, matérias, misturas ou produtos alimentícios, químico-farmacêuticos e medicamentos de qualquer espécie, bem como os respectivos processos de obtenção ou modificação, poderá apresentar novo pedido, no prazo e condições estabelecidos neste artigo, juntando prova de desistência do pedido em andamento.

Parágrafo 6o.- Aplicam-se as disposições desta Lei, no que couber, ao pedido depositado e à patente concedida com base neste artigo.

Art. 231 - Poderá ser depositado pedido de patente relativo às matérias de que trata o artigo anterior, por nacional ou pessoa domiciliada no País, ficando assegurada a data de divulgação do invento, desde que seu objeto não tenha sido colocado em qualquer mercado, por iniciativa direta do titular ou por terceiro com seu consentimento, nem tenham sido realizados, por terceiros, no País, sérios e efetivos preparativos para a exploração do objeto do pedido. Parágrafo 1o.- O depósito deverá ser feito dentro do prazo de 1 (um) ano contado da publicação desta Lei.

Parágrafo 2o.- O pedido de patente depositado com base neste artigo será processado nos termos desta Lei.

Parágrafo 3o.- Fica assegurado à patente concedida com base neste artigo o prazo remanescente de proteção de 20 (vinte) anos contado da data da divulgação do invento, a partir do depósito no Brasil.

Parágrafo 4o.- O depositante que tiver pedido de patente em andamento, relativo às matérias de que trata o artigo anterior, poderá apresentar novo pedido, no prazo e condições estabelecidos neste artigo, juntando prova de desistência do pedido em andamento.

Art. 232 - A produção ou utilização, nos termos da legislação anterior, de substâncias, matérias ou produtos obtidos por meios ou processos químicos e as substâncias, matérias, misturas ou produtos alimentícios, químico-farmacêuticos e medicamentos de qualquer espécie, bem como os respectivos processos de obtenção ou modificação, mesmo que protegidos por patente de produto ou processo em outro país, de conformidade com tratado ou convenção em vigor no Brasil, poderão continuar, nas mesmas condições anteriores à aprovação desta Lei.

Parágrafo 1o.- Não será admitida qualquer cobrança retroativa ou futura, de qualquer valor, a qualquer título, relativa a produtos produzidos ou processos utilizados no Brasil em conformidade com este artigo.

Parágrafo 2o.- Não será igualmente admitida cobrança nos termos do parágrafo anterior, caso, no período anterior à entrada em vigência dessa Lei, tenham sido realizados investimentos significativos para a exploração de produto ou de processo referidos neste artigo, mesmo que protegidos por patente de produto ou de processo em outro país.

Art. 233 - Os pedidos de registro de expressão e sinal de propaganda e de

declaração de notoriedade serão definitivamente arquivados e os registros e declaração permanecerão em vigor pelo prazo de vigência restante, não podendo ser prorrogados.

Art. 234 - Fica assegurada ao depositante a garantia de prioridade de que trata o art. 7o.da Lei no.5.772, de 21 de dezembro de 1971, até o término do prazo em curso.

Art. 235 - É assegurado o prazo em curso concedido na vigência da Lei no.5.772, de 21 de dezembro de 1971.

Art. 236 - O pedido de patente de modelo ou de desenho industrial depositado na vigência da Lei no.5.772, de 21 de dezembro de 1971, será automaticamente denominado pedido de registro de desenho industrial, considerando-se, para todos os efeitos legais, a publicação já feita.

Parágrafo único - Nos pedidos adaptados serão considerados os pagamentos para efeito de cálculo de retribuição qüinqüenal devida.

Art. 237 - Aos pedidos de patente de modelo ou de desenho industrial que tiverem sido objeto de exame na forma da Lei no.5.772, de 21 de dezembro de 1971, não se aplicará o disposto no art. 111.

Art. 238 - Os recursos interpostos na vigência da Lei no.5.772, de 21 de dezembro de 1971, serão decididos na forma nela prevista.

Art. 239 - Fica o Poder Executivo autorizado a promover as necessárias transformações no INPI, para assegurar à Autarquia autonomia financeira e administrativa, podendo esta:

I - contratar pessoal técnico e administrativo mediante concurso público;

II - fixar tabela de salários para os seus funcionários, sujeita à aprovação do Ministério a que estiver vinculado o INPI; e

III - dispor sobre a estrutura básica e regimento interno, que serão aprovados pelo Ministério a que estiver vinculado o INPI.

Parágrafo único - As despesas resultantes da aplicação deste artigo correrão por conta de recursos próprios do INPI.

Art. 240 - O art. 2o. da Lei no.5.648, de 11 de dezembro de 1970, passa a ter a seguinte redação:

"Art. 2o.- O INPI tem por finalidade principal executar, no âmbito nacional, as normas que regulam a propriedade industrial, tendo em vista a sua função social, econômica, jurídica e técnica, bem como pronunciar-se quanto à conveniência de assinatura, ratificação e denúncia de convenções, tratados, convênios e acordos sobre propriedade industrial".

Art. 241 - Fica o Poder Judiciário autorizado a criar juízos especiais para dirimir questões relativas à propriedade intelectual.

Art. 242 - O Poder Executivo submeterá ao Congresso Nacional projeto de lei destinado a promover, sempre que necessário, a harmonização desta Lei com a política para propriedade industrial adotada pelos demais países integrantes do MERCOSUL.

Art. 243 - Esta Lei entra em vigor na data de sua publicação quanto às matérias disciplinadas nos arts. 230, 231, 232 e 239 e 1 (um) ano após sua publicação quanto aos demais artigos.

Art. 244 - Revogam-se a Lei no. 5.772, de 21 de dezembro de 1971, a Lei no.6.348, de 7 de julho de 1976, os arts. 187 a 196 do Decreto-Lei no.2.848, de 7 de dezembro de 1940, os arts. 169 a 189 do Decreto-Lei no.7.903, de 27 de agosto de 1945, e as demais disposições em contrário.

Brasília, 14 de maio de 1996; 1750. da Independência e 1080. da República.

FERNANDO HENRIQUE CARDOSO
Nelson A. Jobim
Sebastião do Rego Barros Neto
Pedro Malan
Francisco Dornelles
José Israel Vargas

B

**O Instituto**
**Ouvidoria**
**Procuradoria**
**Serviços**
**Articulação**
**Institucional**
**Patentes**
**Marcas**
Quem somos
O que é marca?
O que mudou com
o e-MARCAS?
e-MARCAS
Sobre seu pedido
Como registrar a
sua marca passo a
passo
Manual do
Usuário
Busca
Classificações de
Marcas
Custos dos
serviços
Legislação
Downloads
Dúvidas
Links
Perguntas
Freqüentes
**Contrato de**
**Tecnologia**
**Desenho**
**Industrial**
**Indicação**
**Geográfica**
**Programa de**
**Computador**
**Topografia de**
**Circuitos**
**Informação**
**Tecnológica**
**Centro de**
**Treinamento**
**Academia de**
**Inovação e**
**Propriedade**
**Intelectual**

# RESOLUÇÃO Nº 083/2001

**MINISTÉRIO DO DESENVOLVIMENTO, INDÚSTRIA E COMÉRCIO EXTERIOR**
**INSTITUTO NACIONAL DA PROPRIEDADE INDUSTRIAL**

**PRESIDÊNCIA 14/12/2001**

**RESOLUÇÃO Nº 083/2001**

**Assunto: Normaliza o processamento dos depósitos de pedidos de registro de marca**

**O PRESIDENTE DO INPI,** no uso de suas atribuições legais e **CONSIDERANDO** a necessidade contínua de adequar os procedimentos da área de marcas às disposições constantes da Lei nº 9.279/96, e **CONSIDERANDO** a necessidade de atualizar as orientações administrativas quanto ao processamento de pedidos e registros de marca, em face da atualização das Classificações Internacionais adotadas pelo INPI;

**RESOLVE:**

**I.** Normalizar os processamentos de depósito de registro de marcas, estabelecendo as seguintes regras:

**1. Sobre o Pedido de Registro**

**2. Sobre o Exame do Pedido de Registro**

**3. Sobre a Classificação Internacional de Produtos e Serviços**

**4. Sobre a Classificação Internacional de Elementos Figurativos de Marcas**

**5. Sobre a Desistência de Pedido de Registro**

**6. Sobre Recursos**
6.1 Contra Indeferimento de Pedido de Registro
6.2 Contra Indeferimento Parcial de Pedido de Registro
6.3 Contra Declaração ou Denegação de Caducidade
6.4 Contra Indeferimento ou Deferimento de Pedido de Prorrogação da Vigência de Registro
6.5 Contra Indeferimento ou Deferimento de Pedido de Transferência de Titularidade
6.6 Contra Cancelamento de Registro ou Arquivamento de Pedido, nos termos do art. 135 da Lei da Propriedade Industrial - LPI

**7. Sobre Registros**
7.1 Processo Administrativo de Nulidade
7.2 Prorrogação de Vigência
7.3 Extinção

RESOLUÇÃO Nº 083/2001 — Portal INPI

**Biblioteca**
**Economista**
**Cláudio**
**Treiguer**

**Fórum**
**Chat**


Site anterior

7.3.1 Pela expiração do prazo de vigência
7.3.2 Pela inobservância do disposto no art. 217 da LPI
7.3.3 Pela renúncia
7.4 Caducidade

**8. Sobre ação de Nulidade**

**9. Sobre Prioridade Unionista**

**10. Sobre Cessão de Direitos**

**11. Sobre Anotações**
11.1 Alteração de nome, sede ou endereço
11.2 Limitação ou Ônus

**12. Sobre Certidões**
12.1 Certidão de Busca
12.2 Certidão de Andamento

**13. Sobre Cópia Oficial e Fotocópias**

**14. Sobre Procuração**

**15. Sobre Prazos**
15.1 Contagem de prazo
15.2 Devolução de prazo

**16. Sobre Dados das Publicações**
16.1 Dados que constarão de todas as publicações
16.2 Dados que constarão de publicações específicas

**17. Sobre Devolução de Taxa**

**18. Sobre Restauração de Processos**

**19. Disposições Transitórias e Finais**

**1. Sobre o Pedido de Registro**

**1.1** Conforme estabelecido pelo art. 155 da LPI, o pedido de registro de marca deverá referir-se a um único sinal distintivo. O pedido será submetido a exame formal preliminar, nos termos do art. 156, observado ainda o disposto no artigo 157.
**1.2** O tratamento administrativo, bem como os documentos necessários a instrução do pedido estão contidos no Manual Usuário.

**2. Sobre o Exame do Pedido de Registro**

**2.1** Publicado o pedido de registro, passará a fluir o prazo de 60 (sessenta) dias para apresentação de eventual oposição, que será apresentada em petição, conforme instruções contidas no Manual do Usuário.
**2.1.1** Não se conhecerá da oposição se:

RESOLUÇÃO Nº 083/2001 — Portal INPI                                                                    Page 3 of 13

a) apresentada fora do prazo legal de 60 (sessenta) dias, contados da data da publicação do pedido de registro;
b) desacompanhada do comprovante do pagamento da retribuição correspondente à oposição;
c) não contiver fundamentação legal;
d) fundamentada no inciso XXIII do art. 124 ou no art. 126 da LPI, o oponente não comprovar o depósito do pedido de registro de sua marca no INPI, no prazo de 60 (sessenta) dias, contados do dia imediatamente subseqüente ao da apresentação da oposição, independente de notificação ou exigência por parte do INPI.

**2.1.2** Estando a oposição conforme, o requerente do pedido de registro será intimado, mediante publicação, para se manifestar no prazo de 60 (sessenta) dias, contados da referida publicação.
**2.1.3** Decorrido o prazo para apresentação de oposição ou, se interposta esta, findo o prazo para manifestação do requerente, o pedido de registro será objeto de exame pelo INPI.
**2.1.4** Por ocasião do exame, verificar-se-á se os documentos anexados ao pedido de registro preenchem os requisitos formais exigidos e se estão de acordo com as prescrições legais, procedendo-se à busca de anterioridades e levando-se em conta eventual(ais) oposição(ões).
**2.1.5** Quando necessário, serão formuladas as exigências julgadas cabíveis relativas ao enquadramento técnico do pedido de registro, inclusive aquelas introduzidas pelas classificações internacionais adotadas pelo INPI, que deverão ser respondidas no prazo de 60 (sessenta) dias, contados da data da respectiva publicação.
**2.1.6** Não cumprida a exigência, o pedido de registro será definitivamente arquivado, encerrando-se a instância administrativa, nos termos do § 1º do art. 159 da LPI.
**2.1.7** Cumprida a exigência, ainda que não satisfatoriamente, ou contestada a sua formulação, dar-se-á prosseguimento ao exame do pedido de registro.
**2.1.8** Por ocasião do exame será verificada a existência de impedimento definitivo ou temporário à decisão do pedido de registro, decisão esta que, em se tratando de indeferimento, ou de sobrestamento do seu exame, será publicada, identificando-se o objeto do impedimento.
**2.1.9** A partir da publicação da decisão de deferimento do pedido de registro, da qual não caberá recurso (art. 212, § 2º, da LPI), passará a fluir o prazo de 60 (sessenta) dias para que o requerente comprove o pagamento da retribuição correspondente à expedição do certificado de registro e ao primeiro decênio de proteção de sua vigência, mediante apresentação de requerimento com identificação do signatário, devidamente qualificado, conforme instruções previstas no Manual do Usuário.
**2.1.10** A comprovação do pagamento das retribuições correspondentes à expedição do certificado de registro e ao primeiro decênio de proteção de sua vigência, se não efetuada no prazo de 60 (sessenta) dias, prazo ordinário, poderá ser feita no prazo extraordinário de 30 (trinta) dias, contados a partir do dia imediatamente subseqüente ao dia do término do prazo estabelecido no art. 152 da LPI, independentemente de notificação ou exigência por parte do INPI.
**2.1.11** Comprovado o devido pagamento das retribuições referidas acima, será publicada a concessão do registro. A data desta publicação será a data do respectivo certificado de registro, a partir da qual passará a fluir o prazo decenal de proteção.
**2.1.12** Não havendo a comprovação das retribuições correspondentes nos prazos referidos anteriormente, o pedido será definitivamente arquivado,

encerrando-se a instância administrativa.

### 3. Sobre a Classificação Internacional de Produtos e Serviços

Com a adoção pelo INPI da Classificação Internacional de Produtos e Serviços, a partir de 03.01.2000, mudou-se basicamente o princípio até então estabelecido pela Classificação Nacional (Ato Normativo 051/81), já que na Classificação Internacional os
produtos e os serviços assinalados pela marca pretendida têm de ser especificados. A Lei da Propriedade Industrial em vigor, ao instituir dentre outros, a caducidade parcial e a nulidade parcial, também privilegiou o princípio da especialidade da marca, como
se pode depreender do art. 144 da LPI, pois que estabelece que o registro caducará parcialmente em relação aos produtos e serviços não compreendidos pelo uso da marca, desde que não semelhantes ou afins àqueles para os quais a marca foi comprovadamente usada.

Os instrumentos acima citados, aliados à Classificação Internacional, se afinam, corroborando a obrigatoriedade de que os pedidos de registros contenham a especificação de produtos ou de serviços.

Com a entrada em vigor, em 1º de janeiro de 2002, da oitava edição da Classificação de NICE, se verificará a reestruturação da classe 42, a criação das classes 43, 44 e 45, a supressão de indicações existentes e transferências de indicações para as classes 35, 40
e 41, e revisão da Lista Alfabética de Produtos e Serviços, dos Títulos das classes, Notas Explicativas e Observações Gerais.

A adoção da Classificação Internacional impôs a criação de novos procedimentos administrativos, que têm por finalidade adequar os processos em tramitação à nova realidade por meio da reclassificação, desdobramento e/ou agrupamento de processos, em face da
metodologia de enquadramento dos produtos e serviços da Classificação Internacional de Produtos e Serviços, matéria essa detalhada no Manual do Usuário.

### 4. Sobre a Classificação Internacional de Elementos Figurativos de Marcas

A adoção da Classificação Internacional de Elementos Figurativos de Marcas propicia uma mudança no princípio da definição da proteção requerida e obtida em relação aos elementos figurativos da marca.

Fica estabelecida, através do Ato Normativo 151, de 09 de setembro de 1999, a responsabilidade do usuário na indicação da classificação que contemple o objeto do direito pretendido.

As disposições sobre a Classificação Internacional de Elementos Figurativos de Marcas estão contidas no em Ato Normativo próprio, e as instruções no Manual do Usuário.

### 5. Sobre a Desistência de Pedido de Registro

RESOLUÇÃO Nº 083/2001 — Portal INPI

5.1 A desistência do pedido de registro poderá ser apresentada a qualquer momento antes da data de publicação da concessão e será instruída com os documentos discriminados no Manual do Usuário.

## 6. Sobre Recursos

**A)** A decisão proferida em primeira instância cabe recurso, nos termos do art. 212 da LPI, que serão decididos pelo Presidente do INPI, cuja decisão é final e irrecorrível na esfera administrativa.

**B)** Não se conhecerá do recurso se:

**(i)** interposto fora do prazo legal de 60 (sessenta) dias, contados da data da publicação do pedido de registro;

**(ii)** desacompanhado do comprovante do pagamento da retribuição correspondente; e

**(iii)** não contiver fundamentação legal;

**6.1** Contra Indeferimento de Pedido de Registro

**6.1.1** Da decisão que indeferir o pedido de registro caberá recurso, no prazo de 60 (sessenta) dias, contados da data da respectiva publicação.

**6.1.2** Não sendo interposto recurso do ato que indeferir o pedido de registro, ou, se interposto este, não for o mesmo conhecido, o INPI publicará o arquivamento definitivo do pedido de registro, encerrando-se a instância administrativa.

**6.1.3** Se o recurso estiver conforme, será publicado e, da data da publicação, passará a fluir, automaticamente, o prazo de 60 (sessenta) dias para apresentação de contra-razões pelos interessados. Findo esse prazo, o recurso será objeto de exame.

**6.1.4** Por ocasião do exame do recurso, o INPI poderá formular as exigências necessárias ao exame, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**6.1.5** Verificada, no momento do exame, a existência de impedimentos temporários à decisão do recurso, será publicado o sobrestamento do seu exame, identificando-se o objeto do impedimento.

**6.1.6** Concluído o exame do recurso, será publicada a decisão, mantendo-se o indeferimento ou reformando-o, para deferir o pedido de registro.

**6.1.7** A partir da data da publicação da decisão que reformar o ato indeferitório de primeira instância, para deferir o pedido de registro, passará a fluir o prazo de 60 (sessenta) dias para que o requerente quando domiciliado no Brasil ou seu procurador comprove o pagamento da retribuição correspondente à expedição do certificado de registro e ao primeiro decênio de proteção de sua vigência, mediante apresentação de requerimento, em língua portuguesa, com a assinatura do requerente quando domiciliado no Brasil ou seu procurador, com identificação do signatário, devidamente qualificado, conforme instruções previstas no Manual do Usuário.

**6.1.8** A comprovação do pagamento das retribuições correspondentes à expedição do certificado de registro e ao primeiro decênio de proteção de sua vigência, se não efetuada no prazo de 60 (sessenta) dias, prazo ordinário, poderá ser feita no prazo de 30 (trinta) dias, prazo extraordinário, contados a partir do dia imediatamente subseqüente ao dia do término do prazo estabelecido no art. 152 da LPI, independentemente de notificação ou exigência por parte do INPI.

**6.1.9** Comprovado o devido pagamento das retribuições referidas acima, será publicada a concessão do registro. A data desta publicação será a data do respectivo certificado de registro, a partir da qual passará a fluir o prazo decenal de proteção.

**6.1.10** Não havendo a comprovação das retribuições correspondentes nos prazos referidos anteriormente, o pedido será definitivamente arquivado, encerrando-se a instância administrativa.

**6.2** Contra Indeferimento Parcial de Pedido de Registro

**6.2.1** O deferimento com restrições será considerado pelo INPI como um indeferimento parcial, motivo pelo qual será admitida a interposição de recurso contra o indeferimento parcial, que deverá observar o prazo previsto em Lei, no caso do depositante discordar do mesmo.

**6.2.2** O recurso contra o indeferimento parcial deverá ser apresentado simultaneamente com a comprovação do pagamento da retribuição correspondente à expedição do certificado de registro e ao primeiro decênio de proteção de sua vigência, nos termos do art. 152 da LPI.

**6.2.3** Não sendo interposto recurso do ato que indeferir parcialmente o pedido de registro, ou, se interposto este, não for o mesmo conhecido, o INPI publicará a concessão do registro, consoante decisão de primeira instância.

**6.2.4** Se o recurso estiver conforme, será publicado e, da data da publicação, passará a fluir, automaticamente, o prazo de 60 (sessenta) dias para apresentação de contra-razões pelos interessados. Findo esse prazo, o recurso será objeto de exame.

**6.2.5** Por ocasião do exame do recurso, o INPI poderá formular as exigências necessárias ao exame, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**6.2.6** Concluído o exame do recurso, será publicada a decisão, mantendo-se a decisão recorrida, ou reformando-a, quando será publicada a concessão do registro, nos termos da decisão de segunda instância, caso o depositante tenha observado o item 6.2.2 deste ato. A data desta publicação será a data do respectivo certificado de registro, a partir da qual passará a fluir o prazo decenal de proteção.

**6.2.7** Não havendo a comprovação das retribuições correspondentes nos prazos referidos nos itens anteriores, o recurso perderá o seu objeto e o pedido será definitivamente arquivado, encerrando-se a instância administrativa.

**6.3** Contra Declaração ou Denegação de Caducidade

**6.3.1** Da decisão que declarar ou denegar a caducidade do registro caberá recurso, no prazo de 60 (sessenta) dias, contados da data da respectiva publicação.

**6.3.2** Se o recurso estiver conforme, o mesmo será publicado, e, da data da publicação, passará a fluir, automaticamente, o prazo de 60 (sessenta) dias para apresentação de contra-razões pelo(s) interessado(s). Findo esse prazo, o recurso será objeto de exame.

**6.3.3** Por ocasião do exame de recurso, o INPI poderá formular as exigências necessárias, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**6.3.4** Concluído o exame do recurso, será publicada a decisão, encerrando-se a instância administrativa do processo de caducidade.

**6.4** Contra Indeferimento ou Deferimento de Pedido de Prorrogação da Vigência de Registro

**6.4.1** Da decisão que indeferir ou deferir o pedido de prorrogação da vigência de registro caberá recurso, no prazo de 60 (sessenta) dias, contados da data da

RESOLUÇÃO Nº 083/2001 — Portal INPI

respectiva publicação.

**6.4.2** Se o recurso estiver conforme, o mesmo será publicado, e, da data da publicação, passará a fluir, automaticamente, o prazo de 60 (sessenta) dias para apresentação de contra-razões pelo(s) interessado(s). Findo esse prazo, o recurso será objeto de exame.

**6.4.3** Por ocasião do exame de recurso, o INPI poderá formular as exigências necessárias, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**6.4.4** Concluído o exame do recurso, será publicada a decisão.

**6.5** Contra Indeferimento ou Deferimento de Pedido de Transferência de Titularidade

**6.5.1** Da decisão que indeferir ou deferir o pedido de transferência de titularidade caberá recurso, no prazo de 60 (sessenta) dias, contados da data da respectiva publicação.

**6.5.2** Se o recurso estiver conforme, o mesmo será publicado, e, da data da publicação, passará a fluir, automaticamente, o prazo de 60 (sessenta) dias para apresentação de contra-razões pelo(s) interessado(s). Findo esse prazo, o recurso será objeto de exame.

**6.5.3** Por ocasião do exame de recurso, o INPI poderá formular as exigências necessárias, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**6.5.4** Concluído o exame do recurso, será publicada a decisão.

**6.6** Contra Cancelamento de Registro ou Arquivamento de Pedido, nos termos do art. 135 da LPI

**6.6.1** Da decisão que cancelar o registro ou que arquivar o pedido de registro por infringir o art.135 da LPI caberá recurso, no prazo de 60 (sessenta) dias, contados da data da respectiva publicação.

**6.6.2** Se o recurso estiver conforme, o mesmo será publicado, e, da data da publicação, passará a fluir, automaticamente, o prazo de 60 (sessenta) dias para apresentação de contra-razões pelo(s) interessado(s). Findo esse prazo, o recurso será objeto de exame.

**6.6.3** Por ocasião do exame de recurso, o INPI poderá formular as exigências necessárias, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**6.6.4** Concluído o exame do recurso, será publicada a decisão.

### 7. Sobre Registros

**7.1** Processo Administrativo de Nulidade

**7.1.1** O processo administrativo de nulidade poderá ser instaurado pelo INPI ou a requerimento de pessoa com legítimo interesse, que será apresentado através de petição, conforme instruções previstas no Manual do Usuário.

**7.1.2** Não se conhecerá do pedido de processo administrativo de nulidade de registro se:

a) instaurado ou apresentado fora do prazo legal de 180 (cento e oitenta) dias, contados da data da concessão do registro;

b) desacompanhado do comprovante da retribuição correspondente, quando não instaurado de ofício pelo INPI;

c) não contiver fundamentação legal;

d) requerido por pessoa sem legítimo interesse; quando fundamentado no inciso XXIII do art. 124 ou no art. 126, o requerente da nulidade não comprovar o depósito do pedido de registro de sua marca no INPI, no prazo de 60 (sessenta)

dias, contados do dia imediatamente subseqüente ao da apresentação do requerimento da nulidade administrativa, independentemente de notificação ou exigência por parte do INPI.

**7.1.3** Estando conforme o pedido de instauração de processo administrativo de nulidade, será o titular do registro intimado, mediante publicação, para se manifestar no prazo de 60 (sessenta) dias, contados da data da referida publicação.

**7.1.4** Decorrido o prazo fixado acima, mesmo que não apresentada manifestação e ainda que extinto o registro, o processo administrativo de nulidade será objeto de exame e decisão.

**7.1.5** Por ocasião do exame do processo administrativo de nulidade, o INPI poderá formular as exigências necessárias à sua instrução e decisão, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**7.1.6** Por ocasião do exame, verificada a existência de impedimento temporário à decisão do processo administrativo de nulidade, será publicado o sobrestamento do seu exame, identificando-se o objeto do impedimento.

**7.1.7** Concluído o exame do processo administrativo de nulidade, será publicada a decisão, mantendo-se o registro ou declarando-se sua nulidade, total ou parcial.

**7.1.8** A decisão proferida no processo administrativo de nulidade encerrará a instância administrativa do feito.

### 7.2 Prorrogação de Vigência

**7.2.1** O pedido de prorrogação de vigência de registro deverá ser formulado durante o último ano de vigência do registro.

**7.2.2** Se não efetuado no prazo mencionado no item anterior, o pedido de prorrogação de vigência de registro poderá, ainda, ser formulado no prazo de 06 (seis) meses, contados a partir do dia imediatamente subseqüente ao dia do término da vigência do registro, independentemente de qualquer notificação por parte do INPI.

**7.2.3** A prorrogação não será concedida se não atendido o disposto no art. 128 da LPI, segundo estabelece o § 3º do art. 133 da LPI.

**7.2.4** Quando não instruir o pedido de prorrogação, a procuração deverá ser apresentada no prazo de 60 (sessenta) dias, contados a partir do dia imediatamente subseqüente ao dia da apresentação do pedido de prorrogação, independentemente de notificação ou exigência por parte do INPI, sob pena de arquivamento do pedido de prorrogação.

**7.2.5** Por ocasião do exame do pedido de prorrogação serão formuladas as exigências julgadas cabíveis, inclusive aquelas introduzidas pelas Classificações Internacionais adotadas pelo INPI, que deverão ser respondidas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**7.2.6** Decorrido o prazo referido acima, o pedido de prorrogação será examinado. Concluído o exame, será publicada a decisão.

### 7.3 Extinção

**7.3.1** Pela Expiração do Prazo de Vigência

Expirado o prazo de vigência do registro e observado o prazo extraordinário de 6 (seis) meses, previsto no parágrafo segundo do art. 133 da LPI, sem que tenha havido a competente prorrogação, será publicada a extinção do registro.

**7.3.2** Pela Inobservância do Disposto no art. 217 da LPI

Constatada a ausência de procuração nos termos do art. 217 da LPI, será publicada a extinção do registro.

**7.3.3** Pela Renúncia

**7.3.3.1** A renúncia ao registro poderá ser apresentada a qualquer momento após

a sua concessão, podendo ser total ou parcial em relação aos produtos ou serviços, especificados por classe, nos termos da Classificação Internacional de Produtos e Serviços vigente, assinalados pela marca, e deverá ser instruída com os documentos previstos no Manual do Usuário.

**7.4** Caducidade

**7.4.1** O pedido de Caducidade será indeferido se o requente não justificar o seu legítimo interesse.

**7.4.2** Não se conhecerá do requerimento de declaração de caducidade de registro de marca se:

a) na data do requerimento, não tiverem decorrido, pelo menos 05 (cinco) anos da data da concessão do registro;

b) na data do requerimento, o uso da marca tiver sido comprovado ou justificado seu desuso por razões legítimas, em processo anterior, requerido há menos de 05 (cinco) anos;

c) desacompanhado do comprovante do pagamento da retribuição correspondente.

**7.4.3** Estando conforme o requerimento de declaração de caducidade de registro, será o titular intimado, mediante publicação, para comprovar o uso da marca ou justificar seu desuso por razões legítimas, no prazo de 60 (sessenta) dias, contados da data da referida publicação.

**7.4.4** Por ocasião do exame das provas de uso apresentadas, o INPI poderá formular as exigências necessárias, que deverão ser cumpridas no prazo de 60 (sessenta) dias, contados da respectiva publicação.

**7.4.5** Concluído o exame, será publicada a decisão, declarando a caducidade do registro, que poderá ser parcial (art. 144 da LPI), em face dos produtos ou serviços especificados ou em face da classe reivindicada, ou denegando a caducidade do registro, se provado o uso para todos os produtos ou serviços especificados na classe em que a marca estiver registrada.

**7.4.6** A desistência do pedido de caducidade será homologada pelo INPI, em qualquer fase processual.

## 8. Sobre Ação de Nulidade

A ação de nulidade, que prescreve em 5 (cinco) anos da prática do ato administrativo, poderá ser proposta pelo INPI ou qualquer pessoa com legítimo interesse, a contar da data da publicação na Revista da Propriedade Industrial - RPI, conforme estabelecem os arts. 173, 174, e 175 da LPI.

## 9. Sobre Prioridade Unionista

**9.1** O direito de prioridade de depósito assegurado por acordos que o Brasil mantenha com países ou organizações internacionais está previsto no artigo 127 da LPI. No caso da Convenção da União de Paris (CUP), o direito deverá ser exercido no prazo de 06 (seis) meses, contados da data de depósito mais antiga.

**9.2** A reivindicação de prioridade, deverá ser requerida obrigatoriamente no ato do depósito e comprovada por documento hábil da origem, contendo o número, a data e a reprodução do pedido ou do registro, acompanhado da tradução simples do documento, em até 04 (quatro) meses, contados da data do depósito.

**9.3** Quando a prioridade tiver sido obtida por cessão, deverá ser apresentado juntamente com o documento da prioridade o respectivo instrumento de cessão ou a declaração de cessão, acompanhado da tradução simples e dispensada a legalização consular.

**9.4** As formalidades do documento de cessão do direito de prioridade serão

RESOLUÇÃO Nº 083/2001 — Portal INPI

aquelas determinadas pela legislação do país onde houver sido firmado.
**9.5** A reivindicação de prioridade não isenta o pedido da aplicação dos
dispositivos legais constantes da LPI, no que couber.

## 10. Sobre Cessão de Direitos

**10.1** A cessão poderá ser comprovada por qualquer documento hábil que
demonstre a transferência da titularidade do pedido ou do registro da marca,
tais como por incorporação, cisão, fusão, sucessão legítima ou testamentária ou
determinação judicial.
**10.2** O INPI fará a anotação da cessão, fazendo constar a qualificação completa
do cessionário, e a publicará, para que produza efeitos em relação a terceiros.
**10.3** No caso de cessão de registro de marca que se encontre em fase de exame
de prorrogação ou concessão de registro, o certificado já será expedido em nome
do cessionário.
**10.4** Da decisão que indeferir a anotação de cessão ou que cancelar registro ou
arquivar pedido, nos termos do art. 135 da LPI, caberá recurso, no prazo de 60
(sessenta) dias, contados da respectiva publicação, cuja decisão encerrará a
instância administrativa.
**10.5** O pedido de anotação da cessão será instruído com os documentos
previstos no Manual do Usuário.

## 11. Sobre Anotações

**11.1** Alteração de Nome, Sede ou Endereço
**11.1.1** O INPI fará a anotação das alterações de nome, de sede ou de endereço e a
publicará, para que produza efeitos em relação a terceiros.
**11.1.2** No caso de alteração de nome, de sede ou de endereço em registro que se
encontre em fase de exame de prorrogação ou concessão de registro, o
certificado já será expedido com o nome e/ou sede ou endereço alterados.
**11.1.3** O pedido de anotação de alteração de nome, de sede ou de endereço do
requerente ou titular será instruído com os documentos previstos no Manual do
Usuário.

**11.2** Limitação ou Ônus
O INPI fará anotação de qualquer limitação ou ônus que recaia sobre pedido de
registro ou registro, mediante comprovação específica, fazendo-a publicar, para
que produza efeitos em relação a terceiros, na Revista da Propriedade Industrial
- RPI.

## 12. Sobre Certidões

A Diretoria de Marcas expedirá as certidões demandadas pelos usuários, quais
sejam:

**12.1** Certidão de Busca
Procedida pelo Setor de Buscas, consistirá de pesquisa sobre pedidos e registros
de marcas, por classe e por titular.
**12.2** Certidão de Andamento
Procedida pelo Núcleo de Expedição de Certificados, consistirá de informações
sobre a situação dos processos.
**12.3** Os pedidos de Certidão de Busca e de Certidão de Andamento serão
instruídos com os documentos previstos no Manual do Usuário.

### 13. Sobre Cópia Oficial e Fotocópias

A Diretoria de Marcas preparará Cópias Oficiais e extrairá Fotocópias de documentos relativos a processos, mediante requerimento de interessados, conforme instruções previstas no Manual do Usuário.

### 14. Sobre Procuração

**14.1** Quando o ato não for praticado pelo interessado domiciliado no país pessoalmente, deverá ser apresentado o instrumento de procuração juntamente com o requerimento, ou no prazo de 60 (sessenta) dias, contados a partir do dia imediatamente subseqüente ao do primeiro ato da parte no processo, nos termos do art. 215 da LPI, independentemente de notificação ou exigência por parte do INPI.

**14.2** Para a apresentação do respectivo instrumento, deverão ser observados a forma e o prazo estabelecidos no parágrafo 2º do art. 215 da LPI, independentemente de notificação ou exigência por parte do INPI, sob pena de arquivamento, conforme previsto nesse dispositivo legal.

**14.3** Em se tratando de pessoa domiciliada no exterior, a procuração é obrigatória e deve atender ao disposto no art. 217 da LPI.

### 15. Sobre Prazos

**15.1** Contagem de Prazo

**15.1.1** A contagem de prazo é contínua, extinguindo-se automaticamente o direito de praticar o ato após seu decurso.

**15.1.2** Este dispositivo, contemplado no art. 221 da LPI, ressalva o ato não realizado por justa causa.

**15.1.3** Entende-se por justa causa o evento imprevisto, alheio à vontade da parte e que a impediu de praticar o ato. Sendo reconhecida a justa causa, a parte praticará o ato, no prazo que lhe for concedido pelo INPI.

**15.1.4** Para fins de contagem dos prazos, devem ser observadas as regras previstas no Manual do Usuário.

**15.2** Devolução de Prazo

**15.2.1** O pedido para concessão de prazo adicional para a prática de ato não realizado por justa causa, deverá ser apresentado mediante requerimento, conforme modelo instituído, com a assinatura do requerente, com a identificação do signatário, devidamente qualificado, conforme instrução prevista no Manual do Usuário.

**15.2.2** Reconhecida pelo INPI a justa causa que impediu a parte de praticar o ato no prazo legal, o INPI dará ciência ao interessado, na forma do art. 226 da LPI, sobre o prazo que lhe foi concedido, o qual não poderá ser menor que 15 (quinze) dias e maior do que 60 (sessenta) dias.

**15.2.3** Na hipótese de o INPI não acolher o pedido de devolução de prazo, por não reconhecer como justa a causa argüida pela parte, o INPI publicará, na forma do art. 226 da LPI, o indeferimento deste pedido.

**15.2.4** O INPI assegurará aos interessados o fornecimento de cópias oficiais, certidões ou fotocópias, regularmente requeridas, com relação às matérias de que trata a LPI, no prazo de 30 (trinta) dias, salvo por razões justificadas.

**15.2.5** O não fornecimento pelo INPI, no prazo previsto no item anterior, de fotocópias de peças processuais, necessárias à fundamentação de quaisquer das medidas administrativas previstas na LPI, não desobriga o interessado de apresentar a respectiva petição dentro do prazo legal previsto, acompanhada do

comprovante da retribuição correspondente.

**15.2.6** Fornecidas as fotocópias a que se refere o item anterior, o interessado poderá apresentar, no prazo que lhe for concedido pelo INPI, argumentos suplementares, através de petição, isenta de recolhimento de retribuição, acompanhada de cópia do pedido de fotocópia, no qual conste a data do atendimento do pedido.

### 16. Sobre Dados das Publicações

A disponibilizarão de dados através da Internet, ou por qualquer outro meio eletrônico, se constitui em alternativa de consulta para o usuário, já que o órgão oficial de publicação dos atos praticados pela Diretoria de Marcas, é a REVISTA DA PROPRIEDADE INDUSTRIAL – RPI, conforme previsto no art. 226 da LPI.

**16.1** Dados que constarão de todas as publicações:
a) número e data do pedido de registro ou do registro de marca;
b) código do despacho correspondente;
c) nome do depositante ou do titular;
d) Sigla do país, do organismo internacional ou, no caso do Brasil, sigla do País e Unidade da Federação;
e) Procurador/Interessado.

**16.2** Dados que constarão de publicações específicas
**16.2.1** Pedidos comunicados, indeferimento e deferimento de pedido, concessão e prorrogação de registro e suas respectivas retificações:
a) marca;
b) natureza e forma de apresentação da marca;
c) Classificação Internacional de Elementos Figurativos;
d) Classificação Internacional de Produtos e Serviços;
e) especificação dos produtos ou serviços que a marca visa assinalar;
f) dados da prioridade, se for o caso, quando se tratar de pedido de registro.
**16.2.2** Das publicações de intimação de oposição, interposição de recursos de terceiros, instauração de processo administrativo de nulidade e requerimento de declaração de caducidade, além dos dados constantes do item 16.1, também constará o nome do oponente, recorrente ou requerente.
**16.2.3** Além dos dados referidos nos itens 16.1 e 16.2.1, das publicações de deferimento do pedido de registro, de concessão e de prorrogação de registro, constará a eventual anotação sobre a restrição da proteção conferida à marca.
**16.2.4** Além dos dados do item 16.1, das publicações de decisões de sobrestamento, constará o objeto do impedimento.
**16.2.5** Das publicações de decisões de indeferimento dos pedidos de registro, além dos dados referidos nos itens 16.1 e 16.2.1, constarão a base legal e eventuais complementos.
**16.2.6** Das publicações de decisões de deferimento ou indeferimento de recursos, dos processos administrativos de nulidade e de declaração de caducidade, bem como das publicações de extinção de registros constarão a base legal e eventuais complementos, além dos dados do item 16.1.
**16.2.7** Das publicações de instauração de processo administrativo de nulidade instaurada de ofício, além dos dados constantes do item 16.1, constarão a base legal e eventuais complementos.
**16.2.8** Das publicações de intimação de requerimento de declaração de caducidade, além dos dados constantes do item 16.1, também constarão o nome do requerente, o nº da petição, a data em que foi protocolada e a sigla da Unidade do INPI que recebeu o documento.

RESOLUÇÃO Nº 083/2001 — Portal INPI

**16.2.9** Das publicações de anotação de cessão de direitos, além dos dados constantes do item 16.1, constará(ão) o(s) nome(s) do(s) cedente(s) e do (s) cessionário(s).

### 17. Sobre Devolução de Taxa

**17.1** Não será restituída a retribuição devidamente recolhida.
**17.2** O pedido de devolução de preço público deve ser dirigido à Diretoria de Administração Geral, conforme condições estabelecidas pela mesma.
**17.3** As instruções sobre o formulário, retribuição devida e demais documentos necessários à aceitação desta solicitação são estabelecidas pela Diretoria de Administração Geral do INPI.

### 18. Sobre Restauração de Processos

**18.1** O pedido de restauração de processos poderá ser apresentado ao INPI pelo requerente do pedido/titular do registro, ou seu representante legal, e deverá ser instruído com os documentos previstos no Manual do Usuário.

**18.2** O pedido de restauração de processos é um serviço isento de retribuição.

**18.3** Somente poderá ser solicitado este serviço para processos efetivamente protocolizado.

### 19. Disposições Transitórias e Finais

**19.1** As instruções sobre o preenchimento, recebimento e aceitação do comprovante do pagamento da retribuição devida são estabelecidas pela Diretoria de Administração Geral do INPI.

**19.2** As Petições somente serão protocolizadas, quando atendidas as formalidades legais.

**19.3** O processamento do exame de marcas de alto renome, art. 125 da LPI, será objeto de ato específico.

**19.4** As Papeletas de Reclamação, que devem ser protocolizadas, têm por finalidade solicitar consultas e/ou requerer retificações de publicações incorretas. As questões relativas ao exame de mérito devem ser apresentada através de petição própria, devidamente protocolizada.
**19.5** Somente será permitido postular perante o INPI o próprio, quando domiciliado no Brasil, Advogado, devidamente inscrito na OAB, e Agente da Propriedade Industrial cadastrado no INPI.

Esta Resolução entrará em vigor no dia 02 de janeiro de 2002, revogado o Ato Normativo 154, de 21 de dezembro de 1999 e quaisquer disposições em contrário, no que se refere às marcas.

**José Graça Aranha - Presidente**

C



PODER JUDICIÁRIO
TRIBUNAL DE JU.3TIÇA DE SÃO PAULO



TRIBUNAL DE JUSTIÇA DE SAO PAULO
ACÓRDÃO/DECISÃO MONOCRATICA
REGISTRADO(A) SOB N°

ACÓRDÃO

Vistos, relatados e discutidos estes autos de APELAÇÃO CÍVEL COM REVISÃO nº 155.327-4/3-00, da Comarca de SÃO PAULO, em que é apelante MADIPLA PRESTAÇÃO DE SERVIÇOS S. C. LTDA. sendo apelado GRILL PALACE RESTAURANTE:

ACORDAM, em Quinta Câmara de Direito Privado do Tribunal de Justiça do Estado de São Paulo, proferir a seguinte decisão: "NEGARAM PROVjMENTO AO RECURSO, V.U.", de conformidade com o voto do Relator, que integra este acórdão.

O julgamento teve a participação dos Desembargadores DIMAS CARNEIRO e FRANCISCO CASCONI.

São Paulo, 27 de junho de 2007.

A. C. MATHIAS COLTRO
Presidente e Relator

*S-Tre/Hínoi' d& Jfiisiiça do- &tacío~ c/& dao- SZUí/O-*

5ª CÂMARA - SEÇÃO DE DIREITO PRIVADO
APELAÇÃO N² 1 55.327 4/3-00 - VOTO 1 2357
COMARCA: SÃO PAULO — F.REG SANTO AMARO (6ª VARA - PROC. 1039/1999)
RECORRENTE(S)  MADIPLA PRESTAÇÃO DE SERVIÇOS S/C LTDA
RECORRIDO(S)' GRILL PALACE RESTAURANTE:
NATUREZA: MARCAS E PATENTES E RESCISÃO CONTRATUAL

EMENTA MARCAS E PATENTES — PEDIDO DE RESCISÃO DE CONTRATO — ILEGITIMIDADE DO PÓLO ATIVO - AUTORA QUE CEDEU E TRANSFERIU OS DIREITOS SOBRE A MARCA - CESSÃO DE REGISTRO QUE PRODUZ EFEITOS EM RELAÇÃO A TERCEIROS E A PARTIR DA PUBLICAÇÃO — TEMPO DECORRIDO QUE GERA EFEITO *ERGA OMNES* — SENTENÇA MANTIDA - RECURSO IMPROVIDO

Recurso contra a respeitável sentença de fls. 274 e seguintes, acolhendo a alegação de ilegitimidade de parte, revogando a liminar que antecipou os efeitos da tutela e extinguindo o processo sem julgamento do mérito, determinando, ainda, que a ré responda pelas custas do retardamento, desde a contestação, mas fazendo jus aos honorários advocatícios, e condenando a autora por litigância de má-fé, por ter omitido a transferência dos direitos da referida marca.

Pretende a apelante a reforma do *decisum* , afirmando ter o e. juízo acolhido tese trazida em contestação intempestiva, acrescentando que o fato da transferência da marca para o Restaurante Dinho's Place Ltda, empresa que é dos mesmos sócios da apelante, "é absolutamente irrelevante ao deslinde da controvérsia, haja vista a necessidade do provimento jurisdicional desconstitutivo da licença", além de a lei da

Propriedade Industrial somente atribuir validade às transferências após a publicação de seu respectivo deferimento, "o que ainda não veio de ocorrer".

Processado o apelo sem apresentação das contra-razões, nesta instância foi determinada a expedição de ofício ao INPI (fls. 339 e seguintes).

E o relatório, adotado, no mais, o da sentença.

A Madipla Prestação de Serviços S/C Ltda ajuizou ação ordinária contra o Grill Palace Restaurante Ltda, alegando ser uma sociedade por quotas de responsabilidade limitada, exclusivamente destinada à administração e gerenciamento da marca de serviços "DINHO'S PLACE" e, como tal, em 12.09.83 firmou contrato de licença com o réu para uso de marca. Dentre as diversas cláusula e condições constou ser motivo de rescisão imediata "A cessão, transferência ou alienação do controle acionário da licenciada por parte de seus atuais sócios a terceiros".

Na época figuravam como sócios do requerido Jorge Scaff e Ferdinando João Carollo, porém, em meados de 1990, em razão de alteração contratual do requerido, procedeu-se a nova autorização, com expressa anuência da autora, para uso da marca, desde que se mantivesse o sócio Fernando João Carollo, juntamente com a empresa "Comercial, Empreendimentos e Participações 4B Ltda", pertencente à família Bordon. ^-^7

Ocorre    que    em    25.9.98,    a    "Comercial, Empreendimentos e Participações 4B Ltda", retirou-se da sociedade, cedendo e transferindo a totalidade de suas quotas a Narivalda Alves de Mendonça, sem que a autora fosse comunicada quanto a tal alteração, infringindo cláusula contratual e ensejando o pedido de rescisão do contraio.

A ação foi contestada e, posteriormente a requerida trouxe aos autos nova manifestação, na qual argüiu a ilegitimidade da autora, já que em 17.3.1997 teria ela firmado documento de cessão e transferência da marca "Dinho's Place", registrada sob n° 750.151.264 para a empresa "Restaurante Dinho's Place Ltda" , solicitando a averbação no INPI, no dia 07.07.97. Acrescentou que no tocante à marca "Dinho's Place", registrada sob n° 006.651.640, também teria ocorrido a cessão e transferência em 17.3.1997, com pedido de averbação em 11.6.1997..

Portanto, sustenta a requerida que a propriedade das duas marcas foi cedida e transferida para a empresa "Restaurante Dinho's Place Ltda".

Conforme ofício do INPI, a marca nominativa "Dinho's Place", registrada sob n° 750161264 e aquela sob n° 006651640, foram transferidas para "Restaurante Dinho's Place Ltda", conforme requerimento junto àquela Instituição em 07.07.1997, sendo publicadas as transferências em 06.03.2001, na RPI 1574 (fls. 339).

Assim, tem-se como correto o entendimento do juízo de primeiro grau ao acolher a argüição de ilegitimidade ativa que, tratando-se de matéria de ordem pública, pode ser a qualquer momento apreciada.

Nos termos da lei 9279/96, art. 136, cabe ao INPI proceder a anotações nos casos de cessão e transferência e, a partir do instante em que as partes formalizam o contrato, mediante ato formal, a transmissão se consolida.

Ainda e nos termos do art. 137 da mesma lei, *"As anotações produzirão efeitos em relação a terceiros a partir da data de  sua publicação"*

No presente caso, observa-se que em 1997 foi elaborado documento de cessão e transferencia, com protocolo no INPI em 11.06.1997. Portanto, a partir de tal circunstância, tem-se que a propriedade da marca não mais pertencia à autora, motivo pelo qual a ilegitimidade ativa é evidente.

Ainda e no tocante ao art. 137, como salientado na sentença "o fato é que o efeito *erga omnes* da relação absoluta estabelecida entre o titular e a propriedade é negativo, vale dizer, deve ser oposto em sentido contrário por terceiro que se julgue prejudicado, não pelo cessionário do direito, que se demitiu, com a cessão, de qualquer poder jurídico para invocar proteção sobre o que não mais possui".

APELAÇÃO Nº 155.327.4/3-00 -VOTO 12357                    4

Outrossim e quanto à litigância de má-fé fica mantida, pois a autora omitiu na inicnal a cessão e transferência da propriedade da marca, questão fundamental à lide.

Como corolário, nenhuma reforma comporta a sentença.

Ante o exposto, nega-se provimento ao recurso.

^Li/ator

APELAÇÃO Nº 155 327.4/3-00 - VOTO 12357

13



PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA DE SÃO PAULO

ACÓRDÃO



TRIBUNAL DE JUSTIÇA DE SÃO PAULO
ACÓRDÃO/DECISÃO MONOCRÁTICA
REGISTRADO(A) SOB Nº

*01250091*

     Vistos, relatados e discutidos estes autos de APELAÇÃO CÍVEL COM REVISÃO nº 448.414-4/1-00, da Comarca de SÃO PAULO, em que são apelantes MASSA FALIDA de O ALQUIMISTA COSMÉTICOS LTDA. e G BRASIL INDÚSTRIA E COMÉRCIO LTDA. sendo apelados MASSA FALIDA de GIOVANNA FÁBRICA LTDA. e NOTEC COMERCIAL LTDA.:

     ACORDAM, em Décima Câmara de Direito Privado do Tribunal de Justiça do Estado de São Paulo, proferir a seguinte decisão: "NEGARAM PROVIMENTO AOS RECURSOS, AFASTADA A QUESTÃO INCIDENTAL TRAZIDA NA PETIÇÃO DE FLS. 1360/1364, V.U.", de conformidade com o voto do Relator, que integra este acórdão.

     O julgamento teve a participação dos Desembargadores TESTA MARCHI e GALDINO TOLEDO JÚNIOR.

     São Paulo, 13 de março de 2007.

OCTAVIO HELENE
Presidente e Relator

87

 TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**APELAÇÃO CÍVEL n° 448.414-4/1-00**
**Comarca: São Paulo**

**Apelantes:** O Alquimista Cosméticos Ltda. (Massa Falida) e outro
**Apelados:** Giovanna Fabrica Ltda (Massa Falida) e outros

**Voto n° 9.672**

> **Ementa: Ação Revocatória – Alienação de marcas de fábrica devidamente registradas – Propósito de subtrair da falida bens de seu ativo em prejuízo dos credores – Requisitos do "consilium fraudis" e do "eventus damni" evidenciados – Ação Procedente – Sentença mantida – Preliminares rejeitadas - Recursos improvidos – Questão incidental afastada.**

Vistos, relatados e discutidos estes autos de Apelação Cível n° 448.414-4/1-00, da Comarca de São Paulo, em que são apelantes O Alquimista Cosméticos Ltda. (Massa falida) e outro, sendo apelados Giovanna Fabrica Ltda. (Massa Falida) e outros

ACORDAM, em Décima Câmara de Direito Privado do Tribunal de Justiça do Estado de São Paulo, por votação unânime, rejeitadas as preliminares arguidas, **negar provimento aos recursos**, dando por afastada a questão incidental

2

 TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

1. **MASSA FALIDA GIOVANNA FÁBRICA Ltda.**, por intermédio de seu síndico, propôs ação revocatória, com pedido de antecipação de tutela, objetivando a revogação ou a declaração de ineficácia da alienação das marcas de fábrica indicadas nos autos, com registro na repartição competente, valendo-se do disposto no artigo 53 da Lei de Falência vigente à época (Decreto-lei 7661/45) A demanda veio justificada na alegação de existência de plano elaborado com o propósito de subtrair da falida valiosos bens de seu ativo, em prejuízo a credores, bem como no fato de existir relacionamento afetivo entre os representantes legais da requerente e da requerida, configurando o *consilium fraudis* e o *eventus damni*, dada a simulação da venda

Sentenciado o feito, foi julgada procedente a demanda para, com fundamento no artigo 53 do Decreto-lei 7661/45, **I)** declarar ineficaz em relação à Massa Falida de Giovanna Fábrica Ltda , autora, os atos ilegais, porque fraudatórios, de cessão dos direitos marcários especificados nos instrumentos de fls 07/38; **II)** condenar as requeridas Massa Falida de O Alquimista Cosméticos Ltda e Giovanna Baby Indústria e Comércio Ltda sucedida por G Brasil Indústria e Comércio Ltda a restituir o valor dos lucros potenciais com a exploração das marcas fraudulentamente subtraídas do patrimônio da Giovanna Fábrica Ltda , apurados em liquidação por artigos, no período de 17/02/1996 até a efetiva restituição dos direitos marcários à Massa Falida autora, deduzindo-se os valores depositados à ordem deste Juízo pela Notec Comercial Ltda , **III)** declarar nulos e ineficazes ex tunc, como se nunca tivessem existido, os atos de registro de transferência dos direitos marcários executados pelo INPI Assim, vencidas as requeridas e suas assistentes litisconsorciais foram condenadas nas custas processuais e honorários aos patronos da

Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672

3

 TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Massa Falida autora, arbitrados em R$30 000,00, determinada a expedição das comunicações necessárias ao cumprimento da tutela antecipada para tornar definitivo o cancelamento dos registros das marcas em nome da co-ré O Alquimista Cosméticos Ltda para que sejam arrecadados como bens da Massa Falida autora

Irresignadas com tal desfecho, recorrem a Massa Falida de O Alquimista Cosméticos Ltda e G Brasil Indústria e Comércio Ltda , sucessora de Giovanna Baby Indústria e Comércio Ltda , anteriormente denominada Baby World Indústria e Comércio Ltda , pleiteando sua reforma A primeira aduz não existir prova de fraude e conluio fraudulento dos representantes das falidas Alega, em síntese, que não existiu fraude quando da transferência das marcas da Giovanna Fábrica Ltda , tendo ocorrido cessão dos direitos das marcas de forma legal e bem antes da situação de insolvência da Giovanna Fábrica Tanto é assim, que a apelada tentou anular a cessão de marcas feita à apelante, ingressando com ação perante a 9ª Vara Cível do Foro Central da Capital, a qual foi julgada improcedente Além disso, se a sócia da Giovanna Fábrica manteve relações amorosas com o sócio da apelante-Alquimista e, ainda, houve outorga de procuração, isso tudo não é prova de que existiu o "consilium fraudis" na transferência das marcas Diante da ausência do "consilium fraudis" a ação não pode se enquadrar no artigo 53 do Decreto-Lei nº 7661/45 Dessa forma, pleiteia o provimento do recurso para que seja reformada a r sentença, julgando improcedente a ação, com inversão do ônus da sucumbência (fls 1122/1125)

A segunda, G Brasil Indústria e Comércio Ltda , sucessora da Giovanna Baby Indústria e Comércio Ltda , alega, preliminarmente, a

Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672

4

 TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

falta de interesse processual e a impossibilidade jurídica do pedido, isto porque, a ação revocatória não se presta a rescindir coisa julgada – processos da 9ª Vara Cível do Foro Central da Comarca de São Paulo e da 4ª Vara Cível Federal de São Paulo. Embora haja necessidade do provimento, não há adequação, o que gera a carência da ação. Assim, pleiteia a extinção do processo, sem julgamento do mérito, por inépcia da inicial. Alega, ainda, em preliminar, a ocorrência da decadência, pela não publicação do aviso do art. 114 do DL nº 7661/45. No mérito, alega, em resumo, que o fato da autora ter celebrado negócio jurídico de cessão de direitos sobre marcas com outra empresa, quando ambas estavam ativas, representa exercício regular de direito, o que afasta qualquer ilicitude, fraude. Alega que o d. Magistrado não pode tornar ineficazes os negócios jurídicos por mera presunção, sem fundamento consistente ou sem indícios veementes. Dessa forma, afirma inexistir prova da fraude e concluio fraudulento entre as partes falidas. Assim, pleiteia o provimento do recurso, para reformar a r. sentença e inverter o ônus da sucumbência (fls 1130/1136)

Incidentalmente sobreveio petição de fls. 1360/1364, com alegação de nulidade absoluta do processo, vez que a) r. decisão que rejeitou os embargos de declaração opostos em face de r. decisão que recebeu o recurso de apelação somente no efeito devolutivo não foi devidamente publicada, b) negou vigência ao art. 56, §2º do Decreto-lei 7.661/45, c) o escritório de Advocacia De Vivo, Whitaker e Gouveia Gioielli patrocina os interesses de Giovanna Fábrica e de Notec Comercial Ltda, interesses estes antagônicos, d) ocorrência de obscuridade na r. sentença. Assim, por tal petição, pleiteia o reconhecimento e declaração da ocorrência da nulidade pela não publicação da r. decisão de fl. 1244, devolvendo integralmente o prazo

**Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672**

5

 TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

ou para que seja concedido o efeito suspensivo ao recurso de apelação de G Brasil Indústria e Comércio Ltda Com vista às partes não se manifestaram.

Os recursos foram recebidos no efeito devolutivo (fls 1129 e 1140) Contra-razões às fls 1164/1171, 1174/1181, 1183/1184, 1204/1216 (argüição de preliminares de não conhecimento e de ausência de combate a sentença, com final pedido de improvimento dos recursos)

2 Examino a questão incidental onde vem argüida a eventual nulidade absoluta do processo contada do despacho que recebeu o recurso da apelante somente no efeito devolutivo A apelação da recorrente "G Brasil Ind e Com Ltda." foi recebida no efeito devolutivo pelo r despacho de fl 1140. Essa decisão, conforme se verifica da certidão de fl 1161, foi publicada no Diário da Justiça em 04/10/2005 Então, não ocorreu a nulidade alegada, porque intimada a parte do efeito devolutivo da apelação que interpôs, já poderia ela, inconformada, agravar dessa decisão buscando o pretendido duplo efeito O fato de ter embargado não tira a evidência de ter a parte tomado ciência do que foi decidido – o efeito do recurso. Ademais, houve um questionamento anterior aos embargos decidido pelo Juiz que indeferiu a republicação, não ocorrente a nulidade e nem prejuízo "porque os advogados constituídos na data da publicação, 04/10/2005, f 1161, foram incluídos na publicação, que convalesceu" (fls 1231/verso)

Os embargos de declaração (fls 1240/1243), reaviventando essa questão, mereceram o despacho de fl 1244 do

Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672

6

 TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

seguinte teor "Premissa equivocada em decisão desafia recurso infringente ( )" Alega a apelante que não foi intimada dessa decisão, se verdadeiro esse fato não tem ele o condão de anular o processo ou de reabrir o prazo recursal porque do despacho que determinou o processamento do recurso no efeito devolutivo foi a parte regularmente intimada Então, o Juízo não privou a parte do recurso cabível porque feita regular intimação contra a decisão que emprestou efeito devolutivo ao recurso De nulidade absoluta, então, não se cuida O que veio arguido à conta de negativa de vigência ao art 56 § 2º do Decreto-lei 7661/45, é questão que fica superada porque os recursos serão examinados pelo mérito, independendo do efeito processual em que foram recebidos A última questão posta nesta petição incidental – patrocínio de interesses antagônicos – é questão que não diz respeito ao recurso Assim, afastada essa questão incidental, examino as preliminares trazidas em um dos recursos

Improcedem as preliminares arguidas Não há que se falar em decadência, porque o aviso do artigo 114 do Decreto-lei 7661/45, não foi publicado por não restar composto o ativo da falida de modo a permitir a liquidação e, ainda, por estar evidente que o processo falimentar da autora – Giovanna Fábrica Ltda – demonstra maior dificuldade do que os feitos assemelhados Assim, ausente descaso ou negligência no retardamento do processo falimentar, fica afastada a alegada decadência Nesse sentido, os seguintes julgados

> FALÊNCIA - Revocatória - Decadência - Prazo que se
> conta a partir do aviso previsto no artigo 114 da Lei de
> Falências - Não publicado tal aviso sem que para tanto
> tenha concorrido o síndico não se há de reconhecer a
> decadência - Recurso não provido (Agravo de

**Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672**



TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Instrumento n 141 145-4 - São Paulo - 9ª Câmara de
Direito Privado - Relator Ruiter Oliva - 22 02.00 - V U )

FALÊNCIA - Revocatória - Prazo - Contagem a partir da
publicação do aviso previsto no artigo 114 da Lei de
Falências - Publicação não efetivada, sem que para isso
tenha concorrido o síndico - Decadência inocorrente -
Recurso não provido JTJ 194/148

FALÊNCIA - Revocatória - Decadência - Prazo de um ano
a contar da data da publicação do aviso do artigo 114 da
Lei de Falência - Artigo 56, § 1º da Lei de Falência -
Motivo de força maior para a não publicação do aviso e
atraso no procedimento falimentar - Recurso conhecido e
provido para afastar o decreto de extinção do feito
(Apelação Cível n 251 185-4 - São Paulo - 7ª Câmara de
Direito Privado - Relator De Santi Ribeiro - 23 04.03 -
V U.)

    Tampouco, há que se falar em reconhecimento de coisa
julgada, isso porque, se verifica que a demanda ajuizada por O
Alquimista Cosméticos Ltda , ocorrida antes da própria falência,
objetivava impelir o INPI a manter o registro das marcas em seu nome o
que veio impugnado em outra ação proposta por Giovanna Fábrica
Ltda onde se tratava da regularidade das assinaturas lançadas pela
representante legal A esse respeito, bem anotou o d Magistrado, à fl
1104, da r sentença recorrida, cujo trecho aqui se transcreve

    "Está decidido, f. 807, e convém repetir, que a ação da 9ª
    Vara Cível Central, cópia da inicial em fl 85/90, não
    interfere com o objeto e com a pretensão ajuizada nesta
    ação revocatória falimentar É que o fato de ser verdadeira
    a assinatura de Jeanette Irene Kupfer nos instrumentos de
    cessão de direitos marcários não prejudica a pretensão
    ajuizável demandando a ineficácia do ato de alienação de
    bens e direitos, fundada na fraude do devedor e do

**Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672**

8



TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

terceiro que com ele contrata, a teor do artigo 53 do Decreto 7661 de 1945, dita Lei de Falências
( .) A consequência do acolhimento dessa pretensão apresentada na 4ª Vara Cível da Justiça Federal seria permitir a exploração das marcas alienadas pela Falida GIOVANNA FÁBRICA até o momento em que esse negócio jurídico de alienação das marcas e patentes viesse a ser declarado ineficaz por outro Juízo, em demanda como é aquela sob exame
Daí a conclusão de que nem esta ação da 4ª Vara Cível da Justiça Federal de São Paulo interfere, prejudica ou modifica aquilo que vier a ser julgado nesta ação revocatória falimentar"

Por derradeiro, se faz necessário afastar as preliminares arguidas também nas contra-razões de fls. 1204/1216, a saber, não conhecimento do apelo da G Brasil por intempestivo e ausência de combate a sentença em relação ao apelos, isto porque, sucintamente, deve ser observado que o dispositivo e preparo de fls 1112/1114 foram novamente relacionados para publicação em 16/08/05 e publicados no Diário Oficial da Justiça em 18/08/05, reabrindo-se a contagem do prazo quanto à interposição de recurso (certidão cartorária de fls 1114verso). Logo, tempestivo o apelo Improcede, ainda, a outra preliminar arguida, por se mostrarem em termos para apreciação e análise meritória os apelos ofertados.

Dessa forma, inacolhidas as preliminares suscitadas, passo a análise meritória dos recursos

Segundo consta da peça inicial, a autora — Giovanna Fábrica Ltda teve sua quebra decretada em 18/08/1997 e, no momento em que se encontrou com dificuldades financeiras, transferiu os direitos

**Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672**

9



TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

que detinha sobre marcas de grande popularidade, de alto valor estimado no mercado e que integralizavam o estabelecimento empresarial, tudo em conluio fraudulento com um dos seus administradores e também representante legal de O Alquimista Cosméticos Ltda , com desfalque do ativo e, consequente, prejuízo de credores

É dos autos a comprovação da efetiva transferência das marcas e do depósito perante o INPI no período de 16/02/1996 e 03/12/1996 (fls  07 a 74 e 1290/1337)  Dentro deste lapso temporal, a sócia gerente de Giovanna Fabrica Ltda - a Sra  Jeanete Irene Kupfer, que também assina Giovanna Baby ou Giovanna Kupfer -, outorgou plenos poderes para agir isoladamente a Jacques Broder Cohen, sócio gerente de O Alquimista Cosméticos Ltda  e também sócio gerente de Baby World Indústria e Comércio Ltda  nome anterior de Giovanna Baby Indústria e Comércio Ltda, agora G  Brasil Indústria e Comércio Ltda , para administrar as empresas de que era sócia, inclusive a falida (fl  140, 150/153 e 175 e ss)

Observa-se que, a empresa Baby World Ind  Com  Ltda foi constituída em 12/08/1996 (fls  308/316) e registrada na JUCESP em 21/08/1996, dia posterior à revogação de procuração "ad negocia" outorgada pela sócia gerente de Giovanna Fábrica ao sócio gerente Jacques (fls  140, 146, 308/316)  Além disso, também após a revogação da referida procuração, a empresa Alquimista - administrada por Jacques - cedeu a licença de uso da marcas à Baby World Ind Com  Ltda (fls 106/115) Decretada a quebra da Giovanna Fábrica Ltda, em 18/08/1997, o sócio Jacques da empresa Baby World se retirou da mesma (21/07/1997) e em ato posterior, 16/09/1997, alterou a



Apelação Cível n° 448.414-4/1-00 – Voto n° 9.672



### TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

razão social para Giovanna Baby Ind Com Ltda (fls 146/147) Em seqüência, o mesmo cedeu a licença de uso para a empresa Notec Comercial Ltda. Consta nos autos que, o registro das marcas ocorreu em 23/07/1996 e 03/12/1996 (fls 1290/1325), ou seja, dentro do termo legal da quebra - 60 (sessenta) dias anteriores ao primeiro protesto (07/08/1996) -.

Não bastasse isso, o sócio Jacques Cohen reconhece seu envolvimento na Giovanna Fábrica desde o período de janeiro de 1996, vez que ante ao estado de insolvabilidade da mesma, desenvolveu um projeto para constituição de sociedades, demonstrando que a intenção das partes era esvaziar o patrimônio da falida  Tal fato está confirmado nas iniciais de ações trabalhistas ajuizadas em face da Giovanna Fábrica e as empresas de Jacques (fls  159 e ss).

Além disso, se verifica que nos livros comerciais da falida não há qualquer registro relativo à transferência das marcas (fls 473/483). Certo é que, a transferência de todas as marcas se deu quando a falida já estava em estado de insolvência  As marcas foram registradas a partir de julho de 1996 em nome de Alquimista, dentro do prazo legal, tanto é assim que havia lançamentos sobre tributos não pagos desde 1996

Como é sabido, para a configuração do "consilium fraudis" basta o simples conhecimento que tenha ou deva ter o devedor de seu estado de insolvência, o que no caso restou demonstrado  A insolvabilidade foi reconhecida pelo perito da falida ante os resultados negativos, especialmente a partir de 1995 (fl 481)  Os representantes das falidas Giovanna Fábrica e Alquimista mantinham relacionamento

**Apelação Cível n° 448.414-4/1-00 – Voto n° 9.672**



11

TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

desde o final de 1995 e conhecimento de que a empresa Giovanna Fábrica tinha dificuldades econômico-financeiras, posto que desde janeiro de 1996 Jacques Cohen passou a gerir os negócios da Giovanna Fábrica, culminando na transferência de bens de maior valor para sua empresa – marcas avaliadas em mais de R$5 000 000,00 – acarretando prejuízos aos credores da apelada Há que se consignar que, a insolvabilidade e a insolvência de Giovanna Fábrica foi reconhecida pelo representante de O Alquimista em depoimento e em ação por ele ajuizada, além do que administrou a falida desde a morte do marido e sócio de Jeanete (fls 77 e ss, 484/487)

Assim, caracterizada está a fraude e o conluio fraudulento entre as partes na transferência dos bens de maior valor da falida

Nesse sentido:

> FRAUDE CONTRA CREDORES - Requisito - "Consilium fraudis" - Reconhecimento que se impõe em face dos indícios veementes e da prova indireta - Insolvência do devedor, ademais, bem caracterizada, sendo efetivo o prejuízo do credor - Anulatória de negócio jurídico procedente - Recurso provido JTJ 132/113



O "eventus damni", definido como elemento objetivo, é todo ato prejudicial ao credor, por tornar insolvente o devedor, ou por ter sido praticado em estado de insolvência Além dos fundamentos retro apresentados, nota-se que a própria sentença declaratória da falência demonstra a presença de prejuízo pela insolvência de bens no ativo da falida para pagamento de todos os credores Há que se ressaltar, ainda, a extensão dos efeitos da falida a outras empresas que transacionaram com a mesma no período suspeito ou anterior a ele,

Apelação Cível n° 448.414-4/1-00 – Voto n° 9.672

12

 TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

momento em que as causas da quebra se evidenciavam e eram de conhecimento de Jeanette e Jacques

Assim entendendo, diante de todo exposto, rejeitadas as preliminares arguidas, pelo meu voto, **nego provimento aos recursos,** dando por afastada a questão incidental trazida na petição de fls 1360/1364

**OCTAVIO HELENE**
**Desembargador Relator**

Apelação Cível nº 448.414-4/1-00 – Voto nº 9.672

# D – Part I

Ein Service der juris GmbH - www.juris.de -

# Gesetz über den Schutz von Marken und sonstigen Kennzeichen (Markengesetz - MarkenG)

MarkenG

Ausfertigungsdatum: 25.10.1994

Vollzitat:

"Markengesetz vom 25. Oktober 1994 (BGBl. I S. 3082, (1995, 156)), zuletzt geändert durch Artikel 4 Abs. 19 des Gesetzes vom 17. Dezember 2006 (BGBl. I S. 3171 Änderung durch Art. 16 G v. 12.12.2007 I 2840 textlich nachgewiesen, dokumentarisch noch nicht bearbeitet Änderung durch Art. 12 Abs. 3 G v. 13.12.2007 I 2897 textlich nachgewiesen, dokumentarisch noch nicht bearbeitet)"

Stand: Zuletzt geändert durch Art. 4 Abs. 19 G v. 17.12.2006 I 3171
Änderung durch Art. 16 G v. 12.12.2007 I 2840 textlich nachgewiesen, dokumentarisch noch nich
Änderung durch Art. 12 Abs. 3 G v. 13.12.2007 I 2897 textlich nachgewiesen, dokumentarisch no

**Fußnote**

Textnachweis ab: 1. 1.1995
Amtlicher Hinweis des Normgebers auf EG-Recht:
      Umsetzung der
         EWGRL 104/89 (CELEX Nr: 389L0104)

Das G wurde als Artikel 1 G (423-5-1) v. 25.10.1994 I 3082 vom Bundestag mit Zustimmung des Bundesrates beschlossen. Es ist gem. Art. 50 Abs. 3 dieses G nach Maßgabe der Abs. 1 und 2 mWv 1.1.1995 in Kraft getreten.

## Inhaltsübersicht

Teil 1
      Anwendungsbereich
§ 1                Geschützte Marken und sonstige Kennzeichen
§ 2                Anwendung anderer Vorschriften
Teil 2
      Voraussetzungen, Inhalt und Schranken des Schutzes von Marken und geschäftlichen
      Bezeichnungen; Übertragung und Lizenz
         Abschnitt 1
            Marken und geschäftliche Bezeichnungen; Vorrang und Zeitrang
§ 3                Als Marke schutzfähige Zeichen
§ 4                Entstehung des Markenschutzes
§ 5                Geschäftliche Bezeichnungen
§ 6                Vorrang und Zeitrang
         Abschnitt 2
            Voraussetzungen für den Schutz von Marken durch Eintragung
§ 7                Inhaberschaft

| | |
|---|---|
| § 8 | Absolute Schutzhindernisse |
| § 9 | Angemeldete oder eingetragene Marken als relative Schutzhindernisse |
| § 10 | Notorisch bekannte Marken |
| § 11 | Agentenmarken |
| § 12 | Durch Benutzung erworbene Marken und geschäftliche Bezeichnungen mit älterem Zeitrang |
| § 13 | Sonstige ältere Rechte |

Abschnitt 3

Schutzinhalt; Rechtsverletzungen

| | |
|---|---|
| § 14 | Ausschließliches Recht des Inhabers einer Marke; Unterlassungsanspruch; Schadensersatzanspruch |
| § 15 | Ausschließliches Recht des Inhabers einer geschäftlichen Bezeichnung; Unterlassungsanspruch; Schadensersatzanspruch |
| § 16 | Wiedergabe einer eingetragenen Marke in Nachschlagewerken |
| § 17 | Ansprüche gegen Agenten oder Vertreter |
| § 18 | Vernichtungsanspruch |
| § 19 | Auskunftsanspruch |

Abschnitt 4

Schranken des Schutzes

| | |
|---|---|
| § 20 | Verjährung |
| § 21 | Verwirkung von Ansprüchen |
| § 22 | Ausschluß von Ansprüchen bei Bestandskraft der Eintragung einer Marke mit jüngerem Zeitrang |
| § 23 | Benutzung von Namen und beschreibenden Angaben; Ersatzteilgeschäft |
| § 24 | Erschöpfung |
| § 25 | Ausschluß von Ansprüchen bei mangelnder Benutzung |
| § 26 | Benutzung der Marke |

Abschnitt 5

Marken als Gegenstand des Vermögens

| | |
|---|---|
| § 27 | Rechtsübergang |
| § 28 | Vermutung der Rechtsinhaberschaft; Zustellungen an den Inhaber |
| § 29 | Dingliche Rechte; Zwangsvollstreckung; Insolvenzverfahren |
| § 30 | Lizenzen |
| § 31 | Angemeldete Marken |

Teil 3

Verfahren in Markenangelegenheiten

Abschnitt 1

Eintragungsverfahren

| | |
|---|---|
| § 32 | Erfordernisse der Anmeldung |
| § 33 | Anmeldetag; Anspruch auf Eintragung; Veröffentlichung der Anmeldung |
| § 34 | Ausländische Priorität |
| § 35 | Ausstellungspriorität |
| § 36 | Prüfung der Anmeldungserfordernisse |
| § 37 | Prüfung auf absolute Schutzhindernisse |
| § 38 | Beschleunigte Prüfung |
| § 39 | Zurücknahme, Einschränkung und Berichtigung der Anmeldung |
| § 40 | Teilung der Anmeldung |
| § 41 | Eintragung |
| § 42 | Widerspruch |
| § 43 | Einrede mangelnder Benutzung; Entscheidung über den Widerspruch |
| § 44 | Eintragungsbewilligungsklage |

Abschnitt 2

Berichtigung; Teilung; Schutzdauer und Verlängerung

Ein Service der juris GmbH - www.juris.de -

§ 45                    Berichtigung des Registers und von Veröffentlichungen
§ 46                    Teilung der Eintragung
§ 47                    Schutzdauer und Verlängerung
        Abschnitt 3
                Verzicht, Verfall und Nichtigkeit; Löschungsverfahren
§ 48                    Verzicht
§ 49                    Verfall
§ 50                    Nichtigkeit wegen absoluter Schutzhindernisse
§ 51                    Nichtigkeit wegen des Bestehens älterer Rechte
§ 52                    Wirkungen der Löschung wegen Verfalls oder Nichtigkeit
§ 53                    Löschung durch das Patentamt wegen Verfalls
§ 54                    Löschungsverfahren vor dem Patentamt wegen absoluter
                        Schutzhindernisse
§ 55                    Löschungsverfahren vor den ordentlichen Gerichten
        Abschnitt 4
                Allgemeine Vorschriften für das Verfahren vor dem Patentamt
§ 56                    Zuständigkeiten im Patentamt
§ 57                    Ausschließung und Ablehnung
§ 58                    Gutachten
§ 59                    Ermittlung des Sachverhalts; rechtliches Gehör
§ 60                    Ermittlungen; Anhörungen; Niederschrift
§ 61                    Beschlüsse; Rechtsmittelbelehrung
§ 62                    Akteneinsicht; Registereinsicht
§ 63                    Kosten der Verfahren
§ 64                    Erinnerung
§ 64a                   Kostenregelungen im Verfahren vor dem Patentamt
§ 65                    Rechtsverordnungsermächtigung
        Abschnitt 5
                Verfahren vor dem Patentgericht
§ 66                    Beschwerde
§ 67                    Beschwerdesenate; Öffentlichkeit der Verhandlung
§ 68                    Beteiligung des Präsidenten des Patentamts
§ 69                    Mündliche Verhandlung
§ 70                    Entscheidung über die Beschwerde
§ 71                    Kosten des Beschwerdeverfahrens
§ 72                    Ausschließung und Ablehnung
§ 73                    Ermittlung des Sachverhalts; Vorbereitung der mündlichen
                        Verhandlung
§ 74                    Beweiserhebung
§ 75                    Ladungen
§ 76                    Gang der Verhandlung
§ 77                    Niederschrift
§ 78                    Beweiswürdigung; rechtliches Gehör
§ 79                    Verkündung; Zustellung; Begründung
§ 80                    Berichtigungen
§ 81                    Vertretung; Vollmacht
§ 82                    Anwendung weiterer Vorschriften; Anfechtbarkeit; Akteneinsicht
        Abschnitt 6
                Verfahren vor dem Bundesgerichtshof
§ 83                    Zugelassene und zulassungsfreie Rechtsbeschwerde
§ 84                    Beschwerdeberechtigung; Beschwerdegründe
§ 85                    Förmliche Voraussetzungen
§ 86                    Prüfung der Zulässigkeit
§ 87                    Mehrere Beteiligte
§ 88                    Anwendung weiterer Vorschriften

```
§ 89              Entscheidung über die Rechtsbeschwerde
§ 89a             Abhilfe bei Verletzung des Anspruchs auf rechtliches Gehör
§ 90              Kostenentscheidung
      Abschnitt 7
          Gemeinsame Vorschriften
§ 91              Wiedereinsetzung
§ 91a             Weiterbehandlung der Anmeldung
§ 92              Wahrheitspflicht
§ 93              Amtssprache und Gerichtssprache
§ 93a             Entschädigung von Zeugen, Vergütung von Sachverständigen
§ 94              Zustellungen
§ 95              Rechtshilfe
§ 95a             Einreichung elektronischer Dokumente
§ 96              Inlandsvertreter
Teil 4
    Kollektivmarken
§ 97              Kollektivmarken
§ 98              Inhaberschaft
§ 99              Eintragbarkeit von geographischen Herkunftsangaben als
                  Kollektivmarken
§ 100             Schranken des Schutzes; Benutzung
§ 101             Klagebefugnis; Schadensersatz
§ 102             Markensatzung
§ 103             Prüfung der Anmeldung
§ 104             Änderung der Markensatzung
§ 105             Verfall
§ 106             Nichtigkeit wegen absoluter Schutzhindernisse
Teil 5
    Schutz von Marken nach dem Madrider Markenabkommen und nach dem Protokoll zum
    Madrider Markenabkommen; Gemeinschaftsmarken
          Abschnitt 1
              Schutz von Marken nach dem Madrider Markenabkommen
§ 107             Anwendung der Vorschriften dieses Gesetzes; Sprache
§ 108             Antrag auf internationale Registrierung
§ 109             Gebühren
§ 110             Eintragung im Register
§ 111             Nachträgliche Schutzerstreckung
§ 112             Wirkung der internationalen Registrierung
§ 113             Prüfung auf absolute Schutzhindernisse
§ 114             Widerspruch
§ 115             Nachträgliche Schutzentziehung
§ 116             Widerspruch und Antrag auf Löschung aufgrund einer international
                  registrierten Marke
§ 117             Ausschluß von Ansprüchen wegen mangelnder Benutzung
§ 118             Zustimmung bei Übertragungen international registrierter Marken
          Abschnitt 2
              Schutz von Marken nach dem Protokoll zum Madrider Markenabkommen
§ 119             Anwendung der Vorschriften dieses Gesetzes; Sprachen
§ 120             Antrag auf internationale Registrierung
§ 121             Gebühren
§ 122             Vermerk in den Akten; Eintragung im Register
§ 123             Nachträgliche Schutzerstreckung
§ 124             Entsprechende Anwendung der Vorschriften über die Wirkung der nach
                  dem Madrider Markenabkommen international registrierten Marken
§ 125             Umwandlung einer internationalen Registrierung
```

Abschnitt 3
    Gemeinschaftsmarken
§ 125a    Anmeldung von Gemeinschaftsmarken beim Patentamt
§ 125b    Anwendung der Vorschriften dieses Gesetzes
§ 125c    Nachträgliche Feststellung der Ungültigkeit einer Marke
§ 125d    Umwandlung von Gemeinschaftsmarken
§ 125e    Gemeinschaftsmarkengerichte; Gemeinschaftsmarkenstreitsachen
§ 125f    Unterrichtung der Kommission
§ 125g    Örtliche Zuständigkeit der Gemeinschaftsmarkengerichte
§ 125h    Insolvenzverfahren
§ 125i    Erteilung der Vollstreckungsklausel
Teil 6
  Geographische Herkunftsangaben
    Abschnitt 1
      Schutz geographischer Herkunftsangaben
§ 126    Als geographische Herkunftsangaben geschützte Namen, Angaben oder
    Zeichen
§ 127    Schutzinhalt
§ 128    Unterlassungsanspruch; Schadensersatzanspruch
§ 129    Verjährung
    Abschnitt 2
      Schutz von geographischen Angaben und Ursprungsbezeichnungen gemäß der
      Verordnung (EWG) Nr. 2081/92
§ 130    Verfahren vor dem Patentamt; Weiterleitung
§ 131    Einspruchsverfahren
§ 132    Löschungsverfahren
§ 133    Antrag auf Änderung der Spezifikation
§ 133a    Rechtsmittel
§ 134    Überwachung
§ 135    Unterlassungsanspruch; Schadensersatzanspruch
§ 136    Verjährung
    Abschnitt 3
      Ermächtigungen zum Erlaß von Rechtsverordnungen
§ 137    Nähere Bestimmungen zum Schutz einzelner geographischer
    Herkunftsangaben
§ 138    Sonstige Vorschriften für das Verfahren bei Anträgen und
    Einsprüchen nach der Verordnung (EWG) Nr. 2081/92
§ 139    Durchführungsbestimmungen zur Verordnung (EWG) Nr. 2081/92
Teil 7
  Verfahren in Kennzeichenstreitsachen
§ 140    Kennzeichenstreitsachen
§ 141    Gerichtsstand bei Ansprüchen nach diesem Gesetz und dem Gesetz
    gegen den unlauteren Wettbewerb
§ 142    Streitwertbegünstigung
Teil 8
  Straf- und Bußgeldvorschriften; Beschlagnahme bei der Einfuhr und Ausfuhr
    Abschnitt 1
      Straf- und Bußgeldvorschriften
§ 143    Strafbare Kennzeichenverletzung
§ 143a    Strafbare Verletzung der Gemeinschaftsmarke
§ 144    Strafbare Benutzung geographischer Herkunftsangaben
§ 145    Bußgeldvorschriften
    Abschnitt 2
      Beschlagnahme von Waren bei der Einfuhr und Ausfuhr
§ 146    Beschlagnahme bei der Verletzung von Kennzeichenrechten

| § 147 | Einziehung; Widerspruch; Aufhebung der Beschlagnahme |
| § 148 | Zuständigkeiten; Rechtsmittel |
| § 149 | Schadensersatz bei ungerechtfertigter Beschlagnahme |
| § 150 | Beschlagnahme nach der Verordnung (EG) Nr. 3295/94 |
| § 151 | Beschlagnahme bei widerrechtlicher Kennzeichnung mit geographischen Herkunftsangaben |

Teil 9
  Übergangsvorschriften

| § 152 | Anwendung dieses Gesetzes |
| § 153 | Schranken für die Geltendmachung von Verletzungsansprüchen |
| § 154 | Dingliche Rechte; Zwangsvollstreckung; Konkursverfahren |
| § 155 | Lizenzen |
| § 156 | Prüfung angemeldeter Marken auf absolute Schutzhindernisse |
| § 157 | Bekanntmachung und Eintragung |
| § 158 | Widerspruchsverfahren |
| § 159 | Teilung einer Anmeldung |
| § 160 | Schutzdauer und Verlängerung |
| § 161 | Löschung einer eingetragenen Marke wegen Verfalls |
| § 162 | Löschung einer eingetragenen Marke wegen absoluter Schutzhindernisse |
| § 163 | Löschung einer eingetragenen Marke wegen des Bestehens älterer Rechte |
| § 164 | Erinnerung und Durchgriffsbeschwerde |
| § 165 | Übergangsvorschriften |

# Teil 1
# Anwendungsbereich

## § 1 Geschützte Marken und sonstige Kennzeichen

Nach diesem Gesetz werden geschützt:
1. Marken,
2. geschäftliche Bezeichnungen,
3. geographische Herkunftsangaben.

## § 2 Anwendung anderer Vorschriften

Der Schutz von Marken, geschäftlichen Bezeichnungen und geographischen Herkunftsangaben nach diesem Gesetz schließt die Anwendung anderer Vorschriften zum Schutz dieser Kennzeichen nicht aus.

# Teil 2
# Voraussetzungen, Inhalt und Schranken des Schutzes von Marken und geschäftlichen Bezeichnungen, Übertragung und Lizenz

# Abschnitt 1
# Marken und geschäftliche Bezeichnungen, Vorrang und Zeitrang

## § 3 Als Marke schutzfähige Zeichen

(1) Als Marke können alle Zeichen, insbesondere Wörter einschließlich Personennamen, Abbildungen, Buchstaben, Zahlen, Hörzeichen, dreidimensionale Gestaltungen einschließlich der Form einer Ware oder ihrer Verpackung sowie sonstige Aufmachungen einschließlich Farben und Farbzusammenstellungen geschützt werden, die geeignet sind, Waren oder Dienstleistungen eines Unternehmens von denjenigen anderer Unternehmen zu unterscheiden.

(2) Dem Schutz als Marke nicht zugänglich sind Zeichen, die ausschließlich aus einer Form bestehen,
1. die durch die Art der Ware selbst bedingt ist,
2. die zur Erreichung einer technischen Wirkung erforderlich ist oder
3. die der Ware einen wesentlichen Wert verleiht.

## § 4 Entstehung des Markenschutzes

Der Markenschutz entsteht
1. durch die Eintragung eines Zeichens als Marke in das vom Patentamt geführte Register,
2. durch die Benutzung eines Zeichens im geschäftlichen Verkehr, soweit das Zeichen innerhalb beteiligter Verkehrskreise als Marke Verkehrsgeltung erworben hat, oder
3. durch die im Sinne des Artikels 6bis der Pariser Verbandsübereinkunft zum Schutz des gewerblichen Eigentums (Pariser Verbandsübereinkunft) notorische Bekanntheit einer Marke.

## § 5 Geschäftliche Bezeichnungen

(1) Als geschäftliche Bezeichnungen werden Unternehmenskennzeichen und Werktitel geschützt.

(2) Unternehmenskennzeichen sind Zeichen, die im geschäftlichen Verkehr als Name, als Firma oder als besondere Bezeichnung eines Geschäftsbetriebs oder eines Unternehmens benutzt werden. Der besonderen Bezeichnung eines Geschäftsbetriebs stehen solche Geschäftsabzeichen und sonstige zur Unterscheidung des Geschäftsbetriebs von anderen Geschäftsbetrieben bestimmte Zeichen gleich, die innerhalb beteiligter Verkehrskreise als Kennzeichen des Geschäftsbetriebs gelten.

(3) Werktitel sind die Namen oder besonderen Bezeichnungen von Druckschriften, Filmwerken, Tonwerken, Bühnenwerken oder sonstigen vergleichbaren Werken.

## § 6 Vorrang und Zeitrang

(1) Ist im Falle des Zusammentreffens von Rechten im Sinne der §§ 4, 5 und 13 nach diesem Gesetz für die Bestimmung des Vorrangs der Rechte ihr Zeitrang maßgeblich, wird der Zeitrang nach den Absätzen 2 und 3 bestimmt.

(2) Für die Bestimmung des Zeitrangs von angemeldeten oder eingetragenen Marken ist der Anmeldetag (§ 33 Abs. 1) oder, falls eine Priorität nach § 34 oder nach § 35 in Anspruch genommen wird, der Prioritätstag maßgeblich.

(3) Für die Bestimmung des Zeitrangs von Rechten im Sinne des § 4 Nr. 2 und 3 und der §§ 5 und 13 ist der Zeitpunkt maßgeblich, zu dem das Recht erworben wurde.

Ein Service der juris GmbH - www.juris.de -

(4) Kommt Rechten nach den Absätzen 2 und 3 derselbe Tag als ihr Zeitrang zu, so sind die Rechte gleichrangig und begründen gegeneinander keine Ansprüche.

# Abschnitt 2
# Voraussetzungen für den Schutz von Marken durch Eintragung

## § 7 Inhaberschaft

Inhaber von eingetragenen und angemeldeten Marken können sein:
1. natürliche Personen,
2. juristische Personen oder
3. Personengesellschaften, sofern sie mit der Fähigkeit ausgestattet sind, Rechte zu erwerben und Verbindlichkeiten einzugehen.

## § 8 Absolute Schutzhindernisse

(1) Von der Eintragung sind als Marke schutzfähige Zeichen im Sinne des § 3 ausgeschlossen, die sich nicht graphisch darstellen lassen.

(2) Von der Eintragung ausgeschlossen sind Marken,
1. denen für die Waren oder Dienstleistungen jegliche Unterscheidungskraft fehlt,
2. die ausschließlich aus Zeichen oder Angaben bestehen, die im Verkehr zur Bezeichnung der Art, der Beschaffenheit, der Menge, der Bestimmung, des Wertes, der geographischen Herkunft, der Zeit der Herstellung der Waren oder der Erbringung der Dienstleistungen oder zur Bezeichnung sonstiger Merkmale der Waren oder Dienstleistungen dienen können,
3. die ausschließlich aus Zeichen oder Angaben bestehen, die im allgemeinen Sprachgebrauch oder in den redlichen und ständigen Verkehrsgepflogenheiten zur Bezeichnung der Waren oder Dienstleistungen üblich geworden sind,
4. die geeignet sind, das Publikum insbesondere über die Art, die Beschaffenheit oder die geographische Herkunft der Waren oder Dienstleistungen zu täuschen,
5. die gegen die öffentliche Ordnung oder die gegen die guten Sitten verstoßen,
6. die Staatswappen, Staatsflaggen oder andere staatliche Hoheitszeichen oder Wappen eines inländischen Ortes oder eines inländischen Gemeinde- oder weiteren Kommunalverbandes enthalten,
7. die amtliche Prüf- oder Gewährzeichen enthalten, die nach einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt von der Eintragung als Marke ausgeschlossen sind,
8. die Wappen, Flaggen oder andere Kennzeichen, Siegel oder Bezeichnungen internationaler zwischenstaatlicher Organisationen enthalten, die nach einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt von der Eintragung als Marke ausgeschlossen sind,
9. deren Benutzung ersichtlich nach sonstigen Vorschriften im öffentlichen Interesse untersagt werden kann, oder
10. die bösgläubig angemeldet worden sind.

(3) Absatz 2 Nr. 1, 2 und 3 findet keine Anwendung, wenn die Marke sich vor dem Zeitpunkt der Entscheidung über die Eintragung infolge ihrer Benutzung für die Waren oder Dienstleistungen, für die sie angemeldet worden ist, in den beteiligten Verkehrskreisen durchgesetzt hat.

Ein Service der juris GmbH - www.juris.de -

(4) Absatz 2 Nr. 6, 7 und 8 ist auch anzuwenden, wenn die Marke die Nachahmung eines dort aufgeführten Zeichens enthält. Absatz 2 Nr. 6, 7 und 8 ist nicht anzuwenden, wenn der Anmelder befugt ist, in der Marke eines der dort aufgeführten Zeichen zu führen, selbst wenn es mit einem anderen der dort aufgeführten Zeichen verwechselt werden kann. Absatz 2 Nr. 7 ist ferner nicht anzuwenden, wenn die Waren oder Dienstleistungen, für die die Marke angemeldet worden ist, mit denen, für die das Prüf- oder Gewährzeichen eingeführt ist, weder identisch noch diesen ähnlich sind. Absatz 2 Nr. 8 ist ferner nicht anzuwenden, wenn die angemeldete Marke nicht geeignet ist, beim Publikum den unzutreffenden Eindruck einer Verbindung mit der internationalen zwischenstaatlichen Organisation hervorzurufen.

## § 9 Angemeldete oder eingetragene Marken als relative Schutzhindernisse

(1) Die Eintragung einer Marke kann gelöscht werden,
1. wenn sie mit einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang identisch ist und die Waren oder Dienstleistungen, für die sie eingetragen worden ist, mit den Waren oder Dienstleistungen identisch sind, für die die Marke mit älterem Zeitrang angemeldet oder eingetragen worden ist,
2. wenn wegen ihrer Identität oder Ähnlichkeit mit einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang und der Identität oder der Ähnlichkeit der durch die beiden Marken erfaßten Waren oder Dienstleistungen für das Publikum die Gefahr von Verwechslungen besteht, einschließlich der Gefahr, daß die Marken gedanklich miteinander in Verbindung gebracht werden, oder
3. wenn sie mit einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang identisch oder dieser ähnlich ist und für Waren oder Dienstleistungen eingetragen worden ist, die nicht denen ähnlich sind, für die die Marke mit älterem Zeitrang angemeldet oder eingetragen worden ist, falls es sich bei der Marke mit älterem Zeitrang um eine im Inland bekannte Marke handelt und die Benutzung der eingetragenen Marke die Unterscheidungskraft oder die Wertschätzung der bekannten Marke ohne rechtfertigenden Grund in unlauterer Weise ausnutzen oder beeinträchtigen würde.

(2) Anmeldungen von Marken stellen ein Eintragungshindernis im Sinne des Absatzes 1 nur dar, wenn sie eingetragen werden.

## § 10 Notorisch bekannte Marken

(1) Von der Eintragung ausgeschlossen ist eine Marke, wenn sie mit einer im Inland im Sinne des Artikels 6bis der Pariser Verbandsübereinkunft notorisch bekannten Marke mit älterem Zeitrang identisch oder dieser ähnlich ist und die weiteren Voraussetzungen des § 9 Abs. 1 Nr. 1, 2 oder 3 gegeben sind.

(2) Absatz 1 findet keine Anwendung, wenn der Anmelder von dem Inhaber der notorisch bekannten Marke zur Anmeldung ermächtigt worden ist.

## § 11 Agentenmarken

Die Eintragung einer Marke kann gelöscht werden, wenn die Marke ohne die Zustimmung des Inhabers der Marke für dessen Agenten oder Vertreter eingetragen worden ist.

## § 12 Durch Benutzung erworbene Marken und geschäftliche Bezeichnungen mit älterem Zeitrang

Die Eintragung einer Marke kann gelöscht werden, wenn ein anderer vor dem für den Zeitrang der eingetragenen Marke maßgeblichen Tag Rechte an einer Marke im Sinne des § 4 Nr. 2 oder an einer geschäftlichen Bezeichnung im Sinne des § 5 erworben hat und diese ihn berechtigen, die Benutzung der eingetragenen Marke im gesamten Gebiet der Bundesrepublik Deutschland zu untersagen.

## § 13 Sonstige ältere Rechte

(1) Die Eintragung einer Marke kann gelöscht werden, wenn ein anderer vor dem für den Zeitrang der eingetragenen Marke maßgeblichen Tag ein sonstiges, nicht in den §§ 9 bis 12 aufgeführtes Recht erworben hat und dieses ihn berechtigt, die Benutzung der eingetragenen Marke im gesamten Gebiet der Bundesrepublik Deutschland zu untersagen.

(2) Zu den sonstigen Rechten im Sinne des Absatzes 1 gehören insbesondere:
1. Namensrechte,
2. das Recht an der eigenen Abbildung,
3. Urheberrechte,
4. Sortenbezeichnungen,
5. geographische Herkunftsangaben,
6. sonstige gewerbliche Schutzrechte.

# Abschnitt 3
# Schutzinhalt, Rechtsverletzungen

## § 14 Ausschließliches Recht des Inhabers einer Marke, Unterlassungsanspruch, Schadensersatzanspruch

(1) Der Erwerb des Markenschutzes nach § 4 gewährt dem Inhaber der Marke ein ausschließliches Recht.

(2) Dritten ist es untersagt, ohne Zustimmung des Inhabers der Marke im geschäftlichen Verkehr
1. ein mit der Marke identisches Zeichen für Waren oder Dienstleistungen zu benutzen, die mit denjenigen identisch sind, für die sie Schutz genießt,
2. ein Zeichen zu benutzen, wenn wegen der Identität oder Ähnlichkeit des Zeichens mit der Marke und der Identität oder Ähnlichkeit der durch die Marke und das Zeichen erfaßten Waren oder Dienstleistungen für das Publikum die Gefahr von Verwechslungen besteht, einschließlich der Gefahr, daß das Zeichen mit der Marke gedanklich in Verbindung gebracht wird, oder
3. ein mit der Marke identisches Zeichen oder ein ähnliches Zeichen für Waren oder Dienstleistungen zu benutzen, die nicht denen ähnlich sind, für die die Marke Schutz genießt, wenn es sich bei der Marke um eine im Inland bekannte Marke handelt und die Benutzung des Zeichens die Unterscheidungskraft oder die Wertschätzung der bekannten Marke ohne rechtfertigenden Grund in unlauterer Weise ausnutzt oder beeinträchtigt.

(3) Sind die Voraussetzungen des Absatzes 2 erfüllt, so ist es insbesondere untersagt,
1. das Zeichen auf Waren oder ihrer Aufmachung oder Verpackung anzubringen,
2. unter dem Zeichen Waren anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken zu besitzen,
3. unter dem Zeichen Dienstleistungen anzubieten oder zu erbringen,
4. unter dem Zeichen Waren einzuführen oder auszuführen,

5. das Zeichen in Geschäftspapieren oder in der Werbung zu benutzen.

(4) Dritten ist es ferner untersagt, ohne Zustimmung des Inhabers der Marke im geschäftlichen Verkehr
1. ein mit der Marke identisches Zeichen oder ein ähnliches Zeichen auf Aufmachungen oder Verpackungen oder auf Kennzeichnungsmitteln wie Etiketten, Anhängern, Aufnähern oder dergleichen anzubringen,
2. Aufmachungen, Verpackungen oder Kennzeichnungsmittel, die mit einem mit der Marke identischen Zeichen oder einem ähnlichen Zeichen versehen sind, anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken zu besitzen oder
3. Aufmachungen, Verpackungen oder Kennzeichnungsmittel, die mit einem mit der Marke identischen Zeichen oder einem ähnlichen Zeichen versehen sind, einzuführen oder auszuführen,

wenn die Gefahr besteht, daß die Aufmachungen oder Verpackungen zur Aufmachung oder Verpackung oder die Kennzeichnungsmittel zur Kennzeichnung von Waren oder Dienstleistungen benutzt werden, hinsichtlich deren Dritten die Benutzung des Zeichens nach den Absätzen 2 und 3 untersagt wäre.

(5) Wer ein Zeichen entgegen den Absätzen 2 bis 4 benutzt, kann von dem Inhaber der Marke auf Unterlassung in Anspruch genommen werden.

(6) Wer die Verletzungshandlung vorsätzlich oder fahrlässig begeht, ist dem Inhaber der Marke zum Ersatz des durch die Verletzungshandlung entstandenen Schadens verpflichtet.

(7) Wird die Verletzungshandlung in einem geschäftlichen Betrieb von einem Angestellten oder Beauftragten begangen, so kann der Unterlassungsanspruch und, soweit die Angestellte oder Beauftragte vorsätzlich oder fahrlässig gehandelt hat, der Schadensersatzanspruch auch gegen den Inhaber des Betriebs geltend gemacht werden.

## § 15 Ausschließliches Recht des Inhabers einer geschäftlichen Bezeichnung, Unterlassungsanspruch, Schadensersatzanspruch

(1) Der Erwerb des Schutzes einer geschäftlichen Bezeichnung gewährt ihrem Inhaber ein ausschließliches Recht.

(2) Dritten ist es untersagt, die geschäftliche Bezeichnung oder ein ähnliches Zeichen im geschäftlichen Verkehr unbefugt in einer Weise zu benutzen, die geeignet ist, Verwechslungen mit der geschützten Bezeichnung hervorzurufen.

(3) Handelt es sich bei der geschäftlichen Bezeichnung um eine im Inland bekannte geschäftliche Bezeichnung, so ist es Dritten ferner untersagt, die geschäftliche Bezeichnung oder ein ähnliches Zeichen im geschäftlichen Verkehr zu benutzen, wenn keine Gefahr von Verwechslungen im Sinne des Absatzes 2 besteht, soweit die Benutzung des Zeichens die Unterscheidungskraft oder die Wertschätzung der geschäftlichen Bezeichnung ohne rechtfertigenden Grund in unlauterer Weise ausnutzt oder beeinträchtigt.

(4) Wer eine geschäftliche Bezeichnung oder ein ähnliches Zeichen entgegen Absatz 2 oder 3 benutzt, kann von dem Inhaber der geschäftlichen Bezeichnung auf Unterlassung in Anspruch genommen werden.

(5) Wer die Verletzungshandlung vorsätzlich oder fahrlässig begeht, ist dem Inhaber der geschäftlichen Bezeichnung zum Ersatz des daraus entstandenen Schadens verpflichtet.

(6) § 14 Abs. 7 ist entsprechend anzuwenden.

## § 16 Wiedergabe einer eingetragenen Marke in Nachschlagewerken

(1) Erweckt die Wiedergabe einer eingetragenen Marke in einem Wörterbuch, einem Lexikon oder einem ähnlichen Nachschlagewerk den Eindruck, daß es sich bei der Marke um eine Gattungsbezeichnung für die Waren oder Dienstleistungen handelt, für die die Marke eingetragen ist, kann der Inhaber der Marke vom Verleger des Werkes verlangen, daß der Wiedergabe der Marke ein Hinweis beigefügt wird, daß es sich um eine eingetragene Marke handelt.

(2) Ist das Werk bereits erschienen, so beschränkt sich der Anspruch darauf, daß der Hinweis nach Absatz 1 bei einer neuen Auflage des Werkes aufgenommen wird.

(3) Die Absätze 1 und 2 sind entsprechend anzuwenden, wenn das Nachschlagewerk in der Form einer elektronischen Datenbank vertrieben wird oder wenn zu einer elektronischen Datenbank, die ein Nachschlagewerk enthält, Zugang gewährt wird.

## § 17 Ansprüche gegen Agenten oder Vertreter

(1) Ist eine Marke entgegen § 11 für den Agenten oder Vertreter des Inhabers der Marke ohne dessen Zustimmung angemeldet oder eingetragen worden, so ist der Inhaber der Marke berechtigt, von dem Agenten oder Vertreter die Übertragung des durch die Anmeldung oder Eintragung der Marke begründeten Rechts zu verlangen.

(2) Ist eine Marke entgegen § 11 für einen Agenten oder Vertreter des Inhabers der Marke eingetragen worden, so kann der Inhaber die Benutzung der Marke im Sinne des § 14 durch den Agenten oder Vertreter untersagen, wenn er der Benutzung nicht zugestimmt hat. Handelt der Agent oder Vertreter vorsätzlich oder fahrlässig, so ist er dem Inhaber der Marke zum Ersatz des durch die Verletzungshandlung entstandenen Schadens verpflichtet. § 14 Abs. 7 ist entsprechend anzuwenden.

## § 18 Vernichtungsanspruch

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung kann in den Fällen der §§ 14, 15 und 17 verlangen, daß die im Besitz oder Eigentum des Verletzers befindlichen widerrechtlich gekennzeichneten Gegenstände vernichtet werden, es sei denn, daß der durch die Rechtsverletzung verursachte Zustand der Gegenstände auf andere Weise beseitigt werden kann und die Vernichtung für den Verletzer oder den Eigentümer im Einzelfall unverhältnismäßig ist.

(2) Absatz 1 ist entsprechend auf die im Eigentum des Verletzers stehenden, ausschließlich oder nahezu ausschließlich zur widerrechtlichen Kennzeichnung benutzten oder bestimmten Vorrichtungen anzuwenden.

(3) Weitergehende Ansprüche auf Beseitigung bleiben unberührt.

## § 19 Auskunftsanspruch

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung kann den Verletzer in den Fällen der §§ 14, 15 und 17 auf unverzügliche Auskunft über die Herkunft und den Vertriebsweg von widerrechtlich gekennzeichneten Gegenständen in Anspruch nehmen, es sei denn, daß dies im Einzelfall unverhältnismäßig ist.

(2) Der nach Absatz 1 zur Auskunft Verpflichtete hat Angaben zu machen über Namen und Anschrift des Herstellers, des Lieferanten und anderer Vorbesitzer, des gewerblichen Abnehmers oder des Auftraggebers sowie über die Menge der hergestellten, ausgelieferten, erhaltenen oder bestellten Gegenstände.

(3) In Fällen offensichtlicher Rechtsverletzung kann die Verpflichtung zur Erteilung der Auskunft im Wege der einstweiligen Verfügung nach den Vorschriften der Zivilprozeßordnung angeordnet werden.

(4) Die Auskunft darf in einem Strafverfahren oder in einem Verfahren nach dem Gesetz über Ordnungswidrigkeiten wegen einer vor der Erteilung der Auskunft begangenen Tat gegen den zur Auskunft Verpflichteten oder gegen einen in § 52 Abs. 1 der Strafprozeßordnung bezeichneten Angehörigen nur mit Zustimmung des zur Auskunft Verpflichteten verwertet werden.

(5) Weitergehende Ansprüche auf Auskunft bleiben unberührt.

# Abschnitt 4
# Schranken des Schutzes

## § 20 Verjährung

Auf die Verjährung der in den §§ 14 bis 19 genannten Ansprüche finden die Vorschriften des Abschnitts 5 des Buches 1 des Bürgerlichen Gesetzbuchs entsprechende Anwendung. Hat der Verpflichtete durch die Verletzung auf Kosten des Berechtigten etwas erlangt, findet § 852 des Bürgerlichen Gesetzbuchs entsprechende Anwendung.

## § 21 Verwirkung von Ansprüchen

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, die Benutzung einer eingetragenen Marke mit jüngerem Zeitrang für die Waren oder Dienstleistungen, für die sie eingetragen ist, zu untersagen, soweit er die Benutzung der Marke während eines Zeitraums von fünf aufeinanderfolgenden Jahren in Kenntnis dieser Benutzung geduldet hat, es sei denn, daß die Anmeldung der Marke mit jüngerem Zeitrang bösgläubig vorgenommen worden ist.

(2) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, die Benutzung einer Marke im Sinne des § 4 Nr. 2 oder 3, einer geschäftlichen Bezeichnung oder eines sonstigen Rechts im Sinne des § 13 mit jüngerem Zeitrang zu untersagen, soweit er die Benutzung dieses Rechts während eines Zeitraums von fünf aufeinanderfolgenden Jahren in Kenntnis dieser Benutzung geduldet hat, es sei denn, daß der Inhaber dieses Rechts im Zeitpunkt des Rechtserwerbs bösgläubig war.

(3) In den Fällen der Absätze 1 und 2 kann der Inhaber des Rechts mit jüngerem Zeitrang die Benutzung des Rechts mit älterem Zeitrang nicht untersagen.

(4) Die Absätze 1 bis 3 lassen die Anwendung allgemeiner Grundsätze über die Verwirkung von Ansprüchen unberührt.

## § 22 Ausschluß von Ansprüchen bei Bestandskraft der Eintragung einer Marke mit jüngerem Zeitrang

Ein Service der juris GmbH - www.juris.de -

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, die Benutzung einer eingetragenen Marke mit jüngerem Zeitrang für die Waren oder Dienstleistungen, für die sie eingetragen ist, zu untersagen, wenn ein Antrag auf Löschung der Eintragung der Marke mit jüngerem Zeitrang zurückgewiesen worden ist oder zurückzuweisen wäre,

1. weil die Marke oder geschäftliche Bezeichnung mit älterem Zeitrang an dem für den Zeitrang der Eintragung der Marke mit jüngerem Zeitrang maßgeblichen Tag noch nicht im Sinne des § 9 Abs. 1 Nr. 3, des § 14 Abs. 2 Nr. 3 oder des § 15 Abs. 3 bekannt war (§ 51 Abs. 3),
2. weil die Eintragung der Marke mit älterem Zeitrang am Tag der Veröffentlichung der Eintragung der Marke mit jüngerem Zeitrang wegen Verfalls oder wegen absoluter Schutzhindernisse hätte gelöscht werden können (§ 51 Abs. 4).

(2) In den Fällen des Absatzes 1 kann der Inhaber der eingetragenen Marke mit jüngerem Zeitrang die Benutzung der Marke oder der geschäftlichen Bezeichnung mit älterem Zeitrang nicht untersagen.

## § 23 Benutzung von Namen und beschreibenden Angaben, Ersatzteilgeschäft

Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, einem Dritten zu untersagen, im geschäftlichen Verkehr
1. dessen Namen oder Anschrift zu benutzen,
2. ein mit der Marke oder der geschäftlichen Bezeichnung identisches Zeichen oder ein ähnliches Zeichen als Angabe über Merkmale oder Eigenschaften von Waren oder Dienstleistungen, wie insbesondere ihre Art, ihre Beschaffenheit, ihre Bestimmung, ihren Wert, ihre geographische Herkunft oder die Zeit ihrer Herstellung oder ihrer Erbringung, zu benutzen, oder
3. die Marke oder die geschäftliche Bezeichnung als Hinweis auf die Bestimmung einer Ware, insbesondere als Zubehör oder Ersatzteil, oder einer Dienstleistung zu benutzen, soweit die Benutzung dafür notwendig ist,

sofern die Benutzung nicht gegen die guten Sitten verstößt.

## § 24 Erschöpfung

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, einem Dritten zu untersagen, die Marke oder die geschäftliche Bezeichnung für Waren zu benutzen, die unter dieser Marke oder dieser geschäftlichen Bezeichnung von ihm oder mit seiner Zustimmung im Inland, in einem der übrigen Mitgliedstaaten der Europäischen Union oder in einem anderen Vertragsstaat des Abkommens über den Europäischen Wirtschaftsraum in den Verkehr gebracht worden sind.

(2) Absatz 1 findet keine Anwendung, wenn sich der Inhaber der Marke oder der geschäftlichen Bezeichnung der Benutzung der Marke oder der geschäftlichen Bezeichnung im Zusammenhang mit dem weiteren Vertrieb der Waren aus berechtigten Gründen widersetzt, insbesondere wenn der Zustand der Waren nach ihrem Inverkehrbringen verändert oder verschlechtert ist.

## § 25 Ausschluß von Ansprüchen bei mangelnder Benutzung

(1) Der Inhaber einer eingetragenen Marke kann gegen Dritte Ansprüche im Sinne der §§ 14, 18 und 19 nicht geltend machen, wenn die Marke innerhalb der letzten fünf Jahre vor der Geltendmachung des Anspruchs für die Waren oder Dienstleistungen, auf die er sich

zur Begründung seines Anspruchs beruft, nicht gemäß § 26 benutzt worden ist, sofern die Marke zu diesem Zeitpunkt seit mindestens fünf Jahren eingetragen ist.

(2) Werden Ansprüche im Sinne der §§ 14, 18 und 19 wegen Verletzung einer eingetragenen Marke im Wege der Klage geltend gemacht, so hat der Kläger auf Einrede des Beklagten nachzuweisen, daß die Marke innerhalb der letzten fünf Jahre vor Erhebung der Klage für die Waren oder Dienstleistungen, auf die er sich zur Begründung seines Anspruchs beruft, gemäß § 26 benutzt worden ist, sofern die Marke zu diesem Zeitpunkt seit mindestens fünf Jahren eingetragen ist. Endet der Zeitraum von fünf Jahren der Nichtbenutzung nach Erhebung der Klage, so hat der Kläger auf Einrede des Beklagten nachzuweisen, daß die Marke innerhalb der letzten fünf Jahre vor dem Schluß der mündlichen Verhandlung gemäß § 26 benutzt worden ist. Bei der Entscheidung werden nur die Waren oder Dienstleistungen berücksichtigt, für die die Benutzung nachgewiesen worden ist.

## § 26 Benutzung der Marke

(1) Soweit die Geltendmachung von Ansprüchen aus einer eingetragenen Marke oder die Aufrechterhaltung der Eintragung davon abhängig ist, daß die Marke benutzt worden ist, muß sie von ihrem Inhaber für die Waren oder Dienstleistungen, für die sie eingetragen ist, im Inland ernsthaft benutzt worden sein, es sei denn, daß berechtigte Gründe für die Nichtbenutzung vorliegen.

(2) Die Benutzung der Marke mit Zustimmung des Inhabers gilt als Benutzung durch den Inhaber.

(3) Als Benutzung einer eingetragenen Marke gilt auch die Benutzung der Marke in einer Form, die von der Eintragung abweicht, soweit die Abweichungen den kennzeichnenden Charakter der Marke nicht verändern. Satz 1 ist auch dann anzuwenden, wenn die Marke in der Form, in der sie benutzt worden ist, ebenfalls eingetragen ist.

(4) Als Benutzung im Inland gilt auch das Anbringen der Marke auf Waren oder deren Aufmachung oder Verpackung im Inland, wenn die Waren ausschließlich für die Ausfuhr bestimmt sind.

(5) Soweit die Benutzung innerhalb von fünf Jahren ab dem Zeitpunkt der Eintragung erforderlich ist, tritt in den Fällen, in denen gegen die Eintragung Widerspruch erhoben worden ist, an die Stelle des Zeitpunkts der Eintragung der Zeitpunkt des Abschlusses des Widerspruchsverfahrens.

# Abschnitt 5
# Marken als Gegenstand des Vermögens

## § 27 Rechtsübergang

(1) Das durch die Eintragung, die Benutzung oder die notorische Bekanntheit einer Marke begründete Recht kann für alle oder für einen Teil der Waren oder Dienstleistungen, für die die Marke Schutz genießt, auf andere übertragen werden oder übergehen.

(2) Gehört die Marke zu einem Geschäftsbetrieb oder zu einem Teil eines Geschäftsbetriebs, so wird das durch die Eintragung, die Benutzung oder die notorische Bekanntheit der Marke begründete Recht im Zweifel von der Übertragung oder dem Übergang

des Geschäftsbetriebs oder des Teils des Geschäftsbetriebs, zu dem die Marke gehört, erfaßt.

(3) Der Übergang des durch die Eintragung einer Marke begründeten Rechts wird auf Antrag eines Beteiligten in das Register eingetragen, wenn er dem Patentamt nachgewiesen wird.

(4) Betrifft der Rechtsübergang nur einen Teil der Waren oder Dienstleistungen, für die die Marke eingetragen ist, so sind die Vorschriften über die Teilung der Eintragung mit Ausnahme von § 46 Abs. 2 und 3 Satz 1 und 2 entsprechend anzuwenden.

## § 28 Vermutung der Rechtsinhaberschaft, Zustellungen an den Inhaber

(1) Es wird vermutet, daß das durch die Eintragung einer Marke begründete Recht dem im Register als Inhaber Eingetragenen zusteht.

(2) Ist das durch die Eintragung einer Marke begründete Recht auf einen anderen übertragen worden oder übergegangen, so kann der Rechtsnachfolger in einem Verfahren vor dem Patentamt, einem Beschwerdeverfahren vor dem Patentgericht oder einem Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof den Anspruch auf Schutz dieser Marke und das durch die Eintragung begründete Recht erst von dem Zeitpunkt an geltend machen, in dem dem Patentamt der Antrag auf Eintragung des Rechtsübergangs zugegangen ist. Satz 1 gilt entsprechend für sonstige Verfahren vor dem Patentamt, Beschwerdeverfahren vor dem Patentgericht oder Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof, an denen der Inhaber einer Marke beteiligt ist. Übernimmt der Rechtsnachfolger ein Verfahren nach Satz 1 oder 2, so ist die Zustimmung der übrigen Verfahrensbeteiligten nicht erforderlich.

(3) Verfügungen und Beschlüsse des Patentamts, die der Zustellung an den Inhaber der Marke bedürfen, sind dem als Inhaber Eingetragenen zuzustellen. Ist dem Patentamt ein Antrag auf Eintragung eines Rechtsübergangs zugegangen, so sind die in Satz 1 genannten Verfügungen und Beschlüsse auch dem Rechtsnachfolger zuzustellen.

## § 29 Dingliche Rechte, Zwangsvollstreckung, Insolvenzverfahren

(1) Das durch die Eintragung, die Benutzung oder die notorische Bekanntheit einer Marke begründete Recht kann
1. verpfändet werden oder Gegenstand eines sonstigen dinglichen Rechts sein oder
2. Gegenstand von Maßnahmen der Zwangsvollstreckung sein.

(2) Betreffen die in Absatz 1 Nr. 1 genannten Rechte oder die in Absatz 1 Nr. 2 genannten Maßnahmen das durch die Eintragung einer Marke begründete Recht, so werden sie auf Antrag eines Beteiligten in das Register eingetragen, wenn sie dem Patentamt nachgewiesen werden.

(3) Wird das durch die Eintragung einer Marke begründete Recht durch ein Insolvenzverfahren erfaßt, so wird dies auf Antrag des Insolvenzverwalters oder auf Ersuchen des Insolvenzgerichts in das Register eingetragen. Im Falle der Eigenverwaltung (§ 270 der Insolvenzordnung) tritt der Sachwalter an die Stelle des Insolvenzverwalters.

## § 30 Lizenzen

(1) Das durch die Eintragung, die Benutzung oder die notorische Bekanntheit einer Marke begründete Recht kann für alle oder für einen Teil der Waren oder Dienstleistungen, für die die Marke Schutz genießt, Gegenstand von ausschließlichen oder nicht ausschließlichen Lizenzen für das Gebiet der Bundesrepublik Deutschland insgesamt oder einen Teil dieses Gebiets sein.

(2) Der Inhaber einer Marke kann die Rechte aus der Marke gegen einen Lizenznehmer geltend machen, der hinsichtlich
1. der Dauer der Lizenz,
2. der von der Eintragung erfaßten Form, in der die Marke benutzt werden darf,
3. der Art der Waren oder Dienstleistungen, für die die Lizenz erteilt wurde,
4. des Gebiets, in dem die Marke angebracht werden darf, oder
5. der Qualität der von ihm hergestellten Waren oder der von ihm erbrachten Dienstleistungen

gegen eine Bestimmung des Lizenzvertrages verstößt.

(3) Der Lizenznehmer kann Klage wegen Verletzung einer Marke nur mit Zustimmung ihres Inhabers erheben.

(4) Jeder Lizenznehmer kann einer vom Inhaber der Marke erhobenen Verletzungsklage beitreten, um den Ersatz seines Schadens geltend zu machen.

(5) Ein Rechtsübergang nach § 27 oder die Erteilung einer Lizenz nach Absatz 1 berührt nicht die Lizenzen, die Dritten vorher erteilt worden sind.

## § 31 Angemeldete Marken

Die §§ 27 bis 30 gelten entsprechend für durch Anmeldung von Marken begründete Rechte.

# Teil 3
# Verfahren in Markenangelegenheiten

## Abschnitt 1
## Eintragungsverfahren

### § 32 Erfordernisse der Anmeldung

(1) Die Anmeldung zur Eintragung einer Marke in das Register ist beim Patentamt einzureichen. Die Anmeldung kann auch über ein Patentinformationszentrum eingereicht werden, wenn diese Stelle durch Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt dazu bestimmt ist, Markenanmeldungen entgegenzunehmen.

(2) Die Anmeldung muß enthalten:
1. Angaben, die es erlauben, die Identität des Anmelders festzustellen,
2. eine Wiedergabe der Marke und
3. ein Verzeichnis der Waren oder Dienstleistungen, für die die Eintragung beantragt wird.

(3) Die Anmeldung muß den weiteren Anmeldungserfordernissen entsprechen, die in einer Rechtsverordnung nach § 65 Abs. 1 Nr. 2 bestimmt worden sind.

Ein Service der juris GmbH - www.juris.de -

(4) (weggefallen)

## § 33 Anmeldetag, Anspruch auf Eintragung, Veröffentlichung der Anmeldung

(1) Der Anmeldetag einer Marke ist der Tag, an dem die Unterlagen mit den Angaben nach § 32 Abs. 2
1. beim Patentamt
2. oder, wenn diese Stelle durch Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt dazu bestimmt ist, bei einem Patentinformationszentrum eingegangen sind.

(2) Die Anmeldung einer Marke, deren Anmeldetag feststeht, begründet einen Anspruch auf Eintragung. Dem Eintragungsantrag ist stattzugeben, es sei denn, daß die Anmeldungserfordernisse nicht erfüllt sind oder daß absolute Eintragungshindernisse der Eintragung entgegenstehen.

(3) Die Anmeldung einer Marke, deren Anmeldetag feststeht, wird einschließlich solcher Angaben veröffentlicht, die es erlauben, die Identität des Anmelders festzustellen.

## § 34 Ausländische Priorität

(1) Die Inanspruchnahme der Priorität einer früheren ausländischen Anmeldung richtet sich nach den Vorschriften der Staatsverträge mit der Maßgabe, daß die Priorität nach der Pariser Verbandsübereinkunft auch für Dienstleistungen in Anspruch genommen werden kann.

(2) Ist die frühere ausländische Anmeldung in einem Staat eingereicht worden, mit dem kein Staatsvertrag über die Anerkennung der Priorität besteht, so kann der Anmelder ein dem Prioritätsrecht nach der Pariser Verbandsübereinkunft entsprechendes Prioritätsrecht in Anspruch nehmen, soweit nach einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt der andere Staat aufgrund einer ersten Anmeldung beim Patentamt ein Prioritätsrecht gewährt, das nach Voraussetzungen und Inhalt dem Prioritätsrecht nach der Pariser Verbandsübereinkunft vergleichbar ist.

(3) Wer eine Priorität nach Absatz 1 oder 2 in Anspruch nimmt, hat innerhalb von zwei Monaten nach dem Anmeldetag Zeit und Staat der früheren Anmeldung anzugeben. Hat der Anmelder diese Angaben gemacht, fordert ihn das Patentamt auf, innerhalb von zwei Monaten nach der Zustellung der Aufforderung das Aktenzeichen der früheren Anmeldung anzugeben und eine Abschrift der früheren Anmeldung einzureichen. Innerhalb dieser Fristen können die Angaben geändert werden. Werden die Angaben nicht rechtzeitig gemacht, so wird der Prioritätsanspruch für diese Anmeldung verwirkt.

## § 35 Ausstellungspriorität

(1) Hat der Anmelder der Marke Waren oder Dienstleistungen unter der angemeldeten Marke
1. auf einer amtlichen oder amtlich anerkannten internationalen Ausstellung im Sinne des am 22. November 1928 in Paris unterzeichneten Abkommens über internationale Ausstellungen oder
2. auf einer sonstigen inländischen oder ausländischen Ausstellung

zur Schau gestellt, kann er, wenn er die Anmeldung innerhalb einer Frist von sechs Monaten seit der erstmaligen Zurschaustellung der Waren oder Dienstleistungen unter der

Ein Service der juris GmbH - www.juris.de -

angemeldeten Marke einreicht, von diesem Tag an ein Prioritätsrecht im Sinne des § 34 in Anspruch nehmen.

(2) Die in Absatz 1 Nr. 1 bezeichneten Ausstellungen werden vom Bundesministerium der Justiz im Bundesgesetzblatt bekanntgemacht.

(3) Die Ausstellungen im Sinne des Absatzes 1 Nr. 2 werden im Einzelfall in einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt über den Ausstellungsschutz bestimmt.

(4) Wer eine Priorität nach Absatz 1 in Anspruch nimmt, hat innerhalb von zwei Monaten nach dem Anmeldetag den Tag der erstmaligen Zurschaustellung sowie die Ausstellung anzugeben. Hat der Anmelder diese Angaben gemacht, fordert ihn das Patentamt auf, innerhalb von zwei Monaten nach der Zustellung der Aufforderung die Nachweise für die Zurschaustellung der Waren oder Dienstleistungen unter der angemeldeten Marke einzureichen. Werden die Nachweise nicht rechtzeitig eingereicht, so wird der Prioritätsanspruch für diese Anmeldung verwirkt.

(5) Die Ausstellungspriorität nach Absatz 1 verlängert nicht die Prioritätsfrist nach § 34.

## § 36 Prüfung der Anmeldungserfordernisse

(1) Das Patentamt prüft, ob
1. die Anmeldung der Marke den Erfordernissen für die Zuerkennung eines Anmeldetages nach § 33 Abs. 1 genügt,
2. die Anmeldung den sonstigen Anmeldungserfordernissen entspricht,
3. die Gebühren in ausreichender Höhe gezahlt worden sind und
4. der Anmelder nach § 7 Inhaber einer Marke sein kann.

(2) Werden nach Absatz 1 Nr. 1 festgestellte Mängel nicht innerhalb einer vom Patentamt bestimmten Frist beseitigt, so gilt die Anmeldung als zurückgenommen. Kommt der Anmelder der Aufforderung des Patentamts nach, so erkennt das Patentamt als Anmeldetag den Tag zu, an dem die festgestellten Mängel beseitigt werden.

(3) Werden innerhalb einer vom Patentamt bestimmten Frist Klassengebühren nicht oder in nicht ausreichender Höhe nachgezahlt oder wird vom Anmelder keine Bestimmung darüber getroffen, welche Waren- oder Dienstleistungsklassen durch den gezahlten Gebührenbetrag gedeckt werden sollen, so werden zunächst die Leitklasse und sodann die übrigen Klassen in der Reihenfolge der Klasseneinteilung berücksichtigt. Im Übrigen gilt die Anmeldung als zurückgenommen.

(4) Werden sonstige Mängel innerhalb einer vom Patentamt bestimmten Frist nicht beseitigt, so weist das Patentamt die Anmeldung zurück.

(5) Kann der Anmelder nicht nach § 7 Inhaber einer Marke sein, so weist das Patentamt die Anmeldung zurück.

## § 37 Prüfung auf absolute Schutzhindernisse

(1) Ist die Marke nach § 3, 8 oder 10 von der Eintragung ausgeschlossen, so wird die Anmeldung zurückgewiesen.

(2) Ergibt die Prüfung, daß die Marke zwar am Anmeldetag (§ 33 Abs. 1) nicht den Voraussetzungen des § 8 Abs. 2 Nr. 1, 2 oder 3 entsprach, daß das Schutzhindernis aber nach dem Anmeldetag weggefallen ist, so kann die Anmeldung nicht zurückgewiesen werden, wenn der Anmelder sich damit einverstanden erklärt, daß ungeachtet des ursprünglichen Anmeldetages und einer etwa nach § 34 oder § 35 in Anspruch genommenen Priorität der Tag, an dem das Schutzhindernis weggefallen ist, als Anmeldetag gilt und für die Bestimmung des Zeitrangs im Sinne des § 6 Abs. 2 maßgeblich ist.

(3) Eine Anmeldung wird nach § 8 Abs. 2 Nr. 4 oder Nr. 10 nur zurückgewiesen, wenn die Eignung zur Täuschung oder die Bösgläubigkeit ersichtlich ist.

(4) Eine Anmeldung wird nach § 10 nur zurückgewiesen, wenn die Notorietät der älteren Marke amtsbekannt ist und wenn die weiteren Voraussetzungen des § 9 Abs. 1 Nr. 1 oder 2 gegeben sind.

(5) Die Absätze 1 bis 4 sind entsprechend anzuwenden, wenn die Marke nur für einen Teil der Waren oder Dienstleistungen, für die sie angemeldet worden ist, von der Eintragung ausgeschlossen ist.

## § 38 Beschleunigte Prüfung

Auf Antrag des Anmelders wird die Prüfung nach den §§ 36 und 37 beschleunigt durchgeführt.

## § 39 Zurücknahme, Einschränkung und Berichtigung der Anmeldung

(1) Der Anmelder kann die Anmeldung jederzeit zurücknehmen oder das in der Anmeldung enthaltene Verzeichnis der Waren und Dienstleistungen einschränken.

(2) Der Inhalt der Anmeldung kann auf Antrag des Anmelders zur Berichtigung von sprachlichen Fehlern, Schreibfehlern oder sonstigen offensichtlichen Unrichtigkeiten geändert werden.

## § 40 Teilung der Anmeldung

(1) Der Anmelder kann die Anmeldung teilen, indem er erklärt, daß die Anmeldung der Marke für die in der Teilungserklärung aufgeführten Waren und Dienstleistungen als abgetrennte Anmeldung weiterbehandelt werden soll. Für jede Teilanmeldung bleibt der Zeitrang der ursprünglichen Anmeldung erhalten.

(2) Für die abgetrennte Anmeldung sind die nach § 32 erforderlichen Anmeldungsunterlagen einzureichen. Werden die Anmeldungsunterlagen nicht innerhalb von drei Monaten nach dem Zugang der Teilungserklärung eingereicht oder wird die Gebühr nach dem Patentkostengesetz für das Teilungsverfahren nicht innerhalb dieser Frist gezahlt, so gilt die abgetrennte Anmeldung als zurückgenommen. Die Teilungserklärung kann nicht widerrufen werden.

## § 41 Eintragung

Entspricht die Anmeldung den Anmeldungserfordernissen und wird sie nicht gemäß § 37 zurückgewiesen, so wird die angemeldete Marke in das Register eingetragen. Die Eintragung wird veröffentlicht.

Ein Service der juris GmbH - www.juris.de -

## § 42 Widerspruch

(1) Innerhalb einer Frist von drei Monaten nach dem Tag der Veröffentlichung der Eintragung der Marke gemäß § 41 kann von dem Inhaber einer Marke mit älterem Zeitrang gegen die Eintragung der Marke Widerspruch erhoben werden.

(2) Der Widerspruch kann nur darauf gestützt werden, daß die Marke
1. wegen einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang nach § 9 Abs. 1 Nr. 1 oder 2,
2. wegen einer notorisch bekannten Marke mit älterem Zeitrang nach § 10 in Verbindung mit § 9 Abs. 1 Nr. 1 oder 2 oder
3. wegen ihrer Eintragung für einen Agenten oder Vertreter des Markeninhabers nach § 11

gelöscht werden kann.

(3) (weggefallen)

## § 43 Einrede mangelnder Benutzung, Entscheidung über den Widerspruch

(1) Ist der Widerspruch vom Inhaber einer eingetragenen Marke mit älterem Zeitrang erhoben worden, so hat er, wenn der Gegner die Benutzung der Marke bestreitet, glaubhaft zu machen, daß sie innerhalb der letzten fünf Jahre vor der Veröffentlichung der Eintragung der Marke, gegen die der Widerspruch sich richtet, gemäß § 26 benutzt worden ist, sofern sie zu diesem Zeitpunkt seit mindestens fünf Jahren eingetragen ist. Endet der Zeitraum von fünf Jahren der Nichtbenutzung nach der Veröffentlichung der Eintragung, so hat der Widersprechende, wenn der Gegner die Benutzung bestreitet, glaubhaft zu machen, daß die Marke innerhalb der letzten fünf Jahre vor der Entscheidung über den Widerspruch gemäß § 26 benutzt worden ist. Bei der Entscheidung werden nur die Waren oder Dienstleistungen berücksichtigt, für die die Benutzung glaubhaft gemacht worden ist.

(2) Ergibt die Prüfung des Widerspruchs, daß die Marke für alle oder für einen Teil der Waren oder Dienstleistungen, für die sie eingetragen ist, zu löschen ist, so wird die Eintragung ganz oder teilweise gelöscht. Kann die Eintragung der Marke nicht gelöscht werden, so wird der Widerspruch zurückgewiesen.

(3) Ist die eingetragene Marke wegen einer oder mehrerer Marken mit älterem Zeitrang zu löschen, so kann das Verfahren über weitere Widersprüche bis zur rechtskräftigen Entscheidung über die Eintragung der Marke ausgesetzt werden.

(4) Im Falle der Löschung nach Absatz 2 ist § 52 Abs. 2 und 3 entsprechend anzuwenden.

## § 44 Eintragungsbewilligungsklage

(1) Der Inhaber der Marke kann im Wege der Klage gegen den Widersprechenden geltend machen, daß ihm trotz der Löschung der Eintragung nach § 43 ein Anspruch auf die Eintragung zusteht.

(2) Die Klage nach Absatz 1 ist innerhalb von sechs Monaten nach Unanfechtbarkeit der Entscheidung, mit der die Eintragung gelöscht worden ist, zu erheben.

(3) Die Eintragung aufgrund einer Entscheidung zugunsten des Inhabers der Marke wird unter Wahrung des Zeitrangs der Eintragung vorgenommen.

## Abschnitt 2
## Berichtigung, Teilung, Schutzdauer und Verlängerung

### § 45 Berichtigung des Registers und von Veröffentlichungen

(1) Eintragungen im Register können auf Antrag oder von Amts wegen zur Berichtigung von sprachlichen Fehlern, Schreibfehlern oder sonstigen offensichtlichen Unrichtigkeiten geändert werden. War die von der Berichtigung betroffene Eintragung veröffentlicht worden, so ist die berichtigte Eintragung zu veröffentlichen.

(2) Absatz 1 ist entsprechend auf die Berichtigung von Veröffentlichungen anzuwenden.

### § 46 Teilung der Eintragung

(1) Der Inhaber einer eingetragenen Marke kann die Eintragung teilen, indem er erklärt, daß die Eintragung der Marke für die in der Teilungserklärung aufgeführten Waren oder Dienstleistungen als abgetrennte Eintragung fortbestehen soll. Für jede Teileintragung bleibt der Zeitrang der ursprünglichen Eintragung erhalten.

(2) Die Teilung kann erst nach Ablauf der Frist zur Erhebung des Widerspruchs erklärt werden. Die Erklärung ist nur zulässig, wenn ein im Zeitpunkt ihrer Abgabe anhängiger Widerspruch gegen die Eintragung der Marke oder eine in diesem Zeitpunkt anhängige Klage auf Löschung der Eintragung der Marke sich nach der Teilung nur gegen einen der Teile der ursprünglichen Eintragung richten würde.

(3) Für die abgetrennte Eintragung sind die erforderlichen Unterlagen einzureichen. Werden die Unterlagen nicht innerhalb von drei Monaten nach dem Zugang der Teilungserklärung eingereicht oder wird die Gebühr nach dem Patentkostengesetz für das Teilungsverfahren nicht innerhalb dieser Frist gezahlt, so gilt dies als Verzicht auf die abgetrennte Eintragung. Die Teilungserklärung kann nicht widerrufen werden.

### § 47 Schutzdauer und Verlängerung

(1) Die Schutzdauer einer eingetragenen Marke beginnt mit dem Anmeldetag (§ 33 Abs. 1) und endet nach zehn Jahren am letzten Tag des Monats, der durch seine Benennung dem Monat entspricht, in den der Anmeldetag fällt.

(2) Die Schutzdauer kann um jeweils zehn Jahre verlängert werden.

(3) Die Verlängerung der Schutzdauer wird dadurch bewirkt, daß eine Verlängerungsgebühr und, falls die Verlängerung für Waren und Dienstleistungen begehrt wird, die in mehr als drei Klassen der Klasseneinteilung von Waren und Dienstleistungen fallen, für jede weitere Klasse eine Klassengebühr gezahlt werden.

(4) Beziehen sich die Gebühren nur auf einen Teil der Waren oder Dienstleistungen, für die die Marke eingetragen ist, so wird die Schutzdauer nur für diese Waren oder Dienstleistungen verlängert. Werden lediglich die erforderlichen Klassengebühren nicht gezahlt, so wird die Schutzdauer, soweit nicht Satz 1 Anwendung findet, nur für die Klassen verlängert, für die die gezahlten Gebühren ausreichen. Besteht eine Leitklasse, so wird sie zunächst berücksichtigt. Im übrigen werden die Klassen in der Reihenfolge der Klasseneinteilung berücksichtigt.

Ein Service der juris GmbH - www.juris.de -

(5) Die Verlängerung der Schutzdauer wird am Tag nach dem Ablauf der Schutzdauer wirksam. Sie wird in das Register eingetragen und veröffentlicht.

(6) Wird die Schutzdauer nicht verlängert, so wird die Eintragung der Marke mit Wirkung ab dem Ablauf der Schutzdauer gelöscht.

# Abschnitt 3
# Verzicht, Verfall und Nichtigkeit, Löschungsverfahren

## § 48 Verzicht

(1) Auf Antrag des Inhabers der Marke wird die Eintragung jederzeit für alle oder für einen Teil der Waren oder Dienstleistungen, für die sie eingetragen ist, im Register gelöscht.

(2) Ist im Register eine Person als Inhaber eines Rechts an der Marke eingetragen, so wird die Eintragung nur mit Zustimmung dieser Person gelöscht.

## § 49 Verfall

(1) Die Eintragung einer Marke wird auf Antrag wegen Verfalls gelöscht, wenn die Marke nach dem Tag der Eintragung innerhalb eines ununterbrochenen Zeitraums von fünf Jahren nicht gemäß § 26 benutzt worden ist. Der Verfall einer Marke kann jedoch nicht geltend gemacht werden, wenn nach Ende dieses Zeitraums und vor Stellung des Löschungsantrags eine Benutzung der Marke gemäß § 26 begonnen oder wieder aufgenommen worden ist. Wird die Benutzung jedoch im Anschluß an einen ununterbrochenen Zeitraum von fünf Jahren der Nichtbenutzung innerhalb von drei Monaten vor der Stellung des Löschungsantrags begonnen oder wieder aufgenommen, so bleibt sie unberücksichtigt, sofern die Vorbereitungen für die erstmalige oder die erneute Benutzung erst stattgefunden haben, nachdem der Inhaber der Marke Kenntnis davon erhalten hat, daß Antrag auf Löschung gestellt werden könnte. Wird der Antrag auf Löschung nach § 53 Abs. 1 beim Patentamt gestellt, so bleibt für die Berechnung der Frist von drei Monaten nach Satz 3 der Antrag beim Patentamt maßgeblich, wenn die Klage auf Löschung nach § 55 Abs. 1 innerhalb von drei Monaten nach Zustellung der Mitteilung nach § 53 Abs. 4 erhoben wird.

(2) Die Eintragung einer Marke wird ferner auf Antrag wegen Verfalls gelöscht,
1. wenn die Marke infolge des Verhaltens oder der Untätigkeit ihres Inhabers im geschäftlichen Verkehr zur gebräuchlichen Bezeichnung der Waren oder Dienstleistungen, für die sie eingetragen ist, geworden ist;
2. wenn die Marke infolge ihrer Benutzung durch den Inhaber oder mit seiner Zustimmung für die Waren oder Dienstleistungen, für die sie eingetragen ist, geeignet ist, das Publikum insbesondere über die Art, die Beschaffenheit oder die geographische Herkunft dieser Waren oder Dienstleistungen zu täuschen oder
3. wenn der Inhaber der Marke nicht mehr die in § 7 genannten Voraussetzungen erfüllt.

(3) Liegt ein Verfallsgrund nur für einen Teil der Waren oder Dienstleistungen vor, für die die Marke eingetragen ist, so wird die Eintragung nur für diese Waren oder Dienstleistungen gelöscht.

## § 50 Nichtigkeit wegen absoluter Schutzhindernisse

(1) Die Eintragung einer Marke wird auf Antrag wegen Nichtigkeit gelöscht, wenn sie entgegen §§ 3, 7 oder 8 eingetragen worden ist.

(2) Ist die Marke entgegen §§ 3, 7 oder 8 Abs. 2 Nr. 1 bis 9 eingetragen worden, so kann die Eintragung nur gelöscht werden, wenn das Schutzhindernis auch noch im Zeitpunkt der Entscheidung über den Antrag auf Löschung besteht. Ist die Marke entgegen § 8 Abs. 2 Nr. 1, 2 oder 3 eingetragen worden, so kann die Eintragung außerdem nur dann gelöscht werden, wenn der Antrag auf Löschung innerhalb von zehn Jahren seit dem Tag der Eintragung gestellt wird.

(3) Die Eintragung einer Marke kann von Amts wegen gelöscht werden, wenn sie entgegen § 8 Abs. 2 Nr. 4 bis 10 eingetragen worden ist und
1. das Löschungsverfahren innerhalb eines Zeitraums von zwei Jahren seit dem Tag der Eintragung eingeleitet wird,
2. das Schutzhindernis gemäß § 8 Abs. 2 Nr. 4 bis 9 auch noch im Zeitpunkt der Entscheidung über die Löschung besteht und
3. die Eintragung ersichtlich entgegen den genannten Vorschriften vorgenommen worden ist.

(4) Liegt ein Nichtigkeitsgrund nur für einen Teil der Waren oder Dienstleistungen vor, für die die Marke eingetragen ist, so wird die Eintragung nur für diese Waren oder Dienstleistungen gelöscht.

## § 51 Nichtigkeit wegen des Bestehens älterer Rechte

(1) Die Eintragung einer Marke wird auf Klage wegen Nichtigkeit gelöscht, wenn ihr ein Recht im Sinne der §§ 9 bis 13 mit älterem Zeitrang entgegensteht.

(2) Die Eintragung kann aufgrund der Eintragung einer Marke mit älterem Zeitrang nicht gelöscht werden, soweit der Inhaber der Marke mit älterem Zeitrang die Benutzung der Marke mit jüngerem Zeitrang für die Waren oder Dienstleistungen, für die sie eingetragen ist, während eines Zeitraums von fünf aufeinanderfolgenden Jahren in Kenntnis dieser Benutzung geduldet hat, es sei denn, daß die Anmeldung der Marke mit jüngerem Zeitrang bösgläubig vorgenommen worden ist. Das gleiche gilt für den Inhaber eines Rechts mit älterem Zeitrang an einer durch Benutzung erworbenen Marke im Sinne des § 4 Nr. 2, an einer notorisch bekannten Marke im Sinne des § 4 Nr. 3, an einer geschäftlichen Bezeichnung im Sinne des § 5 oder an einer Sortenbezeichnung im Sinne des § 13 Abs. 2 Nr. 4. Die Eintragung einer Marke kann ferner nicht gelöscht werden, wenn der Inhaber eines der in den §§ 9 bis 13 genannten Rechte mit älterem Zeitrang der Eintragung der Marke vor der Stellung des Antrags auf Löschung zugestimmt hat.

(3) Die Eintragung kann aufgrund einer bekannten Marke oder einer bekannten geschäftlichen Bezeichnung mit älterem Zeitrang nicht gelöscht werden, wenn die Marke oder die geschäftliche Bezeichnung an dem für den Zeitrang der Eintragung der Marke mit jüngerem Zeitrang maßgeblichen Tag noch nicht im Sinne des § 9 Abs. 1 Nr. 3, des § 14 Abs. 2 Nr. 3 oder des § 15 Abs. 3 bekannt war.

(4) Die Eintragung kann aufgrund der Eintragung einer Marke mit älterem Zeitrang nicht gelöscht werden, wenn die Eintragung der Marke mit älterem Zeitrang am Tag der Veröffentlichung der Eintragung der Marke mit jüngerem Zeitrang
1. wegen Verfalls nach § 49 oder
2. wegen absoluter Schutzhindernisse nach § 50

hätte gelöscht werden können.

(5) Liegt ein Nichtigkeitsgrund nur für einen Teil der Waren oder Dienstleistungen vor, für die die Marke eingetragen ist, so wird die Eintragung nur für diese Waren oder Dienstleistungen gelöscht.

## § 52 Wirkungen der Löschung wegen Verfalls oder Nichtigkeit

(1) Die Wirkungen der Eintragung einer Marke gelten in dem Umfang, in dem die Eintragung wegen Verfalls gelöscht wird, als von dem Zeitpunkt der Erhebung der Klage auf Löschung an nicht eingetreten. In der Entscheidung kann auf Antrag einer Partei ein früherer Zeitpunkt, zu dem einer der Verfallsgründe eingetreten ist, festgesetzt werden.

(2) Die Wirkungen der Eintragung einer Marke gelten in dem Umfang, in dem die Eintragung wegen Nichtigkeit gelöscht wird, als von Anfang an nicht eingetreten.

(3) Vorbehaltlich der Vorschriften über den Ersatz des Schadens, der durch fahrlässiges oder vorsätzliches Verhalten des Inhabers einer Marke verursacht worden ist, sowie der Vorschriften über ungerechtfertigte Bereicherung berührt die Löschung der Eintragung der Marke nicht
1. Entscheidungen in Verletzungsverfahren, die vor der Entscheidung über den Antrag auf Löschung rechtskräftig geworden und vollstreckt worden sind, und
2. vor der Entscheidung über den Antrag auf Löschung geschlossene Verträge insoweit, als sie vor dieser Entscheidung erfüllt worden sind. Es kann jedoch verlangt werden, daß in Erfüllung des Vertrages gezahlte Beträge aus Billigkeitsgründen insoweit zurückerstattet werden, wie die Umstände dies rechtfertigen.

## § 53 Löschung durch das Patentamt wegen Verfalls

(1) Der Antrag auf Löschung wegen Verfalls (§ 49) kann, unbeschadet des Rechts, den Antrag durch Klage nach § 55 geltend zu machen, beim Patentamt gestellt werden.

(2) Das Patentamt unterrichtet den Inhaber der eingetragenen Marke über den Antrag und fordert ihn auf, dem Patentamt mitzuteilen, ob er der Löschung widerspricht.

(3) Widerspricht der Inhaber der eingetragenen Marke der Löschung nicht innerhalb von zwei Monaten nach Zustellung der Mitteilung, wird die Eintragung gelöscht.

(4) Widerspricht der Inhaber der eingetragenen Marke der Löschung, teilt das Patentamt dies dem Antragsteller mit und unterrichtet ihn darüber, daß der Antrag auf Löschung durch Klage nach § 55 geltend zu machen ist.

## § 54 Löschungsverfahren vor dem Patentamt wegen absoluter Schutzhindernisse

(1) Der Antrag auf Löschung wegen absoluter Schutzhindernisse (§ 50) ist beim Patentamt zu stellen. Der Antrag kann von jeder Person gestellt werden.

(2) Wird ein Antrag auf Löschung gestellt oder wird ein Löschungsverfahren von Amts wegen eingeleitet, so unterrichtet das Patentamt den Inhaber der eingetragenen Marke hierüber. Widerspricht er der Löschung nicht innerhalb von zwei Monaten nach Zustellung

Ein Service der juris GmbH - www.juris.de -

der Mitteilung, so wird die Eintragung gelöscht. Widerspricht er der Löschung, so wird
das Löschungsverfahren durchgeführt.

## § 55 Löschungsverfahren vor den ordentlichen Gerichten

(1) Die Klage auf Löschung wegen Verfalls (§ 49) oder wegen des Bestehens älterer
Rechte (§ 51) ist gegen den als Inhaber der Marke Eingetragenen oder seinen
Rechtsnachfolger zu richten.

(2) Zur Erhebung der Klage sind befugt:
1. in den Fällen des Antrags auf Löschung wegen Verfalls jede Person,
2. in den Fällen des Antrags auf Löschung wegen des Bestehens von Rechten mit älterem
   Zeitrang die Inhaber der in den §§ 9 bis 13 aufgeführten Rechte,
3. in den Fällen des Antrags auf Löschung wegen des Bestehens einer geographischen
   Herkunftsangabe mit älterem Zeitrang (§ 13 Abs. 2 Nr. 5) die nach § 8 Abs. 3
   des Gesetzes gegen den unlauteren Wettbewerb zur Geltendmachung von Ansprüchen
   Berechtigten.

(3) Ist die Klage auf Löschung vom Inhaber einer eingetragenen Marke mit älterem
Zeitrang erhoben worden, so hat er auf Einrede des Beklagten nachzuweisen, daß die
Marke innerhalb der letzten fünf Jahre vor Erhebung der Klage gemäß § 26 benutzt worden
ist, sofern sie zu diesem Zeitpunkt seit mindestens fünf Jahren eingetragen ist. Endet
der Zeitraum von fünf Jahren der Nichtbenutzung nach Erhebung der Klage, so hat der
Kläger auf Einrede des Beklagten nachzuweisen, daß die Marke innerhalb der letzten fünf
Jahre vor dem Schluß der mündlichen Verhandlung gemäß § 26 benutzt worden ist. War die
Marke mit älterem Zeitrang am Tag der Veröffentlichung der Eintragung der Marke mit
jüngerem Zeitrang bereits seit mindestens fünf Jahren eingetragen, so hat der Kläger
auf Einrede des Beklagten ferner nachzuweisen, daß die Eintragung der Marke mit älterem
Zeitrang an diesem Tag nicht nach § 49 Abs. 1 hätte gelöscht werden können. Bei der
Entscheidung werden nur die Waren oder Dienstleistungen berücksichtigt, für die die
Benutzung nachgewiesen worden ist.

(4) Ist vor oder nach Erhebung der Klage das durch die Eintragung der Marke begründete
Recht auf einen anderen übertragen worden oder übergegangen, so ist die Entscheidung
in der Sache selbst auch gegen den Rechtsnachfolger wirksam und vollstreckbar. Für die
Befugnis des Rechtsnachfolgers, in den Rechtsstreit einzutreten, gelten die §§ 66 bis
74 und 76 der Zivilprozeßordnung entsprechend.

# Abschnitt 4
# Allgemeine Vorschriften für das Verfahren vor dem
# Patentamt

## § 56 Zuständigkeiten im Patentamt

(1) Im Patentamt werden zur Durchführung der Verfahren in Markenangelegenheiten
Markenstellen und Markenabteilungen gebildet.

(2) Die Markenstellen sind für die Prüfung von angemeldeten Marken und für die
Beschlußfassung im Eintragungsverfahren zuständig. Die Aufgaben einer Markenstelle
nimmt ein Mitglied des Patentamts (Prüfer) wahr. Die Aufgaben können auch von einem
Beamten des gehobenen Dienstes oder von einem vergleichbaren Angestellten wahrgenommen
werden. Beamte des gehobenen Dienstes und vergleichbare Angestellte sind jedoch nicht

Ein Service der juris GmbH - www.juris.de -

befugt, eine Beeidigung anzuordnen, einen Eid abzunehmen oder ein Ersuchen nach § 95 Abs. 2 an das Patentgericht zu richten.

(3) Die Markenabteilungen sind für die Angelegenheiten zuständig, die nicht in die Zuständigkeit der Markenstellen fallen. Die Aufgaben einer Markenabteilung werden in der Besetzung mit mindestens drei Mitgliedern des Patentamts wahrgenommen. Der Vorsitzende einer Markenabteilung kann alle in die Zuständigkeit der Markenabteilung fallenden Angelegenheiten mit Ausnahme der Entscheidung über die Löschung einer Marke nach § 54 allein bearbeiten oder diese Angelegenheiten einem Angehörigen der Markenabteilung zur Bearbeitung übertragen.

## § 57 Ausschließung und Ablehnung

(1) Für die Ausschließung und Ablehnung der Prüfer und der Mitglieder der Markenabteilungen sowie der mit der Wahrnehmung von Angelegenheiten, die den Markenstellen oder den Markenabteilungen obliegen, betrauten Beamten des gehobenen und mittleren Dienstes oder Angestellten gelten die §§ 41 bis 44, 45 Abs. 2 Satz 2, §§ 47 bis 49 der Zivilprozeßordnung über die Ausschließung und Ablehnung der Gerichtspersonen entsprechend.

(2) Über das Ablehnungsgesuch entscheidet, soweit es einer Entscheidung bedarf, eine Markenabteilung.

## § 58 Gutachten

(1) Das Patentamt ist verpflichtet, auf Ersuchen der Gerichte oder der Staatsanwaltschaften über Fragen, die angemeldete oder eingetragene Marken betreffen, Gutachten abzugeben, wenn in dem Verfahren voneinander abweichende Gutachten mehrerer Sachverständiger vorliegen.

(2) Im übrigen ist das Patentamt nicht befugt, ohne Genehmigung des Bundesministeriums der Justiz außerhalb seines gesetzlichen Aufgabenbereichs Beschlüsse zu fassen oder Gutachten abzugeben.

## § 59 Ermittlung des Sachverhalts, rechtliches Gehör

(1) Das Patentamt ermittelt den Sachverhalt von Amts wegen. Es ist an das Vorbringen und die Beweisanträge der Beteiligten nicht gebunden.

(2) Soll die Entscheidung des Patentamts auf Umstände gestützt werden, die dem Anmelder oder Inhaber der Marke oder einem anderen am Verfahren Beteiligten noch nicht mitgeteilt waren, so ist ihm vorher Gelegenheit zu geben, sich dazu innerhalb einer bestimmten Frist zu äußern.

## § 60 Ermittlungen, Anhörungen, Niederschrift

(1) Das Patentamt kann jederzeit die Beteiligten laden und anhören, Zeugen, Sachverständige und Beteiligte eidlich oder uneidlich vernehmen sowie andere zur Aufklärung der Sache erforderliche Ermittlungen anstellen.

(2) Bis zum Beschluß, mit dem das Verfahren abgeschlossen wird, ist der Anmelder oder Inhaber der Marke oder ein anderer an dem Verfahren Beteiligter auf Antrag anzuhören, wenn dies sachdienlich ist. Hält das Patentamt die Anhörung nicht für sachdienlich, so

Ein Service der juris GmbH - www.juris.de -

weist es den Antrag zurück. Der Beschluß, durch den der Antrag zurückgewiesen wird, ist selbständig nicht anfechtbar.

(3) Über die Anhörungen und Vernehmungen ist eine Niederschrift zu fertigen, die den wesentlichen Gang der Verhandlung wiedergeben und die rechtserheblichen Erklärungen der Beteiligten enthalten soll. Die §§ 160a, 162 und 163 der Zivilprozeßordnung sind entsprechend anzuwenden. Die Beteiligten erhalten eine Abschrift der Niederschrift.

## § 61 Beschlüsse, Rechtsmittelbelehrung

(1) Die Beschlüsse des Patentamts sind, auch wenn sie nach Satz 2 verkündet worden sind, schriftlich auszufertigen, zu begründen und den Beteiligten von Amts wegen zuzustellen. Falls eine Anhörung stattgefunden hat, können sie auch am Ende der Anhörung verkündet werden. Einer Begründung bedarf es nicht, wenn am Verfahren nur der Anmelder oder Inhaber der Marke beteiligt ist und seinem Antrag stattgegeben wird.

(2) Der schriftlichen Ausfertigung ist eine Erklärung beizufügen, mit der die Beteiligten über das Rechtsmittel, das gegen den Beschluß gegeben ist, über die Stelle, bei der das Rechtsmittel einzulegen ist, über die Rechtsmittelfrist und, sofern für das Rechtsmittel eine Gebühr nach dem Patentkostengesetz zu zahlen ist, über die Gebühr unterrichtet werden. Die Frist für das Rechtsmittel beginnt nur zu laufen, wenn die Beteiligten schriftlich belehrt worden sind. Ist die Belehrung unterblieben oder unrichtig erteilt, so ist die Einlegung des Rechtsmittels nur innerhalb eines Jahres seit Zustellung des Beschlusses zulässig, außer wenn der Beteiligte schriftlich dahingehend belehrt worden ist, daß ein Rechtsmittel nicht gegeben sei. § 91 ist entsprechend anzuwenden. Die Sätze 1 bis 4 gelten entsprechend für den Rechtsbehelf der Erinnerung nach § 64.

## § 62 Akteneinsicht, Registereinsicht

(1) Das Patentamt gewährt auf Antrag Einsicht in die Akten von Anmeldungen von Marken, wenn ein berechtigtes Interesse glaubhaft gemacht wird.

(2) Nach der Eintragung der Marke wird auf Antrag Einsicht in die Akten der eingetragenen Marke gewährt.

(3) Die Einsicht in das Register steht jeder Person frei.

## § 63 Kosten der Verfahren

(1) Sind an dem Verfahren mehrere Personen beteiligt, so kann das Patentamt in der Entscheidung bestimmen, daß die Kosten des Verfahrens einschließlich der Auslagen des Patentamts und der den Beteiligten erwachsenen Kosten, soweit sie zur zweckentsprechenden Wahrung der Ansprüche und Rechte notwendig waren, einem Beteiligten ganz oder teilweise zur Last fallen, wenn dies der Billigkeit entspricht. Die Bestimmung kann auch getroffen werden, wenn der Beteiligte die Erinnerung, die Anmeldung der Marke, den Widerspruch oder den Antrag auf Löschung ganz oder teilweise zurücknimmt oder wenn die Eintragung der Marke wegen Verzichts oder wegen Nichtverlängerung der Schutzdauer ganz oder teilweise im Register gelöscht wird. Soweit eine Bestimmung über die Kosten nicht getroffen wird, trägt jeder Beteiligte die ihm erwachsenen Kosten selbst.

Ein Service der juris GmbH - www.juris.de -

(2) Das Patentamt kann anordnen, dass die Gebühr nach dem Patentkostengesetz für die beschleunigte Prüfung, für das Widerspruchs- oder das Löschungsverfahren ganz oder teilweise zurückgezahlt wird, wenn dies der Billigkeit entspricht.

(3) Der Betrag der zu erstattenden Kosten wird auf Antrag durch das Patentamt festgesetzt. Die Vorschriften der Zivilprozessordnung über das Kostenfestsetzungsverfahren (§§ 103 bis 107) und die Zwangsvollstreckung aus Kostenfestsetzungsbeschlüssen (§§ 724 bis 802) sind entsprechend anzuwenden. An die Stelle der Erinnerung tritt die Beschwerde gegen den Kostenfestsetzungsbeschluß. § 66 ist mit der Maßgabe anzuwenden, daß die Beschwerde innerhalb von zwei Wochen einzulegen ist. Die vollstreckbare Ausfertigung wird vom Urkundsbeamten der Geschäftsstelle des Patentgerichts erteilt.

## § 64 Erinnerung

(1) Gegen die Beschlüsse der Markenstellen und der Markenabteilungen, die von einem Beamten des gehobenen Dienstes oder einem vergleichbaren Angestellten erlassen worden sind, findet die Erinnerung statt. Die Erinnerung hat aufschiebende Wirkung.

(2) Die Erinnerung ist innerhalb eines Monats nach Zustellung beim Patentamt einzulegen.

(3) Erachtet der Beamte oder Angestellte, dessen Beschluß angefochten wird, die Erinnerung für begründet, so hat er ihr abzuhelfen. Dies gilt nicht, wenn dem Erinnerungsführer ein anderer an dem Verfahren Beteiligter gegenübersteht.

(4) Über die Erinnerung entscheidet ein Mitglied des Patentamts durch Beschluß.

(5) Die Markenstelle oder die Markenabteilung kann anordnen, dass die Gebühr nach dem Patentkostengesetz für die Erinnerung ganz oder teilweise zurückgezahlt wird.

(6) Nach Einlegung einer Beschwerde nach § 66 Abs. 3 kann über eine Erinnerung nicht mehr entschieden werden. Eine gleichwohl danach erlassene Erinnerungsentscheidung ist gegenstandslos.

## § 64a Kostenregelungen im Verfahren vor dem Patentamt

Im Verfahren vor dem Patentamt gilt für die Kosten das Patentkostengesetz.

## § 65 Rechtsverordnungsermächtigung

(1) Das Bundesministerium der Justiz wird ermächtigt, durch Rechtsverordnung ohne Zustimmung des Bundesrates
1. die Einrichtung und den Geschäftsgang sowie die Form des Verfahrens in Markenangelegenheiten zu regeln, soweit nicht durch Gesetz Bestimmungen darüber getroffen sind,
2. weitere Erfordernisse für die Anmeldung von Marken zu bestimmen,
3. die Klasseneinteilung von Waren und Dienstleistungen festzulegen,
4. nähere Bestimmungen für die Durchführung der Prüfungs-, Widerspruchs- und Löschungsverfahren zu treffen,
5. Bestimmungen über das Register der eingetragenen Marken und gegebenenfalls gesonderte Bestimmungen über das Register für Kollektivmarken zu treffen,

Ein Service der juris GmbH - www.juris.de -

6.  die in das Register aufzunehmenden Angaben über eingetragene Marken zu regeln und Umfang sowie Art und Weise der Veröffentlichung dieser Angaben festzulegen,
7.  Bestimmungen über die sonstigen in diesem Gesetz vorgesehenen Verfahren vor dem Patentamt zu treffen, wie insbesondere das Verfahren bei der Teilung von Anmeldungen und von Eintragungen, das Verfahren zur Erteilung von Auskünften oder Bescheinigungen, das Verfahren der Wiedereinsetzung, das Verfahren der Akteneinsicht, das Verfahren über den Schutz international registrierter Marken und das Verfahren über die Umwandlung von Gemeinschaftsmarken,
8.  Bestimmungen über die Form zu treffen, in der Anträge und Eingaben in Markenangelegenheiten einzureichen sind, einschließlich der Übermittlung von Anträgen und Eingaben durch elektronische Datenübertragung,
9.  Bestimmungen darüber zu treffen, in welcher Form Beschlüsse, Bescheide oder sonstige Mitteilungen des Patentamts in Markenangelegenheiten den Beteiligten zu übermitteln sind, einschließlich der Übermittlung durch elektronische Datenübertragung, soweit nicht eine bestimmte Form der Übermittlung gesetzlich vorgeschrieben ist,
10. Bestimmungen darüber zu treffen, in welchen Fällen und unter welchen Voraussetzungen Eingaben und Schriftstücke in Markenangelegenheiten in anderen Sprachen als der deutschen Sprache berücksichtigt werden,
11. Beamte des gehobenen Dienstes oder vergleichbare Angestellte mit der Wahrnehmung von Angelegenheiten zu betrauen, die den Markenabteilungen obliegen und die ihrer Art nach keine besonderen rechtlichen Schwierigkeiten bieten, mit Ausnahme der Beschlußfassung über die Löschung von Marken (§ 48 Abs. 1, §§ 53 und 54), der Abgabe von Gutachten (§ 58 Abs. 1) und der Entscheidung, mit denen die Abgabe eines Gutachtens abgelehnt wird,
12. Beamte des mittleren Dienstes oder vergleichbare Angestellte mit der Wahrnehmung von Angelegenheiten zu betrauen, die den Markenstellen und der Markenabteilungen obliegen und die ihrer Art nach keine besonderen rechtlichen Schwierigkeiten bieten, mit Ausnahme von Entscheidungen über Anmeldungen und Widersprüche,
13. die in die Veröffentlichung nach § 33 Abs. 3 aufzunehmenden Angaben zu regeln und Umfang sowie Art und Weise der Veröffentlichung dieser Angaben festzulegen.

(2) Das Bundesministerium der Justiz kann die Ermächtigung zum Erlaß von Rechtsverordnungen nach Absatz 1 durch Rechtsverordnung ohne Zustimmung des Bundesrates ganz oder teilweise dem Deutschen Patent- und Markenamt übertragen.

# Abschnitt 5
# Verfahren vor dem Patentgericht

### § 66 Beschwerde

(1) Gegen die Beschlüsse der Markenstellen und der Markenabteilungen findet, soweit gegen sie nicht die Erinnerung gegeben ist (§ 64 Abs. 1), die Beschwerde an das Patentgericht statt. Die Beschwerde steht den am Verfahren vor dem Patentamt Beteiligten zu. Die Beschwerde hat aufschiebende Wirkung.

(2) Die Beschwerde ist innerhalb eines Monats nach Zustellung des Beschlusses beim Patentamt schriftlich einzulegen.

(3) Ist über eine Erinnerung nach § 64 innerhalb von sechs Monaten nach ihrer Einlegung nicht entschieden worden und hat der Erinnerungsführer nach Ablauf dieser Frist Antrag auf Entscheidung gestellt, so ist die Beschwerde abweichend von Absatz 1 Satz 1 unmittelbar gegen den Beschluß der Markenstelle oder der Markenabteilung zulässig,

wenn über die Erinnerung nicht innerhalb von zwei Monaten nach Zugang des Antrags entschieden worden ist. Steht dem Erinnerungsführer in dem Erinnerungsverfahren ein anderer Beteiligter gegenüber, so ist Satz 1 mit der Maßgabe anzuwenden, daß an die Stelle der Frist von sechs Monaten nach Einlegung der Erinnerung eine Frist von zehn Monaten tritt. Hat der andere Beteiligte ebenfalls Erinnerung eingelegt, so bedarf die Beschwerde nach Satz 2 der Einwilligung des anderen Beteiligten. Die schriftliche Erklärung der Einwilligung ist der Beschwerde beizufügen. Legt der andere Beteiligte nicht innerhalb einer Frist von einem Monat nach Zustellung der Beschwerde gemäß Absatz 4 Satz 2 ebenfalls Beschwerde ein, so gilt seine Erinnerung als zurückgenommen. Der Lauf der Fristen nach den Sätzen 1 und 2 wird gehemmt, wenn das Verfahren ausgesetzt oder wenn einem Beteiligten auf sein Gesuch oder auf Grund zwingender Vorschriften eine Frist gewährt wird. Der noch übrige Teil der Fristen nach den Sätzen 1 und 2 beginnt nach Beendigung der Aussetzung oder nach Ablauf der gewährten Frist zu laufen. Nach Erlaß der Erinnerungsentscheidung findet die Beschwerde nach den Sätzen 1 und 2 nicht mehr statt.

(4) Der Beschwerde und allen Schriftsätzen sollen Abschriften für die übrigen Beteiligten beigefügt werden. Die Beschwerde und alle Schriftsätze, die Sachanträge oder die Erklärung der Zurücknahme der Beschwerde oder eines Antrags enthalten, sind den übrigen Beteiligten von Amts wegen zuzustellen. Andere Schriftsätze sind ihnen formlos mitzuteilen, sofern nicht die Zustellung angeordnet wird.

(5) Erachtet die Stelle, deren Beschluß angefochten wird, die Beschwerde für begründet, so hat sie ihr abzuhelfen. Dies gilt nicht, wenn dem Beschwerdeführer ein anderer an dem Verfahren Beteiligter gegenübersteht. Die Stelle kann anordnen, daß die Beschwerdegebühr nach dem Patentkostengesetz zurückgezahlt wird. Wird der Beschwerde nicht nach Satz 1 abgeholfen, so ist sie vor Ablauf von einem Monat ohne sachliche Stellungnahme dem Patentgericht vorzulegen. In den Fällen des Satzes 2 ist die Beschwerde unverzüglich dem Patentgericht vorzulegen.

## § 67 Beschwerdesenate, Öffentlichkeit der Verhandlung

(1) Über Beschwerden im Sinne des § 66 entscheidet ein Beschwerdesenat des Patentgerichts in der Besetzung mit drei rechtskundigen Mitgliedern.

(2) Die Verhandlung über Beschwerden gegen Beschlüsse der Markenstellen und der Markenabteilungen einschließlich der Verkündung der Entscheidungen ist öffentlich, sofern die Eintragung veröffentlicht worden ist.

(3) Die §§ 172 bis 175 des Gerichtsverfassungsgesetzes gelten entsprechend mit der Maßgabe, daß
1. die Öffentlichkeit für die Verhandlung auf Antrag eines Beteiligten auch dann ausgeschlossen werden kann, wenn sie eine Gefährdung schutzwürdiger Interessen des Antragstellers besorgen läßt,
2. die Öffentlichkeit für die Verkündung der Entscheidungen bis zur Veröffentlichung der Eintragung ausgeschlossen ist.

## § 68 Beteiligung des Präsidenten des Patentamts

(1) Der Präsident des Patentamts kann, wenn er dies zur Wahrung des öffentlichen Interesses als angemessen erachtet, im Beschwerdeverfahren dem Patentgericht gegenüber schriftliche Erklärungen abgeben, an den Terminen teilnehmen und in ihnen Ausführungen machen. Schriftliche Erklärungen des Präsidenten des Patentamts sind den Beteiligten von dem Patentgericht mitzuteilen.

Ein Service der juris GmbH - www.juris.de -

(2) Das Patentgericht kann, wenn es dies wegen einer Rechtsfrage von grundsätzlicher Bedeutung als angemessen erachtet, dem Präsidenten des Patentamts anheimgeben, dem Beschwerdeverfahren beizutreten. Mit dem Eingang der Beitrittserklärung erlangt der Präsident des Patentamts die Stellung eines Beteiligten.

## § 69 Mündliche Verhandlung

Eine mündliche Verhandlung findet statt, wenn
1. einer der Beteiligten sie beantragt,
2. vor dem Patentgericht Beweis erhoben wird (§ 74 Abs. 1) oder
3. das Patentgericht sie für sachdienlich erachtet.

## § 70 Entscheidung über die Beschwerde

(1) Über die Beschwerde wird durch Beschluß entschieden.

(2) Der Beschluß, durch den eine Beschwerde als unzulässig verworfen wird, kann ohne mündliche Verhandlung ergehen.

(3) Das Patentgericht kann die angefochtene Entscheidung aufheben, ohne in der Sache selbst zu entscheiden, wenn
1. das Patentamt noch nicht in der Sache selbst entschieden hat,
2. das Verfahren vor dem Patentamt an einem wesentlichen Mangel leidet oder
3. neue Tatsachen oder Beweismittel bekannt werden, die für die Entscheidung wesentlich sind.

(4) Das Patentamt hat die rechtliche Beurteilung, die der Aufhebung nach Absatz 3 zugrunde liegt, auch seiner Entscheidung zugrunde zu legen.

## § 71 Kosten des Beschwerdeverfahrens

(1) Sind an dem Verfahren mehrere Personen beteiligt, so kann das Patentgericht bestimmen, daß die Kosten des Verfahrens einschließlich der den Beteiligten erwachsenen Kosten, soweit sie zur zweckentsprechenden Wahrung der Ansprüche und Rechte notwendig waren, einem Beteiligten ganz oder teilweise zur Last fallen, wenn dies der Billigkeit entspricht. Soweit eine Bestimmung über die Kosten nicht getroffen wird, trägt jeder Beteiligte die ihm erwachsenen Kosten selbst.

(2) Dem Präsidenten des Patentamts können Kosten nur auferlegt werden, wenn er nach seinem Beitritt in dem Verfahren Anträge gestellt hat.

(3) Das Patentgericht kann anordnen, daß die Beschwerdegebühr nach dem Patentkostengesetz zurückgezahlt wird.

(4) Die Absätze 1 bis 3 sind auch anzuwenden, wenn der Beteiligte die Beschwerde, die Anmeldung der Marke, den Widerspruch oder den Antrag auf Löschung ganz oder teilweise zurücknimmt oder wenn die Eintragung der Marke wegen Verzichts oder wegen Nichtverlängerung der Schutzdauer ganz oder teilweise im Register gelöscht wird.

(5) Im Übrigen gelten die Vorschriften der Zivilprozessordnung über das Kostenfestsetzungsverfahren (§§ 103 bis 107) und die Zwangsvollstreckung aus Kostenfestsetzungsbeschlüssen (§§ 724 bis 802) entsprechend.

# D – Part II

## § 72 Ausschließung und Ablehnung

(1) Für die Ausschließung und Ablehnung der Gerichtspersonen gelten die §§ 41 bis 44 und 47 bis 49 der Zivilprozeßordnung entsprechend.

(2) Von der Ausübung des Amtes als Richter ist auch ausgeschlossen, wer bei dem vorausgegangenen Verfahren vor dem Patentamt mitgewirkt hat.

(3) Über die Ablehnung eines Richters entscheidet der Senat, dem der Abgelehnte angehört. Wird der Senat durch das Ausscheiden des abgelehnten Mitglieds beschlußunfähig, so entscheidet ein anderer Beschwerdesenat.

(4) Über die Ablehnung eines Urkundsbeamten entscheidet der Senat, in dessen Geschäftsbereich die Sache fällt.

## § 73 Ermittlung des Sachverhalts, Vorbereitung der mündlichen Verhandlung

(1) Das Patentgericht ermittelt den Sachverhalt von Amts wegen. Es ist an das Vorbringen und die Beweisanträge der Beteiligten nicht gebunden.

(2) Der Vorsitzende oder ein von ihm zu bestimmendes Mitglied des Senats hat schon vor der mündlichen Verhandlung oder, wenn eine solche nicht stattfindet, vor der Entscheidung des Patentgerichts alle Anordnungen zu treffen, die notwendig sind, um die Sache möglichst in einer mündlichen Verhandlung oder in einer Sitzung zu erledigen. Im übrigen gilt § 273 Abs. 2, Abs. 3 Satz 1 und Abs. 4 Satz 1 der Zivilprozeßordnung entsprechend.

## § 74 Beweiserhebung

(1) Das Patentgericht erhebt Beweis in der mündlichen Verhandlung. Es kann insbesondere Augenschein einnehmen, Zeugen, Sachverständige und Beteiligte vernehmen und Urkunden heranziehen.

(2) Das Patentgericht kann in geeigneten Fällen schon vor der mündlichen Verhandlung durch eines seiner Mitglieder als beauftragten Richter Beweis erheben lassen oder unter Bezeichnung der einzelnen Beweisfragen ein anderes Gericht um die Beweisaufnahme ersuchen.

(3) Die Beteiligten werden von allen Beweisterminen benachrichtigt und können der Beweisaufnahme beiwohnen. Sie können an Zeugen und Sachverständige sachdienliche Fragen richten. Wird eine Frage beanstandet, so entscheidet das Patentgericht.

## § 75 Ladungen

(1) Sobald der Termin zur mündlichen Verhandlung bestimmt ist, sind die Beteiligten mit einer Ladungsfrist von mindestens zwei Wochen zu laden. In dringenden Fällen kann der Vorsitzende die Frist abkürzen.

(2) Bei der Ladung ist darauf hinzuweisen, daß beim Ausbleiben eines Beteiligten auch ohne ihn verhandelt und entschieden werden kann.

## § 76 Gang der Verhandlung

(1) Der Vorsitzende eröffnet und leitet die mündliche Verhandlung.

(2) Nach Aufruf der Sache trägt der Vorsitzende oder der Berichterstatter den wesentlichen Inhalt der Akten vor.

(3) Hierauf erhalten die Beteiligten das Wort, um ihre Anträge zu stellen und zu begründen.

(4) Der Vorsitzende hat die Sache mit den Beteiligten in tatsächlicher und rechtlicher Hinsicht zu erörtern.

(5) Der Vorsitzende hat jedem Mitglied des Senats auf Verlangen zu gestatten, Fragen zu stellen. Wird eine Frage beanstandet, so entscheidet der Senat.

(6) Nach Erörterung der Sache erklärt der Vorsitzende die mündliche Verhandlung für geschlossen. Der Senat kann die Wiedereröffnung beschließen.

## § 77 Niederschrift

(1) Zur mündlichen Verhandlung und zu jeder Beweisaufnahme wird ein Urkundsbeamter der Geschäftsstelle als Schriftführer zugezogen. Wird auf Anordnung des Vorsitzenden von der Zuziehung des Schriftführers abgesehen, besorgt ein Richter die Niederschrift.

(2) Über die mündliche Verhandlung und jede Beweisaufnahme ist eine Niederschrift aufzunehmen. Die §§ 160 bis 165 der Zivilprozeßordnung sind entsprechend anzuwenden.

## § 78 Beweiswürdigung, rechtliches Gehör

(1) Das Patentgericht entscheidet nach seiner freien, aus dem Gesamtergebnis des Verfahrens gewonnenen Überzeugung. In der Entscheidung sind die Gründe anzugeben, die für die richterliche Überzeugung leitend gewesen sind.

(2) Die Entscheidung darf nur auf Tatsachen und Beweisergebnisse gestützt werden, zu denen die Beteiligten sich äußern konnten.

(3) Ist eine mündliche Verhandlung vorhergegangen, so kann ein Richter, der bei der letzten mündlichen Verhandlung nicht zugegen war, bei der Beschlußfassung nur mitwirken, wenn die Beteiligten zustimmen.

## § 79 Verkündung, Zustellung, Begründung

(1) Die Endentscheidungen des Patentgerichts werden, wenn eine mündliche Verhandlung stattgefunden hat, in dem Termin, in dem die mündliche Verhandlung geschlossen wird, oder in einem sofort anzuberaumenden Termin verkündet. Dieser soll nur dann über drei Wochen hinaus angesetzt werden, wenn wichtige Gründe, insbesondere der Umfang oder die Schwierigkeit der Sache, dies erfordern. Statt der Verkündung ist die Zustellung der Endentscheidung zulässig. Entscheidet das Patentgericht ohne mündliche Verhandlung, so wird die Verkündung durch Zustellung an die Beteiligten ersetzt. Die Endentscheidungen sind den Beteiligten von Amts wegen zuzustellen.

(2) Die Entscheidungen des Patentgerichts, durch die ein Antrag zurückgewiesen oder über ein Rechtsmittel entschieden wird, sind zu begründen.

- 34 -

## § 80 Berichtigungen

(1) Schreibfehler, Rechenfehler und ähnliche offenbare Unrichtigkeiten in der Entscheidung sind jederzeit vom Patentgericht zu berichtigen.

(2) Enthält der Tatbestand der Entscheidung andere Unrichtigkeiten oder Unklarheiten, so kann die Berichtigung innerhalb von zwei Wochen nach Zustellung der Entscheidung beantragt werden.

(3) Über die Berichtigung nach Absatz 1 kann ohne vorherige mündliche Verhandlung entschieden werden.

(4) Über den Antrag auf Berichtigung nach Absatz 2 entscheidet das Patentgericht ohne Beweisaufnahme durch Beschluß. Hierbei wirken nur die Richter mit, die bei der Entscheidung, deren Berichtigung beantragt ist, mitgewirkt haben.

(5) Der Berichtigungsbeschluß wird auf der Entscheidung und den Ausfertigungen vermerkt.

## § 81 Vertretung, Vollmacht

(1) Vor dem Patentgericht kann sich ein Beteiligter in jeder Lage des Verfahrens durch einen Bevollmächtigten vertreten lassen. Durch Beschluß kann angeordnet werden, daß ein Bevollmächtigter bestellt werden muß. § 96 bleibt unberührt.

(2) Die Vollmacht ist schriftlich zu den Gerichtsakten einzureichen. Sie kann nachgereicht werden. Das Patentgericht kann hierfür eine Frist bestimmen.

(3) Der Mangel der Vollmacht kann in jeder Lage des Verfahrens geltend gemacht werden. Das Patentgericht hat den Mangel der Vollmacht von Amts wegen zu berücksichtigen, wenn nicht als Bevollmächtigter ein Rechtsanwalt oder ein Patentanwalt auftritt.

## § 82 Anwendung weiterer Vorschriften, Anfechtbarkeit, Akteneinsicht

(1) Soweit dieses Gesetz keine Bestimmungen über das Verfahren vor dem Patentgericht enthält, sind das Gerichtsverfassungsgesetz und die Zivilprozeßordnung entsprechend anzuwenden, wenn die Besonderheiten des Verfahrens vor dem Patentgericht dies nicht ausschließen. § 227 Abs. 3 Satz 1 der Zivilprozeßordnung ist nicht anzuwenden. Im Verfahren vor dem Patentgericht gilt für die Gebühren das Patentkostengesetz, für die Auslagen gilt das Gerichtskostengesetz entsprechend.

(2) Eine Anfechtung der Entscheidungen des Patentgerichts findet nur statt, soweit dieses Gesetz sie zuläßt.

(3) Für die Gewährung der Akteneinsicht an dritte Personen ist § 62 Abs. 1 und 2 entsprechend anzuwenden. Über den Antrag entscheidet das Patentgericht.

# Abschnitt 6
# Verfahren vor dem Bundesgerichtshof

## § 83 Zugelassene und zulassungsfreie Rechtsbeschwerde

(1) Gegen die Beschlüsse der Beschwerdesenate des Patentgerichts, durch die über eine Beschwerde nach § 66 entschieden wird, findet die Rechtsbeschwerde an den Bundesgerichtshof statt, wenn der Beschwerdesenat die Rechtsbeschwerde in dem Beschluß zugelassen hat. Die Rechtsbeschwerde hat aufschiebende Wirkung.

(2) Die Rechtsbeschwerde ist zuzulassen, wenn
1. eine Rechtsfrage von grundsätzlicher Bedeutung zu entscheiden ist oder
2. die Fortbildung des Rechts oder die Sicherung einer einheitlichen Rechtsprechung eine Entscheidung des Bundesgerichtshofs erfordert.

(3) Einer Zulassung zur Einlegung der Rechtsbeschwerde bedarf es nicht, wenn gerügt wird,
1. daß das beschließende Gericht nicht vorschriftsmäßig besetzt war,
2. daß bei dem Beschluß ein Richter mitgewirkt hat, der von der Ausübung des Richteramtes kraft Gesetzes ausgeschlossen oder wegen Besorgnis der Befangenheit mit Erfolg abgelehnt war,
3. daß einem Beteiligten das rechtliche Gehör versagt war,
4. daß ein Beteiligter im Verfahren nicht nach Vorschrift des Gesetzes vertreten war, sofern er nicht der Führung des Verfahrens ausdrücklich oder stillschweigend zugestimmt hat,
5. daß der Beschluß aufgrund einer mündlichen Verhandlung ergangen ist, bei der die Vorschriften über die Öffentlichkeit des Verfahrens verletzt worden sind, oder
6. daß der Beschluß nicht mit Gründen versehen ist.

## § 84 Beschwerdeberechtigung, Beschwerdegründe

(1) Die Rechtsbeschwerde steht den am Beschwerdeverfahren Beteiligten zu.

(2) Die Rechtsbeschwerde kann nur darauf gestützt werden, daß der Beschluß auf einer Verletzung des Rechts beruht. Die §§ 546 und 547 der Zivilprozeßordnung gelten entsprechend.

## § 85 Förmliche Voraussetzungen

(1) Die Rechtsbeschwerde ist innerhalb eines Monats nach Zustellung des Beschlusses beim Bundesgerichtshof schriftlich einzulegen.

(2) In dem Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof gelten die Bestimmungen des § 142 über die Streitwertbegünstigung entsprechend.

(3) Die Rechtsbeschwerde ist zu begründen. Die Frist für die Begründung beträgt einen Monat. Sie beginnt mit der Einlegung der Rechtsbeschwerde und kann auf Antrag vom Vorsitzenden verlängert werden.

(4) Die Begründung der Rechtsbeschwerde muß enthalten
1. die Erklärung, inwieweit der Beschluß angefochten und seine Abänderung oder Aufhebung beantragt wird,
2. die Bezeichnung der verletzten Rechtsnorm und
3. wenn die Rechtsbeschwerde auf die Verletzung von Verfahrensvorschriften gestützt wird, die Bezeichnung der Tatsachen, die den Mangel ergeben.

(5) Vor dem Bundesgerichtshof müssen sich die Beteiligten durch einen beim Bundesgerichtshof zugelassenen Rechtsanwalt als Bevollmächtigten vertreten lassen.

Auf Antrag eines Beteiligten ist seinem Patentanwalt das Wort zu gestatten. § 157 Abs. 1 und 2 der Zivilprozeßordnung ist insoweit nicht anzuwenden. Von den Kosten, die durch die Mitwirkung eines Patentanwalts entstehen, sind die Gebühren nach § 13 des Rechtsanwaltsvergütungsgesetzes und außerdem die notwendigen Auslagen des Patentanwalts zu erstatten.

## § 86 Prüfung der Zulässigkeit

Der Bundesgerichtshof hat von Amts wegen zu prüfen, ob die Rechtsbeschwerde an sich statthaft und ob sie in der gesetzlichen Form und Frist eingelegt und begründet ist. Liegen die Voraussetzungen nicht vor, so ist die Rechtsbeschwerde als unzulässig zu verwerfen.

## § 87 Mehrere Beteiligte

(1) Sind an dem Verfahren über die Rechtsbeschwerde mehrere Personen beteiligt, so sind die Beschwerdeschrift und die Beschwerdebegründung den anderen Beteiligten mit der Aufforderung zuzustellen, etwaige Erklärungen innerhalb einer bestimmten Frist nach Zustellung beim Bundesgerichtshof schriftlich einzureichen. Mit der Zustellung der Beschwerdeschrift ist der Zeitpunkt mitzuteilen, in dem die Rechtsbeschwerde eingelegt ist. Die erforderliche Zahl von beglaubigten Abschriften soll der Beschwerdeführer mit der Beschwerdeschrift oder der Beschwerdebegründung einreichen.

(2) Ist der Präsident des Patentamts nicht am Verfahren über die Rechtsbeschwerde beteiligt, so ist § 68 Abs. 1 entsprechend anzuwenden.

## § 88 Anwendung weiterer Vorschriften

(1) Im Verfahren über die Rechtsbeschwerde gelten die Vorschriften der Zivilprozeßordnung über Ausschließung und Ablehnung der Gerichtspersonen (§§ 41 bis 49), über Prozessbevollmächtigte und Beistände (§§ 78 bis 90), über Zustellungen von Amts wegen (§§ 166 bis 190), über Ladungen, Termine und Fristen (§§ 214 bis 229) und über Wiedereinsetzung in den vorigen Stand (§§ 233 bis 238) entsprechend. Im Falle der Wiedereinsetzung in den vorigen Stand gilt § 91 Abs. 8 entsprechend.

(2) Für die Öffentlichkeit des Verfahrens gilt § 67 Abs. 2 und 3 entsprechend.

## § 89 Entscheidung über die Rechtsbeschwerde

(1) Die Entscheidung über die Rechtsbeschwerde ergeht durch Beschluß. Die Entscheidung kann ohne mündliche Verhandlung getroffen werden.

(2) Der Bundesgerichtshof ist bei seiner Entscheidung an die in dem angefochtenen Beschluß getroffenen tatsächlichen Feststellungen gebunden, außer wenn in bezug auf diese Feststellungen zulässige und begründete Rechtsbeschwerdegründe vorgebracht sind.

(3) Die Entscheidung ist zu begründen und den Beteiligten von Amts wegen zuzustellen.

(4) Im Falle der Aufhebung des angefochtenen Beschlusses ist die Sache zur anderweitigen Verhandlung und Entscheidung an das Patentgericht zurückzuverweisen. Das Patentgericht hat die rechtliche Beurteilung, die der Aufhebung zugrunde gelegt ist, auch seiner Entscheidung zugrunde zu legen.

## § 89a Abhilfe bei Verletzung des Anspruchs auf rechtliches Gehör

Auf die Rüge der durch die Entscheidung beschwerten Partei ist das Verfahren fortzuführen, wenn das Gericht den Anspruch dieser Partei auf rechtliches Gehör in entscheidungserheblicher Weise verletzt hat. Gegen eine der Endentscheidung vorausgehende Entscheidung findet die Rüge nicht statt. § 321a Abs. 2 bis 5 der Zivilprozessordnung ist entsprechend anzuwenden.

## § 90 Kostenentscheidung

(1) Sind an dem Verfahren mehrere Personen beteiligt, so kann der Bundesgerichtshof bestimmen, daß die Kosten des Verfahrens einschließlich der den Beteiligten erwachsenen Kosten, soweit sie zur zweckentsprechenden Wahrung der Ansprüche und Rechte notwendig waren, einem Beteiligten ganz oder teilweise zur Last fallen, wenn dies der Billigkeit entspricht. Die Bestimmung kann auch getroffen werden, wenn der Beteiligte die Rechtsbeschwerde, die Anmeldung der Marke, den Widerspruch oder den Antrag auf Löschung ganz oder teilweise zurücknimmt oder wenn die Eintragung der Marke wegen Verzichts oder wegen Nichtverlängerung der Schutzdauer ganz oder teilweise im Register gelöscht wird. Soweit eine Bestimmung über die Kosten nicht getroffen wird, trägt jeder Beteiligte die ihm erwachsenen Kosten selbst.

(2) Wird die Rechtsbeschwerde zurückgewiesen oder als unzulässig verworfen, so sind die durch die Rechtsbeschwerde veranlaßten Kosten dem Beschwerdeführer aufzuerlegen. Hat ein Beteiligter durch grobes Verschulden Kosten veranlaßt, so sind ihm diese aufzuerlegen.

(3) Dem Präsidenten des Patentamts können Kosten nur auferlegt werden, wenn er die Rechtsbeschwerde eingelegt oder in dem Verfahren Anträge gestellt hat.

(4) Im Übrigen gelten die Vorschriften der Zivilprozessordnung über das Kostenfestsetzungsverfahren (§§ 103 bis 107) und die Zwangsvollstreckung aus Kostenfestsetzungsbeschlüssen (§§ 724 bis 802) entsprechend.

# Abschnitt 7
# Gemeinsame Vorschriften

## § 91 Wiedereinsetzung

(1) Wer ohne Verschulden verhindert war, dem Patentamt oder dem Patentgericht gegenüber eine Frist einzuhalten, deren Versäumung nach gesetzlicher Vorschrift einen Rechtsnachteil zur Folge hat, ist auf Antrag wieder in den vorigen Stand einzusetzen. Dies gilt nicht für die Frist zur Erhebung des Widerspruchs und zur Zahlung der Widerspruchsgebühr (§ 6 Abs. 1 Satz 1 des Patentkostengesetzes).

(2) Die Wiedereinsetzung muß innerhalb von zwei Monaten nach Wegfall des Hindernisses beantragt werden.

(3) Der Antrag muß die Angabe der die Wiedereinsetzung begründenden Tatsachen enthalten. Diese Tatsachen sind bei der Antragstellung oder im Verfahren über den Antrag glaubhaft zu machen.

(4) Die versäumte Handlung ist innerhalb der Antragsfrist nachzuholen. Ist dies geschehen, so kann Wiedereinsetzung auch ohne Antrag gewährt werden.

Ein Service der juris GmbH - www.juris.de -

(5) Ein Jahr nach Ablauf der versäumten Frist kann die Wiedereinsetzung nicht mehr beantragt und die versäumte Handlung nicht mehr nachgeholt werden.

(6) Über den Antrag beschließt die Stelle, die über die nachgeholte Handlung zu beschließen hat.

(7) Die Wiedereinsetzung ist unanfechtbar.

(8) Wird dem Inhaber einer Marke Wiedereinsetzung gewährt, so kann er Dritten gegenüber, die in dem Zeitraum zwischen dem Eintritt des Rechtsverlusts an der Eintragung der Marke und der Wiedereinsetzung unter einem mit der Marke identischen oder ihr ähnlichen Zeichen gutgläubig Waren in den Verkehr gebracht oder Dienstleistungen erbracht haben, hinsichtlich dieser Handlungen keine Rechte geltend machen.

## § 91a Weiterbehandlung der Anmeldung

(1) Ist nach Versäumung einer vom Patentamt bestimmten Frist die Markenanmeldung zurückgewiesen worden, so wird der Beschluss wirkungslos, ohne dass es seiner ausdrücklichen Aufhebung bedarf, wenn der Anmelder die Weiterbehandlung der Anmeldung beantragt und die versäumte Handlung nachholt.

(2) Der Antrag ist innerhalb einer Frist von einem Monat nach Zustellung der Entscheidung über die Zurückweisung der Markenanmeldung einzureichen. Die versäumte Handlung ist innerhalb dieser Frist nachzuholen.

(3) Gegen die Versäumung der Frist nach Absatz 2 und der Frist zur Zahlung der Weiterbehandlungsgebühr nach § 6 Abs. 1 Satz 1 des Patentkostengesetzes ist eine Wiedereinsetzung nicht gegeben.

(4) Über den Antrag beschließt die Stelle, die über die nachgeholte Handlung zu beschließen hat.

## § 92 Wahrheitspflicht

In den Verfahren vor dem Patentamt, dem Patentgericht und dem Bundesgerichtshof haben die Beteiligten ihre Erklärungen über tatsächliche Umstände vollständig und der Wahrheit gemäß abzugeben.

## § 93 Amtssprache und Gerichtssprache

Die Sprache vor dem Patentamt und vor dem Patentgericht ist deutsch. Im übrigen finden die Vorschriften des Gerichtsverfassungsgesetzes über die Gerichtssprache Anwendung.

## § 93a Entschädigung von Zeugen, Vergütung von Sachverständigen

Zeugen erhalten eine Entschädigung und Sachverständige eine Vergütung nach dem Justizvergütungs- und -entschädigungsgesetz.

## § 94 Zustellungen

(1) Für Zustellungen im Verfahren vor dem Patentamt gelten die Vorschriften des Verwaltungszustellungsgesetzes mit folgenden Maßgaben:

1. An Empfänger, die sich im Ausland aufhalten und die keinen Inlandsvertreter (§ 96) bestellt haben, können auch durch Aufgabe zur Post zugestellt werden, soweit für den Empfänger die Notwendigkeit zur Bestellung eines Inlandsvertreters im Zeitpunkt der zu bewirkenden Zustellung erkennbar war. § 184 Abs. 2 Satz 1 und 4 der Zivilprozessordnung gilt entsprechend.
2. Für Zustellungen an Erlaubnisscheininhaber (§ 177 der Patentanwaltsordnung) ist § 5 Abs. 4 des Verwaltungszustellungsgesetzes entsprechend anzuwenden.
3. An Empfänger, denen beim Patentamt ein Abholfach eingerichtet worden ist, kann auch dadurch zugestellt werden, daß das Schriftstück im Abholfach des Empfängers niedergelegt wird. Über die Niederlegung ist eine schriftliche Mitteilung zu den Akten zu geben. Auf dem Schriftstück ist zu vermerken, wann es niedergelegt worden ist. Die Zustellung gilt als am dritten Tag nach der Niederlegung im Abholfach bewirkt.

(2) Für Zustellungen im Verfahren vor dem Bundespatentgericht gelten die Vorschriften der Zivilprozessordnung.

## § 95 Rechtshilfe

(1) Die Gerichte sind verpflichtet, dem Patentamt Rechtshilfe zu leisten.

(2) Im Verfahren vor dem Patentamt setzt das Patentgericht auf Ersuchen des Patentamts Ordnungs- oder Zwangsmittel gegen Zeugen oder Sachverständige fest, die nicht erscheinen oder ihre Aussage oder deren Beeidigung verweigern. Ebenso ist die Vorführung eines nicht erschienenen Zeugen anzuordnen.

(3) Über das Ersuchen nach Absatz 2 entscheidet ein Beschwerdesenat des Patentgerichts in der Besetzung mit drei rechtskundigen Mitgliedern. Die Entscheidung ergeht durch Beschluß.

## § 95a Einreichung elektronischer Dokumente

(1) Soweit in Verfahren vor dem Patentamt für Anmeldungen, Anträge oder sonstige Handlungen und in Verfahren vor dem Patentgericht und dem Bundesgerichtshof für vorbereitende Schriftsätze und deren Anlagen, für Anträge und Erklärungen der Beteiligten sowie für Auskünfte, Aussagen, Gutachten und Erklärungen Dritter die Schriftform vorgesehen ist, genügt dieser Form die Aufzeichnung als elektronisches Dokument, wenn dieses für die Bearbeitung durch das Patentamt oder das Gericht geeignet ist. Die verantwortende Person soll das Dokument mit einer qualifizierten elektronischen Signatur nach dem Signaturgesetz versehen.

(2) Das Bundesministerium der Justiz bestimmt durch Rechtsverordnung, die nicht der Zustimmung des Bundesrates bedarf, den Zeitpunkt, von dem an elektronische Dokumente bei dem Patentamt und den Gerichten eingereicht werden können, sowie die für die Bearbeitung der Dokumente geeignete Form. Die Zulassung der elektronischen Form kann auf das Patentamt, eines der Gerichte oder auf einzelne Verfahren beschränkt werden.

(3) Ein elektronisches Dokument ist eingereicht, sobald die für den Empfang bestimmte Einrichtung des Patentamts oder des Gerichts es aufgezeichnet hat.

## § 96 Inlandsvertreter

(1) Wer im Inland weder einen Wohnsitz, Sitz noch Niederlassung hat, kann an einem in diesem Gesetz geregelten Verfahren vor dem Patentamt oder dem Patentgericht nur

teilnehmen und die Rechte aus einer Marke nur geltend machen, wenn er im Inland einen Rechtsanwalt oder Patentanwalt als Vertreter bestellt hat, der zur Vertretung im Verfahren vor dem Patentamt, dem Patentgericht und in bürgerlichen Streitigkeiten, die diese Marke betreffen, sowie zur Stellung von Strafanträgen bevollmächtigt ist.

(2) Staatsangehörige eines Mitgliedstaates der Europäischen Union oder eines anderen Vertragsstaates des Abkommens über den Europäischen Wirtschaftsraum können zur Erbringung einer Dienstleistung im Sinne des Vertrages zur Gründung der Europäischen Gemeinschaft als Vertreter im Sinne des Absatzes 1 bestellt werden, wenn sie berechtigt sind, ihre berufliche Tätigkeit unter einer der in der Anlage zu § 1 des Gesetzes über die Tätigkeit europäischer Rechtsanwälte in Deutschland vom 9. März 2000 (BGBl. I S. 182) oder zu § 1 des Gesetzes über die Eignungsprüfung für die Zulassung zur Patentanwaltschaft vom 6. Juli 1990 (BGBl. I S. 1349, 1351) in der jeweils geltenden Fassung genannten Berufsbezeichnungen auszuüben. In diesem Fall kann ein Verfahren jedoch nur betrieben werden, wenn im Inland ein Rechtsanwalt oder Patentanwalt als Zustellungsbevollmächtigter bestellt worden ist.

(3) Der Ort, an dem ein nach Absatz 1 bestellter Vertreter seinen Geschäftsraum hat, gilt im Sinne des § 23 der Zivilprozessordnung als der Ort, an dem sich der Vermögensgegenstand befindet. Fehlt ein solcher Geschäftsraum, so ist der Ort maßgebend, an dem der Vertreter im Inland seinen Wohnsitz, und in Ermangelung eines solchen der Ort, an dem das Patentamt seinen Sitz hat.

(4) Die rechtsgeschäftliche Beendigung der Bestellung eines Vertreters nach Absatz 1 wird erst wirksam, wenn sowohl diese Beendigung als auch die Bestellung eines anderen Vertreters gegenüber dem Patentamt oder dem Patentgericht angezeigt wird.

# Teil 4
# Kollektivmarken

## § 97 Kollektivmarken

(1) Als Kollektivmarken können alle als Marke schutzfähigen Zeichen im Sinne des § 3 eingetragen werden, die geeignet sind, die Waren oder Dienstleistungen der Mitglieder des Inhabers der Kollektivmarke von denjenigen anderer Unternehmen nach ihrer betrieblichen oder geographischen Herkunft, ihrer Art, ihrer Qualität oder ihren sonstigen Eigenschaften zu unterscheiden.

(2) Auf Kollektivmarken sind die Vorschriften dieses Gesetzes anzuwenden, soweit in diesem Teil nicht etwas anderes bestimmt ist.

## § 98 Inhaberschaft

Inhaber von angemeldeten oder eingetragenen Kollektivmarken können nur rechtsfähige Verbände sein, einschließlich der rechtsfähigen Dachverbände und Spitzenverbände, deren Mitglieder selbst Verbände sind. Diesen Verbänden sind die juristischen Personen des öffentlichen Rechts gleichgestellt.

## § 99 Eintragbarkeit von geographischen Herkunftsangaben als Kollektivmarken

Abweichend von § 8 Abs. 2 Nr. 2 können Kollektivmarken ausschließlich aus Zeichen oder Angaben bestehen, die im Verkehr zur Bezeichnung der geographischen Herkunft der Waren oder der Dienstleistungen dienen können.

## § 100 Schranken des Schutzes, Benutzung

(1) Zusätzlich zu den Schutzschranken, die sich aus § 23 ergeben, gewährt die Eintragung einer geographischen Herkunftsangabe als Kollektivmarke ihrem Inhaber nicht das Recht, einem Dritten zu untersagen, solche Angaben im geschäftlichen Verkehr zu benutzen, sofern die Benutzung den guten Sitten entspricht und nicht gegen § 127 verstößt.

(2) Die Benutzung einer Kollektivmarke durch mindestens eine hierzu befugte Person oder durch den Inhaber der Kollektivmarke gilt als Benutzung im Sinne des § 26.

## § 101 Klagebefugnis, Schadensersatz

(1) Soweit in der Markensatzung nichts anderes bestimmt ist, kann eine zur Benutzung der Kollektivmarke berechtigte Person Klage wegen Verletzung einer Kollektivmarke nur mit Zustimmung ihres Inhabers erheben.

(2) Der Inhaber der Kollektivmarke kann auch Ersatz des Schadens verlangen, der den zur Benutzung der Kollektivmarke berechtigten Personen aus der unbefugten Benutzung der Kollektivmarke oder eines ähnlichen Zeichens entstanden ist.

## § 102 Markensatzung

(1) Der Anmeldung der Kollektivmarke muß eine Markensatzung beigefügt sein.

(2) Die Markensatzung muß mindestens enthalten:
1. Namen und Sitz des Verbandes,
2. Zweck und Vertretung des Verbandes,
3. Voraussetzungen für die Mitgliedschaft,
4. Angaben über den Kreis der zur Benutzung der Kollektivmarke befugten Personen,
5. die Bedingungen für die Benutzung der Kollektivmarke und
6. Angaben über die Rechte und Pflichten der Beteiligten im Falle von Verletzungen der Kollektivmarke.

(3) Besteht die Kollektivmarke aus einer geographischen Herkunftsangabe, muß die Satzung vorsehen, daß jede Person, deren Waren oder Dienstleistungen aus dem entsprechenden geographischen Gebiet stammen und den in der Markensatzung enthaltenen Bedingungen für die Benutzung der Kollektivmarke entsprechen, Mitglied des Verbandes werden kann und in den Kreis der zur Benutzung der Kollektivmarke befugten Personen aufzunehmen ist.

(4) Die Einsicht in die Markensatzung steht jeder Person frei.

## § 103 Prüfung der Anmeldung

Die Anmeldung einer Kollektivmarke wird außer nach § 37 auch zurückgewiesen, wenn sie nicht den Voraussetzungen der §§ 97, 98 und 102 entspricht oder wenn die Markensatzung gegen die öffentliche Ordnung oder die guten Sitten verstößt, es sei denn, daß der Anmelder die Markensatzung so ändert, daß der Zurückweisungsgrund nicht mehr besteht.

## § 104 Änderung der Markensatzung

(1) Der Inhaber der Kollektivmarke hat dem Patentamt jede Änderung der Markensatzung mitzuteilen.

(2) Im Falle einer Änderung der Markensatzung sind die §§ 102 und 103 entsprechend anzuwenden.

## § 105 Verfall

(1) Die Eintragung einer Kollektivmarke wird außer aus den in § 49 genannten Verfallsgründen auf Antrag wegen Verfalls gelöscht,
1. wenn der Inhaber der Kollektivmarke nicht mehr besteht,
2. wenn der Inhaber der Kollektivmarke keine geeigneten Maßnahmen trifft, um zu verhindern, daß die Kollektivmarke mißbräuchlich in einer den Verbandszwecken oder der Markensatzung widersprechenden Weise benutzt wird, oder
3. wenn eine Änderung der Markensatzung entgegen § 104 Abs. 2 in das Register eingetragen worden ist, es sei denn, daß der Inhaber der Kollektivmarke die Markensatzung erneut so ändert, daß der Löschungsgrund nicht mehr besteht.

(2) Als eine mißbräuchliche Benutzung im Sinne des Absatzes 1 Nr. 2 ist es insbesondere anzusehen, wenn die Benutzung der Kollektivmarke durch andere als die zur Benutzung befugten Personen geeignet ist, das Publikum zu täuschen.

(3) Der Antrag auf Löschung nach Absatz 1 ist beim Patentamt zu stellen. Das Verfahren richtet sich nach § 54.

## § 106 Nichtigkeit wegen absoluter Schutzhindernisse

Die Eintragung einer Kollektivmarke wird außer aus den in § 50 genannten Nichtigkeitsgründen auf Antrag wegen Nichtigkeit gelöscht, wenn sie entgegen § 103 eingetragen worden ist. Betrifft der Nichtigkeitsgrund die Markensatzung, so wird die Eintragung nicht gelöscht, wenn der Inhaber der Kollektivmarke die Markensatzung so ändert, daß der Nichtigkeitsgrund nicht mehr besteht.

# Teil 5
# Schutz von Marken nach dem Madrider Markenabkommen und nach dem Protokoll zum Madrider Markenabkommen, Gemeinschaftsmarken

# Abschnitt 1
# Schutz von Marken nach dem Madrider Markenabkommen

## § 107 Anwendung der Vorschriften dieses Gesetzes; Sprache

(1) Die Vorschriften dieses Gesetzes sind auf internationale Registrierungen von Marken nach dem Madrider Abkommen über die internationale Registrierung von Marken (Madrider Markenabkommen), die durch Vermittlung des Patentamts vorgenommen werden oder deren Schutz sich auf das Gebiet der Bundesrepublik Deutschland erstreckt, entsprechend

anzuwenden, soweit in diesem Abschnitt oder im Madrider Markenabkommen nichts anderes
bestimmt ist.

(2) Sämtliche Anträge sowie sonstige Mitteilungen im Verfahren der internationalen
Registrierung und das Verzeichnis der Waren und Dienstleistungen sind in französischer
Sprache einzureichen.

## § 108 Antrag auf internationale Registrierung

(1) Der Antrag auf internationale Registrierung einer in das Register eingetragenen
Marke nach Artikel 3 des Madrider Markenabkommens ist beim Patentamt zu stellen.

(2) Wird der Antrag auf internationale Registrierung vor der Eintragung der Marke in
das Register gestellt, so gilt er als am Tag der Eintragung der Marke zugegangen.

(3) Mit dem Antrag ist das Verzeichnis der Waren und Dienstleistungen, nach Klassen
geordnet in der Reihenfolge der internationalen Klassifikation von Waren und
Dienstleistungen, einzureichen.

## § 109 Gebühren

(1) Ist der Antrag auf internationale Registrierung vor der Eintragung der Marke
in das Register gestellt worden, so wird die nationale Gebühr für das Verfahren auf
internationale Registrierung am Tage der Eintragung fällig.

(2) Die nationale Gebühr nach dem Patentkostengesetz für die internationale
Registrierung ist innerhalb eines Monats nach Fälligkeit, die sich nach § 3 Abs. 1 des
Patentkostengesetzes oder nach Absatz 1 richtet, zu zahlen.

## § 110 Eintragung im Register

Der Tag und die Nummer der internationalen Registrierung einer im Register
eingetragenen Marke sind in das Register einzutragen.

## § 111 Nachträgliche Schutzerstreckung

(1) Beim Patentamt kann ein Antrag auf nachträgliche Schutzerstreckung einer
international registrierten Marke nach Artikel 3(hoch)ter Abs. 2 des Madrider
Markenabkommens gestellt werden.

(2) Die nationale Gebühr nach dem Patentkostengesetz für die nachträgliche
Schutzerstreckung ist innerhalb eines Monats nach Fälligkeit (§ 3 Abs. 1 des
Patentkostengesetzes) zu zahlen.

## § 112 Wirkung der internationalen Registrierung

(1) Die internationale Registrierung einer Marke, deren Schutz nach Artikel 3ter des
Madrider Markenabkommens auf das Gebiet der Bundesrepublik Deutschland erstreckt worden
ist, hat dieselbe Wirkung, wie wenn die Marke am Tag der internationalen Registrierung
nach Artikel 3 Abs. 4 des Madrider Markenabkommens oder am Tag der Eintragung der
nachträglichen Schutzerstreckung nach Artikel 3ter Abs. 2 des Madrider Markenabkommens
zur Eintragung in das vom Patentamt geführte Register angemeldet und eingetragen worden
wäre.

Ein Service der juris GmbH - www.juris.de -

(2) Die in Absatz 1 bezeichnete Wirkung gilt als nicht eingetreten, wenn der international registrierten Marke nach den §§ 113 bis 115 der Schutz verweigert wird.

## § 113 Prüfung auf absolute Schutzhindernisse

(1) International registrierte Marken werden in gleicher Weise wie zur Eintragung in das Register angemeldete Marken nach § 37 auf absolute Schutzhindernisse geprüft. § 37 Abs. 2 ist nicht anzuwenden.

(2) An die Stelle der Zurückweisung der Anmeldung (§ 37 Abs. 1) tritt die Verweigerung des Schutzes.

## § 114 Widerspruch

(1) An die Stelle der Veröffentlichung der Eintragung (§ 41) tritt für international registrierte Marken die Veröffentlichung in dem vom Internationalen Büro der Weltorganisation für geistiges Eigentum herausgegebenen Veröffentlichungsblatt.

(2) Die Frist zur Erhebung des Widerspruchs (§ 42 Abs. 1) gegen die Schutzgewährung für international registrierte Marken beginnt mit dem ersten Tag des Monats, der dem Monat folgt, der als Ausgabemonat des Heftes des Veröffentlichungsblattes angegeben ist, in dem die Veröffentlichung der international registrierten Marke enthalten ist.

(3) An die Stelle der Löschung der Eintragung (§ 43 Abs. 2) tritt die Verweigerung des Schutzes.

## § 115 Nachträgliche Schutzentziehung

(1) An die Stelle des Antrags oder der Klage auf Löschung einer Marke wegen Verfalls (§ 49), wegen des Vorliegens absoluter Schutzhindernisse (§ 50) oder aufgrund eines älteren Rechts (§ 51) tritt für international registrierte Marken der Antrag oder die Klage auf Schutzentziehung.

(2) Wird ein Antrag auf Schutzentziehung nach § 49 Abs. 1 wegen mangelnder Benutzung gestellt, so tritt an die Stelle des Tages der Eintragung in das Register der Tag, an dem die Frist des Artikels 5 Abs. 2 des Madrider Markenabkommens abgelaufen ist, oder, falls bei Ablauf dieser Frist die in den §§ 113 und 114 genannten Verfahren noch nicht abgeschlossen sind, der Tag des Zugangs der abschließenden Mitteilung über die Schutzbewilligung beim Internationalen Büro der Weltorganisation für geistiges Eigentum.

## § 116 Widerspruch und Antrag auf Löschung aufgrund einer international registrierten Marke

(1) Wird aufgrund einer international registrierten Marke Widerspruch gegen die Eintragung einer Marke erhoben, so ist § 43 Abs. 1 mit der Maßgabe anzuwenden, daß an die Stelle des Tages der Eintragung der in § 115 Abs. 2 bezeichnete Tag tritt.

(2) Wird aufgrund einer international registrierten Marke eine Klage auf Löschung einer eingetragenen Marke nach § 51 erhoben, so ist § 55 Abs. 3 mit der Maßgabe anzuwenden, daß an die Stelle des Tages der Eintragung der in § 115 Abs. 2 bezeichnete Tag tritt.

## § 117 Ausschluß von Ansprüchen wegen mangelnder Benutzung

Werden Ansprüche im Sinne der §§ 14, 18 und 19 wegen der Verletzung einer international registrierten Marke geltend gemacht, so ist § 25 mit der Maßgabe anzuwenden, daß an die Stelle des Tages der Eintragung der Marke der in § 115 Abs. 2 bezeichnete Tag tritt.

## § 118 Zustimmung bei Übertragungen international registrierter Marken

Das Patentamt erteilt dem Internationalen Büro der Weltorganisation für geistiges Eigentum die nach Artikel 9bis Abs. 1 des Madrider Markenabkommens erforderliche Zustimmung im Falle der Übertragung einer international registrierten Marke ohne Rücksicht darauf, ob die Marke für den neuen Inhaber der international registrierten Marke in das vom Patentamt geführte Register eingetragen ist.

# Abschnitt 2
# Schutz von Marken nach dem Protokoll zum Madrider Markenabkommen

## § 119 Anwendung der Vorschriften dieses Gesetzes; Sprachen

(1) Die Vorschriften dieses Gesetzes sind auf internationale Registrierungen von Marken nach dem Madrider Protokoll vom 27. Juni 1989 zum Madrider Abkommen über die internationale Registrierung von Marken (Protokoll zum Madrider Markenabkommen), die durch Vermittlung des Patentamts vorgenommen werden oder deren Schutz sich auf das Gebiet der Bundesrepublik Deutschland erstreckt, entsprechend anzuwenden, soweit in diesem Abschnitt oder im Protokoll zum Madrider Markenabkommen nichts anderes bestimmt ist.

(2) Sämtliche Anträge sowie sonstige Mitteilungen im Verfahren der internationalen Registrierung und das Verzeichnis der Waren und Dienstleistungen sind nach Wahl des Antragstellers in französischer oder in englischer Sprache einzureichen.

## § 120 Antrag auf internationale Registrierung

(1) Der Antrag auf internationale Registrierung einer zur Eintragung in das Register angemeldeten Marke oder einer in das Register eingetragenen Marke nach Artikel 3 des Protokolls zum Madrider Markenabkommen ist beim Patentamt zu stellen. Der Antrag kann auch schon vor der Eintragung der Marke gestellt werden, wenn die internationale Registrierung auf der Grundlage einer im Register eingetragenen Marke vorgenommen werden soll.

(2) Soll die internationale Registrierung auf der Grundlage einer im Register eingetragenen Marke vorgenommen werden und wird der Antrag auf internationale Registrierung vor der Eintragung der Marke in das Register gestellt, so gilt er als am Tag der Eintragung der Marke zugegangen.

(3) Mit dem Antrag ist das Verzeichnis der Waren und Dienstleistungen, nach Klassen geordnet in der Reihenfolge der internationalen Klassifikation von Waren und Dienstleistungen, einzureichen.

## § 121 Gebühren

(1) Soll die internationale Registrierung nach dem Madrider Markenabkommen und nach dem Protokoll zum Madrider Markenabkommen auf der Grundlage einer im Register eingetragenen

Marke vorgenommen werden und ist der Antrag auf internationale Registrierung vor der Eintragung der Marke in das Register gestellt worden, so wird die nationale Gebühr nach dem Patentkostengesetz für die internationale Registrierung am Tag der Eintragung fällig.

(2) Die nationale Gebühr nach dem Patentkostengesetz für die internationale Registrierung ist innerhalb eines Monats nach Fälligkeit, die sich nach § 3 Abs. 1 des Patentkostengesetzes oder nach Absatz 1 richtet, zu zahlen.

## § 122 Vermerk in den Akten, Eintragung im Register

(1) Ist die internationale Registrierung auf der Grundlage einer zur Eintragung in das Register angemeldeten Marke vorgenommen worden, so sind der Tag und die Nummer der internationalen Registrierung in den Akten der angemeldeten Marke zu vermerken.

(2) Der Tag und die Nummer der internationalen Registrierung, die auf der Grundlage einer im Register eingetragenen Marke vorgenommen worden ist, ist in das Register einzutragen. Satz 1 ist auch anzuwenden, wenn die internationale Registrierung auf der Grundlage einer zur Eintragung in das Register angemeldeten Marke vorgenommen worden ist und die Anmeldung zur Eintragung geführt hat.

## § 123 Nachträgliche Schutzerstreckung

(1) Der Antrag auf nachträgliche Schutzerstreckung einer international registrierten Marke nach Artikel 3(hoch)ter Abs. 2 des Protokolls zum Madrider Markenabkommen kann beim Patentamt gestellt werden. Soll die nachträgliche Schutzerstreckung auf der Grundlage einer im Register eingetragenen Marke vorgenommen werden und wird der Antrag schon vor der Eintragung der Marke gestellt, so gilt er als am Tag der Eintragung zugegangen.

(2) Die nachträgliche Schutzerstreckung auf der Grundlage einer im Register eingetragenen Marke kann sowohl nach dem Madrider Markenabkommen als auch nach dem Protokoll zum Madrider Markenabkommen vorgenommen werden.

(3) Die nationale Gebühr nach dem Patentkostengesetz für die nachträgliche Schutzerstreckung ist innerhalb eines Monats nach Fälligkeit (§ 3 Abs. 1 des Patentkostengesetzes) zu zahlen.

## § 124 Entsprechende Anwendung der Vorschriften über die Wirkung der nach dem Madrider Markenabkommen international registrierten Marken

Die §§ 112 bis 117 sind auf international registrierte Marken, deren Schutz nach Artikel 3ter des Protokolls zum Madrider Markenabkommen auf das Gebiet der Bundesrepublik Deutschland erstreckt worden ist, entsprechend anzuwenden mit der Maßgabe, daß an die Stelle der in den §§ 112 bis 117 aufgeführten Vorschriften des Madrider Markenabkommens die entsprechenden Vorschriften des Protokolls zum Madrider Markenabkommen treten.

## § 125 Umwandlung einer internationalen Registrierung

(1) Wird beim Patentamt ein Antrag nach Artikel 9quinquies des Protokolls zum Madrider Markenabkommen auf Umwandlung einer im internationalen Register gemäß Artikel 6 Abs. 4 des Protokolls zum Madrider Markenabkommen gelöschten Marke gestellt und geht der Antrag mit den erforderlichen Angaben dem Patentamt vor Ablauf einer Frist von drei

Monaten nach dem Tag der Löschung der Marke im internationalen Register zu, so ist der Tag der internationalen Registrierung dieser Marke nach Artikel 3 Abs. 4 des Protokolls zum Madrider Markenabkommen oder der Tag der Eintragung der Schutzerstreckung nach Artikel 3ter Abs. 2 des Protokolls zum Madrider Markenabkommen, gegebenenfalls mit der für die internationale Registrierung in Anspruch genommenen Priorität, für die Bestimmung des Zeitrangs im Sinne des § 6 Abs. 2 maßgebend.

(2) Der Antragsteller hat eine Bescheinigung des Internationalen Büros der Weltorganisation für geistiges Eigentum einzureichen, aus der sich die Marke und die Waren oder Dienstleistungen ergeben, für die sich der Schutz der internationalen Registrierung vor ihrer Löschung im internationalen Register auf die Bundesrepublik Deutschland erstreckt hatte.

(3) Der Antragsteller hat außerdem eine deutsche Übersetzung des Verzeichnisses der Waren oder Dienstleistungen, für die die Eintragung beantragt wird, einzureichen.

(4) Der Antrag auf Umwandlung wird im übrigen wie eine Anmeldung zur Eintragung einer Marke behandelt. War jedoch am Tag der Löschung der Marke im internationalen Register die Frist nach Artikel 5 Abs. 2 des Protokolls zum Madrider Markenabkommen zur Verweigerung des Schutzes bereits abgelaufen und war an diesem Tag kein Verfahren zur Schutzverweigerung oder zur nachträglichen Schutzentziehung anhängig, so wird die Marke ohne vorherige Prüfung unmittelbar nach § 41 in das Register eingetragen. Gegen die Eintragung einer Marke nach Satz 2 kann Widerspruch nicht erhoben werden.

# Abschnitt 3
# Gemeinschaftsmarken

## § 125a Anmeldung von Gemeinschaftsmarken beim Patentamt

Werden beim Patentamt Anmeldungen von Gemeinschaftsmarken nach Artikel 25 Abs. 1 Buchstabe b der Verordnung (EG) Nr. 40/94 des Rates vom 20. Dezember 1993 über die Gemeinschaftsmarke (ABl. EG Nr. L 11 S 1) eingereicht, so vermerkt das Patentamt auf der Anmeldung den Tag des Eingangs und leitet die Anmeldung ohne Prüfung unverzüglich an das Harmonisierungsamt für den Binnenmarkt (Marken, Muster und Modelle) weiter.

## § 125b Anwendung der Vorschriften dieses Gesetzes

Die Vorschriften dieses Gesetzes sind auf Marken, die nach der Verordnung über die Gemeinschaftsmarke angemeldet oder eingetragen worden sind, in folgenden Fällen anzuwenden:
1. Für die Anwendung des § 9 (Relative Schutzhindernisse) sind angemeldete oder eingetragene Gemeinschaftsmarken mit älterem Zeitrang den nach diesem Gesetz angemeldeten oder eingetragenen Marken mit älterem Zeitrang gleichgestellt, jedoch mit der Maßgabe, daß an die Stelle der Bekanntheit im Inland gemäß § 9 Abs. 1 Nr. 3 die Bekanntheit in der Gemeinschaft gemäß Artikel 9 Abs. 1 Satz 2 Buchstabe c der Verordnung über die Gemeinschaftsmarke tritt.
2. Dem Inhaber einer eingetragenen Gemeinschaftsmarke stehen zusätzlich zu den Ansprüchen nach den Artikeln 9 bis 11 der Verordnung über die Gemeinschaftsmarke die gleichen Ansprüche auf Schadensersatz (§ 14 Abs. 6 und 7), auf Vernichtung (§ 18) und auf Auskunftserteilung (§ 19) zu wie dem Inhaber einer nach diesem Gesetz eingetragenen Marke.

Ein Service der juris GmbH - www.juris.de -

3. Werden Ansprüche aus einer eingetragenen Gemeinschaftsmarke gegen die Benutzung einer nach diesem Gesetz eingetragenen Marke mit jüngerem Zeitrang geltend gemacht, so ist § 21 Abs. 1 (Verwirkung) entsprechend anzuwenden.

4. Wird ein Widerspruch gegen die Eintragung einer Marke (§ 42) auf eine eingetragene Gemeinschaftsmarke mit älterem Zeitrang gestützt, so ist § 43 Abs. 1 (Glaubhaftmachung der Benutzung) entsprechend anzuwenden mit der Maßgabe, daß an die Stelle der Benutzung der Marke mit älterem Zeitrang gemäß § 26 die Benutzung der Gemeinschaftsmarke mit älterem Zeitrang gemäß Artikel 15 der Verordnung über die Gemeinschaftsmarke tritt.

5. Wird ein Antrag auf Löschung der Eintragung einer Marke (§ 51 Abs. 1) auf eine eingetragene Gemeinschaftsmarke mit älterem Zeitrang gestützt, so sind
   a) § 51 Abs. 2 Satz 1 (Verwirkung) entsprechend anzuwenden;
   b) § 55 Abs. 3 (Nachweis der Benutzung) mit der Maßgabe entsprechend anzuwenden, daß an die Selle der Benutzung der Marke mit älterem Zeitrang gemäß § 26 die Benutzung der Gemeinschaftsmarke nach Artikel 15 der Verordnung über die Gemeinschaftsmarke tritt.

6. Anträge auf Beschlagnahme bei der Einfuhr und Ausfuhr können von Inhabern eingetragener Gemeinschaftsmarken in gleicher Weise gestellt werden wie von Inhabern nach diesem Gesetz eingetragener Marken. Die §§ 146 bis 149 sind entsprechend anzuwenden.

## § 125c Nachträgliche Feststellung der Ungültigkeit einer Marke

(1) Ist für eine angemeldete oder eingetragene Gemeinschaftsmarke der Zeitrang einer im Register des Patentamts eingetragenen Marke nach Artikel 34 oder 35 der Verordnung über die Gemeinschaftsmarke in Anspruch genommen worden und ist die im Register des Patentamts eingetragene Marke wegen Nichtverlängerung der Schutzdauer nach § 47 Abs. 6 oder wegen Verzichts nach § 48 Abs. 1 gelöscht worden, so kann auf Antrag nachträglich die Ungültigkeit dieser Marke wegen Verfalls oder wegen Nichtigkeit festgestellt werden.

(2) Die Feststellung der Ungültigkeit erfolgt unter den gleichen Voraussetzungen wie eine Löschung wegen Verfalls oder wegen Nichtigkeit. Jedoch kann die Ungültigkeit einer Marke wegen Verfalls nach § 49 Abs. 1 nur festgestellt werden, wenn die Voraussetzungen für die Löschung nach dieser Vorschrift auch schon in dem Zeitpunkt gegeben waren, in dem die Marke wegen Nichtverlängerung der Schutzdauer oder wegen Verzichts gelöscht worden ist.

(3) Das Verfahren zur Feststellung der Ungültigkeit richtet sich nach den Vorschriften, die für das Verfahren zur Löschung einer eingetragenen Marke gelten, mit der Maßgabe, daß an die Stelle der Löschung der Eintragung der Marke die Feststellung ihrer Ungültigkeit tritt.

## § 125d Umwandlung von Gemeinschaftsmarken

(1) Ist dem Patentamt ein Antrag auf Umwandlung einer angemeldeten oder eingetragenen Gemeinschaftsmarke nach Artikel 109 Abs. 3 der Verordnung über die Gemeinschaftsmarke übermittelt worden, so sind die Gebühr und die Klassengebühren nach dem Patentkostengesetz für das Umwandlungsverfahren mit Zugang des Umwandlungsantrages beim Patentamt fällig.

(2) Betrifft der Umwandlungsantrag eine Marke, die noch nicht als Gemeinschaftsmarke eingetragen war, so wird der Umwandlungsantrag wie die Anmeldung einer Marke zur Eintragung in das Register des Patentamts behandelt mit der Maßgabe, daß an die Stelle

Ein Service der juris GmbH - www.juris.de -

des Anmeldetages im Sinne des § 33 Abs. 1 der Anmeldetag der Gemeinschaftsmarke im
Sinne des Artikels 27 der Verordnung über die Gemeinschaftsmarke oder der Tag einer für
die Gemeinschaftsmarke in Anspruch genommenen Priorität tritt. War für die Anmeldung
der Gemeinschaftsmarke der Zeitrang einer im Register des Patentamts eingetragenen
Marke nach Artikel 34 der Verordnung über die Gemeinschaftsmarke in Anspruch genommen
worden, so tritt dieser Zeitrang an die Stelle des nach Satz 1 maßgeblichen Tages.

(3) Betrifft der Umwandlungsantrag einer Marke, die bereits als Gemeinschaftsmarke
eingetragen war, so trägt das Patentamt die Marke ohne weitere Prüfung unmittelbar
nach § 41 unter Wahrung ihres ursprünglichen Zeitrangs in das Register ein. Gegen die
Eintragung kann Widerspruch nicht erhoben werden.

(4) Im übrigen sind auf Umwandlungsanträge die Vorschriften dieses Gesetzes für die
Anmeldung von Marken anzuwenden.

## § 125e Gemeinschaftsmarkengerichte, Gemeinschaftsmarkenstreitsachen

(1) Für alle Klagen, für die nach der Verordnung über die Gemeinschaftsmarke die
Gemeinschaftsmarkengerichte im Sinne des Artikels 91 Abs. 1 der Verordnung zuständig
sind (Gemeinschaftsmarkenstreitsachen), sind als Gemeinschaftsmarkengerichte erster
Instanz die Landgerichte ohne Rücksicht auf den Streitwert ausschließlich zuständig.

(2) Gemeinschaftsmarkengericht zweiter Instanz ist das Oberlandesgericht, in dessen
Bezirk das Gemeinschaftsmarkengericht erster Instanz seinen Sitz hat.

(3) Die Landesregierungen werden ermächtigt, durch Rechtsverordnung die
Gemeinschaftsmarkenstreitsachen für die Bezirke mehrerer Gemeinschaftsmarkengerichte
einem dieser Gerichte zuzuweisen. Die Landesregierungen können diese Ermächtigung durch
Rechtsverordnung auf die Landesjustizverwaltungen übertragen.

(4) Die Länder können durch Vereinbarung den Gemeinschaftsmarkengerichten eines Landes
obliegende Aufgaben ganz oder teilweise dem zuständigen Gemeinschaftsmarkengericht
eines anderen Landes übertragen.

(5) Auf Verfahren vor den Gemeinschaftsmarkengerichten ist § 140 Abs. 3 bis 5
entsprechend anzuwenden.

## § 125f Unterrichtung der Kommission

Das Bundesministerium der Justiz teilt der Kommission der Europäischen
Gemeinschaften die Gemeinschaftsmarkengerichte erster und zweiter Instanz sowie
jede Änderung der Anzahl, der Bezeichnung oder der örtlichen Zuständigkeit der
Gemeinschaftsmarkengerichte erster und zweiter Instanz mit.

## § 125g Örtliche Zuständigkeit der Gemeinschaftsmarkengerichte

Sind nach Artikel 93 der Verordnung über die Gemeinschaftsmarke deutsche
Gemeinschaftsmarkengerichte international zuständig, so gelten für die örtliche
Zuständigkeit dieser Gerichte die Vorschriften entsprechend, die anzuwenden wären,
wenn es sich um eine beim Patentamt eingereichte Anmeldung einer Marke oder um eine
im Register des Patentamts eingetragene Marke handelte. Ist eine Zuständigkeit danach
nicht begründet, so ist das Gericht örtlich zuständig, bei dem der Kläger seinen
allgemeinen Gerichtsstand hat.

## § 125h Insolvenzverfahren

(1) Ist dem Insolvenzgericht bekannt, daß zur Insolvenzmasse eine angemeldete oder eingetragene Gemeinschaftsmarke gehört, so ersucht es das Harmonisierungsamt für den Binnenmarkt (Marken, Muster und Modelle) im unmittelbaren Verkehr,
1. die Eröffnung des Verfahrens und, soweit nicht bereits darin enthalten, die Anordnung einer Verfügungsbeschränkung,
2. die Freigabe oder die Veräußerung der Gemeinschaftsmarke oder der Anmeldung der Gemeinschaftsmarke,
3. die rechtskräftige Einstellung des Verfahrens und
4. die rechtskräftige Aufhebung des Verfahrens, im Falle einer Überwachung des Schuldners jedoch erst nach Beendigung dieser Überwachung, und einer Verfügungsbeschränkung

in das Register für Gemeinschaftsmarken oder, wenn es sich um eine Anmeldung handelt, in die Akten der Anmeldung einzutragen.

(2) Die Eintragung in das Register für Gemeinschaftsmarken oder in die Akten der Anmeldung kann auch vom Insolvenzverwalter beantragt werden. Im Falle der Eigenverwaltung (§ 270 der Insolvenzordnung) tritt der Sachwalter an die Stelle des Insolvenzverwalters.

## § 125i Erteilung der Vollstreckungsklausel

Für die Erteilung der Vollstreckungsklausel nach Artikel 82 Abs. 2 Satz 2 der Verordnung über die Gemeinschaftsmarke ist das Patentgericht zuständig. Die vollstreckbare Ausfertigung wird vom Urkundsbeamten der Geschäftsstelle des Patentgerichts erteilt.

# Teil 6
# Geographische Herkunftsangaben

# Abschnitt 1
# Schutz geographischer Herkunftsangaben

## § 126 Als geographische Herkunftsangaben geschützte Namen, Angaben oder Zeichen

(1) Geographische Herkunftsangaben im Sinne dieses Gesetzes sind die Namen von Orten, Gegenden, Gebieten oder Ländern sowie sonstige Angaben oder Zeichen, die im geschäftlichen Verkehr zur Kennzeichnung der geographischen Herkunft von Waren oder Dienstleistungen benutzt werden.

(2) Dem Schutz als geographische Herkunftsangaben sind solche Namen, Angaben oder Zeichen im Sinne des Absatzes 1 nicht zugänglich, bei denen es sich um Gattungsbezeichnungen handelt. Als Gattungsbezeichnungen sind solche Bezeichnungen anzusehen, die zwar eine Angabe über die geographische Herkunft im Sinne des Absatzes 1 enthalten oder von einer solchen Angabe abgeleitet sind, die jedoch ihre ursprüngliche Bedeutung verloren haben und als Namen von Waren oder Dienstleistungen oder als Bezeichnungen oder Angaben der Art, der Beschaffenheit, der Sorte oder sonstiger Eigenschaften oder Merkmale von Waren oder Dienstleistungen dienen.

### § 127 Schutzinhalt

(1) Geographische Herkunftsangaben dürfen im geschäftlichen Verkehr nicht für Waren oder Dienstleistungen benutzt werden, die nicht aus dem Ort, der Gegend, dem Gebiet oder dem Land stammen, das durch die geographische Herkunftsangabe bezeichnet wird, wenn bei der Benutzung solcher Namen, Angaben oder Zeichen für Waren oder Dienstleistungen anderer Herkunft eine Gefahr der Irreführung über die geographische Herkunft besteht.

(2) Haben die durch eine geographische Herkunftsangabe gekennzeichneten Waren oder Dienstleistungen besondere Eigenschaften oder eine besondere Qualität, so darf die geographische Herkunftsangabe im geschäftlichen Verkehr für die entsprechenden Waren oder Dienstleistungen dieser Herkunft nur benutzt werden, wenn die Waren oder Dienstleistungen diese Eigenschaften oder diese Qualität aufweisen.

(3) Genießt eine geographische Herkunftsangabe einen besonderen Ruf, so darf sie im geschäftlichen Verkehr für Waren oder Dienstleistungen anderer Herkunft auch dann nicht benutzt werden, wenn eine Gefahr der Irreführung über die geographische Herkunft nicht besteht, sofern die Benutzung für Waren oder Dienstleistungen anderer Herkunft geeignet ist, den Ruf der geographischen Herkunftsangabe oder ihre Unterscheidungskraft ohne rechtfertigenden Grund in unlauterer Weise auszunutzen oder zu beeinträchtigen.

(4) Die vorstehenden Absätze finden auch dann Anwendung, wenn Namen, Angaben oder Zeichen benutzt werden, die der geschützten geographischen Herkunftsangabe ähnlich sind oder wenn die geographische Herkunftsangabe mit Zusätzen benutzt wird, sofern
1. in den Fällen des Absatzes 1 trotz der Abweichung oder der Zusätze eine Gefahr der Irreführung über die geographische Herkunft besteht oder
2. in den Fällen des Absatzes 3 trotz der Abweichung oder der Zusätze die Eignung zur unlauteren Ausnutzung oder Beeinträchtigung des Rufs oder der Unterscheidungskraft der geographischen Herkunftsangabe besteht.

### § 128 Unterlassungsanspruch, Schadensersatzanspruch

(1) Wer im geschäftlichen Verkehr Namen, Angaben oder Zeichen entgegen § 127 benutzt, kann von den nach § 8 Abs. 3 des Gesetzes gegen den unlauteren Wettbewerb zur Geltendmachung von Ansprüchen Berechtigten auf Unterlassung in Anspruch genommen werden.

(2) Wer dem § 127 vorsätzlich oder fahrlässig zuwiderhandelt, ist zum Ersatz des durch die Zuwiderhandlung entstandenen Schadens verpflichtet.

(3) Wird die Zuwiderhandlung in einem geschäftlichen Betrieb von einem Angestellten oder Beauftragten begangen, so kann der Unterlassungsanspruch, und, soweit der Angestellte oder Beauftragte vorsätzlich oder fahrlässig gehandelt hat, der Schadensersatzanspruch auch gegen den Inhaber des Betriebs geltend gemacht werden.

### § 129 Verjährung

Ansprüche nach § 128 verjähren gemäß § 20.

## Abschnitt 2

Ein Service der juris GmbH - www.juris.de -

# Schutz von geographischen Angaben und Ursprungsbezeichnungen gemäß der Verordnung (EWG) Nr. 2081/92

## § 130 Verfahren vor dem Patentamt; Weiterleitung

(1) Anträge auf Eintragung einer geografischen Angabe oder einer Ursprungsbezeichnung in das Verzeichnis der geschützten geografischen Angaben und der geschützten Ursprungsbezeichnungen, das von der Kommission der Europäischen Gemeinschaften gemäß der Verordnung (EWG) Nr. 2081/92 des Rates vom 14. Juli 1992 zum Schutz von geografischen Angaben und Ursprungsbezeichnungen für Agrarerzeugnisse und Lebensmittel (ABl. EG Nr. L 208 S. 1), in ihrer jeweils geltenden Fassung geführt wird, sind beim Patentamt einzureichen.

(2) Für die in diesem Abschnitt geregelten Verfahren sind die im Patentamt errichteten Markenabteilungen zuständig.

(3) Bei der Prüfung des Antrags holt das Patentamt die Stellungnahmen des Bundesministeriums für Ernährung, Landwirtschaft und Verbraucherschutz, der interessierten öffentlichen Körperschaften sowie der interessierten Verbände und Organisationen der Wirtschaft ein.

(4) Das Patentamt veröffentlicht den Antrag im Markenblatt. Innerhalb von vier Monaten seit Veröffentlichung des Antrags kann von jeder Person beim Patentamt eine Stellungnahme zur Schutzfähigkeit der geografischen Angabe oder der Ursprungsbezeichnung, die Gegenstand des Antrags ist, eingereicht werden.

(5) Entspricht der Antrag unter Berücksichtigung der Stellungnahmen nach den Absätzen 3 und 4 den Voraussetzungen der Verordnung (EWG) Nr. 2081/92 und den zu ihrer Durchführung erlassenen Vorschriften, so stellt das Patentamt dieses durch Beschluss fest. Andernfalls wird der Antrag durch Beschluss zurückgewiesen. Der Beschluss ist dem Antragsteller und denjenigen zuzustellen, die innerhalb der Frist von Absatz 4 eine Stellungnahme abgegeben haben.

(6) Steht rechtskräftig fest, dass der Antrag den Voraussetzungen der Verordnung (EWG) Nr. 2081/92 und den zu ihrer Durchführung erlassenen Vorschriften entspricht, so unterrichtet das Patentamt den Antragsteller hierüber und übermittelt den Antrag dem Bundesministerium der Justiz. Das Bundesministerium der Justiz übermittelt den Antrag mit den erforderlichen Unterlagen an die Kommission der Europäischen Gemeinschaften.

## § 131 Einspruchsverfahren

(1) Einsprüche nach Artikel 7 Abs. 3 der Verordnung (EWG) Nr. 2081/92 gegen die Eintragung von geografischen Angaben und Ursprungsbezeichnungen in das von der Kommission der Europäischen Gemeinschaften geführte Verzeichnis der geschützten geografischen Angaben und der geschützten Ursprungsbezeichnungen oder gegen die Änderung der Spezifikation einer geografischen Angabe oder einer Ursprungsbezeichnung sind beim Patentamt innerhalb von vier Monaten seit der Veröffentlichung im Amtsblatt der Europäischen Union gemäß Artikel 6 Abs. 2 der Verordnung (EWG) Nr. 2081/92 einzulegen.

(2) Die Zahlungsfrist für die Einspruchsgebühr richtet sich nach § 6 Abs. 1 Satz 1 des Patentkostengesetzes. Eine Wiedereinsetzung in die Einspruchsfrist und in die Frist zur Zahlung der Einspruchsgebühr ist nicht gegeben.

## § 132 Löschungsverfahren

(1) Anträge auf Löschung einer geschützten geografischen Angabe oder einer geschützten Ursprungsbezeichnung nach Artikel 11a Buchstabe a der Verordnung (EWG) Nr. 2081/92 sind beim Patentamt einzureichen. Ist der Antrag begründet, so stellt das Patentamt dies fest und übermittelt den Antrag an das Bundesministerium der Justiz zur Weiterleitung an die Kommission der Europäischen Gemeinschaften. Ist der Antrag unbegründet, so weist ihn das Patentamt zurück.

(2) Anträge auf Löschung einer geschützten geografischen Angabe oder einer geschützten Ursprungsbezeichnung nach Artikel 11a Buchstabe b der Verordnung (EWG) Nr. 2081/92 können beim Patentamt eingereicht werden. Die Anträge werden ohne Prüfung an das Bundesministerium der Justiz zur Weiterleitung an die Kommission der Europäischen Gemeinschaften übermittelt.

## § 133 Antrag auf Änderung der Spezifikation

Für Anträge auf Änderung der Spezifikation einer geschützten geografischen Angabe oder einer geschützten Ursprungsbezeichnung gemäß Artikel 9 der Verordnung (EWG) Nr. 2081/92 gilt § 130 entsprechend. Eine Gebühr ist nicht zu zahlen.

## § 133a Rechtsmittel

Gegen Entscheidungen, die das Patentamt nach den Vorschriften dieses Abschnitts trifft, findet die Beschwerde zum Bundespatentgericht und die Rechtsbeschwerde zum Bundesgerichtshof statt. Gegen eine Entscheidung gemäß § 130 Abs. 5 Satz 1 steht die Beschwerde denjenigen Personen zu, die gemäß § 130 Abs. 4 fristgerecht zu dem Antrag Stellung genommen haben und die durch die Entscheidung in ihrem berechtigten Interesse betroffen sind. Im Übrigen sind die Vorschriften dieses Gesetzes über das Beschwerdeverfahren vor dem Bundespatentgericht (§§ 66 bis 82) und über das Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof (§§ 83 bis 90) entsprechend anzuwenden.

## § 134 Überwachung

(1) Die nach der Verordnung (EWG) Nr. 2081/92 und den zu ihrer Durchführung erlassenen Vorschriften erforderliche Überwachung und Kontrolle obliegt den nach Landesrecht zuständigen Stellen.

(2) Soweit es zur Überwachung und Kontrolle im Sinne des Absatzes 1 erforderlich ist, können die Beauftragten der zuständigen Stellen bei Betrieben, die Agrarerzeugnisse oder Lebensmittel herstellen oder in den Verkehr bringen (§ 7 Abs. 1 des Lebensmittel- und Bedarfsgegenständegesetzes) oder innergemeinschaftlich verbringen, einführen oder ausführen, während der Geschäfts- oder Betriebszeit
1. Geschäftsräume und Grundstücke, Verkaufseinrichtungen und Transportmittel betreten und dort Besichtigungen vornehmen,
2. Proben gegen Empfangsbescheinigung entnehmen; auf Verlangen des Betroffenen ist ein Teil der Probe oder, falls diese unteilbar ist, eine zweite Probe amtlich verschlossen und versiegelt zurückzulassen,

3. Geschäftsunterlagen einsehen und prüfen,
4. Auskunft verlangen.

Diese Befugnisse erstrecken sich auch auf Agrarerzeugnisse oder Lebensmittel, die an
öffentlichen Orten, insbesondere auf Märkten, Plätzen, Straßen oder im Umherziehen in
den Verkehr gebracht werden.

(3) Inhaber oder Leiter der Betriebe sind verpflichtet, das Betreten der Geschäftsräume
und Grundstücke, Verkaufseinrichtungen und Transportmittel sowie die dort
vorzunehmenden Besichtigungen zu gestatten, die zu besichtigenden Agrarerzeugnisse
oder Lebensmittel selbst oder durch andere so darzulegen, daß die Besichtigung
ordnungsgemäß vorgenommen werden kann, selbst oder durch andere die erforderliche
Hilfe bei Besichtigungen zu leisten, die Proben entnehmen zu lassen, die geschäftlichen
Unterlagen vorzulegen, prüfen zu lassen und Auskünfte zu erteilen.

(4) Erfolgt die Überwachung bei der Einfuhr oder bei der Ausfuhr, so gelten die Absätze
2 und 3 entsprechend auch für denjenigen, der die Agrarerzeugnisse oder Lebensmittel
für den Betriebsinhaber innergemeinschaftlich verbringt, einführt oder ausführt.

(5) Der zur Erteilung einer Auskunft Verpflichtete kann die Auskunft auf solche Fragen
verweigern, deren Beantwortung ihn selbst oder einen der in § 383 Abs. 1 Nr. 1 bis 3
der Zivilprozeßordnung bezeichneten Angehörigen der Gefahr strafrechtlicher Verfolgung
oder eines Verfahrens nach dem Gesetz über Ordnungswidrigkeiten aussetzen würde.

(6) Für Amtshandlungen, die nach Artikel 10 der Verordnung (EWG) Nr. 2081/92 zu
Kontrollzwecken vorzunehmen sind, werden kostendeckende Gebühren und Auslagen erhoben.
Die kostenpflichtigen Tatbestände werden durch das Landesrecht bestimmt.

## § 135 Unterlassungsanspruch, Schadensersatzanspruch

(1) Wer im geschäftlichen Verkehr Handlungen vornimmt, die gegen Artikel 8 oder 13
der Verordnung (EWG) Nr. 2081/92 verstößen, kann von den nach § 8 Abs. 3 des Gesetzes
gegen den unlauteren Wettbewerb zur Geltendmachung von Ansprüchen Berechtigten auf
Unterlassung in Anspruch genommen werden.

(2) § 128 Abs. 2 und 3 ist entsprechend anzuwenden.

## § 136 Verjährung

Die Ansprüche nach § 135 verjähren gemäß § 20.

# Abschnitt 3
# Ermächtigungen zum Erlaß von Rechtsverordnungen

## § 137 Nähere Bestimmungen zum Schutz einzelner geographischer Herkunftsangaben

(1) Das Bundesministerium der Justiz wird ermächtigt, im Einvernehmen mit den
Bundesministerien für Wirtschaft und Technologie und für Ernährung, Landwirtschaft
und Verbraucherschutz durch Rechtsverordnung mit Zustimmung des Bundesrates nähere
Bestimmungen über einzelne geographische Herkunftsangaben zu treffen.

(2) In der Rechtsverordnung können

1. durch Bezugnahme auf politische oder geographische Grenzen das Herkunftsgebiet,
2. die Qualität oder sonstige Eigenschaften im Sinne des § 127 Abs. 2 sowie die dafür maßgeblichen Umstände, wie insbesondere Verfahren oder Art und Weise der Erzeugung oder Herstellung der Waren oder der Erbringung der Dienstleistungen oder Qualität oder sonstige Eigenschaften der verwendeten Ausgangsmaterialien wie deren Herkunft, und
3. die Art und Weise der Verwendung der geographischen Herkunftsangabe

geregelt werden. Bei der Regelung sind die bisherigen lauteren Praktiken, Gewohnheiten und Gebräuche bei der Verwendung der geographischen Herkunftsangabe zu berücksichtigen.

## § 138 Sonstige Vorschriften für das Verfahren bei Anträgen und Einsprüchen nach der Verordnung (EWG) Nr. 2081/92

(1) Das Bundesministerium der Justiz wird ermächtigt, durch Rechtsverordnung ohne Zustimmung des Bundesrates nähere Bestimmungen über das Antrags-, Einspruchs- und Löschungsverfahren (§§ 130 bis 133) zu treffen.

(2) Das Bundesministerium der Justiz kann die Ermächtigung zum Erlaß von Rechtsverordnungen nach Absatz 1 durch Rechtsverordnung ohne Zustimmung des Bundesrates ganz oder teilweise auf das Deutsche Patent- und Markenamt übertragen.

## § 139 Durchführungsbestimmungen zur Verordnung (EWG) Nr. 2081/92

(1) Das Bundesministerium der Justiz wird ermächtigt, im Einvernehmen mit den Bundesministerien für Wirtschaft und Technologie und für Ernährung, Landwirtschaft und Verbraucherschutz durch Rechtsverordnung mit Zustimmung des Bundesrates weitere Einzelheiten des Schutzes von Ursprungsbezeichnungen und geographischen Angaben nach der Verordnung (EWG) Nr. 2081/92 zu regeln, soweit sich das Erfordernis hierfür aus der Verordnung (EWG) Nr. 2081/92 oder den zur Durchführung erlassenen Vorschriften des Rates oder der Kommission der Europäischen Gemeinschaften ergibt. In Rechtsverordnungen nach Satz 1 können insbesondere Vorschriften über
1. die Kennzeichnung der Agrarerzeugnisse oder Lebensmittel,
2. die Berechtigung zum Verwenden der geschützten Bezeichnungen oder
3. die Voraussetzungen und das Verfahren bei der Überwachung oder Kontrolle beim innergemeinschaftlichen Verbringen oder bei der Einfuhr oder Ausfuhr

erlassen werden. Rechtsverordnungen nach Satz 1 können auch erlassen werden, wenn die Mitgliedstaaten nach den dort genannten gemeinschaftsrechtlichen Vorschriften befugt sind, ergänzende Vorschriften zu erlassen.

(2) Die Landesregierungen werden ermächtigt, durch Rechtsverordnung die Durchführung der nach Artikel 10 der Verordnung (EWG) Nr. 2081/92 erforderlichen Kontrollen zugelassenen privaten Kontrollstellen zu übertragen oder solche an der Durchführung dieser Kontrollen zu beteiligen. Die Landesregierungen können auch die Voraussetzungen und das Verfahren der Zulassung privater Kontrollstellen durch Rechtsverordnung regeln. Sie sind befugt, die Ermächtigung nach den Sätzen 1 und 2 durch Rechtsverordnung ganz oder teilweise auf andere Behörden zu übertragen.

# Teil 7
# Verfahren in Kennzeichenstreitsachen

## § 140 Kennzeichenstreitsachen

Ein Service der juris GmbH - www.juris.de -

(1) Für alle Klagen, durch die ein Anspruch aus einem der in diesem Gesetz geregelten Rechtsverhältnisse geltend gemacht wird (Kennzeichenstreitsachen), sind die Landgerichte ohne Rücksicht auf den Streitwert ausschließlich zuständig.

(2) Die Landesregierungen werden ermächtigt, durch Rechtsverordnung die Kennzeichenstreitsachen insgesamt oder teilweise für die Bezirke mehrerer Landgerichte einem von ihnen zuzuweisen, sofern dies der sachlichen Förderung oder schnelleren Erledigung der Verfahren dient. Die Landesregierungen können diese Ermächtigung auf die Landesjustizverwaltungen übertragen. Die Länder können außerdem durch Vereinbarung den Gerichten eines Landes obliegende Aufgaben insgesamt oder teilweise dem zuständigen Gericht eines anderen Landes übertragen.

(3) Von den Kosten, die durch die Mitwirkung eines Patentanwalts in einer Kennzeichenstreitsache entstehen, sind die Gebühren nach § 13 des Rechtsanwaltsvergütungsgesetzes und außerdem die notwendigen Auslagen des Patentanwalts zu erstatten.

## § 141 Gerichtsstand bei Ansprüchen nach diesem Gesetz und dem Gesetz gegen den unlauteren Wettbewerb

Ansprüche, welche die in diesem Gesetz geregelten Rechtsverhältnisse betreffen und auf Vorschriften des Gesetzes gegen den unlauteren Wettbewerb gegründet werden, brauchen nicht im Gerichtsstand des § 14 des Gesetzes gegen den unlauteren Wettbewerb geltend gemacht zu werden.

## § 142 Streitwertbegünstigung

(1) Macht in bürgerlichen Rechtsstreitigkeiten, in denen durch Klage ein Anspruch aus einem der in diesem Gesetz geregelten Rechtsverhältnisse geltend gemacht wird, eine Partei glaubhaft, daß die Belastung mit den Prozeßkosten nach dem vollen Streitwert ihre wirtschaftliche Lage erheblich gefährden würde, so kann das Gericht auf ihren Antrag anordnen, daß die Verpflichtung dieser Partei zur Zahlung von Gerichtskosten sich nach einem ihrer Wirtschaftslage angepaßten Teil des Streitwerts bemißt.

(2) Die Anordnung nach Absatz 1 hat zur Folge, daß die begünstigte Partei die Gebühren ihres Rechtsanwalts ebenfalls nur nach diesem Teil des Streitwerts zu entrichten hat. Soweit ihr Kosten des Rechtsstreits auferlegt werden oder soweit sie diese übernimmt, hat sie die von dem Gegner entrichteten Gerichtsgebühren und die Gebühren seines Rechtsanwalts nur nach dem Teil des Streitwerts zu erstatten. Soweit die außergerichtlichen Kosten dem Gegner auferlegt oder von ihm übernommen werden, kann der Rechtsanwalt der begünstigten Partei seine Gebühren von dem Gegner nach dem für diesen geltenden Streitwert beitreiben.

(3) Der Antrag nach Absatz 1 kann vor der Geschäftsstelle des Gerichts zur Niederschrift erklärt werden. Er ist vor der Verhandlung zur Hauptsache zu stellen. Danach ist er nur zulässig, wenn der angenommene oder festgesetzte Streitwert später durch das Gericht heraufgesetzt wird. Vor der Entscheidung über den Antrag ist der Gegner zu hören.

## Teil 8

Ein Service der juris GmbH - www.juris.de -

# Straf- und Bußgeldvorschriften, Beschlagnahme bei der Einfuhr und Ausfuhr

## Abschnitt 1
## Straf- und Bußgeldvorschriften

### § 143 Strafbare Kennzeichenverletzung

(1) Wer im geschäftlichen Verkehr widerrechtlich
1. entgegen § 14 Abs. 2 Nr. 1 oder 2 ein Zeichen benutzt,
2. entgegen § 14 Abs. 2 Nr. 3 ein Zeichen in der Absicht benutzt, die Unterscheidungskraft oder die Wertschätzung einer bekannten Marke auszunutzen oder zu beeinträchtigen,
3. entgegen § 14 Abs. 4 Nr. 1 ein Zeichen anbringt oder entgegen § 14 Abs. 4 Nr. 2 oder 3 eine Aufmachung oder Verpackung oder ein Kennzeichnungsmittel anbietet, in den Verkehr bringt, besitzt, einführt oder ausführt, soweit Dritten die Benutzung des Zeichens
   a) nach § 14 Abs. 2 Nr. 1 oder 2 untersagt wäre oder
   b) nach § 14 Abs. 2 Nr. 3 untersagt wäre und die Handlung in der Absicht vorgenommen wird, die Ausnutzung oder Beeinträchtigung der Unterscheidungskraft oder der Wertschätzung einer bekannten Marke zu ermöglichen,
4. entgegen § 15 Abs. 2 eine Bezeichnung oder ein Zeichen benutzt oder
5. entgegen § 15 Abs. 3 eine Bezeichnung oder ein Zeichen in der Absicht benutzt, die Unterscheidungskraft oder die Wertschätzung einer bekannten geschäftlichen Bezeichnung auszunutzen oder zu beeinträchtigen,

wird mit Freiheitsstrafe bis zu drei Jahren oder mit Geldstrafe bestraft.

(1a) (weggefallen)

(2) Handelt der Täter gewerbsmäßig, so ist die Strafe Freiheitsstrafe bis zu fünf Jahren oder Geldstrafe.

(3) Der Versuch ist strafbar.

(4) In den Fällen des Absatzes 1 wird die Tat nur auf Antrag verfolgt, es sei denn, daß die Strafverfolgungsbehörde wegen des besonderen öffentlichen Interesses an der Strafverfolgung ein Einschreiten von Amts wegen für geboten hält.

(5) Gegenstände, auf die sich die Straftat bezieht, können eingezogen werden. § 74a des Strafgesetzbuchs ist anzuwenden. Soweit den in § 18 bezeichneten Ansprüchen auf Vernichtung im Verfahren nach den Vorschriften der Strafprozeßordnung über die Entschädigung des Verletzten (§§ 403 bis 406c der Strafprozeßordnung) stattgegeben wird, sind die Vorschriften über die Einziehung nicht anzuwenden.

(6) Wird auf Strafe erkannt, so ist, wenn der Verletzte es beantragt und ein berechtigtes Interesse daran dartut, anzuordnen, daß die Verurteilung auf Verlangen öffentlich bekanntgemacht wird. Die Art der Bekanntmachung ist im Urteil zu bestimmen.

(7) (weggefallen)

### § 143a Strafbare Verletzung der Gemeinschaftsmarke

(1) Wer die Rechte des Inhabers einer Gemeinschaftsmarke nach Artikel 9 Abs. 1
Satz 2 der Verordnung (EG) Nr. 40/94 des Rates vom 20. Dezember 1993 über die
Gemeinschaftsmarke (ABl. EG 1994 Nr. L 11 S. 1) verletzt, indem er trotz eines Verbotes
und ohne Zustimmung des Markeninhabers im geschäftlichen Verkehr
1. ein mit der Gemeinschaftsmarke identisches Zeichen für Waren oder Dienstleistungen
   benutzt, die mit denjenigen identisch sind, für die sie eingetragen ist,
2. ein Zeichen benutzt, wenn wegen der Identität oder Ähnlichkeit des Zeichens
   mit der Gemeinschaftsmarke und der Identität oder Ähnlichkeit der durch die
   Gemeinschaftsmarke und das Zeichen erfassten Waren oder Dienstleistungen für das
   Publikum die Gefahr von Verwechslungen besteht, einschließlich der Gefahr, dass das
   Zeichen mit der Marke gedanklich in Verbindung gebracht wird, oder
3. ein mit der Gemeinschaftsmarke identisches Zeichen oder ein ähnliches Zeichen für
   Waren oder Dienstleistungen benutzt, die nicht denen ähnlich sind, für die die
   Gemeinschaftsmarke eingetragen ist, wenn diese in der Gemeinschaft bekannt ist
   und das Zeichen in der Absicht benutzt wird, die Unterscheidungskraft oder die
   Wertschätzung der Gemeinschaftsmarke ohne rechtfertigenden Grund in unlauterer Weise
   auszunutzen oder zu beeinträchtigen,

wird mit Freiheitsstrafe bis zu drei Jahren oder mit Geldstrafe bestraft.

(2) § 143 Abs. 2 bis 6 gilt entsprechend.

## § 144 Strafbare Benutzung geographischer Herkunftsangaben

(1) Wer im geschäftlichen Verkehr widerrechtlich eine geographische Herkunftsangabe,
einen Namen, eine Angabe oder ein Zeichen
1. entgegen § 127 Abs. 1 oder 2, jeweils auch in Verbindung mit Abs. 4 oder einer
   Rechtsverordnung nach § 137 Abs. 1, benutzt oder
2. entgegen § 127 Abs. 3, auch in Verbindung mit Abs. 4, oder einer Rechtsverordnung
   nach § 137 Abs. 1, in der Absicht benutzt, den Ruf oder die Unterscheidungskraft
   einer geographischen Herkunftsangabe auszunutzen oder zu beeinträchtigen,

wird mit Freiheitsstrafe bis zu zwei Jahren oder mit Geldstrafe bestraft.

(2) Ebenso wird bestraft, wer im geschäftlichen Verkehr widerrechtlich eine nach
Rechtsvorschriften der Europäischen Gemeinschaft geschützte geographische Angabe oder
Ursprungsbezeichnung benutzt, soweit eine Rechtsverordnung nach Absatz 6 für einen
bestimmten Tatbestand auf diese Strafvorschrift verweist.

(3) Der Versuch ist strafbar.

(4) Bei einer Verurteilung bestimmt das Gericht, daß die widerrechtliche Kennzeichnung
der im Besitz des Verurteilten befindlichen Gegenstände beseitigt wird oder, wenn dies
nicht möglich ist, die Gegenstände vernichtet werden.

(5) Wird auf Strafe erkannt, so ist, wenn das öffentliche Interesse dies erfordert,
anzuordnen, daß die Verurteilung öffentlich bekanntgemacht wird. Die Art der
Bekanntmachung ist im Urteil zu bestimmen.

(6) Das Bundesministerium der Justiz wird ermächtigt, durch Rechtsverordnung ohne
Zustimmung des Bundesrates die Tatbestände zu bezeichnen, die als Straftaten nach
Absatz 2 geahndet werden können, soweit dies zur Durchsetzung des in Rechtsvorschriften

Ein Service der juris GmbH - www.juris.de -

der Europäischen Gemeinschaft vorgesehenen Schutzes von geographischen Angaben und Ursprungsbezeichnungen erforderlich ist.

### § 145 Bußgeldvorschriften

(1) Ordnungswidrig handelt, wer im geschäftlichen Verkehr widerrechtlich in identischer oder nachgeahmter Form
1. ein Wappen, eine Flagge oder ein anderes staatliches Hoheitszeichen oder ein Wappen eines inländischen Ortes oder eines inländischen Gemeinde- oder weiteren Kommunalverbandes im Sinne des § 8 Abs. 2 Nr. 6,
2. ein amtliches Prüf- oder Gewährzeichen im Sinne des § 8 Abs. 2 Nr. 7 oder
3. ein Kennzeichen, ein Siegel oder eine Bezeichnung im Sinne des § 8 Abs. 2 Nr. 8

zur Kennzeichnung von Waren oder Dienstleistungen benutzt.

(2) Ordnungswidrig handelt, wer vorsätzlich oder fahrlässig
1. entgegen § 134 Abs. 3, auch in Verbindung mit Abs. 4,
    a) das Betreten von Geschäftsräumen, Grundstücken, Verkaufseinrichtungen oder Transportmitteln oder deren Besichtigung nicht gestattet,
    b) die zu besichtigenden Agrarerzeugnisse oder Lebensmittel nicht so darlegt, daß die Besichtigung ordnungsgemäß vorgenommen werden kann,
    c) die erforderliche Hilfe bei der Besichtigung nicht leistet,
    d) Proben nicht entnehmen läßt,
    e) geschäftliche Unterlagen nicht oder nicht vollständig vorlegt oder nicht prüfen läßt oder
    f) eine Auskunft nicht, nicht richtig oder nicht vollständig erteilt oder
2. einer nach § 139 Abs. 1 erlassenen Rechtsverordnung zuwiderhandelt, soweit sie für einen bestimmten Tatbestand auf diese Bußgeldvorschrift verweist.

(3) Die Ordnungswidrigkeit kann in den Fällen des Absatzes 1 mit einer Geldbuße bis zu zweitausendfünfhundert Euro und in den Fällen des Absatzes 2 mit einer Geldbuße bis zu zehntausend Euro geahndet werden.

(4) In den Fällen des Absatzes 1 ist § 144 Abs. 4 entsprechend anzuwenden.

(5) Verwaltungsbehörde im Sinn des § 36 Abs. 1 Nr. 1 des Gesetzes über Ordnungswidrigkeiten ist in den Fällen des Absatzes 1 das Bundesamt für Justiz.

# Abschnitt 2
# Beschlagnahme von Waren bei der Einfuhr und Ausfuhr

### § 146 Beschlagnahme bei der Verletzung von Kennzeichenrechten

(1) Waren, die widerrechtlich mit einer nach diesem Gesetz geschützten Marke oder geschäftlichen Bezeichnung versehen sind, unterliegen, soweit nicht die Verordnung (EG) Nr. 3295/94 des Rates vom 22. Dezember 1994 über Maßnahmen zum Verbot der Überführung nachgeahmter Waren und unerlaubt hergestellter Vervielfältigungsstücke oder Nachbildungen in den zollrechtlich freien Verkehr oder in ein Nichterhebungsverfahren sowie zum Verbot ihrer Ausfuhr und Wiederausfuhr (ABl. EG Nr. L 341 S. 8) in ihrer jeweils geltenden Fassung anzuwenden ist, auf Antrag und gegen Sicherheitsleistung des Rechtsinhabers bei ihrer Einfuhr oder Ausfuhr der Beschlagnahme durch die Zollbehörde, sofern die Rechtsverletzung offensichtlich ist. Dies gilt für den Verkehr mit anderen Mitgliedstaaten der Europäischen Union sowie mit den anderen Vertragsstaaten des

Ein Service der juris GmbH - www.juris.de -

Abkommens über den Europäischen Wirtschaftsraum nur, soweit Kontrollen durch die Zollbehörden stattfinden.

(2) Ordnet die Zollbehörde die Beschlagnahme an, unterrichtet sie unverzüglich den Verfügungsberechtigten sowie den Antragsteller. Dem Antragsteller sind Herkunft, Menge und Lagerort der Waren sowie Name und Anschrift des Verfügungsberechtigten mitzuteilen. Das Brief- und Postgeheimnis (Artikel 10 des Grundgesetzes) wird insoweit eingeschränkt. Dem Antragsteller wird Gelegenheit gegeben, die Waren zu besichtigen, soweit hierdurch nicht in Geschäfts- oder Betriebsgeheimnisse eingegriffen wird.

## § 147 Einziehung, Widerspruch, Aufhebung der Beschlagnahme

(1) Wird der Beschlagnahme nicht spätestens nach Ablauf von zwei Wochen nach Zustellung der Mitteilung nach § 146 Abs. 2 Satz 1 widersprochen, ordnet die Zollbehörde die Einziehung der beschlagnahmten Waren an.

(2) Widerspricht der Verfügungsberechtigte der Beschlagnahme, unterrichtet die Zollbehörde hiervon unverzüglich den Antragsteller. Dieser hat gegenüber der Zollbehörde unverzüglich zu erklären, ob er den Antrag nach § 146 Abs. 1 in bezug auf die beschlagnahmten Waren aufrechterhält.

(3) Nimmt der Antragsteller den Antrag zurück, hebt die Zollbehörde die Beschlagnahme unverzüglich auf. Hält der Antragsteller den Antrag aufrecht und legt er eine vollziehbare gerichtliche Entscheidung vor, die die Verwahrung der beschlagnahmten Waren oder eine Verfügungsbeschränkung anordnet, trifft die Zollbehörde die erforderlichen Maßnahmen.

(4) Liegen die Fälle des Absatzes 3 nicht vor, hebt die Zollbehörde die Beschlagnahme nach Ablauf von zwei Wochen nach Zustellung der Mitteilung an den Antragsteller nach Absatz 2 auf. Weist der Antragsteller nach, daß die gerichtliche Entscheidung nach Absatz 3 Satz 2 beantragt, ihm aber noch nicht zugegangen ist, wird die Beschlagnahme für längstens zwei weitere Wochen aufrechterhalten.

## § 148 Zuständigkeiten, Rechtsmittel

(1) Der Antrag nach § 146 Abs. 1 ist bei der Bundesfinanzdirektion zu stellen und hat Wirkung für zwei Jahre, sofern keine kürzere Geltungsdauer beantragt wird. Der Antrag kann wiederholt werden.

(2) Für die mit dem Antrag verbundenen Amtshandlungen werden vom Antragsteller Kosten nach Maßgabe des § 178 der Abgabenordnung erhoben.

(3) Die Beschlagnahme und die Einziehung können mit den Rechtsmitteln angefochten werden, die im Bußgeldverfahren nach dem Gesetz über Ordnungswidrigkeiten gegen die Beschlagnahme und Einziehung zulässig sind. Im Rechtsmittelverfahren ist der Antragsteller zu hören. Gegen die Entscheidung des Amtsgerichts ist die sofortige Beschwerde zulässig. Über die sofortige Beschwerde entscheidet das Oberlandesgericht.

## § 149 Schadensersatz bei ungerechtfertigter Beschlagnahme

Erweist sich die Beschlagnahme als von Anfang an ungerechtfertigt und hat der Antragsteller den Antrag nach § 146 Abs. 1 in bezug auf die beschlagnahmten Waren aufrechterhalten oder sich nicht unverzüglich erklärt (§ 147 Abs. 2 Satz 2), so ist

Ein Service der juris GmbH - www.juris.de -

er verpflichtet, den dem Verfügungsberechtigten durch die Beschlagnahme entstandenen Schaden zu ersetzen.

## § 150 Beschlagnahme nach der Verordnung (EG) Nr. 3295/94

In Verfahren nach der in § 146 Abs. 1 genannten Verordnung sind die §§ 146 bis 149 entsprechend anzuwenden, soweit in der Verordnung nichts anderes bestimmt ist.

## § 151 Beschlagnahme bei widerrechtlicher Kennzeichnung mit geographischen Herkunftsangaben

(1) Waren, die widerrechtlich mit einer nach diesem Gesetz oder nach Rechtsvorschriften der Europäischen Gemeinschaft geschützten geographischen Herkunftsangabe versehen sind, unterliegen bei ihrer Einfuhr, Ausfuhr oder Durchfuhr der Beschlagnahme zum Zwecke der Beseitigung der widerrechtlichen Kennzeichnung, sofern die Rechtsverletzung offensichtlich ist. Dies gilt für den Verkehr mit anderen Mitgliedstaaten der Europäischen Union sowie mit den anderen Vertragsstaaten des Abkommens über den Europäischen Wirtschaftsraum nur, soweit Kontrollen durch die Zollbehörden stattfinden.

(2) Die Beschlagnahme wird durch die Zollbehörde vorgenommen. Die Zollbehörde ordnet auch die zur Beseitigung der widerrechtlichen Kennzeichnung erforderlichen Maßnahmen an.

(3) Wird den Anordnungen der Zollbehörde nicht entsprochen oder ist die Beseitigung untunlich, ordnet die Zollbehörde die Einziehung der Waren an.

(4) Die Beschlagnahme und die Einziehung können mit den Rechtsmitteln angefochten werden, die im Bußgeldverfahren nach dem Gesetz über Ordnungswidrigkeiten gegen die Beschlagnahme und Einziehung zulässig sind. Gegen die Entscheidung des Amtsgerichts ist die sofortige Beschwerde zulässig. Über die sofortige Beschwerde entscheidet das Oberlandesgericht.

# Teil 9
# Übergangsvorschriften

## § 152 Anwendung dieses Gesetzes

Die Vorschriften dieses Gesetzes finden, soweit nachfolgend nichts anderes bestimmt ist, auch auf Marken, die vor dem 1. Januar 1995 angemeldet oder eingetragen oder durch Benutzung im geschäftlichen Verkehr oder durch notorische Bekanntheit erworben worden sind, und auf geschäftliche Bezeichnungen Anwendung, die vor dem 1. Januar 1995 nach den bis dahin geltenden Vorschriften geschützt waren.

## § 153 Schranken für die Geltendmachung von Verletzungsansprüchen

(1) Standen dem Inhaber einer vor dem 1. Januar 1995 eingetragenen oder durch Benutzung oder notorische Bekanntheit erworbenen Marke oder einer geschäftlichen Bezeichnung nach den bis dahin geltenden Vorschriften gegen die Benutzung der Marke, der geschäftlichen Bezeichnung oder eines übereinstimmenden Zeichens keine Ansprüche wegen Verletzung zu, so können die Rechte aus der Marke oder aus der geschäftlichen Bezeichnung nach diesem Gesetz nicht gegen die Weiterbenutzung dieser Marke, dieser geschäftlichen Bezeichnung oder dieses Zeichens geltend gemacht werden.

Ein Service der juris GmbH - www.juris.de -

(2) Auf Ansprüche des Inhabers einer vor dem 1. Januar 1995 eingetragenen oder durch Benutzung oder notorische Bekanntheit erworbenen Marke oder einer geschäftlichen Bezeichnung ist § 21 mit der Maßgabe anzuwenden, daß die in § 21 Abs. 1 und 2 vorgesehene Frist von fünf Jahren mit dem 1. Januar 1995 zu laufen beginnt.

## § 154 Dingliche Rechte, Zwangsvollstreckung, Konkursverfahren

(1) Ist vor dem 1. Januar 1995 an dem durch die Anmeldung oder Eintragung einer Marke begründeten Recht ein dingliches Recht begründet worden oder war das durch die Anmeldung oder Eintragung begründete Recht Gegenstand von Maßnahmen der Zwangsvollstreckung, so können diese Rechte oder Maßnahmen nach § 29 Abs. 2 in das Register eingetragen werden.

(2) Absatz 1 ist entsprechend anzuwenden, wenn das durch die Anmeldung oder Eintragung einer Marke begründete Recht durch ein Konkursverfahren erfaßt worden ist.

## § 155 Lizenzen

Auf vor dem 1. Januar 1995 an dem durch die Anmeldung oder Eintragung, durch die Benutzung oder durch die notorische Bekanntheit einer Marke begründeten Recht erteilte Lizenzen ist § 30 mit der Maßgabe anzuwenden, daß diesen Lizenzen die Wirkung des § 30 Abs. 5 nur insoweit zugute kommt, als es sich um nach dem 1. Januar 1995 eingetretene Rechtsübergänge oder an Dritte erteilte Lizenzen handelt.

## § 156 Prüfung angemeldeter Marken auf absolute Schutzhindernisse

(1) Ist vor dem 1. Januar 1995 ein Zeichen angemeldet worden, das nach den bis dahin geltenden Vorschriften aus vom Patentamt von Amts wegen zu berücksichtigenden Gründen von der Eintragung ausgeschlossen war, das aber nach § 3, 7, 8 oder 10 dieses Gesetzes nicht von der Eintragung ausgeschlossen ist, so sind die Vorschriften dieses Gesetzes mit der Maßgabe anzuwenden, daß die Anmeldung als am 1. Januar 1995 eingereicht gilt und daß, ungeachtet des ursprünglichen Anmeldetags und einer etwa in Anspruch genommenen Priorität, der 1. Januar 1995 für die Bestimmung des Zeitrangs im Sinne des § 6 Abs. 2 maßgeblich ist.

(2) Kommt das Patentamt bei der Prüfung des angemeldeten Zeichens zu dem Ergebnis, daß die Voraussetzungen des Absatzes 1 gegeben sind, so teilt es dies dem Anmelder mit.

(3) Teilt der Anmelder dem Patentamt innerhalb einer Frist von zwei Monaten nach Zustellung der Mitteilung nach Absatz 2 mit, daß er mit der Verschiebung des Zeitrangs im Sinne des Absatzes 1 einverstanden ist, wird die Anmeldung des Zeichens als Anmeldung einer Marke nach diesem Gesetz weiterbehandelt.

(4) Teilt der Anmelder dem Patentamt mit, daß er mit einer Verschiebung des Zeitrangs im Sinne des Absatzes 1 nicht einverstanden ist oder gibt er innerhalb der Frist des Absatzes 3 keine Erklärung ab, so weist das Patentamt die Anmeldung zurück.

(5) Der Anmelder kann die Erklärung nach Absatz 3 auch noch in einem Erinnerungsverfahren, einem Beschwerdeverfahren oder in einem Rechtsbeschwerdeverfahren über die Zurückweisung der Anmeldung abgeben, das am 1. Januar 1995 anhängig ist. Die Absätze 2 bis 4 sind entsprechend anzuwenden.

## § 157 Bekanntmachung und Eintragung

Ein Service der juris GmbH - www.juris.de -

Ist vor dem 1. Januar 1995 die Bekanntmachung einer Anmeldung nach § 5 Abs. 1 des Warenzeichengesetzes beschlossen worden, ist die Anmeldung aber noch nicht nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemacht worden, so wird die Marke ohne vorherige Bekanntmachung nach § 41 in das Register eingetragen. Ist für einen nach dem Beschluß der Bekanntmachung gestellten Antrag auf beschleunigte Eintragung die in § 6a Abs. 2 des Warenzeichengesetzes vorgesehene Gebühr bereits gezahlt worden, wird sie von Amts wegen erstattet.

## § 158 Widerspruchsverfahren

(1) Ist vor dem 1. Januar 1995 die Anmeldung einer Marke nach § 5 Abs. 2 des Warenzeichengesetzes oder die Eintragung einer Marke nach § 6a Abs. 3 des Warenzeichengesetzes in Verbindung mit § 5 Abs. 2 des Warenzeichengesetzes bekanntgemacht worden, so können Widersprüche innerhalb der Frist des § 5 Abs. 4 des Warenzeichengesetzes sowohl auf die Widerspruchsgründe des § 5 Abs. 4 des Warenzeichengesetzes als auch auf die Widerspruchsgründe des § 42 Abs. 2 gestützt werden. Wird innerhalb der Frist des § 5 Abs. 4 des Warenzeichengesetzes Widerspruch nicht erhoben, so wird, soweit es sich nicht um eine nach § 6a Abs. 1 des Warenzeichengesetzes eingetragene Marke handelt, die Marke nach § 41 in das Register eingetragen. Ein Widerspruch nach § 42 findet gegen eine solche Eintragung nicht statt.

(2) Ist vor dem 1. Januar 1995 ein Widerspruch gemäß § 5 Abs. 4 des Warenzeichengesetzes gegen die Eintragung einer nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemachten oder einer nach § 6a Abs. 1 des Warenzeichengesetzes eingetragenen Marke erhoben worden oder wird nach dem 1. Januar 1995 ein Widerspruch nach Absatz 1 erhoben, so sind die Widerspruchsgründe des § 5 Abs. 4 Nr. 2 und 3 des Warenzeichengesetzes, soweit der Widerspruch darauf gestützt worden ist, weiterhin anzuwenden. Ist der Widerspruch auf § 5 Abs. 4 Nr. 1 des Warenzeichengesetzes gestützt worden, ist anstelle dieser Bestimmung die Bestimmung des § 42 Abs. 2 Nr. 1 anzuwenden.

(3) Ist in einem Verfahren über einen Widerspruch, der vor dem 1. Januar 1995 erhoben worden ist, die Benutzung der Marke, aufgrund deren Widerspruch erhoben worden ist, bestritten worden oder wird die Benutzung in einem solchen Widerspruchsverfahren bestritten, so ist anstelle des § 5 Abs. 7 des Warenzeichengesetzes § 43 Abs. 1 entsprechend anzuwenden. Satz 1 gilt für das Beschwerdeverfahren vor dem Patentgericht auch dann, wenn ein solches Verfahren am 1. Januar 1995 anhängig ist. Satz 1 gilt nicht für Rechtsbeschwerden, die am 1. Januar 1995 anhängig sind.

(4) Wird der Widerspruch zurückgewiesen, so wird, soweit es sich nicht um eine nach § 6a Abs. 1 des Warenzeichengesetzes eingetragene Marke handelt, die Marke nach § 41 in das Register eingetragen. Ein Widerspruch nach § 42 findet gegen eine solche Eintragung nicht statt.

(5) Wird dem Widerspruch gegen eine nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemachte Anmeldung stattgegeben, so wird die Eintragung versagt. Wird dem Widerspruch gegen eine nach § 6a Abs. 1 des Warenzeichengesetzes eingetragene Marke stattgegeben, so wird die Eintragung nach § 43 Abs. 2 Satz 1 gelöscht.

(6) In den Fällen des Absatzes 1 Satz 2 und des Absatzes 4 Satz 1 findet eine Zurückweisung der Anmeldung aus von Amts wegen zu berücksichtigenden Eintragungshindernissen nicht statt.

## § 159 Teilung einer Anmeldung

Auf die Teilung einer vor dem 1. Januar 1995 nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemachten Anmeldung ist § 40 mit der Maßgabe anzuwenden, daß die Teilung erst nach Ablauf der Widerspruchsfrist erklärt werden kann und daß die Erklärung nur zulässig ist, wenn ein im Zeitpunkt ihrer Abgabe anhängiger Widerspruch sich nach der Teilung nur gegen einen der Teile der ursprünglichen Anmeldung richten würde. Der Teil der ursprünglichen Anmeldung, gegen den sich kein Widerspruch richtet, wird nach § 41 in das Register eingetragen. Ein Widerspruch nach § 42 findet gegen eine solche Eintragung nicht statt.

## § 160 Schutzdauer und Verlängerung

Die Vorschriften dieses Gesetzes über die Schutzdauer und die Verlängerung der Schutzdauer (§ 47) sind auch auf vor dem 1. Januar 1995 eingetragene Marken anzuwenden mit der Maßgabe, daß für die Berechnung der Frist, innerhalb derer die Gebühren für die Verlängerung der Schutzdauer einer eingetragenen Marke wirksam vor Fälligkeit gezahlt werden können, die Vorschriften des § 9 Abs. 2 des Warenzeichengesetzes weiterhin anzuwenden sind, wenn die Schutzdauer nach § 9 Abs. 2 des Warenzeichengesetzes vor dem 1. Januar 1995 abläuft.

## § 161 Löschung einer eingetragenen Marke wegen Verfalls

(1) Ist vor dem 1. Januar 1995 ein Antrag auf Löschung der Eintragung einer Marke nach § 11 Abs. 4 des Warenzeichengesetzes beim Patentamt gestellt worden und ist die Frist des § 11 Abs. 4 Satz 3 des Warenzeichengesetzes für den Widerspruch gegen die Löschung am 1. Januar 1995 noch nicht abgelaufen, so beträgt diese Frist zwei Monate.

(2) Ist vor dem 1. Januar 1995 eine Klage auf Löschung der Eintragung einer Marke nach § 11 Abs. 1 Nr. 3 oder 4 des Warenzeichengesetzes erhoben worden, so wird die Eintragung nur gelöscht, wenn der Klage sowohl nach den bis dahin geltenden Vorschriften als auch nach den Vorschriften dieses Gesetzes stattzugeben ist.

## § 162 Löschung einer eingetragenen Marke wegen absoluter Schutzhindernisse

(1) Ist der Inhaber einer Marke vor dem 1. Januar 1995 benachrichtigt worden, daß die Eintragung der Marke nach § 10 Abs. 2 Nr. 2 des Warenzeichengesetzes gelöscht werden soll, und ist die Frist des § 10 Abs. 3 Satz 2 des Warenzeichengesetzes für den Widerspruch gegen die Löschung am 1. Januar 1995 noch nicht abgelaufen, so beträgt diese Frist zwei Monate.

(2) Ist vor dem 1. Januar 1995 ein Verfahren von Amts wegen zur Löschung der Eintragung einer Marke wegen des Bestehens absoluter Schutzhindernisse nach § 10 Abs. 2 Nr. 2 des Warenzeichengesetzes eingeleitet worden oder ist vor diesem Zeitpunkt ein Antrag auf Löschung nach dieser Vorschrift gestellt worden, so wird die Eintragung nur gelöscht, wenn die Marke sowohl nach den bis dahin geltenden Vorschriften als auch nach den Vorschriften dieses Gesetzes nicht schutzfähig ist. Dies gilt auch dann, wenn nach dem 1. Januar 1995 ein Verfahren nach § 54 zur Löschung der Eintragung einer Marke eingeleitet wird, die vor dem 1. Januar 1995 eingetragen worden ist.

## § 163 Löschung einer eingetragenen Marke wegen des Bestehens älterer Rechte

Ein Service der juris GmbH - www.juris.de -

(1) Ist vor dem 1. Januar 1995 eine Klage auf Löschung der Eintragung einer Marke aufgrund einer früher angemeldeten Marke nach § 11 Abs. 1 Nr. 1 des Warenzeichengesetzes oder aufgrund eines sonstigen älteren Rechts erhoben worden, so wird, soweit in Absatz 2 nichts anderes bestimmt ist, die Eintragung nur gelöscht, wenn der Klage sowohl nach den bis dahin geltenden Vorschriften als auch nach den Vorschriften dieses Gesetzes stattzugeben ist. Dies gilt auch dann, wenn nach dem 1. Januar 1995 eine Klage nach § 55 auf Löschung der Eintragung einer Marke erhoben wird, die vor dem 1. Januar 1995 eingetragen worden ist.

(2) In den Fällen des Absatzes 1 Satz 1 ist § 51 Abs. 2 Satz 1 und 2 nicht anzuwenden. In den Fällen des Absatzes 1 Satz 2 ist § 51 Abs. 2 Satz 1 und 2 mit der Maßgabe anzuwenden, daß die Frist von fünf Jahren mit dem 1. Januar 1995 zu laufen beginnt.

## § 164 Erinnerung und Durchgriffsbeschwerde

Die Vorschriften dieses Gesetzes gelten auch für Erinnerungen, die vor dem 1. Januar 1995 eingelegt worden sind, mit der Maßgabe, daß die in § 66 Abs. 3 Satz 1 und 2 vorgesehenen Fristen von sechs Monaten und zehn Monaten am 1. Januar 1995 zu laufen beginnen.

## § 165 Übergangsvorschriften

Artikel 229 § 6 des Einführungsgesetzes zum Bürgerlichen Gesetzbuche findet mit der Maßgabe entsprechende Anwendung, dass § 20 in der bis zum 1. Januar 2002 geltenden Fassung den Vorschriften des Bürgerlichen Gesetzbuchs über die Verjährung in der bis zum 1. Januar 2002 geltenden Fassung gleichgestellt ist.

E

1

**Trademark Act**

Act concerning the protection of trademarks
and other distinguishing marks

Explained by

**Prof. Reinhard Ingerl, Ph.D.**

LL.M. (Harvard)

Attorney at law in Munich

Honorary Professor at the

Friedrich-Schiller University in Jena

and

Prof. Christian Rohnke, Ph.D.

M.C.J. (Texas)

Attorney at law in Hamburg

Attorney at Law in New York

Honorary Professor at the

Hamburg-Harburg School of Technology

2nd revised edition



Publisher: C.H.Beck Munich 2003

### III. Premises

1. Agent or Representative                                       5

The Trademark Act no longer contains a definition of an agent or representative, instead it reverts to the
terminology of Art. 6[septies] of the PCPIP [Paris Convention for the Protection of Industrial Property], not
to be construed in commercial or legal terms *(Bauer* in GRUR [Association for Commercial Legal
Protection and Copyright, a German IP journal] 1971, 499; for inclusion [or: coverage] of actual
principal-agent relationships, see BPatG [Federal Patents Court] Notice 2001, 264, 266 - *Kümpers;*
*Fezer* 3rd Edition, Section 11, marginal note 9). This does not entail a change of content as compared
with the previous legal definition according to Section 5, Para. 4, No. 2, and Section 11 Para. 1, No. 1 a
of the WZG [Trademark Act]. As previously, any contractual relationship mandating the protection of
principal's interests in business relations is sufficient. The employment relationships previously
mentioned, e.g., in WZG [the Trademark Act] had no previous practical significance. Instead, typical
practical examples include commercial agents and authorized dealers [or: distributors]. With the latter,
the transition to customer may be fluid – which Art. 6septies PCPIP deliberately did not cover (see
Moser v. Filseck GRUR 1959, 86). What is required is a business relationship exceeding the mere
exchange of goods, imposing obligations upon the dealer with regard to downstream retail sales and
that are in the interest of the vendor, without the need [for the dealer] to be the sole [or: exclusive] agent.
Contract producers are also subject to such tying provisions, making their inclusion mandatory, even if
they [the contract producers] are not generally designated as agents or representatives in a narrow sense
(see also Bauer GRUR Int. 1971, 500).

337

§11 Trademarks registered in the name of an agent

An agent need not be in charge of sales activities, although this may be the most common area of application by far; instead a position within procurement on behalf of the principal, i.e., on the purchasing side, may suffice (OLG [Higher Regional Court] Schleswig NJWE-WettbR 2000, 119,1 120 - LUX1S). In contrast, no agent relationship represents a sales cooperation without a specific obligation to safeguard interests, e.g., the requirement to use a uniform design [or: furnishings, exterior], and then limits itself to horizontal market sharing through mutual territorial protection (OLG München [Munich Higher Regional Court] decision of Sept. 2, 1999, reprint p. 32, in OLG report 1999, 338 - RRS Rohrreinigunsservice [pipe cleaning service], if not [currently] in print.; see also OLG Schleswig NJWE-WettbR [NJW-Entscheidungsdienst: Wettbewerbsrecht: Neue Juristische Wochenschrift [New Legal Journal, [Court] Decision Service: Anti-Competition Act (NJWE-WETTBR 2000, 119, 120 - LUX1S, whereby, a "partnership" cooperation in no way, per se, precludes the classification as agent) The obligation to safeguard interests need not be the central focus of the contractual relationship. A corresponding collateral duty is sufficient (old version of DPA [German Patent Office] Notice 1985, 239).

2. Controlling date

6        Contrary to the language falsely centering on the registration in Section 11, the date of the application for the trademark should basically be controlling for the presence of an [principal-]agent relationship (see also Sack in GRUR 1995, 97), which is also required in Art. 6septies of the PCPIP. The revised version fails to appreciate that the application constitutes a breach of duty by the agent, whereas the registration is an official act carrying a, per se, arbitrary date.

7        According to the language of Sections 11 and 17, trademarks are also covered before the start of the principal-agent relationship, if registration occurs after the establishment of the principal-agent relationship. It is, however, appropriate to make a distinction [or: differentiation]. This would only be justified, if the ensuing principal-agent relationship had already been prepared for at the date of the application, so that consequently, a secret application would be a breach of pre-contractual obligations. Thus, an application [that was] entirely perfect at the time of filing should not be subject to the risk of cancellation. This is furthermore emphasized by the fact that it [the application] was not exposed to any request for cancellation during its fortuitous previous registration. Specifically, however, this would violate the principle generally applying to Sections 9, 10, 12, 13 and subsequent to the priority rule, whereby relative [sic] obstacles may only prejudice the registration, if already existing at the date of application.

338



Certification

### Park IP Translations

TRANSLATOR'S DECLARATION:                    January 28, 2008

I, Yngve Roennike, hereby declare:

That I possess advanced knowledge of the German and English languages. The attached translation of the document titled "Markengesetz" has been translated by me and to the best of my knowledge and belief, it accurately reflects the meaning and intention of the original text.

Yngve Roennike

# Markengesetz

## Gesetz über den Schutz von Marken und sonstigen Kennzeichen

Erläutert von

**Prof. Dr. Reinhard Ingerl**

LL.M. (Harvard)
Rechtsanwalt in München
Honorarprofessor an der
Friedrich-Schiller-Universität Jena

und

**Prof. Dr. Christian Rohnke**

M.C.J. (Texas)
Rechtsanwalt in Hamburg
Attorney at Law (New York)
Honorarprofessor an der
Technischen Universität Hamburg-Harburg

2., neubearbeitete Auflage



Verlag C. H. Beck München 2003

Agentenmarken                                    § 11

tige eigene Markenanmeldungen oder durch vertragliche Rege-
lung mit seinem Agenten eigenverantwortlich zu wahren. Unter-
läßt er dies, verdient er keine Privilegierung gegenüber anderen
ausländischen Herstellern, die ihre Geschäftstätigkeit ohne Mar-
kenschutz auf das Inland ausdehnen und sich gegen Anmeldungen
ihrer eigenen Marken durch Dritte nur nach den allgemeinen
Vorschriften, insbesondere des Wettbewerbsrechts, wehren können
(Vor §§ 14–19 Rdn. 160 ff.). Erst recht fragwürdig ist daher die in
der Aml. Begr. nicht weiter gerechtfertigte gesetzliche Erweite-
rung auf Inlandskollisionen (zust. *Hoffmann* MarkenR 2002, 114).
Sie ist allerdings mit dem allgemeinen Bedürfnis begründbar, den
Gleichlauf mit dem Gemeinschaftsmarkenrecht herzustellen.

### III. Voraussetzungen

#### 1. Agent oder Vertreter

Eine Definition des Agenten oder Vertreters enthält das Mar-       **5**
kenG nicht mehr, sondern kehrt zur Terminologie des Art. 6septies
PVÜ zurück, die wirtschaftlich, nicht rechtlich zu verstehen ist
(*Bauer* GRUR 1971, 499; für Einbeziehung auch rein faktischer
Agentenverhältnisse BPatG Mitt. 2001, 264, 266 – *Kämpen*; *Fezer*
3. Aufl. § 11 Rdn. 9). Eine inhaltliche Änderung gegenüber der
früheren Legaldefinition gem. §§ 5 Abs. 4 Nr. 2, 11 Abs. 1 Nr. 1a
WZG ist damit nicht verbunden. Ausreichend ist nach wie vor
jedes Vertragsverhältnis, das zur Wahrnehmung der Inter-
essen des Geschäftsherrn im geschäftlichen Verkehr ver-
pflichtet. Den früher beispielhaft im WZG genannten Arbeits-
verhältnissen kam bisher praktisch keine Bedeutung zu. Typische
Anwendungsbeispiele sind vielmehr Handelsvertreter und Ver-
tragshändler. Bei letzteren kann der Übergang zu den – bewußt
nicht in Art. 6septies PVÜ einbezogenen (vgl. *Moser v. Filseck*
GRUR 1959, 86) – bloßen Kunden fließend sein. Erforderlich ist
eine über den bloßen Güteraustausch hinausgehende Ge-
schäftsbeziehung, die dem Händler beim Weitervertrieb Bindun-
gen im Interesse des Lieferanten auferlegt, ohne daß er Alleinver-
treter sein müßte. Auch Auftragshersteller unterliegen regelmäßig
derartigen Interessenbindungen, so daß ihre Einbeziehung geboten
ist, mögen sie auch üblicherweise nicht als Agenten oder Vertreter
im engeren Sinne bezeichnet werden (ebenso *Bauer* GRUR Int.
1971, 500). Der Agent muß nicht notwendigerweise Vertriebsauf-

337

§ 11                                                        Agentenmarken

gaben wahrnehmen, mag dies auch der bei weitem häufigste Anwendungsbereich sein; vielmehr kann auch eine Tätigkeit im Rahmen der Beschaffung für den Geschäftsherrn, also auf der Einkaufsseite genügen (OLG Schleswig NJWE-WettbR 2000, 119, 120 – LUXIS). Kein Agentenverhältnis stellen dagegen Vertriebskooperationen ohne spezifische Interessenwahrnehmungspflichten dar, die zwar zB zur Verwendung einer einheitlichen Ausstattung verpflichten, sich jedoch im übrigen auf die horizontale Marktaufteilung durch wechselseitigen Gebietsschutz beschränken (OLG München Urt. vom 2.9.1999, Umdr. S. 32, in OLG-Report 1999, 338 – RRS Rohrreinigungsservice insoweit nicht abgedr.; ähnl. OLG Schleswig NJWE-WettbR 2000, 119, 120 – LUXIS, wobei allerdings „partnerschaftliche" Zusammenarbeit allein die Einstufung als Agent keinesfalls ausschließt). Die Verpflichtung zur Interessenwahrnehmung muß nicht im Mittelpunkt der vertraglichen Beziehungen stehen. Es genügt eine entsprechende Nebenpflicht (aA DPA Mitt. 1985, 239).

### 2. Maßgeblicher Zeitpunkt

6    Entgegen dem irrigerweise auf die Eintragung abstellenden Wortlaut des § 11 muß für das Vorliegen des Agentenverhältnisses grdsl der Zeitpunkt der Anmeldung der Marke maßgeblich sein (ebenso Sack GRUR 1995, 97), wie dies auch Art. 6septies PVÜ verlangt. Die Neufassung verkennt, daß die Pflichtverletzung des Agenten in der Anmeldung besteht, während die Eintragung ein behördlicher Vorgang mit eher zufälligem Zeitpunkt ist.

7    Ihrem Wortlaut nach erfassen §§ 11 und 17 auch vor Beginn des Agentenverhältnisses beantragte Marken, wenn die Eintragung nach Begründung des Agentenverhältnisses erfolgt. Richtigerweise ist jedoch zu differenzieren. Gerechtfertigt ist dies nur dann, wenn das spätere Agentenverhältnis zur Zeit der Anmeldung bereits angebahnt war, so daß eine heimliche Anmeldung letztlich vorvertragliche Pflichten verletzte. Demgegenüber sollte eine im Zeitpunkt der Einreichung vollständig makellose Anmeldung nicht nachträglich der Löschungsreife unterworfen werden. Dagegen spricht schon, daß sie bei zufällig früherer Eintragung keinem Löschungsanspruch ausgesetzt gewesen wäre. Vor allem aber würde dadurch der aus dem Prioritätsprinzip folgende, für §§ 9, 10, 12, 13 durchgängig geltende Grundsatz durchbrochen, daß relative Hindernisse der Eintragung nur entgegenstehen können, wenn sie bereits im Anmeldezeitpunkt vorlagen. Der Ge-

338

F

**Beck's Brief Commentary**
Vol. 13 b

**Trademark Law**

Commentary on the Trademark Act,
the Paris Convention
and the Madrid Trademark Agreement

Documentation of the national,
European, and international marking law

Dr. Karl-Heinz Fezer
Professor, University of Konstanz
Professor emeritus, University of Leipzig
Judge, Stuttgart Higher Regional Court

based on

Baumbach/Hefermehl
Trademark Law
12th edition 1985

Third, newly revised edition

Verlag C.H. Beck Munich 2001

## IV. Absence or Withdrawal of Consent of Trademark Owner

12        Grounds for cancellation of the unlawful agent trademark exist when no consent to registration by the owner of the trademark exists. The agent or representative relationship ordinarily authorizes use of the trademark, but not its registration. The provisions of §§ 11 and 17 are also to be applied when the trademark is registered on behalf of the agent or representative only after *the contractual relationship has been terminated,* because the application for registration of the trademark by the representative or agent should ordinarily be judged an infringement of a post-contractual obligation from the terminated agent or representative relationship (cf. Legislative Intent behind Trademark Law, Bundestag Publications, 12/6581, 14 January 1994, p. 73). Registration has also taken place without consent if the trademark owner has declared the *revocation of previously granted consent.* If registration takes place with the consent of the trademark owner, because at the time of registration, based upon the agent or representative relationship, not only authorization for use of the trademark, but also for its registration exists, then the provisions of §§ 11 and 17 should be applied if, upon termination of the contractual relationship, consent for registration is withdrawn or revoked, and registration of the trademark continues to exist. This interpretation of the provisions relating to agent trademarks is offered for the protection of the trademark owner against unlawful agent trademarks, even if neither § 11 nor Art. 4, paragraph 4, lit. g MRL, or Art. 6[septies] PVÜ contains a regulation relating explicitly to the legal situation following the withdrawal of consent (cf. the explicit regulation in Art. 4 Switzerland MSchG [Trademark Protection Law]). In contrast to Art. 6[septies] PVÜ, § 11 also does not explicitly provide that the agent or representative may justify his actions. The legislative body does not consider such an explicit provision to be necessary, because if the actions of the agent or representative are *justified,* claims of the trademark owner against his agent or representative will not be taken into consideration from the outset.



Certification

### Park IP Translations

TRANSLATOR'S DECLARATION:                    January 28, 2008

I, Ronald Radzai, hereby declare:

That I possess advanced knowledge of the German and English
languages. The attached translation of the document called
"Markenrecht" has been translated by me and to the best of my
knowledge and belief, it accurately reflects the meaning and
intention of the original text.

Ronald Radzai

# Beck'sche Kurz-Kommentare

Band 13 b

# Markenrecht

Kommentar zum Markengesetz,
zur Pariser Verbandsübereinkunft
und zum Madrider Markenabkommen

Dokumentation des nationalen,
europäischen und internationalen Kennzeichenrechts

**Dr. Karl-Heinz Fezer**

Ordinarius an der Universität Konstanz
Honorarprofessor an der Universität Leipzig
Richter am Oberlandesgericht Stuttgart

auf der Grundlage von

**Baumbach/Hefermehl**

Warenzeichenrecht
12. Auflage 1985

Dritte, neubearbeitete Auflage

# Verlag C.H.Beck München 2001

## IV. Fehlen oder Wegfall einer Zustimmung des Markeninhabers

**(12)** Der Löschungsgrund der rechtswidrigen Agentenmarke besteht, wenn eine Zustimmung des Inhabers der Marke zur Eintragung nicht vorliegt. Das Agenten- oder Vertreterverhältnis ermächtigt regelmäßig allein zur Benutzung der Marke, nicht auch zu deren Eintragung. Die Vorschriften der §§ 11 und 17 sind auch dann anzuwenden, wenn es nach *Beendigung des Vertragsverhältnisses* zum Markeninhaber die Marke für den Agenten oder Vertreter eingetragen wird, da die Anmeldung der Marke zur Eintragung durch den Vertreter oder Agenten regelmäßig als ein Verstoß gegen eine nachvertragliche Verpflichtung aus dem beendeten Agenten- oder Vertreterverhältnis zu beurteilen ist (s. Begründung zum MarkenG, BT-Drucks. 12/6581 vom 14. Januar 1994, S. 73). Die Eintragung ist auch dann ohne Zustimmung erfolgt, wenn der Markeninhaber den *Widerruf einer erteilten Zustimmung* erklärt. Wenn die Eintragung mit Zustimmung des Markeninhabers erfolgt, weil im Zeitpunkt der Eintragung auf Grund des Agenten- oder Vertreterverhältnisses nicht nur eine Ermächtigung zur Benutzung der Marke, sondern auch zu deren Eintragung besteht, dann sind die Vorschriften der §§ 11 und 17 dann anzuwenden, wenn mit der Beendigung des Vertragsverhältnisses die Zustimmung zur Eintragung wegfällt oder widerrufen wird und die Eintragung der Marke bestehen bleibt. Diese Auslegung der Vorschriften über die Agentenmarke ist zum Schutz des Markeninhabers vor rechtswidrigen Agentenmarken geboten, auch wenn weder § 11 noch Art. 4 Abs. 4 lit. g MRL oder Art. 6<sup>septies</sup> PVÜ eine ausdrückliche Regelung über die Rechtslage nach Wegfall der Zustimmung enthalten (s. die ausdrückliche Regelung in Art. 4 Schweiz. MSchG). Anders als Art. 6<sup>septies</sup> PVÜ sieht § 11 auch nicht ausdrücklich vor, dass der Agent oder Vertreter sein Handeln rechtfertigen kann. Der Gesetzgeber hielt eine solche ausdrückliche Vorschrift für nicht erforderlich, weil bei einem *gerechtfertigten* Vorgehen des Agenten oder Vertreters Ansprüche des Markeninhabers gegen seinen Agenten oder Vertreter von vornherein nicht in Betracht kommen. ...

## V. Ort des Markenschutzes

**13** Bei Fallkonstellationen der Agentenmarke handelt es sich regelmäßig um Sachverhalte des internationalen Wirtschaftsverkehrs, bei denen ein ausländischer Markeninhaber einen inländischen Agenten oder Vertreter zur Benutzung seiner ausländischen Marke im Inland ermächtigt. Das Bestehen *ausländischen* Markenschutzes hinsichtlich der Eintragung im Inland als dem Geltungsbereich des MarkenG stellt aber keine Anwendungsvoraussetzung der §§ 11 und 17 dar. Zwar ist Voraussetzung des Art. 6<sup>septies</sup> PVÜ, dass der Markenschutz des Inhabers der Marke in einem anderen Verbandsland als demjenigen besteht, in dem der Agent oder der Vertreter die Eintragung der Marke beantragt. Regelungsgegenstand der PVÜ sind aber nur konventionsrechtliche Sachverhalte der Verbandsländer. Die Vorschriften der §§ 11 und 17 enthalten aber keine entsprechende Einschränkung (Begründung zum MarkenG, BT-Drucks. 12/6581 vom 14. Januar 1994, S. 73). Das relative Eintragungshindernis einer rechtswidrigen Agentenmarke nach § 11 ist deshalb auch bei rein *inländischen* Sachverhalten anzuwenden. Solche Fallkonstellationen kommen bei nicht eingetragenen Kennzeichenrechten wie etwa bei durch den Erwerb von Verkehrsgeltung entstehenden Markenrechten nach § 4 Nr. 2 in Betracht.

## G: Verfahrensrecht

**14** Im *Eintragungsverfahren* stellt der Löschungsgrund einer rechtswidrigen Agentenmarke nach § 11 einen Widerspruchsgrund nach § 42 Abs. 2 Nr. 3 und so ein relatives Eintragungshindernis dar. Die rechtswidrige Agentenmarke wird nach § 51 Abs. 1 auf Klage wegen Nichtigkeit gelöscht. Im *Löschungsverfahren* vor den ordentlichen Gerichten ist der Inhaber der Marke im Sinne des § 11 zur Erhebung der Klage nach § 55 Abs. 2 Nr. 2 befugt. Die ohne Zustimmung des Markeninhabers erfolgte Eintragung der Agentenmarke ist dann nicht zu löschen, wenn der Markeninhaber nachträglich der Eintragung der Marke zustimmt (§ 51 Abs. 2 S. 3).

G

3. Claim of the mark proprietor to transfer of an agent mark

Trademark Act § 5, 11, 15, 17 I, 153 ! – SNOMED

    I. § 153 I of Trademark Act does not prevent the proprietor of a mark registered prior to 1 Jan 1995 from demanding the transfer of an agent mark per § 11 and 17 of Trademark Act.

    2. Magnetic tapes and microfiches, on the one hand, and computer programs, magnetic recording media, and printing products on the other hand are similar to each other.

    3. The consent to register an agent trademark (§ 11 Trademark Act) must exist for the duration of the registration and can be revoked.

    4. Rights to a title per § 5 and 15 Trademark Act lie with the one who claims them in an outwardly recognizable manner upon their creation.

...

4. The defendant under Number 1 applied for its trademark in 1991 without the consent of the plaintiff. That much is undisputed.

    The defendants claim a subsequent, implied consent. Whether or not the factual allegations are capable of supporting this can be left undecided, so that further review of the defendant on this point in the challenged registration need not be pursued. In any case, this type of consent would not justify their claim to perpetual registration vis-à-vis the plaintiff, since consent must be valid for the duration of registration and is canceled if the trademark owner revokes consent (*Fezer*, § 11, margin No. 12). In any case, at this time the plaintiff is no longer prepared to accept the registration of the defendant under Number 1, and has revoked its consent - which is at least implied, and, in any case, at the moment in which it claimed the transfer, at the very latest.

...

The agent who does not adequately safeguard the interests of his client does not deserve any protection, and this also holds precisely when the client is in need of protection only due to the ending of the agent relationship itself. That the client could have safeguarded himself contractually by granting the permission does not appear to be decisive, since he could also have imposed a ban on application on his agent when establishing the contractual relation. If the lawmakers had deemed that to be an adequate possibility, the protection of § 11 Trademark Act would not have been necessary.



Certification

### Park IP Translations

TRANSLATOR'S DECLARATION:                January 28, 2008

I, Ronald Radzai, hereby declare:

That I possess advanced knowledge of the German and English languages. The attached translation of the document called "Markenrecht" has been translated by me and to the best of my knowledge and belief, it accurately reflects the meaning and intention of the original text.

*Ronald Radzai (ver)*

Ronald Radzai

NJW-RR 2000, 1202 – ARD-1). Auch bei der mittelbaren Verwechslungsgefahr gilt der Grundsatz, dass der Schutzbereich einer Marke so weit geht, wie Verwechslungen zu besorgen sind.

Eine solche mittelbare Verwechslungsgefahr besteht. Der Verkehr wird angesichts der identischen bzw. hochgradig ähnlichen Warenbereiche annehmen, dass die unter der Kennzeichnung „CORN POPS" und „Rice-Pops" vertriebenen Produkte, insbesondere die süßen Knabberartikel, stammten aus demselben Haus.

Zunächst einmal ist der Wortbestandteil „Pops" der Klagemarke Anknüpfungspunkt für ein Serienzeichen. Nach ständiger Rechtsprechung des BGH greift diese Art der Verwechslungsgefahr dann ein, wenn der übereinstimmende Bestandteil des Zeichens vom Verkehr als Stamm mehrerer Zeichen eines Unternehmens angesehen wird und deshalb nachfolgende Bezeichnungen mit wesensgleichem Stamm dem gleichen Zeicheninhaber zuordnet (BGH, GRUR 2002, 542 [544] – Big; BGH, GRUR 2002, 544 [547] – Bank 24; BGH, GRUR 1999, 587 [589] – Cefallone). Dies setzt allerdings voraus, dass Anhaltspunkte für eine solche Schlussfolgerung vorliegen, die etwa darin liegen können, dass der Zeicheninhaber bereits mehrere Zeichen mit dem in Rede stehenden Zeichenbestandteil benutzt: Dies ist bei der Kl: allerdings nicht der Fall. Denn nach der vorgetragenen Benutzungslage hat sie jedenfalls im Inland lediglich die Marke „Corn Pops" benutzt. Darüber hinaus ist aber grundsätzlich auch nicht ausgeschlossen, in einem erstmalig verwendeten Zeichen ein Stammzeichen zu sehen. In diesem Fall bedarf es aber konkreter Anhaltspunkte, dass sich das Zeichen zu einem Zeichenstamm entwickelt (BGH, GRUR 1999, 155 [156] – Dribeck's Light; GRUR 1996, 777 [778] – Joy; GRUR 1996, 200 [202] – Innovadiclophlont). Solche konkreten Anhaltspunkte sind gegeben. Zum einen handelt es sich bei „Pops" um einen – wie bereits ausgeführt – nicht beschreibenden, sondern durchaus prägenden Begriff. Hinzu kommt, dass es sich bei „Pops" in der Kennzeichnung „CORN POPS" um das Grundwort handelt, das eher als Anknüpfungspunkt für ein Serienzeichen in Betracht kommt als das Bestimmungswort „CORN" (vgl. Ingerl/Rohnke, MarkenG, 1998, § 14 Rdnr. 429 m.w. Nachw.), zumal der Zeichenbestandteil „Corn" stark beschreibende Anklänge aufweist, ohne dass dies allerdings – wie bereits oben erörtert – seine daraus herzuleitende mitprägende Wirkung entfallen lässt. Auf Grund der Teilidentität zwischen Klagemarke und Verletzungszeichen in dem Bestandteil „Pops" liegt für den Verkehr, der die Marke „CORN POPS" der Kl. kennt, die Annahme nahe, es handele sich bei Rice-Pops um ein Produkt der Kl. Denn durch die Voranstellung der jeweiligen Bezeichnungen „Corn" bzw. „Rice" kann der Eindruck entstehen, dass es sich bei „Pops" um den Stammbestandteil eines Serienzeichens handelt, das jeweils durch Voranstellen eines konkretisierenden Bestandteils zur Grundlage der „Pops" für unterschiedliche Produktlinien von Waren verwendet wird. Dies gilt um so mehr, als die sehr dicht beieinanderliegenden und teilweise identischen Warenbereiche auch unterschiedliche Produktlinien einer „Pops"-Reihe besonders naheliegend erscheinen lassen. Die Unterlassungsklage ist danach begründet.

II. Der Löschungsanspruch folgt aus § 51 I i. V. mit § 9 I Nr. 2 MarkenG. Zur Begründung kann auf das oben unter I. Gesagte Bezug genommen werden.

III. Die Einräumung einer Aufbrauchfrist kommt nicht in Betracht. Hierfür hätte es eines substanziierten Sachvortrags der Bekl. bedurft, der ein Interesse an der Einräumung einer Aufbrauchfrist erkennen lässt (BGH, GRUR 1982, 420 [423] – BBC/DDC; GRUR 1961, 283 [284] – Mon Cherie II).

Anm. d. Schriftltg.: Zu der zitierten Entscheidung BGH, GRUR 2000, 608 – ARD-1, s. auch die Anm. Loewenheim, LM H. 9/2000 § 14 MarkenG Nr. 12.

## 3. Anspruch des Markeninhabers auf Übertragung einer Agentenmarke

MarkenG §§ 5, 11, 15, 17 I, 153 I – SNOMED

1. § 153 I MarkenG hindert den Inhaber einer vor dem 1. 1. 1995 eingetragenen Marke nicht, nach §§ 11, 17 MarkenG die Übertragung einer Agentenmarke zu verlangen.

2. Die Waren Magnetbänder und Microfiche einerseits und Computerprogramme, Magnetaufzeichnungsträger und Druckereierzeugnisse andererseits sind einander ähnlich.

3. Die Zustimmung zur Eintragung einer Agentenmarke (§ 11 MarkenG) muss für die Dauer der Eintragung bestehen und kann widerrufen werden.

4. Rechte an einem Titel nach §§ 5, 15 MarkenG stehen dem zu, der für sie bei ihrem Entstehen nach außen erkennbar für sich in Anspruch nimmt.

OLG Hamburg, Urt. u. 27. 2. 2003 – 3 U 43/01

Zum Sachverhalt: Die Parteien streiten um Rechte an der Bezeichnung „SNOMED".

Die Kl. ist eine amerikanische gemeinnützige Einrichtung, der mehr als 15 000 Pathologen angehören. Sie ist u. a. im Bereich der Qualitätssicherung für Laboratorien tätig und befasst sich mit der medizinischen Nomenklatur. Sie ist Inhaberin der am 22. 5. 1984 eingetragenen US-Marke „SNOMED" für Magnetbänder und Mikrofiche, die im System für die Nomenklatur und Klassifikation medizinischer Terminologie enthalten.

Die Kl. verlegt ein von den Professoren C und R betreutes mehrbändiges Kompendium unter dem Titel SNOMED Systematized nomenclature of medicine, das seit 1974 in den USA publiziert wird. Solcher sind drei Auflagen erschienen (SNOMED I, II und III), zunächst als Druckwerk, jedenfalls seit 1989 auch in elektronischer Form. Auf der Grundlage dieses (englischsprachigen) Werks können krankheitsrelevante Informationen, einschließlich die krankheitsbedingten Symptome, der erhobenen Diagnosen und der angewendeten Behandlung, einheitlich indexiert und dadurch auch elektronisch in einer einheitlichen Datenstruktur gespeichert werden. Alle Versionen und Auflagen des Werks tragen einen Hinweis auf die von der Kl. in Anspruch genommene Rechtsinhaberschaft entweder als förmliche Urheberbezeichnung oder durch sonstige namentliche Nennung der Kl. Das Kompendium wird in der internationalen wissenschaftlichen Literatur umfassend besprochen und ausgewertet, teilweise bereits seit den 70er Jahren.

Die Kl. schloss am 15. 9. 1983 mit dem S-Verlag einen Lizenzvertrag, in dem die Übersetzung und Übernahme von „SNOMED II" sowie der weltweite Vertrieb der deutschsprachigen Fassung in eigenen Namen durch den S-Verlag vereinbart wurde. Die deutsche Ausgabe sollte unter dem Originaltitel „SNOMED" sowie mit folgendem Hinweis erscheinen:

„Copyright S-Verlag (...) Authorized translation from the Englishlanguage edition and updates published by the College .... Copyright 1979, 1982 The College .... All rights reserved."

Der S-Verlag erhielt eine Option für künftige Auflagen, die er aber nicht ausübte. Eine Unterlizenzierung Dritter war mit der Maßgabe untersagt, dass bei einem Verstoß alle mit den Lizenzvertrag begründeten Rechte an die Kl. zurückfallen sollten. Die Kl. gestattete dem Verlag auch die Übersetzung und Veröffentlichung ihrer Publikation „SNOMED Coding Manual".

Der 1988 verstorbene W, der bereits in den 70er Jahren das Vorläuferwerk „SNOP" übersetzt hatte und 1975 an der „Field Trial Edition" beteiligt war, erstellte im Auftrag des S-Verlags Übersetzungen und Bearbeitungen, die 1984 im S-Verlag unter den Titeln „SNOMED Systematisierte Nomenklatur der Medizin Band I Numerischer Index", „SNOMED Systematisierte Nomenklatur der Medizin Band II Alphabetischer Index" und „SNOMED Manual" erschienen. Auf der Rückseite des Titelblattes befanden sich die Hinweise:

„American Original: SNOMED – Systematized Nomenclature of Medicine. Volume I, Numeric Index. Authorized translation from the English-language version and updates published by the College .... Copyright 1979, 1982 The College .... All rights reserved. .... CIP-Kurztitelaufnahme der Deutschen Bibliothek Systematisierte Nomenklatur der Medizin; SNOMED / bearbeitet u. adaptiert nach der amerik. Ausg. von W".

Die Rechte aus den Verlagsverträge mit W überträg der S-Verlag am 4. 3. 1996 auf die Bekl. zu 1. Die Bekl. zu 1 ist eine am 12. 11. 1992 gegründete Stiftung zur Förderung wissenschaftlicher Forschungsprojekte auf den Gebieten Linguistik und Medizin und ging aus der am 17. 7. 1990 entstandenen F-Stiftung Gründungsgesellschaft mbH hervor. Vorstand und Beirat gehörten u. a. Wissenschaftler der medizinischen Informatik an. Bis zum 11. 11. 1997 war R

Case 1:08-cv-00389-CM    Document 20-8    Filed 01/28/2008    Page 22 of 23

Mitglied des Stiftungskuratoriums. Die Bekl. zu 1 ist Inhaberin der am 15. 6. 1991 angemeldeten und am 16. 3. 1993 eingetragenen deutschen Marke Nr. DE 203 23 95 „SNOMED" für Computerprogramme, Magnetaufzeichnungsträger und Druckererzeugnisse.

Die Bekl. zu 2 ist ein am 31. 8. 1990 gegründetes und am 15. 11. 1990 eingetragenes Unternehmen in Form einer GmbH, das sich mit der Entwicklung und dem Vertrieb von EDV-gestützten Verfahren, Instrumenten und Methoden der Information und Dokumentation für Aufgaben des Gesundheitswesens befasst, insbesondere unter Verwendung und Fortentwicklung des Produktes ID SNOMED. Sie meldete am 17. 12. 1998 „SNOMED" als Gemeinschaftsmarke für die Erstellung von Programmen für die Datenverarbeitung im Bereich der medizinischen und epidemiologischen Dokumentation an. Zuvor hatte sie sich 1996 bzw. 1997 die Marke auch in der Schweiz und in Österreich schützen lassen. Gegen die Gemeinschaftsmarkenanmeldung hat die Kl. Widerspruch eingelegt. Die beiden Bekl. sind personell und rechtlich miteinander verflochten; so ist die Bekl. zu 1 Gesellschafterin der Bekl. zu 2, und der geschäftsführende Gesellschafter der Bekl. zu 2 ist Vorstandsmitglied der Bekl. zu 1. Die Bekl. zu 1 hat der Bekl. zu 2 umfassende Nutzungsrechte an „SNOMED" (deutsche Fassung) eingeräumt.

Als in den 90er Jahren Planungen für eine deutsche Übersetzung seit 1989 in den USA publizierten SNOMED III begannen und die Kl. erwog, evtl. nicht die Bekl. zu 1, sondern Dritte – insbesondere die Arbeitsgemeinschaft der Wissenschaftlichen Medizinischen Fachgesellschaften (AWMF) – mit der Übersetzung zu betrauen, wies sie die Bekl. zu 1 auch darauf hin, kam es 1996 zu einer schriftlichen Auseinandersetzung der Kl. und der Bekl. zu 1 über die Rechte an SNOMED II, der Marke „SNOMED" und an künftigen Auflagen des Kompendiums im deutschsprachigen Bereich. Eine deutsche Fassung von SNOMED III erschien bisher nicht.

Die Kl. hat behauptet, das Kompendium SNOMED sei 1979 – wie schon 1975 die Field Version – an beteiligte Wissenschaftler, auch in Deutschland, gelangt. Seit 1979 sei es in Deutschland gekauft und beworben worden, in Bibliotheken verfügbar und seit mindestens 1989 auch auf Diskette erhältlich gewesen (Beweis: Zeugnis A und C). Das Zeichen und der Werktitel SNOMED würden in den maßgeblichen Fachverkehrskreisen – also bei den Spezialisten der medizinischen Informatik – ihr, der Kl., zugeordnet (Beweis: Sachverständigengutachten). Das Werk SNOMED sei von C und R für sie verfasst worden, ohne dass dieser zu irgendeinem Zeitpunkt ihr Organ gewesen sei. Der Beitrag von W habe sich in der Übersetzung und Adaptierung (inkl. lateinischer Vokabeln) erschöpft. „SNOMED" sei immer in Alleinstellung oder grafisch besonders hervorgehoben verwendet worden. Das Produkt „ID SNOMED" der Bekl. zu 2 sei zwar nicht mit ihrem eigenen identisch, diene jedoch dem gleichen Zweck und richte sich an denselben Abnehmerkreis (Beweis: Sachverständigengutachten). Positive Kenntnis von der streitgegenständlichen Markeneintragung der Bekl. zu 1 habe sie erst durch eine eigene Markenrecherche. im Frühjahr 1999 erhalten, die durch Hinweise Dritter Ende 1998/Anfang 1999 veranlasst worden sei. Benutzungshandlungen seien ihr nicht vor 1999 bekannt geworden.

Die Kl. hat u. a. beantragt,

1. die Bekl. zu 1 zu verurteilen, die für die Waren „Computerprogramme, Magnetaufzeichnungsträger und Druckererzeugnisse" am 15. 6. 1991 beim DPA angemeldete und am 16. 3. 1993 in die Warenzeichenrolle beim DPA (jetzt: DPMA) eingetragene Marke Nr. DE 203 23 95 „SNOMED" auf die Kl. zu übertragen und gegenüber dem DPMA der Eintragung der Kl. als Rechtsnachfolgerin der Bekl. zu 1 zuzustimmen;

hilfsweise, die Bekl. zu 1 zu verurteilen, in die Löschung der für die Waren „Computerprogramme, Magnetaufzeichnungsträger und Druckererzeugnisse" am 15. 6. 1991 beim DPA angemeldeten und am 16. 3. 1993 in die Warenzeichenrolle beim DPA eingetragenen Marke Nr. DE 203 23 95 „SNOMED" gegenüber dem DPMA einzuwilligen,

II. die Bekl. zu 1 und zu 2 zu verurteilen,

1. es bei Meidung der gesetzlich vorgesehenen Ordnungsmittel zu unterlassen, im Bereich der Bundesrepublik Deutschland ohne Zustimmung der Kl. das Zeichen „SNOMED" und/oder „ID SNOMED" im geschäftlichen Verkehr für Computerprogramme, Magnetaufzeichnungsträger und Druckererzeugnisse zu benutzen, insbesondere das vorstehend bezeichnete Zeichen auf den vorstehend bezeichneten Waren oder ihrer Aufmachung oder Verpackung anzubringen, unter den vorstehend bezeichneten Zeichen die vorstehend wiedergegebenen Waren anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken zu besitzen, einzuführen oder auszuführen und schließlich die vorstehend bezeichneten Zeichen in Geschäftspapieren oder in der Werbung zu benutzen,

III. die Bekl. zu 2 zu verurteilen,

1. es bei Meidung der gesetzlich vorgesehenen Ordnungsmittel zu unterlassen, im Bereich der Bundesrepublik Deutschland ohne Zustimmung der Kl. das Zeichen „SNOMED" und/oder „ID SNOMED" im geschäftlichen Verkehr für die Erstellung von Programmen für die Datenverarbeitung im Bereich der medizinischen Dokumenta-

tion zu benutzen, insbesondere unter den vorstehend bezeichneten Zeichen die vorstehend wiedergegebenen Dienstleistungen anzubieten und/oder in den Verkehr zu bringen und schließlich die vorstehend bezeichneten Zeichen in Geschäftspapieren oder in der Werbung für derartigen Dienstleistungen zu benutzen.

Das LG hat der Klage im Wesentlichen stattgegeben. Die Berufung der Bekl. blieb erfolglos.

Aus den Gründen: I. Die Kl. hat einen Anspruch auf Übertragung der streitgegenständlichen Marke der Bekl. zu 1 aus §§ 11, 17 I MarkenG.

1. Diese Vorschrift ist auf den vorliegenden Fall anwendbar. Nach § 152 MarkenG gilt dieses grundsätzlich auch für Marken, die vor dem 1. 1. 1995 angemeldet oder eingetragen worden sind, sowie für geschäftliche Bezeichnungen, die nach den bis dahin geltenden Vorschriften geschützt waren. Die Kl. war nach §§ 5 IV 2, 11 I Nr. 1 a WZG gegen die Eintragung einer Agentenmarke geschützt. Die Bekl. können sich nicht auf § 153 I MarkenG berufen, wonach dem Inhaber einer Marke, die er vor 1995 erworben hat, und dem nach den bis dahin geltenden Recht gegen die Benutzung der Marke, die er nun angreift, keine Ansprüche wegen Verletzung zustanden, verwehrt ist, Rechte aus seiner Marke nunmehr gegen die Weiterbenutzung der angegriffenen Marke geltend zu machen (vgl. BGH, GRUR 1998, 165 [166] = NJW-RR 1998, 253 = LM H. 4/1998 § 16 UWG Nr. 157 – RBB), denn der Kl. standen Ansprüche wegen der Verletzung ihrer Marke zu. Sie konnte als Inhaberin eines älteren ausländischen Zeichens Widerspruch einlegen (§ 5 IV 2 WZG) und Löschung der Agentenmarke verlangen (§ 11 I Nr. 1 a WZG), wenn der Agent das Zeichen – ohne Zustimmung – für gleiche oder gleichartige Waren angemeldet hat oder hat eintragen lassen.

Für §§ 11, 17 I MarkenG kommt es ebenso wenig wie für den vorherigen Rechtszustand darauf an, dass es sich um eine ausländische Marke handelt, denn deren Schutz war in Umsetzung des PVÜ beabsichtigt (Ingerl/Rohnke, MarkenG, 1998, § 11 Rdnr. 16). Es bedeutet keinen Unterschied, dass der Agent dort dadurch Marke angemeldet war, dass er auf Grund eines Vertragsverhältnisses die Interessen seines Partners im geschäftlichen Verkehr wahrzunehmen hatte. Für den heutigen § 11 MarkenG gilt nichts anderes, denn die §§ 5 IV 2, 11 I Nr. 1 a WZG entsprachen den Konventionsverpflichtung nach Art. 6septies PVÜ, zu deren Terminologie das Markengesetz zurückgekehrt ist (vgl. Ingerl/Rohnke, § 11 Rdnr. 7).

Ebenso wenig ist es von Bedeutung, dass das frühere Recht als Schutz gegen missbräuchliche Agentenmarken nur einen Löschungsanspruch vorsah, während § 17 MarkenG zusätzlich einen Übertragungsanspruch gibt. Darin liegt keine Erweiterung des Schutzrechts, denn ein Recht zur „Weiterbenutzung" der Marke kam auch nach dem WZG angesichts des Löschungsanspruchs nicht in Betracht, so dass eine Änderung hinsichtlich der Rechtsfolgen einer Verletzung den Zweck der §§ 152, 153 MarkenG unberührt lässt. Sollte, wie die Bekl. meinen, Fezer (MarkenG, 2. Aufl. [1999], § 152 Rdnr. 6) insoweit einen gegenteiligen Standpunkt vertreten, wäre ihm jedenfalls nicht zu folgen.

2. Die Bekl. zu 1 ist hinsichtlich des Übertragungsanspruchs passivlegitimiert. Zwar existierte sie im maßgeblichen Zeitpunkt der Markenanmeldung (vgl. Ingerl/Rohnke, § 11 Rdnr. 8) noch nicht. Doch ist sie unstreitig in die Rechte und Pflichten ihrer Vorläuferin, der F-Gründungsgesellschaft, eingetreten, die die streitgegenständliche Marke am 15. 6. 1991 angemeldet hat. Sie selbst ist am 12. 11. 1992 gegründet worden, für sie ist die Marke eingetragen.

Der Gründungsgesellschaft kam eine Agentenstellung im Sinne des Gesetzes zu, denn sie hatte auf Grund eines bestehenden Vertragsverhältnisses die Interessen der Kl. im geschäftlichen Verkehr wahrzunehmen. Eben dies ziehen die Bekl. in Zweifel. Es habe keine vertragliche Beziehung zwischen der Kl. und der Bekl. zu 1 gegeben. Es fehle an einem Übertragungsakt, durch den die Pflichten von W auf sie

Markenrecht                                                    GRUR-RR 2003, Heft 9    271

übergegangen seien. Das LG habe eine „faktische" Agentenstellung angenommen, die an dem Umstand scheitere, dass die Kl. nie beansprucht habe, „Prinzipal" der Kl. zu sein.

Ob mit den Erwägungen des LG eine Agentenstellung der Gründungsgesellschaft angenommen werden kann, bedarf keiner Prüfung, denn unbeschadet dessen bestanden zwischen ihr und der Kl. eigene vertragliche Beziehungen, die die Gründungsgesellschaft verpflichteten, die Interessen der Kl. zu wahren. Begriffe wie „Agent" und „Prinzipal" treffen zwar den Regelfall, etwa bei Handelsvertretern, auf Bezeichnungen kommt es aber nicht an. Entscheidend ist, ob sich aus dem Vertragsverhältnis eine Interessenbindung ergibt, die es verbietet, die Marke ohne Zustimmung des anderen eintragen zu lassen, weil eine über den bloßen Güteraustausch hinausgehende Geschäftsbeziehung mit der Verpflichtung besteht, die Interessen des anderen wahrzunehmen (vgl. Ingerl/ Rohnke, § 11 Rdnr. 7).

Gegenstand der Gründungsgesellschaft war neben den Aktivitäten zur Gründung der Bekl. zu 1 auch die „Förderung von Projekten zur Weiterentwicklung der ‚Systematisierten Nomenklatur der Medizin (SNOMED)' für den deutschsprachigen Raum" und die „Sicherstellung der Einheidlichkeit der Weiterentwicklung der ‚Systematisierten Nomenklatur der Medizin (SNOMED)'." Dieser Geschäftszweck ließ sich nur in Zusammenarbeit mit der Kl. verwirklichen, die Rechte an den bisherigen Ausgaben von „SNOMED" in den USA und (jedenfalls auch) Deutschland besaß. Diese Zusammenarbeit war seitens der Gründungsgesellschaft nicht etwa nur beabsichtigt, sondern bereits in die Tat umgesetzt worden. Es hatte sich ein Gedankenaustausch mit R entwickelt, der für die Kl. „SNOMED" betreute und herausgegeben hatte, und dieser Austausch hatte zu konkreten Absprachen geführt, die ohne Rechtsbindungswillen nicht erklärlich wären.

Dass R dabei für die Kl. sprach, brauchte nicht besonders hervorgehoben zu werden, denn es versteht sich von selbst, dass eine Aktivitäten neben dem wissenschaftlichen Interesse, das ihn leitete, jedenfalls auch für die Rechtsinhaberin vorgenommen wurden, die mit seinem Handeln einverstanden sein musste, wenn „SNOMED III" – in welcher Form auch immer – in Deutschland auf den Markt kommen sollte. Ihr Organ brauchte er dabei nicht zu sein, jede (auch konkludente) Bevollmächtigung genügte. Er war „the person to speak to regarding SNOMED", oder er war – wie es die Bekl. in der Berufungsbegründung ausdrücken – „neben C die Zentralfigur der Kl. bei der Entwicklung des SNOMED-Projektes. Er und der Zeuge C steuerten damals ule Vorgänge bezüglich SNOMED im Hause der Kl."

Damit haben sich die Kl. und die Gründungsgesellschaft zusammengetan, um i. S. des § 705 BGB einen gemeinsamen Zweck zu erreichen und gemeinsam zu fördern (vgl. Palandt/ Sprau, BGB, 62. Aufl. [2003], § 705 Rdnr. 20 ff. m.w. Nachw.), nämlich „SNOMED III" im deutschsprachigen Raum erscheinen zu lassen. Die Bekl. zu 1 hat nach ihrem eigenen Bekunden „als ‚das deutsche SNOMED-Komitee agiert" und dies auf ihren Briefbögen dokumentiert, und „die Kooperation der Parteien (wurde) ja auch laufend fortgesetzt, indem die Parteien nicht nur zu Fachkongressen zusammentrafen", wie es in der Berufungsbegründung heißt. Ein Schreiben wie das von R vom 7. 5. 1991 – also vor Anmeldung der streitgegenständlichen Marke – ist anders nicht zu erklären. Es ist an H gerichtet, den laut Registerauszug alleinigen Geschäftsführer der Gründungsgesellschaft, und behandelt nicht nur Fragen der zu errichtenden Stiftung, sondern auch Maßnahmen im Hinblick auf die deutsche Ausgabe von „SNOMED III" und das Treffen in Washington den neu zu formierenden „International SNOMED Committee", das ohne Beteiligung der Kl. nicht denkbar war. Dass dies letztlich auch die Sicht der Bekl. ist, ergibt sich aus ihrer Einlassung, die Eintragung habe dazu gedient, die Verbreitung von „SNOMED"-Ausgaben im deutschsprachigen Raum abzusichern. Ohne Zustimmung derjenigen, die Rechte an dieser

Bezeichnung besaß, war dies ohnehin nicht möglich, die Eintragung sicherte also auch und gerade die Rechte der Kl. Dies macht deutlich, dass sich die Gründungsgesellschaft insoweit durchaus als „Agent" der Kl. betrachtete. In jedem Fall hatte sie bei dieser Konstellation die Belange der Kl. als ihrer Vertragspartnerin zu wahren. Es wäre auch nicht zu verstehen, warum sich die Bekl., wenn es an einer vertraglichen Beziehung zwischen der Kl. und der Bekl. zu 1 gefehlt hätte, auf eine konkludente Genehmigung der Markeneintragung berufen, wenn sie nicht selbst davon ausgehen, dass es einer solchen Zustimmung bedurfte, was wiederum eine vertragliche Beziehung voraussetzt. Eine solche wird auch nicht dadurch ausgeschlossen, dass ein oder beide Vertragspartner in erster Linie wissenschaftliche Ziele mit ihrer Kooperation verfolgten.

3. Die prioritätsältere US-amerikanische Wortmarke Nr. 1.278.742 „SNOMED" der Kl. ist für Magnetbänder und Microfiche eingetragen, die ein System für die Nomenklatur und Klassifikation medizinischer Terminologie enthalten. Die für die Bekl. zu 1 eingetragene Wortmarke Nr. 203 23 95 betrifft Computerprogramme, Magnetaufzeichnungsträger und Druckereierzeugnisse.

Zu Unrecht meinen die Bekl., das LG hätte den Schutz der klägerischen Marke nicht auf Druckereierzeugnisse und Computerprogramme erstrecken dürfen. Auch im Rahmen des § 11 MarkenG gelten die allgemeinen Verletzungstatbestände. Die Ähnlichkeit von Waren und Dienstleistungen ist einheitlich zu bestimmen (Ingerl/Rohnke, § 11 Rdnr. 17, § 9 Rdnr. 9). Magnetbänder und Microfiches sind Medien, um gedankliche Inhalte dauerhaft zu speichern. Das gleiche gilt für Druckereierzeugnisse. Erscheinen sie unter derselben Marke, geht der Verkehr davon aus, dass ihre Herstellung unter einheitlicher Kontrolle steht (vgl. Ingerl/Rohnke, § 14 Rdnr. 236). So hat schon das BPatG die Ähnlichkeit von Druckereierzeugnissen und „Datenträgern in Form von Magnetbändern, -scheiben und platten" bejaht (zit. in GRUR 1997, 504). Ähnliches gilt für Computerprogramme. Programme sind zwar Steuerungssysteme und unterscheiden sich daher von reinen Speichermedien, die deren aber den Umgang mit gespeicherten Daten und deren Verarbeitung. Zudem muss ein Programm selbst auf einem Speichermedium fixiert werden. Dazu dienten früher vor allem auch Magnetbänder. Diesen Umstand berücksichtigt das LG, wenn es auf das Jahr 1984 abstellt, als die Marke der Kl. eingetragen worden ist. Damit hat es zum Ausdruck gebracht, dass es damals keine Computerprogramme gegeben hätte, sondern was zum damaligen Zeitpunkt mit der Anmeldung für die Kl. geschützt werden sollte. Wer elektronische Datenträger unter der Marke SNOMED kennt, kann nicht ernsthaft zweifeln, dass ein mit SNOMED gekennzeichnetes Rechnerprogramm jedenfalls auch für den Umgang mit den ihm unter dieser Marke bekannten elektronischen Speichermedien gedacht ist. Er wird deshalb wegen dieser Nähe selbstverständlich von geschäftlichen Beziehungen zwischen den herstellenden Unternehmen ausgehen.

4. Die Bekl. zu 1 hat ihre Marke 1991 ohne Zustimmung der Kl. angemeldet. Das ist unstreitig.

Die Bekl. berufen sich auf eine nachträgliche konkludente Genehmigung. Ob das tatsächliche Vorbringen ermöglicht, dies zu bejahen, kann dahinstehen, so dass auf die Kritik der Bekl. zu diesem Punkt im angefochtenen Urteil nicht weiter eingegangen werden muss. Eine solche Genehmigung berechtigt sie jedenfalls nicht, ihre Eintragung für alle Zeit gegenüber der Kl. zu behaupten, denn die Zustimmung muss für die Dauer der Eintragung bestehen und entfällt, wenn der Markeninhaber die Zustimmung widerruft (Fezer, § 11 Rdnr. 12). Jetzt ist die Kl. jedenfalls nicht mehr bereit, die Eintragung der Bekl. zu 1 hinzunehmen, und hat ihre Zustimmung – mindestens konkludent und jedenfalls spätestens in dem Augenblick, in dem sie die Übertragung verlangt hat – widerrufen.