UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SOFTWARE AG, INC. and SOFTWARE
AG,

                              Plaintiffs,

          -against-

CONSIST SOFTWARE SOLUTIONS,
INC. f/k/a CONSIST INTERNATIONAL,
INC. and NATALIO FRIDMAN,

                              Defendants;

---

Case No. 08 Civ. 389 (CM) (FM)

## SOFTWARE AG'S MEMORANDUM OF LAW IN RESPONSE TO THE COURT'S FEBRUARY 1, 2008 NOTICE TO COUNSEL

James David Jacobs
Frank M. Gasparo
Marcella Ballard
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel: 212-626-4100
Fax: 212-310-1600

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Carla Woods et al. v. Boston Scientific Corp.,*
    2006 U.S. dist. LEXIS 96050 (S.D.N.Y. 2006) ...................................................... 18

*Columbia Nastri & Carta Carbone, S/p/A v. Columbia Ribbon & Carbon Mfg. Co.,*
    367 F.2d 308 (2d Cir. 1966) *aff'g* 1965 U.S. Dist. LEXIS 6862 (S.D.N.Y. Oct. 18,
    1965) .......................................................................................................... passim

*Global Maschinen, GmbH,*
    227 U.S.P.Q. 862 (T.T.A.B 1985) ....................................................................... 5

*Green Party v. N.Y. State Bd. of Elections,*
    389 F.3d 411 (2d Cir. 2004) ............................................................................. 18

*Madden v. Rosseter,*
    114 Misc. 416, 187 N.Y.S. 462 (Sup.Ct.), *aff'd mem.* ........................................ 8, 9

*Major-Prodotti Dentari-Societa In Nome Collettivo Di Renaldo Giovanni & Figli v.*
    *Shimer,*
    161 USPQ 437 (TTAB 1968) ............................................................................. 5

*Marcy Playground, Inc. v. Capitol Records,*
    6 F.Supp. 2d 277 (S.D.N.Y. 1998) ................................................................ 20, 21

*Marisa Christina Inc. v. Bernard Chaus, Inc.*
    808 F.Supp. 356 (S.D.N.Y. 1992) ...................................................................... 20

*New York. Dubinsky v. Blue Dale Dress Co., Inc.,*
    162 Misc. 177, 292 N.Y.S. 898 (Sup.Ct.1936) ..................................................... 8

*Niagara Falls Int'l Bridge Co. v. Grand Trunk Ry.,*
    241 N.Y. 85, 148 N.E. 797 (1925) ...................................................................... 8

*Omag Optik UND Mechanik A.G. v. Weinstein,*
    85 F.Supp. 631 (SDNY 1949) ........................................................................... 5

*The Southland Corp. v. Froelich,*
    41 F.Supp. 2d 227 (E.D.N.Y. 1999) ................................................................... 18

*Ushodaya Enterprises, Ltd. v. V.R.S. International, Inc.,*
    63 F.Supp.2d 329 (S.D.N.Y. 1999) .................................................................... 5

**OTHER AUTHORITIES**

Natalio Fridman "Fridman Dep." at P. 62 ll. 18-20 ......................................................... 10

**PRELIMINARY STATEMENT**

On February 1, 2008 this court issued a Notice to Counsel (the "Notice") that

comments upon the parties' post-hearing proposed Findings of Fact and Conclusions of Law

(collectively "Findings") and asks for further submissions regarding German law.[1]  Since the

answers to the court's questions implicate issues in addition to German law, this

memorandum is not limited to German law.

Most importantly, a Second Circuit case, which has not previously been cited to the

court, decisively and authoritatively answers both the court's express question at the January

24th hearing and an underlying inquiry in the Notice:  has a New York court ordered a foreign

trademark registrant to transfer a *foreign* trademark registration to the trademark owner?  The

answer is an emphatic yes:  *Columbia Nastri & Carta Carbone, SpA v. Columbia Ribbon &*

*Carbon Manufacturing Co.*, 367 F.2d 308 (2d Cir. 1966), *aff'g*, 1965 U.S. Dist. LEXIS 6862

(S.D.N.Y. Oct. 18, 1965) (Judge Palmieri).

*Columbia Nastri,* which we discuss at length below, compels the conclusion that this

court must order defendants Consist Software Solutions, Inc. ("Consist") and Natalio

Fridman ("Fridman") (together "Defendants") to transfer all trademark registrations for

Software AG's Software products in Consist's former 7-country territory in South America

(the "Territory") to Software AG.  Because *Columbia Nastri* is dispositive regarding whether

this court should order Defendants to transfer all trademark registrations in the Territory to

Software AG, the case answers or moots most, if not all, of the questions in the Notice.

---

[1] Consist first raised the relevance of German law at the January 24th hearing.  January 24, 2008 Transcript ("Tr.") at 12, 13.  The Court then expressed an interest in how that law affected the case.  *Id.*  Accordingly, Software AG briefed that law in its Proposed Findings.

Nevertheless, after discussing *Columbia Nastri,* we address each of the court's questions in turn. Not surprisingly, the discussion of foreign law reaches the same result as did *Columbia Nastri:*  all trademark registrations for Software AG's Software products in the Territory must be transferred to Software AG now that the parties' relationship has come to an end.

Despite discovery, oral argument and briefing, Consist failed to raise that it registered Software AG trademarks in two other South American countries, Argentina and Uruguay. We ask the court to consider these additional marks as part of the present motion.  To help the court's consideration of the applicable foreign law Software AG submits the declaration of Michael Fammler on German law ("Fammler Decl.") and Esther M. Flesch on Brazilian law ("Flesch Decl.").  Software AG also submits declarations from Bernard William Malone on Argentine law ("Malone Decl.") and Lucia Salaverry on Uruguay law ("Salaverry Decl."). Each of these declarations establishes that a New York court may issue an order requiring the assignment of trademarks between parties and that that order does not run afoul of those countries' law or policy.

## STATEMENT OF FACTS

For the sole purpose of the instant preliminary injunction motion Software AG assumes the following facts.  In the early to mid 1980's Software AG's chief executive Peter Schnell gave defendant Fridman permission to register Software AG's trademarks in Brazil in Consist's name.  Software AG further assumes that it was aware of Consist's applications to register the marks NATURAL and ADABAS in Brazil.

In 1984 when Consist applied to register NATURAL and ADABAS in Brazil, German law governed the exclusive distributorship agreement between the parties.  That

agreement, which covered the time period from 1984 to 1987 (the "1984 Agreement")

provided in pertinent part that "PACS", Consist's predecessor, shall:

> [A]cknowledge the SYSTEMS and all documentation or information as a
> trade secret of SAG and undertake to oblige also its own personnel to protect
> the SYSTEMS as well as their copyrights and trade-marks and to prevent it
> from unauthorized use.

*See* Declaration of Marcella Ballard dated February 18, 2008 ("Ballard Decl") Ex. 1: 1984

Agreement, Paragraph 5(1). Ballard Decl., Ex. A. The 1984 Agreement further defined

SYSTEMS as "certain software packages according to attachment 1".... Attachment 1 to the

1984 Agreement expressly provides that both ADABAS and NATURAL (among others) are

included in the "SYSTEMS". *Id.*

The governing law changed from German to New York law in the parties'

distributorship agreement dated January 1, 1995 (the "1995 Agreement"). Ballard Decl., Ex.

B. *See* Ballard Decl. Ex. 2. The agreement at issue in this case, in effect from January 1,

1998 to December 31, 2007 (the "Agreement"), also expressly provides that it is governed by

New York law. Thus on December 31, 2007, when Consist's exclusive distributorship

expired, the parties' relationship was governed by New York law. Defendants have refused

to assign the trademark registrations for the trademarks NATURAL and ADABAS to

Software AG after the expiration of the Agreement.

On January 15, 2008 Software AG moved this court for, among other relief, a

preliminarily injunction directing Defendants to assign Consist's trademark registrations for

NATURAL and ADABAS to Software AG. On January 24, 2008, the court held an

evidentiary hearing. On January 28, 2008, the parties submitted their proposed Findings of

fact and Conclusions of Law. On February 1, 2008 the court issued its Notice requesting

further submissions.

3

Since the date of the Notice, Software AG has discovered that in addition to its Brazilian registrations, Consist has registered NATURAL and ADABAS in Uruguay, and Argentina. Consist also has obtained registrations for TAMINO, ENTIRE, COM-PLETE and PREDICT, all of which are trademarks of Software AG products in Argentina. Software AG is filing with this memorandum a Supplemental Notice of Motion that includes the transfer of these registrations among the relief requested.

## ARGUMENT

The court specifically raised the following questions in the Notice:

- Does German law provide that a supplier can revoke its consent to its distributor allowing the distributor to register in its name the supplier's trademark?

- If German law provides that a supplier can revoke its consent to its distributor allowing the distributor to register the supplier's trademark in the distributor's name, does that German law apply extraterritorially to trademarks registered in countries outside of Germany, e.g., Brazil?

- Does the fact that the parties' relationship was governed by New York law at the time of "revocation" make German law on this point irrelevant?

- Did the contractual obligation in existence at the time that Consist registered the trademarks require Consist to register the marks for the benefit of Software AG, or does the contractual obligation have the effect of creating something like a constructive trust in favor of Software AG, regardless of how the mark was registered?

- Is there German law governing distributorship agreements that speaks to this issue?

- Does the amount of time that has passed since the registrations have anything to do with the enforceability of any obligation for Consist to assign the registrations to Software AG?

- Under United States law has the time for bringing suit for breach of a contractual obligation to register the marks for the benefit of Software AG long since passed?

As noted above *Columbia Nastri* answers or moots most, if not all, of these questions. After discussing that case, we turn to each of the court's questions in turn discussing the law of Germany, Brazil, Argentina, Uruguay and New York where appropriate.

## I.   NOW THAT THE DISTRIBUTORSHIP HAS ENDED, CONSIST MUST ASSIGN ITS TRADEMARK REGISTRATIONS IN THE TERRITORY BACK TO SOFTWARE AG

### A.   New York Case Law Commands a Distributor, Indeed a Foreign Distributor, to Assign a Foreign Trademark Back to Its Supplier Upon Termination of the Parties' Agreement.

In Software AG's Findings we cited numerous cases establishing that -- at least with respect to a United States trademark -- a former distributor must assign the trademarks for the products of its supplier to its supplier when the distributorship concludes. *See, e.g., Ushodaya Enterprises, Ltd. v. V.R.S. International, Inc.*, 63 F.Supp.2d 329 (S.D.N.Y. 1999); *Global Maschinen, GmbH*, 227 U.S.P.Q. 862, 866 (T.T.A.B. 1985); *Major-Prodotti Dentari-Societa In Nome Collettivo Di Renaldo Giovanni & Figli v. Shimer*, 161 U.S.P.Q. 437 (T.T.A.B. 1968); *Omag Optik UND Mechanik A.G. v. Weinstein*, 85 F.Supp. 631 (S.D.N.Y. 1949).

The above-cited cases rely on various theories, such as a constructive trust, reversionary property interest, or an implied agreement to transfer a U.S. trademark registration to the supplier once the distributorship relationship ends. Regardless of the theory the cases all come to the same conclusion: unless the supplier manifested a clear intent to transfer ownership of the trademarks to the distributor, the courts hold that the supplier is the rightful owner of the trademark registrations upon the termination of the distributorship relationship.

What was missing from that previously cited uniform authority was a case in which a court relying on New York law orders the transfer of a *foreign* trademark registration.

*Columbia Nastri & Carta Carbone, S/p/A v. Columbia Ribbon & Carbon Mfg. Co.,* 367 F.2d

308 (2d Cir. 1966), *aff'g,* 1965 U.S. Dist. LEXIS 6862 (S.D.N.Y. Oct. 18, 1965) is that

missing authority.

In *Columbia Nastri* an American company manufactured and sold carbon paper,

inked ribbons, and other duplicating materials in the United States and throughout the world.

*See Columbia Nastri,* 1965 U.S. Dist. LEXIS 6862, at *6. The American company formed

an Italian company as a wholly owned subsidiary in 1924 to manufacture and sell the same

products in Italy. *See id.* at *1. The American company sold all of its stock in the Italian

company to three Italian nationals in 1949. *See id.* at *2. A royalty agreement was executed

by the parties in June 1949 --around the time of the sale of the stock. *See id.* The royalty

agreement granted the Italian company exclusive permission to use certain trademarks in

Italy and obligated the American company to provide to the Italian company know-how,

formulae, and technical assistance and to refrain from doing business in Italy while the

agreement was in effect. *See id.* The royalty agreement was twice extended --in 1952 and

then again in 1955-- on substantially the same terms and conditions. *See id.*

The royalty agreement referenced several trademarks. The American company

originally registered these trademarks in its own name. However, at various times prior to

the sale of its Italian subsidiary it transferred the registrations of these marks to the Italian

company. Thus, when the royalty agreement was made, these trademarks were already

registered in Italy in the name of the Italian company. *See id.* at *6.

After the American company and the Italian company were unable to negotiate a third

extension of the royalty agreement, in 1959 the Italian company brought a declaratory

judgment action in the Southern District of New York against the American company. The

Italian company asserted it did not need to pay further royalties since the Italian trademarks were its property because they were registered in Italy in its name and under Italian law the "ownership" of a trademark resides with the registrant.

The district court rejected as irrelevant the fact that the trademark registrations were in the Italian company's name. *See id.* at \*18. The district court held that the Italian trademarks were the property of the American company and that the Italian company held the registrations as nominee of and in trust for the American company:

> 3. The trademarks here in dispute were at all times the rightful property of [the American company]. During such time as they were registered in the name of [the Italian company], they were **held by [the Italian company] as nominee and trustee for [the American company]**. …
>
> 4. [The Italian company] was entitled to avail itself of the name 'Columbia' and the trademarks … only in accordance with the terms of its agreements with the [American company] **and only so long as those agreements remained in full force and effect**.

*Id.* (emphasis added). The district court also found that the American company "at no time assigned any of the trademarks to the [Italian company]". The district court thus ordered the Italian company to assign the Italian trademark registrations to the American company and to eliminate the word "Columbia" from its title, and enjoined the Italian company from using the American companies' trademarks or its name "Columbia" in Italy. *See id.* \*19-20.

The Italian company appealed the decision to the Court of Appeals for the Second Circuit. The Second Circuit affirmed the district court decision. Chief Judge Lumbard found no error in the findings and orders of the district court:

> The evidence amply supports Judge Palmieri's conclusion that under New York law … the Italian corporation held the Italian trademarks

7

registered in its name as constructive trustee for the American corporation.

*Columbia Nastri*, 367 F.2d at 311 (footnote omitted). In response to the Italian company's argument that there was no written memorandum evidencing the creation of any trust, the court declared that "no intent to create a trust, and *a fortiori* no such memorandum, is required for declaration of a constructive trust." *Id.*

The Second Circuit also addressed the Italian company's argument that the district court lacked jurisdiction to order it to cease using the name "Columbia" in Italy or that it abused its discretion. The court recognized that the district court's "order practically, if not necessarily, compels affirmative action by the Italian corporation in Italy." *Id.* at 312. The court also acknowledged that the Italian company's manufacturing and selling appears to be restricted to Italy and therefore its "use of the name 'Columbia' probably produces no effects within the United States, except on the level of profits remitted to the American corporation." *Id.*

In holding that a district court in New York had the power to affect actions in Italy, the court found that under New York case law the district court clearly had jurisdiction to order actions to be taken outside of New York. *See id.* at 313 (citing *Niagara Falls Int'l Bridge Co. v. Grand Trunk Ry.*, 241 N.Y. 85, 148 N.E. 797 (1925); *New York Dubinsky v. Blue Dale Dress Co., Inc.*, 162 Misc. 177, 292 N.Y.S. 898 (Sup.Ct.1936); *Madden v. Rosseter*, 114 Misc. 416, 187 N.Y.S. 462 (Sup.Ct.), *aff'd mem.*, 196 App.Div. 891, 187 N.Y.S. 943 (1st Dep't 1921);  42 Colum.L.Rev. 479 (1942); Goodrich, Conflict of Laws 138-39 (4th ed. Scoles 1964)).

The court then held that Judge Palmieri's order was not an abuse of discretion:

> 'Convenience and economy' clearly required, when the district court had determined whether the royalty agreement was valid and validly terminated, as the Italian corporation asked it to do, that the court grant the American corporation the full relief to which its determination showed it was entitled.

*Id.* at 313 (quoting Restatement (Second), Conflicts of laws § 94, Comment b (Tent. Draft No. 4, 1957)).

The court also placed the burden squarely upon the Italian company to show that the order ran afoul of the policy of Italy. It noted that the Italian company made no showing that the order conflicts with any such policy and that it seemed unlikely that the order would conflict with any Italian policy *See id.* at 313. Finally, the court stated that it was not a "requisite to the issuance of the injunction that the applicant show that it can be enforced" in Italy, *see id.* at 314, because a New York court having jurisdiction over a party may order that party to do all acts necessary in the foreign country to effect the transfer.

The facts in *Columbia Nastri* are strikingly similar to the facts in our case. Software AG and Consist had a continuous relationship that spanned multiple agreements in which Consist had exclusive rights in a defined Territory as did the American company and the Italian company in *Columbia Nastri*. Throughout the Software AG and Consist relationship, Software AG has owned the disputed trademarks everywhere in the world except the Territory and expressly granted Consist permission to register those trademarks in Brazil. This was precisely the situation in *Columbia Nastri* between the American company and the Italian company in the Italian territory.

Further, in *Columbia Nastri*, the Italian company's principal argument was that the Italian trademarks were its property since these trademarks were registered in Italy in its

name and under Italian law the "ownership" of a trademark resides with the registrant. *See id.* at 311 n. 1. Consist has put before this Court precisely the same argument. This argument failed for the Italian company in *Columbia Nastri* and should similarly fail for Consist.

The trademarks here in dispute were at all times the rightful property of Software AG, like the American company in *Columbia Nastri*. Although the trademarks ADABAS and NATURAL were registered in the name of Consist in the Territory, this Court should hold, as did the *Columbia Nastri* court, that Consist holds the trademarks registered in its name on behalf of Software AG. Indeed, unlike the agreement in *Columbia Nastri,* Consist in this case was under an express contractual obligation to Software AG to protect Software AG's trademarks. Thus, in addition to relying on the theory that Consist was a constructive trustee, this Court may rely on Consist's express contractual obligations, either express or implied through the covenant of good faith and fair dealing.

Like the *Columbia Nastri* court, this court has jurisdiction to order an assignment of all trademark registrations in the Territory despite that such an order may require affirmative action in the Territory. In the Agreement the defined entity Consist expressly "include[s] all Consist subsidiaries and affiliates". Consist and Natalio Fridman are clearly before this court and reside in this district.

There is no question that Fridman directs and controls Consist and each of its affiliates in the Territory. Fridman testified he is the "principle of [Consist] Brazil, Argentina pushing the sales." Ballard Decl. Ex. C (Nov. 5, 2007 Deposition of Natalio Fridman "Fridman Dep." at P. 62 ll. 18-20.) Fridman further testified that each of the Consist affiliates in the Territory are "100% subsidiaries" of Consist in New York that "have the name Consist" and "have the exclusive license for the territory and that's it okay?" (*Id.* at p.

122-23). At the Preliminary Injunction Hearing, Fridman admitted he had a "broad" power of attorney over the Consist affiliates in the Territory. Ballard Decl. Ex. D: Tr. at 91. Indeed, Defendants do not contend otherwise.

Moreover, as was the case in *Columbia Nastri* the statute of limitations or laches do not bar the relief that Software AG seeks. The assumed facts here are that Consist rightfully registered in Brazil Software AG's trademarks in its name during the Term. Defendants only first breached their obligations, whether deemed to be contractual or as a constructive trustee, when they refused to assign those trademark registrations back to Software AG when the relationship concluded. Thus, the earliest possible date that Defendants breached their duties was December 31, 2007. This action followed 15 days later.

Nor does the fact that the trademark registrations are located in the Territory change the result. *Columbia Nastri* placed the burden on the foreign distributor to show that Italian policy opposed a New York court order requiring the assignment of an Italian trademark registration. Consist has not established that Brazilian law (or any other law in the Territory) has a law or a stated policy against the assignment of trademark registrations made pursuant to a New York court order. *See* Flesch Decl., Fammler Decl., Malone Decl., Salaverry Decl.

Thus, Defendants utterly failed to meet their burden that an order requiring the assignment of the trademark registrations runs afoul of the policy of the implicated foreign countries. Indeed, despite knowing that Software AG sought an assignment of the trademark registrations (and not cancellation), Defendants submitted a declaration on Brazilian law that spoke only to trademark registration cancellation.

Consist's avoidance of Brazilian assignment law is quite understandable in light of the accompanying Flesch Declaration. Ms. Flesch establishes that Brazil has no interest in

11

and in fact does not regulate the assignment of trademark registrations between parties. To the contrary the assignment of a Brazilian trademark is a purely private matter between the contracting parties that involves no Brazilian governmental involvement except the ministerial recordation of the assignment by the Brazilian Trademark Office. Flesch Decl. ¶¶ 6, 15.

In addition, Brazilian law does not conflict with Software AG's contract interpretation. On the contrary it requires, as does New York law, that Consist assign the trademark registrations to Software AG now that the distribution relationship is over. Flesch Decl. ¶¶ 21-29, 33-39.

The result should be no different regarding the Uruguay and Argentinean registrations. Consist obtained Uruguan registrations at least six years after Schnell granted Fridman permission to register the trademarks in Brazil. The last Argentinian registration occurred more than 20 years after Fridman spoke to Schnell and after Software AG gave Consist formal notice that Consist's distributorship would not be renewed.

Accordingly, a strong case can be made that Consist obtained these registrations without Software AG's permission. However, that fact need not be decided. Certainly, Consist cannot be better off if it did not have Software AG's permission, than it is with Software AG's permission. Since the law of Uruguay and Argentina is in all relevant respects the same as Brazil, Consist must transfer the Uruguayan and Argentinian registrations to Software AG.

In sum, the law of all relevant jurisdictions requires that Defendants assign the trademark registrations for Software AG's products to Software AG. Furthermore, this court has the authority to order Defendants to make those assignments and Defendant have not

raised any policy of a foreign country that would conflict with that order.  On the contrary the foreign law is totally consistent with New York law.

## II.    ANSWERS TO COURT'S QUESTIONS

### A.    Does German law provide that a supplier can revoke its consent to its distributor registering in the distributor's name the supplier's trademark?

Yes.  Pursuant to § 662 of the German Civil Code, Software AG and Consist entered into an oral agency agreement as a result of Mr. Schnell authorizing Consist to register the Brazilian trademarks and Consist accepted that authorization by registering those trademarks with the Brazilian trademark office in Consist's name.  Fammler Decl. ¶ 17.  According to § 671 of the German Civil Code, the principal may terminate the agency agreement at any time *pro futuro* by way of a revocation of its authorization.  The revocation can be communicated to the agent in writing, orally and may even be implied.  Fammler Decl. ¶ 9.

### B.    If German law provides that a supplier can revoke its consent to its distributor registering in the distributor's name the supplier's trademark, does that German law apply extra territorially to trademarks registered in countries outside of Germany, *e.g.*, Brazil?

Yes.  German law distinguishes between the actual transfer of title to property, including intellectual property rights, and the underlying obligation to transfer ownership. Thus, the analysis of the transfer of property requires a court to first evaluate whether there is an obligation to transfer property rights and second, assuming the obligation exists, the legal requirements to effectuate the transfer.  This two step analysis is referred to as the "Principle of Abstraction".

This underlying obligation to transfer is determined by the law that the parties expressly chose or, in the absence of an expressed or implied contractual arrangement, the law of the country where the party carrying out the characteristic performance has its habitual

residence. Even if the intellectual property is situated in a country other than the choice of law country, in the case where a contract specifies that it is to be governed by the law of a certain country, such as German law, German courts have repeatedly confirmed that the law of that country (German law) governs the underlying obligations to transfer those intellectual property rights. *See, e.g.,* Court of Appeals Karlsruhe, Docket no. 6 U 32/86, published in GRUR Int. 1987, 788 *et seq.*, dated February 25, 1987 (stating that Japanese law governs contractual rights and obligations of parties per Japanese choice of law provision, but German law determines scope of the right to use the German intellectual property).

The right to revoke an authorization under an agency agreement is a way to terminate a contract and thus is governed by the underlying law of obligations. Accordingly, assuming an agency agreement is governed by German law, German law governs the right to revoke authorization and dictates the consequences of that revocation, regardless of whether the agreement concerns German or non-German intellectual property rights. Fammler Decl. ¶¶ 24, 25, 26.

C.    **Does the fact that the parties' relationship was governed by New York law at the time of "revocation" make German law on this point irrelevant?**

In accordance with German law until 1995 Consist held the trademark registrations in the Territory for the benefit of Software AG. After January 1, 1995 when New York law governed the relationship, Consist held the registrations as a constructive trustee or under a express or implied contractual obligation. That is, although the applicable law and possibly the legal theory changed on January 1, 1995, the substance of Consist's obligation did not. Both German and New York law provide that a distributor may register marks of its supplier in its own name, but must transfer the trademark registrations when the distributorship ends.

**D.    Did the contractual obligation in existence at the time that Consist registered the trademarks require Consist to register the marks for the benefit of Software AG, or does the contractual obligation have the effect of creating something like constructive trust in favor of Software AG, regardless of how the mark was registered?**

Consist was not required under the German Civil Code to register the trademarks in Software AG's name. Fammler Decl. ¶ 17. Therefore, the exact contents and effect of the agreement between the parties to register the trademarks depends on the interpretation of the oral agreement between Consist (Fridman), and Software AG (Schnell). Fammler Decl. ¶ 18. The German Civil Code mandates that the intent of the parties to a contract be examined when construing that contract and interpreting oral or written declarations by those parties. The German Civil Code also requires that the fundamental principles of good faith and fairness be considered. Further, a German court will consider all external circumstances surrounding an oral or written party declaration in order to determine the intent of the respective party. Fammler Decl. ¶ 5.

The 1998 Distribution Agreement, and each of the prior agreements between Software AG and Consist, constitute the background and circumstances under which Software AG and Consist declared their intention to enter into the agency agreement. Their declarations of intent can only be understood in the light of the existing distributorship relationship. Fammler Decl. ¶ 19.

During the term of the 1998 Distribution Agreement, Consist agreed to distribute the "SYSTEMS", including ADABAS and NATURAL, in the Territory. Fammler Decl. ¶ 13. Paragraph 5(1) of the 1998 Distribution Agreement, as well as each of the prior agreements between the parties that were governed by German law, include a substantively identical provision regarding Consist's obligation "to protect the SYSTEMS as well as their … trademarks". Fammler Decl. ¶¶ 14, 15. Considering §§ 133 and 157 of the German Civil

15

Code in connection with that provision plus the permission of Mr. Schnell, a German judge would look at the meaning of the words "protect the … trademarks" in light of what the parties intended by this language and the principles of fairness. Fammler Decl. ¶ 18.

Since Consist registered the trademarks in the Territory in its own name at a time it had a contractual obligation to protect those trademarks, such registration would be interpreted, under German law, as being undertaken on behalf of Software AG, its principal, pursuant to Consist's duty to protect the trademarks ADABAS and NATURAL under the distribution agreements. Fammler Decl. ¶ 20. The last distribution agreement between the parties, the 1998 Distribution Agreement, was terminated as of December 31, 2007. Assuming that German law still applied, the German Civil Code would mandate that Consist return all Software AG property to Software AG that was the subject of the agency agreement, which would also include the assignment of the trademark registrations in the Territory that had been undertaken in the name of Consist on behalf of Software AG. Fammler Decl. ¶¶ 10, 11, 28.

**E.    Is there some German law governing distributorship agreements that speaks to this issue?**

It is the common understanding in German distribution law that with the termination of the distribution agreement the right to use the principal's trademark ceases. *See* Stumpf, Der Vertragshändlervertrag, 3rd edition 1997, note 725. Fammler Decl. ¶ 23.

**F.    Does the amount of time that has passed since the registrations have anything to do with the enforceability of any obligation for Consist to assign the registrations to Software AG?**

No. Regardless of the law applied, German, New York, or even Brazilian, Argentinian or that of Uruguay, Software AG's cause of action against Consist did not arise until after December 31, 2007. Until then Consist rightfully held the registration pursuant to

both the series of exclusive distributorship agreements in which it was obligated to "protect" the trademarks and at least with respect to Brazil, the express permission of Peter Schnell. Not until its distributorship terminated on December 31, 2007 and it wrongfully refused to assign the registrations to Software AG did Consist breach its obligations to Software AG. At that time Software AG's time to seek legal redress began to run.

**G.    Under U.S. law has the time for bringing suit for breach of a contractual obligation to register the marks for benefit of Software AG long since passed?**

As noted in the immediately prior answer Software AG's time for bringing suit did not begin to run until January 1, 2008. The Court has preliminarily found, which Software AG has accepted for purposes of this motion, that pursuant to Software AG's express permission and with its full knowledge Consist applied for, registered, and thereafter presumably rightfully held the Brazilian trademark registrations for ADABAS and NATURAL.

Thus, not until Consist refused to voluntarily assign to Software AG those registrations after December 31, 2007 did Software AG have motivation to force Consist to assign those registrations. That is, until that time Consist was acting in accordance with the Agreement and its other legal obligations—it had not breached the Agreement or its fiduciary obligations. Accordingly, by reason of the very facts that this Court preliminarily found, Software AG was not negligent "in taking any steps to figure out how Consist was protecting the marks" and "the time for bringing suit has [not] long passed." Indeed, the time for bringing suit only commenced 15 days prior to the date this action commenced.

### III.    IN THE ABSENCE OF A PRELIMINARY INJUNCTION ORDERING THE TRANSFER OF THE BRAZILIAN TRADEMARK REGISTRATIONS SOFTWARE AG WILL SUFFER IRREPARABLE HARM

Plaintiffs are entitled to injunctive relief if they demonstrate (1) irreparable harm in the absence of an injunction; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in their favor. *See, e.g., Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir. 2004). Plaintiffs have demonstrated irreparable harm and both a likelihood of success and a balance of hardships tipping decidedly in their favor.

When irreparable harm will occur if the defendant is allowed to continue breaching a implied covenant, injunctive relief is available to assure that a defendant will not evade the rights and obligations created by the contract. *See Carla Woods et al. v. Boston Scientific Corp.*, 2006 U.S. dist. LEXIS 96050 at *42-43 (S.D.N.Y. 2006)(enjoining defendants' continuing breach and prohibiting defendant from selecting a successor to the CEO without plaintiff's input); *see also The Southland Corp. v. Froelich*, 41 F.Supp. 2d 227 (E.D.N.Y. 1999)(granting preliminary injunction enjoining defendant franchisee, whose trademark rights were created by the franchise agreement, from using the trademarks because franchisor had properly terminated agreement).

In the absence of an injunction Software AG will suffer irreparable harm. Defendants will control the registrations for ADABAS and NATURAL among others, in the Territory, two products that they no longer have the right to distribute and for which they are unable to offer maintenance services. Nevertheless, Defendants will be able to harass Software AG and possibly totally frustrate Software AG's marketing of NATURAL and ADABAS and the

maintenance services for those products. There is no way to calculate the sales that Software AG will lose because it will not be able to properly identify its products and services, both to existing and potential new customers.

Furthermore, in the absence of an injunction Software AG may be forced to use different names for its products and services: one name in the entire world and another different name in the Territory. Tr. at 75 ll. 3-4. Again the cost and lost opportunities of this dual naming to Software AG is not fully identifiable and thus not calculable in money damages.

Even if Software AG had not established a likelihood of success, since the balance of hardships tip decidedly in its favor, it is still entitled to an injunction requiring Consist to assign the registrations for ADABAS and NATURAL to Software AG. The irreparable harm that Software AG suffers in the absence of an injunction requiring Consist to assign the registrations is detailed in the preceding paragraphs.

On the other hand Consist suffers no legitimate harm if the registrations are assigned to Software AG. Now that its distributorship has terminated Consist has absolutely no need for the registrations for NATURAL and ADABAS—it can no longer offer licenses or maintenance on those products. Indeed, Consist concedes in its papers that it will no longer offer such products or maintenance in new agreements. And, in the unlikely event that Software AG does not prevail at the end of this case, Software AG can transfer the registrations back to Consist.

The cases in Defendants' proposed Findings do not rebut that Software AG will suffer irreparable harm in the absence of a preliminary injunction. Defendants rely on *Brewer v. West Irondequoit Cent. Schin). Dist.*, 212 F.3d 738, 744 (2d Cir. 2000), contending

that a mandatory preliminary injunction will not issue if the relief "cannot be undone".

*Brewer* is entirely inapposite. *Brewer* involves a 4th grade student's right to be bused to a

school outside her district in the face of a voluntary program designed by the school to

achieve integration. *Id.*

    *Brewar* is inapplicable for another reason, the injunctive relief that Software AG

requests can be undone. If, at the conclusion of the case Consist is able to demonstrate it is

entitled to the trademark registrations in the Territory, Software AG will be able to re-assign

the registrations to Consist. Defendants can hardly argue that Software AG will not "protect"

and zealously guard its flagship products' trademarks in the interim.

    Defendants cite *Marcy Playground, Inc. v. Capitol Records,* 6 F.Supp. 2d 277

(S.D.N.Y. 1998), and *Marisa Christina Inc. v. Bernard Chaus, Inc.* 808 F.Supp. 356

(S.D.N.Y. 1992), for the proposition that a speculative theory of injury is too hypothetical to

form the basis for a preliminary injunction. *Marisa Christina* is wholly inapposite. That

case concerned a plaintiff-sweater company for copyright infringement on products which it

was no longer selling. 808 F.Supp. at 359. Plaintiff argued that a customer who had bought

one of plaintiff's sweaters last year may see one of defendant's [infringing] sweaters selling

at half price and feel "ripped off." The court found that plaintiff's products were no longer

for sale "fatally weaken[ed] the presumption of irreparable harm that ordinarily accompanies

a copyright infringement case". *Id.* at 360. Quite the opposite is true in this case. Software

AG is just now, after having Consist as its distributor for the past 33 years, entering the

Territory. At this crucial juncture, where Software AG is directly selling, distributing and

maintaining its own products there is a particular concern that Consist is hanging on, causing

confusion, and refusing to relinquish the trademark registrations.

The *Marcy Playground* case is also completely distinguishable. That case concerned plaintiffs who wished to be given credit for alleged contributions as producers on a hit album and single from that album. Concluding that the music is sold "for other reasons entirely" than who is credited for producing it, Judge Kaplan found that there was no real likelihood of confusion in the market place because plaintiffs were not given production credit.. *Id.* at 17. The court held there was no convincing basis for concluding the careers of the plaintiffs in *Marcy Playground* would at all be affected by credits in the liner notes of an already-released album (particularly where, the production credits were sharply in dispute). Finally, where the release of some ½ million albums had already occurred, Judge Kaplan found that a preliminary injunction in that case would be "very much like locking the barn door after the horse is gone." *Id.* at 20. Hence, the court held that there was no showing of a likelihood of irreparable harm and that the plaintiffs' theory was merely speculative.

The contrary is the case here. The harm to Software AG stemming from the inability to use its own products' names in the Territory is immediate and non-speculative. Unlike in *Marcy Playground,* Software AG waited only 15 days before filing this lawsuit and motion for a preliminary injunction. *See id.* at 15 (unexplained delay of at least three months in seeking an injunction after bringing suit more than 6 months after the release of the album). In addition, Software AG is not relying on speculative theories of harm.

21

## IV. CONCLUSION

For the reasons stated above this court should order Consist to assign the trademark

registrations in the Territory to Software AG.

Dated:  New York, New York                    Respectfully submitted,
        February 13, 2008


                               By: /s/ James David Jacobs
                               James David Jacobs
                               Frank M. Gasparo
                               Marcella Ballard
                               BAKER & McKENZIE LLP
                               1114 Avenue of the Americas
                               New York, NY 10036
                               Tel: 212-626-4100
                               Fax: 212-310-1600

                               Attorneys for Plaintiffs Software AG, Inc.
                               and Software AG