James David Jacobs
Frank M. Gasparo
Marcella Ballard
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel: 212-626-4100
Fax: 212-310-1600

Attorneys for Software AG, Inc.
and Software AG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOFTWARE AG, INC. and SOFTWARE AG, <br><br> Plaintiffs, <br><br> -against- <br><br> CONSIST SOFTWARE SOLUTIONS, INC. f/k/a CONSIST INTERNATIONAL, INC. and NATALIO FRIDMAN, <br> Defendants. | Case No. 08-CV-00389 (CM) (FM) <br><br> **DECLARATION OF DR. MICHAEL A. FAMMLER** |

DR. MICHAEL A. FAMMLER hereby declares:

1.     I am a partner in the German law firm of Baker & McKenzie, Partnerschaft von

Rechtsanwälten, Wirtschaftsprüfern, Steuerberatern and Solicitors, Bethmannstrasse 50-54,

60311 Frankfurt/Main, Germany.

2.     I submit this declaration on behalf of plaintiffs Software AG, Inc. ("SAGA") and

Software AG ("SAG") (collectively "Software AG" or "Plaintiffs"). I have personal

knowledge of the facts and law stated herein and am competent to testify thereto. I am fluent

in English and German and have translated the German laws, commentaries and cases quoted

in this declaration from German to English.

1

3.      I am an experienced intellectual property lawyer.  My areas of practice include general intellectual property advice, anti-piracy and anti-counterfeiting, trademark registration and portfolio management, commercial/non-contentious intellectual property and trademark/trade dress litigation.  I received a J.D. degree from Universitaet Konstanz in 1984, earned a PHD degree from Universitaet Konstanz in 1989, and earned an LLM in 1990 from Southern Methodist University in the United States.

4.      In this declaration, I rely on the German Civil Code, two leading commentaries on the German Civil Code (Palandt and Münchener Kommentar),  a well-known German treatise (Ingerl/ Rohnke, Markengesetz), German trademark law and German case law. Palandt and Münchener Kommentar are two of the leading German commentaries for interpreting the German Civil Code.  Palandt and Münchener Kommentar are citable authority in Germany and are considered by the German courts as  a relevant authority for interpreting German law.

**German Civil Code – Party Intent and Agency Relationships**

5.      The German Civil Code mandates that the intent of the parties to a contract be examined when construing that contract and interpreting any oral or written declarations by those parties.  The German Civil Code also requires that the fundamental principles of good faith and fairness be considered.  *See* § 157 of the German Civil Code, attached as Exhibit A (stating "contracts shall be construed as required by good faith with a view to the prevailing practices"); § 133 of the German Civil Code, attached as Exhibit B ("When construing the declarations of a party the true intent shall be examined and not the mere formal wording of the declaration".)  Further, a German court will consider all external circumstances

surrounding an oral or written party declaration in order to determine the intent of the respective party. *See* Palandt, BGB, 67th edition, § 133 note 15, attached as Exhibit C.

6.      A German court may also consult the intent of the parties to fill in any gaps in a contract that result from the lack of a particular contractual provision. *See* Palandt, BGB, 67th edition 2008, § 157 note 7, attached as Exhibit D.

7.      The German Civil Code also includes provisions that address an agency relationship and the related agreement between an agent and a principal. *See* § 662 *et seq.* of the German Civil Code, attached as Exhibit E.

8.      An agency agreement exists regardless of its form and may be entered into orally. An agent can perform the respective transaction or business on behalf of the principal either in the agent's own name or in the principal's name. *See* Münchener Kommentar, BGB, 4th edition 2005, § 662 notes 6 and 19, attached as Exhibit F. Section 662 of the German Civil Code provides: "By accepting an agency the agent is obliged to conduct the assigned transaction without remuneration." Attached as Exhibit E.

9.      According to § 671 of the German Civil Code, the principal may terminate the agency agreement at any time *pro futuro* by way of a revocation of his authorization, and the revocation can be communicated to the agent in writing, orally and may even be implied. *See* Münchener Kommentar, BGB, 4th edition 2005, § 671 note 3, attached as Exhibit G.

10.     Upon termination of the agency relationship, pursuant to § 667 of the German Civil Code, the agent must thereafter return to the principal the principal's property, including title to any property, that the agent received during the agency relationship. *See* Münchener Kommentar, BGB, 4th edition 2005, § 667 note 10, attached as Exhibit H; Ingerl/ Rohnke, Markengesetz, 2nd edition 2003, before §§ 14 to 19, note 156, attached as Exhibit I.

11.     In the case of a trademark registration, returning of property means the (re-) assignment of the trademark, including the execution of all forms and documents which are necessary to achieve the recording of the assignment in the relevant register.

## Software AG and Consist Entered Into an Agency Agreement Under German Contract Law

12.     I have reviewed the 1998 Distribution Agreement between SAGA and Consist Software Solutions, Inc. ("Consist"). I have also reviewed the prior agreements between the parties which were governed under German law.

13.     During the Term of the 1998 Distribution Agreement, Consist agreed to distribute the "SYSTEMS", including ADABAS and NATURAL, in the Territory.

14.     Paragraph 5(1) of the 1998 Distribution Agreement requires Consist "to protect the SYSTEMS as well as their ... trademarks":

> Consist acknowledges the SYSTEMS and all documentation or information as trade secrets of SAGA and undertakes to oblige its personnel to protect the SYSTEMS as well as their copyrights and trademarks and to prevent them from unauthorized use.

15.     The prior agreements between the parties that were governed by German law each include a substantively identical provision regarding Consist's obligation "to protect the SYSTEMS as well as their ... trademarks".

16.     I have also reviewed the Court's Notice to Counsel entered February 1, 2008 in which the Court concludes that Mr. Peter Schnell gave Mr. Fridman, the President of Consist, permission to register the trademarks ADABAS and NATURAL in Brazil. My understanding is that this permission was granted by Mr. Schnell at a time when the parties distribution relationship was governed by German law.

17.     Pursuant to § 662 of the German Civil Code, Software AG and Consist entered into an oral agency agreement as a result of Mr. Schnell authorizing Consist to register the

trademarks in Brazil and Consist accepted that authorization by registering those trademarks with the Brazilian trademark office. Consist, acting as the agent, performed the transaction, *i.e.*, registered the trademarks, on behalf of Software AG, the principal, in Consist's own name in accordance with § 662 of the German Civil Code. Consist was not required under the German Civil Code to register the trademarks in Software AG's name.

18.     Therefore, the exact contents and effect of the agreement between the parties to register the trademarks in Brazil depends on the interpretation of that oral agreement between Consist and Software AG. Considering §§ 133 and 157 of the German Civil Code in connection with Paragraph 5(1) quoted above (and substantially identical paragraphs in the preceding agreements) plus the declaration by Mr. Schnell, a German judge would look at the meaning of the words "protect the ... trademarks" in light of what the parties intended by this language and the principle of fairness.

19.     The 1998 Distribution Agreement, and each of the prior agreements between Software AG and Consist constitute the background and circumstances under which Software AG and Consist declared their intention to enter into the agency agreement. Their declarations of intent can only be understood in the light of the existing distributorship relationship and the obligations of Consist, the agent, to protect the SYSTEMS and trademarks of Software AG, the principal, pursuant to Paragraph 5(1).

20.     Since Consist registered the trademarks with the Brazilian trademark office in its own name at a time it had a contractual obligation to protect those trademarks, such registration would be interpreted, under German law, as being undertaken on behalf of Software AG, its principal, pursuant to Consist's duty to protect the trademarks ADABAS and NATURAL under the distribution agreements.

5

**German Law Dictates that Consist Must Assign the Trademarks to Software AG now that the Distribution Agreement and the Agency Agreement Have Expired**

21.    This Court held that Software AG properly terminated this agency agreement as of December 31, 2007.

22.    Upon termination, and assuming that German law still applies, the German Civil Code mandates that Consist return all Software AG property to Software AG that is the subject of the agency agreement.  This property necessarily includes the assignment of the trademark registrations in Brazil that Consist had undertaken in its name on behalf of Software AG in accordance with Consist's duty to protect the trademarks during the course of the distribution agreements.  *See* § 667 of the German Civil Code, attached as Exhibit J.

23.    It is the common understanding in German distribution law that with the termination of the distribution agreement the right to use the principal's trademark ceases.  *See* Stumpf, Der Vertragshändlervertrag, 3rd edition 1997, note 725, attached as Exhibit K.

24.    German law distinguishes between the actual transfer of title to property, including intellectual property rights, and the underlying obligation to transfer ownership.  Thus, the analysis of the transfer of property requires a court to first evaluate whether there is an obligation to transfer property rights and second, assuming the obligation exists, the legal requirements to effectuate the transfer.  This two step analysis is referred to as the "Principle of Abstraction".

25.    This underlying obligation  to transfer is determined by the law that the parties expressly chose or, in the absence of an expressed or implied contractual arrangement, the law of the country where the party carrying out the characteristic performance has its habitual residence.  Even if the intellectual property is situated in a country other than the choice of law country, in the case where a contract specifies that it is to be governed by the law of a

6

certain country, such as German law, German courts have repeatedly confirmed that the law of that country (German law) governs the underlying obligations to transfer those intellectual property rights. *See, e.g.,* Court of Appeals Karlsruhe, Docket no. 6 U 32/86, published in GRUR Int. 1987, 788 *et seq.,* dated February 25, 1987 (stating that Japanese law governs contractual rights and obligations of parties per Japanese choice of law provision, but German law determines scope of the right to use the German intellectual property), attached as Exhibit L.

26.     The right to revoke an authorization under an agency agreement is a way to terminate a contract and thus is governed by the underlying law of obligations. Accordingly, assuming an agency agreement is governed by German law, German law governs the right to revoke authorization and dictates the consequences of that revocation, regardless of whether the agreement concerns German or non-German intellectual property rights.

27.     In a case that is directly applicable to the instant situation the Federal Supreme Court expressly ruled that German law obliged the seller of a trademark registered in France to hand over to the buyer those documents required under French law for the recording of the assignment. *See* Federal Supreme Court, Docket no. 1 b ZR 22/63, published in GRUR Ausl. 1965, 504 et seq., dated October 21, 1964, attached as Exhibit M.  In other words German law dictated the obligation to transfer the trademark and French law set forth the necessary formalities to effectuate that obligation.

28.     From this leading case it follows that, assuming German law governed the distributorship agreement between Software AG and Consist, a German court would issue a judgment obliging Consist, the agent and former distributor of Software AG, to carry out all

necessary acts in Brazil to transfer the trademark registrations for NATURAL and ADABAS
to Software AG.

**Software AG is Not Time-Barred Under German Law**

29.     Under German contract law, the common limitation period to bring a claim,
including claims under § 667 of the German Civil Code regarding termination of an agency
agreement, is three years. *See* § 195 of the German Civil Code, attached as Exhibit N.
Generally, the three year period begins at the end of the year in which the claim arose. For
claims arising under § 667 of the German Civil Code, however, the start of the limitation
period depends on the specific facts and circumstances. A claim under § 667 of the German
Civil Code becomes due only if the agency agreement has either fulfilled its purpose, or if
such purpose has ultimately not been achieved. Only then the claim to return all property
becomes due. *See* Federal Supreme Court, Docket no. IX ZR 139/04, dated June 23, 2005,
attached as Exhibit O.

30.     Software AG's claim against Consist to assign the trademarks ADABAS and
NATURAL only arose with the termination of the 1998 Distribution Agreement because
Consist's duty as the agent to protect the SYSTEMS and trademarks of Software AG ended
with the termination of the 1998 Distribution Agreement.

31.     Therefore, Software AG's claim against Consist under German contract law is not
time-barred.

**German Trademark Law**

32.     The German Trademark Act  contains two provisions specifically related to
German trademark registrations in the name of  "agents":

*§ 11 Agentenmarken*

8

*Die Eintragung einer Marke kann gelöscht werden, wenn die Marke ohne die Zustimmung des Inhabers der Marke für dessen Agenten oder Vertreter eingetragen worden ist.*

### English Translation:
Section 11 Trademarks in the Name of an Agent

Registration of a trademark may be cancelled if the trademark was registered without the consent of the proprietor of the trademark in favor of the proprietor's agent or representative.

*§ 17 Ansprüche gegen Agenten oder Vertreter*

*(1)Ist eine Marke entgegen § 11 für den Agenten oder Vertreter des Inhabers der Marke ohne dessen Zustimmung angemeldet oder eingetragen worden, so ist der Inhaber der Marke berechtigt, von dem Agenten oder Vertreter die Übertragung des durch die Anmeldung oder Eintragung der Marke begründeten Rechts zu verlangen.*

*(2)Ist eine Marke entgegen § 11 für einen Agenten oder Vertreter des Inhabers der Marke eingetragen worden, so kann der Inhaber die Benutzung der Marke im Sinne des § 14 durch den Agenten oder Vertreter untersagen, wenn er der Benutzung nicht zugestimmt hat. Handelt der Agent oder Vertreter vorsätzlich oder fahrlässig, so ist er dem Inhaber der Marke zum Ersatz des durch die Verletzungshandlung entstandenen Schadens verpflichtet. § 14 Abs. 7 ist entsprechend anzuwenden.*

### English Translation:
Section 17 Claims against Agents or Representatives

(1) If, in contravention of section 11, a trademark was applied for or registered in favor of an agent or representative of the proprietor of the trademark without the proprietor's consent, the proprietor of the trademark shall be entitled to demand from the agent or representative the assignment of the right established by the application or registration of the trademark.

(2) If, in contravention of section 11, a trademark was registered in favor of an agent or representative of the proprietor of the trademark, the proprietor can prohibit his agent or representative from using his trademark within the meaning of section 14 unless he consented to such use. If the agent or representative acts willfully or negligently, he shall be liable to compensate the proprietor of the trademark for damage resulted from the infringing act. Section 14, subsection 7, shall apply mutatis mutandis.

*See* http://www.gesetze-im-internet.de/markeng/index.html (in German) (effective October 25, 1994, last amended December 17, 2006), attached as Exhibit P.

9

33.    According to Section 152 of the 1994 German Trademark Act, Sections 11 and 17

of that Act also apply to trademarks filed for or registered prior to 1994, *e.g.*, during the

period from 1984 through 1991:

*§ 152 Anwendung dieses Gesetzes*

*Die Vorschriften dieses Gesetzes finden, soweit nachfolgend nicht anders bestimmt ist,*
*auch auf Marken, die vor dem 1. Januar 1995 angemeldet oder eingetragen oder durch*
*Benutzung im geschäftlichen Verkehr oder durch notorische Bekanntheit erworben*
*worden sind, und auf geschäftliche Bezeichnungen Anwendung, die vor dem 1. Januar*
*1995 nach den bis dahin geltenden Vorschriften geschützt waren."*

**English Translation:**
Section 152 Application of this Law

Except as otherwise provided herein below, the provisions of this Law shall also
apply to trademarks which were applied for or registered prior to 1 January 1995
or which were acquired prior to this date through use in the course of trade or
through the fact that they were well-known trademarks, and to trade designations
which were protected prior to 1 January 1995 according to the provisions which
were in force up to this date.

*See* http://www.gesetze-im-internet.de/markeng/index.html (in German), attached as
Exhibit P.

34.    German case law establishes that an "agency" must not be understood in a

technical sense. Rather, the term needs to be interpreted economically and thus includes not

only commission agents, but also distributors, per article 6 septies Paris Convention. *See*

Ingerl/Rohnke, Markengesetz, 2nd edition 2003, § 11, note 5, attached as Exhibit Q.

35.    Sections 11 and 17 of the German Trademark Act apply when a trademark

registration occurred <u>with the consent</u> of the trademark owner, for example, because at the

time of the registration there was an existing agency or distribution relationship which not

only allowed the use of the trademark but also its registration by the distributor, and that

consent is later withdrawn with the termination or lapse of the agreement. Therefore, such

consent is not in perpetuity and may be revoked by the principal or manufacturer. *See* Fezer,

10

Markenrecht, 3rd edition, 2001, § 11, note 12, attached as Exhibit R. Also, the withdrawal of

a consent is deemed a "registration without the consent of the proprietor" pursuant to § 11

German Trademark Act. *Id.*

36.    For example, the Court of Appeals Hamburg expressly stated that consent can be

revoked by implied conduct and that a request for assignment of a trademark needs to be

considered such a revocation. The court declared that a principal or manufacturer particularly

deserves protection in those cases that arise with termination of the agency relationship. The

court stated that it is immaterial that there is no express contractual provision requiring the

assignment. Further, the court stated that implementation of § 11 of German Trademark Act

would not have been necessary if the legislator had considered the possibility of contractual

provisions as a sufficient remedy. *See* Docket no. 3 U 34/01, published in GRUR-RR 2003,

269 *et seq.*, dated February 27, 2003, attached as Exhibit S.


I declare under the penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed on:    February 13, 2008
                Frankfurt, Germany

_____
Dr. Michael A. Fammler



 **Bundesministerium der Justiz**

**juris**

<u>Nichtamtliches Inhaltsverzeichnis</u>

### § 157 Auslegung von Verträgen

Verträge sind so auszulegen, wie Treu und Glauben mit Rücksicht auf die Verkehrssitte es erfordern.

<u>zum Seitenanfang</u>                <u>Datenschutz</u>                <u>Seite ausdrucken</u>

**B**





Nichtamtliches Inhaltsverzeichnis

## § 133 Auslegung einer Willenserklärung

Bei der Auslegung einer Willenserklärung ist der wirkliche Wille zu erforschen und nicht an dem buchstäblichen Sinne des Ausdrucks zu haften.

zum Seitenanfang                    Datenschutz                    Seite ausdrucken

C

Beck'sche Kurz-Kommentare

Band 7

Palandt

# Bürgerliches Gesetzbuc

mit Einführungsgesetz (Auszug), Allgemeines Gleichbehandlungsgeset
(Auszug), BGB-Informationspflichten-Verordnung, Unterlassungsklageng
Produkthaftungsgesetz, Erbbaurechtsverordnung, Wohnungseigentumsge
Hausratsverordnung, Vormünder- und Betreuervergütungsgesetz,
Lebenspartnerschaftsgesetz, Gewaltschutzgesetz (Artikel 1)

bearbeitet von

Dr. Petra Bassenge
Vorsitzender Richter
am Landgericht Lübeck a. D.

Prof. Dr. Uwe Diederichsen
Universität Göttingen

Dr. Jürgen Ellenberger
Richter am Bundesgerichtshof

Dr. Christian Grüneberg
Richter am Bundesgerichtshof

Prof. Dr. Helmut Heinrichs
Präsident des Oberlandesgerichts
Bremen a. D.

Prof. Dr. Gerd Brudermüller
Vorsitzender Richter
am Oberlandesgericht Karlsruhe

Wolfgang Edenhofer
Präsident des Amtsgerichts München i

Prof. Dr. Andreas Heldrich
Universität München

Hartwig Sprau

Vizepräsident des Bayerischen
Obersten Landesgerichts a. D.

Walter Weidenkaff
Vorsitzender Richter
am Oberlandesgericht München

67., neubearbeitete Auflage

Verlag C. H. Beck München 2008

36, 201), bei Erkl, die der Schriftform (§ 126) bedürfen, genügt eine beglaubigte Abschrift (BGH NJW 67, 823). Die Zustellg ist an die Part, nicht an den ProzBevollm zu richten (LG Wuppertal NJW 86, 1274).

**3**    **b)** Die öffentliche Zustellung richtet sich nach ZPO 185 ff. Sie setzt voraus: Unverschuldete Unkenntn über die Pers des ErklEmpfängers (ähnl iF der Hinterlegg § 372 Rn 6) od Unkenntn über den Aufenthaltsort des Empfängers. Dieses Erfordern ist ebso zu verstehen wie in ZPO 185 I Nr 1. Wird der BewilligungsBeschl dch falsche Angaben erschlichen, ist die Zustellg gleichwohl wirks (BGH 64, 5); ist aber, wenn die Voraussetzgen für eine öff Zustellg für das Gericht erkennb nicht vorlagen (BGH NJW 02, 827, 07, 303). Hat sich der Erkläde arglist verhalten, kann § 242 der Berufg auf die eingetretene RFolge entgegstehen (BGH 64, 5). Aber keine Arglist trotz Kenntn einer Anschrift bei Zweifeln, ob dort zugestellt werden konnte (KG NJW-RR 06, 1380).

## 133    *Auslegung einer Willenserklärung.*    Bei der Auslegung einer Willenserklärung ist der wirkliche Wille zu erforschen und nicht an dem buchstäblichen Sinne des Ausdrucks zu haften.

**1**    **1) Allgemeines. – a) Bedeutung.** Ausleg einer WillensErkl ist Ermittl ihres rechtl maßg Sinnes. Das Gesetz enthält in §§ 133, 157 für die Ausleg zwei grdlegde Normen. § 133 gilt seinem Wortlaut nach für die Auslegg der einz WillensErkl. Er ist aber auch auf Vertr anzuwenden (MüKo/Busche Rn 17). Umgekehrt betrifft § 157 seinem Wortlaut nach nur den bereits zustande gekommenen Vertr. Auch die einz WillensErkl u einseit RGesch sind aber nach Treu u Glauben mit Rücks auf die Verkehrssitte auszulegen (BGH 47, 78). Der Unterschied zw beiden Normen besteht darin, dass § 133 auf den empirischen PartWillen abstellt (sog natürl Ausleg), währd § 157 auf die obj ErklBedeutg verweist (sog obj normative Ausleg). Wie das funktionelle Verh zw den beiden Vorschr im einz aufzufassen ist, ist str; ebso die Frage, ob § 133 od § 157 die vorrang Ausleggsnorm ist (s Soe/Wolf § 157 Rn 11 ff). Dieser Streit ist für die RAnwendg unergieb u kann daher hier auf sich beruhen. Rspr u Lehre haben aus den beiden Normen unter Einbeziehg von allg RGrds einen weitgehd allg anerkannten Kanon von Auslegungsgrundsätzen entwickelt. Von diesen Grds beruhen das Verbot der Buchstabenauslegg (Rn 14), die Grds über die Auslegg von nicht empfangsbedürft WillensErkl (Rn 13) u der Vorrang des übereinstimmden PartWillens (Rn 8) auf § 133; dagg richtet sich die Ausleg von empfangsbedürft WillensErkl (Rn 9) überwiegd u die ergänzde VertrAuslegg (§ 157 Rn 2 ff) ausschließl nach § 157.

**2**    **b)** § 133 und § 157. Da die Ausleg nach §§ 133 u 157 ineinand übergeht u nicht sinnvoll von einand getrennt werden kann, erstreckt sich die Kommentierg des § 133 auf die gesamten für die Ausleg von WillensErkl u Vertr maßgebden RGrds. Ledigl die ergänzde VertrAusleg, die ErklBedeutg typ Klauseln u EinzFälle sind bei § 157 dargestellt. Auslegung von Gesetzen s Einl 40 ff v § 1.

**3**    **2) Anwendungsbereich. – a) Willenserklärungen.** Die §§ 133, 157 gelten für WillensErkl jeder Art, auch für abstrakte Erkl wie Wechsel- od ScheckErkl (BGH 21, 161, Köln NJW-RR 97, 940) u Inhaberschuldverschreibgen (BGH 28, 263), für dingl RGesch wie die Auflassg (RG 152, 192, BayObLG 74, 115), für ProzerVergl (BAG NJW 73, 918), formbedürft Erkl (Rn 19), konkludente WillensErkl (Rn 11), Leistgsbeschreibgen (BGH NJW 80, 1903) u Feststellgsvermerke (BGH 47, 357, NJW 95, 45), EinverständnErkl zu Operationen im GrdBuchVerk sind die §§ 133, 157 gleichfalls anzuwenden, jedoch bestehen Besonderh (Rn 12 u 26 f). Auch die Frage, ob ein bestimmtes willentl Verhalten eine WillensErkl darstellt, ist ein Problem der Ausleg u daher nach den §§ 133, 157 zu beurteilen (BGH 21, 106, Einf 3 v § 116).

**4**    **b)** Auch Prozesshandlungen (Übbl 37 v § 104) sind nach §§ 133, 157 auszulegen (BGH 22, 269, FamRZ 01, 1703, BayObLG NJW-RR 96, 651), auch solche des Gerichts, wie zB ein Pfändgs- u ÜberweisgsBeschl (BGH NJW 83, 886, Ffm NJW 81, 468). Im öffentlichen Recht sind die §§ 133, 157 gleichfalls entspr anzuwenden (BGH 86, 104, 110, NJW 98, 2138, 2140). Das folgt für öffrechtl Vertr aus VwVfG 62, gilt aber auch für WillensErkl des Bürgers (BVerwG NJW 90, 1928, BFH WM 82, 1138) u für solche der Behörde (BVerwG NJW 76, 304). Entscheidd ist, wie der Empfänger die Erkl bei obj Würdigg verstehen durfte (BVerwG 41, 306); Unklarh gehen zu Lasten der Verwaltg (BVerwG aaO); eine reine Buchstabeninterpretation ist unzuläss (BVerwG NVwZ 84, 518, Düss NJW 01, 686/88). S auch Rn 27 f.

**5**    **3) Voraussetzungen der Auslegung. – a)** Die Feststellung des Erklärungstatbestandes, dh die Ermittlg der für die Ausleg relevante Tats (BGH NJW-RR 92, 773), muss der Auslegg vorausgehen. Dabei ist zw Ggst u Mitteln der Ausleg zu unterscheiden. AuslegsGgst ist der konkrete ErklAkt, dessen rechtl Inhalt festgestellt werden soll. Mittel der Ausleg sind die außerhalb des ErklAktes liegden Umst, die einen Schluss auf den Sinn der Erkl u damit auf ihren rechtl Inhalt zulassen (Larenz/Wolf § 28 Rn 41). Bsp sind etwa VorVerhandlgen der Part, die Abwicklg früherer Gesch od Äußergen der Part (Rn 17 f). Währd die Ausleg rechtl Würdigg ist, ist die Ermittlg der auslegsrelevanten Umst TatsFeststellg, für die die Grds über die Behauptgs- u Beweislast gelten (Rn 29).

**6**    **b)** Auslegungsbedürftigkeit ist Voraussetzg der Auslegg. Hat die WillensErkl nach Wortlaut u Zweck einen eindeut Inhalt, ist für eine Ausleg kein Raum (BGH 25, 319, 80, 246/50, BayObLG 81, 34). Der insow krit Literatur (MüKo/Busche Rn 50) ist zuzugeben, dass die Feststellg der Eindeutigk die Berücks aller BegleitUmst voraussetzt u daher selbst ein interpretatorischer Vorgang ist. Gleichwohl hat der schon im gemeinen Recht anerkannte Grds, dass eindeut Erkl keiner Ausleg bedürfen, als Hilfsmittel für die jur Praxis seine Bedeutg. Er stellt klar, dass es keiner Sinnermittlg bedarf, wenn am ErklInhalt kein Zweifel mögl ist (RGRK/Krüger-Nieland Rn 5). Ob Eindeutigk vorliegt, ist eine revisible RFrage (BGH 32, 63). Sie kann auch bei einem (scheinb) eindeut Wortlaut zu verneinen sein (BGH 86, 46).

**6 a**    **c)** Die Auslegungsfähigkeit ist weitere Voraussetzg der Auslegg. Auslegsfäh sind grdsätzl auch widerspruchsvolle u scheinb widersinnige Erkl (BGH 20, 110). And ist es nur, wenn sich nach Ausschöpf aller Auslegsmöglichk kein geltgsfähiger Sinn ermitteln lässt (BGH JW 16, 405).

**6 b**    **d)** Maßgebender Zeitpunkt. Die Ausleg ist auf die Verh im Zeitpkt der Abgabe od entspr Rn 9 des Zugangs der Erkl abzustellen, spätere Änderungen des Willens od der für die Ausleg maßg Umst sind nicht zu berücksichtigen (BGH NJW 88, 2878, 98, 3268, VersR 07, 784). Nachträgl Verhalten einer Part kann nur in der Weise berücksichtigt werden, dass es Rückschlüsse auf ihren tats Willen u ihr tats Verständnis im Ztpkt der Abgabe der Erkl zulassen kann (BGH NJW-RR 07, 529).

**7**    **4) Wirklicher Wille und objektive Erklärungsbedeutung. – a)** Natürliche und normative Auslegung. Nach § 133 ist der Ausleg der wirkl Wille zu erforschen. Diese Formulierg erweckt den Anschein, dass

Rechtsgeschäfte. Titel 2. Willenserklärung                                                 **§ 133**

es für die Auslegg entscheidd auf den inneren Willen des Erklärden ankomme. Das trifft jedoch in dieser Allgemeinh nicht zu. Aber auch die gelegentl vertretene GgAnsicht, unter dem wirkl Willen iSd § 133 sei der in der Erkl objektivierte Wille zu verstehen (so früher Manigk, Danz), ist nicht richtig. Je nach der Art der Erkl u der bestehden Interessenlage hat die Auslegg entwedr auf den wahren Willen des Erklärden abzustellen, sog natürliche Auslegg (Rn 8 u 13) od die obj ErklBedeutg seines Verhaltens zu ermitteln, sog normative Auslegg (Rn 9 u 12). Die natürl Auslegg hat im Wortlaut des § 133 („wirkl Wille") ihre Grdl. Dagg sind die Grds der normativen Auslegg mit der obj ErklBedeutg als Zentralbegriff unmittelb weder dem § 133 noch dem § 157 zu entnehmen. Sie ergeben sich aus dem Gedanken des Vertrauensschutzes u dem §§ 119 ff. Die §§ 119 ff wären leerlaufd, wenn die Auslegg in allen Fallgruppen einen dem wirkl Willen des Erklärden entspr Erklinhalt herzustellen hätte.

b) Besteht ein übereinstimmender Wille der Part, so ist dieser rechtl auch dann allein maßg, wenn er im                                                                    **8**
Inhalt der Erkl keinen od nur einen unvollkommenen Ausdr gefunden hat (BGH 20, 110, 71, 247, NJW 96, 1679, NJW 98, 746/47, 02, 1058, BAG 22, 174; stRspr); das gilt auch, wenn die Part eine Klausel in AGB übereinstimmd abweichd von ihrem obj Sinn verstehen (BGH 113, 259, NJW 95, 1496) u im Verh zw Ausstellr u erstem Nehmer auch für Schecks u Wechsel (s Köln NJW-RR 97, 940). Das übereinstimmd Gewollte hat den Vorrang vor einer irrtüml od absichtl Falschbezeichng, *falsa demonstratio non nocet*. Nicht erfdl ist, dass der ErklEmpfänger sich den wirkl Willen des Erklärden zu eigen gemacht hat; es genügt, dass er ihn erkannt hat (BGH NJW 84, 721, NJW-RR 93, 373). Auch bei formbedürft R.Gesch ist eine Falschbezeichng unschädl, vorausgesetzt, dass sie unabsichtl erfolgt ist (Rn 19; zur absichtl Falschbezeichng s § 311b Rn 36). Missverständl ist die gelegentl verwandte Formulierg, bei einem übereinstimmden PartWillen sei für eine Auslegg kein Raum (so BGH LM [B] Nr 7, BAG AP Nr 28). Die Feststellg, dass die Part übereinstimmend dasselbe gewollt haben, erfordert idR eine Auslegg. Außerdem kann der übereinstimmde PartWille überh wertlos sein u einer Ergänz bedürfen.

c) Empfangsbedürftige Willenserklärungen. – aa) Objektive Erklärungsbedeutung. Empfangsbedürft                                                              **9**
WillensErkl sind – falls nicht Rn 8 zutrifft – so auszulegen, wie sie der ErklEmpfänger nach Treu u Glauben unter Berücks der Verkehrssitte verstehen musste (BGH 36, 33, 103, 280, NJW 90, 3206, 92, 1446, 96, 3777, BAG NJW 94, 3372, stRspr); das gilt, sofern deutsches Recht anzuwenden ist, auch für fremdsprach Erkl (Ffm NJW-RR 95, 36). Bei der Auslegg dürfen nur solche Umst berücks werden, die bei Zugang der Erkl dem Empfänger bekannt od für ihn erkennb waren (BGH NJW 06, 3777). Auf seinen „Horizont" u seine Verständnismöglichk ist die Auslegg abzustellen, u zwar auch dann, wenn der Erklärde die Erkl anders verstanden hat u auch verstehen durfte. Der Empfänger darf der Erkl allerdings nicht einfach den für ihn günstigsten Sinn beilegen. Er ist nach Treu u Glauben verpfl, unter Berücks aller ihm erkennb Umst mit gehörig Aufmerksamk zu prüfen, was der Erklärde gemeint hat (BGH NJW 81, 2296, BAG NJW 06, 2284/86, Larenz/Wolf § 28 Rn 17). Entscheidd ist aber im Ergebn nicht der empirische Wille des Erklärden, sond der dch normative Auslegg zu ermittelnde objekt ErklWert seines Verhaltens (BGH 36, 33). Auch wenn es darum geht, ob ein bestimmter ErklAkt als WillensErkl aufzufassen ist od nicht, ist nicht der innere Wille des Erklärden, sond die obj ErklBedeutg seines Gesamtverhaltens maßg (BGH 21, 106, 91, 328, NJW 06, 3777, Einf 3 v § 116). – bb) Formular des Empfängers. Wird für die                **10**
Erkl ein Formular des Empfängers benutzt, ist analog § 305c II darauf abzustellen, wie der Erklärde das Formular verstehen durfte (s BGH NJW 83, 1904, 97, 3087 u die Nachw zur AusglQuittg, § 39 Rn 10). Bei einem Antr auf kostenlose Eintrag in eine Datenbank kommt kein AnzeigenVertr zustande, wenn die darauf gerichtete Erkl in einem Text auf der RückS versteckt ist (AG Rendsbg SchlHAnz 06, 275). – cc) Auch für konkludente Wil-                        **11**
lenserklärungen ist im Ergebn entscheidd, wie sie der ErklEmpfänger nach Treu u Glauben verstehen musste. Konkludente WillensErkl setzen idR das Bewusstsein des Handelnden voraus, dass eine WillensErkl wenigstens möglw erfdl ist (BGH NJW 95, 953). Für die konkludente Genehmigg eines schwebd unwirks Gesch verlangt die Rspr daher grdsätzl, dass nicht nur die Handelnde die schwebden Unwirksamk bewusst ist od zumindest mit ihr rechnet (BGH 2, 153, NJW 88, 1200, Nürnbg VersR. 91, 209), für die Bestätigg (§ 144) eines anfechtb Gesch, dass der Handelnde von seinem AnfechtgsR weiß od die Vorstellg hat, ihm könne möglicherw ein solches Recht zustehen (BGH 129, 377, NJW 67, 722, 71, 1800). Da das ErklBewusstsein kein notw Bestandteil der WillensErkl ist (Einf 17 v § 116), kann schlüssiges Verhalten aber auch dann als WillensErkl gewertet werden, wenn der Handelnde an die Möglichk einer solchen Wertg nicht gedacht hat. Voraussetzg ist jedoch, dass der Handelnde bei Anwendg pflichtgem Sorgfalt erkennen konnte, dass sein Verhalten als WillensErkl aufgefasst werden durfte u der and Teil es auch tats so verstanden hat (BGH 91, 324, 109, 171/77, NJW 95, 953, ZIP 04, 1394). Das gilt auch für Zustimmgen u Bestätigen (BGH aaO). Bei dem ArbEinsatz handelt es sich um ein tatsächl Verhalten, dem nicht notwend ein bestimmter rgesch ErklWert in Bezug auf den Inhalt des ArbVerh zukommt. Vielmehr ist auf die Absprachen abzustellen, die dem erhöhten ArbEinsatz zu Grunde liegen (BAG NZA 07, 801). Aus dem Schutzzweck der Norm, die das Zustimmgserfordern festlegt, kann sich ergeben, dass an die Annahme einer stillschw Zustimmg besonders strenge Anfordergen zu stellen sind (BGH 116, 274, Einwilligg in Weitergabe der Patientenkartei). Wird der Kaufpreis vereinbargsgem auf das Fremdgeldkonto eines Dritten gezahlt, kann zw dem Käufer u dem Dritten konkludent ein TreuhandVertr zustande kommen (BGH NJW 06, 3777).

d) Erklärungen an die Allgemeinheit. Darunter sind solche Erkl zu verstehen, die für eine unbestimmte                                                                **12**
Vielzahl von Pers Bedeutg erlangen können. Ihre Auslegg richtet sich nach der Verständnismöglichk eines dchschnittl Beteiligten od eines Angehörigen des gerade angesprochenen PersKreises. Außer dem Text der Erkl dürfen nur solche Umst berücks werden, die jedermann od doch jedem Angehörigen der angesprochenen Kreise bekannt od erkennb sind (BGH 53, 307). Das gilt für die Satzg von Vereinen (BGH 47, 180, 63, 290, § 25 [BGH BB 81, 926, Düss ZIP 87, 230), für HauptversammlgsBeschl (RG 146, 154), GesellschVertr von PublikumsKG (Hbg WiB 96, 899, s auch BGH NJW 06, 2845), UnternVertr gem AktG 291 I (Passarge BB 06, 2769), Beschl von WEigtGemsch (Stgt NJW-RR 91, 913), WechselErkl (BGH 21, 161, 64, 14, DB 79, 1081), Inhaberschuldverschreiben (BGH 28, 263) u schriftl Vollm, die zu einem Handeln ggü einer Vielzahl von Pers ermächtigen (s Ffm DNotZ 04, 937). Da die Auslegg einheitlich vorzunehmen ist, müssen Umst, die nur einz Beteiligten bekannt od erkennb sind, außer Betr bleiben (BGH 28, 264). Auch die Auslobg ist obj nach der Verständnismöglichk eines dchschnittl Beteiligten auszulegen, obwohl sie an sich eine nicht empfangsbedürft WillensErkl ist (Kornblum JuS 81, 801). Ähnl Grds gelten für die Auslegg von Allgemeinen Geschäftsbedingungen (§ 305c Rn 15 ff).

e) Letztwillige Verfügungen. Für sie gilt eine grdsätzl and Auslegsmethode. Bei ihnen spielt der Gedanke                                                        **13**
des Vertrauensschutzes keine Rolle. Entscheidd für ihre Auslegg ist nicht der obj Sinn der Erkl, sond der wirkl Wille des Erbl (BGH 80, 249, 86, 45, Larenz/Wolf § 28 Rn 95, allgM). Ist dieser nicht feststellb, ist der mutmaßl Wille maßg (BGH 86, 45, BayObLG 82, 165). Die für die Auslegg maßg Norm ist § 133, nicht § 157. Ergänzd

115

**§ 133**                                    Buch 1. Abschnitt 3. *Heinrichs/Ellenberger*

gilt § 2084, wonach von verschiedenen Ausleggsmöglichk iZw derjen der Vorzug zu geben ist, bei der die Vfg Erfolg hat. Einzelhbei § 2084. Beim ErbVertr ist bei vertragsgm Vfgen der übereinstimmde Wille der VertrPart maßg (Mü NJW RR 06, 1597).

**14**  **5) Verfahren bei der Auslegung. – a) Wortlaut der Erklärung.** Trotz des in § 133 enthaltenen Verbots der Buchstabeninterpretation (BGH NJW 02, 1260) hat die Erkl auszugehen (BGH **121**, 13/16, NJW 94, 189, 95, 1212, 98, 2966, 01, 144, 2535, VersR 07, 784). Maßg ist iZw der allg Sprach-Gebrauch (s BGH **LM** (C) Nr 17, Mü NJW-RR 96, 239), bei Texten, die sich an Fachleute richten, die fachsprachl Bedeutg (BGH NJW-RR 94, 1108), bei Begriffen, die in dem beteiligten Verkehrskreis in einem bestimmten Sinn verstanden werden, diese Bedeutg (BGH NJW 01, 1344). Verwendet ein RLehrer in einer Urkunde den Begriff „Schuld-Anerk", ist er iZw im rechtstechn Sinn zu verstehen (LG Bln NJW 05, 993). Ein besond Sprachgebrauch des Erklärden ist zu berücksichtigen, bei empfangsbedürft Erkl aber nur, wenn er dem ErklEmpfänger bekannt od erkennb war (Rn 9). Mündl Erläuterungen des Erklärden zu einem schriftl VertrAnge-bot sind auch dann zu berücksichtigen, wenn der Vertreter nur zur Entgegnahme des Angebots, nicht aber zum VertrSchluss bevollmächtigt war (BGH 82, 222, § 166 Rn 5). Die Erkl, es sei keine Zusicherg gegeben worden, schließt idR die Annahme einer konkludenten Garantieübern aus (BGH NJW 92, 170). Die Klausel „die Tilgg erfolgt dch eine LebensVers der X-Vers" ist idR dahin auszulegen, dass die Tilgg des Darl nicht auf den dch die LebensVers ausgezahlten Betrag beschränkt ist, sond der DarlN das Risiko einer entstehnden Deckgslücke zu tragen hat (Karlsr WM 06, 1810, LG Freibg, Mainz, Göttingen WM 05, 2090, Wegmann BKR 07, 268, überholt Karlsr NJW 03, 2322). Das gilt erst Recht, wenn ledigl vermerkt ist, dass Rückzahlg des Darl u Auszahlg der VersSumme am gleichen Tag erfolgen (Kblz ZIP 07, 1259). And, wenn der DarlN nach den vom DarlG abgegebenen Erkl darauf vertrauen durfte, er brauche keine Zuzahlgn zu leisten (s Hennrichs JuS 02, 975). Die Erkl des VersN im Todesfall solle sein Eheg bezugsberecht sein, ist so auszulegen, dass der zum Ztpkt der Abgabe der Erkl mit dem VersN verheiratete Eheg begünstigt ist (BGH VersR 07, 784). Bei beurkundeten Erkl kommt es auf den Willen u die Vorstellgn des Erklärden an; die Ansicht der UrkundsPers sind nur erhebl, wenn der Erklärde sie sich zu eig gemacht hat (BGH DNotZ 61, 396, FamRZ 98, 908). Ähnl wie bei der Gesetzesauslegg (Einl 40 ff v § 1) sind auch bei RGesch der sprachl Zushang (grammatikal Auslegg) u die Stellg der Formulierg im Gesamtzushang des Textes (systemat Auslegg) zu berücksichtigen (BGH NJW 57, 873). Als Hilfsmittel können auch die Argumentationsformen herangezogen werden, die bei der Gesetzesauslegg verwandt werden, wie Analogie, Umkehrschluss u teleolog Reduktion (Einl 48 ff v § 1).

**15**  **b) Begleitumstände.** Nach der Ermittlg des Wortsinnes sind in einem zweiten Schritt die außerhalb des ErklAktes liegdn BegleitUmst in die Auslegg einzubeziehen, soweit sie einen Schluss auf den Sinngehalt der Erkl zulassen (BGH NJW-RR 00, 1002/03, BAG NJW 71, 639). Bei empfangsbedürft WillensErkl sind aber nur die Umst zu berücksichtigen, die dem ErklEmpf bekannt od erkennb waren (BGH Rn 9). Bei Erkl an die Allge-meinh nur allg bekannte (Rn 12). Als relevante BegleitUmst kommen neben der Verkehrssitte (Rn 21) **vor allem in Betracht: – aa) Entstehungsgeschichte.** Wicht AnhaltsPkte für die Auslegg können sich aus der Abwicklg früherer Gesch, den VorVerhandlgen der Beteiligten (BGH NJW 81, 2295, ZIP 04, 843), auch die mit nur einem Gesamtvertreter (BGH NJW 99, 3191), aus einem zunächst abgeschl formunwirks Vertr (BGH NJW 87, 2437) od der Präambel des Vertr (BGH NJW-RR 96, 1120, Pilger BB 00, 368) ergeben. Das Gesamtbild der VertrVer-handlgen kann eine vom übl Wortsinn abweichde Auslegg rechtfertigen (BGH NJW 71, 40). – **bb) Äußerungen der Parteien** über den Inhalt des RGesch. Obwohl die Erkl mit dem Zeitpkt ihres Wirksamwerdens ihren grdsätzl unveränderl ErklWert erhält (Rn 6 b), kann auch späteres Verhalten der Part zumindest als Indiz für die Auslegg von Bedeutg sein (BGH NJW 88, 2878, NJW-RR 89, 199, 98, 259, 801, BB 05, 2097, BAG AP Nr 32). – **cc)** Die von den Part in einer GeschäftsverbindungGebindg herausgebildeten Usancen („GeschVerbindgsbrauch", Müller/Graff, Auswirkgn einer laufdn GeschVerbindg, 1974, S 134). Sie können die Auslegg einer EinzErkl od des Vertr betreffen.

**18**  **c) Interessenlage.** Zu berücksichtigen ist auch u vor allem die bestehde Interessenlage (BGH **21**, 328, 109, 22, NJW 81, 1549, 2295, 00, 2099) u der mit dem RGesch verfolgte Zweck (BGH **2**, 385, 20, 110, BGH NJW 07, 2320 Tz 27). Geboten ist eine nach beiden Seiten interessengerechte Auslegg (BGH NJW 94, 2228, 00, 2508, 02, 747, WuM 07, 443 Tz 12); iZw ist der Auslegg der Vorzug zu geben, die zu einem vernünftigen, widerspfreien u den Interessen beider VertrPart gerecht werdden Ergebn führt (BGH NJW-RR 06, 338, BAG NJW 06, 2284/86). Aus der Interessenlage kann sich ergeben, dass eine scheinb eindeut Regelg völl ungewöhnl u unerwartete Wagnisse nicht erfasst (BGH 124, 68), dass eine Abwohnklausel als Mietvorauszahlg (BGH LM § 157 Nr 6), das Bestreiten einer Verpfl als Anfechtg (BGH DB 71, 2302) u ein Rücktr als Künd (RG 89, 398) aufzufassen ist. Sieht das Gesetz für die Erreichg eines bestimmten Zweckes mehrere rechtl Gestaltgsmöglichk vor, ist ein Abstellen auf die Interessenlage dagg idR unergieb u iZw der Wortlaut entscheidd. Eine als Bürgsch bezeichnete Erkl kann daher nicht ow als Schuldbeitritt (BGH LM (B) Nr 7) u umgekehrt ein Schuldbeitritt nicht ow als Bürgsch ausgelegt werden (BGH LM (C) Nr 34). Hauptanwendgsfeld für die am Zweck orientierte Auslegg ist die ergänzde VertrAuslegg (§ 157 Rn 2 ff). Welchen Stellenwert der Wortlaut der Erkl u die weiter zu berücksich Umst im Ergebn haben, hängt von den Umst des Einzelfalles ab. Entscheidd ist, wie die Erkl unter Berücks aller BegleitUmst, insbes des Gesamtverhaltens der Part u der von ihnen verfolgten Zwecke, redlicherw zu verstehen ist (BGH WM 64, 906). Zu Vertr, in denen der Spielbank mit dem Spieler eine Sperre vereinbart, s Einl 9 v § 241 aE.

**19**  **d) Auch bei formbedürftigen Erklärungen** sind Umst außerhalb der Urkunde bei der Auslegg mitzube-rücksichtigen (BGH 63, 362, 86, 46, stRspr). Das gilt auch für dingl Einigngen (BGH LM (B) Nr 13) u letztw Vfgen (Rn 13). Dem Vertretenen ist aber nur die Kenntn von Vertretern zuzurechnen, nicht die von VerhdlgsGeh (BGH NJW-RR 86, 1019, § 166 Rn 7). In einem ersten Untersuchsschritt ist festzustellen, wie die Erkl unter Berücks aller maßg Umst auszulegen ist (BGH 80, 250, 86, 47); dabei dürfen Umst außerhalb der Urkunde nur berücks werden, soweit sie beweisen sind (Rn 29). Anschließd ist zu prüfen, ob die so ausgelegte Erkl der Form genügt (BGH 86, 47, NJW 00, 1569, BAG ZIP 05, 366/68). Bei der Prüfg folgt die Rspr der sog Andeutungstheorie. Sie verlangt, dass der aus Umst außerhalb der Urkunde ermittelte rgesch Wille in der Urkunde einen, wenn auch unvollkommenen Ausdr gefundn haben muss (BGH 63, 362, 80, 245, 250, 87, 154, NJW 96, 2793, 00, 1569, BAG ZIP 05, 366, NJW 07, 250 Tz 23). Dem ist mit zwei Einschränkgn zuzu-stimmen. Die Andeutgstheorie gilt nicht für die ergänzde VertrAuslegg (BGH 86, 47 f); sie tritt überdies zurück hinter den allg anerkannten Grds, dass eine unabsichtl Falschbezeichg auch bei formbedürft Erkl unschädl ist (BGH 87, 153, NJW 02, 1038, § 311 b Rn 37). Im Übrigen gilt, dass bei formbedürft Erkl nur der Wille beachtl ist, der unter Wahrg der vorgeschriebenen Form erklärt worden ist. Auszulegen ist daher der Inhalt der

# D

schiebd bedingten Gebots dch Abgabe eines höheren Gebots s Rn 1. Der Betreiber der Internet-Plattform ist Empfangsvertreter (§ 164 III) hinsichtl der beiderseits abgegebnen WillensErkl. Zur Rücknahme seines Angebots – zB wg eines nicht unter § 119 fallden Irrtums od eines VertrSchlusses außerhalb des Internets – ist der Einlieferer nur bei einem entspr Vorbeh in seiner InternetErkl od den AGB des Betreibers befugt. Fehlt er, wie in den eBay-AGB (KG NJW 05, 1053), kommt mit dem Bieter, der vor der „Löschg" des Angebots das Höchstgebot abgegeben hat, ein Vertr zustande (KG aaO, Oldenbg NJW 05, 2556). Ein Gebot, das dem Betreiber wg techn Funktionstörgen nicht zugeht, wird nicht wirks u führt nicht zu einem VertrSchluss (arg §§ 130, 120). Dass die elektron Erkl von dem abgegeben worden ist, dessen Name od Passwort verwandt worden ist, muss derjen beweisen, der aus der Erkl Rechte berleiten will (Hamm NJW 07, 611). Zum Missbr des Internetanschlusses dch Angehörige od Dritte s § 172 Rn 18. Enthält bei Internet-Versteigergen übl abschließde Beurteilung des und Teils unricht TatsBehauptgen, Schmähkritik od eine Verunglimpfg ohne sachl Grdl, hat der Geschädigte gg den Verletzer wg Verletzg seiner vertragl NebenPfl gem §§ 280 I, 249 I einen Anspr auf Zustimmg zur Löschg (s LG Düss MMR 04, 496, AG Erlangen ZGS 04, 359, AG Kblz NJW-RR 06, 1643, Janal NJW 06, 870, AnwK/Kremer/Noack § 156 Anh Rn 38).

## 157 Auslegung von Verträgen. Verträge sind so auszulegen, wie Treu und Glauben mit Rücksicht auf die Verkehrssitte es erfordern.

**1) Allgemeines.** § 157 gilt entgg seinem Wortlaut nicht nur für die Auslegg von Vertr, sond auch für die von einseit R.Gesch u einz WillensErkl (BGH 47, 75/78). Umgekehrt ist § 133 nicht nur auf die Auslegg von WillensErkl, sond auch auf die von Vertr u R.Gesch jeder Art anzuwenden (§ 133 Rn 1). Der Anwendgsbereich beider Vorschr deckt sich daher. Auch inhaltl ist eine Trenng in eine Auslegg nach § 157 u § 133 nicht mögl. Beide Vorschr sind bei der Auslegg nebeneinander heranzuziehen (BGH 105, 24/27). Aus ihnen haben Rspr u Lehre die bei § 133 dargestellten AusleggGrds entwickelt. Die Erläuterg des § 157 kann sich daher auf die Kommentierg der ergänzden VertrAuslegg (Rn 2 ff), die Anführg von Einzelfällen (Rn 12 ff) u Hinw zu den im Verkehr gebräuchl typ Klauseln (Rn 18) beschränken. [1]

**2) Ergänzende Vertragsauslegung. – a) Begriffe.** Die eigentl Auslegg hat festzustellen, ob ein bestimmtes Verhalten als WillensErkl aufzufassen ist u welchen Inhalt die Erkl hat. Dagg hat die ergänzde VertrAuslegg den Zweck, Lücken der rgeschr Regelg zu schließen (BGH 9, 273, 77, 301/04, Staud/Roth Rn 4). Sie knüpft an den im Vertr enthaltenen Regelgsplan der Part an u versteht diesen als eine R.Quelle, aus der unter Berücks von Treu u Glauben u der Verkehrssitte Regelgen für offen gebliebene Punkte abgeleitet werden können (s BGH 9, 273, NJW 78, 695). [2]

**b) Anwendungsbereich.** Die ergänzde Auslegg ist bei R.Gesch aller Art mögl. Ihr unterliegen auch formbedürft Gesch (BGH 81, 135/43, § 133 Rn 19), Vertr, die einer öffentl Genehmig bedürfen (BGH WM 82, 1331), Ehe– u ErbVertr (BGH NJW 57, 423) u Test (BGH 22, 357, § 2084 Rn 8), GemschOrdngen von WEigtümern (BGH NJW 04, 3413), TarifVertr (Rn 16, aber nur, wenn konkrete AnhaltsPkte dafür bestehen, welche Regelg die Part in Kenntn der Lücke getroffen hätten (BAG DB 01, 202). Auch AGB können ergänzd ausgelegt werden, jedoch ergeben sich aus § 306 Schranken (§ 306 c Rn 17). Stehen die Part in VertrVerhandlgen od in sozialem Kontakt, kann nach der Rspr trotz Fehlens eines VertrSchlusses im Wege ergänzder Auslegg ein stillschw Haftgs-Ausschluss angenommen werden (BGH NJW 79, 643, 80, 1681, § 276 Rn 37). Abgrenzung zu § 242 s dort Rn 18, zu § 313 s dort Rn. 10. [2a]

**c)** Der Vertr muss eine **Regelungslücke**, eine „planwidr Unvollständigk" (BGH 127, 138/42, ZIP 07, 774 Tz 26, BAG NJW 07, 2348 Tz 23), enthalten (BGH 40, 91/103, 125, 7/17, NJW 02, 2310, NJW-RR 05, 687/90, stRspr). Sie ist gegeben, wenn der Vertr eine Bestimmg vermissen lässt, die erfdl ist, um den ihm zu Grde liegdn Regelgsplan zu verwirklichen; ohne die Vervollständig des Vertr muss eine angem, interessengerechte Lösg nicht zu erzielen sein (BGH ZIP 07, 774 Tz 28). Gleichgült ist, ob die Lücke von Anfang an bestanden hat od nachträgl entsteht (BGH NJW 81, 220). Sie kann auch darauf beruhen, dass die Part einen Punkt bewusst offen gelassen haben, etwa in der Hoffng, sie würden sich insow noch einigen (BGH 75, 1116, 82, 2816, BAG DB 80, 934). Sie ist idR darauf zurückzuführen, dass die Part an einen bestimmten regelgsbedürft Punkt nicht gedacht haben (BGH NJW-RR 91, 177), dass sie eine Regelg für nicht erfdl hielten (BGH NJW 02, 1260/62) od dass sich die bei VertrSchluss bestehden wirtschaftl od rechtl Verh nachträgl geändert haben (BGH 123, 281/85, NJW-RR 99, 923, NJW-RR 05, 687). Auch die Unwirksamk einer VertrBestimmg kann eine Regelgslücke begründen (BGH 63, 132/35, 90, 69/74, 137, 153/57, BayObLG 98, 13/18). Keine Lücke liegt dagg vor, wenn die getroffene Regelg nach dem Willen der Part bewusst abschließd sein sollte (BGH NJW 85, 1835, Hamm NJW-RR 04, 298). Sie kann nicht daraus hergeleitet werden, dass sich eine einzelne Regelg als unbill erweist (Staud/Roth Rn 19). [3]

**d) Vorrang des dispositiven Rechts. aa)** Eine ergänzde VertrAuslegg scheidet aus, wenn die VertrLücke dch Heranziehg des dispositiven Rechts sachgerecht geschlossen werden kann (BGH 40, 91/103, 77, 301/04, 137, 153/57, NJW 82, 2190/91, AnwK/Looschelders Rn 8, str). Bsp: KaufVertr ohne Regelg der Mängelhaftg. Es gelten die §§ 434 ff u nicht die Grds der ergänzden VertrAuslegg. Die ergänzde VertrAuslegg darf das dispositive Recht nicht funktionslos machen. Ihre Grds sind vor allem in zwei Fallgruppen heranzuziehen: – aa) Der Rekurs auf dispositives Recht **widerspricht** dem mutmaßl **Parteiwillen** (BGH NJW 75, 1116, 79, 1705, NJW-RR 90, 817). Das ist zB der Fall, wenn die Part bei den Verhandlgen übereinstimmd von einer längeren als der gesetzl KündFr ausgegangen sind (BAG AP § 154 Nr 1). Ein entgegenstehder Wille kann auch anzunehmen sein, wenn das dispositive Recht der Interessenlage offensichtl nicht gerecht wird (BGH NJW 82, 2816) od wenn es, wie das Gesellschaftsr, veraltet ist u in der Praxis idR abdedugen wird (BGH 123, 281/85, NJW 79, 1705). [4] [5]

**bb)** Es geht um eine Lücke, für die das dispos Recht **keine oder keine interessengerechte Regelung** enthält (Staud/Roth 23). So liegt es häuf bei gemischten od atyp Vertr (Staud/Roth Rn 27), aber auch Typen-Vertr weisen vielfach rechtl od tats Besonderh auf, denen das dispositive Recht nicht ausreichd Rechng trägt (BGH 74, 370/73). **Einzelfälle:** Unwirks Tagespreisklausel (BGH 90, 69/75). Wegfall des Enteigngszwecks bei einem Verkauf zur Abwendg der Enteigng (BGH 135, 92). Unerwartete Belastg des Käufers mit Erschließgskosten (BGH NJW 88, 2099). Erhöhg der vom Käufer zu tragden Kosten, weil die Erschließg statt von der Gemeinde privat dchgeführt wird (BGH NJW-RR 87, 458, 00, 894). WettbewVerbot bei einem Praxistausch zw Ärzten (BGH 16, 71/76). Verzinsg der Mietkaution eines gewerbl Mieters (BGH NJW 94, 3287). Abrede über SchönhtsReparaturen, wenn diese nicht mehr ausgeführt werden können (BGH 77, 301, 92, 363, NJW 02, 2883). And, wenn die dem Mieter bei VertrEnde obliegdn UmbauMaßn undchführbr od sinnlos wer- [6]

den (BGH 96, 141/45). Die Vereinbg eines Gewährleistgsausschlusses kann den Verkäufer zur Abtretg seines Anspr gg den arglist Erstverkäufer verpfl (Rn 12 „GrdstKaufVertr"). Das von einer GmbH übernommene Verbot, das von ihr gekaufte Grdst („Wahrzeichen der Stadt") weiterzuveräußern, kann, wenn die Part irrtüml von einer UStPfl od UStFreih ausgegangen sind, erfolgt die notw Anpassg dch ergänzde VertrAuslegg (Rn 13).

7    e) Der **hypothetische Parteiwille** ist Grdlage für die Ergänzg des VertrInhalts (BGH 9, 273/78, **111**, 214/17). Es ist darauf abzustellen, was die Part bei angem Abwäg ihrer Interessen nach Treu u Glauben als redl VertrPart vereinb hätten, wenn sie den nicht geregelten Fall bedacht hätten (BGH 84, 1/7, NJW 04, 2449, 06, 54, NJW-RR 05, 687/90, 1421). Dabei ist zunächst an den Vertr selbst anzuknüpfen. Die in ihm enthaltenen Regelgen u Wertgen sind AusgangspPkt der VertrErgänzg (BGH NJW 88, 2099/100, NJW-RR 05, 1421). Zugl sind mit Treu u Glauben u. der Verkehrssitte auch obj Maßstäbe zu berücksichtigen (BGH 9, 273/78, **12**, 337/43, 90, 69/77, Staud/Roth Rn 31). Die Auslegg ist auf den Ztpkt des VertrSchlusses abzustellen, nach auf den der Feststellg der VertrLücke (BGH NJW 93, 3193, NJW-RR 05, 687/89). Welche Regelgsvorschläge die Part gemacht hätten, wenn sie die Lücke rechtzeit erkannt hätten, ist unerhebl u nicht beweisbedürft (Staud/Roth aaO). Bei unerwarteten Vor- od Nachteilen ist vielfach eine Halbteilg die angem VertrErgänzg (s BGH NJW-RR 00, 894).

8    f) **Schranken.** Die ergänzde VertrAuslegg muss den Grds der Privatautonomie u der VertrTreue respektieren u darf nicht zu einer freien richterl RSchöpfg ausufern (s BGH 9, 273/79, 40, 91/103 ff). Sie hat folgde Grenzen: — aa) **Parteiwille.** Das Ergebn der ergänzden Auslegg darf nicht im Widerspr zum tats PartWillen od zum VertrInhalt stehen (BGH 90, 69/77, NJW 95, 1212). Sie ist ausgeschl, wenn die Part über den (scheinb) regelgsbedürft Punkt bewusst eine abschließde Regelg getroffen haben (BGH 2, 385, NJW 85, 1835). Ggü einer eindeut vertragl Abrede ist sie nur zuläss, wenn sich aus konkreten Tats ergibt, dass trotz des Wortlauts eine Regelgslücke vorliegt (BGH NJW 02, 2310). Eine ergänzde Auslegg kommt wg Verstoßes gg den mutmaßl PartWillen nicht in Betr, 9    wenn sie zur Nichtigk des Vertr führen würde (BGH NJW 70, 468). — bb) Der ergänzende VertrAuslegg darf nicht zu einer (wesentl) **Erweiterung des Vertragsgegenstandes** führen (BGH 9, 273/78, 40, 91/103, NJW 82, 2191, BAG AP Nr 3). Sie muss sich innerhalb des tats gegebenen Rahmens der getroffenen Vereinbg halten (BGH **12**, 337/43, 29, 107/10). Sie kann eine sinnlos gewordene Verpfl dch eine andl ersetzen (BGH 92, 363/70), darf ein WegeR auf ein Grdst verschieben, dch das Part ihr aus öff Weg angesehen haben (aA RG 87, 211/13), scheidet aber aus, wenn sie einer Part Rechte verschaffen würde, die sie währd den VertrVerhandlgen nicht hat dchsetzen 10    können (BGH NJW-RR 91, 1031/33). — cc) Kann die Regelgslücke in **verschiedener Weise** ausgeschlossen werden u bestehen keine AnhaltsPkte dafür, für welche Alternative sich die Part entschieden hätten, ist eine ergänzde VertrAuslegg ausgeschl (BGH 62, 83/89 u 327, 90, 69/80, NJW 90, 1723/25, NJW-RR 05, 1619). Sie scheidet auch dann aus, wenn sich ein Ereign wg einer grdlegden Änderg der Verh einer Beurteilg nach dem PartWillen entzieht (BGH 84, 361/68: Rückabwicklg ehebezogener Zuwendg nach Scheidg).

11    g) **Verfahrensrecht.** Es gelten die allg Grds (§ 133 Rn 29 ff). Die ergänzde VertrAuslegg gehört, soweit sie nicht typ Vereinbgen betrifft, zum Bereich der TatsFeststellg u ist vom Revisionsgericht nur beschränkt nachprüfb (BGH 111, 110/15). Hat der Tatrichter die ergänzde Auslegg materiellrechtl fehlerh unterlassen, kann sie aber vom Revisionsgericht nachgeholt werden, wenn weitere tats Feststellgen nicht notw sind u es keiner Ermittlg von Erfahrgswissen od Verkehrssitten bedarf (BGH NJW 98, 1219, NJW-RR 00, 894).

12    3) Die **Judikatur** zu §§ 133, 157 stellt auf den Einzelfall ab, betrifft aber auch Regelgen, die in der VertrPraxis immer wieder verwandt werden: — **Abfindungsklauseln:** Ob sie sich auch auf noch nicht geltd gemachte Anspr (Mängel) beziehen, ist Frage des Einzelfalls, s § 779 Rn 12, des Anspr s § 397 Rn 4. — Ob die vertragl Übernahme der Altlastenbeseitigung sich auch auf die Kosten der Feststellg der Altlasten erstreckt, ist Frage des Einzelfalls (s Brdbg OLG-NL 05, 266, verneind). Wer sich bei einem **Aufhebungsvertrag** auf eine Wirkg ex tunc beruft, trägt dafür die Beweislast (Düss DNotZ 06, 681). — Zum Begriff der **Bezugsfertigkeit** s BGH NJW-RR. 04, 166, der **Erschließungskosten** s Hamm NJW-RR 94, 339, Wilhelms DNotZ 04, 33. Verteilg nach dchgeführten Verträgen (BGH VersR. 07, 784). — Erkl, die den **Ehegatten** als Empfänger künft Leistgen bestimmen (VersVertr, und Zuwendgen), begünstigen iZw den im Ztpkt der Abgabe der Erkl mit dem Erklärden verheirateten Eheg (BGH VersR. 07, 784). — **Fälligkeitsklauseln** s § 271 Rn 4. — **Freistellungsvereinbarungen** verpfl idR nicht nur zur Erfüllg begründeter, sond auch zur Abwehr unbegründeter Anspr (BGH NJW 70, 1594, 83, 1729, 02, 2382). — Auslegg von **Freizeichnungsklauseln** u stillschw Haftgsfreistellg vgl § 276 Rn 36 ff. — Bei **Gewinnbeteiligungen** od ertragsähnlig Vergütgen ist es Frage des Einzelfalls, ob Einnahmen aus Subventionen mitzuberücksichtigen sind: Platzzuschüsse bei BühnenaufführgsVertr, ja (BGH 13, 115); Anpassgsbeihilfe bei Förderzins, nein (BGH LM (D) Nr 23). — **Grundstückskaufvertrag.** Bei einem Gewährleistgsausschluss wird eine Verpfl des Verkäufers zur Abtretg seiner Anspr gg den arglist Erstverkäufer vom BGH nur bejaht, wenn AnhaltsPkte dafür bestehen, dass der Verkäufer (Erstkäufer) nicht endgült entlastet werden sollte (BGH NJW 04, 1873, 97, 652, aA Klimke/Lehmann-Richter NJW 04, 3672). Hat der Käufer die mitübernommene Baugenehmigg nicht ausgenutzt, hat er keinen Anspr auf die den Verkäufer zurückgewährte Stellplatzablösesumme (BGH DNotZ 04, 705). Übernimmt GrdstKäufer Hyp, ist idR neben dem Nennbetrag der Darl auch ein Zuschlag auf den DarlBetrag (Agio) auf den Kaufpreis anzurechnen, zB Nennbetrag u Auszahlg 100%, bei Rückzahlg 105% (BGH DNotZ 70, 247). Unterschreitet die Wohnfläche die im Vertr veranschlagte um mehr als 10%, ist der Kaufpreis entspr zu mindern, die Minderg wird auch dann nicht gekürzt, wenn denn der Vertr bei Ändergen bis 10% eine Minderg entfällt (BGH DNotZ 00, 124). Beim Verkauf zur Abwendg der Enteigng besteht bei Aufg des Enteignungszwecks binnen 2 Jahren ab Kenntnis ein Anspr auf Rückübereignug (BGH 135, 92).

13    Die **Umsatzsteuer** (USt) ist ein rechtl unselbständ Teil des zu zahlenden Preises (BGH 58, 291/95, 60, 199/203, **103**, 284/87, 115, 47/50). Sie ist, wenn sich aus den Umst nichts and ergibt, in dem angebotenen Preis enthalten (BGH aaO, NJW 02, 2312, PaPkG 1 1). Das gilt auch, wenn der Verkäufer in seiner offengelegten Kalkulation keine USt angesetzt hat (BGH NJW 01, 2464). RA, Steuerberater u Architekten können aber USt zusätzl zu ihrem Honorar fordern (RVG VV 7008, StBGebV 15, 1, HOAI 9 I 1). Ist Pachthöhe vom Umsatz abhäng, ist iZw der Bruttoumsatz maßg (Hamm BB 78, 1282). Der bei Unabbringlichk der Fdg bestehde Anspr auf Erstattg der USt geht beim echten Factoring nicht auf den Factor über (BGH NJW-RR 97, 1052). Auch bei Angeboten an einen zum Vorsteuerabzug berecht Untern nimmt die hM an, dass die USt iZw im angebotenen Preis enthalten ist (BGH NJW 02, 2312 mwN). Das gilt insbes dann, wenn ein „Brutto"-Preis vereinbart worden ist (s KG MDR 99, 604). Es hat sich kein Handelsbrauch herausgebildet, dass Preisangebote u -Vereinbargen im Verkehr zw vorsteuerabzugsberecht Untern iZw „netto" zu verstehen sind (Düss NJW 76,

# E

 **Bundesministerium der Justiz**

**juris**

<u>Nichtamtliches Inhaltsverzeichnis</u>

## § 662 Vertragstypische Pflichten beim Auftrag

Durch die Annahme eines Auftrags verpflichtet sich der Beauftragte, ein ihm von dem Auftraggeber übertragenes Geschäft für diesen unentgeltlich zu besorgen.

<u>zum Seitenanfang</u>                    <u>Datenschutz</u>                    <u>Seite ausdrucken</u>

**F**

# Münchener Kommentar zum Bürgerlichen Gesetzbuch

Band 4
Schuldrecht · Besonderer Teil II

§§ 611–704

EFZG · TzBfG · KSchG

Redakteur

**Dr. Martin Henssler**

Professor an der Universität zu Köln

4. Auflage

Verlag C. H. Beck München 2005

## Die einzelnen Bände des Münchener Kommentars zum BGB

*Band 1* · Einleitung und Allgemeiner Teil
§§ 1–240 · AGB-Gesetz
Redakteur: Prof. Dr. Dr. h. c. Franz Jürgen Säcker

*Band 2* · Schuldrecht · Allgemeiner Teil
§§ 241–432 · FernAbsG
Redakteur: Richter am BGH Prof. Dr. Dr. h. c. Wolfgang Krüger

*Band 2 a* · Schuldrecht · Allgemeiner Teil
§§ 241–432
Redakteur: Richter am BGH Prof. Dr. Wolfgang Krüger

*Band 3* · Schuldrecht · Besonderer Teil I
§§ 433–610 · Finanzierungsleasing
HeizkostenV/Betriebskosten V · CISG
Redakteure: Prof. Dr. Wolfgang Krüger/Prof. Dr. Harm Peter Westermann

*Band 4* · Schuldrecht · Besonderer Teil II
§§ 611–704 · EFZG · TzBfG · KSchG
Redakteur: Prof. Dr. Martin Henssler

*Band 5* · Schuldrecht · Besonderer Teil III
§§ 705–853 · PartGG · ProdHftG
Redakteur: Prof. Dr. Dr. h. c. mult. Peter Ulmer

*Band 6* · Sachenrecht
§§ 854–1296 · WEG · ErbbauVO
SachenRBerG · SchuldRAndG
Redakteur Vors. Richter am BGH a. D. Dr. Manfred Eberhard Rinne

*Band 7* · Familienrecht I
§§ 1297–1588 · VAHRG · VAÜG · HausratsV
Redakteur: Prof. Dr. Kurt Rebmann

*Band 8* · Familienrecht II
§§ 1589–1921 · SGB VIII
Redakteur: Prof. Dr. Dieter Schwab

*Band 9* · Erbrecht
§§ 1922–2385 · §§ 27–35 BeurkG
Redakteur: Dr. Gerhard Schlichting

*Band 10* · EGBGB (Art. 1–46) · Internationales Privatrecht
Redakteur: Prof. Dr. Dr. h. c. Hans Jürgen Sonnenberger

*Band 11* · Internationales Handels- und Gesellschaftsrecht
EGBGB (Art. 50–245)
Redakteur: Prof. Dr. Dr. h. c. Hans Jürgen Sonnenberger

## Titel 12. Auftrag und Geschäftsbesorgungsvertrag

### Untertitel 1. Auftrag

**§ 662 Vertragstypische Pflichten beim Auftrag**

Durch die Annahme eines Auftrags verpflichtet sich der Beauftragte, ein ihm von dem Auftraggeber übertragenes Geschäft für diesen unentgeltlich zu besorgen.

Schrifttum: *Affeler,* Das Mandat im öffentlichen Recht, AöR 30 (1913), 538; *v. Bernuth,* Keine entsprechende Anwendbarkeit des § 664 BGB auf entgeltliche Geschäftsbesorgungsverträge, NJW 1952, 731; *Blankenak,* Der bei Treubrüchen im öffentlichen Dienst ... S. 105; *Canaris,* Rückabwicklung bei schadensersetzter Tätigkeit in fremdem Interesse, ... Zum Gesellschaftsanspruch gegenüber dem Treuhänder, JZ 1970, 245; *Dorn,* Arbeitsleistung und Aufwendungsersatz, JZ 1964, 93; *Frhr. v. Gahlenz,* Die Haftung der Banken bei Einschaltung Dritter, 1983; *Gehlen,* Vertragliche Haftungsbeschränkung in Geschäftsbesorgungs ... *Hadding,* Inhaltskontrolle im Rahmen der Geschäftsbesorgung, AcP 198 (1998), 457; *Heist/Schoß,* Informationsanspruch ...

#### Übersicht

|  | RdNr. |
| --- | --- |
| I. Allgemeines ................ | 1–8 |
| 1. Überblick ................ | 1 |
| 2. Begriff des Auftrags ........ | 2–4 |
| 3. Auftrag als unvollkommen zweiseitiger Vertrag ........ | 5 |
| 4. Form des Auftrags ........ | 6–8 |

---

§ 661 a   16–18

Abschnitt 8. Titel ... Auslobung

### VI. Einzelheiten

**16**  **1. Kollisionsrecht.** Gewinnmitteilungen wurden bisher häufig durch Unternehmen im Ausland, namentlich in den Benelux-Staaten versendet, so dass die Frage nach der Zuständigkeit deutscher Gerichte und der Anwendbarkeit deutschen Rechts zu beantworten war, wenn in Deutschland ansässige Verbraucher derartige Zusendungen erhielten. Nachdem die Frage schon in zahlreichen veröffentlichten Instanzenurteile weit überwiegend bejaht worden war, hat der BGH nunmehr diese Auffassung im Ergebnis gebilligt und mit überzeugender Begründung klargestellt, dass in solchen Fällen die internationale Zuständigkeit deutscher Gerichte entweder aus Art. 13f. EuGVÜ (Verbraucherschen) oder aus Art. 5 Nr. 3 EuGVÜ (unerlaubte Handlungen) begründet ist.

**17**  **2. Verfassungsmäßigkeit des § 241 a.** Ähnlich wie bei der neuen Regelung des § 241 a (Lieferung unbestellter Waren) wurde auch die Verfassungsmäßigkeit von § 661 a bezweifelt und sogar verneint. Nach den Überlegungen insbesondere von *Chr. Schmidt* verstößt die Vorschrift gegen das Schuldprinzip sowie gegen das Verbot der Doppelbestrafung; sie genügt ferner nicht dem Bestimmtheitsgrundsatz. Der BGH hat sich dieser Kritik im Ergebnis mit Recht nicht angeschlossen und mit eingehender Begründung die Vorschrift für nicht verfassungswidrig erklärt. § 661 a ist demnach ein Beleg für eine zwar rechtspolitisch abziehbare Über- oder Fehlreaktion des Gesetzgebers, die aber die Grenze zur Verfassungswidrigkeit nicht überschreitet.

### VII. Beweislast

**18**  Derjenige, der den ein IV 1–4 erläuterten Voraussetzungen der Vorschrift darzutun und zu beweisen. Für den Fall, dass ein Vertreterschaft in Betracht kommt, sind die in § 164 RdNr. 139 ff. dargelegten Regelungen zu beachten und hier insbesondere der Grundsatz, dass derjenige, der sich auf ein gültiges Vertreterschaft beruft, die Beweislast für das Vorliegen einer Vertretungsmacht trägt.

2542                                                        2543

Seiter

§ 662  1-3    Abschnitt 8. Titel 12. Auftrag und Geschäftsbesorgungvertrag

|  | RdNr. |
|---|---|
| II. Geschäftsbesorgung in § 662 und § 675 | |
| 1. Allgemeines | 9-24 |
| a) Einführung | 9, 10 |
| b) Geschäftsbesorgung nach § 675 | 11-14 |
| c) Zusammenfassung | 16, 17 |
| 2. Einzelheiten | 18-24 |
| a) Umfang der Geschäftsbesorgung | 18 |
| b) Handeln des Beauftragten im eigenen oder fremden Namen | 19 |
| c) Erfolgsbezug positiver Tun | 20 |
| d) Selbständigkeit des Beauftragten | 21 |
| e) Fremdcharakter der Geschäftsbesorgung | 22-24 |
| III. Unentgeltlichkeit der Geschäftsbesorgung | 25-32 |
| 1. Allgemeines | 25 |
| 2. Bedeutung, Abgrenzung zu Anerkennung, Belohnung | 26-28 |
| 3. Entgeltvereinbarung nach Vertragsschluss | 29 |
| 4. Vereinbarung über Aufwendungen | 30 |
| 5. Zuwendung als Schenkung | 31 |
| 6. Auftrag und Schenkung | 32 |
| IV. Rechtsstellung des Beauftragten | 33-41 |
| 1. Hauptpflicht (§ 662) | 33-34 |
| b) Nebenpflichten nach Auftragsrecht | 35-40b |
| c) Abweichen des Beauftragten von Vertragsanweisungen | 41 |
| 42 |

|  | RdNr. |
|---|---|
| 2. Rechte des Beauftragten | 43, 44 |
| a) Anspruch auf Durchführung der Geschäftsbesorgung (§ 662) | 43 |
| b) Weitere Bezüge nach Auftragsrecht | 44 |
| V. Rechtsstellung des Auftraggebers | 45-50 |
| a) Pflichten des Auftraggebers | 45-48a |
| a) Hauptpflichten | 45 |
| b) Nebenpflichten | 46-48a |
| 2. Rechte des Auftraggebers | 49, 50 |
| VI. Haftungsmaßstäbe | 51-57 |
| 1. Haftung des Auftraggebers | 52 |
| 2. Haftung des Beauftragten | 53-57 |
| VII. Abgrenzung zu anderen unentgeltlichen Verträgen | 58 |
| VIII. Abgrenzung zu Gefälligkeiten | 59-61 |
| 1. Allgemeines | 59, 60 |
| 2. Einzelfälle | 61 |
| IX. Verhältnis von Auftrag und Vollmacht | 62 |
| X. Beendigung des Auftrags | 63 |
| XI. Entsprechende Anwendung der §§ 662 ff. | 64-69 |
| 1. Ausdrückliche gesetzliche Anordnung | 64-67 |
| 2. Auftrag und öffentliches Recht. Allgemeines | 68, 69 |

## I. Allgemeines

**1. Überblick.** Die Vorschrift bezeichnet die Parteien des Auftragsverhältnisses (Auftraggeber, Beauftragter), bestimmt die **Hauptpflicht** des Beauftragten (unentgeltliche Besorgung eines Geschäfts) und stellt klar, dass das Auftragsverhältnis nur einverständlich zustande kommen kann ("Annahme eines Auftrags"). Dazu ist ein entsprechender Vertrag erforderlich.

**2. Begriff des Auftrags.** Unter dem Begriff "Auftrag" versteht das BGB den Vertrag, durch den jemand für einen anderen unentgeltlich ein Geschäft besorgt. Demgegenüber wird behauptet,[1] das Gesetz begreife darunter auch das von dem Auftraggeber ausgehende Angebot, vgl. § 662, 663. Doch ist die dort gebrauchte Wendung "Annahme des Auftrags" nicht technisch gemeint. Auch dort ist unter "Auftrag" das gesamte Rechtsverhältnis zu verstehen, das nur einverständlich zustande kommen kann. Es handelt sich um ein sprachliche Ausdrucksform, die das Substantiv "Auftrag" erlaubt (ebenso § 765 Abs. 2: "Übernahme der Bürgschaft"), die aber bei der Erklärung der meisten übrigen Vertragstypen nicht angängig ist ("Annahme des Kaufvertrags").

**3.** Im Gegensatz zum BGB versteht der allgemeine Geschäftsverkehr den Begriff "Auftrag" meist iS einer **einseitigen Willensäußerung,** die die Aufforderung enthält, für einen anderen tätig zu werden: Als "Auftrag" werden häufig Befehle und Weisungen innerhalb eines bereits bestehenden Rechtsverhältnisses (zB eines Dienstvertrags) bezeichnet, ferner die Bitte, jemanden entgeltlich eine Gefälligkeit zu erweisen, sei sie nun rein gesellschaftlicher oder rechtlicher Art;[2] in letzteren Falle kommen neben Auftrag andere Vertrags-

[1] Planck/Lobe Vor § 662 Anm. 1; Staudinger/Wittmann, in Soergel/Baselius Vor § 662 RdNr. 1 Fn. 2; Erman/Ehmann Vor § 662 RdNr. 1.

[2] Vgl. RdNr. 61 ff.

2544    Seiler

---

typen in Betracht, die eine Tätigkeit für einen anderen zum Gegenstand haben.[3] Auch für Anträge zum Abschluss entgeltlicher Verträge wie Kauf-, Werk-, Makler- oder Geschäftsbesorgungsvertrag (§ 675) ist im Geschäftsverkehr die Bezeichnung "Auftrag" oder "Auftragserteilung" üblich. – In allen Fällen bedarf es jeweils der Prüfung, welche rechtliche Bedeutung dem von den Parteien gebrauchten Ausdruck zukommt.

Außerhalb des BGB wird der Begriff "Auftrag" ebenfalls mehrdeutig verwendet, vgl. zB [4] die §§ 168 Abs. 1 S. 3, 193 Abs. 1, 1194 Abs. 1, 753, 755 ZPO, §§ 115, 117 InsO, §§ 6, 7, Abs. 2, 8 Abs. 1, 15 Abs. 4 und 5, 28 Abs. 2, 60 Abs. 1, 61 RVG, § 3 GrKostG; auch hier muss im Einzelfall die genaue Bedeutung ermittelt werden.

**3. Auftrag als unvollkommen zweiseitiger Vertrag.** Der Auftrag ist wegen seiner [5] Unentgeltlichkeit ein unvollkommen zweiseitig verpflichtender,[6] kein gegenseitiger **Vertrag:** der Pflicht zur Geschäftsbesorgung steht keine Gegenleistung des Auftraggebers gegenüber. Die Ansprüche des Beauftragten auf Vorschuss oder Ersatz von Aufwendungen nach den §§ 669, 670 sind kein Entgelt für die Geschäftsbesorgung, um den vollen der Beauftragte den Auftrag übernommen hat (daher nur zeitweilig verpflichtend); sie sollen lediglich verhindern, dass der Beauftragte mit Vermögensopfern belastet wird. Sie entstehen außerdem nicht in jedem Falle, weil nicht jede Geschäftsbesorgung Aufwendungen erforderlich macht und nicht jeder Beauftragte Vorschuss verlangt (daher unvollkommen zweiseitig). – Damit sind die §§ 320 ff. unanwendbar.[7]

**4. Form des Auftrags.** Eine Formvorschrift für den Abschluss des Auftragsvertrags [6] enthalten die §§ 662 ff. nicht. Die Formbedürftigkeit kann sich aber aus allgemeinen Vorschriften ergeben. – In Betracht kommt Formzwang nach § 311b, wenn der Beauftragte wegen eines Grundstücks tätig werden soll. Die Frage, ob ein solcher Auftrag der notariellen Beurkundung bedarf, lässt sich nicht generell beantworten. Entscheidend ist der Vertragsinhalt. Enthält dieser unmittelbar oder mittelbar einen durch den Auftrag entstehende Verpflichtung zur Übertragung oder zum Erwerb eines Grundstücks, ist der Auftrag beurkundungspflichtig. Einzelheiten in § 311b RdNr. 22 (Band 2A). – Zur Frage, ob Formzwang für die Pflicht des Beauftragten nach § 667 besteht, Grundstücksübertragung zu sein, vgl. Auftraggeber zu übertragen, vgl. § 667 RdNr. 2, 11.

Formbedürftigkeit nach § 518 Abs. 1 besteht nicht, da in der Eingehung der Verpflich- [7] tung zu einer Geschäftsbesorgung keine Schenkung liegt.[7] – Im Inhalt des Auftrags geht die Verpflichtung zur Übernahme einer Bürgschaft durch den Beauftragten für den Auftraggeber als Hauptschuldner, bedarf die Erklärung des Beauftragten, er verpflichte sich zur Übernahme einer Bürgschaft, analog § 766 S. 1 der Schriftform, wenn durch den Auftrag eine endgültige Bindung zum Abschluss der Bürgschaft geschaffen wird. Dies ist wegen des jederzeitigen Kündigungsrechts nach § 671 Abs. 1 grundsätzlich zu verneinen,[8] aber zu bejahen, falls die Kündigungsbefugnis ausgeschlossen ist (vgl. § 671 RdNr. 5, 6 und im Fall des § 675).[9]

Ein Auftrag, durch den jemand einen anderen damit betraut, einen Anspruch auf Abtre- [8] tung eines Geschäftsanteils an einer GmbH (§ 14 GmbHG) im eigenen Namen geltend zu machen und den Anteil sodann für den Auftraggeber im eigenen Namen zu verwalten, bedarf nicht der Form des § 15 Abs. 4 S. 1 GmbHG; die Verpflichtung des Beauftragten, den Anteil seinerseits auf den Auftraggeber zu übertragen, beruht nicht (unmittelbar) auf einer Vereinbarung, wie die Vorschrift dies voraussetzt, sondern sie entsteht kraft des § 667.[10]

[3] Vgl. RdNr. 9 ff.
[4] Vgl. dazu RdNr. 25 ff.
[5] Vgl. RG LZ 1924 Sp. 587; Jauernig/Mansel RdNr. 2; vgl. BGHZ 15, 102, 105 = NJW 1954, 1885; Staudinger/Wittmann Vor § 662 RdNr. 2; Soergel/Beuthien Vor § 662 RdNr. 5.

[6] Vgl. RdNr. 60.
[7] Im Ergebnis ebenso RG SeuffA 86 Nr. 197 (für den Fall der Vollmacht).
[8] Für Form nach § 766 S. 1 ohne die Einschränkung im Text Medicus RdNr. 373.
[9] Vgl. BGHZ 19, 69, 70 = NJW 1956, 58 m. weit. Nachw.

Seiler    2545

## II. Geschäftsbesorgung in § 662 und § 675

**9**  **1. Allgemeines. a) Einführung.** Nach § 662 muss der Beauftragte für die Auftraggeber ein Geschäft besorgen; Gegenstand des Auftragsvertrags ist also die Tätigkeit für einen anderen. Leistungen, die in einer Tätigkeit des Schuldners bestehen, kennt das BGB auch sonst: im Dienst-, Werk-, Makler- und Verwaltungsvertrag sowie in den Vorschriften über die Geschäftsführung ohne Auftrag. Makler- und Verwaltungsvertrag betreffen derart spezielle Tätigkeiten (vgl. die §§ 652 Abs. 1, 1, 656 Abs. 1, 1, 688), dass die Abgrenzung zum Auftragsvertrag keine Schwierigkeiten macht; die Geschäftsbesorgung ("Geschäftsführung") nach den §§ 677 ff unterscheidet sich von derjenigen nach Auftragsrecht durch den fehlenden Vertragsschluss (vgl. § 677).

**10**  Somit verbinden **Auftrags-, Dienst- und Werkvertrag**, die auseinanderzuhalten sind. Das Merkmal der **Unentgeltlichkeit**, das sich zunächst anbietet, reicht entgegen der hM (vgl. RdNr. 25) offenbar nicht aus. Denn diese Unterscheidung wird durch § 675 wieder aufgehoben: Danach sind auf einen Dienst- oder Werkvertrag, "der eine Geschäftsbesorgung zum Gegenstand hat", Teile des Auftragsrechts anwendbar. Demnach gibt es Dienst- und Werkleistungen, die keine Geschäftsbesorgung sind. Aus § 675 muss offenbar insoweit der Schluss gezogen werden, dass es einen bes. Begriff der Geschäftsbesorgung gibt, der zu bestimmen ist, um den Anwendungsbereich von Dienst- und Werkvertrag einerseits und Auftragsrecht andererseits (direkt oder über § 675) ermitteln zu können. Was das Gesetz unter "Geschäftsbesorgung" versteht, muss daher von § 675 her untersucht werden, weil diese Vorschrift den in § 662 zunächst unproblematisch erscheinenden Begriff in Frage stellt.

**11**  **b) Geschäftsbesorgung nach § 675.** Da § 675 zwischen Geschäftsbesorgung einerseits und Dienst- und Werkleistung andererseits unterscheidet, suchen Rspr. und hL in begrifflicher Abgrenzung ihrer Lösung. Diese ist kontrovers, während im Ergebnis Einigkeit besteht: Welche konkreten Fälle zu § 675 gehören, wird im Wesentlichen einheitlich beurteilt.

**12**  Nach hM gibt es zwei **Begriffe** von Geschäftsbesorgung: Unter § 662 fällt jede **Tätigkeit für einen anderen**; § 675 könne dagegen nicht jede fremdnützige Tätigkeit betreffen, weil die Vorschrift dann auch jede Dienst- oder Werkleistung erfassen würde, obwohl sie doch nur für einige davon gelten soll ("Auf einen Dienstvertrag ..., der eine Geschäftsbesorgung zum Gegenstand hat"). Der "eigentliche" Begriff der Geschäftsbesorgung des § 675 müsse daher enger sein; er wird dann als **selbständige Tätigkeit wirtschaftlicher Art** ... Nach hL ist dagegen der Begriff "Geschäftsbesorgung" in beiden Vorschriften gleich. § 675 bringe nur zum Ausdruck, dass die Auftragsregeln dann heranzuziehen sind, wo die dort getroffenen Regeln zu einem angemessenen Ergebnis führen; es sei deshalb wohl das Auftragsrecht dann anzuwenden, wenn die Treuhindung die mit der Tätigkeit Betrauten für die Tätigkeit selbst bestimmend ist.

**13**  **Stellungnahme.** Der Versuch der hM, den Geltungsbereich des Auftragsrechts vom Begriff der Geschäftsbesorgung her zu bestimmen, erweist sich als nicht durchführbar. Der Begriff ist so weit, dass auch eine Definition keine klaren Umgrenzungen bietet. Die genannten Begriffsbestimmungen sind demzufolge in Wahrheit nicht die Ergebnis einer Interpretation des Begriffs "Geschäftsbesorgung", sondern nur der Versuch, in abstrakter Form die Art von Tätigkeiten wiederzugeben, für die die Heranziehung der Auftragsregeln als passend empfunden wird. Außerdem ist die von der hM zu § 675 vertretene Begriffsbestimmung nicht geeignet, eine klare und in den Ergebnissen überzeugende Grenzlinie zu reinen Dienst- und Werkverträgen zu ziehen: Selbständigkeit lässt sich als gegebene Tätigkeit liegt auch beim Werkunternehmer vor, beim Dienstverpflichteten, kann sie gegeben sein (Beispiel: Arzt). Ferner können Leistungen des Werkunternehmers (Beispiel: Reparaturen von Handwerkern) aus den Dienstverpflichteten (Beispiel: Hausbälzeln) wirtschaftlicher Art sein. Die – zu Recht – als Leistungen nach § 675 anerkannten Tätigkeiten wie die der Rechtsanwälte, Steuerberater, Gutachter, Vermögensverwalter oder der Banken, d aus anderen Gründen nach der Vorschrift zu behandeln: Hier liegen regelmäßig Umstände vor, bei denen ein Bedürfnis nach den im Auftragsrecht geregelten Rechtsfolgen besteht. Es werden Aufwendungen gemacht, die üblicherweise nicht schon beim Eingriff berücksichtigt sind. Meist werden Unterlagen überlassen, die später wieder zurückzugeben sind. Auch sind idR. Auskünfte zu geben und sie Rechenschaft abzulegen. Bei den nach allgM nicht unter § 675 fallenden Tätigkeiten wie denen des Lehrers oder des Arztes werden die genannten Umstände häufig nicht vorliegen, so dass sich eine Heranziehung der Auftragsrechtsfolgen aus diesem Grunde erübrigt. Im Allgemeinen wird hier aber – nach den festgestellten Ausgangspunkt verständlich – zu starr verfahren. Es ist nicht einzubar, warum Lehrer oder Ärzte zB nicht verpflichtet sein sollen, Auskünfte zu erteilen. In den Bereichen, in denen nach hM eine Geschäftsbesorgung iSd. § 675 nicht vorliegt, müssen zuweilen Auftragsvorschriften herangezogen werden, um zu einem sachgerechten Ergebnis zu gelangen. – Danach ist eine klare Abgrenzung zwischen Tätigkeiten als Dienst- oder Werkleistungen einerseits und Geschäftsbesorgung andererseits weder durchführbar noch notwendig.

**14**  Auch aus der Entstehungsgeschichte der §§ 662, 675 ergibt sich, dass es dem Gesetzgeber lediglich nicht auf begriffliche Unterscheidungen ankam, sondern darauf, dass das Auftragsrecht da Anwendung finden, wo die Interessenlage dies verlangt. Daher muss die "Geschäftsbesorgung" in § 675 als **abgekürzte Ausdrucksweise** für ein Rechtsverhältnis verstanden werden, das die beiden Auftragsgeleisten **geleistet Rechtsfolgen** notwendig macht, weil sie nach den Rechtsregeln über die ... des Rechtsverhältnisses zu einem sachgerechten Ergebnis führen. Diese besonders, weil § 662 abstrahierenden Begriff der Geschäftsbesorgung, ergänt §w § 675 gibt es also nicht. – Methodisch entspricht dieser Gedanken der allgm. Untersuchungen zur typologischen Rechtsfindung im besonderen Vertragsrecht das BGB, wonach im Rahmen einer typologischen Gesamtwürdigung die Frage nach der Angemessenheit der Rechtsfolgen entscheidende Bedeutung zukommt.

**15**  **c) Geschäftsbesorgung nach § 662** ist nach überwiegend vertretener Ansicht jede **Tätigkeit**, die unter das mandatum zur Tätigkeiten höherer Art fallen, abgeleitet und den weiteren gemeinrechtlichen Mandatsbegriff zugrunde gelegt, dazu gehören auch rein ...

## § 662  16–18    Abschnitt 8. Titel 12. Auftrag und Geschäftsbesorgungsvertrag

faktische Handlungen. Nach der abweichenden Ansicht von Enter[27] sind faktische Handlungen nicht nach Auftragsrecht zu behandeln, weil es Kennzeichen eines echten Geschäftsbesorgung sei, dass der Beauftragte entspr. seiner treuhänderischen Stellung eigene fremdnützige Überlegungen anstelle. Ähnlich sollen nach Larenz[28] reine Handreichungen ausscheiden. Indessen sind solche Einschränkungen nicht überzeugend. Die von Enter (zu Recht) betonte, dem gewährten Vertrauen folgende Treuebindung ist ihrer Intensität nach keine feste Größe. Dass sie überhaupt bestehe, ist aus dem Umstand ableitbar, dass der Betreffende eine fremde Angelegenheit übernimmt. Das Maß der zu wahrenden Treue hängt dann von der Art der übernommenen Tätigkeit ab. Wer etwa die Korrespondenz eines anderen führt, ist in viel stärkerem Maße mit dessen persönlichen Verhältnissen vertraut und dengemäß zu größerer Loyalität verpflichtet als etwa derjenige, der während einer zweiwöchigen Reise des Nachbarn dessen Gartenblumen pflegt, ohne dass dieser von jeder Treuepflicht entbunden wäre. — Entsprechendes gilt für das Maß an Selbständigkeit; hier sind allein die getroffene Vereinbarung, später erteilte Weisungen und der Gegenstand des Auftrages bestimmend. — Schließlich sind auch bei unbedeutenden Tätigkeiten die im Auftragsrecht geregelten Rechtsfolgen nicht verzichtbar, zB wenn jemand einem anderen bei mechanischen Verrichtungen zur Hand geht und Gerät erlangt.[30] So wären unbedeutende faktische Tätigkeiten, wollte man Auftragsrecht für sie nicht heranziehen, ungeregelt, und man wäre ohnehin zu einer Analogie gezwungen.[30]

16   **d) Zusammenfassung.** Ein Auftragsvertrag iSd § 662 kann über **alle unentgeltlichen Tätigkeiten** geschlossen werden, sie können rechtsgeschäftlicher, rechtsgeschäftsähnlicher oder faktischer, wirtschaftlicher oder ideeller Art sein. Auch die Erteilung von Rat oder Empfehlung kann Gegenstand einer Geschäftsbesorgung sein, sofern sie rechtlich verbindlich vereinbart ist. Um eine Tätigkeit von einiger Bedeutung braucht es sich nicht zu handeln; auch ein bestimmter Spielraum für eigene Initiativen des Ausführenden ist nicht erforderlich, so dass einfache Verrichtungen (Handreichungen) gleichermaßen unter die §§ 662 ff. fallen.

17   Das Auftragsrecht schreibt zwar vor, dass die Tätigkeit für einen anderen unentgeltlich übernommen wird. Nach § 675 ist das Auftragsrecht zum größten Teil aber auch auf entgeltliche Tätigkeiten anwendbar. Wann dies der Fall ist, richtet sich nach der Art der übernommenen Verrichtung und den Umständen des Einzelfalls. Zunächst sind die Vorschriften über Dienst- und Werkvertrag heranzuziehen; danach muss entschieden werden, welche der beiden Vertragsarten gegeben ist. Soweit die dort getroffenen Regelungen nicht ausreichen, um zu einem sachgerechten Ausgleich unter den Parteien zu kommen, ist Auftragsrecht heranzuziehen. Es gibt einige typische Vertragsanbahnungen, bei denen das regelmäßig der Fall ist.[31] In stärkerem Maße als bei anderen Vertragsarten ist der Geltungsbereich des Auftragsrechts im Bereich der entgeltlichen Tätigkeiten demnach von den Einzelheiten zu bestimmen.

18   **2. Einzelheiten. a) Umfang der Geschäftsbesorgung.** Für den Umfang der zu erbringenden Leistung des Beauftragten ist in erster Linie die Vereinbarung der Beteiligten entscheidend. Es kann sich um eine einmalige Tätigkeit handeln oder um einen größeren Kreis (Komplex) von zusammenhängenden Angelegenheiten.[32] Beispiel hierfür ist die (meist entgeltliche) Verwaltung fremden Vermögens.[33] Die Parteien können vereinbaren, dass die Leistung des Beauftragten zunächst nur dem Rahmen nach abgesteckt[34] und durch spätere Weisungen des Auftraggebers (§ 665) präzisiert wird; sie kann ferner schon in allen Einzel-

27 BT (4. Aufl.) § 82 I 1.
28 II § 56 I.
29 Vgl. Planck/Lobe § 675 Anm. 2.
30 Emmerich/Lehmann § 160 I.3 x. Ormann Vor § 665 Anm. 2x; Erman/Ehmann Vor § 665 Anm. 2x.
31 Vgl. § 675 RdNr. 26ff.

32 Beispiel: BGH BB 1969, 1154; RGZ 80, 129; RG Recht 1917 Nr. 1253; RG BayZ 1919, 12, 13; KG Recht 1913 Nr. 1570.
33 Beispiel RGZ 65, 17, 18: Jemand gestattet einem anderen, in seinem an einer „Zuverlässigkeitsfahrt" teilnehmenden Kfz mitzufahren.
34 Beispiel: RG Gruchot 67 (1917), 181; KG Recht 1913 Nr. 1253; RG Recht 1913 Nr. 1570.

---

## Vertragstypische Pflichten beim Auftrag    19–22  § 662

heiten von vornherein festgelegt werden; sie kann sich im Zuge der Auftragsdurchführung ändern,[35] sie kann auch nach dem Erklärungstext zu beurteilen sein, doch aus dem Verhalten des Beauftragten aus der Sicht des Auftraggebers hatte.[36] Zur Abgrenzung zwischen Weisungen iS d § 665 und Erklärungen im Rahmen des Vertragsschlusses s. § 665 RdNr. 9.

19   **b) Handeln des Beauftragten im eigenen oder fremden Namen.** Der Beauftragte kann im eigenen Namen oder im Namen des Auftraggebers handeln sollen; die Vereinbarung hierüber ist Inhalt des Auftragsvertrages, wenn auch Vollmacht und Auftragsvertrag in ihrer Wirksamkeit grundsätzlich voneinander unabhängig sind (Außen-, Innenverhältnis). Ist Handeln im Namen des Auftraggebers vereinbart und erteilt die Auftraggeber die erforderliche Vollmacht nicht, fehlt es an einer Mitwirkungshandlung des Auftraggebers.

20   **c) Erforderlichkeit positiven Tuns.** Die zu besorgende Angelegenheit muss in einer Tätigkeit des Beauftragten bestehen; das Unterlassen oder Dulden[37] kann nicht Gegenstand eines Auftragsvertrages sein.[38] Das folgt (sprachlich) daraus, dass ein „Geschäft" zu „besorgen" ist (§ 662); auch würden die Auftragsregeln, insbes. die §§ 667, 670, für Unterlassungen und Duldungen nicht passen.

21   **d) Selbständigkeit des Beauftragten.** Der Grad an Selbständigkeit des Beauftragten ist unterschiedlich. Maßgebend sind die Abreden der Parteien (§ 662), später gegebene Weisungen (§ 665), der Auftragsgegenstand und – damit verbunden – sein Sinn und Zweck. Je genauer die erklärten Vorstellungen des Auftraggebers sind, desto enger ist der Spielraum für den Beauftragten. Während der Dauer des Auftragsverhältnisses kann der Auftraggeber den Spielraum sowohl erweitern als auch eingrenzen, solange er mit seinen Weisungen im Rahmen des vereinbarten Auftragsgegenstandes verbleibt.[39] – Keineswegs ist ein bestimmtes Maß an Selbständigkeit Voraussetzung eines Auftragsvertrages.[40] Allerdings ist vielfach im Bereiche der entgeltlichen Tätigkeiten für einen anderen nach § 675, die den bedeutsameren Teil des Auftragsrechts bilden, schon vom Gegenstand her eine gewisse Selbständigkeit des Beauftragten gegeben (Rechts- und Steuerberatung, Prozessvertretung und Vermögensverwaltung). In solchen Fällen kann die Entscheidungsfreiheit des Beauftragten sehr weit reichen. Es kann daran aber auch völlig fehlen, wenn der Gegenstand des Auftrags eng umrissen ist (zB Kauf eines bestimmten Buches).

22   **e) Fremdcharakter der Geschäftsbesorgung.** Nach § 662 hat der Beauftragte das ihm von dem Auftraggeber „übertragene" Geschäft „für diesen" zu besorgen. Daraus folgt, dass es sich um eine Angelegenheit des Auftraggebers handeln muss (nicht um gratis), an deren Wahrnehmung er Interesse hat und die er deshalb auch hätte selbst vornehmen können. Die Ergebnisse der Geschäftsbesorgung müssen dem Auftraggeber also zufallen sollen. Dieser Fremdcharakter der Tätigkeit ergibt sich im Auftragsrecht ohne weiteres daraus, dass die Parteien das Geschäft auf Grund des Vertrages als ein Geschäft des Auftraggebers behandeln wollen, der Auftraggeber demnach die Vornahme der Tätigkeit wünscht und deshalb einen Vertrag darüber schließt. Das dengegenüber zur Bestimmung des Fremdcharakters die bei der Geschäftsführung ohne Auftrag üblichen Gesichtspunkte (objektiv, subjektiv fremde, neutrale Geschäfte) herangezogen werden,[41] ist nicht sachgerecht; deshalb muss gesondert untersucht werden, ob das Geschäft als Auftrag eines anderen oder die Angelegenheit des

35 Beispiel in BGH WM 1983, 837, 839.
36 Beispiel in BGH LM Nr. 23 = NJW 1980, 1743.

37 Vgl. § 665 RdNr. 12.
38 Ebenso Staudinger/Wittmann Vor § 662 RdNr. 10; Soergel/Beuthien RdNr. 8; Erman/Ehmann Vor § 662 RdNr. 85 anders Larenz II § 56 I; Esser BT (4. Aufl.) § 82 I 1.
39 Ebenso Staudinger/Wittmann Vor § 662 Anm. 3b.
40 Ebenso Staudinger/Wittmann Vor § 662 RdNr. 10; Soergel/Beuthien RdNr. 8; Erman/Ehmann Vor § 662 Anm. 3b.
41 Vgl. Ormann Vor § 662 Anm. 3b.

G

# Münchener Kommentar
# zum Bürgerlichen Gesetzbuch

Band 4

Schuldrecht · Besonderer Teil II

§§ 611–704

EFZG · TzBfG · KSchG

Redakteur

**Dr. Martin Henssler**
Professor an der Universität zu Köln

4. Auflage



Verlag C. H. Beck München 2005

---

## Die einzelnen Bände
## des Münchener Kommentars zum BGB

*Band 1: Einleitung und Allgemeiner Teil*
§§ 1–240 · AGB-Gesetz
Redakteur: Prof. Dr. Dr. h. c. Franz Jürgen Säcker

*Band 1 a: Allgemeiner Teil (Auszug)*
§§ 80, 81, 105 a, 126–127, 194–218, ProstG
Redakteur: Prof. Dr. Dr. h. c. Franz Jürgen Säcker

*Band 2: Schuldrecht · Allgemeiner Teil*
§§ 241–432 · FernAbsG
Redakteur: Richter am BGH Prof. Dr. Wolfgang Krüger

*Band 2 a: Schuldrecht · Allgemeiner Teil*
§§ 241–432
Redakteur: Richter am BGH Prof. Dr. Wolfgang Krüger

*Band 3: Schuldrecht · Besonderer Teil I*
§§ 433–610 · Finanzierungsleasing
HeizkostenV · BetriebskostenV · CISG
Redakteure: Prof. Dr. Wolfgang Krüger/Prof. Dr. Harm Peter Westermann

*Band 4: Schuldrecht · Besonderer Teil II*
§§ 611–704 · EFZG · TzBfG · KSchG
Redakteur: Prof. Dr. Martin Henssler

*Band 5: Schuldrecht · Besonderer Teil III*
§§ 705–853 · PartGG · ProdHaftG
Redakteur: Prof. Dr. Dr. h. c. mult. Peter Ulmer

*Band 6: Sachenrecht*
§§ 854–1296 · WEG · ErbbauVO
SachenRBerG · SchuldRÄndG
Redakteur: Vors. Richter am BGH a. D. Dr. Manfred Eberhard Rinne

*Band 7: Familienrecht I*
§§ 1297–1588 · VAHRG · VAÜG · HausratsV
Redakteur: Prof. Dr. Kurt Rebmann

*Band 8: Familienrecht II*
§§ 1589–1921 · SGB VIII
Redakteur: Prof. Dr. Dieter Schwab

*Band 9: Erbrecht*
§§ 1922–2385 · §§ 27–35 BeurkG
Redakteur: Dr. Gerhard Schlichting

*Band 10: EGBGB (Art. 1–46) · Internationales Privatrecht*
Redakteur: Prof. Dr. Dr. h. c. Hans Jürgen Sonnenberger

*Band 11: Internationales Handels- und Gesellschaftsrecht*
EGBGB (Art. 50–245)
Redakteur: Prof. Dr. Dr. h. c. Hans Jürgen Sonnenberger

## § 671    Abschnitt 8. Titel 12. Auftrag und Geschäftsbesorgungsvertrag

24  Die arbeitsgerichtliche Praxis wendet § 670 im Arbeitsverhältnis in sehr freier Analogie (s. RdNr. 17) zugunsten sowohl des Arbeitgebers als auch des Arbeitnehmers an. Die Vorschrift wird damit zur Rechtsgrundlage für die Erstattung von Auslagen und Nebenkosten, die nach Treu und Glauben der jeweils andere Teil zu tragen hat. Eine offene Berufung auf nebenvertragliche Pflichten oder § 242 wäre dogmatisch übertragender. Beispiele: Der Arbeitgeber hat Anspruch auf Erstattung von Lohnsteuer, die vom Arbeitnehmer nicht einbehalten, später aber vom Finanzamt nachgefordert worden ist.[74] Entspr. gilt für die irrtümliche Auszahlung zu hoher Bezüge.[75] – Der Arbeitnehmer/Bewerber hat Anspruch auf Erstattung von Vorstellungskosten[76] und Umzugskosten[77] sowie auf Ersatz bestimmter im Zusammenhang mit dem Arbeitsverhältnis entstandener Sachschäden.[78]

25  Zur Anwendung im öffentlichen Recht s. § 662 RdNr. 68f. u. Vor § 677 Rd-Nr. 23ff.

## § 671  Widerruf, Kündigung

(1) Der Auftrag kann von dem Auftraggeber jederzeit widerrufen, von dem Beauftragten jederzeit gekündigt werden.

(2) [1]Der Beauftragte darf nur in der Art kündigen, dass der Auftraggeber für die Besorgung des Geschäfts anderweit Fürsorge treffen kann, es sei denn, dass ein wichtiger Grund für die unzeitige Kündigung vorliegt. [2]Kündigt er ohne solchen Grund zur Unzeit, so hat er dem Auftraggeber den daraus entstehenden Schaden zu ersetzen.

(3) Liegt ein wichtiger Grund vor, so ist der Beauftragte zur Kündigung auch dann berechtigt, wenn er auf das Kündigungsrecht verzichtet hat.

### Übersicht

|  | RdNr. |
|---|---|
| I. Normzweck | 1, 2 |
| II. Widerruf und Kündigung des Auftrags (§ 671 Abs. 1) |  |
| 1. Rechtsnatur | 3 |
| 2. Bezugung | 3–11 |
| 3. Verzicht | 4 |
| a) Verzicht des Beauftragten | 5–8 |
| b) Verzicht des Auftraggebers | 6 |
| c) Unwirksamkeit nach allgemeinen Vorschriften | 7 |
| 4. Rechtsfolgen | 8 |
| 5. Widerrufsrecht bei mehreren Auftraggebern | 9 |
| III. Kündigung zur Unzeit (§ 671 Abs. 2) | 10, 11 |
| 1. Begriff | 12 |
| 2. Rechtsfolgen | 13 |
| IV. Wichtiger Grund zur Kündigung (§ 671 Abs. 1 und 3) | 14 |
| V. Entsprechende Anwendung des § 671 | 15 |

### I. Normzweck

1  Die Vorschrift nennt zwei bes. Gründe, die außer den allgemeinen Erlöschensgründen (Erfüllung, Vereinbarung, Unmöglichkeit usw.) den Auftrag beenden können. Das Auftragsverhältnis kann von beiden Vertragspartnern jederzeit durch einseitige Erklärung mit Wirkung für die Zukunft aufgehoben werden, und zwar vom Auftraggeber durch Widerruf und vom Beauftragten durch Kündigung. – Die unterschiedliche Terminologie, die vom Gesetzgeber „im Hinblick auf die Wissenschaft und Gesetzgebung hergebrachte

[74] BAG NJW 1979, 2223; BAG AP Nr. 4; BAGE 6, 52, 59 = AP Nr. 5; BAG AP Nr. 20; LAG Düsseldorf DB 1972, 1782; gem. § 28 g SGB IV ebenso für Sozialversicherungsbeiträge.
[75] BAG NJW 1977, 862.
[76] BAG NZA 1989, 468; ArbG Berlin DB 1975, 1609; B. Müller ZTR 1990, 237. Grundlagen u. Einzelheiten in § 629 RdNr. 24 ff.
[77] BAG AP Nr. 17; ferner LAG Frankfurt VersR 1973, 1178; LAG Düsseldorf DB 1990, 240.

2610    Seiler

---

### § 671  Widerruf, Kündigung

Ausdrucksweise“[1] beibehalten worden ist, hat zur sprachpsychologischen Bedeutung. Mit dem Widerruf soll dokumentiert werden, dass der Auftraggeber den „Herr“ im Geschäft ist.[2] Der Sache nach handelt es sich in beiden Fällen um Kündigung.[3] – Die Begründung für die jederzeitige Beendigungsmöglichkeit ergibt sich aus aufseiten des Auftraggebers ohne weiteres aus dem Wesen des Auftrags als eines „besonderen Vertrauensverhältnisses“,[4] das der Vertrauende jederzeit beenden können muss. Aufseiten des Beauftragten ist die beliebige Beendigung nach Meinung der Gesetzesverfasser nicht so selbstverständlich,[5] aber wohl letztlich aus der Unentgeltlichkeit der Geschäftsbesorgung herzuleiten.

Da die fristlose Kündigung des Auftrags für den Auftraggeber nachteilig sein kann,  2
sichert § 671 Abs. 2 ein Interesse an Schutz vor überraschender Auftragsbeendigung durch eine Schadensersatzpflicht des Beauftragten (gesetzlich geregelter Fall der positiven Forderungsverletzung).[6] Das Interesse des Auftraggebers muss allerdings zurückstehen, wenn ein wichtiger Grund die Durchführung des Auftrags unzumutbar macht. Der wichtige Grund wirkt in zweifacher Hinsicht zugunsten des Beauftragten: Er lässt seine Schadensersatzpflicht entfallen und macht seinen Kündigungsverzicht unwirksam (§ 671 Abs. 3).

### II. Widerruf und Kündigung des Auftrags (§ 671 Abs. 1)

1. Rechtsnatur. Widerruf und Kündigung sind empfangsbedürftige Willenserklä-  3
rungen, für die die §§ 104 ff. gelten. Einer Form bedürfen sie nicht. Auch allgemeinen Regeln können sie auch stillschweigend abgegeben werden; die ausdrückliche und korrekte Bezeichnung als Widerruf oder Kündigung ist nicht erforderlich; eine Falschbezeichnung[7] schadet nicht. Es reicht aus, dass der Wille, den Auftrag zu beenden, deutlich gemacht, also erklärt wird[8] und dass diese Erklärung dem Vertragspartner iSd. § 130 zugeht.[9] – Zum Verhältnis zur Weisung vgl. § 165 RdNr. 12. – „jederzeit“ bedeutet, dass die Auffassung von Abschluss des Auftrags für die Beendigung der Ausführung möglich ist und das bestimmte Gründe weder vorzuliegen noch genannt zu werden brauchen.

2. Bedingung. Trotz der prinzipiellen Bedingungsfeindlichkeit einseitiger Rechts-  4
geschäfte (berechtigte Vorbehalte gegen diese Lehre in § 158 RdNr. 27 ff.) ist wegen der weniger schutzwürdigen Position des Beauftragten seit jeher[10] anerkannt, dass der Widerruf des Auftraggebers auch unter einer aufschiebenden Bedingung erfolgen kann (zB „für den Todesfall“).[11] Dagegen ist das Kündigungsrecht des bedingten Kündigung des Beauftragten umstritten. Im Gegensatz zu einer älteren Meinung[12] die sie für nicht zulässig, also für wirkungslos hält, soll nach einer anderen Auffassung[13] nach den Umständen des Einzelfalls zu unterscheiden sein, ob die schutzwürdigen Interessen des Auftraggebers ausreichend beachtet sind. Nach richtiger Meinung[14] ist auch die bedingte Kündigung wirksam, weil nur

[1] Mot. II S. 544.
[2] Tilzweise ähnlich Medicus, Die Kündigung, 2. Aufl. 1951, S. 3 ff.
[3] Beispiel in: RG JW 1905, 682, 683: Erklärung des Auftraggebers, das Geschäft für sich allein ausführen zu wollen; vgl. Bamberger/Roth/Czub RdNr. 2.
[4] RGZ 61, 125, 126: Widerruf mittels Feststellungsklage.
[5] Mot. II S. 544; Staudinger/Löw Anm. 3 b; Staudinger/Wittmann RdNr. 3. Eine auffassende Bedingung ist unzulässig, vgl. RGRK/Steffen RdNr. 6; Erman/Ehmann RdNr. 5.
[6] Staudinger/Wittmann RdNr. 5; Soergel/Beuthien RdNr. 1; Bamberger/Roth/Czub RdNr. 1; Erman/Ehmann RdNr. 1; auch BGH WM 1971, 956; kritisch Gutermann § 198 (1998) 457, 481 ff.
[7] Vgl. RGRK/Steffen RdNr. 5.
[8] Mot. II S. 547; Planck/Lobe Anm. 3 b.
[9] Beispiel in: RG JW 1905, 682, 689: Erklärung gegenüber dem Falschen.
[10] Mot. II S. 544; Planck/Lobe Anm. 3 a.
[11] Mot. II S. 544; Planck/Lobe Anm. 3 b; Staudinger/Wittmann RdNr. 5.
[12] Mot. II S. 547; RGRK/Steffen RdNr. 5.
[13] Staudinger/Nipperdey (11. Aufl. 1958) Nr. 2; ebenso Staudinger/Wittmann RdNr. 3.
[14] Erman/Ehmann RdNr. 6; ferner Staudinger/Kündigung bedingter Kündigungen vgl. § 158 RdNr. 30 f.

2–4    § 671

Seiler    2611

**H**

# Münchener Kommentar
## zum Bürgerlichen Gesetzbuch

Band 4

Schuldrecht · Besonderer Teil II

§§ 611–704

EFZG · TzBfG · KSchG

Redakteur

**Dr. Martin Henssler**
Professor an der Universität zu Köln

4. Auflage



Verlag C. H. Beck München 2005

---

### Die einzelnen Bände
### des Münchener Kommentars zum BGB

*Band 1:* Einleitung und Allgemeiner Teil
§§ 1–240 · AGB-Gesetz
Redakteur: Prof. Dr. Dr. h. c. Franz Jürgen Säcker

*Band 1 a:* Allgemeiner Teil (Auszug)
§§ 80, 81, 105a, 126–127, 194–218, ProstG
Redakteur: Prof. Dr. Dr. h. c. Franz Jürgen Säcker

*Band 2:* Schuldrecht · Allgemeiner Teil
§§ 241–432 · FernAbsG
Redakteur: Richter am BGH Prof. Dr. Wolfgang Krüger

*Band 2 a:* Schuldrecht · Allgemeiner Teil
§§ 241–432
Redakteur: Richter am BGH Prof. Dr. Wolfgang Krüger

*Band 3:* Schuldrecht · Besonderer Teil I
§§ 433–610 · Finanzierungsleasing
HeizkostenV · BetriebskostenV · CISG
Redakteure: Prof. Dr. Wolfgang Krüger/Prof. Dr. Harm Peter Westermann

*Band 4:* Schuldrecht · Besonderer Teil II
§§ 611–704 · EFZG · TzBfG · KSchG
Redakteur: Prof. Dr. Martin Henssler

*Band 5:* Schuldrecht · Besonderer Teil III
§§ 705–853 · PartGG · ProdHaftG
Redakteur: Prof. Dr. Dr. h. c. mult. Peter Ulmer

*Band 6:* Sachenrecht
§§ 854–1296 · WEG · ErbbauVO
SachenRBerG · SchuldRÄndG
Redakteur: Vors. Richter am BGH a. D. Dr. Manfred Eberhard Rinne

*Band 7:* Familienrecht I
§§ 1297–1588 · VAHRG · VAÜG · HausratsV
Redakteur: Prof. Dr. Kurt Rebmann

*Band 8:* Familienrecht II
§§ 1589–1921 · SGB VIII
Redakteur: Prof. Dr. Dieter Schwab

*Band 9:* Erbrecht
§§ 1922–2385 · §§ 27–35 BeurkG
Redakteur: Dr. Gerhard Schlichting

*Band 10:* EGBGB (Art. 1–46) · Internationales Privatrecht
Redakteur: Prof. Dr. Dr. h. c. Hans Jürgen Sonnenberger

*Band 11:* Internationales Handels- und Gesellschaftsrecht
EGBGB (Art. 50–245)
Redakteur: Prof. Dr. Dr. h. c. Hans Jürgen Sonnenberger

§ 667   4-7   Abschnitt 8. Titel 12. Auftrag und Geschäftsbesorgungsvertrag

führung des Geschäfts mit Gewissheit oder nur möglicherweise benötigt wird, spielt keine Rolle. Ausreichend ist, dass es den Zwecken der Geschäftsbesorgung dienen kann und dafür gedacht ist. Nicht zur Ausführung der Geschäftsbesorgung hat der Beauftragte erlangt, was ihm nur gelegentlich des Auftragsverhältnisses ausgehändigt wird.

b) Gegenstand des Erlangten können sein Gelder, Wertpapiere (zB Wechsel, Schecks), Buchhaltungs- und sonstige Geschäftsunterlagen, Urkunden (für Vollmachtsurkunden s. § 175), Briefe, zum Verkauf bestimmte Sachen, zB Pkw. Zu sicherheitshalber an einen Gläubiger abgetretenen Forderungen s. RdNr. 13. – In welcher Rechtsnorm der Beauftragte den Gegenstand erhalten hat, ist gleichgültig. An Sachen wird im Allgemeinen lediglich der Besitz übertragen, entweder indem der Auftraggeber dem mittelbaren Besitz behält (§ 868) oder indem er den eigenen Besitz aufgibt (§ 856); denkbar ist auch, dass der Beauftragte Besitzdiener nach § 855 wird; bei selbständigen Tätigkeiten gehobener Art scheidet diese Möglichkeit allerdings aus. – Geld wird häufig, wenn es dem Beauftragten zur eigenen Verwendung (Spesen) übergeben wird, zu Eigentum übertragen sein (§ 929 S. 1). Eine Bank erlangt an dem bei ihr im Rahmen eines Girovertrages eingezahlten Geldern regelmäßig Eigentum (vgl § 700 Abs. 1 S. 1).[1] – Darauf, ob das Erlangte Vermögenswert hat, kommt es nicht an.

c) Noch vorhanden. § 667 1. Alt. setzt ferner unausgesprochen, aber logisch voraus, dass das zur Ausführung Erhaltene beim Beauftragten (teilweise) noch vorhanden ist.[8] Soweit es bestimmungsgemäß verwendet wurde, zB das zum Kauf einer Sache überlassene Geld verbraucht ist, entsteht der Anspruch nicht.[9] Soweit es durch rechtliche Maßnahmen (Enteignung) beeinträchtigt ist, kann der Tatbestand des § 667 2. Alt. (Einschränkung des Erlangten) vorliegen.[10] Zu den Rechtsfolgen im Falle, dass der Erlangte das Erlangte zu anderen Zwecken (zB wegen bestimmungswidriger Verwendung) s. RdNr. 20 f.

2. Rechtsfolgen. Das zur Ausführung des Geschäftsbesorgung noch Vorhandene hat der Beauftragte dem Auftraggeber herauszugeben. Die dazu erforderliche Rechtshandlung richtet sich nach dem Gegenstand des Erhaltenen. Hatte der Beauftragte unmittelbaren Besitz an Sachen erlangt, muss er diesen auf den Auftraggeber zurückübertragen (vgl § 854 Abs. 1). War er Eigentümer geworden, muss er die Sache dem Auftraggeber übereignen (§§ 929 ff., 873, 925). Forderungen sind abzutreten (§§ 398 ff.; zB waren Forderungen an den Beauftragten zur Einziehung abgetreten, wird nur der Abtretung bedurft)[11] – Ist Geld zurückzugeben, geht der Anspruch des Auftraggebers grundsätzlich auf Rückzahlung einer entsprechenden Geldsumme und nicht zur besonderen Abrede auf Rückgabe gerade der hingegebenen Geldzeichen.[12] – Hat der Beauftragte zur Ausführung des Auftrags Geld in ausländischer Währung erhalten, geht auch der Anspruch des § 667 1. Alt. auf Zahlung in ausländischer Währung.[13]

3. Einzelheiten. Der Beauftragte hat dem Auftraggeber die ihm ausgehändigten Unterlagen (Urkunden, Belege, Korrespondenz) zurückzugeben (praktisch bedeutsam insbes. für die nach § 675 eingeblich tätigen Geschäftsbesorger wie Rechtsanwälte, Steuerberater, Wirtschaftsprüfer), ferner nicht verbrauchte Spesengelder oder nicht verbrauchte Gelder, die im Rahmen des zur Ausführung des Geschäfts als Gegenleistung verwendet werden sollten (zB Kauf, Geld), zurückzuzahlen.[14] Werden dem Beauftragten Preisnachlässe (Rabatte) von

---

[4] Vgl. RGZ 101, 307 u. Schüßlmann ZHR 43, 515 je nach Einzelfall.  
[5] Ennecc. § Hermann § 700 RdNr. 1.  
[6] BGH NJW 2001, 2476, 2477; RG Warn. 1920 Nr. 158 S. 194; OLG Frankfurt WM 1984, 1369, 1371; Ommann Anm. 1 a.  
[7] So RGRK-Steffen 1947, 65, 66; OLG Frankfurt MDR 1948, 216. ("Erlöschen" des Anspruch); BGB 1948, 216. ("Erlöschen" des Anspruch); Planck-Lehr Anm. 2 c; Soergel/Beuthien RdNr. 4, 16; Ennecc./Ehmann RdNr. 9 e.

[8] Beispiel: BGH JZ 1994, 416 m. Anm. Medicus.  
[9] Beispiel: RG Recht 1928 Nr. 1831.  
[10] Näheres bei: Staudinger/K. Schmidt Vor § 244 RdNr. C 2 ff.; ferner Medicus JuS 1983, 897, 901.  
[11] BGH WM 1969, 26, 27 (auch zu § 244 Abs. 2).  
[14] BGH WM 1991, 514 f.; NJW 1983, 626 f.

2592   Seiler

---

§ 8-11   § 667

Dritten gewährt, muss er das auf diese Weise gesparte Geld zurückgeben, selbst wenn es nach den Vorstellungen des Beauftragten oder des Dritten dem Beauftragten zugute kommen sollte. Ist der Preisnachlass als Bestechung des Beauftragten gedacht und wird dieser dadurch veranlasst, die Interessen des Auftraggebers nicht ausreichend zu wahren, stehen dem Auftraggeber Schadensersatzansprüche zu.[15]

Tritt der Auftraggeber dem Beauftragten eine Forderung ab (§§ 398 f.), damit dieser sie einziehe, sind die auf Grund der Einziehung gezahlten Gelder aus der Geschäftsbesorgung erlangt (§ 667 2. Alt.) (vgl RdNr. 13).



III. § 667 2. Alt. (Herausgabe des Erlangten)

1. Voraussetzungen. a) "Aus der Geschäftsbesorgung erlangt". Im Gegensatz zur § 667 1. Alt. (§ 667 geht in der 2. Alt. um Gegenstände, die der Beauftragte nicht vom Auftraggeber, sondern als Folge seiner Tätigkeit erhalten hat (zB von einem Dritten). In Sinne des § 667 2. Alt. "aus der Geschäftsbesorgung" erlangt sind die Sachen und Rechte, die der Beauftragte auf Grund eines inneren Zusammenhangs mit dem geführten Geschäft erhalten hat.[16] Kausalität zwischen Geschäftsbesorgung und Erlangtem allein reicht nicht aus, da der Beauftragte demnach auch das herausgegeben hätte, was er nur bei Gelegenheit seiner Tätigkeit bekommen hat. Entscheidend ist der Gesichtspunkt, dass der Auftraggeber das Erlangte muss, was ihm gebührt, weil es sich um seine Angelegenheit handelt. Aus der Geschäftsbesorgung ist demgemäß nur erlangt, was der Beauftragte in Erfüllung des Auftrags erhalten hat und zwar auch dann, wenn es sich um eine Mehrleistung (Überzahlung) handelt.[17] Bei Hingetätigen Geschäftsbesorgungen kann sich naturgemäß der Gegenstand des Erlangten mehrfach ändern. § 667 2. Alt. bezieht sich dagegen nicht auf Gegenstände, die der Beauftragte in Abweichung vom Vertrag (§ 665) oder von Weisungen des Auftraggebers (§ 665) bekommen hat.

b) Gegenstand der Herausgabeanspruch und Rechts- und tatsächliche Positionen: obligatorische Rechte (zB Forderungen), dingliche Teilrechte, Eigentum und Besitz an beweglichen Sachen und Grundstücken, an Nutzungen (§ 100),[19] Früchten (§ 99)[20] und Zubehör (§ 97).[21] – Weitere Rechtspositionen der Beauftragte erlangt hat, hängt davon ab, ob er im eigenen oder im fremden Namen gehandelt hat. Ist er im eigenen Namen tätig geworden, wird er selbst Rechtsinhaber;[22] zB Inhaber eines Anspruchs nach § 433, Eigentümer der zu erwerbenden Ware oder des zu erwerbenden Grundstücks. Ist er im Namen des Auftraggebers tätig geworden, wird dieser Rechtsinhaber, der Beauftragte kann hier allenfalls den unmittelbaren Besitz an Sachen erlangt haben.[23]

2. Rechtsfolgen. Die zur Herausgabe erforderliche Rechtshandlung richtet sich wie in der 1. Alt. der Vorschrift (o. RdNr. 4) nach dem Gegenstand des Erlangten. Dieser ist in der 2. Alt. des § 667 vielfältiger, weil der Beauftragte in der 1. Alt. häufig nur den Besitz an den übergebenen Sachen bekommt, während der Gegenstand des Erlangten, wenn der Beauftragte im eigenen Namen handelt, sehr unterschiedlich je nach Inhalt der Geschäftsbesorgung sein kann. Hat der Beauftragte Besitz an Sachen erlangt, muss er diesen dem Auftraggeber verschaffen (§ 854 Abs. 1). War er Eigentümer einer beweglichen Sache oder eines Grundstücks geworden, muss er das Eigentum auf den Auftraggeber übertragen (§§ 929 ff., 873, 925). Die Verpflichtung zur Grundstücksübertragung bedarf nicht der Form des § 311b S. 1 (früher § 313 S. 1);[24] – Forderungen, zB Erfüllungs- oder Schadensersatz-

---

[15] Vgl. auch Ormann Anm. 1 zu Zahlung von Sondervergütungen (Schmiergeldern) s. RdNr. 17.  
[16] RGZ 97, 61; nur BGHZ 143, 373, 375 = NJW 2000, 1496; BGH ZIP 2004, 1267; NJW 1994, 3346; Soergel/Beuthien RdNr. 7; Ennecc./Ehmann RdNr. 12.  
[17] OLG Hamburg MDR 1982, 670.  
[18] Vgl. das instruktive Beispiel in BGH JZ 1996, 416 (treuhänderische Tätigkeit in der DDR).  
[19] Vgl § 592 E I, Mot. II S. 539, Prot. II S. 360.

[20] Vgl § 598 E II.  
[20] Vgl. Mot. (Fn. 19).  
[21] Deshalb Zugriffsrecht des Gläubigers des Beauftragten: OLG Hamburg HansGZ 1912 Beibl. S. 230, 231; vgl. ferner RGZ 97, 61, 4, 5.  
[22] Beispiel: RGZ 24, 75, 78 (Grundstückserwerb).  
[23] Vgl. RdNr. 2, 2. Zwar wird der Beauftragte bei Eigentum an einem Grundstück, wenn sein Eigentum die Grundstücke für beide Eheleute erworben hat, vgl Hönich FamRZ 1975, 533, 536.

2593   Seiler

**I**

# Markengesetz

## Gesetz über den Schutz von Marken und sonstigen Kennzeichen

Erläutert von

**Prof. Dr. Reinhard Ingerl**

LL.M. (Harvard)
Rechtsanwalt in München
Honorarprofessor an der
Friedrich-Schiller-Universität Jena

und

**Prof. Dr. Christian Rohnke**

M.C.J. (Texas)
Rechtsanwalt in Hamburg
Attorney at Law (New York)
Honorarprofessor an der
Technischen Universität Hamburg-Harburg

2., neubearbeitete Auflage



Verlag C. H. Beck München 2003

Vor §§ 14–19          K. Kennzeichenvindikation (§ 118 Abs. 2)

die korrespondierende Prozeßgebühr anzurechnen (§ 118 Abs. 2 BRAGO).

154  Die Erhöhungsgebühr nach § 6 BRAGO fällt auf der Beklagenseite nur bei Vertretung mehrerer Gesamtschuldner gegenüber einem Schadensersatzanspruch an, nicht jedoch für die Vertretung Mehrerer gegen Unterlassungs-, oder Auskunftsansprüche, da diese jeweils selbständige Ansprüche sind (ausf. OLG Düsseldorf GRUR 2000, 825 – ComTech für Gesellschaft und Geschäftsführer; aA Tilmann GRUR 1986, 691, 694).

## K. Kennzeichenvindikation

155  Einen Anspruch auf Übertragung eines Kennzeichenrechts sieht das MarkenG nur im Falle des ungetreuen Agenten vor (§ 17 Abs. 1). In welchen Fällen und unter welchen Voraussetzungen sich daraus im Wege der Analogie zu § 17 Abs. 1 ein Übertragungsanspruch begründen läßt, ist noch ungeklärt, jedoch keineswegs von vornherein ausgeschlossen (aA Fezer, 3. Aufl. § 17 Rdn. 2). Der BGH hat einen solchen Übertragungsanspruch bislang lediglich in bezug auf Internet-Domain-Namen geprüft und im wesentlichen aus domainspezifischen Gründen abgelehnt, insbesondere wegen des fehlenden absoluten Rechts an der Registrierung als solcher, im Gegensatz zu Kennzeichenrechten an dem entsprechenden Zeichen (BGH GRUR 2002, 622, 626 – shell.de, entsprechende Anwendung des § 17 Abs. 1 oder auch des dazu Nach § 15 Rdn. 144). Im Falle von Kennzeichenrechten ist eine entsprechende Rechtsgedankens jedenfalls dann naheliegende als Rückgriff auf § 8 S. 2 PatG oder ger § 894 BGB sowie § 812 BGB (BGH aaO – shell.de mwN), wenn es zwischen den Parteien Sonderbeziehungen gibt.

156  Vorab stellt sich jedoch die Frage nach der hierdurch zu schließenden Lücke im Schutzsystem des MarkenG. Im Falle von Markeneintragungen muß es sich um Fallgestaltungen handeln, bei denen die bloße Löschung nicht ausreichend ist. Das ist immer dann der Fall, wenn der Verletzte davon abgehalten wurde, selbst rechtzeitig eine entsprechende Markenanmeldung vorzunehmen. Dies Situation kann auch außerhalb des unmittelbaren Anwendungsbereichs des § 17 gegeben sein, wenn der Verletzte darauf vertrauen durfte, daß der Markenschutz für ihn von einem Dritten beantragt werden würde, so daß es einer eigenen An-

432

L. Einwendungen und Einreden          Vor §§ 14–19

meldung nicht bedurfte. In diesen Fällen werden allerdings häufig vertragliche Beziehungen bestehen, so daß als Anspruchsgrundlage neben einer Analogie zu § 17 Abs. 1 ein Schadensersatzanspruch wegen positiver Vertragsverletzung oder ein Herausgabeanspruch nach Geschäftsbesorgungsrecht in Betracht kommen kann. Zum Übertragungsanspruch bei kraft Verkehrsgeltung erworbenen Marken eines Händlers s. Munz GRUR 1995, 474, 476/477.

157  Ohne vertragliche Beziehungen kommt ein Herausgabeanspruch nach den Grundsätzen der Geschäftsführung ohne Auftrag (§§ 667, 681, 687 Abs. 2 BGB) in Frage, soweit die Markenanmeldung im Einzelfall als (auch) fremdes Geschäft betrachten läßt (so jetzt auch von Linstow MarkenR 1999, 83 für „unlautere Offensivmarken"). Ob eine Benutzung des zu vindizierenden Kennzeichens ältere Rechte anderweitiger Dritter verletzt, ist für die Beurteilung als Geschäft (auch) des Verletzten, der den Übertragungsanspruch geltend macht, entgegen der vom BGH zu den wegen ihrer technischen Sperrwirkung nicht vergleichbaren Domain-Namen – vertretenen Auffassung ohne Bedeutung (BGH GRUR 2002, 622, 626 – shell.de). Solche Rechte Dritter stehen auch sonst Übertragungen nicht entgegen; die Dritten sind an einem Vorgehen gegen den Erwerber nicht gehindert.

158  Problematischer ist dagegen die Ableitung als Schadensersatzanspruch nach §§ 14 Abs. 6, 15 Abs. 5 (bejahend Fezer 3. Aufl. § 17 Rdn. 2 für Fälle der nicht definierten „Markenanmaßung"; OLG Hamm CR 1998, 241, 243), da dieser nicht zu einer Besserstellung des Verletzten gegenüber dem Zustand führen darf, der bestünde, wäre die rechtswidrige Kennzeichenerwerb ganz unterblieben. (insoweit verallgemeinerungsfähig BGH GRUR 2002, 622, 626 – shell.de mwN). Diesen Zustand wird aber regelmäßig bereits die Löschungsanspruch herbeiführen.

## L. Einwendungen und Einreden

### I. Einwendungen und Einreden des Verletzers (Verweisungen)

159  Einige Einreden bzw. Einwendungen des Verletzers gegenüber dem Verletzungsanspruchen regelt das MarkenG ausdrücklich als Schutzschranken: Vorführung (§ 20), Verwirkung (§ 21), lautere Benutzung als Name, Adresse, beschreibende Angabe oder Be-

433

**J**



juris

Nichtamtliches Inhaltsverzeichnis

## § 667 Herausgabepflicht

Der Beauftragte ist verpflichtet, dem Auftraggeber alles, was er zur Ausführung des Auftrags erhält und was er aus der Geschäftsbesorgung erlangt, herauszugeben.

zum Seitenanfang                    Datenschutz                    Seite ausdrucken

**K**

# Der Vertragshändlervertrag

Begründet von
**Dr. Herbert Stumpf**

Herausgegeben von
**Dr. Matthias Jaletzke**
**Dr. Jörg-Martin Schultze, LL.M.**

Bearbeitet von

Dr. Sebastian Gronstedt, LL.M., Dr. Matthias Jaletzke,
Dipl.-Vw. Sibilla Nagel, Dr. Jörg-Martin Schultze, LL.M.,
Dr. Constanze Ulmer-Eilfort, LL.M., Dr. Ulf Wauschkuhn
sämtlich Rechtsanwälte in Frankfurt am Main

3., neubearbeitete und erweiterte Auflage 1997



Verlag Recht und Wirtschaft GmbH
Heidelberg

schrift[59] rechtswidrig und unwirksam. Insbesondere sind sie nach den Gruppenfreistellungsverordnungen im Vertriebsbereich nicht von dem Verbot des Art. 85 EGV freigestellt. Deshalb können in Verträgen, auf die EU-Kartellrecht anzuwenden ist, nachvertragliche Wettbewerbsverbote nicht vorgesehen werden. Da bei Verträgen mit Vertragsparteien in unterschiedlichen EU-Mitgliedsstaaten oder bei Vertriebssystemen das Risiko der Anwendbarkeit des EU-Kartellrechts praktisch immer gegeben ist, wird in diesen Fällen nahezu immer vor die Vereinbarung nachvertraglicher Wettbewerbsverbote abgesehen.

718 Anders ist die Situation, wenn EU-Kartellrecht nicht anzuwenden ist und der Vertrag nur deutschem Kartellrecht unterliegt. Hier ist zu unterscheiden: Stehen sich Händler und Unternehmer nicht nur als Wirtschaftsteilnehmer verschiedener Vertriebsstufen, sondern auch als Wettbewerber gegenüber, so kann ein Wettbewerbsverbot gegen das in § 1 GWB geregelte Kartellverbot, das Verbot horizontaler Wettbewerbsbeschränkungen, verstoßen. Das ist besonders in Bereichen problematisch, in denen ein Hersteller sowohl direkt als auch über Großhändler vertreibt. Gleiches gilt, wenn der Unternehmer selbst Händler ist und einen Vertragshändlervertrag mit einem Unterhändler geschlossen hat. Es liegt in diesen Fällen meist auch dann kein zulässiges Wettbewerbsverbot vor, wenn der Unternehmer unter analoger Anwendung des § 89b HGB zur Zahlung eines Ausgleichsanspruchs verpflichtet ist. Der potentielle Abfluß von Kunden aufgrund der Wettbewerbslichkeit des Vertragshändlers ist vielmehr bei der Berechnung des Ausgleichsanspruchs zu berücksichtigen.

719 Liegt zwischen Unternehmer und Händler dagegen kein Wettbewerbsverhältnis vor, so ist ein nachvertragliches Wettbewerbsverbot kartellrechtlich zulässig und wirksam, solange es nicht wegen übermäßiger Marktbeeinträchtigung von den Kartellbehörden für unwirksam erklärt wird, § 18 GWB.

720 Ist ein nachvertragliches Wettbewerbsverbot kartellrechtlich zulässig, so stellt sich die Frage, ob es den Beschränkungen der handelsvertreterrechtlichen Vorschrift des § 90a HGB unterliegt. Danach bedarf ein nachvertragliches Wettbewerbsverbot der Schriftform, ist auf einen Zeitraum von zwei Jahren nach Vertragsbeendigung beschränkt, und der Prinzipal hat dem Handelsvertreter für die Dauer der Wettbewerbsbeschränkung eine angemessene Entschädigung zu bezahlen.

721 Der Bundesgerichtshof hat schon früh angedeutet, daß er eine entsprechende Anwendung der Vorschrift in den Fällen für möglich hält, in denen der Vertragshändler so schutzwürdig ist wie ein Handelsvertreter.[60] Er hatte diese Frage aber noch nicht zu entscheiden. Das OLG München ist aber in der Linie des Bundesgerichtshofs gefolgt und hat für einen typischen Bierverlagsvertrag[61] die Anwendbarkeit des § 90a HGB angenommen. In einer Entscheidung zum Franchiserecht hat der Bun-

59 Siehe Kapitel 2.2.
60 BGH, Urt. v. 11.12.1958, BGHZ 29, 83, 87 = BB 1959, 7.
61 Vertrag, bei dem ein Teil, der Bierverleger, Bier von der Brauerei erwirbt und in eigenem Namen weiterverkauft.

desgerichtshof den gleichen Standpunkt für einen Fall eingenommen, in dem der Franchisenehmer nach seiner Schutzbedürftigkeit am Handelsvertreter vergleichbar war.[62] Es handelte sich dabei um einen Fall des Vertriebsfranchising.

Man wird deshalb davon ausgehen müssen, daß § 90a HGB für Vertragshändlerverhältnisse Anwendung findet, die nach den oben unter 2.1.2 genannten Kriterien handelsvertreterähnlich sind. Ein nachvertragliches Wettbewerbsverbot ist in diesen Fällen nur gegen Karenzentschädigung und nur für die Dauer von zwei Jahren zulässig.

Es stellt sich dann die Frage, wie die angemessene Entschädigung zu bemessen ist. Das Gesetz stellt insoweit keine Regelung bereit. Die Entschädigung kann sinnvollerweise nicht über dem durchschnittlichen Verdienst des Vertragshändlers in den letzten Vertragsjahren liegen. Im übrigen bestimmt sie sich aufgrund der konkreten Umstände. Entscheidend ist, in welchem Umfang das Wettbewerbsverbot den Vertragshändler wirklich einschränkt. Auch ohne besondere gesetzliche Regelung muß sich der Vertragshändler anderweitigen Verdienst deshalb anrechnen lassen.[63] Eine Mindestentschädigung ist nicht vorgesehen.

Außerhalb der Vorschrift des § 90a HGB sind nachvertragliche Wettbewerbsverbote auch ohne Zahlung einer Entschädigung bis zur Grenze der Sittenwidrigkeit grundsätzlich zulässig. Die Grenze ist aber eher eng zu ziehen.[64] Bei der Bewertung ist eine vertraglich vorgesehene Entschädigung miteinzubeziehen. Unter Berücksichtigung des Gedankens der Berufsfreiheit, der mit Art. 12 GG Verfassungsrang genießt, werden Wettbewerbsverbote von längerer Dauer als zwei Jahre stets auf erhebliche Bedenken stoßen.

## 17.2.8 Sonstige Beendigungsfolgen

Nach Beendigung des Vertrages darf sich der Händler nicht mehr als Vertragshändler des Unternehmers bezeichnen. Er hat die weitere Benutzung der Marken des Unternehmers einzustellen.[65]

62 BGH, Urt. v. 12.11.1986, WM 1987, 512, 513.
63 BGH, Urt. v. 19.12.1991, BGHZ 63, 353 = BB 1975, 197; Baumbach/Hopt, HGB, § 90a Rn. 19.
64 Ulmer S. 351 ff.
65 Ulmer/Brandner/Hensen, AGBG, Anhang §§ 9–11, Rn. 892.

**L**

OLG Karlsruhe: OLG Karlsruhe 25.02.1987 6 U 32/86
"Offenendspinnmaschinen"                                   **GRURInt 1987 Heft 11     788 ▽**

## OLG Karlsruhe 25.02.1987 6 U 32/86 "Offenendspinnmaschinen"

*PatG 1968 §§ 9 , 24 Abs. 5 ; PatG 1981 § 33 Abs. 1 ; ZPO §§ 92 Abs. 1 , 100 Abs. 4 ; BGB § 422*

**1. Bei einer internationalen Lizenzabsprache unterliegt die Beurteilung der Nutzungsberechtigung derjenigen nationalen Rechtsordnung, nach welcher die Schutzwirkungen des lizenzierten Patents zu beurteilen sind (Schutzrechtsstatut).**

**2. Auch das dem einfachen Lizenznehmer eingeräumte positive Benutzungsrecht wirkt gegenüber dem Inhaber eines identischen prioritätsjüngeren Schutzrechts.**

**3. Das Benutzungsrecht des Lizenznehmers reicht nicht weiter als die Benutzungsberechtigung des Patentinhabers selbst. Es reicht indessen nicht so weit wie das Untersagungsrecht aus dem prioritätsälteren Patent gegenüber dem abhängigen Patent.**

**4. Entschädigungsschuldner für die Benutzung einer offengelegten Patentanmeldung ist nur, wer hieraus den wirtschaftlichen Nutzen zieht. Die Entschädigungspflicht gemäß § 24 Abs. 5 PatG 1968 (§ 33 Abs. 1 PatG 1981) trifft daher in der Regel zur die Gesellschaft, nicht das für sie handelnde Organ.**

**5. Die Unterlassungsverpflichtung von Gesellschaft und Organ unterliegt nicht den Regeln über die Gesamtschuldnerhaftung. Dies hindert aber nicht deren Verurteilung in die Kosten als Gesamtschuldner.**

*OLG Karlsruhe, Urteil vom 25.02.1987 - 6 U 32/86 (nicht rechtskräftig) ("Offenendspinnmaschinen")*

**Sachverhalt**

Die Kl. sind Inhaber der Deutschen Patente 2 458 042 (im folgenden: Klagepatent 1 und 2 507 153 im folgenden: Klageschutzrecht 2) Die Schutzrechte betreffen das Anspinnverfahren bei Offenendspinnmaschinen. Die Patente werden von der Firma Spindelfabrik S. GmbH (im folgenden: Spindelfabrik S.) genutzt. Der Kl. zu 1 ist deren Generalbevollmächtigter, der Kl. zu 2 Mitgesellschafter und Geschäftsführer der genannten Firma. Auch die unter Ziffer 1 bekl. Firma S. und S. Maschinenfabrik AG (im folgenden: Bekl. zu 1), deren Vorstandsmitglied die Bekl. zu 2 ist, befaßt sich mit der Herstellung und dem Vertrieb von Offenendspinnmaschinen.

Das Klagepatent 1 wurde am 7. 12. 1974 angemeldet. Der Prüfer führte die aufgrund japanischer Voranmeldungen prioritätsältere, nicht vorveröffentlichte deutsche Patentanmeldung 2 505 943, deren Inhaber die japanische Firma M. Ltd. war, ein und setzte das Erteilungsverfahren bis zur Entscheidung über die Patenterteilung für die (im folgenden nach dem Erfinder H. benannte) Anmeldung aus. Das Kl.-Patent wurde nach Bekanntmachung am 28. 6. 1979 durch Beschluß vom 6. 11. 1984 erteilt. Die Erteilung des am 16. 6. 1976 offengelegten Klagepatents 1 wurde am 5. 6. 1985 veröffentlicht.

Zwischenzeitlich, nämlich am 23./28. 7. 1982 hatte die Bekl. mit der Firma M. einen Vertrag geschlossen, der es ihr gegen Zahlung von 33 000 DM gestattete, das H.-Patent und die entsprechenden Auslandsschutzrechte für ihre Offenendspinnmaschinen zu nutzen. In Ziff. 2 der Vereinbarung heißt es:

"M. gewährt hiermit dem Lizenznehmer eine nicht ausschließliche weltweite Lizenz an den Patenten für Herstellung, Benutzung und Vertrieb der geschützten Vorrichtung, jedoch nur als Teil der Offenendspinnmaschinen des Lizenznehmers. Die eingeräumte Lizenz ist eine beschränkte Lizenz. M. behält sich alle nicht ausdrücklich gewährten Rechte vor."

Eineinhalb Jahre später wurde das H.-Patent einschließlich der zugehörigen Auslandsschutzrechte von der Spindelfabrik S. für ca. 100 000 US-Dollar erworben. In dem Vertrag vom 17. 2. 1984 weist die Firma M. auf ihre Vereinbarung mit der Bekl. ausdrücklich wie folgt hin:

OLG Karlsruhe: OLG Karlsruhe 25.02.1987 6 U 32/86
"Offenendspinnmaschinen"                                   **GRURInt 1987 Heft 11     789 ▲▽**

"M. hat S. mitgeteilt, daß M. eine nicht ausschließliche Lizenz an den unter Ziffer 1 erwähnten Patenten und Patentanmeldungen der S. und S. AG an I. Bundesrepublik Deutschland (nachstehend Lizenznehmer genannt) gewährt hat. S. kauft die unter Ziffer 1 genannten Patente und Patentanmeldungen zusammen mit dem Lizenzvertrag vom 23./28. Juli 1982, der mit dem genannten Lizenznehmer abgeschlossen wurde, und vereinbart ferner, daß sie und die mit ihnen geschäftlich oder durch Lizenzen verbundenen Personen die lizenzierten Rechte des Lizenznehmers gemäß dem Lizenzvertrag wie vereinbart während der Dauer der unter Ziffer 1 erwähnten Patente und Patentanmeldungen aufrecht erhalten. Eine Kopie des Lizenzvertrages ist als Anlage A angefügt und bildet einen Bestandteil dieser Vereinbarung."

Zugleich informierte M. die Bekl. mit Schreiben vom 22. 2. 1984 über die Übertragung der Rechte am H.-Patent auf die Firma Spindelfabrik S. und wies darauf hin, es sei hierbei ausdrücklich vereinbart worden, daß die der Bekl. gewährte Lizenz durch die Erwerberin unverändert aufrecht erhalten werde.

Die Bekl. stellt her und vertreibt jedenfalls seit 1983 Offenendspinnmaschinen des Typs "RU 11-Spincomat", der, wie die Parteien außer Streit stellen, von den Merkmalen der geltend gemachten Patentansprüche des Klagepatents 1 Gebrauch macht, während die Benutzung der Merkmale des Klageschutzrechts 2 streitig ist.

Die Bekl. steht auf dem Standpunkt, ihr Benutzungsrecht aus der Lizenzerteilung M. wirke auch gegenüber dem Kl. fort. Sie mache von dem Verfahren des prioritätsälteren H.-Patents berechtigterweise Gebrauch, weshalb ihr die Herstellung und der Vertrieb ihres RU 11-Spincomats aufgrund des prioritätsjüngeren Klagepatents 1 nicht verboten werden könne. Das Klageschutzrecht 1 enthalte keinen über das H.-Patent hinausreichenden Erfindungsgedanken, weshalb auch ihrem u. a. auf identische Vorpatentierung gestützten Einspruch gegen das Klagepatent 1 stattgegeben werden müsse. Gegenüber dem Klageschutzrecht 2, das sie nicht verletze, verteidigt sie sich hilfsweise damit, nur vom Gegenstand des ihr lizenzierten H.-Patents Gebrauch zu machen.

Das LG hat die Klageanträge abgewiesen.

## Aus den Entscheidungsgründen:

Die zulässige Berufung der Kl. hat im wesentlichen Erfolg. Die Bekl. verletzt mit der angegriffenen Vorrichtung RU 11-Spincomat das Klagepatent 1. Ein Recht zur Benutzung dieses Patents kann sie aus der Lizenzerteilung von M. am H.-Patent nicht erfolgreich herleiten. Das Klagepatent 1 weist gegenüber dem prioritätsälteren H.-Patent einen erfinderischen Überschuß auf. Das Benutzungsrecht aus der Lizenzerteilung M. erstreckt sich nicht auf den Erfindungsgegenstand des abhängigen Klagepatents 1. Eine Identität der Schutzrechte im Sinne des § 4 Abs. 2 PatG 1968 ist nicht gegeben. Der Einspruch der Bekl. gegen das Klagepatent 1 verspricht keine Aussicht auf Erfolg, weshalb eine Aussetzung des Rechtsstreits nicht geboten ist. Die Lehre des Klageschutzrechts 2 benutzt die Bekl. nicht.

I.

1. Der Senat geht bei seiner Entscheidung davon aus, daß der Bekl. aufgrund der Vereinbarung vom 23./28. 7. 1982 mit der Firma M. rechtswirksam eine Lizenzberechtigung erteilt wurde.

Die in Ziff. 6 des Vertrages der Bekl. mit der Firma M. vom 23./28. 7. 1982 vereinbarte Anwendung japanischen Rechts berührt nicht die Geltung inländischen Rechts zur Beurteilung der Rechtswirkungen der Nutzungsberechtigung der Bekl. an den lizenzierten deutschen Klageschutzrechten gegenüber Dritten. Die Vereinbarung japanischen Rechts vermag allenfalls die schuldrechtliche Berechtigung und Verpflichtung der Lizenzvertragsparteien untereinander zu erfassen (Staudinger/Firsching, EGBGB, Teil 2 b, 10./11. Aufl. Rdn. 436, 439 vor Art. 12 EGBGB. Die Frage der Nutzungsberechtigung des Lizenzberechtigten gegenüber dritten Schutzrechtsinhabern ist typischerweise der jeweiligen nationalen Rechtsordnung unterstellt, nach welcher die Wirkungen und Beschränkungen eines gewerblichen Schutzrechts zu beurteilen sind, Staudinger/Firsching, a.a.O., Rdn. 440 vor Art. 12 EGBGB; Beier, **GRUR** In. 1981, 293, 305; Urteil des Senats vom 14. 4. 1982 - 6 U 132/81 -; anders zum Schuldstatut E. Ulmer, Immaterialgüterrechte, S. 48 ff., der eine einheitliche Behandlung nach dem Sitzland des Lizenzgebers befürwortet. Da nach dem vernünftigen Verständnis der Vertragsparteien eines Lizenzvertrages die Nutzungsberechtigung ihre Schutzwirkung im Land des lizenzierten Schutzrechts entfalten soll, ist typischerweise vom Recht des Schutzlands auszugehen, sofern nicht die Vertragsparteien diesem Verständnis entgegenstehende ausdrückliche Vereinbarungen getroffen haben. Das Recht des Schutzlands ist Schwerpunkt des Lizenzverhältnisses. Eine die Schutzwirkungen betreffende abweichende Vereinbarung - die Disponibilität vorausgesetzt - müßte deshalb ausdrücklich Eingang in die vertragliche Vereinbarung gefunden haben. Ziff. 6 des Vertrages, wonach seine Auslegung dem japanischen Recht unterworfen ist, genügt diesem Erfordernis nicht. Danach ist im

vorliegenden Fall, wie auch von den Parteien des Rechtsstreits übereinstimmend gehandhabt, das deutsche Patentrecht anzuwenden.

Nach dem eindeutigen Wortlaut der Vertragsabsprache, zu deren Verständnis es deshalb auch nicht der nach Ziff. 6 vorgesehenen Auslegung nach japanischem Recht bedarf, hat die Firma M. der Bekl. ein (nicht ausschließliches) Nutzungsrecht am Gegenstand des H.-Patents und der entsprechenden Auslandsschutzrechte eingeräumt. Die Einräumung eines Nutzungsrechts wurde auch schon im vorausgegangenen Schreiben der Firma M. vom 6. 7. 1982 angekündigt. Von einem bloßen Verzicht der Patentinhaberin auf die Geltendmachung von Verbietungsansprüchen aus ihren Schutzrechten gegenüber der Bekl. kann nicht gesprochen werden. Es sind keine Anhaltspunkte dafür gegeben, daß die Bekl. in all den in der Anlage zu der Vereinbarung vom 23./28. 7. 1982 aufgeführten Staaten der Gefahr einer Patentverletzungsklage der Firma M. ausgesetzt gewesen sei. Auch die von M. mit der Spindelfabrik S. anläßlich der Patentübertragung getroffene Vereinbarung vom 17. 2. 1984 weist mit der Formulierung, daß die "lizenzierten Rechte" der Bekl. zu beachten und aufrecht zu erhalten seien, eindeutig darauf hin, daß der Bekl. ein während des Bestandes des H.-Patents fortdauerndes Nutzungsrecht eingeräumt sein sollte.

a) Der Fortbestand des Nutzungsrechts berechtigt die Bekl. zum Gebrauch des Patents der im H.-Patent offenbaren Lehre nicht nur gegenüber dem Patentinhaber, sondern auch gegenüber Dritten mit identischem inländischem Schutzrecht, RG GRUR 1940, 23, 25 - Wasserröhrenkessel; BGH in GRUR 1963, 563, 567 Aufhängevorrichtung. Die vom Berechtigten abgeleitete Nutzungsbefugnis des Lizenznehmers kann durch die Erteilung eines späteren identischen Schutzrechts nicht eingeräumt werden. Der Lizenznehmer wird in seiner Berechtigung dem Schutzrechtsinhaber selbst gleich gestellt, dessen Berechtigung, seine Erfindung zu nutzen, durch einen prioritätsjüngeren Schutzrechtsinhaber nicht in Frage gestellt werden kann.

Das mit Drittwirkung ausgestattete Nutzungsrecht knüpft die Rechtsprechung an die dem Lizenznehmer eingeräumte Befugnis zur positiven Nutzung der lizenzierten technischen Lehre, ohne von den dogmatisch umstrittenen (vgl. BGH in GRUR 1982, 41 l - Verankerungsteil) Fragen einer dinglichen Berechtigung und des Sukzessionsschutzes des einfachen Lizenznehmers (vgl. nunmehr §§ 15 Abs. 2 PatG, 22 Abs. 3 GebrMG 1986) abhängig zu sein. Es ist in der Rechtsprechung (vgl. a.a.O.) und überwiegend auch in der Literatur (Storch in Anm. zu BGH-Aufhängevorrichtung a.a.O. S. 567; Benkard, PatG 7. Aufl., § 9 Rdn. 5; Klauer/Möhring, PatG, 3. Aufl., § 6 Rdn. 53) anerkannt, daß das positive Benutzungsrecht mit Drittwirkung auch dem einfachen Lizenznehmer zusteht. Entscheidend ist somit allein der Fortbestand des tatsächlichen Benutzungsrechts, um den Lizenznehmer vor Verbotsansprüchen aus identischen prioritätsjüngeren inländischen Schutzrechten zu schützen. Der Fortbestand des Nutzungsrechts

der Bekl. ist schon dadurch gewährleistet, daß der Lizenzvertrag mit der Firma M. nicht beendet ist. Auf eine Drittwirkung der Vereinbarung der Spindelfabrik S. mit der Firma M. vom 17. 2. 1984 auf die Kl. persönlich kommt es deshalb nicht an. Diese Vereinbarung bedeutet (lediglich) eine Bestätigung des Fortbestandes der vereinbarten Lizenz durch die nunmehrige Patentinhaberin und zusätzlich eine von der neuen Patentinhaberin zugunsten der Bekl. eingegangene Verpflichtung (§ 328 BGB), auf den Fortbestand von deren Lizenzrechten zu achten.

b) Das Benutzungsrecht der Bekl. gegenüber Dritten reicht indes nicht weiter als die Berechtigung des Patentinhabers insoweit selbst. Unzutreffend ist es deshalb, das Benutzungsrecht des Lizenzberechtigten mit dem Umfang seines Nutzungsrechts aus dem Lizenzvertrag gleich zu setzen. Die Befugnis des Lizenznehmers, im Verhältnis zu seinem Lizenzgeber den lizenzierten Gegenstand in erweiterter, verbesserter, möglicherweise auch in erfinderisch ausgestalteter Form zu nutzen, erfährt gegenüber Dritten eine Eingrenzung durch deren bessere Schutzrechtsberechtigung. Das Benutzungsrecht des Lizenzberechtigten eines prioritätsälteren Patents entspricht nicht notwendigerweise dem lizenzvertraglichen Nutzungsrecht. Es reicht auch nicht immer so weit, wie der

Inhaber des älteren Rechts einem Dritten die Benutzung untersagen könnte, RG in **GRUR** 1940, a.a.O. Vom Schutzumfang eines prioritätsälteren Schutzrechts ist zwar auch eine Ausführungsform erfaßt, welche zusätzliche Elemente enthält, mögen diese auch erfinderisch fortentwickelt sein, BGH in **GRUR** 1975, 484 , 496 Etikettiergerät; 1977, 654, 656 Absetzwagen III; Benkard a.a.O. § 14 Rdn. 134. Auch wenn dem Dritten hierfür ein Patent erteilt ist, unterliegt er als abhängiger Schutzrechtsinhaber den Verbotsansprüchen des prioritätsälteren Berechtigten. Aus dessen Untersagungsrecht folgt indes nicht ein positives Benutzungsrecht am Erfindungsgegenstand des prioritätsjüngeren Patents. Das Benutzungsrecht des prioritätsälteren Patentberechtigten wie des von ihm ermächtigten Lizenzberechtigten ist im Verhältnis zum schutzrechtsberechtigten Dritten auf diejenige Lehre beschränkt, die in dem älteren Schutzrecht dem Fachmann offenbart ist. Eine im prioritätsjüngeren beanspruchte Lehre wird vom dem Benutzungsrecht nicht umfaßt, auch wenn ihre Verwirklichung vom Inhaber des älteren Patents verboten werden könnte, weil sie als abhängige Lehre nicht ohne Benutzung des prioritätsälteren Erfindungsgegenstandes verwirklicht werden kann. Benutzungsrecht und Untersagungsrecht fallen bei abhängiger Schutzrechtserteilung auseinander, RG in **GRUR** 1940 a.a.O. Es ist deshalb entgegen der Betrachtungsweise der Parteien nicht die Frage vorrangig, ob die Bekl. das H.-Patent benutzt, sondern zu prüfen, ob die Bekl. von einem erfinderischen Überschuß des Klagepatents 1 Gebrauch macht.

2. Der Senat ist der Auffassung, daß das Klagepatent 1 eine vom H.-Patent abhängige, aber erfinderisch fortentwickelte und durch die Patenterteilung zu Recht unter Schutz gestellte technische Lehre enthält und deshalb dem Einwand identischer Vorpatentierung gemäß § 4 Abs. 2 PatG 1968 nicht ausgesetzt ist. Die Bekl. macht vom Erfindungsgegenstand des Klagepatents 1 patentgemäßen Gebrauch.

II.; III.

IV.

1. Die maßgeblichen Organe der Bekl. zu 1 haben in vorwerfbarer Weise das Klagepatent 1 verletzt. Ihr Verschulden ist als leichte Fahrlässigkeit einzustufen. Ihre Einschätzung, ihr Benutzungsrecht am H.-Patent auch dem Klagepatent 1 entgegenhalten zu können, entschuldigt sie nicht. Sie mußten ernsthaft die Möglichkeit in Erwägung ziehen, daß das Klageschutzrecht 1, dessen Benutzung sie nicht bezweifeln, gegenüber dem H.-Patent einen erfinderischen Überschuß aufweist. Das schuldhafte Handeln der verantwortlichen Organe, hier vornehmlich des als persönlich Haftenden in Anspruch genommenen Bekl. zu 2 hat die Bekl. zu 1 sich gemäß § 31 BGB zurechnen zu lassen. Dies gilt auch für das Verschulden, soweit es den geltend gemachten Entschädigungsanspruch gemäß §§ 24 Abs. 5 PatG 1968, 33 Abs. 1 PatG 1981 betrifft, wobei eine Überlegungsfrist von einem Monat zugebilligt wird.

Die eigenständige deliktische Haftung des Bekl. zu 2 als handelndes Organ neben der von ihm vertretenen bekl. Aktiengesellschaft ist allgemein anerkannt, BGH in **GRUR** 1979, 48 , 49 Straßendecke.

2. Eine eigene Entschädigungshaftung des Bekl. zu 2 für die Benutzung des Gegenstandes der offengelegten Patentanmeldung 1 gemäß §§ 24 Abs. 5 PatG 1968, 33 Abs. 1 PatG 1981 scheidet aus. Die Entschädigungshaftung wegen Benutzung einer offengelegten Patentanmeldung ist keine deliktische Schadensersatzhaftung, BGH in **GRUR** 1975, 430 , 434 Bäckerhefe; Benkard a.a.O. § 33 Rdn. 12; teilweise a. A. Ohl, **GRUR** 1976, 557 , 560 . Die Entschädigungspflicht des § 24 Abs. 5 PatG 1968, § 33 Abs. 1 PatG 1981 knüpft an die (nicht verbotswidrige) Benutzung des Gegenstandes der offengelegten Patentanmeldung, die zu einem bestandskräftigen Patent erstarkt (§§ 35 Abs. 2 Satz 2, 13 PatG 1968, §§ 58 Abs. 2 , 21 Abs. 5 , 22 Abs. 2 PatG 1981). Nicht eine deliktische Verletzung eines Ausschließlichkeitsrechts, sondern allein die nicht verbotswidrige Benutzung des Gegenstands einer offengelegten Patentanmeldung begründet die Entschädigungspflicht. Entschädigungsverpflichtet ist der Benutzer. Anspruchsschuldner ist - entsprechend der Passivlegitimation bei einer Bereicherungshaftung im gewerblichen Rechtsschutz vgl. BGH in **GRUR** 1979, 48 , 50 Straßendecke; Ullmann, **GRUR** 1978, 615 , 621 allein, wer die Nutzung aus dem Gebrauch des Gegenstandes der Anmeldung zieht; eine Identität des Haftenden mit dem Handelnden muß nicht gegeben sein.

Nutznießer und Handelnder beim Gebrauch des Gegenstandes einer offengelegten Patentanmeldung fallen auseinander, wenn der Handelnde Organ einer juristischen Person ist, zu deren Nutzung allein er tätig wird. Entschädigungspflichtig hinsichtlich der Benutzung der offengelegten Patentanmeldung ist vorliegendenfalls allein die Bekl. zu 1. Die gegen den Bekl. zu 2 gerichtete Klage ist insoweit abzuweisen.

V.

Die Kostenentscheidung ergeht gemäß §§ 92 Abs. 1 , 100 Abs. 4 ZPO. Soweit die Klage gegen den Bekl. zu 2 wegen mangelnder Entschädigungsverpflichtung aus §§ 24 Abs. 5 PatG 1968, 33 Abs. 1 PatG 1981 abgewiesen wird, fällt dies für den Kostenausspruch nicht ins Gewicht, § 92 Abs. 2 ZPO.

Die Bekl. haften als Gesamtschuldner für die Kosten des Rechtsstreits gemäß § 100 Abs. 4 ZPO auch soweit ihre Verurteilung in der Sache nicht auf gesamtschuldnerische Haftung gerichtet ist. Die Verurteilung zur Unterlassung trifft die Bekl. nicht als Gesamtschuldner (a. A. Tilmann, GRUR 1986, 691 , 694 ). Die Verurteilung der Bekl. gründet zwar auf eine vom Bekl. zu 2 als Vorstandsmitglied zu verantwortende Verletzungshandlung; insofern läßt sich von einer Zweckgemeinschaft zwischen den Bekl. zu 1 und dem Bekl. zu 2 sprechen, weshalb auch die auf die Vergangenheit bezogene gemeinsame Verpflichtung (Rechnungslegung, Schadensersatzhaftung) als Gesamtschuld zu qualifizieren ist. Das Unterlassungsgebot ist indes in die Zukunft gerichtet und trifft jeden der beiden Bekl. unabhängig voneinander. Das verbotmäßige Verhalten eines Unterlassungsschuldners wirkt nicht auch zu Gunsten des anderen; § 422 Abs. 1 BGB ist auf Unterlassungsschuldner nicht anwendbar. Der Bekl. zu 2 bleibt zur Unterlassung verpflichtet, auch wenn er aus der Bekl. zu 1 als verantwortliches Organ ausscheiden sollte. Die Bekl. zu 1 bleibt zu Unterlassung verpflichtet, auch wenn anstelle des Bekl. zu 2 eine andere Person als verantwortliches Vorstandsmitglied eingesetzt werden sollte. Die Zukunftswirkung der Verurteilung zur Unterlassung steht der Annahme einer Gesamtschuldnerschaft entgegen. Dies hindert indes nicht, die Haftung der Bekl. für den sie treffenden Kostenanteil gemäß § 100 Abs. 4 ZPO gesamtschuldnerisch auszusprechen. Wie der Senat bereits zur Kostenhaftung einer offenen Handelsgesellschaft neben ihren Gesellschaftern ausgesprochen hat

OLG Karlsruhe: OLG Karlsruhe 25.02.**1987** 6 U 32/86
"Offenendspinnmaschinen"                                 **GRURint 1987** Heft 11    791 ▲▼

(NJW 1973, 1202), setzt die gesamtschuldnerische Kostenhaftung gemäß § 100 Abs. 4 ZPO nicht notwendigerweise voraus, daß die Parteien hinsichtlich der Hauptschuld materiellrechtlich als Gesamtschuldner haften. Eine gesamtschuldnerische Haftung auf die Kosten gemäß § 100 Abs. 4 ZPO ist anzuordnen, wenn jeder der Schuldner hinsichtlich der Hauptschuld auf das Ganze haftet (vgl. insoweit auch Tilmann a.a.O., S. 696). Es ist deshalb sachlich gerechtfertigt, die Bekl. hinsichtlich des sie treffenden Kostenanteils als Gesamtschuldner zu verurteilen.

Mitgeteilt von Frau Dr. Engisch, Karlsruhe

[AR 966]

© Copyright C.H. Beck

M

## BGH 21.10.1964 Ib ZR 22/63 "Carla"

*Art. 7 ff. EGBGB, § 8 WZG*

**1. Die Übertragung eines eingetragenen Warenzeichens ist nach dem Recht des Landes zu beurteilen, in dem das Zeichen eingetragen ist. Welches Recht auf den der Übertragung zugrunde liegenden Verpflichtungsvertrag anzuwenden ist, richtet sich dagegen bei Fehlen einer ausdrücklichen oder stillschweigend getroffenen Vereinbarung nach dem mutmaßlichen Willen der Parteien, bei dessen Bestimmung dem Schwerpunkt des Vertragsverhältnisses besondere Bedeutung zukommt.** \*

**2. Bei der Übertragung eines in Frankreich eingetragenen Warenzeichens ergibt sich die Verpflichtung des Veräußerers, dem Erwerber die nach französischem Recht für die Umschreibung der Eintragung erforderlichen Unterlagen zur Verfügung zu stellen, nicht schon aus dem dinglichen Übertragungsvertrag. Vielmehr kommt es dafür auf das der Übertragung zugrunde liegende Verpflichtungsgeschäft an.** \*

*BGH, Urteil vom 21.10.1964 - Ib ZR 22/63 ("Carla")*

Im Juni 1959 einigten sich die drei Gesellschafter der Bekl. - B. und die Eheleute M. - in Erwartung der Rückgliederung des Saarlandes dahin, daß die Eheleute M. aus der beklagten Gesellschaft ausscheiden und daß in Zukunft bestimmte Erzeugnisse im Gebiet des Saarlandes und der Bundesrepublik nur durch die Bekl. oder ihren Rechtsnachfolger, in Frankreich dagegen nur noch durch die Eheleute M. oder ein von ihnen in Frankreich zu gründendes Unternehmen oder dessen Rechtsnachfolger hergestellt und vertrieben werden dürften. Die Eheleute M. schieden sodann aus der Bekl. aus und gründeten in Sarreguémines die Kl. Die Parteien streiten nunmehr um das in Frankreich für die Bekl. eingetragene Warenzeichen "Carla". Insbesondere geht es um die Auslegung eines zwischen ihnen am 12. Mai 1960 abgeschlossenen privatschriftlichen Vertrags, dessen Ziff. 4 lautet:

"Gleichzeitig übergibt die Firma **Carla** Gewürzfabrik Karl Friedr. Baumann GmbH in Saarbrücken hiermit an die Firma **Carla** in Sarreguémines die in ihrem Besitz befindlichen Unterlagen über die Anmeldung des Warenzeichens,**Carla**' für Frankreich.

Die Firma **Carla** Gewürzfabrik Karl Friedr. Baumann GmbH in Saarbrücken erklärt sich ausdrücklich damit einverstanden, daß das Warenzeichen,**Carla**' in Frankreich nur von der Firma **Carla** in Sarreguémines benutzt werden darf. Sie ist deshalb damit einverstanden, daß das Zeichen vertraggemäß § 8 des Warenzeichengesetzes vom 5. Mai 1936 auf die Firma **Carla** S.à .r.l. in Sarregémines übertragen wird."

Die Bekl. sieht hierin die bloße Einräumung einer Lizenz. Auch hält sie den Vertrag vom 12. Mai 1960 für unverbindlich, da ihr damaliger Geschäftsführer B. das Zeichen schon am 7. Mai 1960 an den Kaufmann Mi. übertragen habe. Die Kl. ist der Auffassung, daß ihr das Zeichen übertragen worden sei. Sie hat bei der französischen Registerbehörde die Umschreibung der Eintragung beantragt, wurde aber von dort zur Angabe des Ortes und Datums der Anmeldung

und der Nummer der Eintragung aufgefordert. Mit der Klage bezweckt sie, sich diese Nachweise in der gehörigen Form zu verschaffen.

Das Landgericht und das Berufungsgericht haben im wesentlichen antragsgemäß und übereinstimmend Feststellungsurteil dahin erlassen, daß es sich bei dem im Vertrag vom 12. Mai 1960 bezeichneten Warenzeichen "Carla" um die Warenzeichenanmeldung handele, die am 22. September 1949 unter der Nummer 56 569 beim Greffe du Tribunal de Commerce in Paris eingereicht wurde. Die Revision der Bekl. wurde mit der Maßgabe zurückgewiesen, daß die Urteilsformel die Fassung eines dem Berufungsurteil inhaltlich entsprechenden Leistungsurteils erhielt.

### Aus den GründenIII.

Das Berufungsurteil folgert die Verpflichtung der Bekl. zur Abgabe der in Frage stehenden Erklärung bereits aus der von der Kl. behaupteten Übertragung des Warenzeichens alssolcher, indem es auf den Vertrag vom 12. Mai 1960 französisches Recht anwendet. Dazu führt es aus, den Vertragschließenden sei es darum gegangen, den Geschäftsbetrieb, der seinen Sitz in Saarbrücken hatte, für die Zeit nach der

Rückgliederung des Saarlandes in zwei voneinander völlig unabhängige Betriebe, nämlich den Betrieb in Saarbrücken und ein neu zu gründendes Unternehmen in Frankreich aufzuteilen; der in Frankreich vorhandene Kundenstamm und die dort eingeführte Marke habe für dieses Unternehmen erhalten werden sollen; der Wille der Parteien sei dahin gegangen, nur das französische Markenrecht, dieses aber ganz auf die Kl. zu übertragen; dafür spreche auch die allerdings verfehlte Bezugnahme auf § 8 des deutschen Warenzeichengesetzes. Das infolge der Rückgliederung des Saarlandes abgespaltene, im Saarland entsprechend §§ 1 ff. des Gesetzes über die Eingliederung des Saarlandes auf dem Gebiete des gewerblichen Rechtsschutzes vom 30. Juni 1959 (BGBl. I 388) aufrechterhaltene deutsche Warenzeichenrecht sei dagegen nicht mit übertragen worden; für die Übertragung des französischen Zeichenrechts sei hiernach französisches Recht maßgebend. Aus Art. 1135 und 1160 Code civil und dem Dekret vom 27. Februar 1891 ergebe sich als Folge der Übertragung des Zeichenrechts die dem § 402 BGB entsprechende Verpflichtung der Bekl., den "vollen Erwerb" des Zeichenrechts durch die Kl. zu unterstützen, zu dem nach französischem Recht die Umschreibung im Zeichenregister gehöre. Da diese aber wiederum eine Urkunde mit einem Inhalt voraussetze, aus dem sich auch Datum und Ort der Anmeldung sowie die Nummer der Zeicheneintragung ergeben, sei die Bekl. verpflichtet, die "Umschreibungsurkunde zu erstellen".

Diese Ausführungen werden von der Revision als den Auslegungsgrundsätzen des deutschen Rechts (§§ 133, 157 BGB) widersprechend angegriffen; bei Anwendung dieser Vorschriften hätte, so meint die Revision, das Berufungsgericht zu dem Ergebnis gelangen müssen, daß nicht eine Übertragung des Zeichenrechts, sondern nur eine Überlassung des Gebrauchs, also die Einräumung einer Lizenz gewollt gewesen sei, von der allein der als Zeuge vernommene Geschäftsführer der Bekl. auch stets gesprochen habe.

Dieser Angriff hat im Ergebnis keinen Erfolg. Entgegen der Ansicht des Berufungsgerichts läßt sich das Klagebegehren bei der hier gegebenen besonderen Sachlage allerdings nicht schon allein aus dem Übertragungsgeschäft als solchem rechtfertigen; vielmehr bedarf es der Heranziehung der diesem zugrunde liegenden schuldrechtlichen Abrede der Parteien, die - wie noch auszuführen ist - nach deutschem Recht zu beurteilen ist.

1. Der Vertrag vom 12. Mai 1960 hatte nach dem insoweit übereinstimmenden Vorbringen der Parteien eine schuldrechtliche Abrede und zugleich ein Erfüllungsgeschäft zum nhalt; Streit geht nur darum, welchen Inhalt die schuldrechtliche Abrede und demzufolge auch das Erfüllungsgeschäft gehabt hat. Ist bei einem schuldrechtlichen Vertrag, der eine Auslandsbeziehung aufweist - wie im Streitfall eine ausdrückliche oder stillschweigend getroffene Vereinbarung über die anzuwendende Rechtsordnung nicht festzustellen, so muß der sogenannte mutmaßliche (hypothetische) Wille der Parteien über die anzuwendende Rechtsordnung festgestellt werden; dabei handelt es sich, wie in der

Rechtsprechung des Bundesgerichtshofs stets angenommen worden ist, weniger um die Ermittlung hypothetischer subjektiver Vorstellungen der Parteien, als um eine vernünftige, im Wege ergänzender Rechtsfindung vorzunehmende Interessenabwägung auf objektiver Grundlage; es ist nach einem Anknüpfungspunkt zu suchen, der sich aus der Eigenart des zu entscheidenden Sachverhalts und aus der Interessenlage unter Berücksichtigung objektiver Gesichtspunkte ergibt; besonderes Gewicht kommt dabei der Frage zu, wo sich der Schwerpunkt des Vertragsverhältnisses befindet (BGHZ 7, 231, 235; vgl. zuletzt **BGH** NJW 1961, 25). Regelmäßig führt diese Bestimmung der Rechtsordnung zu einem einheitlichen Anknüpfungspunkt für alle sich aus dem Vertrage ergebenden Verpflichtungen, nicht zu einer für beide Parteien getrennten (RGZ 68, 203, 207; **BGH** NJW 1961, 25); dagegen kann das Erfüllungsgeschäft, insbesondere eine Rechtsübertragung, als solche nach einer anderen Rechtsordnung zu beurteilen sein, als das ihm zugrunde liegende Verpflichtungsgeschäft (Soergel-Kegel, 9. Aufl. Anm. 252 vor Art. 7 ff. EG BGB).

Die Frage, welches Recht nach dem sogenannten hypothetischen Parteiwillen anzuwenden ist, unterliegt als Rechtsfrage der Nachprüfung des Revisionsgerichts, da es sich um ergänzende Rechtsfindung handelt (NJW 9, 221, 223; **Raape**, Internationales Privatrecht, 5. Aufl. S. 475). Der VIII. Zivilsenat hat allerdings ausgeführt (NJW 1961, 25), bei der Ermittlung dieses hypothetischen Willens handele es sich wesentlich um eine der Nachprüfung im Revisionsverfahren entzogene

tatrichterliche Beurteilung. Das ist jedoch nicht als eine Abkehr von der vorbezeichneten Rechtsprechung anzusehen; diese ist lediglich dahin klarzustellen, daß der sogenannte Schwerpunkt des Vertragsverhältnisses, nach dem sich die Frage des anzuwenden Rechts weitgehend beantwortet, seinerseits davon abhängen kann, worauf der rechtsgeschäftliche Wille der Vertragsschließenden überhaupt gerichtet war; die Beantwortung dieser Frage ist allerdings weitgehend dem Tatrichter vorbehalten. So hängt auch im vorliegenden Fall die Frage, wo der Schwerpunkt des gesamten Vertragsverhältnisses liegt, wesentlich davon ab, auf welchen rechtlichen und wirtschaftlichen Erfolg sich der Wille der Parteien richtete, so insbesondere, ob sie eine endgültige, volle Übertragung des Zeichenrechts ohne Begründung eines Dauerschuldverhältnisses, oder aber eine Lizenzgewährung mit dauernden gegenseitigen Rechten und Pflichten, insbesondere mit einem Recht der Kündigung aus wichtigem Grunde gewollt haben. In einem derartigen Falle gehört die Frage, auf welchen Erfolg sich der Parteiwille richtet, zu den vorab zu ermittelnden Voraussetzungen für die Beantwortung der Frage nach dem anzuwenden Recht; diese Vorfrage aber ist, da noch kein anzuwendendes Recht für das Rechtsverhältnis feststeht, nach den allgemeinen Auslegungsgrundsätzen der §§ 133, 157 BGB zu beantworten, soweit es um die Ermittlung des Parteiwillens geht. Auf die Frage, inwieweit bei dieser Auslegung auch die nach dem in Betracht kommenden ausländischen sachlichen Recht gegebenen rechtlichen Gestaltungsmöglichkeiten als Objekt des Parteiwillens zu berücksichtigen sind, braucht im Streitfall nicht eingegangen zu werden, weil nach dem insoweit übereinstimmenden Parteivortrag im Rahmen beider in Frage stehenden Rechtsordnungen als Gestaltungsmöglichkeiten nur entweder die Übertragung des Zeichenrechts oder die Überlassung des Zeichengebrauchs in Betracht kommen.

2. Die Anwendung französischen Rechts auf die Übertragung des französischen Warenzeichenrechts als solche stellt sich jedoch auch bei dieser vorausgehenden Anwendung der Auslegungsregeln des deutschen Rechts hinsichtlich des rechtsgeschäftlichen Parteiwillens als zutreffend dar. Mit Recht hat das Berufungsgericht bei der Auslegung des Vertrages den von den Parteien verfolgten Zweck entscheidend berücksichtigt. Dieser bestand nach den rechtsirrtumsfrei getroffenen Feststellungen des Berufungsgerichts in der Teilung des ursprünglich einheitlichen Geschäftsbetriebes in zwei unabhängige Unternehmen, deren eines (die Kl.) das fragliche Warenzeichen im französischen Gebiet allein sollte benutzen dürfen; das Berufungsgericht legt den Vertrag ferner dahin aus, der Alleingesellschafter der Bekl. habe in den französischen Betrieb nicht mehr hineinreden wollen, und stellt dazu die Erwägung an, nach französischem Recht könne der Inhaber eines Warenzeichens gegen Dritte, die das Zeichen benutzen, nur vorgehen, wenn er als Zeicheninhaber eingetragen sei. Für die hier zunächst allein zu entscheidende Frage, ob

**BGH: BGH** 21.10.1964 Ib ZR 22/63 "Carla"          GRURAusl 1965 Heft 10          506

der Wille der Vertragschließenden sich auf Übertragung des französischen Zeichenrechts oder nur auf Einräumung einer Gebrauchserlaubnis gerichtet hat, hätte das Berufungsgericht noch darauf hinweisen können, daß der Lizenznehmer nach französischem Recht nicht befugt ist, die Verletzungsklage zu erheben (Kraßer in "Die Warenzeichenlizenz", 1963, S. 94, 108); die Einräumung einer bloßen Lizenz hätte der Kl. daher nicht diejenige Rechtsstellung verschafft, die sie nach dem vom Berufungsgericht festgestellten Willen der Vertragschließenden haben sollte, denn die Kl. wäre dann für die Wahrnehmung ihrer Zeichenrechte in Frankreich auf die Mitwirkung der Bekl. angewiesen gewesen, die sich um den zu errichtenden französischen Betrieb nicht kümmern, sondern ihn selbständig wirtschaften lassen wollte. Auch die übrigen Umstände der Vereinbarung - keine zeitliche Begrenzung der Rechtseinräumung, Übergabe der schriftlichen Unterlagen über die Anmeldung des französischen Warenzeichens, Bezugnahme auf die Vorschrift des § 8 des Deutschen Warenzeichengesetzes - sprechen auch bei Anwendung der Auslegungsregeln des deutschen Rechts eher für, jedenfalls aber nicht gegen das vom Berufungsgericht gewonnene Auslegungsergebnis.

3. Wollten aber die Parteien die volle Übertragung des französischen Zeichenrechts, so ist dem Berufungsgericht weiter jedenfalls darin beizupflichten, daß auf die Übertragung des Zeichenrechts als solche, also auf das Erfüllungsgeschäft, französisches Recht anzuwenden ist. Für die Abtretung von Forderungen (RGZ 65, 357; RG Seuff 79, 353; **BGH** WM 1957, 1574) und die Übertragung von urheberrechtlichen Befugnissen (vgl. OLG München GRUR Ausl. 1960, 75) entspricht dies der in der

Rechtsprechung herrschenden Auffassung (vgl. **Soergel-Kegel**, 9. Aufl., Anm. 250 vor Art. 7 EG BGB). Dasselbe muß grundsätzlich auch für die Übertragung des Rechts aus einem eingetragenen War enzeichen angenommen werden; soweit im Schrifttum für die Abtretung von Forderungen demgegenüber geltend gemacht wird, es sei allgemein oder doch in Fragen des Schuldnerschutzes an das Recht des Schuldnerwohnsitzes anzuknüpfen, bedarf es keiner Stellungnahme, denn für die Übertragung von Zeichenrechten scheidet dieser Anknüpfungspunkt aus.

Die für das übertragene Recht maßgebende Rechtsordnung entscheidet insbesondere darüber, ob das Recht übertragbar ist (RGZ 20, 234; RG Warn 1917 Nr. 113; OLG München a.a.O.). Da nach französischem Recht das Warenzeichen ohne Geschäftsbetrieb übertragen werden kann, hängt die Wirksamkeit der Übertragung des Zeichenrechts oder des auf sie gerichteten schuldrechtlichen Vertrages deshalb nicht davon ab, ob der Geschäftsbetrieb, zu dem das Zeichen bis zur Übertragung gehörte, mit übertragen worden ist.

4. Nach den Feststellungen des Berufungsgerichts gehört nun allerdings nach französischem Recht zum "vollen Erwerb" des Zeichenrechts auch die Umschreibung im Register. Obwohl ein voller Erwerb danach möglicherweise noch nicht gegeben ist, folgert das Berufungsgericht die Pflicht der Bekl., der Kl. zum vollen Erwerb behilflich zu sein, schon aus dem Umstand, daß die Bekl. das Zeichenrecht "übertragen habe". Die Auffassung des Berufungsgerichts ist insoweit, wie auch sein Hinweis auf die entsprechenden Vorschriften des deutschen Rechts (§§ 413, 402 BGB) erkennen läßt, offenbar die, daß die Verpflichtung der Bekl. zur Ausstellung einer zur Umschreibung des Zeichenrechts dienenden Urkunde sich nach französischem Recht schon aus dem abstrakten Übertragungsgeschäft ergebe.

a) Bei dieser Begründung des Klageanspruchs schon aus der Rechtsübertragung als solcher ist das Berufungsgericht ohne dies allerdings näher darzulegen - offenbar weiter davon ausgegangen, daß nach französischem Recht die Übertragung des Zeichenrechts auf die Kl. nicht wirksam wäre, wenn dasselbe Recht schon vorher durch den Vertrag vom 7. Mai 1960 auf den Kaufmann Migeot übertragen worden wäre. Deshalb hat das Berufungsgericht diese Frage geprüft. Ob es bei dieser Prüfung französisches oder deutsches Recht angewandt hat, läßt das Urteil wiederum nicht erkennen. Das nötigt jedoch nicht zu einer Aufhebung des Urteils zur Klärung dieser Frage. Denn die Revision macht nicht etwa geltend, es sei französisches Recht auf diese Vereinbarung anzuwenden und es sei dem Berufungsgericht bei der Feststellung des Inhalts ausländischen Rechts ein Verfahrensfehler unterlaufen. Sie macht vielmehr nur geltend, auf den Vertrag sei deutsches Recht anzuwenden und die Rechtsanwendung des Berufungsgerichts verstoße gegen §§ 133, 157 BGB.

b) Aber auch, wenn man mit der Revision die Anwendbarkeit deutschen Rechts auf die Vereinbarung vom 7. Mai 1960 annimmt, kann die Revision im Ergebnis keinen Erfolg haben.

Zwar bestehen rechtliche Bedenken gegen die Meinung des Berufungsgerichts, das Zeichenrecht sei deshalb nicht wirksam auf Migeot übertragen worden, weil der damalige Geschäftsführer und Alleininhaber der Geschäftsanteile der beklagten Gesellschaft die Übertragung im eigenen Namen erklärt habe. Für die Revisionsinstanz ist deshalb davon auszugehen, daß das Warenzeichen schon am 7. Mai 1960 wirksam an einen Dritten übertragen worden und somit die spätere Übertragung desselben Zeichens gegenüber der Kl. nicht wirksam war. Infolgedessen ist dem Berufungsurteil die rechtliche Grundlage insoweit entzogen, als es die Pflicht der Bekl. zur Abgabe der geforderten ergänzenden Erklärung allein schon aus dem Übertragungsgeschäft selbst herleitet. Aber dieselbe Verpflichtung ergibt sich jedenfalls aus dem im Vertrag vom 12. Mai 1960 nach der vom Berufungsgericht getroffenen Auslegung ferner enthaltenen Grundgeschäft, dessen Wirksamkeit von der Unwirksamkeit des Erfüllungsgeschäfts nicht berührt wird. Danach fiel die Übertragung des Zeichenrechts in den Rahmen der Gesamtvereinbarung über das Ausscheiden des jetzigen Gesellschafter der Kl. aus der Bekl. und ihrer Auseinandersetzung mit dem verbleibenden Gesellschafter der Bekl. Nach diesem Vertrage ist die Bekl. verpflichtet, der Kl. das französische Zeichenrecht zu verschaffen und deshalb auch Erklärungen abzugeben, die wie das Berufungsgericht feststellt - nach dem französischen Verfahrensrecht erforderlich sind, um die Umschreibung im Register zu bewirken. Die Erfüllung dieser Verpflichtung ist auch bei Wirksamkeit der behaupteten voraufgehenden Abtretung des Rechts an dem Warenzeichen an Migeot nicht etwa objektiv unmöglich gewesen oder geworden; sie kann daher ohne

Rücksicht auf diese behauptete Abtretung gefordert werden.

Das Berufungsgericht hat diese Verpflichtung augenscheinlich aus den Vorschriften der Art. 1135 und 1160 Code civil hergeleitet. Dagegen erhebt die Revision Bedenken, die jedoch im Ergebnis nicht zu einer anderen Beurteilung führen können. Auch wenn das Erfüllungsgeschäft - hier die Übertragung des Zeichenrechts - nach ausländischem Recht zu beurteilen ist, kann allerdings für das zugrunde liegende Rechtsgeschäft inländisches Recht maßgebend sein (vgl. **Soergel- Kegel**, a.a.O., Anm. 252); für den Standpunkt der Revision, daß insoweit deutsches Recht anzuwenden sei, spricht das Verhalten der Parteien im Rechtsstreit, die übereinstimmend vorgetragen haben, daß französisches Recht nur anzuwenden sei, soweit die "dingliche" Übertragung des französischen Zeichenrechts in Frage stehe; so hat die Kl. aus § 242 BGB die vertragliche Nebenpflicht der Bekl. zur Abgabe der geforderten Erklärung hergeleitet; die Bekl. hat die Nichtigkeit des Grundgeschäfts nach deutschem Recht geltend gemacht, weil das abgetretene Recht im Zeitpunkt der Erklärung schon nicht mehr der Bekl. zugestanden habe, und sie hat deshalb die Vorschriften der §§ 402, 413 als nicht anwendbar bezeichnet. Gehen aber die Parteien im Rechtsstreit übereinstimmend von einem Recht als dem maßgebenden aus, so ist das beim Fehlen sonstiger eindeutiger Hinweise auf einen objektiven Schwerpunkt des Rechtsgeschäfts ein sehr starkes Beweiszeichen für einen mutmaßlichen Willen in dieser Richtung (**BGH** LM Nr. 1 und 17 zu Art. 7 ff. EG BGB - Deutsches internationales Privatrecht). Es kommt hier hinzu, daß die fragliche Vereinbarung nur einen Teil einer Auseinandersetzung zwischen Gesellschaftern einer inländischen Gesellschaft bildete. Da das Berufungsgericht in bezug auf den. schuldrechtlichen Teil des Vertrages vom 12. Mai 1960 keinen gegenteiligen Willen der Parteien festgestellt und auch sonst keine Anhaltspunkte hervorgehoben hat, die gegen die Anwendbarkeit deutschen Rechts auf diesen Teil des Vertrages sprechen, muß hiernach von der Anwendbarkeit dieses Rechts ausgegangen werden. Diesen Standpunkt haben in der Revisionsverhandlung auch beide Parteien vertreten.

Aber auch nach deutschem Recht ergibt, wie bereits unter III 2 erörtert worden ist, die Auslegung des Willens der Parteien zweifelsfrei, daß die Bekl. verpflichtet ist, der Kl. das französische Zeichenrecht zu verschaffen und ihr

**BGH: BGH** 21.10.1964 Ib ZR 22/63 **"Carla"**          GRURAusl 1965 Heft 10      507

deshalb dabei behilflich zu sein, die Umschreibung des französischen Warenzeichens herbeizuführen; dazu gehört, daß die Bekl. die nach dem französischen Verfahrensrecht erforderlichen ergänzenden Erklärungen abgibt, und zwar in Schriftform, da diese Form den selbstverständlichen Gepflogenheiten des Geschäftsverkehrs entspricht (§ 157 BGB).

[AR 1011]

*Kein amtlicher Leitsatz.
*Kein amtlicher Leitsatz.

© Copyright C.H. Beck

N



**Bundesministerium
der Justiz**

juris

Nichtamtliches Inhaltsverzeichnis

# § 195 Regelmäßige Verjährungsfrist

Die regelmäßige Verjährungsfrist beträgt drei Jahre.

zum Seitenanfang                    Datenschutz                    Seite ausdrucken



*FEDERAL SUPREME COURT, IX ZR 139/04 OF JUNE 23, 2005*

# BUNDESGERICHTSHOF

## IM NAMEN DES VOLKES

## URTEIL

IX ZR 139/04

Verkündet am:
23. Juni 2005
Bürk
Justizhauptsekretärin
als Urkundsbeamtin
der Geschäftsstelle

in dem Rechtsstreit

| | |
|---|---|
| Nachschlagewerk: | ja |
| BGHZ: | nein |
| BGHR: | ja |

---

BRAO § 55 Abs. 3, § 53 Abs. 9 und 10; InsO § 95 Abs. 1; BGB §§ 667, 271

a) Der amtlich bestellte Abwickler einer Kanzlei kann auch dann mit seiner Vergütungsforderung gegen den Anspruch auf Herausgabe des aus der Abwicklung Erlangten aufrechnen, wenn zwischenzeitlich das Insolvenzverfahren über das Vermögen des Vertretenen eröffnet worden ist.

b) Nach Ablauf seiner Bestellung ist der ehemalige Abwickler zur Herausgabe des bis dahin nicht ausgekehrten Fremdgeldes an den Verwalter verpflichtet. Eine Aufrechnung mit seinem Vergütungsanspruch ist unzulässig.

BGH, Urteil vom 23. Juni 2005 - IX ZR 139/04 - OLG Rostock
LG Rostock

- 3 -

Der IX. Zivilsenat des Bundesgerichtshofs hat auf die mündliche Verhandlung vom 23. Juni 2005 durch den Vorsitzenden Richter Dr. Fischer, die Richter Raebel, Vill, Cierniak und die Richterin Lohmann

für Recht erkannt:

      Die Revision des Klägers und die Anschlußrevision des Beklagten gegen das Urteil des 3. Zivilsenats des Oberlandesgerichts Rostock vom 14. Juni 2004 werden zurückgewiesen.

      Von den Kosten des Revisionsverfahrens tragen der Kläger 62 % und der Beklagte 38 %.

Von Rechts wegen

Tatbestand:

      Der Beklagte war vom 1. Januar 1999 bis zum 31. Dezember 2001 amtlich bestellter Abwickler der Kanzlei des ehemaligen Rechtsanwalts R.    (fortan: Schuldner). Am 14. Oktober 1999 wurde das Insolvenzverfahren über das Vermögen des Schuldners eröffnet; der Kläger wurde zum Treuhänder bestellt. Der Kläger verlangt die Auszahlung eines Betrages von 21.057,78 Euro, der sich am 31. Dezember 1999 auf dem vom Beklagten für die Abwicklung eingerichteten Bankkonto befand. Der Beklagte hat die Ansicht vertreten, die Kanzlei werde nicht vom Insolvenzbeschlag erfaßt. Hilfsweise hat er mit seinem Vergütungsanspruch aufgerechnet, den er zunächst mit 32.058 Euro beziffert hat.

- 4 -

Das Landgericht hat die Klage als derzeit unbegründet abgewiesen, weil die Abwicklung im Zeitpunkt der letzten mündlichen Verhandlung noch nicht beendet war (ZInsO 2002, 290). Während des Berufungsverfahrens hat die Rechtsanwaltskammer Mecklenburg-Vorpommern die Vergütung des Beklagten auf 17.639,57 Euro festgesetzt. Am 31. Dezember 2001, als die Bestellung des Beklagten auslief, wies das Abwicklungskonto einen Stand von 31.593,08 Euro auf; ein Betrag von 9.592,36 Euro entfiel auf Fremdgeld. Der Kläger hat weiterhin nur Auszahlung des Guthabens am 31. Dezember 1999 verlangt. Das Berufungsgericht hat den Beklagten unter Zurückweisung der weitergehenden Berufung zur Zahlung von 7.963,49 Euro nebst Zinsen verurteilt (ZIP 2004, 1857). Es hat die Revision zugelassen, weil die Rechtsfrage, ob die Vergütungsforderung des Abwicklers einer Anwaltskanzlei eine Masseverbindlichkeit oder eine einfache Insolvenzforderung darstelle, von grundsätzlicher Bedeutung sei.

Gegen dieses Urteil richten sich die Revision des Klägers und die Anschlußrevision des Beklagten. Der Kläger verlangt Zahlung des gesamten Guthabens des Abwicklungskontos am 31. Dezember 1999; der Beklagte erstrebt die vollständige Abweisung der Klage.

### Entscheidungsgründe:

Die Revision des Klägers und die Anschlußrevision des Beklagten bleiben ohne Erfolg.

- 5 -

I.

Dem Kläger war gegen die Versäumung der Revisions- und der Revisionsbegründungsfrist Wiedereinsetzung in den vorigen Stand zu gewähren. Das Berufungsurteil ist dem Kläger am 16. Juni 2004 zugestellt worden. Am 16. Juli 2004 hat der Kläger Prozeßkostenhilfe für das Revisionsverfahren beantragt. Der Beschluß über die Bewilligung von Prozeßkostenhilfe ist ihm am 9. Februar 2005 zugestellt worden. Noch am 9. Februar 2005 hat der Kläger durch einen am Bundesgerichtshof zugelassenen Rechtsanwalt Revision eingelegt und Wiedereinsetzung in den vorigen Stand beantragt; am 9. März 2005 ist die Revisionsbegründung eingegangen. Die Wiedereinsetzungsfristen für die Einlegung der Revision (§ 234 Abs. 1 Satz 1 ZPO) und deren Begründung (§ 234 Abs. 1 Satz 2 ZPO) sind damit gewahrt worden.

II.

Das Berufungsgericht hat ausgeführt: Der Anspruch des Klägers auf Herausgabe dessen, was der Beklagte aus der Abwicklung der Kanzlei erlangt habe, folge aus § 667 BGB in Verbindung mit § 55 Abs. 3 Satz 1, § 53 Abs. 9 Satz 2 BRAO. Er erstrecke sich insbesondere auf die Entgelte, die der Beklagte nach der Eröffnung des Insolvenzverfahrens eingenommen habe, aber auch auf die Fremdgelder in Höhe von 7.963,49 Euro; denn der Beklagte sei nach Ende der Abwicklung nicht mehr berechtigt, über diese Fremdgelder zu verfügen. Nunmehr sei es Aufgabe des Klägers, die Fremdgelder an die Berechtigten - denen ein Aussonderungsrecht nach § 47 InsO zustehe - herauszugeben. Der Anspruch sei mit Ende der Abwicklung am 31. Dezember 2001 fällig geworden.

- 6 -

Der Beklagte könne jedoch mit seiner Vergütungsforderung aus § 670 BGB in Verbindung mit § 55 Abs. 3 Satz 1, § 53 Abs. 9 Satz 2 BRAO in der festgesetzten Höhe aufrechnen. Die Vergütungsforderung sei eine Masseverbindlichkeit, auch soweit die Tätigkeit des Beklagten vor Eröffnung des Insolvenzverfahrens entgolten werde. Die durch Fehlen einer den Rang der Abwicklungsvergütung bestimmenden Norm begründete Regelungslücke in der Insolvenzordnung sei durch die entsprechende Anwendung des § 324 Abs. 1 Nr. 6 InsO zu füllen. Die Bürgenhaftung der Rechtsanwaltskammer gemäß § 53 Abs. 10 Satz 6 BRAO stehe nicht entgegen. Der Beklagte könne seine gesamte Vergütungsforderung zur Aufrechnung stellen, obwohl der Kläger den Saldo per 31. Dezember 1999 verlange; denn die Vergütung sei insgesamt fällig. Nur gegenüber dem Anspruch auf Auskehrung des Fremdgeldes sei die Aufrechnung unzulässig.

III.

Diese Ausführungen halten einer rechtlichen Überprüfung im Ergebnis stand.

1. Revision des Klägers

Grundlage des Begehrens des Klägers ist § 667 BGB in Verbindung mit § 55 Abs. 3 Satz 1, § 53 Abs. 9 Satz 2 BRAO und § 80 InsO. Der Anspruch auf Herausgabe des aus der Abwicklung Erlangten ist gemäß § 35 InsO Bestandteil der Insolvenzmasse.

- 7 -

a) Gegenstand der Revision des Klägers ist der vom Berufungsgericht wegen der vom Beklagten erklärten Aufrechnung abgewiesene Anspruch auf Zahlung (vgl. BGHZ 71, 380, 382) von (21.057,78 - 7.963,49 =) 13.094,29 Euro. Die Rüge der Revision, das Berufungsgericht habe keinen richterlichen Hinweis erteilt, welchen Streitgegenstand es annehmen wolle, geht fehl. Das Berufungsgericht hat im Termin zur letzten mündlichen Verhandlung am 24. Mai 2004 ausdrücklich darauf hingewiesen, daß der Beklagte mittlerweile die Schlußrechnung vorgelegt habe und auf dieser Basis entschieden werden könne. Der Kläger hat seinen Antrag gleichwohl nicht umgestellt. Damit hat er ausdrücklich davon abgesehen, eine über den Betrag von 21.057,78 Euro hinausgehende Forderung - sei es auch hilfsweise - in diesem Rechtsstreit geltend zu machen.

b) Dieser Anspruch ist jedoch gemäß §§ 387, 389 BGB durch Aufrechnung mit dem Vergütungsanspruch erloschen. Die Parteien streiten darum, ob der Vergütungsanspruch des Beklagten aus § 55 Abs. 3, § 53 Abs. 10 Satz 4 BRAO als Abwickler der Kanzlei des Schuldners eine Masseforderung oder nur eine Insolvenzforderung darstellt. Diese Rechtsfrage wird jedoch nicht entscheidungserheblich; denn die Aufrechnung ist auch dann, wenn man dem Beklagten nur eine Insolvenzforderung zugesteht, gemäß § 95 Abs. 1 Satz 1 InsO zulässig.

aa) Die Abwicklung ist vor Eröffnung des Insolvenzverfahrens über das Vermögen des Schuldners angeordnet worden. Damit entstanden dem Grunde nach sowohl der Anspruch auf Herausgabe des Erlangten (vgl. BGHZ 71, 380, 384 f) als auch der Vergütungsanspruch.

- 8 -

bb) Beide Ansprüche sind gleichzeitig mit dem Ende der Abwicklung - also nach Eröffnung des Insolvenzverfahrens - fällig geworden.

(1) Die Fälligkeit eines Anspruchs aus § 667 BGB richtet sich nach den getroffenen Vereinbarungen, hilfsweise nach den Umständen des jeweiligen Falles (§ 271 Abs. 1, 2. Fall BGB). Der Anspruch auf Herausgabe dessen, was der Beauftragte zur Ausführung des Auftrags erhalten hat, wird in der Regel erst dann fällig, wenn der Zweck erreicht oder endgültig verfehlt wurde (BGH, Urt. v. 3. Mai 2005 - IX ZR 401/00, z.V.b.; Soergel/Beuthien, BGB 12. Aufl. § 667 Rn. 19; Erman/Ehmann, BGB 11. Aufl. § 667 Rn. 7; MünchKomm-BGB/Seiler, 4. Aufl. § 667 Rn. 20). Das aus der Geschäftsführung Erlangte - insbesondere für den Auftraggeber eingezogenes Geld - kann demgegenüber schon dann herauszugeben sein, wenn der Beauftragte etwas erlangt hat, was herauszugeben ist (Erman/Ehmann, aaO Rn. 27); auch hier kommt es jedoch auf die Umstände des Einzelfalles an (Soergel/Beuthien, aaO Rn. 21; Palandt/Sprau, BGB 64. Aufl. § 667 Rn. 8; vgl. auch BGHZ 109, 260, 264).

(2) Das vom Beklagten während der Dauer der Abwicklung verwaltete Guthaben auf dem Abwicklungskonto war - auch soweit der Beklagte gemäß § 55 Abs. 3, § 53 Abs. 9 und 10 BRAO Gebührenforderungen des Schuldners eingezogen hat - nicht nur "aus der Geschäftsbesorgung erlangt" (§ 667 Fall 2 BGB), sondern diente auch der weiteren "Ausführung des Auftrags" (§ 667 Fall 1 BGB). Der nach § 55 BRAO bestellte Abwickler hat das vorhandene Barvermögen in Besitz zu nehmen, um daraus die Kosten für die vorläufige Aufrechterhaltung des Kanzleibetriebs zu bestreiten (Feuerich/Weyland, BRAO 6. Aufl. § 53 Rn. 36; vgl. auch die Hinweise der Bundesrechtsanwaltskammer für die Tätigkeit des Abwicklers, BRAK-Mitt. 1995, 238, 239). Gleiches gilt für eingehende Gebühren. Diese können im Rahmen des Erforderlichen ebenfalls

- 9 -

für Aufwendungen wie Porto- oder Gerichtskosten (§ 55 Abs. 3, § 53 Abs. 9 Satz 2 BRAO, § 670 BGB) und für Vorschüsse auf die spätere Vergütung verwandt werden (BGHZ 156, 362, 369 f). In der Regel wird der Anspruch auf Herausgabe des Erlangten nach § 53 Abs. 9 Satz 2 BRAO, § 667 BGB also erst mit dem Ende der Abwicklung fällig werden.

(3) Anders könnte möglicherweise zu entscheiden sein, wenn der Abwickler Überschüsse erwirtschaftet, die offensichtlich nicht mehr für die weitere Abwicklung benötigt werden (§ 271 Abs. 1 Fall 2 BGB). Um einen solchen Fall handelte es sich hier jedoch nicht. Nach der jetzt vorliegenden Endabrechnung wies das Abwicklungskonto am 31. Dezember 2001 einen Stand von 31.593,03 Euro auf. Abzüglich der Fremdgelder von insgesamt 9.592,36 Euro und der Abwicklervergütung von 17.639,57 Euro bleibt nur ein Betrag von 4.361,10 Euro, welcher der Masse zugute kommt. Am 31. Dezember 1999 - auf diesen Stichtag möchte der Kläger abstellen - stand keinesfalls fest, ob die Abwicklung einen Überschuß erbringen oder auch nur zur Deckung aller Unkosten ausreichen würde. Entgegen der Ansicht der Revision war es nicht Sache des Beklagten, im einzelnen darzulegen, in welcher Höhe das am 31. Dezember 1999 vorhandene Guthaben auf dem Abwicklungskonto für die weitere Abwicklung der Kanzlei benötigt werden würde. Darlegungs- und beweispflichtig für die tatsächlichen Voraussetzungen eines Anspruchs aus § 667 BGB ist der Auftraggeber (BGH, Urt. v. 18. November 1986 - IVa ZR 79/85, WM 1987, 80), der gemäß § 666 BGB jederzeit einen Auskunftsanspruch über den Stand der Geschäfte geltend machen kann. Der Auftragnehmer hat lediglich die bestimmungsgemäße Verwendung etwa erhaltener Gelder - die hier nicht im Streit ist - zu beweisen (vgl. BGH, Urt. v. 4. Oktober 2001 - III ZR 290/00, BGH-Report 2002, 71; v. 4. November 2002 - II ZR 210/00, BGH-Report 2003, 331; v. 19. Februar 2004 - III ZR 147/03, WM 2004, 2213).

- 10 -

(4) Der Vergütungsanspruch des Abwicklers wird ebenfalls mit dem Ende der Abwicklung fällig. Zuvor hat der Abwickler nur Anspruch auf Sicherheit (§ 53 Abs. 10 Satz 4 BRAO) und Vorschüsse (§ 53 Abs. 10 Satz 6 BRAO). Die Festsetzung durch die zuständige Rechtsanwaltskammer ist keine Fälligkeitsvoraussetzung. Sie ist nicht obligatorisch, sondern wird nur dann erforderlich, wenn sich die Beteiligten nicht über die Höhe der Vergütung einigen können (§ 53 Abs. 10 Satz 5 BRAO).

c) Folge der Aufrechnung ist das Erlöschen der beiderseitigen Forderungen, soweit sie sich decken (§ 389 BGB). Der Vergütungsanspruch des Beklagten gemäß § 55 Abs. 3 Satz 1, § 53 Abs. 10 Satz 4 BRAO beträgt 17.639,57 Euro. In dieser Höhe hat die zuständige Rechtsanwaltskammer Mecklenburg-Vorpommern die Vergütung gemäß § 55 Abs. 3, § 53 Abs. 10 Satz 5 BRAO festgesetzt. Die Festsetzung ist auch im Verhältnis zum Kläger bestandskräftig. Der Einwand des Klägers, er sei am Festsetzungsverfahren nicht beteiligt worden, widerspricht den Feststellungen des angefochtenen Urteils. Das Berufungsgericht hat die Akten der Rechtsanwaltskammer beigezogen. Aus diesen ergab sich, daß der Bescheid über die Festsetzung der Vergütung dem Kläger spätestens am 9. Februar 2004 zugestellt worden ist und der Kläger innerhalb der Monatsfrist des § 223 Abs. 1 BRAO keinen Antrag auf gerichtliche Überprüfung gestellt hat. Die entsprechenden Ausführungen im Tatbestand des angefochtenen Urteils hat der Kläger nicht durch einen Tatbestandsberichtigungsantrag angegriffen.

- 11 -

2. Anschlußrevision des Beklagten

a) Die Revision des Beklagten ist als Anschlußrevision zulässig. § 554 Abs. 2 Satz 1 ZPO erklärt die Anschlußrevision auch dann für statthaft, wenn "die Revision nicht zugelassen worden ist". In der bisherigen Rechtsprechung des Bundesgerichtshofs ist offengeblieben, ob mit Rücksicht auf die Abhängigkeit der Anschlußrevision von der Hauptrevision ein rechtlicher oder wirtschaftlicher Zusammenhang zwischen dem Streitgegenstand der Hauptrevision und demjenigen der Anschlußrevision bestehen muß (BGHZ 155, 189, 191 f; BGH, Urt. v. 24. Mai 2005 - IX ZR 276/03, z.V.b.). Diese Frage bedarf auch im vorliegenden Fall keiner Entscheidung, weil ein entsprechender Zusammenhang besteht. Sowohl die Haupt- als auch die Anschlußrevision betreffen die Frage, ob und in welchem Umfang der nach §§ 55, 53 BRAO bestellte Abwickler einer Rechtsanwaltskanzlei gegenüber dem Treuhänder im Insolvenzverfahren über das Vermögen des Rechtsanwalts herausgabepflichtig ist. Die Frist des § 554 Abs. 1 Satz 2 ZPO ist eingehalten worden.

b) Die Anschlußrevision bleibt jedoch ohne Erfolg. Der Herausgabeanspruch des Klägers aus § 667 BGB in Verbindung mit § 55 Abs. 3 Satz 1, § 53 Abs. 9 Satz 2 BRAO und § 80 InsO erstreckt sich auch auf das vom Beklagten eingezogene Fremdgeld.

aa) Entgegen der Ansicht der Anschlußrevision steht das Aussonderungsrecht (§ 47 InsO) der Auftraggeber des Schuldners diesem Anspruch nicht entgegen. Der Herausgabeanspruch der Mandanten aus § 667 BGB richtet sich gegen den Schuldner, den ehemaligen Rechtsanwalt nämlich, in dessen Interesse, für dessen Rechnung und auf dessen Kosten der Beklagte tätig geworden ist (§ 55 Abs. 3, § 53 Abs. 9 Satz 1 BRAO). Während seiner Bestellung zum

- 12 -

Abwickler der Kanzlei des Schuldners hätte der Beklagte diese Ansprüche be-
friedigen können und müssen. An Weisungen des Vertretenen ist der Abwickler
nicht gebunden (§ 55 Abs. 3, § 53 Abs. 10 Satz 2 BRAO). Nach Ablauf der Be-
stellung besteht demgegenüber keine Grundlage für ein Handeln des Beklagten
namens des Schuldners mehr, wie auch die Gläubiger keine Möglichkeit mehr
haben, Zahlungen durch den Beklagten zwangsweise durchzusetzen.

bb) Daß der Kläger während der Dauer der Abwicklung einer Auszahlung
von Fremdgeld an die Berechtigten zu Unrecht widersprochen hat, steht seinem
Anspruch auf Herausgabe des aus der Abwicklung Erlangten nach Ablauf der
Bestellung des Beklagten nicht entgegen. Gegebenenfalls haftet er den Berech-
tigten aus § 60 InsO; der Beklagte - der die Auszahlungen trotz des Wider-
spruchs des Klägers hätte vornehmen müssen (§ 55 Abs. 3, § 53 Abs. 10
Satz 2 BRAO) - kann sich darauf jedoch nicht berufen. Im übrigen war sein ei-
genes Verhalten nicht weniger widersprüchlich als dasjenige des Klägers; denn
er hat seinerseits die Auszahlung an die Mandanten wegen des angeblichen
"Insolvenzbeschlages" des Geldes verweigert.

c) Die hilfsweise erklärte Aufrechnung mit dem restlichen Vergütungsan-
spruch des Beklagten ist unzulässig. Über die gesetzlich oder vertraglich aus-
drücklich geregelten Fälle hinaus ist eine Aufrechnung ausgeschlossen, wenn
das nach dem besonderen Inhalt des zwischen den Parteien begründeten
Schuldverhältnisses als stillschweigend vereinbart angesehen werden muß
oder wenn die Natur der Rechtsbeziehung oder der Zweck der geschuldeten
Leistung eine Erfüllung im Wege der Aufrechnung als mit Treu und Glauben
(§ 242 BGB) unvereinbar erscheinen läßt. Nach ständiger Rechtsprechung des
Bundesgerichtshofes dürfen insbesondere Treuhänder gegen den Anspruch auf
Herausgabe des Erlangten nicht beliebig aufrechnen, es sei denn, die Gegen-

- 13 -

forderungen haben ihren Grund in dem Treuhandverhältnis oder dem Auftrag und den damit verbundenen Aufwendungen (BGHZ 95, 109, 113; 113, 90, 93 f; BGH, Urt. v. 21. Januar 1999 - I ZR 209/96, WM 1999, 1462, 1463).

aa) Das Fremdgeld, dessen Auskehrung der Kläger verlangt, beruht auf Einziehungsaufträgen, die der Beklagte in seiner Eigenschaft als Abwickler der Kanzlei des Schuldners von dessen Mandanten erhalten hatte. Es mußte an die Mandanten des Schuldners ausgekehrt werden, in deren Auftrag es eingezogen worden war. Diesen gegenüber wäre eine Aufrechnung mit dem Vergütungsanspruch allerdings schon mangels Gegenseitigkeit der beiderseitigen Forderungen unzulässig gewesen; denn der Vergütungsanspruch des Abwicklers richtet sich gegen den Vertretenen, nicht gegen dessen Mandanten (§ 55 Abs. 3, § 53 Abs. 10 Satz 4 BRAO).

bb) Auch nach dem Ende der Abwicklungstätigkeit besteht die Zweckbindung des Fremdgeldes fort. Der Anspruch der Mandanten des Schuldners gegen diesen auf Auskehrung der ihnen zustehenden Beträge bleibt unberührt (vgl. für den umgekehrten Fall der Anordnung der Abwicklung OLG Düsseldorf AnwBl. 1997, 226). Der Beklagte ist lediglich nicht mehr berechtigt, für den Schuldner zu handeln; dieser - und für ihn gemäß § 80 InsO der Kläger - muß den Anspruch vielmehr selbst erfüllen. Diese Zweckbindung prägt auch das Rechtsverhältnis der Parteien. Der Beklagte kann sich folglich nicht dadurch, daß er die Ansprüche der Gläubiger pflichtwidrig nicht erfüllt hat, einen Vorteil verschaffen, nämlich die vor dem Ende der Bestellung zum Abwickler nicht bestehende Möglichkeit der Aufrechnung mit seiner Gebührenforderung.

3. Der Senat sieht Anlaß zu folgendem Hinweis: In den Tatsacheninstanzen hat der Kläger die Auffassung vertreten, nicht zur Aussonderung des vom

- 14 -

Beklagten eingezogenen Fremdgeldes verpflichtet zu sein, weil der Beklagte dieses Geld nicht auf einem Anderkonto, sondern auf dem von ihm selbst eingerichteten und auf seinen Namen lautenden Abwicklungskonto verwahrt habe (ebenso Bähr, jurisPR-InsR 2/2005 vom 12. Mai 2005, Anm. 4). Diese Ansicht ist unrichtig. Das Fremdgeld wäre nur dann vom Insolvenzbeschlag erfaßt worden, wenn es sich auf einem Konto des Schuldners befunden hätte. Rechte an einem Konto des Beklagten standen der Masse hingegen nicht zu. Während der Dauer der Abwicklung gehörte das Fremdgeld unter keinem denkbaren Gesichtspunkt zur Masse. Daran ändert sich nichts durch die Herausgabe des Fremdgeldes an den Kläger. Die für den Beklagten geltende Zweckbindung der Treuhand gegenüber den Mandanten des Schuldners hat der Kläger daher in gleicher Weise zu beachten. Das Geld ist ohne weitere Sachprüfung an die Mandanten auszukehren, denen es seit 1999 rechtswidrig vorenthalten wird.

Fischer                              Raebel                                      Vill

              Cierniak                                    Lohmann

P-Part 1.

Ein Service der juris GmbH - www.juris.de -

# Gesetz über den Schutz von Marken und sonstigen Kennzeichen (Markengesetz - MarkenG)

MarkenG

Ausfertigungsdatum: 25.10.1994

Vollzitat:

"Markengesetz vom 25. Oktober 1994 (BGBl. I S. 3082, (1995, 156)), zuletzt geändert durch Artikel 16 des Gesetzes vom 12. Dezember 2007 (BGBl. I S. 2840)"

Stand: Zuletzt geändert durch Art. 12 Abs. 3 G v. 13.12.2007 I 2897

**Fußnote**

Textnachweis ab: 1.1.1995
Amtlicher Hinweis des Normgebers auf EG-Recht:
    Umsetzung der
      EWGRL 104/89 (CELEX Nr: 389L0104)

Das G wurde als Artikel 1 G (423-5-1) v. 25.10.1994 I 3082 vom Bundestag mit Zustimmung des Bundesrates beschlossen. Es ist gem. Art. 50 Abs. 3 dieses G nach Maßgabe der Abs. 1 und 2 mWv 1.1.1995 in Kraft getreten.

## Inhaltsübersicht

Teil 1
    Anwendungsbereich
§ 1             Geschützte Marken und sonstige Kennzeichen
§ 2             Anwendung anderer Vorschriften
Teil 2
    Voraussetzungen, Inhalt und Schranken des Schutzes von Marken und geschäftlichen
    Bezeichnungen; Übertragung und Lizenz
        Abschnitt 1
           Marken und geschäftliche Bezeichnungen; Vorrang und Zeitrang
§ 3             Als Marke schutzfähige Zeichen
§ 4             Entstehung des Markenschutzes
§ 5             Geschäftliche Bezeichnungen
§ 6             Vorrang und Zeitrang
        Abschnitt 2
           Voraussetzungen für den Schutz von Marken durch Eintragung
§ 7             Inhaberschaft
§ 8             Absolute Schutzhindernisse
§ 9             Angemeldete oder eingetragene Marken als relative
             Schutzhindernisse
§ 10           Notorisch bekannte Marken
§ 11           Agentenmarken

§ 12                Durch Benutzung erworbene Marken und geschäftliche Bezeichnungen
                    mit älterem Zeitrang
§ 13                Sonstige ältere Rechte
        Abschnitt 3
            Schutzinhalt; Rechtsverletzungen
§ 14                Ausschließliches Recht des Inhabers einer Marke;
                    Unterlassungsanspruch; Schadensersatzanspruch
§ 15                Ausschließliches Recht des Inhabers einer geschäftlichen
                    Bezeichnung; Unterlassungsanspruch; Schadensersatzanspruch
§ 16                Wiedergabe einer eingetragenen Marke in Nachschlagewerken
§ 17                Ansprüche gegen Agenten oder Vertreter
§ 18                Vernichtungsanspruch
§ 19                Auskunftsanspruch
        Abschnitt 4
            Schranken des Schutzes
§ 20                Verjährung
§ 21                Verwirkung von Ansprüchen
§ 22                Ausschluß von Ansprüchen bei Bestandskraft der Eintragung einer
                    Marke mit jüngerem Zeitrang
§ 23                Benutzung von Namen und beschreibenden Angaben; Ersatzteilgeschäft
§ 24                Erschöpfung
§ 25                Ausschluß von Ansprüchen bei mangelnder Benutzung
§ 26                Benutzung der Marke
        Abschnitt 5
            Marken als Gegenstand des Vermögens
§ 27                Rechtsübergang
§ 28                Vermutung der Rechtsinhaberschaft; Zustellungen an den Inhaber
§ 29                Dingliche Rechte; Zwangsvollstreckung; Insolvenzverfahren
§ 30                Lizenzen
§ 31                Angemeldete Marken
Teil 3
    Verfahren in Markenangelegenheiten
        Abschnitt 1
            Eintragungsverfahren
§ 32                Erfordernisse der Anmeldung
§ 33                Anmeldetag; Anspruch auf Eintragung; Veröffentlichung der
                    Anmeldung
§ 34                Ausländische Priorität
§ 35                Ausstellungspriorität
§ 36                Prüfung der Anmeldungserfordernisse
§ 37                Prüfung auf absolute Schutzhindernisse
§ 38                Beschleunigte Prüfung
§ 39                Zurücknahme, Einschränkung und Berichtigung der Anmeldung
§ 40                Teilung der Anmeldung
§ 41                Eintragung
§ 42                Widerspruch
§ 43                Einrede mangelnder Benutzung; Entscheidung über den Widerspruch
§ 44                Eintragungsbewilligungsklage
        Abschnitt 2
            Berichtigung; Teilung; Schutzdauer und Verlängerung
§ 45                Berichtigung des Registers und von Veröffentlichungen
§ 46                Teilung der Eintragung
§ 47                Schutzdauer und Verlängerung
        Abschnitt 3
            Verzicht, Verfall und Nichtigkeit; Löschungsverfahren

§ 48            Verzicht
§ 49            Verfall
§ 50            Nichtigkeit wegen absoluter Schutzhindernisse
§ 51            Nichtigkeit wegen des Bestehens älterer Rechte
§ 52            Wirkungen der Löschung wegen Verfalls oder Nichtigkeit
§ 53            Löschung durch das Patentamt wegen Verfalls
§ 54            Löschungsverfahren vor dem Patentamt wegen absoluter
                Schutzhindernisse
§ 55            Löschungsverfahren vor den ordentlichen Gerichten
        Abschnitt 4
            Allgemeine Vorschriften für das Verfahren vor dem Patentamt
§ 56            Zuständigkeiten im Patentamt
§ 57            Ausschließung und Ablehnung
§ 58            Gutachten
§ 59            Ermittlung des Sachverhalts; rechtliches Gehör
§ 60            Ermittlungen; Anhörungen; Niederschrift
§ 61            Beschlüsse; Rechtsmittelbelehrung
§ 62            Akteneinsicht; Registereinsicht
§ 63            Kosten der Verfahren
§ 64            Erinnerung
§ 64a           Kostenregelungen im Verfahren vor dem Patentamt
§ 65            Rechtsverordnungsermächtigung
        Abschnitt 5
            Verfahren vor dem Patentgericht
§ 66            Beschwerde
§ 67            Beschwerdesenate; Öffentlichkeit der Verhandlung
§ 68            Beteiligung des Präsidenten des Patentamts
§ 69            Mündliche Verhandlung
§ 70            Entscheidung über die Beschwerde
§ 71            Kosten des Beschwerdeverfahrens
§ 72            Ausschließung und Ablehnung
§ 73            Ermittlung des Sachverhalts; Vorbereitung der mündlichen
                Verhandlung
§ 74            Beweiserhebung
§ 75            Ladungen
§ 76            Gang der Verhandlung
§ 77            Niederschrift
§ 78            Beweiswürdigung; rechtliches Gehör
§ 79            Verkündung; Zustellung; Begründung
§ 80            Berichtigungen
§ 81            Vertretung; Vollmacht
§ 82            Anwendung weiterer Vorschriften; Anfechtbarkeit; Akteneinsicht
        Abschnitt 6
            Verfahren vor dem Bundesgerichtshof
§ 83            Zugelassene und zulassungsfreie Rechtsbeschwerde
§ 84            Beschwerdeberechtigung; Beschwerdegründe
§ 85            Förmliche Voraussetzungen
§ 86            Prüfung der Zulässigkeit
§ 87            Mehrere Beteiligte
§ 88            Anwendung weiterer Vorschriften
§ 89            Entscheidung über die Rechtsbeschwerde
§ 89a           Abhilfe bei Verletzung des Anspruchs auf rechtliches Gehör
§ 90            Kostenentscheidung
        Abschnitt 7
            Gemeinsame Vorschriften

§ 91            Wiedereinsetzung
§ 91a           Weiterbehandlung der Anmeldung
§ 92            Wahrheitspflicht
§ 93            Amtssprache und Gerichtssprache
§ 93a           Entschädigung von Zeugen, Vergütung von Sachverständigen
§ 94            Zustellungen
§ 95            Rechtshilfe
§ 95a           Einreichung elektronischer Dokumente
§ 96            Inlandsvertreter
Teil 4
    Kollektivmarken
§ 97            Kollektivmarken
§ 98            Inhaberschaft
§ 99            Eintragbarkeit von geographischen Herkunftsangaben als
                Kollektivmarken
§ 100           Schranken des Schutzes; Benutzung
§ 101           Klagebefugnis; Schadensersatz
§ 102           Markensatzung
§ 103           Prüfung der Anmeldung
§ 104           Änderung der Markensatzung
§ 105           Verfall
§ 106           Nichtigkeit wegen absoluter Schutzhindernisse
Teil 5
    Schutz von Marken nach dem Madrider Markenabkommen und nach dem Protokoll zum
    Madrider Markenabkommen; Gemeinschaftsmarken
        Abschnitt 1
            Schutz von Marken nach dem Madrider Markenabkommen
§ 107           Anwendung der Vorschriften dieses Gesetzes; Sprache
§ 108           Antrag auf internationale Registrierung
§ 109           Gebühren
§ 110           Eintragung im Register
§ 111           Nachträgliche Schutzerstreckung
§ 112           Wirkung der internationalen Registrierung
§ 113           Prüfung auf absolute Schutzhindernisse
§ 114           Widerspruch
§ 115           Nachträgliche Schutzentziehung
§ 116           Widerspruch und Antrag auf Löschung aufgrund einer international
                registrierten Marke
§ 117           Ausschluß von Ansprüchen wegen mangelnder Benutzung
§ 118           Zustimmung bei Übertragungen international registrierter Marken
        Abschnitt 2
            Schutz von Marken nach dem Protokoll zum Madrider Markenabkommen
§ 119           Anwendung der Vorschriften dieses Gesetzes; Sprachen
§ 120           Antrag auf internationale Registrierung
§ 121           Gebühren
§ 122           Vermerk in den Akten; Eintragung im Register
§ 123           Nachträgliche Schutzerstreckung
§ 124           Entsprechende Anwendung der Vorschriften über die Wirkung der nach
                dem Madrider Markenabkommen international registrierten Marken
§ 125           Umwandlung einer internationalen Registrierung
        Abschnitt 3
            Gemeinschaftsmarken
§ 125a          Anmeldung von Gemeinschaftsmarken beim Patentamt
§ 125b          Anwendung der Vorschriften dieses Gesetzes
§ 125c          Nachträgliche Feststellung der Ungültigkeit einer Marke

§ 125d          Umwandlung von Gemeinschaftsmarken
§ 125e          Gemeinschaftsmarkengerichte; Gemeinschaftsmarkenstreitsachen
§ 125f          Unterrichtung der Kommission
§ 125g          Örtliche Zuständigkeit der Gemeinschaftsmarkengerichte
§ 125h          Insolvenzverfahren
§ 125i          Erteilung der Vollstreckungsklausel
Teil 6
     Geographische Herkunftsangaben
          Abschnitt 1
               Schutz geographischer Herkunftsangaben
§ 126          Als geographische Herkunftsangaben geschützte Namen, Angaben oder
               Zeichen
§ 127          Schutzinhalt
§ 128          Unterlassungsanspruch; Schadensersatzanspruch
§ 129          Verjährung
          Abschnitt 2
               Schutz von geographischen Angaben und Ursprungsbezeichnungen gemäß der
               Verordnung (EWG) Nr. 2081/92
§ 130          Verfahren vor dem Patentamt; Weiterleitung
§ 131          Einspruchsverfahren
§ 132          Löschungsverfahren
§ 133          Antrag auf Änderung der Spezifikation
§ 133a         Rechtsmittel
§ 134          Überwachung
§ 135          Unterlassungsanspruch; Schadensersatzanspruch
§ 136          Verjährung
          Abschnitt 3
               Ermächtigungen zum Erlaß von Rechtsverordnungen
§ 137          Nähere Bestimmungen zum Schutz einzelner geographischer
               Herkunftsangaben
§ 138          Sonstige Vorschriften für das Verfahren bei Anträgen und
               Einsprüchen nach der Verordnung (EWG) Nr. 2081/92
§ 139          Durchführungsbestimmungen zur Verordnung (EWG) Nr. 2081/92
Teil 7
     Verfahren in Kennzeichenstreitsachen
§ 140          Kennzeichenstreitsachen
§ 141          Gerichtsstand bei Ansprüchen nach diesem Gesetz und dem Gesetz
               gegen den unlauteren Wettbewerb
§ 142          Streitwertbegünstigung
Teil 8
     Straf- und Bußgeldvorschriften; Beschlagnahme bei der Einfuhr und Ausfuhr
          Abschnitt 1
               Straf- und Bußgeldvorschriften
§ 143          Strafbare Kennzeichenverletzung
§ 143a         Strafbare Verletzung der Gemeinschaftsmarke
§ 144          Strafbare Benutzung geographischer Herkunftsangaben
§ 145          Bußgeldvorschriften
          Abschnitt 2
               Beschlagnahme von Waren bei der Einfuhr und Ausfuhr
§ 146          Beschlagnahme bei der Verletzung von Kennzeichenrechten
§ 147          Einziehung; Widerspruch; Aufhebung der Beschlagnahme
§ 148          Zuständigkeiten; Rechtsmittel
§ 149          Schadensersatz bei ungerechtfertigter Beschlagnahme
§ 150          Beschlagnahme nach der Verordnung (EG) Nr. 3295/94

| § 151 | Beschlagnahme bei widerrechtlicher Kennzeichnung mit geographischen Herkunftsangaben |
|---|---|
| Teil 9 | |
| | Übergangsvorschriften |
| § 152 | Anwendung dieses Gesetzes |
| § 153 | Schranken für die Geltendmachung von Verletzungsansprüchen |
| § 154 | Dingliche Rechte; Zwangsvollstreckung; Konkursverfahren |
| § 155 | Lizenzen |
| § 156 | Prüfung angemeldeter Marken auf absolute Schutzhindernisse |
| § 157 | Bekanntmachung und Eintragung |
| § 158 | Widerspruchsverfahren |
| § 159 | Teilung einer Anmeldung |
| § 160 | Schutzdauer und Verlängerung |
| § 161 | Löschung einer eingetragenen Marke wegen Verfalls |
| § 162 | Löschung einer eingetragenen Marke wegen absoluter Schutzhindernisse |
| § 163 | Löschung einer eingetragenen Marke wegen des Bestehens älterer Rechte |
| § 164 | Erinnerung und Durchgriffsbeschwerde |
| § 165 | Übergangsvorschriften |

# Teil 1
# Anwendungsbereich

## § 1 Geschützte Marken und sonstige Kennzeichen

Nach diesem Gesetz werden geschützt:
1. Marken,
2. geschäftliche Bezeichnungen,
3. geographische Herkunftsangaben.

## § 2 Anwendung anderer Vorschriften

Der Schutz von Marken, geschäftlichen Bezeichnungen und geographischen Herkunftsangaben nach diesem Gesetz schließt die Anwendung anderer Vorschriften zum Schutz dieser Kennzeichen nicht aus.

# Teil 2
# Voraussetzungen, Inhalt und Schranken des Schutzes von Marken und geschäftlichen Bezeichnungen, Übertragung und Lizenz

# Abschnitt 1
# Marken und geschäftliche Bezeichnungen, Vorrang und Zeitrang

## § 3 Als Marke schutzfähige Zeichen

Ein Service der juris GmbH - www.juris.de -

(1) Als Marke können alle Zeichen, insbesondere Wörter einschließlich Personennamen, Abbildungen, Buchstaben, Zahlen, Hörzeichen, dreidimensionale Gestaltungen einschließlich der Form einer Ware oder ihrer Verpackung sowie sonstige Aufmachungen einschließlich Farben und Farbzusammenstellungen geschützt werden, die geeignet sind, Waren oder Dienstleistungen eines Unternehmens von denjenigen anderer Unternehmen zu unterscheiden.

(2) Dem Schutz als Marke nicht zugänglich sind Zeichen, die ausschließlich aus einer Form bestehen,
1. die durch die Art der Ware selbst bedingt ist,
2. die zur Erreichung einer technischen Wirkung erforderlich ist oder
3. die der Ware einen wesentlichen Wert verleiht.

## § 4 Entstehung des Markenschutzes

Der Markenschutz entsteht
1. durch die Eintragung eines Zeichens als Marke in das vom Patentamt geführte Register,
2. durch die Benutzung eines Zeichens im geschäftlichen Verkehr, soweit das Zeichen innerhalb beteiligter Verkehrskreise als Marke Verkehrsgeltung erworben hat, oder
3. durch die im Sinne des Artikels 6bis der Pariser Verbandsübereinkunft zum Schutz des gewerblichen Eigentums (Pariser Verbandsübereinkunft) notorische Bekanntheit einer Marke.

## § 5 Geschäftliche Bezeichnungen

(1) Als geschäftliche Bezeichnungen werden Unternehmenskennzeichen und Werktitel geschützt.

(2) Unternehmenskennzeichen sind Zeichen, die im geschäftlichen Verkehr als Name, als Firma oder als besondere Bezeichnung eines Geschäftsbetriebs oder eines Unternehmens benutzt werden. Der besonderen Bezeichnung eines Geschäftsbetriebs stehen solche Geschäftsabzeichen und sonstige zur Unterscheidung des Geschäftsbetriebs von anderen Geschäftsbetrieben bestimmte Zeichen gleich, die innerhalb beteiligter Verkehrskreise als Kennzeichen des Geschäftsbetriebs gelten.

(3) Werktitel sind die Namen oder besonderen Bezeichnungen von Druckschriften, Filmwerken, Tonwerken, Bühnenwerken oder sonstigen vergleichbaren Werken.

## § 6 Vorrang und Zeitrang

(1) Ist im Falle des Zusammentreffens von Rechten im Sinne der §§ 4, 5 und 13 nach diesem Gesetz für die Bestimmung des Vorrangs der Rechte ihr Zeitrang maßgeblich, wird der Zeitrang nach den Absätzen 2 und 3 bestimmt.

(2) Für die Bestimmung des Zeitrangs von angemeldeten oder eingetragenen Marken ist der Anmeldetag (§ 33 Abs. 1) oder, falls eine Priorität nach § 34 oder nach § 35 in Anspruch genommen wird, der Prioritätstag maßgeblich.

(3) Für die Bestimmung des Zeitrangs von Rechten im Sinne des § 4 Nr. 2 und 3 und der §§ 5 und 13 ist der Zeitpunkt maßgeblich, zu dem das Recht erworben wurde.

(4) Kommt Rechten nach den Absätzen 2 und 3 derselbe Tag als ihr Zeitrang zu, so sind die Rechte gleichrangig und begründen gegeneinander keine Ansprüche.

Ein Service der juris GmbH - www.juris.de -

# Abschnitt 2
# Voraussetzungen für den Schutz von Marken durch Eintragung

## § 7 Inhaberschaft

Inhaber von eingetragenen und angemeldeten Marken können sein:
1. natürliche Personen,
2. juristische Personen oder
3. Personengesellschaften, sofern sie mit der Fähigkeit ausgestattet sind, Rechte zu erwerben und Verbindlichkeiten einzugehen.

## § 8 Absolute Schutzhindernisse

(1) Von der Eintragung sind als Marke schutzfähige Zeichen im Sinne des § 3 ausgeschlossen, die sich nicht graphisch darstellen lassen.

(2) Von der Eintragung ausgeschlossen sind Marken,
1. denen für die Waren oder Dienstleistungen jegliche Unterscheidungskraft fehlt,
2. die ausschließlich aus Zeichen oder Angaben bestehen, die im Verkehr zur Bezeichnung der Art, der Beschaffenheit, der Menge, der Bestimmung, des Wertes, der geographischen Herkunft, der Zeit der Herstellung der Waren oder der Erbringung der Dienstleistungen oder zur Bezeichnung sonstiger Merkmale der Waren oder Dienstleistungen dienen können,
3. die ausschließlich aus Zeichen oder Angaben bestehen, die im allgemeinen Sprachgebrauch oder in den redlichen und ständigen Verkehrsgepflogenheiten zur Bezeichnung der Waren oder Dienstleistungen üblich geworden sind,
4. die geeignet sind, das Publikum insbesondere über die Art, die Beschaffenheit oder die geographische Herkunft der Waren oder Dienstleistungen zu täuschen,
5. die gegen die öffentliche Ordnung oder die gegen die guten Sitten verstoßen,
6. die Staatswappen, Staatsflaggen oder andere staatliche Hoheitszeichen oder Wappen eines inländischen Ortes oder eines inländischen Gemeinde- oder weiteren Kommunalverbandes enthalten,
7. die amtliche Prüf- oder Gewährzeichen enthalten, die nach einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt von der Eintragung als Marke ausgeschlossen sind,
8. die Wappen, Flaggen oder andere Kennzeichen, Siegel oder Bezeichnungen internationaler zwischenstaatlicher Organisationen enthalten, die nach einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt von der Eintragung als Marke ausgeschlossen sind,
9. deren Benutzung ersichtlich nach sonstigen Vorschriften im öffentlichen Interesse untersagt werden kann, oder
10. die bösgläubig angemeldet worden sind.

(3) Absatz 2 Nr. 1, 2 und 3 findet keine Anwendung, wenn die Marke sich vor dem Zeitpunkt der Entscheidung über die Eintragung infolge ihrer Benutzung für die Waren oder Dienstleistungen, für die sie angemeldet worden ist, in den beteiligten Verkehrskreisen durchgesetzt hat.

(4) Absatz 2 Nr. 6, 7 und 8 ist auch anzuwenden, wenn die Marke die Nachahmung eines dort aufgeführten Zeichens enthält. Absatz 2 Nr. 6, 7 und 8 ist nicht anzuwenden, wenn der Anmelder befugt ist, in der Marke eines der dort aufgeführten Zeichen zu führen, selbst wenn es mit einem anderen der dort aufgeführten Zeichen verwechselt werden kann.

Ein Service der juris GmbH - www.juris.de -

Absatz 2 Nr. 7 ist ferner nicht anzuwenden, wenn die Waren oder Dienstleistungen, für die die Marke angemeldet worden ist, mit denen, für die das Prüf- oder Gewährzeichen eingeführt ist, weder identisch noch diesen ähnlich sind. Absatz 2 Nr. 8 ist ferner nicht anzuwenden, wenn die angemeldete Marke nicht geeignet ist, beim Publikum den unzutreffenden Eindruck einer Verbindung mit der internationalen zwischenstaatlichen Organisation hervorzurufen.

## § 9 Angemeldete oder eingetragene Marken als relative Schutzhindernisse

(1) Die Eintragung einer Marke kann gelöscht werden,

1. wenn sie mit einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang identisch ist und die Waren oder Dienstleistungen, für die sie eingetragen worden ist, mit den Waren oder Dienstleistungen identisch sind, für die die Marke mit älterem Zeitrang angemeldet oder eingetragen worden ist,
2. wenn wegen ihrer Identität oder Ähnlichkeit mit einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang und der Identität oder der Ähnlichkeit der durch die beiden Marken erfaßten Waren oder Dienstleistungen für das Publikum die Gefahr von Verwechslungen besteht, einschließlich der Gefahr, daß die Marken gedanklich miteinander in Verbindung gebracht werden, oder
3. wenn sie mit einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang identisch oder dieser ähnlich ist und für Waren oder Dienstleistungen eingetragen worden ist, die nicht denen ähnlich sind, für die die Marke mit älterem Zeitrang angemeldet oder eingetragen worden ist, falls es sich bei der Marke mit älterem Zeitrang um eine im Inland bekannte Marke handelt und die Benutzung der eingetragenen Marke die Unterscheidungskraft oder die Wertschätzung der bekannten Marke ohne rechtfertigenden Grund in unlauterer Weise ausnutzen oder beeinträchtigen würde.

(2) Anmeldungen von Marken stellen ein Eintragungshindernis im Sinne des Absatzes 1 nur dar, wenn sie eingetragen werden.

## § 10 Notorisch bekannte Marken

(1) Von der Eintragung ausgeschlossen ist eine Marke, wenn sie mit einer im Inland im Sinne des Artikels 6bis der Pariser Verbandsübereinkunft notorisch bekannten Marke mit älterem Zeitrang identisch oder dieser ähnlich ist und die weiteren Voraussetzungen des § 9 Abs. 1 Nr. 1, 2 oder 3 gegeben sind.

(2) Absatz 1 findet keine Anwendung, wenn der Anmelder von dem Inhaber der notorisch bekannten Marke zur Anmeldung ermächtigt worden ist.

## § 11 Agentenmarken

Die Eintragung einer Marke kann gelöscht werden, wenn die Marke ohne die Zustimmung des Inhabers der Marke für dessen Agenten oder Vertreter eingetragen worden ist.

## § 12 Durch Benutzung erworbene Marken und geschäftliche Bezeichnungen mit älterem Zeitrang

Die Eintragung einer Marke kann gelöscht werden, wenn ein anderer vor dem für den Zeitrang der eingetragenen Marke maßgeblichen Tag Rechte an einer Marke im Sinne des § 4 Nr. 2 oder an einer geschäftlichen Bezeichnung im Sinne des § 5 erworben hat und diese ihn berechtigen, die Benutzung der eingetragenen Marke im gesamten Gebiet der Bundesrepublik Deutschland zu untersagen.

## § 13 Sonstige ältere Rechte

(1) Die Eintragung einer Marke kann gelöscht werden, wenn ein anderer vor dem für den Zeitrang der eingetragenen Marke maßgeblichen Tag ein sonstiges, nicht in den §§ 9 bis 12 aufgeführtes Recht erworben hat und dieses ihn berechtigt, die Benutzung der eingetragenen Marke im gesamten Gebiet der Bundesrepublik Deutschland zu untersagen.

(2) Zu den sonstigen Rechten im Sinne des Absatzes 1 gehören insbesondere:
1. Namensrechte,
2. das Recht an der eigenen Abbildung,
3. Urheberrechte,
4. Sortenbezeichnungen,
5. geographische Herkunftsangaben,
6. sonstige gewerbliche Schutzrechte.

# Abschnitt 3
# Schutzinhalt, Rechtsverletzungen

## § 14 Ausschließliches Recht des Inhabers einer Marke, Unterlassungsanspruch, Schadensersatzanspruch

(1) Der Erwerb des Markenschutzes nach § 4 gewährt dem Inhaber der Marke ein ausschließliches Recht.

(2) Dritten ist es untersagt, ohne Zustimmung des Inhabers der Marke im geschäftlichen Verkehr
1. ein mit der Marke identisches Zeichen für Waren oder Dienstleistungen zu benutzen, die mit denjenigen identisch sind, für die sie Schutz genießt,
2. ein Zeichen zu benutzen, wenn wegen der Identität oder Ähnlichkeit des Zeichens mit der Marke und der Identität oder Ähnlichkeit der durch die Marke und das Zeichen erfaßten Waren oder Dienstleistungen für das Publikum die Gefahr von Verwechslungen besteht, einschließlich der Gefahr, daß das Zeichen mit der Marke gedanklich in Verbindung gebracht wird, oder
3. ein mit der Marke identisches Zeichen oder ein ähnliches Zeichen für Waren oder Dienstleistungen zu benutzen, die nicht denen ähnlich sind, für die die Marke Schutz genießt, wenn es sich bei der Marke um eine im Inland bekannte Marke handelt und die Benutzung des Zeichens die Unterscheidungskraft oder die Wertschätzung der bekannten Marke ohne rechtfertigenden Grund in unlauterer Weise ausnutzt oder beeinträchtigt.

(3) Sind die Voraussetzungen des Absatzes 2 erfüllt, so ist es insbesondere untersagt,
1. das Zeichen auf Waren oder ihrer Aufmachung oder Verpackung anzubringen,
2. unter dem Zeichen Waren anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken zu besitzen,
3. unter dem Zeichen Dienstleistungen anzubieten oder zu erbringen,
4. unter dem Zeichen Waren einzuführen oder auszuführen,
5. das Zeichen in Geschäftspapieren oder in der Werbung zu benutzen.

(4) Dritten ist es ferner untersagt, ohne Zustimmung des Inhabers der Marke im geschäftlichen Verkehr
1. ein mit der Marke identisches Zeichen oder ein ähnliches Zeichen auf Aufmachungen oder Verpackungen oder auf Kennzeichnungsmitteln wie Etiketten, Anhängern, Aufnähern oder dergleichen anzubringen,

Ein Service der juris GmbH - www.juris.de -

2. Aufmachungen, Verpackungen oder Kennzeichnungsmittel, die mit einem mit der Marke identischen Zeichen oder einem ähnlichen Zeichen versehen sind, anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken zu besitzen oder

3. Aufmachungen, Verpackungen oder Kennzeichnungsmittel, die mit einem mit der Marke identischen Zeichen oder einem ähnlichen Zeichen versehen sind, einzuführen oder auszuführen,

wenn die Gefahr besteht, daß die Aufmachungen oder Verpackungen zur Aufmachung oder Verpackung oder die Kennzeichnungsmittel zur Kennzeichnung von Waren oder Dienstleistungen benutzt werden, hinsichtlich deren Dritten die Benutzung des Zeichens nach den Absätzen 2 und 3 untersagt wäre.

(5) Wer ein Zeichen entgegen den Absätzen 2 bis 4 benutzt, kann von dem Inhaber der Marke auf Unterlassung in Anspruch genommen werden.

(6) Wer die Verletzungshandlung vorsätzlich oder fahrlässig begeht, ist dem Inhaber der Marke zum Ersatz des durch die Verletzungshandlung entstandenen Schadens verpflichtet.

(7) Wird die Verletzungshandlung in einem geschäftlichen Betrieb von einem Angestellten oder Beauftragten begangen, so kann der Unterlassungsanspruch und, soweit der Angestellte oder Beauftragte vorsätzlich oder fahrlässig gehandelt hat, der Schadensersatzanspruch auch gegen den Inhaber des Betriebs geltend gemacht werden.

## § 15 Ausschließliches Recht des Inhabers einer geschäftlichen Bezeichnung, Unterlassungsanspruch, Schadensersatzanspruch

(1) Der Erwerb des Schutzes einer geschäftlichen Bezeichnung gewährt ihrem Inhaber ein ausschließliches Recht.

(2) Dritten ist es untersagt, die geschäftliche Bezeichnung oder ein ähnliches Zeichen im geschäftlichen Verkehr unbefugt in einer Weise zu benutzen, die geeignet ist, Verwechslungen mit der geschützten Bezeichnung hervorzurufen.

(3) Handelt es sich bei der geschäftlichen Bezeichnung um eine im Inland bekannte geschäftliche Bezeichnung, so ist es Dritten ferner untersagt, die geschäftliche Bezeichnung oder ein ähnliches Zeichen im geschäftlichen Verkehr zu benutzen, wenn keine Gefahr von Verwechslungen im Sinne des Absatzes 2 besteht, soweit die Benutzung des Zeichens die Unterscheidungskraft oder die Wertschätzung der geschäftlichen Bezeichnung ohne rechtfertigenden Grund in unlauterer Weise ausnutzt oder beeinträchtigt.

(4) Wer eine geschäftliche Bezeichnung oder ein ähnliches Zeichen entgegen Absatz 2 oder 3 benutzt, kann von dem Inhaber der geschäftlichen Bezeichnung auf Unterlassung in Anspruch genommen werden.

(5) Wer die Verletzungshandlung vorsätzlich oder fahrlässig begeht, ist dem Inhaber der geschäftlichen Bezeichnung zum Ersatz des daraus entstandenen Schadens verpflichtet.

(6) § 14 Abs. 7 ist entsprechend anzuwenden.

## § 16 Wiedergabe einer eingetragenen Marke in Nachschlagewerken

(1) Erweckt die Wiedergabe einer eingetragenen Marke in einem Wörterbuch, einem Lexikon oder einem ähnlichen Nachschlagewerk den Eindruck, daß es sich bei der Marke um eine Gattungsbezeichnung für die Waren oder Dienstleistungen handelt, für die die Marke eingetragen ist, kann der Inhaber der Marke vom Verleger des Werkes verlangen, daß der

Ein Service der juris GmbH - www.juris.de -

Wiedergabe der Marke ein Hinweis beigefügt wird, daß es sich um eine eingetragene Marke handelt.

(2) Ist das Werk bereits erschienen, so beschränkt sich der Anspruch darauf, daß der Hinweis nach Absatz 1 bei einer neuen Auflage des Werkes aufgenommen wird.

(3) Die Absätze 1 und 2 sind entsprechend anzuwenden, wenn das Nachschlagewerk in der Form einer elektronischen Datenbank vertrieben wird oder wenn zu einer elektronischen Datenbank, die ein Nachschlagewerk enthält, Zugang gewährt wird.

## § 17 Ansprüche gegen Agenten oder Vertreter

(1) Ist eine Marke entgegen § 11 für den Agenten oder Vertreter des Inhabers der Marke ohne dessen Zustimmung angemeldet oder eingetragen worden, so ist der Inhaber der Marke berechtigt, von dem Agenten oder Vertreter die Übertragung des durch die Anmeldung oder Eintragung der Marke begründeten Rechts zu verlangen.

(2) Ist eine Marke entgegen § 11 für einen Agenten oder Vertreter des Inhabers der Marke eingetragen worden, so kann der Inhaber die Benutzung der Marke im Sinne des § 14 durch den Agenten oder Vertreter untersagen, wenn er der Benutzung nicht zugestimmt hat. Handelt der Agent oder Vertreter vorsätzlich oder fahrlässig, so ist er dem Inhaber der Marke zum Ersatz des durch die Verletzungshandlung entstandenen Schadens verpflichtet. § 14 Abs. 7 ist entsprechend anzuwenden.

## § 18 Vernichtungsanspruch

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung kann in den Fällen der §§ 14, 15 und 17 verlangen, daß die im Besitz oder Eigentum des Verletzers befindlichen widerrechtlich gekennzeichneten Gegenstände vernichtet werden, es sei denn, daß der durch die Rechtsverletzung verursachte Zustand der Gegenstände auf andere Weise beseitigt werden kann und die Vernichtung für den Verletzer oder den Eigentümer im Einzelfall unverhältnismäßig ist.

(2) Absatz 1 ist entsprechend auf die im Eigentum des Verletzers stehenden, ausschließlich oder nahezu ausschließlich zur widerrechtlichen Kennzeichnung benutzten oder bestimmten Vorrichtungen anzuwenden.

(3) Weitergehende Ansprüche auf Beseitigung bleiben unberührt.

## § 19 Auskunftsanspruch

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung kann den Verletzer in den Fällen der §§ 14, 15 und 17 auf unverzügliche Auskunft über die Herkunft und den Vertriebsweg von widerrechtlich gekennzeichneten Gegenständen in Anspruch nehmen, es sei denn, daß dies im Einzelfall unverhältnismäßig ist.

(2) Der nach Absatz 1 zur Auskunft Verpflichtete hat Angaben zu machen über Namen und Anschrift des Herstellers, des Lieferanten und anderer Vorbesitzer, des gewerblichen Abnehmers oder des Auftraggebers sowie über die Menge der hergestellten, ausgelieferten, erhaltenen oder bestellten Gegenstände.

(3) In Fällen offensichtlicher Rechtsverletzung kann die Verpflichtung zur Erteilung der Auskunft im Wege der einstweiligen Verfügung nach den Vorschriften der Zivilprozeßordnung angeordnet werden.

Ein Service der juris GmbH - www.juris.de -

(4) Die Auskunft darf in einem Strafverfahren oder in einem Verfahren nach dem Gesetz über Ordnungswidrigkeiten wegen einer vor der Erteilung der Auskunft begangenen Tat gegen den zur Auskunft Verpflichteten oder gegen einen in § 52 Abs. 1 der Strafprozeßordnung bezeichneten Angehörigen nur mit Zustimmung des zur Auskunft Verpflichteten verwertet werden.

(5) Weitergehende Ansprüche auf Auskunft bleiben unberührt.

# Abschnitt 4
# Schranken des Schutzes

## § 20 Verjährung

Auf die Verjährung der in den §§ 14 bis 19 genannten Ansprüche finden die Vorschriften des Abschnitts 5 des Buches 1 des Bürgerlichen Gesetzbuchs entsprechende Anwendung. Hat der Verpflichtete durch die Verletzung auf Kosten des Berechtigten etwas erlangt, findet § 852 des Bürgerlichen Gesetzbuchs entsprechende Anwendung.

## § 21 Verwirkung von Ansprüchen

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, die Benutzung einer eingetragenen Marke mit jüngerem Zeitrang für die Waren oder Dienstleistungen, für die sie eingetragen ist, zu untersagen, soweit er die Benutzung der Marke während eines Zeitraums von fünf aufeinanderfolgenden Jahren in Kenntnis dieser Benutzung geduldet hat, es sei denn, daß die Anmeldung der Marke mit jüngerem Zeitrang bösgläubig vorgenommen worden ist.

(2) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, die Benutzung einer Marke im Sinne des § 4 Nr. 2 oder 3, einer geschäftlichen Bezeichnung oder eines sonstigen Rechts im Sinne des § 13 mit jüngerem Zeitrang zu untersagen, soweit er die Benutzung dieses Rechts während eines Zeitraums von fünf aufeinanderfolgenden Jahren in Kenntnis dieser Benutzung geduldet hat, es sei denn, daß der Inhaber dieses Rechts im Zeitpunkt des Rechtserwerbs bösgläubig war.

(3) In den Fällen der Absätze 1 und 2 kann der Inhaber des Rechts mit jüngerem Zeitrang die Benutzung des Rechts mit älterem Zeitrang nicht untersagen.

(4) Die Absätze 1 bis 3 lassen die Anwendung allgemeiner Grundsätze über die Verwirkung von Ansprüchen unberührt.

## § 22 Ausschluß von Ansprüchen bei Bestandskraft der Eintragung einer Marke mit jüngerem Zeitrang

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, die Benutzung einer eingetragenen Marke mit jüngerem Zeitrang für die Waren oder Dienstleistungen, für die sie eingetragen ist, zu untersagen, wenn ein Antrag auf Löschung der Eintragung der Marke mit jüngerem Zeitrang zurückgewiesen worden ist oder zurückzuweisen wäre,
1. weil die Marke oder geschäftliche Bezeichnung mit älterem Zeitrang an dem für den Zeitrang der Eintragung der Marke mit jüngerem Zeitrang maßgeblichen Tag noch nicht im Sinne des § 9 Abs. 1 Nr. 3, des § 14 Abs. 2 Nr. 3 oder des § 15 Abs. 3 bekannt war (§ 51 Abs. 3),

2. weil die Eintragung der Marke mit älterem Zeitrang am Tag der Veröffentlichung der Eintragung der Marke mit jüngerem Zeitrang wegen Verfalls oder wegen absoluter Schutzhindernisse hätte gelöscht werden können (§ 51 Abs. 4).

(2) In den Fällen des Absatzes 1 kann der Inhaber der eingetragenen Marke mit jüngerem Zeitrang die Benutzung der Marke oder der geschäftlichen Bezeichnung mit älterem Zeitrang nicht untersagen.

## § 23 Benutzung von Namen und beschreibenden Angaben, Ersatzteilgeschäft

Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, einem Dritten zu untersagen, im geschäftlichen Verkehr
1. dessen Namen oder Anschrift zu benutzen,
2. ein mit der Marke oder der geschäftlichen Bezeichnung identisches Zeichen oder ein ähnliches Zeichen als Angabe über Merkmale oder Eigenschaften von Waren oder Dienstleistungen, wie insbesondere ihre Art, ihre Beschaffenheit, ihre Bestimmung, ihren Wert, ihre geographische Herkunft oder die Zeit ihrer Herstellung oder ihrer Erbringung, zu benutzen, oder
3. die Marke oder die geschäftliche Bezeichnung als Hinweis auf die Bestimmung einer Ware, insbesondere als Zubehör oder Ersatzteil, oder einer Dienstleistung zu benutzen, soweit die Benutzung dafür notwendig ist,
sofern die Benutzung nicht gegen die guten Sitten verstößt.

## § 24 Erschöpfung

(1) Der Inhaber einer Marke oder einer geschäftlichen Bezeichnung hat nicht das Recht, einem Dritten zu untersagen, die Marke oder die geschäftliche Bezeichnung für Waren zu benutzen, die unter dieser Marke oder dieser geschäftlichen Bezeichnung von ihm oder mit seiner Zustimmung im Inland, in einem der übrigen Mitgliedstaaten der Europäischen Union oder in einem anderen Vertragsstaat des Abkommens über den Europäischen Wirtschaftsraum in den Verkehr gebracht worden sind.

(2) Absatz 1 findet keine Anwendung, wenn sich der Inhaber der Marke oder der geschäftlichen Bezeichnung der Benutzung der Marke oder der geschäftlichen Bezeichnung im Zusammenhang mit dem weiteren Vertrieb der Waren aus berechtigten Gründen widersetzt, insbesondere wenn der Zustand der Waren nach ihrem Inverkehrbringen verändert oder verschlechtert ist.

## § 25 Ausschluß von Ansprüchen bei mangelnder Benutzung

(1) Der Inhaber einer eingetragenen Marke kann gegen Dritte Ansprüche im Sinne der §§ 14, 18 und 19 nicht geltend machen, wenn die Marke innerhalb der letzten fünf Jahre vor der Geltendmachung des Anspruchs für die Waren oder Dienstleistungen, auf die er sich zur Begründung seines Anspruchs beruft, nicht gemäß § 26 benutzt worden ist, sofern die Marke zu diesem Zeitpunkt seit mindestens fünf Jahren eingetragen ist.

(2) Werden Ansprüche im Sinne der §§ 14, 18 und 19 wegen Verletzung einer eingetragenen Marke im Wege der Klage geltend gemacht, so hat der Kläger auf Einrede des Beklagten nachzuweisen, daß die Marke innerhalb der letzten fünf Jahre vor Erhebung der Klage für die Waren oder Dienstleistungen, auf die er sich zur Begründung seines Anspruchs beruft, gemäß § 26 benutzt worden ist, sofern die Marke zu diesem Zeitpunkt seit mindestens fünf Jahren eingetragen ist. Endet der Zeitraum von fünf Jahren der Nichtbenutzung nach Erhebung der Klage, so hat der Kläger auf Einrede des Beklagten nachzuweisen, daß die Marke innerhalb der letzten fünf Jahre vor dem Schluß der mündlichen Verhandlung gemäß § 26 benutzt worden ist. Bei der Entscheidung werden nur

die Waren oder Dienstleistungen berücksichtigt, für die die Benutzung nachgewiesen worden ist.

## § 26 Benutzung der Marke

(1) Soweit die Geltendmachung von Ansprüchen aus einer eingetragenen Marke oder die Aufrechterhaltung der Eintragung davon abhängig ist, daß die Marke benutzt worden ist, muß sie von ihrem Inhaber für die Waren oder Dienstleistungen, für die sie eingetragen ist, im Inland ernsthaft benutzt worden sein, es sei denn, daß berechtigte Gründe für die Nichtbenutzung vorliegen.

(2) Die Benutzung der Marke mit Zustimmung des Inhabers gilt als Benutzung durch den Inhaber.

(3) Als Benutzung einer eingetragenen Marke gilt auch die Benutzung der Marke in einer Form, die von der Eintragung abweicht, soweit die Abweichungen den kennzeichnenden Charakter der Marke nicht verändern. Satz 1 ist auch dann anzuwenden, wenn die Marke in der Form, in der sie benutzt worden ist, ebenfalls eingetragen ist.

(4) Als Benutzung im Inland gilt auch das Anbringen der Marke auf Waren oder deren Aufmachung oder Verpackung im Inland, wenn die Waren ausschließlich für die Ausfuhr bestimmt sind.

(5) Soweit die Benutzung innerhalb von fünf Jahren ab dem Zeitpunkt der Eintragung erforderlich ist, tritt in den Fällen, in denen gegen die Eintragung Widerspruch erhoben worden ist, an die Stelle des Zeitpunkts der Eintragung der Zeitpunkt des Abschlusses des Widerspruchsverfahrens.

# Abschnitt 5
# Marken als Gegenstand des Vermögens

## § 27 Rechtsübergang

(1) Das durch die Eintragung, die Benutzung oder die notorische Bekanntheit einer Marke begründete Recht kann für alle oder für einen Teil der Waren oder Dienstleistungen, für die die Marke Schutz genießt, auf andere übertragen werden oder übergehen.

(2) Gehört die Marke zu einem Geschäftsbetrieb oder zu einem Teil eines Geschäftsbetriebs, so wird das durch die Eintragung, die Benutzung oder die notorische Bekanntheit der Marke begründete Recht im Zweifel von der Übertragung oder dem Übergang des Geschäftsbetriebs oder des Teils des Geschäftsbetriebs, zu dem die Marke gehört, erfaßt.

(3) Der Übergang des durch die Eintragung einer Marke begründeten Rechts wird auf Antrag eines Beteiligten in das Register eingetragen, wenn er dem Patentamt nachgewiesen wird.

(4) Betrifft der Rechtsübergang nur einen Teil der Waren oder Dienstleistungen, für die die Marke eingetragen ist, so sind die Vorschriften über die Teilung der Eintragung mit Ausnahme von § 46 Abs. 2 und 3 Satz 1 und 2 entsprechend anzuwenden.

## § 28 Vermutung der Rechtsinhaberschaft, Zustellungen an den Inhaber

Ein Service der juris GmbH - www.juris.de -

(1) Es wird vermutet, daß das durch die Eintragung einer Marke begründete Recht dem im Register als Inhaber Eingetragenen zusteht.

(2) Ist das durch die Eintragung einer Marke begründete Recht auf einen anderen übertragen worden oder übergegangen, so kann der Rechtsnachfolger in einem Verfahren vor dem Patentamt, einem Beschwerdeverfahren vor dem Patentgericht oder einem Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof den Anspruch auf Schutz dieser Marke und das durch die Eintragung begründete Recht erst von dem Zeitpunkt an geltend machen, in dem dem Patentamt der Antrag auf Eintragung des Rechtsübergangs zugegangen ist. Satz 1 gilt entsprechend für sonstige Verfahren vor dem Patentamt, Beschwerdeverfahren vor dem Patentgericht oder Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof, an denen der Inhaber einer Marke beteiligt ist. Übernimmt der Rechtsnachfolger ein Verfahren nach Satz 1 oder 2, so ist die Zustimmung der übrigen Verfahrensbeteiligten nicht erforderlich.

(3) Verfügungen und Beschlüsse des Patentamts, die der Zustellung an den Inhaber der Marke bedürfen, sind dem als Inhaber Eingetragenen zuzustellen. Ist dem Patentamt ein Antrag auf Eintragung eines Rechtsübergangs zugegangen, so sind die in Satz 1 genannten Verfügungen und Beschlüsse auch dem Rechtsnachfolger zuzustellen.

## § 29 Dingliche Rechte, Zwangsvollstreckung, Insolvenzverfahren

(1) Das durch die Eintragung, die Benutzung oder die notorische Bekanntheit einer Marke begründete Recht kann
1. verpfändet werden oder Gegenstand eines sonstigen dinglichen Rechts sein oder
2. Gegenstand von Maßnahmen der Zwangsvollstreckung sein.

(2) Betreffen die in Absatz 1 Nr. 1 genannten Rechte oder die in Absatz 1 Nr. 2 genannten Maßnahmen das durch die Eintragung einer Marke begründete Recht, so werden sie auf Antrag eines Beteiligten in das Register eingetragen, wenn sie dem Patentamt nachgewiesen werden.

(3) Wird das durch die Eintragung einer Marke begründete Recht durch ein Insolvenzverfahren erfaßt, so wird dies auf Antrag des Insolvenzverwalters oder auf Ersuchen des Insolvenzgerichts in das Register eingetragen. Im Falle der Eigenverwaltung (§ 270 der Insolvenzordnung) tritt der Sachwalter an die Stelle des Insolvenzverwalters.

## § 30 Lizenzen

(1) Das durch die Eintragung, die Benutzung oder die notorische Bekanntheit einer Marke begründete Recht kann für alle oder für einen Teil der Waren oder Dienstleistungen, für die die Marke Schutz genießt, Gegenstand von ausschließlichen oder nicht ausschließlichen Lizenzen für das Gebiet der Bundesrepublik Deutschland insgesamt oder einen Teil dieses Gebiets sein.

(2) Der Inhaber einer Marke kann die Rechte aus der Marke gegen einen Lizenznehmer geltend machen, der hinsichtlich
1. der Dauer der Lizenz,
2. der von der Eintragung erfaßten Form, in der die Marke benutzt werden darf,
3. der Art der Waren oder Dienstleistungen, für die die Lizenz erteilt wurde,
4. des Gebiets, in dem die Marke angebracht werden darf, oder
5. der Qualität der von ihm hergestellten Waren oder der von ihm erbrachten Dienstleistungen

gegen eine Bestimmung des Lizenzvertrages verstößt.

(3) Der Lizenznehmer kann Klage wegen Verletzung einer Marke nur mit Zustimmung ihres Inhabers erheben.

(4) Jeder Lizenznehmer kann einer vom Inhaber der Marke erhobenen Verletzungsklage beitreten, um den Ersatz seines Schadens geltend zu machen.

(5) Ein Rechtsübergang nach § 27 oder die Erteilung einer Lizenz nach Absatz 1 berührt nicht die Lizenzen, die Dritten vorher erteilt worden sind.

## § 31 Angemeldete Marken

Die §§ 27 bis 30 gelten entsprechend für durch Anmeldung von Marken begründete Rechte.

# Teil 3
# Verfahren in Markenangelegenheiten

# Abschnitt 1
# Eintragungsverfahren

## § 32 Erfordernisse der Anmeldung

(1) Die Anmeldung zur Eintragung einer Marke in das Register ist beim Patentamt einzureichen. Die Anmeldung kann auch über ein Patentinformationszentrum eingereicht werden, wenn diese Stelle durch Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt dazu bestimmt ist, Markenanmeldungen entgegenzunehmen.

(2) Die Anmeldung muß enthalten:
1. Angaben, die es erlauben, die Identität des Anmelders festzustellen,
2. eine Wiedergabe der Marke und
3. ein Verzeichnis der Waren oder Dienstleistungen, für die die Eintragung beantragt wird.

(3) Die Anmeldung muß den weiteren Anmeldungserfordernissen entsprechen, die in einer Rechtsverordnung nach § 65 Abs. 1 Nr. 2 bestimmt worden sind.

(4) (weggefallen)

## § 33 Anmeldetag, Anspruch auf Eintragung, Veröffentlichung der Anmeldung

(1) Der Anmeldetag einer Marke ist der Tag, an dem die Unterlagen mit den Angaben nach § 32 Abs. 2
1. beim Patentamt
2. oder, wenn diese Stelle durch Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt dazu bestimmt ist, bei einem Patentinformationszentrum eingegangen sind.

(2) Die Anmeldung einer Marke, deren Anmeldetag feststeht, begründet einen Anspruch auf Eintragung. Dem Eintragungsantrag ist stattzugeben, es sei denn, daß die Anmeldungserfordernisse nicht erfüllt sind oder daß absolute Eintragungshindernisse der Eintragung entgegenstehen.

(3) Die Anmeldung einer Marke, deren Anmeldetag feststeht, wird einschließlich solcher Angaben veröffentlicht, die es erlauben, die Identität des Anmelders festzustellen.

## § 34 Ausländische Priorität

(1) Die Inanspruchnahme der Priorität einer früheren ausländischen Anmeldung richtet sich nach den Vorschriften der Staatsverträge mit der Maßgabe, daß die Priorität nach der Pariser Verbandsübereinkunft auch für Dienstleistungen in Anspruch genommen werden kann.

(2) Ist die frühere ausländische Anmeldung in einem Staat eingereicht worden, mit dem kein Staatsvertrag über die Anerkennung der Priorität besteht, so kann der Anmelder ein dem Prioritätsrecht nach der Pariser Verbandsübereinkunft entsprechendes Prioritätsrecht in Anspruch nehmen, soweit nach einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt der andere Staat aufgrund einer ersten Anmeldung beim Patentamt ein Prioritätsrecht gewährt, das nach Voraussetzungen und Inhalt dem Prioritätsrecht nach der Pariser Verbandsübereinkunft vergleichbar ist.

(3) Wer eine Priorität nach Absatz 1 oder 2 in Anspruch nimmt, hat innerhalb von zwei Monaten nach dem Anmeldetag Zeit und Staat der früheren Anmeldung anzugeben. Hat der Anmelder diese Angaben gemacht, fordert ihn das Patentamt auf, innerhalb von zwei Monaten nach der Zustellung der Aufforderung das Aktenzeichen der früheren Anmeldung anzugeben und eine Abschrift der früheren Anmeldung einzureichen. Innerhalb dieser Fristen können die Angaben geändert werden. Werden die Angaben nicht rechtzeitig gemacht, so wird der Prioritätsanspruch für diese Anmeldung verwirkt.

## § 35 Ausstellungspriorität

(1) Hat der Anmelder der Marke Waren oder Dienstleistungen unter der angemeldeten Marke
1. auf einer amtlichen oder amtlich anerkannten internationalen Ausstellung im Sinne des am 22. November 1928 in Paris unterzeichneten Abkommens über internationale Ausstellungen oder
2. auf einer sonstigen inländischen oder ausländischen Ausstellung
zur Schau gestellt, kann er, wenn er die Anmeldung innerhalb einer Frist von sechs Monaten seit der erstmaligen Zurschaustellung der Waren oder Dienstleistungen unter der angemeldeten Marke einreicht, von diesem Tag an ein Prioritätsrecht im Sinne des § 34 in Anspruch nehmen.

(2) Die in Absatz 1 Nr. 1 bezeichneten Ausstellungen werden vom Bundesministerium der Justiz im Bundesgesetzblatt bekanntgemacht.

(3) Die Ausstellungen im Sinne des Absatzes 1 Nr. 2 werden im Einzelfall in einer Bekanntmachung des Bundesministeriums der Justiz im Bundesgesetzblatt über den Ausstellungsschutz bestimmt.

(4) Wer eine Priorität nach Absatz 1 in Anspruch nimmt, hat innerhalb von zwei Monaten nach dem Anmeldetag den Tag der erstmaligen Zurschaustellung sowie die Ausstellung anzugeben. Hat der Anmelder diese Angaben gemacht, fordert ihn das Patentamt auf, innerhalb von zwei Monaten nach der Zustellung der Aufforderung die Nachweise für die Zurschaustellung der Waren oder Dienstleistungen unter der angemeldeten Marke einzureichen. Werden die Nachweise nicht rechtzeitig eingereicht, so wird der Prioritätsanspruch für diese Anmeldung verwirkt.

(5) Die Ausstellungspriorität nach Absatz 1 verlängert nicht die Prioritätsfrist nach § 34.

## § 36 Prüfung der Anmeldungserfordernisse

(1) Das Patentamt prüft, ob
1. die Anmeldung der Marke den Erfordernissen für die Zuerkennung eines Anmeldetages nach § 33 Abs. 1 genügt,
2. die Anmeldung den sonstigen Anmeldungserfordernissen entspricht,
3. die Gebühren in ausreichender Höhe gezahlt worden sind und
4. der Anmelder nach § 7 Inhaber einer Marke sein kann.

(2) Werden nach Absatz 1 Nr. 1 festgestellte Mängel nicht innerhalb einer vom Patentamt bestimmten Frist beseitigt, so gilt die Anmeldung als zurückgenommen. Kommt der Anmelder der Aufforderung des Patentamts nach, so erkennt das Patentamt als Anmeldetag den Tag zu, an dem die festgestellten Mängel beseitigt werden.

(3) Werden innerhalb einer vom Patentamt bestimmten Frist Klassengebühren nicht oder in nicht ausreichender Höhe nachgezahlt oder wird vom Anmelder keine Bestimmung darüber getroffen, welche Waren- oder Dienstleistungsklassen durch den gezahlten Gebührenbetrag gedeckt werden sollen, so werden zunächst die Leitklasse und sodann die übrigen Klassen in der Reihenfolge der Klasseneinteilung berücksichtigt. Im Übrigen gilt die Anmeldung als zurückgenommen.

(4) Werden sonstige Mängel innerhalb einer vom Patentamt bestimmten Frist nicht beseitigt, so weist das Patentamt die Anmeldung zurück.

(5) Kann der Anmelder nicht nach § 7 Inhaber einer Marke sein, so weist das Patentamt die Anmeldung zurück.

## § 37 Prüfung auf absolute Schutzhindernisse

(1) Ist die Marke nach § 3, 8 oder 10 von der Eintragung ausgeschlossen, so wird die Anmeldung zurückgewiesen.

(2) Ergibt die Prüfung, daß die Marke zwar am Anmeldetag (§ 33 Abs. 1) nicht den Voraussetzungen des § 8 Abs. 2 Nr. 1, 2 oder 3 entsprach, daß das Schutzhindernis aber nach dem Anmeldetag weggefallen ist, so kann die Anmeldung nicht zurückgewiesen werden, wenn der Anmelder sich damit einverstanden erklärt, daß ungeachtet des ursprünglichen Anmeldetages und einer etwa nach § 34 oder § 35 in Anspruch genommenen Priorität der Tag, an dem das Schutzhindernis weggefallen ist, als Anmeldetag gilt und für die Bestimmung des Zeitrangs im Sinne des § 6 Abs. 2 maßgeblich ist.

(3) Eine Anmeldung wird nach § 8 Abs. 2 Nr. 4 oder Nr. 10 nur zurückgewiesen, wenn die Eignung zur Täuschung oder die Bösgläubigkeit ersichtlich ist.

(4) Eine Anmeldung wird nach § 10 nur zurückgewiesen, wenn die Notorietät der älteren Marke amtsbekannt ist und wenn die weiteren Voraussetzungen des § 9 Abs. 1 Nr. 1 oder 2 gegeben sind.

(5) Die Absätze 1 bis 4 sind entsprechend anzuwenden, wenn die Marke nur für einen Teil der Waren oder Dienstleistungen, für die sie angemeldet worden ist, von der Eintragung ausgeschlossen ist.

## § 38 Beschleunigte Prüfung

Auf Antrag des Anmelders wird die Prüfung nach den §§ 36 und 37 beschleunigt durchgeführt.

## § 39 Zurücknahme, Einschränkung und Berichtigung der Anmeldung

(1) Der Anmelder kann die Anmeldung jederzeit zurücknehmen oder das in der Anmeldung enthaltene Verzeichnis der Waren und Dienstleistungen einschränken.

(2) Der Inhalt der Anmeldung kann auf Antrag des Anmelders zur Berichtigung von sprachlichen Fehlern, Schreibfehlern oder sonstigen offensichtlichen Unrichtigkeiten geändert werden.

## § 40 Teilung der Anmeldung

(1) Der Anmelder kann die Anmeldung teilen, indem er erklärt, daß die Anmeldung der Marke für die in der Teilungserklärung aufgeführten Waren und Dienstleistungen als abgetrennte Anmeldung weiterbehandelt werden soll. Für jede Teilanmeldung bleibt der Zeitrang der ursprünglichen Anmeldung erhalten.

(2) Für die abgetrennte Anmeldung sind die nach § 32 erforderlichen Anmeldungsunterlagen einzureichen. Werden die Anmeldungsunterlagen nicht innerhalb von drei Monaten nach dem Zugang der Teilungserklärung eingereicht oder wird die Gebühr nach dem Patentkostengesetz für das Teilungsverfahren nicht innerhalb dieser Frist gezahlt, so gilt die abgetrennte Anmeldung als zurückgenommen. Die Teilungserklärung kann nicht widerrufen werden.

## § 41 Eintragung

Entspricht die Anmeldung den Anmeldungserfordernissen und wird sie nicht gemäß § 37 zurückgewiesen, so wird die angemeldete Marke in das Register eingetragen. Die Eintragung wird veröffentlicht.

## § 42 Widerspruch

(1) Innerhalb einer Frist von drei Monaten nach dem Tag der Veröffentlichung der Eintragung der Marke gemäß § 41 kann von dem Inhaber einer Marke mit älterem Zeitrang gegen die Eintragung der Marke Widerspruch erhoben werden.

(2) Der Widerspruch kann nur darauf gestützt werden, daß die Marke
1. wegen einer angemeldeten oder eingetragenen Marke mit älterem Zeitrang nach § 9 Abs. 1 Nr. 1 oder 2,
2. wegen einer notorisch bekannten Marke mit älterem Zeitrang nach § 10 in Verbindung mit § 9 Abs. 1 Nr. 1 oder 2 oder
3. wegen ihrer Eintragung für einen Agenten oder Vertreter des Markeninhabers nach § 11 gelöscht werden kann.

(3) (weggefallen)

## § 43 Einrede mangelnder Benutzung, Entscheidung über den Widerspruch

(1) Ist der Widerspruch vom Inhaber einer eingetragenen Marke mit älterem Zeitrang erhoben worden, so hat er, wenn der Gegner die Benutzung der Marke bestreitet, glaubhaft zu machen, daß sie innerhalb der letzten fünf Jahre vor der Veröffentlichung der Eintragung der Marke, gegen die der Widerspruch sich richtet, gemäß § 26 benutzt worden ist, sofern sie zu diesem Zeitpunkt seit mindestens fünf Jahren

eingetragen ist. Endet der Zeitraum von fünf Jahren der Nichtbenutzung nach der Veröffentlichung der Eintragung, so hat der Widersprechende, wenn der Gegner die Benutzung bestreitet, glaubhaft zu machen, daß die Marke innerhalb der letzten fünf Jahre vor der Entscheidung über den Widerspruch gemäß § 26 benutzt worden ist. Bei der Entscheidung werden nur die Waren oder Dienstleistungen berücksichtigt, für die die Benutzung glaubhaft gemacht worden ist.

(2) Ergibt die Prüfung des Widerspruchs, daß die Marke für alle oder für einen Teil der Waren oder Dienstleistungen, für die sie eingetragen ist, zu löschen ist, so wird die Eintragung ganz oder teilweise gelöscht. Kann die Eintragung der Marke nicht gelöscht werden, so wird der Widerspruch zurückgewiesen.

(3) Ist die eingetragene Marke wegen einer oder mehrerer Marken mit älterem Zeitrang zu löschen, so kann das Verfahren über weitere Widersprüche bis zur rechtskräftigen Entscheidung über die Eintragung der Marke ausgesetzt werden.

(4) Im Falle der Löschung nach Absatz 2 ist § 52 Abs. 2 und 3 entsprechend anzuwenden.

## § 44 Eintragungsbewilligungsklage

(1) Der Inhaber der Marke kann im Wege der Klage gegen den Widersprechenden geltend machen, daß ihm trotz der Löschung der Eintragung nach § 43 ein Anspruch auf die Eintragung zusteht.

(2) Die Klage nach Absatz 1 ist innerhalb von sechs Monaten nach Unanfechtbarkeit der Entscheidung, mit der die Eintragung gelöscht worden ist, zu erheben.

(3) Die Eintragung aufgrund einer Entscheidung zugunsten des Inhabers der Marke wird unter Wahrung des Zeitrangs der Eintragung vorgenommen.

# Abschnitt 2
# Berichtigung, Teilung, Schutzdauer und Verlängerung

## § 45 Berichtigung des Registers und von Veröffentlichungen

(1) Eintragungen im Register können auf Antrag oder von Amts wegen zur Berichtigung von sprachlichen Fehlern, Schreibfehlern oder sonstigen offensichtlichen Unrichtigkeiten geändert werden. War die von der Berichtigung betroffene Eintragung veröffentlicht worden, so ist die berichtigte Eintragung zu veröffentlichen.

(2) Absatz 1 ist entsprechend auf die Berichtigung von Veröffentlichungen anzuwenden.

## § 46 Teilung der Eintragung

(1) Der Inhaber einer eingetragenen Marke kann die Eintragung teilen, indem er erklärt, daß die Eintragung der Marke für die in der Teilungserklärung aufgeführten Waren oder Dienstleistungen als abgetrennte Eintragung fortbestehen soll. Für jede Teileintragung bleibt der Zeitrang der ursprünglichen Eintragung erhalten.

(2) Die Teilung kann erst nach Ablauf der Frist zur Erhebung des Widerspruchs erklärt werden. Die Erklärung ist nur zulässig, wenn ein im Zeitpunkt ihrer Abgabe anhängiger Widerspruch gegen die Eintragung der Marke oder eine in diesem Zeitpunkt anhängige Klage auf Löschung der Eintragung der Marke sich nach der Teilung nur gegen einen der Teile der ursprünglichen Eintragung richten würde.

(3) Für die abgetrennte Eintragung sind die erforderlichen Unterlagen einzureichen. Werden die Unterlagen nicht innerhalb von drei Monaten nach dem Zugang der Teilungserklärung eingereicht oder wird die Gebühr nach dem Patentkostengesetz für das Teilungsverfahren nicht innerhalb dieser Frist gezahlt, so gilt dies als Verzicht auf die abgetrennte Eintragung. Die Teilungserklärung kann nicht widerrufen werden.

## § 47 Schutzdauer und Verlängerung

(1) Die Schutzdauer einer eingetragenen Marke beginnt mit dem Anmeldetag (§ 33 Abs. 1) und endet nach zehn Jahren am letzten Tag des Monats, der durch seine Benennung dem Monat entspricht, in den der Anmeldetag fällt.

(2) Die Schutzdauer kann um jeweils zehn Jahre verlängert werden.

(3) Die Verlängerung der Schutzdauer wird dadurch bewirkt, daß eine Verlängerungsgebühr und, falls die Verlängerung für Waren und Dienstleistungen begehrt wird, die in mehr als drei Klassen der Klasseneinteilung von Waren und Dienstleistungen fallen, für jede weitere Klasse eine Klassengebühr gezahlt werden.

(4) Beziehen sich die Gebühren nur auf einen Teil der Waren oder Dienstleistungen, für die die Marke eingetragen ist, so wird die Schutzdauer nur für diese Waren oder Dienstleistungen verlängert. Werden lediglich die erforderlichen Klassengebühren nicht gezahlt, so wird die Schutzdauer, soweit nicht Satz 1 Anwendung findet, nur für die Klassen verlängert, für die die gezahlten Gebühren ausreichen. Besteht eine Leitklasse, so wird sie zunächst berücksichtigt. Im übrigen werden die Klassen in der Reihenfolge der Klasseneinteilung berücksichtigt.

(5) Die Verlängerung der Schutzdauer wird am Tag nach dem Ablauf der Schutzdauer wirksam. Sie wird in das Register eingetragen und veröffentlicht.

(6) Wird die Schutzdauer nicht verlängert, so wird die Eintragung der Marke mit Wirkung ab dem Ablauf der Schutzdauer gelöscht.

# Abschnitt 3
# Verzicht, Verfall und Nichtigkeit, Löschungsverfahren

## § 48 Verzicht

(1) Auf Antrag des Inhabers der Marke wird die Eintragung jederzeit für alle oder für einen Teil der Waren oder Dienstleistungen, für die sie eingetragen ist, im Register gelöscht.

(2) Ist im Register eine Person als Inhaber eines Rechts an der Marke eingetragen, so wird die Eintragung nur mit Zustimmung dieser Person gelöscht.

## § 49 Verfall

(1) Die Eintragung einer Marke wird auf Antrag wegen Verfalls gelöscht, wenn die Marke nach dem Tag der Eintragung innerhalb eines ununterbrochenen Zeitraums von fünf Jahren nicht gemäß § 26 benutzt worden ist. Der Verfall einer Marke kann jedoch nicht geltend gemacht werden, wenn nach Ende dieses Zeitraums und vor Stellung des Löschungsantrags eine Benutzung der Marke gemäß § 26 begonnen oder wieder aufgenommen worden ist. Wird die Benutzung jedoch im Anschluß an einen ununterbrochenen Zeitraum

- 22 -

von fünf Jahren der Nichtbenutzung innerhalb von drei Monaten vor der Stellung des Löschungsantrags begonnen oder wieder aufgenommen, so bleibt sie unberücksichtigt, sofern die Vorbereitungen für die erstmalige oder die erneute Benutzung erst stattgefunden haben, nachdem der Inhaber der Marke Kenntnis davon erhalten hat, daß Antrag auf Löschung gestellt werden könnte. Wird der Antrag auf Löschung nach § 53 Abs. 1 beim Patentamt gestellt, so bleibt für die Berechnung der Frist von drei Monaten nach Satz 3 der Antrag beim Patentamt maßgeblich, wenn die Klage auf Löschung nach § 55 Abs. 1 innerhalb von drei Monaten nach Zustellung der Mitteilung nach § 53 Abs. 4 erhoben wird.

(2) Die Eintragung einer Marke wird ferner auf Antrag wegen Verfalls gelöscht,

1. wenn die Marke infolge des Verhaltens oder der Untätigkeit ihres Inhabers im geschäftlichen Verkehr zur gebräuchlichen Bezeichnung der Waren oder Dienstleistungen, für die sie eingetragen ist, geworden ist;

2. wenn die Marke infolge ihrer Benutzung durch den Inhaber oder mit seiner Zustimmung für die Waren oder Dienstleistungen, für die sie eingetragen ist, geeignet ist, das Publikum insbesondere über die Art, die Beschaffenheit oder die geographische Herkunft dieser Waren oder Dienstleistungen zu täuschen oder

3. wenn der Inhaber der Marke nicht mehr die in § 7 genannten Voraussetzungen erfüllt.

(3) Liegt ein Verfallsgrund nur für einen Teil der Waren oder Dienstleistungen vor, für die die Marke eingetragen ist, so wird die Eintragung nur für diese Waren oder Dienstleistungen gelöscht.

## § 50 Nichtigkeit wegen absoluter Schutzhindernisse

(1) Die Eintragung einer Marke wird auf Antrag wegen Nichtigkeit gelöscht, wenn sie entgegen §§ 3, 7 oder 8 eingetragen worden ist.

(2) Ist die Marke entgegen §§ 3, 7 oder 8 Abs. 2 Nr. 1 bis 9 eingetragen worden, so kann die Eintragung nur gelöscht werden, wenn das Schutzhindernis auch noch im Zeitpunkt der Entscheidung über den Antrag auf Löschung besteht. Ist die Marke entgegen § 8 Abs. 2 Nr. 1, 2 oder 3 eingetragen worden, so kann die Eintragung außerdem nur dann gelöscht werden, wenn der Antrag auf Löschung innerhalb von zehn Jahren seit dem Tag der Eintragung gestellt wird.

(3) Die Eintragung einer Marke kann von Amts wegen gelöscht werden, wenn sie entgegen § 8 Abs. 2 Nr. 4 bis 10 eingetragen worden ist und

1. das Löschungsverfahren innerhalb eines Zeitraums von zwei Jahren seit dem Tag der Eintragung eingeleitet wird,

2. das Schutzhindernis gemäß § 8 Abs. 2 Nr. 4 bis 9 auch noch im Zeitpunkt der Entscheidung über die Löschung besteht und

3. die Eintragung ersichtlich entgegen den genannten Vorschriften vorgenommen worden ist.

(4) Liegt ein Nichtigkeitsgrund nur für einen Teil der Waren oder Dienstleistungen vor, für die die Marke eingetragen ist, so wird die Eintragung nur für diese Waren oder Dienstleistungen gelöscht.

## § 51 Nichtigkeit wegen des Bestehens älterer Rechte

(1) Die Eintragung einer Marke wird auf Klage wegen Nichtigkeit gelöscht, wenn ihr ein Recht im Sinne der §§ 9 bis 13 mit älterem Zeitrang entgegensteht.

Ein Service der juris GmbH - www.juris.de -

(2) Die Eintragung kann aufgrund der Eintragung einer Marke mit älterem Zeitrang nicht gelöscht werden, soweit der Inhaber der Marke mit älterem Zeitrang die Benutzung der Marke mit jüngerem Zeitrang für die Waren oder Dienstleistungen, für die sie eingetragen ist, während eines Zeitraums von fünf aufeinanderfolgenden Jahren in Kenntnis dieser Benutzung geduldet hat, es sei denn, daß die Anmeldung der Marke mit jüngerem Zeitrang bösgläubig vorgenommen worden ist. Das gleiche gilt für den Inhaber eines Rechts mit älterem Zeitrang an einer durch Benutzung erworbenen Marke im Sinne des § 4 Nr. 2, an einer notorisch bekannten Marke im Sinne des § 4 Nr. 3, an einer geschäftlichen Bezeichnung im Sinne des § 5 oder an einer Sortenbezeichnung im Sinne des § 13 Abs. 2 Nr. 4. Die Eintragung einer Marke kann ferner nicht gelöscht werden, wenn der Inhaber eines der in den §§ 9 bis 13 genannten Rechte mit älterem Zeitrang der Eintragung der Marke vor der Stellung des Antrags auf Löschung zugestimmt hat.

(3) Die Eintragung kann aufgrund einer bekannten Marke oder einer bekannten geschäftlichen Bezeichnung mit älterem Zeitrang nicht gelöscht werden, wenn die Marke oder die geschäftliche Bezeichnung an dem für den Zeitrang der Eintragung der Marke mit jüngerem Zeitrang maßgeblichen Tag noch nicht im Sinne des § 9 Abs. 1 Nr. 3, des § 14 Abs. 2 Nr. 3 oder des § 15 Abs. 3 bekannt war.

(4) Die Eintragung kann aufgrund der Eintragung einer Marke mit älterem Zeitrang nicht gelöscht werden, wenn die Eintragung der Marke mit älterem Zeitrang am Tag der Veröffentlichung der Eintragung der Marke mit jüngerem Zeitrang
1. wegen Verfalls nach § 49 oder
2. wegen absoluter Schutzhindernisse nach § 50
hätte gelöscht werden können.

(5) Liegt ein Nichtigkeitsgrund nur für einen Teil der Waren oder Dienstleistungen vor, für die Marke eingetragen ist, so wird die Eintragung nur für diese Waren oder Dienstleistungen gelöscht.

## § 52 Wirkungen der Löschung wegen Verfalls oder Nichtigkeit

(1) Die Wirkungen der Eintragung einer Marke gelten in dem Umfang, in dem die Eintragung wegen Verfalls gelöscht wird, als von dem Zeitpunkt der Erhebung der Klage auf Löschung an nicht eingetreten. In der Entscheidung kann auf Antrag einer Partei ein früherer Zeitpunkt, zu dem einer der Verfallsgründe eingetreten ist, festgesetzt werden.

(2) Die Wirkungen der Eintragung einer Marke gelten in dem Umfang, in dem die Eintragung wegen Nichtigkeit gelöscht wird, als von Anfang an nicht eingetreten.

(3) Vorbehaltlich der Vorschriften über den Ersatz des Schadens, der durch fahrlässiges oder vorsätzliches Verhalten des Inhabers einer Marke verursacht worden ist, sowie der Vorschriften über ungerechtfertigte Bereicherung berührt die Löschung der Eintragung der Marke nicht
1. Entscheidungen in Verletzungsverfahren, die vor der Entscheidung über den Antrag auf Löschung rechtskräftig geworden und vollstreckt worden sind, und
2. vor der Entscheidung über den Antrag auf Löschung geschlossene Verträge insoweit, als sie vor dieser Entscheidung erfüllt worden sind. Es kann jedoch verlangt werden, daß in Erfüllung des Vertrages gezahlte Beträge aus Billigkeitsgründen insoweit zurückerstattet werden, wie die Umstände dies rechtfertigen.

## § 53 Löschung durch das Patentamt wegen Verfalls

(1) Der Antrag auf Löschung wegen Verfalls (§ 49) kann, unbeschadet des Rechts, den Antrag durch Klage nach § 55 geltend zu machen, beim Patentamt gestellt werden.

(2) Das Patentamt unterrichtet den Inhaber der eingetragenen Marke über den Antrag und fordert ihn auf, dem Patentamt mitzuteilen, ob er der Löschung widerspricht.

(3) Widerspricht der Inhaber der eingetragenen Marke der Löschung nicht innerhalb von zwei Monaten nach Zustellung der Mitteilung, wird die Eintragung gelöscht.

(4) Widerspricht der Inhaber der eingetragenen Marke der Löschung, teilt das Patentamt dies dem Antragsteller mit und unterrichtet ihn darüber, daß der Antrag auf Löschung durch Klage nach § 55 geltend zu machen ist.

## § 54 Löschungsverfahren vor dem Patentamt wegen absoluter Schutzhindernisse

(1) Der Antrag auf Löschung wegen absoluter Schutzhindernisse (§ 50) ist beim Patentamt zu stellen. Der Antrag kann von jeder Person gestellt werden.

(2) Wird ein Antrag auf Löschung gestellt oder wird ein Löschungsverfahren von Amts wegen eingeleitet, so unterrichtet das Patentamt den Inhaber der eingetragenen Marke hierüber. Widerspricht er der Löschung nicht innerhalb von zwei Monaten nach Zustellung der Mitteilung, so wird die Eintragung gelöscht. Widerspricht er der Löschung, so wird das Löschungsverfahren durchgeführt.

## § 55 Löschungsverfahren vor den ordentlichen Gerichten

(1) Die Klage auf Löschung wegen Verfalls (§ 49) oder wegen des Bestehens älterer Rechte (§ 51) ist gegen den als Inhaber der Marke Eingetragenen oder seinen Rechtsnachfolger zu richten.

(2) Zur Erhebung der Klage sind befugt:
1. in den Fällen des Antrags auf Löschung wegen Verfalls jede Person,
2. in den Fällen des Antrags auf Löschung wegen des Bestehens von Rechten mit älterem Zeitrang die Inhaber der in den §§ 9 bis 13 aufgeführten Rechte,
3. in den Fällen des Antrags auf Löschung wegen des Bestehens einer geographischen Herkunftsangabe mit älterem Zeitrang (§ 13 Abs. 2 Nr. 5) die nach § 8 Abs. 3 des Gesetzes gegen den unlauteren Wettbewerb zur Geltendmachung von Ansprüchen Berechtigten.

(3) Ist die Klage auf Löschung vom Inhaber einer eingetragenen Marke mit älterem Zeitrang erhoben worden, so hat er auf Einrede des Beklagten nachzuweisen, daß die Marke innerhalb der letzten fünf Jahre vor Erhebung der Klage gemäß § 26 benutzt worden ist, sofern sie zu diesem Zeitpunkt seit mindestens fünf Jahren eingetragen ist. Endet der Zeitraum von fünf Jahren der Nichtbenutzung nach Erhebung der Klage, so hat der Kläger auf Einrede des Beklagten nachzuweisen, daß die Marke innerhalb der letzten fünf Jahre vor dem Schluß der mündlichen Verhandlung gemäß § 26 benutzt worden ist. War die Marke mit älterem Zeitrang am Tag der Veröffentlichung der Eintragung der Marke mit jüngerem Zeitrang bereits seit mindestens fünf Jahren eingetragen, so hat der Kläger auf Einrede des Beklagten ferner nachzuweisen, daß die Eintragung der Marke mit älterem Zeitrang an diesem Tag nicht nach § 49 Abs. 1 hätte gelöscht werden können. Bei der Entscheidung werden nur die Waren oder Dienstleistungen berücksichtigt, für die die Benutzung nachgewiesen worden ist.

Ein Service der juris GmbH - www.juris.de -

(4) Ist vor oder nach Erhebung der Klage das durch die Eintragung der Marke begründete Recht auf einen anderen übertragen worden oder übergegangen, so ist die Entscheidung in der Sache selbst auch gegen den Rechtsnachfolger wirksam und vollstreckbar. Für die Befugnis des Rechtsnachfolgers, in den Rechtsstreit einzutreten, gelten die §§ 66 bis 74 und 76 der Zivilprozeßordnung entsprechend.

# Abschnitt 4
# Allgemeine Vorschriften für das Verfahren vor dem Patentamt

## § 56 Zuständigkeiten im Patentamt

(1) Im Patentamt werden zur Durchführung der Verfahren in Markenangelegenheiten Markenstellen und Markenabteilungen gebildet.

(2) Die Markenstellen sind für die Prüfung von angemeldeten Marken und für die Beschlußfassung im Eintragungsverfahren zuständig. Die Aufgaben einer Markenstelle nimmt ein Mitglied des Patentamts (Prüfer) wahr. Die Aufgaben können auch von einem Beamten des gehobenen Dienstes oder von einem vergleichbaren Angestellten wahrgenommen werden. Beamte des gehobenen Dienstes und vergleichbare Angestellte sind jedoch nicht befugt, eine Beeidigung anzuordnen, einen Eid abzunehmen oder ein Ersuchen nach § 95 Abs. 2 an das Patentgericht zu richten.

(3) Die Markenabteilungen sind für die Angelegenheiten zuständig, die nicht in die Zuständigkeit der Markenstellen fallen. Die Aufgaben einer Markenabteilung werden in der Besetzung mit mindestens drei Mitgliedern des Patentamts wahrgenommen. Der Vorsitzende einer Markenabteilung kann alle in die Zuständigkeit der Markenabteilung fallenden Angelegenheiten mit Ausnahme der Entscheidung über die Löschung einer Marke nach § 54 allein bearbeiten oder diese Angelegenheiten einem Angehörigen der Markenabteilung zur Bearbeitung übertragen.

## § 57 Ausschließung und Ablehnung

(1) Für die Ausschließung und Ablehnung der Prüfer und der Mitglieder der Markenabteilungen sowie der mit der Wahrnehmung von Angelegenheiten, die den Markenstellen oder den Markenabteilungen obliegen, betrauten Beamten des gehobenen und mittleren Dienstes oder Angestellten gelten die §§ 41 bis 44, 45 Abs. 2 Satz 2, §§ 47 bis 49 der Zivilprozeßordnung über die Ausschließung und Ablehnung der Gerichtspersonen entsprechend.

(2) Über das Ablehnungsgesuch entscheidet, soweit es einer Entscheidung bedarf, eine Markenabteilung.

## § 58 Gutachten

(1) Das Patentamt ist verpflichtet, auf Ersuchen der Gerichte oder der Staatsanwaltschaften über Fragen, die angemeldete oder eingetragene Marken betreffen, Gutachten abzugeben, wenn in dem Verfahren voneinander abweichende Gutachten mehrerer Sachverständiger vorliegen.

Ein Service der juris GmbH - www.juris.de -

(2) Im übrigen ist das Patentamt nicht befugt, ohne Genehmigung des Bundesministeriums der Justiz außerhalb seines gesetzlichen Aufgabenbereichs Beschlüsse zu fassen oder Gutachten abzugeben.

## § 59 Ermittlung des Sachverhalts, rechtliches Gehör

(1) Das Patentamt ermittelt den Sachverhalt von Amts wegen. Es ist an das Vorbringen und die Beweisanträge der Beteiligten nicht gebunden.

(2) Soll die Entscheidung des Patentamts auf Umstände gestützt werden, die dem Anmelder oder Inhaber der Marke oder einem anderen am Verfahren Beteiligten noch nicht mitgeteilt waren, so ist ihm vorher Gelegenheit zu geben, sich dazu innerhalb einer bestimmten Frist zu äußern.

## § 60 Ermittlungen, Anhörungen, Niederschrift

(1) Das Patentamt kann jederzeit die Beteiligten laden und anhören, Zeugen, Sachverständige und Beteiligte eidlich oder uneidlich vernehmen sowie andere zur Aufklärung der Sache erforderliche Ermittlungen anstellen.

(2) Bis zum Beschluß, mit dem das Verfahren abgeschlossen wird, ist der Anmelder oder Inhaber der Marke oder ein anderer am Verfahren Beteiligter auf Antrag anzuhören, wenn dies sachdienlich ist. Hält das Patentamt die Anhörung nicht für sachdienlich, so weist es den Antrag zurück. Der Beschluß, durch den der Antrag zurückgewiesen wird, ist selbständig nicht anfechtbar.

(3) Über die Anhörungen und Vernehmungen ist eine Niederschrift zu fertigen, die den wesentlichen Gang der Verhandlung wiedergeben und die rechtserheblichen Erklärungen der Beteiligten enthalten soll. Die §§ 160a, 162 und 163 der Zivilprozeßordnung sind entsprechend anzuwenden. Die Beteiligten erhalten eine Abschrift der Niederschrift.

## § 61 Beschlüsse, Rechtsmittelbelehrung

(1) Die Beschlüsse des Patentamts sind, auch wenn sie nach Satz 2 verkündet worden sind, schriftlich auszufertigen, zu begründen und den Beteiligten von Amts wegen zuzustellen. Falls eine Anhörung stattgefunden hat, können sie auch am Ende der Anhörung verkündet werden. Einer Begründung bedarf es nicht, wenn am Verfahren nur der Anmelder oder Inhaber der Marke beteiligt ist und seinem Antrag stattgegeben wird.

(2) Der schriftlichen Ausfertigung ist eine Erklärung beizufügen, mit der die Beteiligten über das Rechtsmittel, das gegen den Beschluß gegeben ist, über die Stelle, bei der das Rechtsmittel einzulegen ist, über die Rechtsmittelfrist und, sofern für das Rechtsmittel eine Gebühr nach dem Patentkostengesetz zu zahlen ist, über die Gebühr unterrichtet werden. Die Frist für das Rechtsmittel beginnt nur zu laufen, wenn die Beteiligten schriftlich belehrt worden sind. Ist die Belehrung unterblieben oder unrichtig erteilt, so ist die Einlegung des Rechtsmittels nur innerhalb eines Jahres seit Zustellung des Beschlusses zulässig, außer wenn der Beteiligte schriftlich dahingehend belehrt worden ist, daß ein Rechtsmittel nicht gegeben sei. § 91 ist entsprechend anzuwenden. Die Sätze 1 bis 4 gelten entsprechend für den Rechtsbehelf der Erinnerung nach § 64.

## § 62 Akteneinsicht, Registereinsicht

(1) Das Patentamt gewährt auf Antrag Einsicht in die Akten von Anmeldungen von Marken, wenn ein berechtigtes Interesse glaubhaft gemacht wird.

Ein Service der juris GmbH - www.juris.de -

(2) Nach der Eintragung der Marke wird auf Antrag Einsicht in die Akten der eingetragenen Marke gewährt.

(3) Die Einsicht in das Register steht jeder Person frei.

## § 63 Kosten der Verfahren

(1) Sind an dem Verfahren mehrere Personen beteiligt, so kann das Patentamt in der Entscheidung bestimmen, daß die Kosten des Verfahrens einschließlich der Auslagen des Patentamts und der den Beteiligten erwachsenen Kosten, soweit sie zur zweckentsprechenden Wahrung der Ansprüche und Rechte notwendig waren, einem Beteiligten ganz oder teilweise zur Last fallen, wenn dies der Billigkeit entspricht. Die Bestimmung kann auch getroffen werden, wenn der Beteiligte die Erinnerung, die Anmeldung der Marke, den Widerspruch oder den Antrag auf Löschung ganz oder teilweise zurücknimmt oder wenn die Eintragung der Marke wegen Verzichts oder wegen Nichtverlängerung der Schutzdauer ganz oder teilweise im Register gelöscht wird. Soweit eine Bestimmung über die Kosten nicht getroffen wird, trägt jeder Beteiligte die ihm erwachsenen Kosten selbst.

(2) Das Patentamt kann anordnen, dass die Gebühr nach dem Patentkostengesetz für die beschleunigte Prüfung, für das Widerspruchs- oder das Löschungsverfahren ganz oder teilweise zurückgezahlt wird, wenn dies der Billigkeit entspricht.

(3) Der Betrag der zu erstattenden Kosten wird auf Antrag durch das Patentamt festgesetzt. Die Vorschriften der Zivilprozessordnung über das Kostenfestsetzungsverfahren (§§ 103 bis 107) und die Zwangsvollstreckung aus Kostenfestsetzungsbeschlüssen (§§ 724 bis 802) sind entsprechend anzuwenden. An die Stelle der Erinnerung tritt die Beschwerde gegen den Kostenfestsetzungsbeschluß. § 66 ist mit der Maßgabe anzuwenden, daß die Beschwerde innerhalb von zwei Wochen einzulegen ist. Die vollstreckbare Ausfertigung wird vom Urkundsbeamten der Geschäftsstelle des Patentgerichts erteilt.

## § 64 Erinnerung

(1) Gegen die Beschlüsse der Markenstellen und der Markenabteilungen, die von einem Beamten des gehobenen Dienstes oder einem vergleichbaren Angestellten erlassen worden sind, findet die Erinnerung statt. Die Erinnerung hat aufschiebende Wirkung.

(2) Die Erinnerung ist innerhalb eines Monats nach Zustellung beim Patentamt einzulegen.

(3) Erachtet der Beamte oder Angestellte, dessen Beschluß angefochten wird, die Erinnerung für begründet, so hat er ihr abzuhelfen. Dies gilt nicht, wenn dem Erinnerungsführer ein anderer an dem Verfahren Beteiligter gegenübersteht.

(4) Über die Erinnerung entscheidet ein Mitglied des Patentamts durch Beschluß.

(5) Die Markenstelle oder die Markenabteilung kann anordnen, dass die Gebühr nach dem Patentkostengesetz für die Erinnerung ganz oder teilweise zurückgezahlt wird.

(6) Nach Einlegung einer Beschwerde nach § 66 Abs. 3 kann über eine Erinnerung nicht mehr entschieden werden. Eine gleichwohl danach erlassene Erinnerungsentscheidung ist gegenstandslos.

## § 64a Kostenregelungen im Verfahren vor dem Patentamt

Ein Service der juris GmbH - www.juris.de -

Im Verfahren vor dem Patentamt gilt für die Kosten das Patentkostengesetz.

## § 65 Rechtsverordnungsermächtigung

(1) Das Bundesministerium der Justiz wird ermächtigt, durch Rechtsverordnung ohne Zustimmung des Bundesrates
1. die Einrichtung und den Geschäftsgang sowie die Form des Verfahrens in Markenangelegenheiten zu regeln, soweit nicht durch Gesetz Bestimmungen darüber getroffen sind,
2. weitere Erfordernisse für die Anmeldung von Marken zu bestimmen,
3. die Klasseneinteilung von Waren und Dienstleistungen festzulegen,
4. nähere Bestimmungen für die Durchführung der Prüfungs-, Widerspruchs- und Löschungsverfahren zu treffen,
5. Bestimmungen über das Register der eingetragenen Marken und gegebenenfalls gesonderte Bestimmungen über das Register für Kollektivmarken zu treffen,
6. die in das Register aufzunehmenden Angaben über eingetragene Marken zu regeln und Umfang sowie Art und Weise der Veröffentlichung dieser Angaben festzulegen,
7. Bestimmungen über die sonstigen in diesem Gesetz vorgesehenen Verfahren vor dem Patentamt zu treffen, wie insbesondere das Verfahren bei der Teilung von Anmeldungen und von Eintragungen, das Verfahren zur Erteilung von Auskünften oder Bescheinigungen, das Verfahren der Wiedereinsetzung, das Verfahren der Akteneinsicht, das Verfahren über den Schutz international registrierter Marken und das Verfahren über die Umwandlung von Gemeinschaftsmarken,
8. Bestimmungen über die Form zu treffen, in der Anträge und Eingaben in Markenangelegenheiten einzureichen sind, einschließlich der Übermittlung von Anträgen und Eingaben durch elektronische Datenübertragung,
9. Bestimmungen darüber zu treffen, in welcher Form Beschlüsse, Bescheide oder sonstige Mitteilungen des Patentamts in Markenangelegenheiten den Beteiligten zu übermitteln sind, einschließlich der Übermittlung durch elektronische Datenübertragung, soweit nicht eine bestimmte Form der Übermittlung gesetzlich vorgeschrieben ist,
10. Bestimmungen darüber zu treffen, in welchen Fällen und unter welchen Voraussetzungen Eingaben und Schriftstücke in Markenangelegenheiten in anderen Sprachen als der deutschen Sprache berücksichtigt werden,
11. Beamte des gehobenen Dienstes oder vergleichbare Angestellte mit der Wahrnehmung von Angelegenheiten zu betrauen, die den Markenabteilungen obliegen und die ihrer Art nach keine besonderen rechtlichen Schwierigkeiten bieten, mit Ausnahme der Beschlußfassung über die Löschung von Marken (§ 48 Abs. 1, §§ 53 und 54), der Abgabe von Gutachten (§ 58 Abs. 1) und der Entscheidung, mit denen die Abgabe eines Gutachtens abgelehnt wird,
12. Beamte des mittleren Dienstes oder vergleichbare Angestellte mit der Wahrnehmung von Angelegenheiten zu betrauen, die den Markenstellen oder Markenabteilungen obliegen und die ihrer Art nach keine besonderen rechtlichen Schwierigkeiten bieten, mit Ausnahme von Entscheidungen über Anmeldungen und Widersprüche,
13. die in die Veröffentlichung nach § 33 Abs. 3 aufzunehmenden Angaben zu regeln und Umfang sowie Art und Weise der Veröffentlichung dieser Angaben festzulegen.

(2) Das Bundesministerium der Justiz kann die Ermächtigung zum Erlaß von Rechtsverordnungen nach Absatz 1 durch Rechtsverordnung ohne Zustimmung des Bundesrates ganz oder teilweise dem Deutschen Patent- und Markenamt übertragen.

# Abschnitt 5

Ein Service der juris GmbH - www.juris.de -

# Verfahren vor dem Patentgericht

## § 66 Beschwerde

(1) Gegen die Beschlüsse der Markenstellen und der Markenabteilungen findet, soweit gegen sie nicht die Erinnerung gegeben ist (§ 64 Abs. 1), die Beschwerde an das Patentgericht statt. Die Beschwerde steht den am Verfahren vor dem Patentamt Beteiligten zu. Die Beschwerde hat aufschiebende Wirkung.

(2) Die Beschwerde ist innerhalb eines Monats nach Zustellung des Beschlusses beim Patentamt schriftlich einzulegen.

(3) Ist über eine Erinnerung nach § 64 innerhalb von sechs Monaten nach ihrer Einlegung nicht entschieden worden und hat der Erinnerungsführer nach Ablauf dieser Frist Antrag auf Entscheidung gestellt, so ist die Beschwerde abweichend von Absatz 1 Satz 1 unmittelbar gegen den Beschluß der Markenstelle oder der Markenabteilung zulässig, wenn über die Erinnerung nicht innerhalb von zwei Monaten nach Zugang des Antrags entschieden worden ist. Steht dem Erinnerungsführer in dem Erinnerungsverfahren ein anderer Beteiligter gegenüber, so ist Satz 1 mit der Maßgabe anzuwenden, daß an die Stelle der Frist von sechs Monaten nach Einlegung der Erinnerung eine Frist von zehn Monaten tritt. Hat der andere Beteiligte ebenfalls Erinnerung eingelegt, so bedarf die Beschwerde nach Satz 2 der Einwilligung des anderen Beteiligten. Die schriftliche Erklärung der Einwilligung ist der Beschwerde beizufügen. Legt der andere Beteiligte nicht innerhalb einer Frist von einem Monat nach Zustellung der Beschwerde gemäß Absatz 4 Satz 2 ebenfalls Beschwerde ein, so gilt seine Erinnerung als zurückgenommen. Der Lauf der Fristen nach den Sätzen 1 und 2 wird gehemmt, wenn das Verfahren ausgesetzt oder wenn einem Beteiligten auf sein Gesuch oder auf Grund zwingender Vorschriften eine Frist gewährt wird. Der noch übrige Teil der Fristen nach den Sätzen 1 und 2 beginnt nach Beendigung der Aussetzung oder nach Ablauf der gewährten Frist zu laufen. Nach Erlaß der Erinnerungsentscheidung findet die Beschwerde nach den Sätzen 1 und 2 nicht mehr statt.

(4) Der Beschwerde und allen Schriftsätzen sollen Abschriften für die übrigen Beteiligten beigefügt werden. Die Beschwerde und alle Schriftsätze, die Sachanträge oder die Erklärung der Zurücknahme der Beschwerde oder eines Antrags enthalten, sind den übrigen Beteiligten von Amts wegen zuzustellen. Andere Schriftsätze sind ihnen formlos mitzuteilen, sofern nicht die Zustellung angeordnet wird.

(5) Erachtet die Stelle, deren Beschluß angefochten wird, die Beschwerde für begründet, so hat sie ihr abzuhelfen. Dies gilt nicht, wenn dem Beschwerdeführer ein anderer an dem Verfahren Beteiligter gegenübersteht. Die Stelle kann anordnen, daß die Beschwerdegebühr nach dem Patentkostengesetz zurückgezahlt wird. Wird der Beschwerde nicht nach Satz 1 abgeholfen, so ist sie vor Ablauf von einem Monat ohne sachliche Stellungnahme dem Patentgericht vorzulegen. In den Fällen des Satzes 2 ist die Beschwerde unverzüglich dem Patentgericht vorzulegen.

## § 67 Beschwerdesenate, Öffentlichkeit der Verhandlung

(1) Über Beschwerden im Sinne des § 66 entscheidet ein Beschwerdesenat des Patentgerichts in der Besetzung mit drei rechtskundigen Mitgliedern.

(2) Die Verhandlung über Beschwerden gegen Beschlüsse der Markenstellen und der Markenabteilungen einschließlich der Verkündung der Entscheidungen ist öffentlich, sofern die Eintragung veröffentlicht worden ist.

(3) Die §§ 172 bis 175 des Gerichtsverfassungsgesetzes gelten entsprechend mit der Maßgabe, daß
1. die Öffentlichkeit für die Verhandlung auf Antrag eines Beteiligten auch dann ausgeschlossen werden kann, wenn sie eine Gefährdung schutzwürdiger Interessen des Antragstellers besorgen läßt,
2. die Öffentlichkeit für die Verkündung der Entscheidungen bis zur Veröffentlichung der Eintragung ausgeschlossen ist.

## § 68 Beteiligung des Präsidenten des Patentamts

(1) Der Präsident des Patentamts kann, wenn er dies zur Wahrung des öffentlichen Interesses als angemessen erachtet, im Beschwerdeverfahren dem Patentgericht gegenüber schriftliche Erklärungen abgeben, an den Terminen teilnehmen und in ihnen Ausführungen machen. Schriftliche Erklärungen des Präsidenten des Patentamts sind den Beteiligten von dem Patentgericht mitzuteilen.

(2) Das Patentgericht kann, wenn es dies wegen einer Rechtsfrage von grundsätzlicher Bedeutung als angemessen erachtet, dem Präsidenten des Patentamts anheimgeben, dem Beschwerdeverfahren beizutreten. Mit dem Eingang der Beitrittserklärung erlangt der Präsident des Patentamts die Stellung eines Beteiligten.

## § 69 Mündliche Verhandlung

Eine mündliche Verhandlung findet statt, wenn
1. einer der Beteiligten sie beantragt,
2. vor dem Patentgericht Beweis erhoben wird (§ 74 Abs. 1) oder
3. das Patentgericht sie für sachdienlich erachtet.

## § 70 Entscheidung über die Beschwerde

(1) Über die Beschwerde wird durch Beschluß entschieden.

(2) Der Beschluß, durch den eine Beschwerde als unzulässig verworfen wird, kann ohne mündliche Verhandlung ergehen.

(3) Das Patentgericht kann die angefochtene Entscheidung aufheben, ohne in der Sache selbst zu entscheiden, wenn
1. das Patentamt noch nicht in der Sache selbst entschieden hat,
2. das Verfahren vor dem Patentamt an einem wesentlichen Mangel leidet oder
3. neue Tatsachen oder Beweismittel bekannt werden, die für die Entscheidung wesentlich sind.

(4) Das Patentamt hat die rechtliche Beurteilung, die der Aufhebung nach Absatz 3 zugrunde liegt, auch seiner Entscheidung zugrunde zu legen.

## § 71 Kosten des Beschwerdeverfahrens

(1) Sind an dem Verfahren mehrere Personen beteiligt, so kann das Patentgericht bestimmen, daß die Kosten des Verfahrens einschließlich der den Beteiligten erwachsenen Kosten, soweit sie zur zweckentsprechenden Wahrung der Ansprüche und Rechte notwendig waren, einem Beteiligten ganz oder teilweise zur Last fallen, wenn dies der Billigkeit entspricht. Soweit eine Bestimmung über die Kosten nicht getroffen wird, trägt jeder Beteiligte die ihm erwachsenen Kosten selbst.

(2) Dem Präsidenten des Patentamts können Kosten nur auferlegt werden, wenn er nach seinem Beitritt in dem Verfahren Anträge gestellt hat.

(3) Das Patentgericht kann anordnen, daß die Beschwerdegebühr nach dem Patentkostengesetz zurückgezahlt wird.

(4) Die Absätze 1 bis 3 sind auch anzuwenden, wenn der Beteiligte die Beschwerde, die Anmeldung der Marke, den Widerspruch oder den Antrag auf Löschung ganz oder teilweise zurücknimmt oder wenn die Eintragung der Marke wegen Verzichts oder wegen Nichtverlängerung der Schutzdauer ganz oder teilweise im Register gelöscht wird.

(5) Im Übrigen gelten die Vorschriften der Zivilprozessordnung über das Kostenfestsetzungsverfahren (§§ 103 bis 107) und die Zwangsvollstreckung aus Kostenfestsetzungsbeschlüssen (§§ 724 bis 802) entsprechend.

## § 72 Ausschließung und Ablehnung

(1) Für die Ausschließung und Ablehnung der Gerichtspersonen gelten die §§ 41 bis 44 und 47 bis 49 der Zivilprozeßordnung entsprechend.

(2) Von der Ausübung des Amtes als Richter ist auch ausgeschlossen, wer bei dem vorausgegangenen Verfahren vor dem Patentamt mitgewirkt hat.

(3) Über die Ablehnung eines Richters entscheidet der Senat, dem der Abgelehnte angehört. Wird der Senat durch das Ausscheiden des abgelehnten Mitglieds beschlußunfähig, so entscheidet ein anderer Beschwerdesenat.

(4) Über die Ablehnung eines Urkundsbeamten entscheidet der Senat, in dessen Geschäftsbereich die Sache fällt.

## § 73 Ermittlung des Sachverhalts, Vorbereitung der mündlichen Verhandlung

(1) Das Patentgericht ermittelt den Sachverhalt von Amts wegen. Es ist an das Vorbringen und die Beweisanträge der Beteiligten nicht gebunden.

(2) Der Vorsitzende oder ein von ihm zu bestimmendes Mitglied des Senats hat schon vor der mündlichen Verhandlung oder, wenn eine solche nicht stattfindet, vor der Entscheidung des Patentgerichts alle Anordnungen zu treffen, die notwendig sind, um die Sache möglichst in einer mündlichen Verhandlung oder in einer Sitzung zu erledigen. Im übrigen gilt § 273 Abs. 2, Abs. 3 Satz 1 und Abs. 4 Satz 1 der Zivilprozeßordnung entsprechend.

## § 74 Beweiserhebung

(1) Das Patentgericht erhebt Beweis in der mündlichen Verhandlung. Es kann insbesondere Augenschein einnehmen, Zeugen, Sachverständige und Beteiligte vernehmen und Urkunden heranziehen.

(2) Das Patentgericht kann in geeigneten Fällen schon vor der mündlichen Verhandlung durch eines seiner Mitglieder als beauftragten Richter Beweis erheben lassen oder unter Bezeichnung der einzelnen Beweisfragen ein anderes Gericht um die Beweisaufnahme ersuchen.

(3) Die Beteiligten werden von allen Beweisterminen benachrichtigt und können der Beweisaufnahme beiwohnen. Sie können an Zeugen und Sachverständige sachdienliche Fragen richten. Wird eine Frage beanstandet, so entscheidet das Patentgericht.

P-Part 2.

Ein Service der juris GmbH - www.juris.de -

## § 75 Ladungen

(1) Sobald der Termin zur mündlichen Verhandlung bestimmt ist, sind die Beteiligten mit einer Ladungsfrist von mindestens zwei Wochen zu laden. In dringenden Fällen kann der Vorsitzende die Frist abkürzen.

(2) Bei der Ladung ist darauf hinzuweisen, daß beim Ausbleiben eines Beteiligten auch ohne ihn verhandelt und entschieden werden kann.

## § 76 Gang der Verhandlung

(1) Der Vorsitzende eröffnet und leitet die mündliche Verhandlung.

(2) Nach Aufruf der Sache trägt der Vorsitzende oder der Berichterstatter den wesentlichen Inhalt der Akten vor.

(3) Hierauf erhalten die Beteiligten das Wort, um ihre Anträge zu stellen und zu begründen.

(4) Der Vorsitzende hat die Sache mit den Beteiligten in tatsächlicher und rechtlicher Hinsicht zu erörtern.

(5) Der Vorsitzende hat jedem Mitglied des Senats auf Verlangen zu gestatten, Fragen zu stellen. Wird eine Frage beanstandet, so entscheidet der Senat.

(6) Nach Erörterung der Sache erklärt der Vorsitzende die mündliche Verhandlung für geschlossen. Der Senat kann die Wiedereröffnung beschließen.

## § 77 Niederschrift

(1) Zur mündlichen Verhandlung und zu jeder Beweisaufnahme wird ein Urkundsbeamter der Geschäftsstelle als Schriftführer zugezogen. Wird auf Anordnung des Vorsitzenden von der Zuziehung des Schriftführers abgesehen, besorgt ein Richter die Niederschrift.

(2) Über die mündliche Verhandlung und jede Beweisaufnahme ist eine Niederschrift aufzunehmen. Die §§ 160 bis 165 der Zivilprozeßordnung sind entsprechend anzuwenden.

## § 78 Beweiswürdigung, rechtliches Gehör

(1) Das Patentgericht entscheidet nach seiner freien, aus dem Gesamtergebnis des Verfahrens gewonnenen Überzeugung. In der Entscheidung sind die Gründe anzugeben, die für die richterliche Überzeugung leitend gewesen sind.

(2) Die Entscheidung darf nur auf Tatsachen und Beweisergebnisse gestützt werden, zu denen die Beteiligten sich äußern konnten.

(3) Ist eine mündliche Verhandlung vorhergegangen, so kann ein Richter, der bei der letzten mündlichen Verhandlung nicht zugegen war, bei der Beschlußfassung nur mitwirken, wenn die Beteiligten zustimmen.

## § 79 Verkündung, Zustellung, Begründung

(1) Die Endentscheidungen des Patentgerichts werden, wenn eine mündliche Verhandlung stattgefunden hat, in dem Termin, in dem die mündliche Verhandlung geschlossen wird, oder in einem sofort anzuberaumenden Termin verkündet. Dieser soll nur dann über drei Wochen hinaus angesetzt werden, wenn wichtige Gründe, insbesondere der Umfang oder die

Schwierigkeit der Sache, dies erfordern. Statt der Verkündung ist die Zustellung der Endentscheidung zulässig. Entscheidet das Patentgericht ohne mündliche Verhandlung, so wird die Verkündung durch Zustellung an die Beteiligten ersetzt. Die Endentscheidungen sind den Beteiligten von Amts wegen zuzustellen.

(2) Die Entscheidungen des Patentgerichts, durch die ein Antrag zurückgewiesen oder über ein Rechtsmittel entschieden wird, sind zu begründen.

## § 80 Berichtigungen

(1) Schreibfehler, Rechenfehler und ähnliche offenbare Unrichtigkeiten in der Entscheidung sind jederzeit vom Patentgericht zu berichtigen.

(2) Enthält der Tatbestand der Entscheidung andere Unrichtigkeiten oder Unklarheiten, so kann die Berichtigung innerhalb von zwei Wochen nach Zustellung der Entscheidung beantragt werden.

(3) Über die Berichtigung nach Absatz 1 kann ohne vorherige mündliche Verhandlung entschieden werden.

(4) Über den Antrag auf Berichtigung nach Absatz 2 entscheidet das Patentgericht ohne Beweisaufnahme durch Beschluß. Hierbei wirken nur die Richter mit, die bei der Entscheidung, deren Berichtigung beantragt ist, mitgewirkt haben.

(5) Der Berichtigungsbeschluß wird auf der Entscheidung und den Ausfertigungen vermerkt.

## § 81 Vertretung, Vollmacht

(1) Vor dem Patentgericht kann sich ein Beteiligter in jeder Lage des Verfahrens durch einen Bevollmächtigten vertreten lassen. Durch Beschluß kann angeordnet werden, daß ein Bevollmächtigter bestellt werden muß. § 96 bleibt unberührt.

(2) Die Vollmacht ist schriftlich zu den Gerichtsakten einzureichen. Sie kann nachgereicht werden. Das Patentgericht kann hierfür eine Frist bestimmen.

(3) Der Mangel der Vollmacht kann in jeder Lage des Verfahrens geltend gemacht werden. Das Patentgericht hat den Mangel der Vollmacht von Amts wegen zu berücksichtigen, wenn nicht als Bevollmächtigter ein Rechtsanwalt oder ein Patentanwalt auftritt.

## § 82 Anwendung weiterer Vorschriften, Anfechtbarkeit, Akteneinsicht

(1) Soweit dieses Gesetz keine Bestimmungen über das Verfahren vor dem Patentgericht enthält, sind das Gerichtsverfassungsgesetz und die Zivilprozeßordnung entsprechend anzuwenden, wenn die Besonderheiten des Verfahrens vor dem Patentgericht dies nicht ausschließen. § 227 Abs. 3 Satz 1 der Zivilprozeßordnung ist nicht anzuwenden. Im Verfahren vor dem Patentgericht gilt für die Gebühren das Patentkostengesetz, für die Auslagen gilt das Gerichtskostengesetz entsprechend.

(2) Eine Anfechtung der Entscheidungen des Patentgerichts findet nur statt, soweit dieses Gesetz sie zuläßt.

(3) Für die Gewährung der Akteneinsicht an dritte Personen ist § 62 Abs. 1 und 2 entsprechend anzuwenden. Über den Antrag entscheidet das Patentgericht.

# Abschnitt 6

Ein Service der juris GmbH - www.juris.de -

# Verfahren vor dem Bundesgerichtshof

## § 83 Zugelassene und zulassungsfreie Rechtsbeschwerde

(1) Gegen die Beschlüsse der Beschwerdesenate des Patentgerichts, durch die über eine Beschwerde nach § 66 entschieden wird, findet die Rechtsbeschwerde an den Bundesgerichtshof statt, wenn der Beschwerdesenat die Rechtsbeschwerde in dem Beschluß zugelassen hat. Die Rechtsbeschwerde hat aufschiebende Wirkung.

(2) Die Rechtsbeschwerde ist zuzulassen, wenn
1. eine Rechtsfrage von grundsätzlicher Bedeutung zu entscheiden ist oder
2. die Fortbildung des Rechts oder die Sicherung einer einheitlichen Rechtsprechung eine Entscheidung des Bundesgerichtshofs erfordert.

(3) Einer Zulassung zur Einlegung der Rechtsbeschwerde bedarf es nicht, wenn gerügt wird,
1. daß das beschließende Gericht nicht vorschriftsmäßig besetzt war,
2. daß bei dem Beschluß ein Richter mitgewirkt hat, der von der Ausübung des Richteramtes kraft Gesetzes ausgeschlossen oder wegen Besorgnis der Befangenheit mit Erfolg abgelehnt war,
3. daß einem Beteiligten das rechtliche Gehör versagt war,
4. daß ein Beteiligter im Verfahren nicht nach Vorschrift des Gesetzes vertreten war, sofern er nicht der Führung des Verfahrens ausdrücklich oder stillschweigend zugestimmt hat,
5. daß der Beschluß aufgrund einer mündlichen Verhandlung ergangen ist, bei der die Vorschriften über die Öffentlichkeit des Verfahrens verletzt worden sind, oder
6. daß der Beschluß nicht mit Gründen versehen ist.

## § 84 Beschwerdeberechtigung, Beschwerdegründe

(1) Die Rechtsbeschwerde steht den am Beschwerdeverfahren Beteiligten zu.

(2) Die Rechtsbeschwerde kann nur darauf gestützt werden, daß der Beschluß auf einer Verletzung des Rechts beruht. Die §§ 546 und 547 der Zivilprozeßordnung gelten entsprechend.

## § 85 Förmliche Voraussetzungen

(1) Die Rechtsbeschwerde ist innerhalb eines Monats nach Zustellung des Beschlusses beim Bundesgerichtshof schriftlich einzulegen.

(2) In dem Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof gelten die Bestimmungen des § 142 über die Streitwertbegünstigung entsprechend.

(3) Die Rechtsbeschwerde ist zu begründen. Die Frist für die Begründung beträgt einen Monat. Sie beginnt mit der Einlegung der Rechtsbeschwerde und kann auf Antrag vom Vorsitzenden verlängert werden.

(4) Die Begründung der Rechtsbeschwerde muß enthalten
1. die Erklärung, inwieweit der Beschluß angefochten und seine Abänderung oder Aufhebung beantragt wird,
2. die Bezeichnung der verletzten Rechtsnorm und
3. wenn die Rechtsbeschwerde auf die Verletzung von Verfahrensvorschriften gestützt wird, die Bezeichnung der Tatsachen, die den Mangel ergeben.

(5) Vor dem Bundesgerichtshof müssen sich die Beteiligten durch einen beim Bundesgerichtshof zugelassenen Rechtsanwalt als Bevollmächtigten vertreten lassen. Auf Antrag eines Beteiligten ist seinem Patentanwalt das Wort zu gestatten. § 157 Abs. 1 und 2 der Zivilprozeßordnung ist insoweit nicht anzuwenden. Von den Kosten, die durch die Mitwirkung eines Patentanwalts entstehen, sind die Gebühren nach § 13 des Rechtsanwaltsvergütungsgesetzes und außerdem die notwendigen Auslagen des Patentanwalts zu erstatten.

## § 86 Prüfung der Zulässigkeit

Der Bundesgerichtshof hat von Amts wegen zu prüfen, ob die Rechtsbeschwerde an sich statthaft und ob sie in der gesetzlichen Form und Frist eingelegt und begründet ist. Liegen die Voraussetzungen nicht vor, so ist die Rechtsbeschwerde als unzulässig zu verwerfen.

## § 87 Mehrere Beteiligte

(1) Sind an dem Verfahren über die Rechtsbeschwerde mehrere Personen beteiligt, so sind die Beschwerdeschrift und die Beschwerdebegründung den anderen Beteiligten mit der Aufforderung zuzustellen, etwaige Erklärungen innerhalb einer bestimmten Frist nach Zustellung beim Bundesgerichtshof schriftlich einzureichen. Mit der Zustellung der Beschwerdeschrift ist der Zeitpunkt mitzuteilen, in dem die Rechtsbeschwerde eingelegt ist. Die erforderliche Zahl von beglaubigten Abschriften soll der Beschwerdeführer mit der Beschwerdeschrift oder der Beschwerdebegründung einreichen.

(2) Ist der Präsident des Patentamts nicht am Verfahren über die Rechtsbeschwerde beteiligt, so ist § 68 Abs. 1 entsprechend anzuwenden.

## § 88 Anwendung weiterer Vorschriften

(1) Im Verfahren über die Rechtsbeschwerde gelten die Vorschriften der Zivilprozessordnung über Ausschließung und Ablehnung der Gerichtspersonen (§§ 41 bis 49), über Prozessbevollmächtigte und Beistände (§§ 78 bis 90), über Zustellungen von Amts wegen (§§ 166 bis 190), über Ladungen, Termine und Fristen (§§ 214 bis 229) und über Wiedereinsetzung in den vorigen Stand (§§ 233 bis 238) entsprechend. Im Falle der Wiedereinsetzung in den vorigen Stand gilt § 91 Abs. 8 entsprechend.

(2) Für die Öffentlichkeit des Verfahrens gilt § 67 Abs. 2 und 3 entsprechend.

## § 89 Entscheidung über die Rechtsbeschwerde

(1) Die Entscheidung über die Rechtsbeschwerde ergeht durch Beschluß. Die Entscheidung kann ohne mündliche Verhandlung getroffen werden.

(2) Der Bundesgerichtshof ist bei seiner Entscheidung an die in dem angefochtenen Beschluß getroffenen tatsächlichen Feststellungen gebunden, außer wenn in bezug auf diese Feststellungen zulässige und begründete Rechtsbeschwerdegründe vorgebracht sind.

(3) Die Entscheidung ist zu begründen und den Beteiligten von Amts wegen zuzustellen.

(4) Im Falle der Aufhebung des angefochtenen Beschlusses ist die Sache zur anderweitigen Verhandlung und Entscheidung an das Patentgericht zurückzuverweisen. Das Patentgericht hat die rechtliche Beurteilung, die der Aufhebung zugrunde gelegt ist, auch seiner Entscheidung zugrunde zu legen.

Ein Service der juris GmbH - www.juris.de -

**§ 89a Abhilfe bei Verletzung des Anspruchs auf rechtliches Gehör**

Auf die Rüge der durch die Entscheidung beschwerten Partei ist das Verfahren fortzuführen, wenn das Gericht den Anspruch dieser Partei auf rechtliches Gehör in entscheidungserheblicher Weise verletzt hat. Gegen eine der Endentscheidung vorausgehende Entscheidung findet die Rüge nicht statt. § 321a Abs. 2 bis 5 der Zivilprozessordnung ist entsprechend anzuwenden.

**§ 90 Kostenentscheidung**

(1) Sind an dem Verfahren mehrere Personen beteiligt, so kann der Bundesgerichtshof bestimmen, daß die Kosten des Verfahrens einschließlich der den Beteiligten erwachsenen Kosten, soweit sie zur zweckentsprechenden Wahrung der Ansprüche und Rechte notwendig waren, einem Beteiligten ganz oder teilweise zur Last fallen, wenn dies der Billigkeit entspricht. Die Bestimmung kann auch getroffen werden, wenn der Beteiligte die Rechtsbeschwerde, die Anmeldung der Marke, den Widerspruch oder den Antrag auf Löschung ganz oder teilweise zurücknimmt oder wenn die Eintragung der Marke wegen Verzichts oder wegen Nichtverlängerung der Schutzdauer ganz oder teilweise im Register gelöscht wird. Soweit eine Bestimmung über die Kosten nicht getroffen wird, trägt jeder Beteiligte die ihm erwachsenen Kosten selbst.

(2) Wird die Rechtsbeschwerde zurückgewiesen oder als unzulässig verworfen, so sind die durch die Rechtsbeschwerde veranlaßten Kosten dem Beschwerdeführer aufzuerlegen. Hat ein Beteiligter durch grobes Verschulden Kosten veranlaßt, so sind ihm diese aufzuerlegen.

(3) Dem Präsidenten des Patentamts können Kosten nur auferlegt werden, wenn er die Rechtsbeschwerde eingelegt oder in dem Verfahren Anträge gestellt hat.

(4) Im Übrigen gelten die Vorschriften der Zivilprozessordnung über das Kostenfestsetzungsverfahren (§§ 103 bis 107) und die Zwangsvollstreckung aus Kostenfestsetzungsbeschlüssen (§§ 724 bis 802) entsprechend.

# Abschnitt 7
# Gemeinsame Vorschriften

**§ 91 Wiedereinsetzung**

(1) Wer ohne Verschulden verhindert war, dem Patentamt oder dem Patentgericht gegenüber eine Frist einzuhalten, deren Versäumung nach gesetzlicher Vorschrift einen Rechtsnachteil zur Folge hat, ist auf Antrag wieder in den vorigen Stand einzusetzen. Dies gilt nicht für die Frist zur Erhebung des Widerspruchs und zur Zahlung der Widerspruchsgebühr (§ 6 Abs. 1 Satz 1 des Patentkostengesetzes).

(2) Die Wiedereinsetzung muß innerhalb von zwei Monaten nach Wegfall des Hindernisses beantragt werden.

(3) Der Antrag muß die Angabe der die Wiedereinsetzung begründenden Tatsachen enthalten. Diese Tatsachen sind bei der Antragstellung oder im Verfahren über den Antrag glaubhaft zu machen.

(4) Die versäumte Handlung ist innerhalb der Antragsfrist nachzuholen. Ist dies geschehen, so kann Wiedereinsetzung auch ohne Antrag gewährt werden.

(5) Ein Jahr nach Ablauf der versäumten Frist kann die Wiedereinsetzung nicht mehr beantragt und die versäumte Handlung nicht mehr nachgeholt werden.

(6) Über den Antrag beschließt die Stelle, die über die nachgeholte Handlung zu beschließen hat.

(7) Die Wiedereinsetzung ist unanfechtbar.

(8) Wird dem Inhaber einer Marke Wiedereinsetzung gewährt, so kann er Dritten gegenüber, die in dem Zeitraum zwischen dem Eintritt des Rechtsverlusts an der Eintragung der Marke und der Wiedereinsetzung unter einem mit der Marke identischen oder ihr ähnlichen Zeichen gutgläubig Waren in den Verkehr gebracht oder Dienstleistungen erbracht haben, hinsichtlich dieser Handlungen keine Rechte geltend machen.

## § 91a Weiterbehandlung der Anmeldung

(1) Ist nach Versäumung einer vom Patentamt bestimmten Frist die Markenanmeldung zurückgewiesen worden, so wird der Beschluss wirkungslos, ohne dass es seiner ausdrücklichen Aufhebung bedarf, wenn der Anmelder die Weiterbehandlung der Anmeldung beantragt und die versäumte Handlung nachholt.

(2) Der Antrag ist innerhalb einer Frist von einem Monat nach Zustellung der Entscheidung über die Zurückweisung der Markenanmeldung einzureichen. Die versäumte Handlung ist innerhalb dieser Frist nachzuholen.

(3) Gegen die Versäumung der Frist nach Absatz 2 und der Frist zur Zahlung der Weiterbehandlungsgebühr nach § 6 Abs. 1 Satz 1 des Patentkostengesetzes ist eine Wiedereinsetzung nicht gegeben.

(4) Über den Antrag beschließt die Stelle, die über die nachgeholte Handlung zu beschließen hat.

## § 92 Wahrheitspflicht

In den Verfahren vor dem Patentamt, dem Patentgericht und dem Bundesgerichtshof haben die Beteiligten ihre Erklärungen über tatsächliche Umstände vollständig und der Wahrheit gemäß abzugeben.

## § 93 Amtssprache und Gerichtssprache

Die Sprache vor dem Patentamt und vor dem Patentgericht ist deutsch. Im übrigen finden die Vorschriften des Gerichtsverfassungsgesetzes über die Gerichtssprache Anwendung.

## § 93a Entschädigung von Zeugen, Vergütung von Sachverständigen

Zeugen erhalten eine Entschädigung und Sachverständige eine Vergütung nach dem Justizvergütungs- und -entschädigungsgesetz.

## § 94 Zustellungen

(1) Für Zustellungen im Verfahren vor dem Patentamt gelten die Vorschriften des Verwaltungszustellungsgesetzes mit folgenden Maßgaben:
1. An Empfänger, die sich im Ausland aufhalten und die keinen Inlandsvertreter (§ 96) bestellt haben, können auch durch Aufgabe zur Post zugestellt werden, soweit für den Empfänger die Notwendigkeit zur Bestellung eines Inlandsvertreters im

Zeitpunkt der zu bewirkenden Zustellung erkennbar war. § 184 Abs. 2 Satz 1 und 4 der Zivilprozeßordnung gilt entsprechend.

2. Für Zustellungen an Erlaubnisscheininhaber (§ 177 der Patentanwaltsordnung) ist § 5 Abs. 4 des Verwaltungszustellungsgesetzes entsprechend anzuwenden.

3. An Empfänger, denen beim Patentamt ein Abholfach eingerichtet worden ist, kann auch dadurch zugestellt werden, daß das Schriftstück im Abholfach des Empfängers niedergelegt wird. Über die Niederlegung ist eine schriftliche Mitteilung zu den Akten zu geben. Auf dem Schriftstück ist zu vermerken, wann es niedergelegt worden ist. Die Zustellung gilt als am dritten Tag nach der Niederlegung im Abholfach bewirkt.

(2) Für Zustellungen im Verfahren vor dem Bundespatentgericht gelten die Vorschriften der Zivilprozeßordnung.

## § 95 Rechtshilfe

(1) Die Gerichte sind verpflichtet, dem Patentamt Rechtshilfe zu leisten.

(2) Im Verfahren vor dem Patentamt setzt das Patentgericht auf Ersuchen des Patentamts Ordnungs- oder Zwangsmittel gegen Zeugen oder Sachverständige fest, die nicht erscheinen oder ihre Aussage oder deren Beeidigung verweigern. Ebenso ist die Vorführung eines nicht erschienenen Zeugen anzuordnen.

(3) Über das Ersuchen nach Absatz 2 entscheidet ein Beschwerdesenat des Patentgerichts in der Besetzung mit drei rechtskundigen Mitgliedern. Die Entscheidung ergeht durch Beschluß.

## § 95a Einreichung elektronischer Dokumente

(1) Soweit in Verfahren vor dem Patentamt für Anmeldungen, Anträge oder sonstige Handlungen und in Verfahren vor dem Patentgericht und dem Bundesgerichtshof für vorbereitende Schriftsätze und deren Anlagen, für Anträge und Erklärungen der Beteiligten sowie für Auskünfte, Aussagen, Gutachten und Erklärungen Dritter die Schriftform vorgesehen ist, genügt dieser Form die Aufzeichnung als elektronisches Dokument, wenn dieses für die Bearbeitung durch das Patentamt oder das Gericht geeignet ist. Die verantwortende Person soll das Dokument mit einer qualifizierten elektronischen Signatur nach dem Signaturgesetz versehen.

(2) Das Bundesministerium der Justiz bestimmt durch Rechtsverordnung, die nicht der Zustimmung des Bundesrates bedarf, den Zeitpunkt, von dem an elektronische Dokumente bei dem Patentamt und den Gerichten eingereicht werden können, sowie die für die Bearbeitung der Dokumente geeignete Form. Die Zulassung der elektronischen Form kann auf das Patentamt, eines der Gerichte oder auf einzelne Verfahren beschränkt werden.

(3) Ein elektronisches Dokument ist eingereicht, sobald die für den Empfang bestimmte Einrichtung des Patentamts oder des Gerichts es aufgezeichnet hat.

## § 96 Inlandsvertreter

(1) Wer im Inland weder einen Wohnsitz, Sitz noch Niederlassung hat, kann an einem in diesem Gesetz geregelten Verfahren vor dem Patentamt oder dem Patentgericht nur teilnehmen und die Rechte aus einer Marke nur geltend machen, wenn er im Inland einen Rechtsanwalt oder Patentanwalt als Vertreter bestellt hat, der zur Vertretung im Verfahren vor dem Patentamt, dem Patentgericht und in bürgerlichen Streitigkeiten, die diese Marke betreffen, sowie zur Stellung von Strafanträgen bevollmächtigt ist.

(2) Staatsangehörige eines Mitgliedstaates der Europäischen Union oder eines anderen Vertragsstaates des Abkommens über den Europäischen Wirtschaftsraum können zur Erbringung einer Dienstleistung im Sinne des Vertrages zur Gründung der Europäischen Gemeinschaft als Vertreter im Sinne des Absatzes 1 bestellt werden, wenn sie berechtigt sind, ihre berufliche Tätigkeit unter einer der in der Anlage zu § 1 des Gesetzes über die Tätigkeit europäischer Rechtsanwälte in Deutschland vom 9. März 2000 (BGBl. I S. 182) oder zu § 1 des Gesetzes über die Eignungsprüfung für die Zulassung zur Patentanwaltschaft vom 6. Juli 1990 (BGBl. I S. 1349, 1351) in der jeweils geltenden Fassung genannten Berufsbezeichnungen auszuüben. In diesem Fall kann ein Verfahren jedoch nur betrieben werden, wenn im Inland ein Rechtsanwalt oder Patentanwalt als Zustellungsbevollmächtigter bestellt worden ist.

(3) Der Ort, an dem ein nach Absatz 1 bestellter Vertreter seinen Geschäftsraum hat, gilt im Sinne des § 23 der Zivilprozessordnung als der Ort, an dem sich der Vermögensgegenstand befindet. Fehlt ein solcher Geschäftsraum, so ist der Ort maßgebend, an dem der Vertreter im Inland seinen Wohnsitz, und in Ermangelung eines solchen der Ort, an dem das Patentamt seinen Sitz hat.

(4) Die rechtsgeschäftliche Beendigung der Bestellung eines Vertreters nach Absatz 1 wird erst wirksam, wenn sowohl diese Beendigung als auch die Bestellung eines anderen Vertreters gegenüber dem Patentamt oder dem Patentgericht angezeigt wird.

# Teil 4
# Kollektivmarken

## § 97 Kollektivmarken

(1) Als Kollektivmarken können alle als Marke schutzfähigen Zeichen im Sinne des § 3 eingetragen werden, die geeignet sind, die Waren oder Dienstleistungen der Mitglieder des Inhabers der Kollektivmarke von denjenigen anderer Unternehmen nach ihrer betrieblichen oder geographischen Herkunft, ihrer Art, ihrer Qualität oder ihren sonstigen Eigenschaften zu unterscheiden.

(2) Auf Kollektivmarken sind die Vorschriften dieses Gesetzes anzuwenden, soweit in diesem Teil nicht etwas anderes bestimmt ist.

## § 98 Inhaberschaft

Inhaber von angemeldeten oder eingetragenen Kollektivmarken können nur rechtsfähige Verbände sein, einschließlich der rechtsfähigen Dachverbände und Spitzenverbände, deren Mitglieder selbst Verbände sind. Diesen Verbänden sind die juristischen Personen des öffentlichen Rechts gleichgestellt.

## § 99 Eintragbarkeit von geographischen Herkunftsangaben als Kollektivmarken

Abweichend von § 8 Abs. 2 Nr. 2 können Kollektivmarken ausschließlich aus Zeichen oder Angaben bestehen, die im Verkehr zur Bezeichnung der geographischen Herkunft der Waren oder der Dienstleistungen dienen können.

## § 100 Schranken des Schutzes, Benutzung

Ein Service der juris GmbH - www.juris.de -

(1) Zusätzlich zu den Schutzschranken, die sich aus § 23 ergeben, gewährt die Eintragung einer geographischen Herkunftsangabe als Kollektivmarke ihrem Inhaber nicht das Recht, einem Dritten zu untersagen, solche Angaben im geschäftlichen Verkehr zu benutzen, sofern die Benutzung den guten Sitten entspricht und nicht gegen § 127 verstößt.

(2) Die Benutzung einer Kollektivmarke durch mindestens eine hierzu befugte Person oder durch den Inhaber der Kollektivmarke gilt als Benutzung im Sinne des § 26.

## § 101 Klagebefugnis, Schadensersatz

(1) Soweit in der Markensatzung nichts anderes bestimmt ist, kann eine zur Benutzung der Kollektivmarke berechtigte Person Klage wegen Verletzung einer Kollektivmarke nur mit Zustimmung ihres Inhabers erheben.

(2) Der Inhaber der Kollektivmarke kann auch Ersatz des Schadens verlangen, der den zur Benutzung der Kollektivmarke berechtigten Personen aus der unbefugten Benutzung der Kollektivmarke oder eines ähnlichen Zeichens entstanden ist.

## § 102 Markensatzung

(1) Der Anmeldung der Kollektivmarke muß eine Markensatzung beigefügt sein.

(2) Die Markensatzung muß mindestens enthalten:
1. Namen und Sitz des Verbandes,
2. Zweck und Vertretung des Verbandes,
3. Voraussetzungen für die Mitgliedschaft,
4. Angaben über den Kreis der zur Benutzung der Kollektivmarke befugten Personen,
5. die Bedingungen für die Benutzung der Kollektivmarke und
6. Angaben über die Rechte und Pflichten der Beteiligten im Falle von Verletzungen der Kollektivmarke.

(3) Besteht die Kollektivmarke aus einer geographischen Herkunftsangabe, muß die Satzung vorsehen, daß jede Person, deren Waren oder Dienstleistungen aus dem entsprechenden geographischen Gebiet stammen und den in der Markensatzung enthaltenen Bedingungen für die Benutzung der Kollektivmarke entsprechen, Mitglied des Verbandes werden kann und in den Kreis der zur Benutzung der Kollektivmarke befugten Personen aufzunehmen ist.

(4) Die Einsicht in die Markensatzung steht jeder Person frei.

## § 103 Prüfung der Anmeldung

Die Anmeldung einer Kollektivmarke wird außer nach § 37 auch zurückgewiesen, wenn sie nicht den Voraussetzungen der §§ 97, 98 und 102 entspricht oder wenn die Markensatzung gegen die öffentliche Ordnung oder die guten Sitten verstößt, es sei denn, daß der Anmelder die Markensatzung so ändert, daß der Zurückweisungsgrund nicht mehr besteht.

## § 104 Änderung der Markensatzung

(1) Der Inhaber der Kollektivmarke hat dem Patentamt jede Änderung der Markensatzung mitzuteilen.

(2) Im Falle einer Änderung der Markensatzung sind die §§ 102 und 103 entsprechend anzuwenden.

## § 105 Verfall

(1) Die Eintragung einer Kollektivmarke wird außer aus den in § 49 genannten Verfallsgründen auf Antrag wegen Verfalls gelöscht,
1. wenn der Inhaber der Kollektivmarke nicht mehr besteht,
2. wenn der Inhaber der Kollektivmarke keine geeigneten Maßnahmen trifft, um zu verhindern, daß die Kollektivmarke mißbräuchlich in einer den Verbandszwecken oder der Markensatzung widersprechenden Weise benutzt wird, oder
3. wenn eine Änderung der Markensatzung entgegen § 104 Abs. 2 in das Register eingetragen worden ist, es sei denn, daß der Inhaber der Kollektivmarke die Markensatzung erneut so ändert, daß der Löschungsgrund nicht mehr besteht.

(2) Als eine mißbräuchliche Benutzung im Sinne des Absatzes 1 Nr. 2 ist es insbesondere anzusehen, wenn die Benutzung der Kollektivmarke durch andere als die zur Benutzung befugten Personen geeignet ist, das Publikum zu täuschen.

(3) Der Antrag auf Löschung nach Absatz 1 ist beim Patentamt zu stellen. Das Verfahren richtet sich nach § 54.

## § 106 Nichtigkeit wegen absoluter Schutzhindernisse

Die Eintragung einer Kollektivmarke wird außer aus den in § 50 genannten Nichtigkeitsgründen auf Antrag wegen Nichtigkeit gelöscht, wenn sie entgegen § 103 eingetragen worden ist. Betrifft der Nichtigkeitsgrund die Markensatzung, so wird die Eintragung nicht gelöscht, wenn der Inhaber der Kollektivmarke die Markensatzung so ändert, daß der Nichtigkeitsgrund nicht mehr besteht.

# Teil 5
# Schutz von Marken nach dem Madrider Markenabkommen und nach dem Protokoll zum Madrider Markenabkommen, Gemeinschaftsmarken

## Abschnitt 1
## Schutz von Marken nach dem Madrider Markenabkommen

### § 107 Anwendung der Vorschriften dieses Gesetzes; Sprache

(1) Die Vorschriften dieses Gesetzes sind auf internationale Registrierungen von Marken nach dem Madrider Abkommen über die internationale Registrierung von Marken (Madrider Markenabkommen), die durch Vermittlung des Patentamts vorgenommen werden oder deren Schutz sich auf das Gebiet der Bundesrepublik Deutschland erstreckt, entsprechend anzuwenden, soweit in diesem Abschnitt oder im Madrider Markenabkommen nichts anderes bestimmt ist.

(2) Sämtliche Anträge sowie sonstige Mitteilungen im Verfahren der internationalen Registrierung und das Verzeichnis der Waren und Dienstleistungen sind in französischer Sprache einzureichen.

### § 108 Antrag auf internationale Registrierung

(1) Der Antrag auf internationale Registrierung einer in das Register eingetragenen Marke nach Artikel 3 des Madrider Markenabkommens ist beim Patentamt zu stellen.

(2) Wird der Antrag auf internationale Registrierung vor der Eintragung der Marke in das Register gestellt, so gilt er als am Tag der Eintragung der Marke zugegangen.

(3) Mit dem Antrag ist das Verzeichnis der Waren und Dienstleistungen, nach Klassen geordnet in der Reihenfolge der internationalen Klassifikation von Waren und Dienstleistungen, einzureichen.

## § 109 Gebühren

(1) Ist der Antrag auf internationale Registrierung vor der Eintragung der Marke in das Register gestellt worden, so wird die nationale Gebühr für das Verfahren auf internationale Registrierung am Tage der Eintragung fällig.

(2) Die nationale Gebühr nach dem Patentkostengesetz für die internationale Registrierung ist innerhalb eines Monats nach Fälligkeit, die sich nach § 3 Abs. 1 des Patentkostengesetzes oder nach Absatz 1 richtet, zu zahlen.

## § 110 Eintragung im Register

Der Tag und die Nummer der internationalen Registrierung einer im Register eingetragenen Marke sind in das Register einzutragen.

## § 111 Nachträgliche Schutzerstreckung

(1) Beim Patentamt kann ein Antrag auf nachträgliche Schutzerstreckung einer international registrierten Marke nach Artikel 3(hoch)ter Abs. 2 des Madrider Markenabkommens gestellt werden.

(2) Die nationale Gebühr nach dem Patentkostengesetz für die nachträgliche Schutzerstreckung ist innerhalb eines Monats nach Fälligkeit (§ 3 Abs. 1 des Patentkostengesetzes) zu zahlen.

## § 112 Wirkung der internationalen Registrierung

(1) Die internationale Registrierung einer Marke, deren Schutz nach Artikel 3ter des Madrider Markenabkommens auf das Gebiet der Bundesrepublik Deutschland erstreckt worden ist, hat dieselbe Wirkung, wie wenn die Marke am Tag der internationalen Registrierung nach Artikel 3 Abs. 4 des Madrider Markenabkommens oder am Tag der Eintragung der nachträglichen Schutzerstreckung nach Artikel 3ter Abs. 2 des Madrider Markenabkommens zur Eintragung in das vom Patentamt geführte Register angemeldet und eingetragen worden wäre.

(2) Die in Absatz 1 bezeichnete Wirkung gilt als nicht eingetreten, wenn der international registrierten Marke nach den §§ 113 bis 115 der Schutz verweigert wird.

## § 113 Prüfung auf absolute Schutzhindernisse

(1) International registrierte Marken werden in gleicher Weise wie zur Eintragung in das Register angemeldete Marken nach § 37 auf absolute Schutzhindernisse geprüft. § 37 Abs. 2 ist nicht anzuwenden.

(2) An die Stelle der Zurückweisung der Anmeldung (§ 37 Abs. 1) tritt die Verweigerung des Schutzes.

Ein Service der juris GmbH - www.juris.de -

## § 114 Widerspruch

(1) An die Stelle der Veröffentlichung der Eintragung (§ 41) tritt für international registrierte Marken die Veröffentlichung in dem vom Internationalen Büro der Weltorganisation für geistiges Eigentum herausgegebenen Veröffentlichungsblatt.

(2) Die Frist zur Erhebung des Widerspruchs (§ 42 Abs. 1) gegen die Schutzgewährung für international registrierte Marken beginnt mit dem ersten Tag des Monats, der dem Monat folgt, der als Ausgabemonat des Heftes des Veröffentlichungsblattes angegeben ist, in dem die Veröffentlichung der international registrierten Marke enthalten ist.

(3) An die Stelle der Löschung der Eintragung (§ 43 Abs. 2) tritt die Verweigerung des Schutzes.

## § 115 Nachträgliche Schutzentziehung

(1) An die Stelle des Antrags oder der Klage auf Löschung einer Marke wegen Verfalls (§ 49), wegen des Vorliegens absoluter Schutzhindernisse (§ 50) oder aufgrund eines älteren Rechts (§ 51) tritt für international registrierte Marken der Antrag oder die Klage auf Schutzentziehung.

(2) Wird ein Antrag auf Schutzentziehung nach § 49 Abs. 1 wegen mangelnder Benutzung gestellt, so tritt an die Stelle des Tages der Eintragung in das Register der Tag, an dem die Frist des Artikels 5 Abs. 2 des Madrider Markenabkommens abgelaufen ist, oder, falls bei Ablauf dieser Frist die in den §§ 113 und 114 genannten Verfahren noch nicht abgeschlossen sind, der Tag des Zugangs der abschließenden Mitteilung über die Schutzbewilligung beim Internationalen Büro der Weltorganisation für geistiges Eigentum.

## § 116 Widerspruch und Antrag auf Löschung aufgrund einer international registrierten Marke

(1) Wird aufgrund einer international registrierten Marke Widerspruch gegen die Eintragung einer Marke erhoben, so ist § 43 Abs. 1 mit der Maßgabe anzuwenden, daß an die Stelle des Tages der Eintragung der in § 115 Abs. 2 bezeichnete Tag tritt.

(2) Wird aufgrund einer international registrierten Marke eine Klage auf Löschung einer eingetragenen Marke nach § 51 erhoben, so ist § 55 Abs. 3 mit der Maßgabe anzuwenden, daß an die Stelle des Tages der Eintragung der in § 115 Abs. 2 bezeichnete Tag tritt.

## § 117 Ausschluß von Ansprüchen wegen mangelnder Benutzung

Werden Ansprüche im Sinne der §§ 14, 18 und 19 wegen der Verletzung einer international registrierten Marke geltend gemacht, so ist § 25 mit der Maßgabe anzuwenden, daß an die Stelle des Tages der Eintragung der Marke der in § 115 Abs. 2 bezeichnete Tag tritt.

## § 118 Zustimmung bei Übertragungen international registrierter Marken

Das Patentamt erteilt dem Internationalen Büro der Weltorganisation für geistiges Eigentum die nach Artikel 9bis Abs. 1 des Madrider Markenabkommens erforderliche Zustimmung im Falle der Übertragung einer international registrierten Marke ohne Rücksicht darauf, ob die Marke für den neuen Inhaber der international registrierten Marke in das vom Patentamt geführte Register eingetragen ist.

Ein Service der juris GmbH - www.juris.de -

# Abschnitt 2
# Schutz von Marken nach dem Protokoll zum Madrider Markenabkommen

## § 119 Anwendung der Vorschriften dieses Gesetzes; Sprachen

(1) Die Vorschriften dieses Gesetzes sind auf internationale Registrierungen von Marken nach dem Madrider Protokoll vom 27. Juni 1989 zum Madrider Abkommen über die internationale Registrierung von Marken (Protokoll zum Madrider Markenabkommen), die durch Vermittlung des Patentamts vorgenommen werden oder deren Schutz sich auf das Gebiet der Bundesrepublik Deutschland erstreckt, entsprechend anzuwenden, soweit in diesem Abschnitt oder im Protokoll zum Madrider Markenabkommen nichts anderes bestimmt ist.

(2) Sämtliche Anträge sowie sonstige Mitteilungen im Verfahren der internationalen Registrierung und das Verzeichnis der Waren und Dienstleistungen sind nach Wahl des Antragstellers in französischer oder in englischer Sprache einzureichen.

## § 120 Antrag auf internationale Registrierung

(1) Der Antrag auf internationale Registrierung einer zur Eintragung in das Register angemeldeten Marke oder einer in das Register eingetragenen Marke nach Artikel 3 des Protokolls zum Madrider Markenabkommen ist beim Patentamt zu stellen. Der Antrag kann auch schon vor der Eintragung der Marke gestellt werden, wenn die internationale Registrierung auf der Grundlage einer im Register eingetragenen Marke vorgenommen werden soll.

(2) Soll die internationale Registrierung auf der Grundlage einer im Register eingetragenen Marke vorgenommen werden und wird der Antrag auf internationale Registrierung vor der Eintragung der Marke in das Register gestellt, so gilt er als am Tag der Eintragung der Marke zugegangen.

(3) Mit dem Antrag ist das Verzeichnis der Waren und Dienstleistungen, nach Klassen geordnet in der Reihenfolge der internationalen Klassifikation von Waren und Dienstleistungen, einzureichen.

## § 121 Gebühren

(1) Soll die internationale Registrierung nach dem Madrider Markenabkommen und nach dem Protokoll zum Madrider Markenabkommen auf der Grundlage einer im Register eingetragenen Marke vorgenommen werden und ist der Antrag auf internationale Registrierung vor der Eintragung der Marke in das Register gestellt worden, so wird die nationale Gebühr nach dem Patentkostengesetz für die internationale Registrierung am Tag der Eintragung fällig.

(2) Die nationale Gebühr nach dem Patentkostengesetz für die internationale Registrierung ist innerhalb eines Monats nach Fälligkeit, die sich nach § 3 Abs. 1 des Patentkostengesetzes oder nach Absatz 1 richtet, zu zahlen.

## § 122 Vermerk in den Akten, Eintragung im Register

(1) Ist die internationale Registrierung auf der Grundlage einer zur Eintragung in das Register angemeldeten Marke vorgenommen worden, so sind der Tag und die Nummer der internationalen Registrierung in den Akten der angemeldeten Marke zu vermerken.

(2) Der Tag und die Nummer der internationalen Registrierung, die auf der Grundlage einer im Register eingetragenen Marke vorgenommen worden ist, ist in das Register einzutragen. Satz 1 ist auch anzuwenden, wenn die internationale Registrierung auf der Grundlage einer zur Eintragung in das Register angemeldeten Marke vorgenommen worden ist und die Anmeldung zur Eintragung geführt hat.

## § 123 Nachträgliche Schutzerstreckung

(1) Der Antrag auf nachträgliche Schutzerstreckung einer international registrierten Marke nach Artikel 3(hoch)ter Abs. 2 des Protokolls zum Madrider Markenabkommen kann beim Patentamt gestellt werden. Soll die nachträgliche Schutzerstreckung auf der Grundlage einer im Register eingetragenen Marke vorgenommen werden und wird der Antrag schon vor der Eintragung der Marke gestellt, so gilt er als am Tag der Eintragung zugegangen.

(2) Die nachträgliche Schutzerstreckung auf der Grundlage einer im Register eingetragenen Marke kann sowohl nach dem Madrider Markenabkommen als auch nach dem Protokoll zum Madrider Markenabkommen vorgenommen werden.

(3) Die nationale Gebühr nach dem Patentkostengesetz für die nachträgliche Schutzerstreckung ist innerhalb eines Monats nach Fälligkeit (§ 3 Abs. 1 des Patentkostengesetzes) zu zahlen.

## § 124 Entsprechende Anwendung der Vorschriften über die Wirkung der nach dem Madrider Markenabkommen international registrierten Marken

Die §§ 112 bis 117 sind auf international registrierte Marken, deren Schutz nach Artikel 3ter des Protokolls zum Madrider Markenabkommen auf das Gebiet der Bundesrepublik Deutschland erstreckt worden ist, entsprechend anzuwenden mit der Maßgabe, daß an die Stelle der in den §§ 112 bis 117 aufgeführten Vorschriften des Madrider Markenabkommens die entsprechenden Vorschriften des Protokolls zum Madrider Markenabkommen treten.

## § 125 Umwandlung einer internationalen Registrierung

(1) Wird beim Patentamt ein Antrag nach Artikel 9quinquies des Protokolls zum Madrider Markenabkommen auf Umwandlung einer im internationalen Register gemäß Artikel 6 Abs. 4 des Protokolls zum Madrider Markenabkommen gelöschten Marke gestellt und geht der Antrag mit den erforderlichen Angaben dem Patentamt vor Ablauf einer Frist von drei Monaten nach dem Tag der Löschung der Marke im internationalen Register zu, so ist der Tag der internationalen Registrierung dieser Marke nach Artikel 3 Abs. 4 des Protokolls zum Madrider Markenabkommen oder der Tag der Eintragung der Schutzerstreckung nach Artikel 3ter Abs. 2 des Protokolls zum Madrider Markenabkommen, gegebenenfalls mit der für die internationale Registrierung in Anspruch genommenen Priorität, für die Bestimmung des Zeitrangs im Sinne des § 6 Abs. 2 maßgebend.

(2) Der Antragsteller hat eine Bescheinigung des Internationalen Büros der Weltorganisation für geistiges Eigentum einzureichen, aus der sich die Marke und die Waren oder Dienstleistungen ergeben, für die sich der Schutz der internationalen

Registrierung vor ihrer Löschung im internationalen Register auf die Bundesrepublik Deutschland erstreckt hatte.

(3) Der Antragsteller hat außerdem eine deutsche Übersetzung des Verzeichnisses der Waren oder Dienstleistungen, für die die Eintragung beantragt wird, einzureichen.

(4) Der Antrag auf Umwandlung wird im übrigen wie eine Anmeldung zur Eintragung einer Marke behandelt. War jedoch am Tag der Löschung der Marke im internationalen Register die Frist nach Artikel 5 Abs. 2 des Protokolls zum Madrider Markenabkommen zur Verweigerung des Schutzes bereits abgelaufen und war an diesem Tag kein Verfahren zur Schutzverweigerung oder zur nachträglichen Schutzentziehung anhängig, so wird die Marke ohne vorherige Prüfung unmittelbar nach § 41 in das Register eingetragen. Gegen die Eintragung einer Marke nach Satz 2 kann Widerspruch nicht erhoben werden.

# Abschnitt 3
# Gemeinschaftsmarken

## § 125a Anmeldung von Gemeinschaftsmarken beim Patentamt

Werden beim Patentamt Anmeldungen von Gemeinschaftsmarken nach Artikel 25 Abs. 1 Buchstabe b der Verordnung (EG) Nr. 40/94 des Rates vom 20. Dezember 1993 über die Gemeinschaftsmarke (ABl. EG Nr. L 11 S 1) eingereicht, so vermerkt das Patentamt auf der Anmeldung den Tag des Eingangs und leitet die Anmeldung ohne Prüfung unverzüglich an das Harmonisierungsamt für den Binnenmarkt (Marken, Muster und Modelle) weiter.

## § 125b Anwendung der Vorschriften dieses Gesetzes

Die Vorschriften dieses Gesetzes sind auf Marken, die nach der Verordnung über die Gemeinschaftsmarke angemeldet oder eingetragen worden sind, in folgenden Fällen anzuwenden:
1. Für die Anwendung des § 9 (Relative Schutzhindernisse) sind angemeldete oder eingetragene Gemeinschaftsmarken mit älterem Zeitrang den nach diesem Gesetz angemeldeten oder eingetragenen Marken mit älterem Zeitrang gleichgestellt, jedoch mit der Maßgabe, daß an die Stelle der Bekanntheit im Inland gemäß § 9 Abs. 1 Nr. 3 die Bekanntheit in der Gemeinschaft gemäß Artikel 9 Abs. 1 Satz 2 Buchstabe c der Verordnung über die Gemeinschaftsmarke tritt.
2. Dem Inhaber einer eingetragenen Gemeinschaftsmarke stehen zusätzlich zu den Ansprüchen nach den Artikeln 9 bis 11 der Verordnung über die Gemeinschaftsmarke die gleichen Ansprüche auf Schadensersatz (§ 14 Abs. 6 und 7), auf Vernichtung (§ 18) und auf Auskunftserteilung (§ 19) zu wie dem Inhaber einer nach diesem Gesetz eingetragenen Marke.
3. Werden Ansprüche aus einer eingetragenen Gemeinschaftsmarke gegen die Benutzung einer nach diesem Gesetz eingetragenen Marke mit jüngerem Zeitrang geltend gemacht, so ist § 21 Abs. 1 (Verwirkung) entsprechend anzuwenden.
4. Wird ein Widerspruch gegen die Eintragung einer Marke (§ 42) auf eine eingetragene Gemeinschaftsmarke mit älterem Zeitrang gestützt, so ist § 43 Abs. 1 (Glaubhaftmachung der Benutzung) entsprechend anzuwenden mit der Maßgabe, daß an die Stelle der Benutzung der Marke mit älterem Zeitrang gemäß § 26 die Benutzung der Gemeinschaftsmarke mit älterem Zeitrang gemäß Artikel 15 der Verordnung über die Gemeinschaftsmarke tritt.
5. Wird ein Antrag auf Löschung der Eintragung einer Marke (§ 51 Abs. 1) auf eine eingetragene Gemeinschaftsmarke mit älterem Zeitrang gestützt, so sind
   a) § 51 Abs. 2 Satz 1 (Verwirkung) entsprechend anzuwenden;

b) § 55 Abs. 3 (Nachweis der Benutzung) mit der Maßgabe entsprechend anzuwenden, daß an die Selle der Benutzung der Marke mit älterem Zeitrang gemäß § 26 die Benutzung der Gemeinschaftsmarke nach Artikel 15 der Verordnung über die Gemeinschaftsmarke tritt.

6. Anträge auf Beschlagnahme bei der Einfuhr und Ausfuhr können von Inhabern eingetragener Gemeinschaftsmarken in gleicher Weise gestellt werden wie von Inhabern nach diesem Gesetz eingetragener Marken. Die §§ 146 bis 149 sind entsprechend anzuwenden.

## § 125c Nachträgliche Feststellung der Ungültigkeit einer Marke

(1) Ist für eine angemeldete oder eingetragene Gemeinschaftsmarke der Zeitrang einer im Register des Patentamts eingetragenen Marke nach Artikel 34 oder 35 der Verordnung über die Gemeinschaftsmarke in Anspruch genommen worden und ist die im Register des Patentamts eingetragene Marke wegen Nichtverlängerung der Schutzdauer nach § 47 Abs. 6 oder wegen Verzichts nach § 48 Abs. 1 gelöscht worden, so kann auf Antrag nachträglich die Ungültigkeit dieser Marke wegen Verfalls oder wegen Nichtigkeit festgestellt werden.

(2) Die Feststellung der Ungültigkeit erfolgt unter den gleichen Voraussetzungen wie eine Löschung wegen Verfalls oder wegen Nichtigkeit. Jedoch kann die Ungültigkeit einer Marke wegen Verfalls nach § 49 Abs. 1 nur festgestellt werden, wenn die Voraussetzungen für die Löschung nach dieser Vorschrift auch schon in dem Zeitpunkt gegeben waren, in dem die Marke wegen Nichtverlängerung der Schutzdauer oder wegen Verzichts gelöscht worden ist.

(3) Das Verfahren zur Feststellung der Ungültigkeit richtet sich nach den Vorschriften, die für das Verfahren zur Löschung einer eingetragenen Marke gelten, mit der Maßgabe, daß an die Stelle der Löschung der Eintragung der Marke die Feststellung ihrer Ungültigkeit tritt.

## § 125d Umwandlung von Gemeinschaftsmarken

(1) Ist dem Patentamt ein Antrag auf Umwandlung einer angemeldeten oder eingetragenen Gemeinschaftsmarke nach Artikel 109 Abs. 3 der Verordnung über die Gemeinschaftsmarke übermittelt worden, so sind die Gebühr und die Klassengebühren nach dem Patentkostengesetz für das Umwandlungsverfahren mit Zugang des Umwandlungsantrages beim Patentamt fällig.

(2) Betrifft der Umwandlungsantrag eine Marke, die noch nicht als Gemeinschaftsmarke eingetragen war, so wird der Umwandlungsantrag wie die Anmeldung einer Marke zur Eintragung in das Register des Patentamts behandelt mit der Maßgabe, daß an die Stelle des Anmeldetages im Sinne des § 33 Abs. 1 der Anmeldetag der Gemeinschaftsmarke im Sinne des Artikels 27 der Verordnung über die Gemeinschaftsmarke oder der Tag einer für die Gemeinschaftsmarke in Anspruch genommenen Priorität tritt. War für die Anmeldung der Gemeinschaftsmarke der Zeitrang einer im Register des Patentamts eingetragenen Marke nach Artikel 34 der Verordnung über die Gemeinschaftsmarke in Anspruch genommen worden, so tritt dieser Zeitrang an die Stelle des nach Satz 1 maßgeblichen Tages.

(3) Betrifft der Umwandlungsantrag einer Marke, die bereits als Gemeinschaftsmarke eingetragen war, so trägt das Patentamt die Marke ohne weitere Prüfung unmittelbar nach § 41 unter Wahrung ihres ursprünglichen Zeitrangs in das Register ein. Gegen die Eintragung kann Widerspruch nicht erhoben werden.

(4) Im übrigen sind auf Umwandlungsanträge die Vorschriften dieses Gesetzes für die Anmeldung von Marken anzuwenden.

## § 125e Gemeinschaftsmarkengerichte, Gemeinschaftsmarkenstreitsachen

(1) Für alle Klagen, für die nach der Verordnung über die Gemeinschaftsmarke die Gemeinschaftsmarkengerichte im Sinne des Artikels 91 Abs. 1 der Verordnung zuständig sind (Gemeinschaftsmarkenstreitsachen), sind als Gemeinschaftsmarkengerichte erster Instanz die Landgerichte ohne Rücksicht auf den Streitwert ausschließlich zuständig.

(2) Gemeinschaftsmarkengericht zweiter Instanz ist das Oberlandesgericht, in dessen Bezirk das Gemeinschaftsmarkengericht erster Instanz seinen Sitz hat.

(3) Die Landesregierungen werden ermächtigt, durch Rechtsverordnung die Gemeinschaftsmarkenstreitsachen für die Bezirke mehrerer Gemeinschaftsmarkengerichte einem dieser Gerichte zuzuweisen. Die Landesregierungen können diese Ermächtigung durch Rechtsverordnung auf die Landesjustizverwaltungen übertragen.

(4) Die Länder können durch Vereinbarung den Gemeinschaftsmarkengerichten eines Landes obliegende Aufgaben ganz oder teilweise dem zuständigen Gemeinschaftsmarkengericht eines anderen Landes übertragen.

(5) Auf Verfahren vor den Gemeinschaftsmarkengerichten ist § 140 Abs. 3 bis 5 entsprechend anzuwenden.

## § 125f Unterrichtung der Kommission

Das Bundesministerium der Justiz teilt der Kommission der Europäischen Gemeinschaften die Gemeinschaftsmarkengerichte erster und zweiter Instanz sowie jede Änderung der Anzahl, der Bezeichnung oder der örtlichen Zuständigkeit der Gemeinschaftsmarkengerichte erster und zweiter Instanz mit.

## § 125g Örtliche Zuständigkeit der Gemeinschaftsmarkengerichte

Sind nach Artikel 93 der Verordnung über die Gemeinschaftsmarke deutsche Gemeinschaftsmarkengerichte international zuständig, so gelten für die örtliche Zuständigkeit dieser Gerichte die Vorschriften entsprechend, die anzuwenden wären, wenn es sich um eine beim Patentamt eingereichte Anmeldung einer Marke oder um eine im Register des Patentamts eingetragene Marke handelte. Ist eine Zuständigkeit danach nicht begründet, so ist das Gericht örtlich zuständig, bei dem der Kläger seinen allgemeinen Gerichtsstand hat.

## § 125h Insolvenzverfahren

(1) Ist dem Insolvenzgericht bekannt, daß zur Insolvenzmasse eine angemeldete oder eingetragene Gemeinschaftsmarke gehört, so ersucht es das Harmonisierungsamt für den Binnenmarkt (Marken, Muster und Modelle) im unmittelbaren Verkehr,
1. die Eröffnung des Verfahrens und, soweit nicht bereits darin enthalten, die Anordnung einer Verfügungsbeschränkung,
2. die Freigabe oder die Veräußerung der Gemeinschaftsmarke oder der Anmeldung der Gemeinschaftsmarke,
3. die rechtskräftige Einstellung des Verfahrens und

4. die rechtskräftige Aufhebung des Verfahrens, im Falle einer Überwachung
   des Schuldners jedoch erst nach Beendigung dieser Überwachung, und einer
   Verfügungsbeschränkung

in das Register für Gemeinschaftsmarken oder, wenn es sich um eine Anmeldung handelt,
in die Akten der Anmeldung einzutragen.

(2) Die Eintragung in das Register für Gemeinschaftsmarken oder in die Akten
der Anmeldung kann auch vom Insolvenzverwalter beantragt werden. Im Falle der
Eigenverwaltung (§ 270 der Insolvenzordnung) tritt der Sachwalter an die Stelle des
Insolvenzverwalters.

## § 125i Erteilung der Vollstreckungsklausel

Für die Erteilung der Vollstreckungsklausel nach Artikel 82 Abs. 2 Satz 2 der
Verordnung über die Gemeinschaftsmarke ist das Patentgericht zuständig. Die
vollstreckbare Ausfertigung wird vom Urkundsbeamten der Geschäftsstelle des
Patentgerichts erteilt.

# Teil 6
# Geographische Herkunftsangaben

# Abschnitt 1
# Schutz geographischer Herkunftsangaben

## § 126 Als geographische Herkunftsangaben geschützte Namen, Angaben oder Zeichen

(1) Geographische Herkunftsangaben im Sinne dieses Gesetzes sind die Namen von
Orten, Gegenden, Gebieten oder Ländern sowie sonstige Angaben oder Zeichen, die im
geschäftlichen Verkehr zur Kennzeichnung der geographischen Herkunft von Waren oder
Dienstleistungen benutzt werden.

(2) Dem Schutz als geographische Herkunftsangaben sind solche Namen, Angaben
oder Zeichen im Sinne des Absatzes 1 nicht zugänglich, bei denen es sich um
Gattungsbezeichnungen handelt. Als Gattungsbezeichnungen sind solche Bezeichnungen
anzusehen, die zwar eine Angabe über die geographische Herkunft im Sinne des Absatzes 1
enthalten oder von einer solchen Angabe abgeleitet sind, die jedoch ihre ursprüngliche
Bedeutung verloren haben und als Namen von Waren oder Dienstleistungen oder als
Bezeichnungen oder Angaben der Art, der Beschaffenheit, der Sorte oder sonstiger
Eigenschaften oder Merkmale von Waren oder Dienstleistungen dienen.

## § 127 Schutzinhalt

(1) Geographische Herkunftsangaben dürfen im geschäftlichen Verkehr nicht für Waren
oder Dienstleistungen benutzt werden, die nicht aus dem Ort, der Gegend, dem Gebiet
oder dem Land stammen, das durch die geographische Herkunftsangabe bezeichnet
wird, wenn bei der Benutzung solcher Namen, Angaben oder Zeichen für Waren oder
Dienstleistungen anderer Herkunft eine Gefahr der Irreführung über die geographische
Herkunft besteht.

Ein Service der juris GmbH - www.juris.de -

(2) Haben die durch eine geographische Herkunftsangabe gekennzeichneten Waren oder Dienstleistungen besondere Eigenschaften oder eine besondere Qualität, so darf die geographische Herkunftsangabe im geschäftlichen Verkehr für die entsprechenden Waren oder Dienstleistungen dieser Herkunft nur benutzt werden, wenn die Waren oder Dienstleistungen diese Eigenschaften oder diese Qualität aufweisen.

(3) Genießt eine geographische Herkunftsangabe einen besonderen Ruf, so darf sie im geschäftlichen Verkehr für Waren oder Dienstleistungen anderer Herkunft auch dann nicht benutzt werden, wenn eine Gefahr der Irreführung über die geographische Herkunft nicht besteht, sofern die Benutzung für Waren oder Dienstleistungen anderer Herkunft geeignet ist, den Ruf der geographischen Herkunftsangabe oder ihre Unterscheidungskraft ohne rechtfertigenden Grund in unlauterer Weise auszunutzen oder zu beeinträchtigen.

(4) Die vorstehenden Absätze finden auch dann Anwendung, wenn Namen, Angaben oder Zeichen benutzt werden, die der geschützten geographischen Herkunftsangabe ähnlich sind oder wenn die geographische Herkunftsangabe mit Zusätzen benutzt wird, sofern
1. in den Fällen des Absatzes 1 trotz der Abweichung oder der Zusätze eine Gefahr der Irreführung über die geographische Herkunft besteht oder
2. in den Fällen des Absatzes 3 trotz der Abweichung oder der Zusätze die Eignung zur unlauteren Ausnutzung oder Beeinträchtigung des Rufs oder der Unterscheidungskraft der geographischen Herkunftsangabe besteht.

### § 128 Unterlassungsanspruch, Schadensersatzanspruch

(1) Wer im geschäftlichen Verkehr Namen, Angaben oder Zeichen entgegen § 127 benutzt, kann von den nach § 8 Abs. 3 des Gesetzes gegen den unlauteren Wettbewerb zur Geltendmachung von Ansprüchen Berechtigten auf Unterlassung in Anspruch genommen werden.

(2) Wer dem § 127 vorsätzlich oder fahrlässig zuwiderhandelt, ist zum Ersatz des durch die Zuwiderhandlung entstandenen Schadens verpflichtet.

(3) Wird die Zuwiderhandlung in einem geschäftlichen Betrieb von einem Angestellten oder Beauftragten begangen, so kann der Unterlassungsanspruch, und, soweit der Angestellte oder Beauftragte vorsätzlich oder fahrlässig gehandelt hat, der Schadensersatzanspruch auch gegen den Inhaber des Betriebs geltend gemacht werden.

### § 129 Verjährung

Ansprüche nach § 128 verjähren gemäß § 20.

# Abschnitt 2
# Schutz von geographischen Angaben und Ursprungsbezeichnungen gemäß der Verordnung (EWG) Nr. 2081/92

### § 130 Verfahren vor dem Patentamt; Weiterleitung

(1) Anträge auf Eintragung einer geografischen Angabe oder einer Ursprungsbezeichnung in das Verzeichnis der geschützten geografischen Angaben und der geschützten Ursprungsbezeichnungen, das von der Kommission der Europäischen Gemeinschaften gemäß der Verordnung (EWG) Nr. 2081/92 des Rates vom 14. Juli 1992 zum Schutz von

geografischen Angaben und Ursprungsbezeichnungen für Agrarerzeugnisse und Lebensmittel (ABl. EG Nr. L 208 S. 1), in ihrer jeweils geltenden Fassung geführt wird, sind beim Patentamt einzureichen.

(2) Für die in diesem Abschnitt geregelten Verfahren sind die im Patentamt errichteten Markenabteilungen zuständig.

(3) Bei der Prüfung des Antrags holt das Patentamt die Stellungnahmen des Bundesministeriums für Ernährung, Landwirtschaft und Verbraucherschutz, der interessierten öffentlichen Körperschaften sowie der interessierten Verbände und Organisationen der Wirtschaft ein.

(4) Das Patentamt veröffentlicht den Antrag im Markenblatt. Innerhalb von vier Monaten seit Veröffentlichung des Antrags kann von jeder Person beim Patentamt eine Stellungnahme zur Schutzfähigkeit der geografischen Angabe oder der Ursprungsbezeichnung, die Gegenstand des Antrags ist, eingereicht werden.

(5) Entspricht der Antrag unter Berücksichtigung der Stellungnahmen nach den Absätzen 3 und 4 den Voraussetzungen der Verordnung (EWG) Nr. 2081/92 und den zu ihrer Durchführung erlassenen Vorschriften, so stellt das Patentamt dieses durch Beschluss fest. Andernfalls wird der Antrag durch Beschluss zurückgewiesen. Der Beschluss ist dem Antragsteller und denjenigen zuzustellen, die innerhalb der Frist von Absatz 4 eine Stellungnahme abgegeben haben.

(6) Steht rechtskräftig fest, dass der Antrag den Voraussetzungen der Verordnung (EWG) Nr. 2081/92 und den zu ihrer Durchführung erlassenen Vorschriften entspricht, so unterrichtet das Patentamt den Antragsteller hierüber und übermittelt den Antrag dem Bundesministerium der Justiz. Das Bundesministerium der Justiz übermittelt den Antrag mit den erforderlichen Unterlagen an die Kommission der Europäischen Gemeinschaften.

## § 131 Einspruchsverfahren

(1) Einsprüche nach Artikel 7 Abs. 3 der Verordnung (EWG) Nr. 2081/92 gegen die Eintragung von geografischen Angaben und Ursprungsbezeichnungen in das von der Kommission der Europäischen Gemeinschaften geführte Verzeichnis der geschützten geografischen Angaben und der geschützten Ursprungsbezeichnungen oder gegen die Änderung der Spezifikation einer geografischen Angabe oder einer Ursprungsbezeichnung sind beim Patentamt innerhalb von vier Monaten seit der Veröffentlichung im Amtsblatt der Europäischen Union gemäß Artikel 6 Abs. 2 der Verordnung (EWG) Nr. 2081/92 einzulegen.

(2) Die Zahlungsfrist für die Einspruchsgebühr richtet sich nach § 6 Abs. 1 Satz 1 des Patentkostengesetzes. Eine Wiedereinsetzung in die Einspruchsfrist und in die Frist zur Zahlung der Einspruchsgebühr ist nicht gegeben.

## § 132 Löschungsverfahren

(1) Anträge auf Löschung einer geschützten geografischen Angabe oder einer geschützten Ursprungsbezeichnung nach Artikel 11a Buchstabe a der Verordnung (EWG) Nr. 2081/92 sind beim Patentamt einzureichen. Ist der Antrag begründet, so stellt das Patentamt dies fest und übermittelt den Antrag an das Bundesministerium der Justiz zur Weiterleitung an die Kommission der Europäischen Gemeinschaften. Ist der Antrag unbegründet, so weist ihn das Patentamt zurück.

(2) Anträge auf Löschung einer geschützten geografischen Angabe oder einer geschützten Ursprungsbezeichnung nach Artikel 11a Buchstabe b der Verordnung (EWG) Nr. 2081/92

können beim Patentamt eingereicht werden. Die Anträge werden ohne Prüfung an das Bundesministerium der Justiz zur Weiterleitung an die Kommission der Europäischen Gemeinschaften übermittelt.

## § 133 Antrag auf Änderung der Spezifikation

Für Anträge auf Änderung der Spezifikation einer geschützten geografischen Angabe oder einer geschützten Ursprungsbezeichnung gemäß Artikel 9 der Verordnung (EWG) Nr. 2081/92 gilt § 130 entsprechend. Eine Gebühr ist nicht zu zahlen.

## § 133a Rechtsmittel

Gegen Entscheidungen, die das Patentamt nach den Vorschriften dieses Abschnitts trifft, findet die Beschwerde zum Bundespatentgericht und die Rechtsbeschwerde zum Bundesgerichtshof statt. Gegen eine Entscheidung gemäß § 130 Abs. 5 Satz 1 steht die Beschwerde denjenigen Personen zu, die gemäß § 130 Abs. 4 fristgerecht zu dem Antrag Stellung genommen haben und die durch die Entscheidung in ihrem berechtigten Interesse betroffen sind. Im Übrigen sind die Vorschriften dieses Gesetzes über das Beschwerdeverfahren vor dem Bundespatentgericht (§§ 66 bis 82) und über das Rechtsbeschwerdeverfahren vor dem Bundesgerichtshof (§§ 83 bis 90) entsprechend anzuwenden.

## § 134 Überwachung

(1) Die nach der Verordnung (EWG) Nr. 2081/92 und den zu ihrer Durchführung erlassenen Vorschriften erforderliche Überwachung und Kontrolle obliegt den nach Landesrecht zuständigen Stellen.

(2) Soweit es zur Überwachung und Kontrolle im Sinne des Absatzes 1 erforderlich ist, können die Beauftragten der zuständigen Stellen bei Betrieben, die Agrarerzeugnisse oder Lebensmittel herstellen oder in den Verkehr bringen (§ 7 Abs. 1 des Lebensmittel- und Bedarfsgegenständegesetzes) oder innergemeinschaftlich verbringen, einführen oder ausführen, während der Geschäfts- oder Betriebszeit
1. Geschäftsräume und Grundstücke, Verkaufseinrichtungen und Transportmittel betreten und dort Besichtigungen vornehmen,
2. Proben gegen Empfangsbescheinigung entnehmen; auf Verlangen des Betroffenen ist ein Teil der Probe oder, falls diese unteilbar ist, eine zweite Probe amtlich verschlossen und versiegelt zurückzulassen,
3. Geschäftsunterlagen einsehen und prüfen,
4. Auskunft verlangen.
Diese Befugnisse erstrecken sich auch auf Agrarerzeugnisse oder Lebensmittel, die an öffentlichen Orten, insbesondere auf Märkten, Plätzen, Straßen oder im Umherziehen in den Verkehr gebracht werden.

(3) Inhaber oder Leiter der Betriebe sind verpflichtet, das Betreten der Geschäftsräume und Grundstücke, Verkaufseinrichtungen und Transportmittel sowie die dort vorzunehmenden Besichtigungen zu gestatten, die zu besichtigenden Agrarerzeugnisse oder Lebensmittel selbst oder durch andere so darzulegen, daß die Besichtigung ordnungsgemäß vorgenommen werden kann, selbst oder durch andere die erforderliche Hilfe bei Besichtigungen zu leisten, die Proben entnehmen zu lassen, die geschäftlichen Unterlagen vorzulegen, prüfen zu lassen und Auskünfte zu erteilen.

(4) Erfolgt die Überwachung bei der Einfuhr oder bei der Ausfuhr, so gelten die Absätze 2 und 3 entsprechend auch für denjenigen, der die Agrarerzeugnisse oder Lebensmittel für den Betriebsinhaber innergemeinschaftlich verbringt, einführt oder ausführt.

Ein Service der juris GmbH - www.juris.de -

(5) Der zur Erteilung einer Auskunft Verpflichtete kann die Auskunft auf solche Fragen verweigern, deren Beantwortung ihn selbst oder einen der in § 383 Abs. 1 Nr. 1 bis 3 der Zivilprozeßordnung bezeichneten Angehörigen der Gefahr strafrechtlicher Verfolgung oder eines Verfahrens nach dem Gesetz über Ordnungswidrigkeiten aussetzen würde.

(6) Für Amtshandlungen, die nach Artikel 10 der Verordnung (EWG) Nr. 2081/92 zu Kontrollzwecken vorzunehmen sind, werden kostendeckende Gebühren und Auslagen erhoben. Die kostenpflichtigen Tatbestände werden durch das Landesrecht bestimmt.

### § 135 Unterlassungsanspruch, Schadensersatzanspruch

(1) Wer im geschäftlichen Verkehr Handlungen vornimmt, die gegen Artikel 8 oder 13 der Verordnung (EWG) Nr. 2081/92 verstoßen, kann von den nach § 8 Abs. 3 des Gesetzes gegen den unlauteren Wettbewerb zur Geltendmachung von Ansprüchen Berechtigten auf Unterlassung in Anspruch genommen werden.

(2) § 128 Abs. 2 und 3 ist entsprechend anzuwenden.

### § 136 Verjährung

Die Ansprüche nach § 135 verjähren gemäß § 20.

# Abschnitt 3
# Ermächtigungen zum Erlaß von Rechtsverordnungen

### § 137 Nähere Bestimmungen zum Schutz einzelner geographischer Herkunftsangaben

(1) Das Bundesministerium der Justiz wird ermächtigt, im Einvernehmen mit den Bundesministerien für Wirtschaft und Technologie und für Ernährung, Landwirtschaft und Verbraucherschutz durch Rechtsverordnung mit Zustimmung des Bundesrates nähere Bestimmungen über einzelne geographische Herkunftsangaben zu treffen.

(2) In der Rechtsverordnung können
1. durch Bezugnahme auf politische oder geographische Grenzen das Herkunftsgebiet,
2. die Qualität oder sonstige Eigenschaften im Sinne des § 127 Abs. 2 sowie die dafür maßgeblichen Umstände, wie insbesondere Verfahren oder Art und Weise der Erzeugung oder Herstellung der Waren oder der Erbringung der Dienstleistungen oder Qualität oder sonstige Eigenschaften der verwendeten Ausgangsmaterialien wie deren Herkunft, und
3. die Art und Weise der Verwendung der geographischen Herkunftsangabe
geregelt werden. Bei der Regelung sind die bisherigen lauteren Praktiken, Gewohnheiten und Gebräuche bei der Verwendung der geographischen Herkunftsangabe zu berücksichtigen.

### § 138 Sonstige Vorschriften für das Verfahren bei Anträgen und Einsprüchen nach der Verordnung (EWG) Nr. 2081/92

(1) Das Bundesministerium der Justiz wird ermächtigt, durch Rechtsverordnung ohne Zustimmung des Bundesrates nähere Bestimmungen über das Antrags-, Einspruchs- und Löschungsverfahren (§§ 130 bis 133) zu treffen.

(2) Das Bundesministerium der Justiz kann die Ermächtigung zum Erlaß von Rechtsverordnungen nach Absatz 1 durch Rechtsverordnung ohne Zustimmung des Bundesrates ganz oder teilweise auf das Deutsche Patent- und Markenamt übertragen.

### § 139 Durchführungsbestimmungen zur Verordnung (EWG) Nr. 2081/92

(1) Das Bundesministerium der Justiz wird ermächtigt, im Einvernehmen mit den Bundesministerien für Wirtschaft und Technologie und für Ernährung, Landwirtschaft und Verbraucherschutz durch Rechtsverordnung mit Zustimmung des Bundesrates weitere Einzelheiten des Schutzes von Ursprungsbezeichnungen und geographischen Angaben nach der Verordnung (EWG) Nr. 2081/92 zu regeln, soweit sich das Erfordernis hierfür aus der Verordnung (EWG) Nr. 2081/92 oder den zu ihrer Durchführung erlassenen Vorschriften des Rates oder der Kommission der Europäischen Gemeinschaften ergibt. In Rechtsverordnungen nach Satz 1 können insbesondere Vorschriften über
1. die Kennzeichnung der Agrarerzeugnisse oder Lebensmittel,
2. die Berechtigung zum Verwenden der geschützten Bezeichnungen oder
3. die Voraussetzungen und das Verfahren bei der Überwachung oder Kontrolle beim innergemeinschaftlichen Verbringen oder bei der Einfuhr oder Ausfuhr
erlassen werden. Rechtsverordnungen nach Satz 1 können auch erlassen werden, wenn die Mitgliedstaaten nach den dort genannten gemeinschaftsrechtlichen Vorschriften befugt sind, ergänzende Vorschriften zu erlassen.

(2) Die Landesregierungen werden ermächtigt, durch Rechtsverordnung die Durchführung der nach Artikel 10 der Verordnung (EWG) Nr. 2081/92 erforderlichen Kontrollen zugelassenen privaten Kontrollstellen zu übertragen oder solche an der Durchführung dieser Kontrollen zu beteiligen. Die Landesregierungen können auch die Voraussetzungen und das Verfahren der Zulassung privater Kontrollstellen durch Rechtsverordnung regeln. Sie sind befugt, die Ermächtigung nach den Sätzen 1 und 2 durch Rechtsverordnung ganz oder teilweise auf andere Behörden zu übertragen.

# Teil 7
# Verfahren in Kennzeichenstreitsachen

### § 140 Kennzeichenstreitsachen

(1) Für alle Klagen, durch die ein Anspruch aus einem der in diesem Gesetz geregelten Rechtsverhältnisse geltend gemacht wird (Kennzeichenstreitsachen), sind die Landgerichte ohne Rücksicht auf den Streitwert ausschließlich zuständig.

(2) Die Landesregierungen werden ermächtigt, durch Rechtsverordnung die Kennzeichenstreitsachen insgesamt oder teilweise für die Bezirke mehrerer Landgerichte einem von ihnen zuzuweisen, sofern dies der sachlichen Förderung oder schnelleren Erledigung der Verfahren dient. Die Landesregierungen können diese Ermächtigung auf die Landesjustizverwaltungen übertragen. Die Länder können außerdem durch Vereinbarung den Gerichten eines Landes obliegende Aufgaben insgesamt oder teilweise dem zuständigen Gericht eines anderen Landes übertragen.

(3) Von den Kosten, die durch die Mitwirkung eines Patentanwalts in einer Kennzeichenstreitsache entstehen, sind die Gebühren nach § 13 des Rechtsanwaltsvergütungsgesetzes und außerdem die notwendigen Auslagen des Patentanwalts zu erstatten.

Ein Service der juris GmbH - www.juris.de -

## § 141 Gerichtsstand bei Ansprüchen nach diesem Gesetz und dem Gesetz gegen den unlauteren Wettbewerb

Ansprüche, welche die in diesem Gesetz geregelten Rechtsverhältnisse betreffen und auf Vorschriften des Gesetzes gegen den unlauteren Wettbewerb gegründet werden, brauchen nicht im Gerichtsstand des § 14 des Gesetzes gegen den unlauteren Wettbewerb geltend gemacht zu werden.

## § 142 Streitwertbegünstigung

(1) Macht in bürgerlichen Rechtsstreitigkeiten, in denen durch Klage ein Anspruch aus einem der in diesem Gesetz geregelten Rechtsverhältnisse geltend gemacht wird, eine Partei glaubhaft, daß die Belastung mit den Prozeßkosten nach dem vollen Streitwert ihre wirtschaftliche Lage erheblich gefährden würde, so kann das Gericht auf ihren Antrag anordnen, daß die Verpflichtung dieser Partei zur Zahlung von Gerichtskosten sich nach einem ihrer Wirtschaftslage angepaßten Teil des Streitwerts bemißt.

(2) Die Anordnung nach Absatz 1 hat zur Folge, daß die begünstigte Partei die Gebühren ihres Rechtsanwalts ebenfalls nur nach diesem Teil des Streitwerts zu entrichten hat. Soweit ihr Kosten des Rechtsstreits auferlegt werden oder soweit sie diese übernimmt, hat sie die von dem Gegner entrichteten Gerichtsgebühren und die Gebühren seines Rechtsanwalts nur nach dem Teil des Streitwerts zu erstatten. Soweit die außergerichtlichen Kosten dem Gegner auferlegt oder von ihm übernommen werden, kann der Rechtsanwalt der begünstigten Partei seine Gebühren von dem Gegner nach dem für diesen geltenden Streitwert beitreiben.

(3) Der Antrag nach Absatz 1 kann vor der Geschäftsstelle des Gerichts zur Niederschrift erklärt werden. Er ist vor der Verhandlung zur Hauptsache zu stellen. Danach ist er nur zulässig, wenn der angenommene oder festgesetzte Streitwert später durch das Gericht heraufgesetzt wird. Vor der Entscheidung über den Antrag ist der Gegner zu hören.

# Teil 8
# Straf- und Bußgeldvorschriften, Beschlagnahme bei der Einfuhr und Ausfuhr

# Abschnitt 1
# Straf- und Bußgeldvorschriften

## § 143 Strafbare Kennzeichenverletzung

(1) Wer im geschäftlichen Verkehr widerrechtlich
1. entgegen § 14 Abs. 2 Nr. 1 oder 2 ein Zeichen benutzt,
2. entgegen § 14 Abs. 2 Nr. 3 ein Zeichen in der Absicht benutzt, die Unterscheidungskraft oder die Wertschätzung einer bekannten Marke auszunutzen oder zu beeinträchtigen,
3. entgegen § 14 Abs. 4 Nr. 1 ein Zeichen anbringt oder entgegen § 14 Abs. 4 Nr. 2 oder 3 eine Aufmachung oder Verpackung oder ein Kennzeichnungsmittel anbietet, in den Verkehr bringt, besitzt, einführt oder ausführt, soweit Dritten die Benutzung des Zeichens

a) nach § 14 Abs. 2 Nr. 1 oder 2 untersagt wäre oder
b) nach § 14 Abs. 2 Nr. 3 untersagt wäre und die Handlung in der Absicht vorgenommen wird, die Ausnutzung oder Beeinträchtigung der Unterscheidungskraft oder der Wertschätzung einer bekannten Marke zu ermöglichen,
4. entgegen § 15 Abs. 2 eine Bezeichnung oder ein Zeichen benutzt oder
5. entgegen § 15 Abs. 3 eine Bezeichnung oder ein Zeichen in der Absicht benutzt, die Unterscheidungskraft oder die Wertschätzung einer bekannten geschäftlichen Bezeichnung auszunutzen oder zu beeinträchtigen,
wird mit Freiheitsstrafe bis zu drei Jahren oder mit Geldstrafe bestraft.

(1a) (weggefallen)

(2) Handelt der Täter gewerbsmäßig, so ist die Strafe Freiheitsstrafe bis zu fünf Jahren oder Geldstrafe.

(3) Der Versuch ist strafbar.

(4) In den Fällen des Absatzes 1 wird die Tat nur auf Antrag verfolgt, es sei denn, daß die Strafverfolgungsbehörde wegen des besonderen öffentlichen Interesses an der Strafverfolgung ein Einschreiten von Amts wegen für geboten hält.

(5) Gegenstände, auf die sich die Straftat bezieht, können eingezogen werden. § 74a des Strafgesetzbuchs ist anzuwenden. Soweit den in § 18 bezeichneten Ansprüchen auf Vernichtung im Verfahren nach den Vorschriften der Strafprozeßordnung über die Entschädigung des Verletzten (§§ 403 bis 406c der Strafprozeßordnung) stattgegeben wird, sind die Vorschriften über die Einziehung nicht anzuwenden.

(6) Wird auf Strafe erkannt, so ist, wenn der Verletzte es beantragt und ein berechtigtes Interesse daran dartut, anzuordnen, daß die Verurteilung auf Verlangen öffentlich bekanntgemacht wird. Die Art der Bekanntmachung ist im Urteil zu bestimmen.

(7) (weggefallen)

## § 143a Strafbare Verletzung der Gemeinschaftsmarke

(1) Wer die Rechte des Inhabers einer Gemeinschaftsmarke nach Artikel 9 Abs. 1 Satz 2 der Verordnung (EG) Nr. 40/94 des Rates vom 20. Dezember 1993 über die Gemeinschaftsmarke (ABl. EG 1994 Nr. L 11 S. 1) verletzt, indem er trotz eines Verbotes und ohne Zustimmung des Markeninhabers im geschäftlichen Verkehr
1. ein mit der Gemeinschaftsmarke identisches Zeichen für Waren oder Dienstleistungen benutzt, die mit denjenigen identisch sind, für die sie eingetragen ist,
2. ein Zeichen benutzt, wenn wegen der Identität oder Ähnlichkeit des Zeichens mit der Gemeinschaftsmarke und der Identität oder Ähnlichkeit der durch die Gemeinschaftsmarke und das Zeichen erfassten Waren oder Dienstleistungen für das Publikum die Gefahr von Verwechslungen besteht, einschließlich der Gefahr, dass das Zeichen mit der Marke gedanklich in Verbindung gebracht wird, oder
3. ein mit der Gemeinschaftsmarke identisches Zeichen oder ein ähnliches Zeichen für Waren oder Dienstleistungen benutzt, die nicht denen ähnlich sind, für die die Gemeinschaftsmarke eingetragen ist, wenn diese in der Gemeinschaft bekannt ist und das Zeichen in der Absicht benutzt wird, die Unterscheidungskraft oder die Wertschätzung der Gemeinschaftsmarke ohne rechtfertigenden Grund in unlauterer Weise auszunutzen oder zu beeinträchtigen,
wird mit Freiheitsstrafe bis zu drei Jahren oder mit Geldstrafe bestraft.

(2) § 143 Abs. 2 bis 6 gilt entsprechend.

## § 144 Strafbare Benutzung geographischer Herkunftsangaben

(1) Wer im geschäftlichen Verkehr widerrechtlich eine geographische Herkunftsangabe, einen Namen, eine Angabe oder ein Zeichen
1. entgegen § 127 Abs. 1 oder 2, jeweils auch in Verbindung mit Abs. 4 oder einer Rechtsverordnung nach § 137 Abs. 1, benutzt oder
2. entgegen § 127 Abs. 3, auch in Verbindung mit Abs. 4, oder einer Rechtsverordnung nach § 137 Abs. 1, in der Absicht benutzt, den Ruf oder die Unterscheidungskraft einer geographischen Herkunftsangabe auszunutzen oder zu beeinträchtigen,
wird mit Freiheitsstrafe bis zu zwei Jahren oder mit Geldstrafe bestraft.

(2) Ebenso wird bestraft, wer im geschäftlichen Verkehr widerrechtlich eine nach Rechtsvorschriften der Europäischen Gemeinschaft geschützte geographische Angabe oder Ursprungsbezeichnung benutzt, soweit eine Rechtsverordnung nach Absatz 6 für einen bestimmten Tatbestand auf diese Strafvorschrift verweist.

(3) Der Versuch ist strafbar.

(4) Bei einer Verurteilung bestimmt das Gericht, daß die widerrechtliche Kennzeichnung der im Besitz des Verurteilten befindlichen Gegenstände beseitigt wird oder, wenn dies nicht möglich ist, die Gegenstände vernichtet werden.

(5) Wird auf Strafe erkannt, so ist, wenn das öffentliche Interesse dies erfordert, anzuordnen, daß die Verurteilung öffentlich bekanntgemacht wird. Die Art der Bekanntmachung ist im Urteil zu bestimmen.

(6) Das Bundesministerium der Justiz wird ermächtigt, durch Rechtsverordnung ohne Zustimmung des Bundesrates die Tatbestände zu bezeichnen, die als Straftaten nach Absatz 2 geahndet werden können, soweit dies zur Durchsetzung des in Rechtsvorschriften der Europäischen Gemeinschaft vorgesehenen Schutzes von geographischen Angaben und Ursprungsbezeichnungen erforderlich ist.

## § 145 Bußgeldvorschriften

(1) Ordnungswidrig handelt, wer im geschäftlichen Verkehr widerrechtlich in identischer oder nachgeahmter Form
1. ein Wappen, eine Flagge oder ein anderes staatliches Hoheitszeichen oder ein Wappen eines inländischen Ortes oder eines inländischen Gemeinde- oder weiteren Kommunalverbandes im Sinne des § 8 Abs. 2 Nr. 6,
2. ein amtliches Prüf- oder Gewährzeichen im Sinne des § 8 Abs. 2 Nr. 7 oder
3. ein Kennzeichen, ein Siegel oder eine Bezeichnung im Sinne des § 8 Abs. 2 Nr. 8
zur Kennzeichnung von Waren oder Dienstleistungen benutzt.

(2) Ordnungswidrig handelt, wer vorsätzlich oder fahrlässig
1. entgegen § 134 Abs. 3, auch in Verbindung mit Abs. 4,
   a) das Betreten von Geschäftsräumen, Grundstücken, Verkaufseinrichtungen oder Transportmitteln oder deren Besichtigung nicht gestattet,
   b) die zu besichtigenden Agrarerzeugnisse oder Lebensmittel nicht so darlegt, daß die Besichtigung ordnungsgemäß vorgenommen werden kann,
   c) die erforderliche Hilfe bei der Besichtigung nicht leistet,
   d) Proben nicht entnehmen läßt,
   e) geschäftliche Unterlagen nicht oder nicht vollständig vorlegt oder nicht prüfen läßt oder
   f) eine Auskunft nicht, nicht richtig oder nicht vollständig erteilt oder

2. einer nach § 139 Abs. 1 erlassenen Rechtsverordnung zuwiderhandelt, soweit sie für einen bestimmten Tatbestand auf diese Bußgeldvorschrift verweist.

(3) Die Ordnungswidrigkeit kann in den Fällen des Absatzes 1 mit einer Geldbuße bis zu zweitausendfünfhundert Euro und in den Fällen des Absatzes 2 mit einer Geldbuße bis zu zehntausend Euro geahndet werden.

(4) In den Fällen des Absatzes 1 ist § 144 Abs. 4 entsprechend anzuwenden.

(5) Verwaltungsbehörde im Sinn des § 36 Abs. 1 Nr. 1 des Gesetzes über Ordnungswidrigkeiten ist in den Fällen des Absatzes 1 das Bundesamt für Justiz.

# Abschnitt 2
# Beschlagnahme von Waren bei der Einfuhr und Ausfuhr

## § 146 Beschlagnahme bei der Verletzung von Kennzeichenrechten

(1) Waren, die widerrechtlich mit einer nach diesem Gesetz geschützten Marke oder geschäftlichen Bezeichnung versehen sind, unterliegen, soweit nicht die Verordnung (EG) Nr. 3295/94 des Rates vom 22. Dezember 1994 über Maßnahmen zum Verbot der Überführung nachgeahmter Waren und unerlaubt hergestellter Vervielfältigungsstücke oder Nachbildungen in den zollrechtlich freien Verkehr oder in ein Nichterhebungsverfahren sowie zum Verbot ihrer Ausfuhr und Wiederausfuhr (ABl. EG Nr. L 341 S. 8) in ihrer jeweils geltenden Fassung anzuwenden ist, auf Antrag und gegen Sicherheitsleistung des Rechtsinhabers bei ihrer Einfuhr oder Ausfuhr der Beschlagnahme durch die Zollbehörde, sofern die Rechtsverletzung offensichtlich ist. Dies gilt für den Verkehr mit anderen Mitgliedstaaten der Europäischen Union sowie mit den anderen Vertragsstaaten des Abkommens über den Europäischen Wirtschaftsraum nur, soweit Kontrollen durch die Zollbehörden stattfinden.

(2) Ordnet die Zollbehörde die Beschlagnahme an, unterrichtet sie unverzüglich den Verfügungsberechtigten sowie den Antragsteller. Dem Antragsteller sind Herkunft, Menge und Lagerort der Waren sowie Name und Anschrift des Verfügungsberechtigten mitzuteilen. Das Brief- und Postgeheimnis (Artikel 10 des Grundgesetzes) wird insoweit eingeschränkt. Dem Antragsteller wird Gelegenheit gegeben, die Waren zu besichtigen, soweit hierdurch nicht in Geschäfts- oder Betriebsgeheimnisse eingegriffen wird.

## § 147 Einziehung, Widerspruch, Aufhebung der Beschlagnahme

(1) Wird der Beschlagnahme nicht spätestens nach Ablauf von zwei Wochen nach Zustellung der Mitteilung nach § 146 Abs. 2 Satz 1 widersprochen, ordnet die Zollbehörde die Einziehung der beschlagnahmten Waren an.

(2) Widerspricht der Verfügungsberechtigte der Beschlagnahme, unterrichtet die Zollbehörde hiervon unverzüglich den Antragsteller. Dieser hat gegenüber der Zollbehörde unverzüglich zu erklären, ob er den Antrag nach § 146 Abs. 1 in bezug auf die beschlagnahmten Waren aufrechterhält.

(3) Nimmt der Antragsteller den Antrag zurück, hebt die Zollbehörde die Beschlagnahme unverzüglich auf. Hält der Antragsteller den Antrag aufrecht und legt er eine vollziehbare gerichtliche Entscheidung vor, die die Verwahrung der beschlagnahmten Waren oder eine Verfügungsbeschränkung anordnet, trifft die Zollbehörde die erforderlichen Maßnahmen.

(4) Liegen die Fälle des Absatzes 3 nicht vor, hebt die Zollbehörde die Beschlagnahme nach Ablauf von zwei Wochen nach Zustellung der Mitteilung an den Antragsteller nach Absatz 2 auf. Weist der Antragsteller nach, daß die gerichtliche Entscheidung nach Absatz 3 Satz 2 beantragt, ihm aber noch nicht zugegangen ist, wird die Beschlagnahme für längstens zwei weitere Wochen aufrechterhalten.

## § 148 Zuständigkeiten, Rechtsmittel

(1) Der Antrag nach § 146 Abs. 1 ist bei der Bundesfinanzdirektion zu stellen und hat Wirkung für zwei Jahre, sofern keine kürzere Geltungsdauer beantragt wird. Der Antrag kann wiederholt werden.

(2) Für die mit dem Antrag verbundenen Amtshandlungen werden vom Antragsteller Kosten nach Maßgabe des § 178 der Abgabenordnung erhoben.

(3) Die Beschlagnahme und die Einziehung können mit den Rechtsmitteln angefochten werden, die im Bußgeldverfahren nach dem Gesetz über Ordnungswidrigkeiten gegen die Beschlagnahme und Einziehung zulässig sind. Im Rechtsmittelverfahren ist der Antragsteller zu hören. Gegen die Entscheidung des Amtsgerichts ist die sofortige Beschwerde zulässig. Über die sofortige Beschwerde entscheidet das Oberlandesgericht.

## § 149 Schadensersatz bei ungerechtfertigter Beschlagnahme

Erweist sich die Beschlagnahme als von Anfang an ungerechtfertigt und hat der Antragsteller den Antrag nach § 146 Abs. 1 in bezug auf die beschlagnahmten Waren aufrechterhalten oder sich nicht unverzüglich erklärt (§ 147 Abs. 2 Satz 2), so ist er verpflichtet, den dem Verfügungsberechtigten durch die Beschlagnahme entstandenen Schaden zu ersetzen.

## § 150 Beschlagnahme nach der Verordnung (EG) Nr. 3295/94

In Verfahren nach der in § 146 Abs. 1 genannten Verordnung sind die §§ 146 bis 149 entsprechend anzuwenden, soweit in der Verordnung nichts anderes bestimmt ist.

## § 151 Beschlagnahme bei widerrechtlicher Kennzeichnung mit geographischen Herkunftsangaben

(1) Waren, die widerrechtlich mit einer nach diesem Gesetz oder nach Rechtsvorschriften der Europäischen Gemeinschaft geschützten geographischen Herkunftsangabe versehen sind, unterliegen bei ihrer Einfuhr, Ausfuhr oder Durchfuhr der Beschlagnahme zum Zwecke der Beseitigung der widerrechtlichen Kennzeichnung, sofern die Rechtsverletzung offensichtlich ist. Dies gilt für den Verkehr mit anderen Mitgliedstaaten der Europäischen Union sowie mit den anderen Vertragsstaaten des Abkommens über den Europäischen Wirtschaftsraum nur, soweit Kontrollen durch die Zollbehörden stattfinden.

(2) Die Beschlagnahme wird durch die Zollbehörde vorgenommen. Die Zollbehörde ordnet auch die zur Beseitigung der widerrechtlichen Kennzeichnung erforderlichen Maßnahmen an.

(3) Wird den Anordnungen der Zollbehörde nicht entsprochen oder ist die Beseitigung untunlich, ordnet die Zollbehörde die Einziehung der Waren an.

(4) Die Beschlagnahme und die Einziehung können mit den Rechtsmitteln angefochten werden, die im Bußgeldverfahren nach dem Gesetz über Ordnungswidrigkeiten gegen die Beschlagnahme und Einziehung zulässig sind. Gegen die Entscheidung des Amtsgerichts

Ein Service der juris GmbH - www.juris.de -

ist die sofortige Beschwerde zulässig. Über die sofortige Beschwerde entscheidet das Oberlandesgericht.

# Teil 9
# Übergangsvorschriften

## § 152 Anwendung dieses Gesetzes

Die Vorschriften dieses Gesetzes finden, soweit nachfolgend nichts anderes bestimmt ist, auch auf Marken, die vor dem 1. Januar 1995 angemeldet oder eingetragen oder durch Benutzung im geschäftlichen Verkehr oder durch notorische Bekanntheit erworben worden sind, und auf geschäftliche Bezeichnungen Anwendung, die vor dem 1. Januar 1995 nach den bis dahin geltenden Vorschriften geschützt waren.

## § 153 Schranken für die Geltendmachung von Verletzungsansprüchen

(1) Standen dem Inhaber einer vor dem 1. Januar 1995 eingetragenen oder durch Benutzung oder notorische Bekanntheit erworbenen Marke oder einer geschäftlichen Bezeichnung nach den bis dahin geltenden Vorschriften gegen die Benutzung der Marke, der geschäftlichen Bezeichnung oder eines übereinstimmenden Zeichens keine Ansprüche wegen Verletzung zu, so können die Rechte aus der Marke oder aus der geschäftlichen Bezeichnung nach diesem Gesetz nicht gegen die Weiterbenutzung dieser Marke, dieser geschäftlichen Bezeichnung oder dieses Zeichens geltend gemacht werden.

(2) Auf Ansprüche des Inhabers einer vor dem 1. Januar 1995 eingetragenen oder durch Benutzung oder notorische Bekanntheit erworbenen Marke oder einer geschäftlichen Bezeichnung ist § 21 mit der Maßgabe anzuwenden, daß die in § 21 Abs. 1 und 2 vorgesehene Frist von fünf Jahren mit dem 1. Januar 1995 zu laufen beginnt.

## § 154 Dingliche Rechte, Zwangsvollstreckung, Konkursverfahren

(1) Ist vor dem 1. Januar 1995 an dem durch die Anmeldung oder Eintragung einer Marke begründeten Recht ein dingliches Recht begründet worden oder war das durch die Anmeldung oder Eintragung begründete Recht Gegenstand von Maßnahmen der Zwangsvollstreckung, so können diese Rechte oder Maßnahmen nach § 29 Abs. 2 in das Register eingetragen werden.

(2) Absatz 1 ist entsprechend anzuwenden, wenn das durch die Anmeldung oder Eintragung einer Marke begründete Recht durch ein Konkursverfahren erfaßt worden ist.

## § 155 Lizenzen

Auf vor dem 1. Januar 1995 an dem durch die Anmeldung oder Eintragung, durch die Benutzung oder durch die notorische Bekanntheit einer Marke begründeten Recht erteilte Lizenzen ist § 30 mit der Maßgabe anzuwenden, daß diesen Lizenzen die Wirkung des § 30 Abs. 5 nur insoweit zugute kommt, als es sich um nach dem 1. Januar 1995 eingetretene Rechtsübergänge oder an Dritte erteilte Lizenzen handelt.

## § 156 Prüfung angemeldeter Marken auf absolute Schutzhindernisse

(1) Ist vor dem 1. Januar 1995 ein Zeichen angemeldet worden, das nach den bis dahin geltenden Vorschriften aus vom Patentamt von Amts wegen zu berücksichtigenden Gründen von der Eintragung ausgeschlossen war, das aber nach § 3, 7, 8 oder 10 dieses Gesetzes nicht von der Eintragung ausgeschlossen ist, so sind die Vorschriften dieses Gesetzes

mit der Maßgabe anzuwenden, daß die Anmeldung als am 1. Januar 1995 eingereicht gilt und daß, ungeachtet des ursprünglichen Anmeldetags und einer etwa in Anspruch genommenen Priorität, der 1. Januar 1995 für die Bestimmung des Zeitrangs im Sinne des § 6 Abs. 2 maßgeblich ist.

(2) Kommt das Patentamt bei der Prüfung des angemeldeten Zeichens zu dem Ergebnis, daß die Voraussetzungen des Absatzes 1 gegeben sind, so teilt es dies dem Anmelder mit.

(3) Teilt der Anmelder dem Patentamt innerhalb einer Frist von zwei Monaten nach Zustellung der Mitteilung nach Absatz 2 mit, daß er mit der Verschiebung des Zeitrangs im Sinne des Absatzes 1 einverstanden ist, wird die Anmeldung des Zeichens als Anmeldung einer Marke nach diesem Gesetz weiterbehandelt.

(4) Teilt der Anmelder dem Patentamt mit, daß er mit einer Verschiebung des Zeitrangs im Sinne des Absatzes 1 nicht einverstanden ist oder gibt er innerhalb der Frist des Absatzes 3 keine Erklärung ab, so weist das Patentamt die Anmeldung zurück.

(5) Der Anmelder kann die Erklärung nach Absatz 3 auch noch in einem Erinnerungsverfahren, einem Beschwerdeverfahren oder in einem Rechtsbeschwerdeverfahren über die Zurückweisung der Anmeldung abgeben, das am 1. Januar 1995 anhängig ist. Die Absätze 2 bis 4 sind entsprechend anzuwenden.

## § 157 Bekanntmachung und Eintragung

Ist vor dem 1. Januar 1995 die Bekanntmachung einer Anmeldung nach § 5 Abs. 1 des Warenzeichengesetzes beschlossen worden, ist die Anmeldung aber noch nicht nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemacht worden, so wird die Marke ohne vorherige Bekanntmachung nach § 41 in das Register eingetragen. Ist für einen nach dem Beschluß der Bekanntmachung gestellten Antrag auf beschleunigte Eintragung die in § 6a Abs. 2 des Warenzeichengesetzes vorgesehene Gebühr bereits gezahlt worden, wird sie von Amts wegen erstattet.

## § 158 Widerspruchsverfahren

(1) Ist vor dem 1. Januar 1995 die Anmeldung einer Marke nach § 5 Abs. 2 des Warenzeichengesetzes oder die Eintragung einer Marke nach § 6a Abs. 3 des Warenzeichengesetzes in Verbindung mit § 5 Abs. 2 des Warenzeichengesetzes bekanntgemacht worden, so können Widersprüche innerhalb der Frist des § 5 Abs. 4 des Warenzeichengesetzes sowohl auf die Widerspruchsgründe des § 5 Abs. 4 des Warenzeichengesetzes als auch auf die Widerspruchsgründe des § 42 Abs. 2 gestützt werden. Wird innerhalb der Frist des § 5 Abs. 4 des Warenzeichengesetzes Widerspruch nicht erhoben, so wird, soweit es sich nicht um eine nach § 6a Abs. 1 des Warenzeichengesetzes eingetragene Marke handelt, die Marke nach § 41 in das Register eingetragen. Ein Widerspruch nach § 42 findet gegen eine solche Eintragung nicht statt.

(2) Ist vor dem 1. Januar 1995 ein Widerspruch gemäß § 5 Abs. 4 des Warenzeichengesetzes gegen die Eintragung einer nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemachten oder einer nach § 6a Abs. 1 des Warenzeichengesetzes eingetragenen Marke erhoben worden oder wird nach dem 1. Januar 1995 ein Widerspruch nach Absatz 1 erhoben, so sind die Widerspruchsgründe des § 5 Abs. 4 Nr. 2 und 3 des Warenzeichengesetzes, soweit der Widerspruch darauf gestützt worden ist, weiterhin anzuwenden. Ist der Widerspruch auf § 5 Abs. 4 Nr. 1 des Warenzeichengesetzes gestützt worden, ist anstelle dieser Bestimmung die Bestimmung des § 42 Abs. 2 Nr. 1 anzuwenden.

Ein Service der juris GmbH - www.juris.de -

(3) Ist in einem Verfahren über einen Widerspruch, der vor dem 1. Januar 1995 erhoben worden ist, die Benutzung der Marke, aufgrund deren Widerspruch erhoben worden ist, bestritten worden oder wird die Benutzung in einem solchen Widerspruchsverfahren bestritten, so ist anstelle des § 5 Abs. 7 des Warenzeichengesetzes § 43 Abs. 1 entsprechend anzuwenden. Satz 1 gilt für das Beschwerdeverfahren vor dem Patentgericht auch dann, wenn ein solches Verfahren am 1. Januar 1995 anhängig ist. Satz 1 gilt nicht für Rechtsbeschwerden, die am 1. Januar 1995 anhängig sind.

(4) Wird der Widerspruch zurückgewiesen, so wird, soweit es sich nicht um eine nach § 6a Abs. 1 des Warenzeichengesetzes eingetragene Marke handelt, die Marke nach § 41 in das Register eingetragen. Ein Widerspruch nach § 42 findet gegen eine solche Eintragung nicht statt.

(5) Wird dem Widerspruch gegen eine nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemachte Anmeldung stattgegeben, so wird die Eintragung versagt. Wird dem Widerspruch gegen eine nach § 6a Abs. 1 des Warenzeichengesetzes eingetragene Marke stattgegeben, so wird die Eintragung nach § 43 Abs. 2 Satz 1 gelöscht.

(6) In den Fällen des Absatzes 1 Satz 2 und des Absatzes 4 Satz 1 findet eine Zurückweisung der Anmeldung aus von Amts wegen zu berücksichtigenden Eintragungshindernissen nicht statt.

## § 159 Teilung einer Anmeldung

Auf die Teilung einer vor dem 1. Januar 1995 nach § 5 Abs. 2 des Warenzeichengesetzes bekanntgemachten Anmeldung ist § 40 mit der Maßgabe anzuwenden, daß die Teilung erst nach Ablauf der Widerspruchsfrist erklärt werden kann und daß die Erklärung nur zulässig ist, wenn ein im Zeitpunkt ihrer Abgabe anhängiger Widerspruch sich nach der Teilung nur gegen einen der Teile der ursprünglichen Anmeldung richten würde. Der Teil der ursprünglichen Anmeldung, gegen den sich kein Widerspruch richtet, wird nach § 41 in das Register eingetragen. Ein Widerspruch nach § 42 findet gegen eine solche Eintragung nicht statt.

## § 160 Schutzdauer und Verlängerung

Die Vorschriften dieses Gesetzes über die Schutzdauer und die Verlängerung der Schutzdauer (§ 47) sind auch auf vor dem 1. Januar 1995 eingetragene Marken anzuwenden mit der Maßgabe, daß für die Berechnung der Frist, innerhalb derer die Gebühren für die Verlängerung der Schutzdauer einer eingetragenen Marke wirksam vor Fälligkeit gezahlt werden können, die Vorschriften des § 9 Abs. 2 des Warenzeichengesetzes weiterhin anzuwenden sind, wenn die Schutzdauer nach § 9 Abs. 2 des Warenzeichengesetzes vor dem 1. Januar 1995 abläuft.

## § 161 Löschung einer eingetragenen Marke wegen Verfalls

(1) Ist vor dem 1. Januar 1995 ein Antrag auf Löschung der Eintragung einer Marke nach § 11 Abs. 4 des Warenzeichengesetzes beim Patentamt gestellt worden und ist die Frist des § 11 Abs. 4 Satz 3 des Warenzeichengesetzes für den Widerspruch gegen die Löschung am 1. Januar 1995 noch nicht abgelaufen, so beträgt diese Frist zwei Monate.

(2) Ist vor dem 1. Januar 1995 eine Klage auf Löschung der Eintragung einer Marke nach § 11 Abs. 1 Nr. 3 oder 4 des Warenzeichengesetzes erhoben worden, so wird die Eintragung nur gelöscht, wenn der Klage sowohl nach den bis dahin geltenden Vorschriften als auch nach den Vorschriften dieses Gesetzes stattzugeben ist.

Ein Service der juris GmbH - www.juris.de -

## § 162 Löschung einer eingetragenen Marke wegen absoluter Schutzhindernisse

(1) Ist der Inhaber einer Marke vor dem 1. Januar 1995 benachrichtigt worden, daß die Eintragung der Marke nach § 10 Abs. 2 Nr. 2 des Warenzeichengesetzes gelöscht werden soll, und ist die Frist des § 10 Abs. 3 Satz 2 des Warenzeichengesetzes für den Widerspruch gegen die Löschung am 1. Januar 1995 noch nicht abgelaufen, so beträgt diese Frist zwei Monate.

(2) Ist vor dem 1. Januar 1995 ein Verfahren von Amts wegen zur Löschung der Eintragung einer Marke wegen des Bestehens absoluter Schutzhindernisse nach § 10 Abs. 2 Nr. 2 des Warenzeichengesetzes eingeleitet worden oder ist vor diesem Zeitpunkt ein Antrag auf Löschung nach dieser Vorschrift gestellt worden, so wird die Eintragung nur gelöscht, wenn die Marke sowohl nach den bis dahin geltenden Vorschriften als auch nach den Vorschriften dieses Gesetzes nicht schutzfähig ist. Dies gilt auch dann, wenn nach dem 1. Januar 1995 ein Verfahren nach § 54 zur Löschung der Eintragung einer Marke eingeleitet wird, die vor dem 1. Januar 1995 eingetragen worden ist.

## § 163 Löschung einer eingetragenen Marke wegen des Bestehens älterer Rechte

(1) Ist vor dem 1. Januar 1995 eine Klage auf Löschung der Eintragung einer Marke aufgrund einer früher angemeldeten Marke nach § 11 Abs. 1 Nr. 1 des Warenzeichengesetzes oder aufgrund eines sonstigen älteren Rechts erhoben worden, so wird, soweit in Absatz 2 nichts anderes bestimmt ist, die Eintragung nur gelöscht, wenn der Klage sowohl nach den bis dahin geltenden Vorschriften als auch nach den Vorschriften dieses Gesetzes stattzugeben ist. Dies gilt auch dann, wenn nach dem 1. Januar 1995 eine Klage nach § 55 auf Löschung der Eintragung einer Marke erhoben wird, die vor dem 1. Januar 1995 eingetragen worden ist.

(2) In den Fällen des Absatzes 1 Satz 1 ist § 51 Abs. 2 Satz 1 und 2 nicht anzuwenden. In den Fällen des Absatzes 1 Satz 2 ist § 51 Abs. 2 Satz 1 und 2 mit der Maßgabe anzuwenden, daß die Frist von fünf Jahren mit dem 1. Januar 1995 zu laufen beginnt.

## § 164 Erinnerung und Durchgriffsbeschwerde

Die Vorschriften dieses Gesetzes gelten auch für Erinnerungen, die vor dem 1. Januar 1995 eingelegt worden sind, mit der Maßgabe, daß die in § 66 Abs. 3 Satz 1 und 2 vorgesehenen Fristen von sechs Monaten und zehn Monaten am 1. Januar 1995 zu laufen beginnen.

## § 165 Übergangsvorschriften

Artikel 229 § 6 des Einführungsgesetzes zum Bürgerlichen Gesetzbuche findet mit der Maßgabe entsprechende Anwendung, dass § 20 in der bis zum 1. Januar 2002 geltenden Fassung den Vorschriften des Bürgerlichen Gesetzbuchs über die Verjährung in der bis zum 1. Januar 2002 geltenden Fassung gleichgestellt ist.

Q

1

**Trademark Act**

Act concerning the protection of trademarks

and other distinguishing marks

Explained by

**Prof. Reinhard Ingerl, Ph.D.**

LL.M. (Harvard)

Attorney at law in Munich

Honorary Professor at the

Friedrich-Schiller University in Jena


and


Prof. Christian Rohnke, Ph.D.

M.C.J. (Texas)

Attorney at law in Hamburg

Attorney at Law in New York

Honorary Professor at the

Hamburg-Harburg School of Technology


2nd revised edition



Publisher: C.H.Beck Munich 2003

### III. Premises

1. Agent or Representative                                                    5

The Trademark Act no longer contains a definition of an agent or representative, instead it reverts to the terminology of Art. 6$^{septies}$ of the PCPIP [Paris Convention for the Protection of Industrial Property], not to be construed in commercial or legal terms *(Bauer* in GRUR [Association for Commercial Legal Protection and Copyright, a German IP journal] 1971, 499; for inclusion [or: coverage] of actual principal-agent relationships, see BPatG [Federal Patents Court] Notice 2001, 264, 266 - *Kümpers; Fezer* 3rd Edition, Section 11, marginal note 9). This does not entail a change of content as compared with the previous legal definition according to Section 5, Para. 4, No. 2, and Section 11 Para. 1, No. 1 a of the WZG [Trademark Act]. As previously, any contractual relationship mandating the protection of principal's interests in business relations is sufficient. The employment relationships previously mentioned, e.g., in WZG [the Trademark Act] had no previous practical significance. Instead, typical practical examples include commercial agents and authorized dealers [or: distributors]. With the latter, the transition to customer may be fluid – which Art. 6septies PCPIP deliberately did not cover (see Moser v. Filseck GRUR 1959, 86). What is required is a business relationship exceeding the mere exchange of goods, imposing obligations upon the dealer with regard to downstream retail sales and that are in the interest of the vendor, without the need [for the dealer] to be the sole [or: exclusive] agent. Contract producers are also subject to such tying provisions, making their inclusion mandatory, even if they [the contract producers] are not generally designated as agents or representatives in a narrow sense (see also Bauer GRUR Int. 1971, 500).

337

§11Trademarks registered in the name of an agent

An agent need not be in charge of sales activities, although this may be the most common area of application by far; instead a position within procurement on behalf of the principal, i.e., on the purchasing side, may suffice (OLG [Higher Regional Court] Schleswig NJWE-WettbR 2000, 119,1 120 - LUX1S). In contrast, no agent relationship represents a sales cooperation without a specific obligation to safeguard interests, e.g., the requirement to use a uniform design [or: furnishings, exterior], and then limits itself to horizontal market sharing through mutual territorial protection (OLG München [Munich Higher Regional Court] decision of Sept. 2, 1999, reprint p. 32, in OLG report 1999, 338 - RRS Rohrreinigunsservice [pipe cleaning service], if not [currently] in print.; see also OLG Schleswig NJWE-WettbR [NJW-Entscheidungsdienst: Wettbewerbsrecht: Neue Juristische Wochenschrift [New Legal Journal, [Court] Decision Service: Anti-Competition Act (NJWE-WETTBR 2000, 119, 120 - LUX1S, whereby, a "partnership" cooperation in no way, per se, precludes the classification as agent) The obligation to safeguard interests need not be the central focus of the contractual relationship. A corresponding collateral duty is sufficient (old version of DPA [German Patent Office] Notice 1985, 239).

2. Controlling date

6      Contrary to the language falsely centering on the registration in Section 11, the date of the application for the trademark should basically be controlling for the presence of an [principal-]agent relationship (see also Sack in GRUR 1995, 97), which is also required in Art. 6septies of the PCPIP. The revised version fails to appreciate that the application constitutes a breach of duty by the agent, whereas the registration is an official act carrying a, per se, arbitrary date.

7      According to the language of Sections 11 and 17, trademarks are also covered before the start of the principal-agent relationship, if registration occurs after the establishment of the principal-agent relationship. It is, however, appropriate to make a distinction [or: differentiation]. This would only be justified, if the ensuing principal-agent relationship had already been prepared for at the date of the application, so that consequently, a secret application would be a breach of pre-contractual obligations. Thus, an application [that was] entirely perfect at the time of filing should not be subject to the risk of cancellation. This is furthermore emphasized by the fact that it [the application] was not exposed to any request for cancellation during its fortuitous previous registration. Specifically, however, this would violate the principle generally applying to Sections 9, 10, 12, 13 and subsequent to the priority rule, whereby relative [sic] obstacles may only prejudice the registration, if already existing at the date of application.

338



Certification

### Park IP Translations

TRANSLATOR'S DECLARATION:                    January 28, 2008

I, Yngve Roennike, hereby declare:


That I possess advanced knowledge of the German and English languages. The attached translation of the document titled "Markengesetz" has been translated by me and to the best of my knowledge and belief, it accurately reflects the meaning and intention of the original text.


Yngve Roennike

# Markengesetz

Gesetz über den Schutz von Marken
und sonstigen Kennzeichen

Erläutert von

**Prof. Dr. Reinhard Ingerl**

LL.M. (Harvard)
Rechtsanwalt in München
Honorarprofessor an der
Friedrich-Schiller-Universität Jena

und

**Prof. Dr. Christian Rohnke**

M.C.J. (Texas)
Rechtsanwalt in Hamburg
Attorney at Law (New York)
Honorarprofessor an der
Technischen Universität Hamburg-Harburg

2., neubearbeitete Auflage



Verlag C. H. Beck München 2003

Agentenmarken                                                    **§ 11**

zeitige eigene Markenanmeldungen oder durch vertragliche Rege-
lung mit seinem Agenten eigenverantwortlich zu wahren. Unter-
läßt er dies, verdient er keine Privilegierung gegenüber anderen
ausländischen Herstellern, die ihre Geschäftstätigkeit ohne Mar-
kenschutz auf das Inland ausdehnen und sich gegen Anmeldungen
ihrer eigenen Marken durch Dritte nur nach den allgemeinen
Vorschriften, insbesondere des Wettbewerbsrechts, wehren können
(Vor §§ 14–19 Rdn. 160 ff.). Erst recht fragwürdig ist daher die in
der Amtl. Begr. nicht weiter gerechtfertigte gesetzliche Erweite-
rung auf Inlandskollisionen (zust. *Hoffmann* MarkenR 2002, 114).
Sie ist allerdings mit dem allgemeinen Bedürfnis begründbar, den
Gleichlauf mit dem Gemeinschaftsmarkenrecht herzustellen.

### III. Voraussetzungen

#### 1. Agent oder Vertreter

Eine Definition des Agenten oder Vertreters enthält das Mar-
kenG nicht mehr, sondern kehrt zur Terminologie des Art. 6^septies
PVÜ zurück, die wirtschaftlich, nicht rechtlich zu verstehen ist
(*Bauer* GRUR 1971, 499; für Einbeziehung auch rein faktischer
Agentenverhältnisse BPatG Mitt. 2001, 264, 266 – *Kümpen; Fezer*
3. Aufl. § 11 Rdn. 9). Eine inhaltliche Änderung gegenüber der
früheren Legaldefinition gem. §§ 5 Abs. 4 Nr. 2, 11 Abs. 1 Nr. 1a
WZG ist damit nicht verbunden. Ausreichend ist nach wie vor
jedes Vertragsverhältnis, das zur Wahrnehmung der Inter-
essen des Geschäftsherrn im geschäftlichen Verkehr ver-
pflichtet. Den früher beispielhaft im WZG genannten Arbeits-
verhältnissen kam bisher praktisch keine Bedeutung zu. Typische
Anwendungsbeispiele sind vielmehr Handelsvertreter und Ver-
tragshändler. Bei letzteren kann der Übergang zu den – bewußt
nicht in Art. 6^septies PVÜ einbezogenen (vgl. *Moser v. Filseck*
GRUR 1959, 86) – bloßen Kunden fließend sein. Erforderlich ist
eine über den bloßen Güteraustausch hinausgehende Ge-
schäftsbeziehung, die dem Händler beim Weitervertrieb Bindun-
gen im Interesse des Lieferanten auferlegt, ohne daß er Alleinver-
treter sein müßte. Auch Auftragshersteller unterliegen regelmäßig
derartigen Interessenbindungen, so daß ihre Einbeziehung geboten
ist, mögen sie auch üblicherweise nicht als Agenten oder Vertreter
im engeren Sinne bezeichnet werden (ebenso *Bauer* GRUR Int.
1971, 500). Der Agent muß nicht notwendigerweise Vertriebsauf-

337

§ 11                                                              Agentenmarken

gaben wahrnehmen, mag dies auch der bei weitem häufigste An-
wendungsbereich sein; vielmehr kann auch eine Tätigkeit im
Rahmen der Beschaffung für den Geschäftsherrn, also auf der Ein-
kaufsseite genügen (OLG Schleswig NJWE-WettbR 2000, 119,
120 – LUXIS). Kein Agentenverhältnis stellen dagegen Vertriebs-
kooperationen ohne spezifische Interessenwahrnehmungs-
pflichten dar, die zwar zB zur Verwendung einer einheitlichen
Ausstattung verpflichten, sich jedoch im übrigen auf die horizontale
Marktaufteilung durch wechselseitigen Gebietsschutz beschränken
(OLG München Urt. vom 2. 9. 1999, Umdr. S. 32, in OLG-
Report 1999, 338 – RRS Rohreinigungsservice insoweit nicht ab-
gedr.; ähnl. OLG Schleswig NJWE-WettbR 2000, 119, 120 –
LUXIS, wobei allerdings „partnerschaftliche" Zusammenarbeit al-
lein die Einstufung als Agent keinesfalls ausschließt). Die Ver-
pflichtung zur Interessenwahrnehmung muß nicht im Mittelpunkt
der vertraglichen Beziehungen stehen. Es genügt eine entsprechen-
de Nebenpflicht (sA DPA Mitt. 1985, 239).

### 2. Maßgeblicher Zeitpunkt

6    Entgegen dem irrigerweise auf die Eintragung abstellenden
Wortlaut des § 11 muß für das Vorliegen des Agentenverhältnisses
grdsl der Zeitpunkt der Anmeldung der Marke maßgeblich sein
(ebenso Sack GRUR 1995, 97), wie dies auch Art. 6septies PVÜ
verlangt. Die Neufassung verkennt, daß die Pflichtverletzung des
Agenten in der Anmeldung besteht, während die Eintragung ein
behördlicher Vorgang mit eher zufälligem Zeitpunkt ist.

7    Ihrem Wortlaut nach erfassen §§ 11 und 17 auch vor Beginn
des Agentenverhältnisses beantragte Marken, wenn die Eintra-
gung nach Begründung des Agentenverhältnisses erfolgt. Richti-
gerweise ist jedoch zu differenzieren. Gerechtfertigt ist dies nur
dann, wenn das spätere Agentenverhältnis zur Zeit der Anmel-
dung bereits angebahnt war, so daß eine heimliche Anmeldung
letztlich vorvertragliche Pflichten verletzte. Demgegenüber sollte
eine im Zeitpunkt der Einreichung vollständig makellose Anmel-
dung nicht nachträglich der Löschungsreife unterworfen werden.
Dagegen spricht schon, daß sie bei zufällig früherer Eintragung
keinem Löschungsanspruch ausgesetzt gewesen wäre. Vor allem
aber würde dadurch der aus dem Prioritätsprinzip folgende, für
§§ 9, 10, 12, 13 durchgängig geltende Grundsatz durchbrochen,
daß relative Hindernisse der Eintragung nur entgegenstehen kön-
nen, wenn sie bereits im Anmeldezeitpunkt vorlagen. Der Ge-

338

R

**Beck's Brief Commentary**
Vol. 13 b

**Trademark Law**

Commentary on the Trademark Act,
the Paris Convention
and the Madrid Trademark Agreement

Documentation of the national,
European, and international marking law

Dr. Karl-Heinz Fezer
Professor, University of Konstanz
Professor emeritus, University of Leipzig
Judge, Stuttgart Higher Regional Court

based on

Baumbach/Hefermehl
Trademark Law
12th edition 1985

Third, newly revised edition

Verlag C.H. Beck Munich 2001

IV. Absence or Withdrawal of Consent of Trademark Owner

12       Grounds for cancellation of the unlawful agent trademark exist when no consent to registration by the owner of the trademark exists. The agent or representative relationship ordinarily authorizes use of the trademark, but not its registration. The provisions of §§ 11 and 17 are also to be applied when the trademark is registered on behalf of the agent or representative only after *the contractual relationship has been terminated,* because the application for registration of the trademark by the representative or agent should ordinarily be judged an infringement of a post-contractual obligation from the terminated agent or representative relationship (cf. Legislative Intent behind Trademark Law, Bundestag Publications, 12/6581, 14 January 1994, p. 73). Registration has also taken place without consent if the trademark owner has declared the *revocation of previously granted consent.* If registration takes place with the consent of the trademark owner, because at the time of registration, based upon the agent or representative relationship, not only authorization for use of the trademark, but also for its registration exists, then the provisions of §§ 11 and 17 should be applied if, upon termination of the contractual relationship, consent for registration is withdrawn or revoked, and registration of the trademark continues to exist. This interpretation of the provisions relating to agent trademarks is offered for the protection of the trademark owner against unlawful agent trademarks, even if neither § 11 nor Art. 4, paragraph 4, lit. g MRL, or Art. 6[septies] PVÜ contains a regulation relating explicitly to the legal situation following the withdrawal of consent (cf. the explicit regulation in Art. 4 Switzerland MSchG [Trademark Protection Law]). In contrast to Art. 6[septies] PVÜ, § 11 also does not explicitly provide that the agent or representative may justify his actions. The legislative body does not consider such an explicit provision to be necessary, because if the actions of the agent or representative are *justified,* claims of the trademark owner against his agent or representative will not be taken into consideration from the outset.



Certification

### Park IP Translations

TRANSLATOR'S DECLARATION:                 January 28, 2008

I, Ronald Radzai, hereby declare:

That I possess advanced knowledge of the German and English languages. The attached translation of the document called "Markenrecht" has been translated by me and to the best of my knowledge and belief, it accurately reflects the meaning and intention of the original text.

Ronald Radzai

# Beck'sche Kurz-Kommentare

Band 13 b

# Markenrecht

Kommentar zum Markengesetz,
zur Pariser Verbandsübereinkunft
und zum Madrider Markenabkommen

Dokumentation des nationalen,
europäischen und internationalen Kennzeichenrechts

### Dr. Karl-Heinz Fezer

Ordinarius an der Universität Konstanz
Honorarprofessor an der Universität Leipzig
Richter am Oberlandesgericht Stuttgart

auf der Grundlage von

### Baumbach/Hefermehl

Warenzeichenrecht
12. Auflage 1985

Dritte, neubearbeitete Auflage

# Verlag C.H.Beck München 2001

MarkenG § 11 12–14                                                      Agentenmarken

## IV. Fehlen oder Wegfall einer Zustimmung des Markeninhabers

**(12)**  Der Löschungsgrund der rechtswidrigen Agentenmarke besteht, wenn eine Zustimmung des Inhabers der Marke zur Eintragung nicht vorliegt. Das Agenten- oder Vertreterverhältnis ermächtigt regelmäßig allein zur Benutzung der Marke, nicht auch zu deren Eintragung. Die Vorschriften der §§ 11 und 17 sind auch dann anzuwenden, wenn erst nach *Beendigung des Vertragsverhältnisses* zum Markeninhaber die Marke für den Agenten oder Vertreter eingetragen wird, da die Anmeldung der Marke zur Eintragung durch den Vertreter oder Agenten regelmäßig als ein Verstoß gegen eine nachvertragliche Verpflichtung aus dem beendeten Agenten- oder Vertreterverhältnis zu beurteilen ist (s. Begründung zum MarkenG, BT-Drucks. 12/6581 vom 14. Januar 1994, S. 73). Die Eintragung ist auch dann ohne Zustimmung erfolgt, wenn der Markeninhaber den *Widerruf einer erteilten Zustimmung* erklärt. Wenn die Eintragung mit Zustimmung des Markeninhabers erfolgt, weil im Zeitpunkt der Eintragung auf Grund des Agenten- oder Vertreterverhältnisses nicht nur eine Ermächtigung zur Benutzung der Marke, sondern auch zu deren Eintragung besteht, dann sind die Vorschriften der §§ 11 und 17 dann anzuwenden, wenn mit der Beendigung des Vertragsverhältnisses die Zustimmung zur Eintragung wegfällt oder widerrufen wird und die Eintragung der Marke bestehen bleibt. Diese Auslegung der Vorschriften über die Agentenmarke ist zum Schutz des Markeninhabers vor rechtswidrigen Agentenmarken geboten, auch wenn weder § 11 noch Art. 4 Abs. 4 lit. g MRL oder Art. 6⁰ᵉ PVÜ eine ausdrückliche Regelung über die Rechtslage nach Wegfall der Zustimmung enthalten (s. die ausdrückliche Regelung in Art. 4 Schweiz. MSchG). Anders als Art. 6ᵉᵖᵗⁱᵉˢ PVÜ sieht § 11 auch nicht ausdrücklich vor, dass der Agent oder Vertreter sein Handeln rechtfertigen kann. Der Gesetzgeber hielt eine solche ausdrückliche Vorschrift für nicht erforderlich, weil bei einem *gerechtfertigten* Vorgehen des Agenten oder Vertreters Ansprüche des Markeninhabers gegen seinen Agenten oder Vertreter von vornherein nicht in Betracht kommen. ...

## V. Ort des Markenschutzes

**13**  Bei Fallkonstellationen der Agentenmarke handelt es sich regelmäßig um Sachverhalte des internationalen Wirtschaftsverkehrs, bei denen ein ausländischer Markeninhaber einen inländischen Agenten oder Vertreter zur Benutzung seiner ausländischen Marke im Inland ermächtigt. Das Bestehen *ausländischen* Markenschutzes hinsichtlich der Eintragung im Inland als dem Geltungsbereich des MarkenG stellt aber keine Anwendungsvoraussetzung der §§ 11 und 17 dar. Zwar ist Voraussetzung des Art. 6ᵉᵖᵗⁱᵉˢ PVÜ, dass der Markenschutz des Inhabers der Marke in einem anderen Verbandsland als demjenigen besteht, in dem der Agent oder der Vertreter die Eintragung der Marke beantragt. Regelungsgegenstand der PVÜ sind aber nur konventionsrechtliche Sachverhalte der Verbandsländer. Die Vorschriften der §§ 11 und 17 enthalten nach dem erklärten Willen des Gesetzgebers keine entsprechende Einschränkung (Begründung zum MarkenG, BT-Drucks. 12/6581 vom 14. Januar 1994, S. 73). Das relative Eintragungshindernis einer rechtswidrigen Agentenmarke nach § 11 ist deshalb auch bei rein *inländischen* Sachverhalten anzuwenden. Solche Fallkonstellationen kommen bei nicht eingetragenen Kennzeichenrechten wie etwa bei durch den Erwerb von Verkehrsgeltung entstehenden Markenrechten nach § 4 Nr. 2 in Betracht.

## C: Verfahrensrecht

**14**  Im *Eintragungsverfahren* stellt der Löschungsgrund einer rechtswidrigen Agentenmarke nach § 11 einen Widerspruchsgrund nach § 42 Abs. 2 Nr. 3 und so ein relatives Eintragungshindernis dar. Die rechtswidrige Agentenmarke wird nach § 51 Abs. 1 auf Klage wegen Nichtigkeit gelöscht. Im *Löschungsverfahren* vor den ordentlichen Gerichten ist der Inhaber der Marke im Sinne des § 11 zur Erhebung der Klage nach § 55 Abs. 2 Nr. 2 befugt. Die ohne Zustimmung des Markeninhabers erfolgte Eintragung der Agentenmarke ist dann nicht zu löschen, wenn der Markeninhaber nachträglich der Eintragung der Marke zustimmt (§ 51 Abs. 2 S. 3).

602

S

3. Claim of the mark proprietor to transfer of an agent mark

Trademark Act § 5, 11, 15, 17 I, 153 ! – SNOMED

1. § 153 I of Trademark Act does not prevent the proprietor of a mark registered prior to 1 Jan 1995 from demanding the transfer of an agent mark per § 11 and 17 of Trademark Act.

2. Magnetic tapes and microfiches, on the one hand, and computer programs, magnetic recording media, and printing products on the other hand are similar to each other.

3. The consent to register an agent trademark (§ 11 Trademark Act) must exist for the duration of the registration and can be revoked.

4. Rights to a title per § 5 and 15 Trademark Act lie with the one who claims them in an outwardly recognizable manner upon their creation.

...

4. The defendant under Number 1 applied for its trademark in 1991 without the consent of the plaintiff. That much is undisputed.

The defendants claim a subsequent, implied consent. Whether or not the factual allegations are capable of supporting this can be left undecided, so that further review of the defendant on this point in the challenged judgment need not be pursued. In any case, this type of consent would not justify their claim to perpetual registration vis-à-vis the plaintiff, since consent must be valid for the duration of registration and is canceled if the trademark owner revokes consent (*Fezer*, § 11, margin No. 12). In any case, at this time the plaintiff is no longer prepared to accept the registration of the defendant under Number 1, and has revoked its consent - which is at least implied, and, in any case, at the moment in which it claimed the transfer, at the very latest.

...

The agent who does not adequately safeguard the interests of his client does not deserve any protection, and this also holds precisely when the client is in need of protection only due to the ending of the agent relationship itself. That the client could have safeguarded himself contractually by granting the permission does not appear to be decisive, since he could also have imposed a ban on application on his agent when establishing the contractual relation. If the lawmakers had deemed that to be an adequate possibility, the protection of § 11 Trademark Act would not have been necessary.



Certification

## Park IP Translations

TRANSLATOR'S DECLARATION:                January 28, 2008

I, Ronald Radzai, hereby declare:


That I possess advanced knowledge of the German and English languages. The attached translation of the document called "Markenrecht" has been translated by me and to the best of my knowledge and belief, it accurately reflects the meaning and intention of the original text.


Ronald Radzai

NJW-RR 2000, 1202 – ARD-1). Auch bei der mittelbaren Verwechslungsgefahr gilt der Grundsatz, dass der Schutzbereich einer Marke so weit geht, wie Verwechslungen zu besorgen sind.

Eine solche mittelbare Verwechslungsgefahr besteht. Der Verkehr wird angesichts der identischen bzw. hochgradig ähnlichen Warenbereiche annehmen, die unter der Kennzeichnung „CORN POPS" und „Rice-Pops" vertriebenen Produkte, insbesondere die süßen Knabberartikel, stammten aus demselben Haus.

Zunächst einmal ist der Wortbestandteil „Pops" der Klagemarke Anknüpfungspunkt für ein Serienzeichen. Nach ständiger Rechtsprechung des BGH greift diese Art der Verwechslungsgefahr dann ein, wenn der übereinstimmende Bestandteil der Zeichen vom Verkehr als Stamm mehrerer Zeichen eines Unternehmens angesehen wird und deshalb nachfolgende Bezeichnungen mit wesensgleichem Stamm dem gleichen Zeicheninhaber zuordnet (BGH, GRUR 2002, 542 [544] – Big; BGH, GRUR 2002, 544 [547] – Bank 24; BGH, GRUR 1999, 587 [589] – Cefallone). Dies setzt allerdings voraus, dass Anhaltspunkte für eine solche Schlussfolgerung vorliegen, die etwa darin liegen können, dass der Zeicheninhaber bereits mehrere Zeichen mit dem in Rede stehenden Zeichenbestandteil benutzt. Dies ist bei der Kl. allerdings nicht der Fall. Denn nach der vorgetragenen Benutzunglage hat sie jedenfalls im Inland lediglich die Marke „Corn Pops" benutzt. Darüber hinaus ist aber grundsätzlich auch nicht ausgeschlossen, in einem erstmalig verwendeten Zeichen ein Stammzeichen zu sehen. In diesem Fall bedarf es aber konkreter Anhaltspunkte, dass sich das Zeichen zu einem Zeichenstamm entwickelt (BGH, GRUR 1999, 155 [156] – Dribeck's Light; GRUR 1996, 777 [778] – Joy; GRUR 1996, 200 [202] – Innovadiclophlont). Solche konkreten Anhaltspunkte sind gegeben. Zum einen handelt es sich bei „Pops" um einen – wie bereits ausgeführt – nicht beschreibenden, sondern durchaus prägenden Begriff. Hinzu kommt, dass es sich bei „Pops" in der Kennzeichnung „CORN POPS" um das Grundwort handelt, das eher als Anknüpfungspunkt für ein Serienzeichen in Betracht kommt als das Bestimmungswort „CORN" (vgl. Ingerl/Rohnke, MarkenG, 1998, § 14 Rdnr. 429 m. w. Nachw.), zumal der Zeichenbestandteil „Corn" stark beschreibende Anklänge aufweist, ohne dass dies allerdings – wie bereits oben erörtert – seine das Gesamtzeichen mitprägende Wirkung entfallen lässt. Auf Grund der Teilidentität zwischen Klagemarke und Verletzungszeichen in dem Bestandteil „Pops" liegt für den Verkehr, der die Marke „CORN POPS" der Kl. kennt, die Annahme nahe, es handele sich bei Rice-Pops um ein Produkt der Kl. Denn durch die Voranstellung der jeweiligen Bezeichnungen „Corn" bzw. „Rice" kann der Eindruck entstehen, dass es sich bei „Pops" um den Stammbestandteil eines Serienzeichens handelt, das jeweils durch Voranstellen eines konkretisierenden Bestandteils zur Grundlage der „Pops" für unterschiedliche Produktlinien von Waren verwendet wird. Dies gilt um so mehr, als die sehr dicht beieinanderliegenden und teilweise identischen Warenbereiche solch unterschiedliche Produktlinien einer „Pops"-Reihe besonders naheliegend erscheinen lassen. Die Unterlassungsklage ist danach begründet.

II. Der Löschungsanspruch folgt aus § 51 I i. V. mit § 9 I Nr. 2 MarkenG. Zur Begründung kann auf das oben unter I. Gesagte Bezug genommen werden.

III. Die Einräumung einer Aufbrauchfrist kommt nicht in Betracht. Hierfür hätte es eines substanziierten Sachvortrags der Bekl. bedurft, der ein Interesse an der Einräumung einer Aufbrauchfrist erkennen lässt (BGH, GRUR 1982, 420 [423] – BBC/DDC; GRUR 1961, 283 [284] – Mon Cherie II).

Anm. d. Schriftltg.: Zu der zitierten Entscheidung BGH, GRUR 2000, 608 – ARD-1, s. auch die Anm. Loewenheim, LM H. 9/2000 § 14 MarkenG Nr. 12.

## 5. Anspruch des Markeninhabers auf Übertragung einer Agentenmarke

MarkenG §§ 5, 11, 15, 17 I, 153 I – SNOMED

1. § 153 I MarkenG hindert den Inhaber einer vor dem 1. 1. 1995 eingetragenen Marke nicht, nach §§ 11, 17 MarkenG die Übertragung einer Agentenmarke zu verlangen.

2. Die Waren Magnetbänder und Microfiche einerseits und Computerprogramme, Magnetaufzeichnungsträger und Druckereierzeugnisse andererseits sind einander ähnlich.

3. Die Zustimmung zur Eintragung einer Agentenmarke (§ 11 MarkenG) muss für die Dauer der Eintragung bestehen und kann widerrufen werden.

4. Rechte an einem Titel nach §§ 5, 15 MarkenG stehen dem zu, der sie bei ihrem Entstehen nach außen erkennbar für sich in Anspruch nimmt.

OLG Hamburg, Urt. v. 27. 2. 2003 – 3 U 43/01

Zum Sachverhalt: Die Parteien streiten um Rechte an der Bezeichnung „SNOMED".

Die Kl. ist eine amerikanische gemeinnützige Einrichtung, der mehr als 15 000 Pathologen angehören. Sie ist u. a. im Bereich der Qualitätssicherung für Laboratorien tätig und befasst sich mit der medizinischen Nomenklatur. Sie ist Inhaberin der am 22. 5. 1984 eingetragenen US-Marke „SNOMED" für Magnetbänder und Microfiche, die ein System für die Nomenklatur und Klassifikation medizinischer Terminologie enthalten.

Die Kl. verlegt ein von den Professoren C und R betreutes mehrbändiges Kompendium unter dem Titel SNOMED Systematized nomenclature of medicine, das seit 1974 in den USA publiziert wird. Seither sind drei Auflagen erschienen (SNOMED I, II und III), zunächst als Druckwerk, jedenfalls seit 1989 auch in elektronischer Form. Auf der Grundlage dieses (englischsprachigen) Werks können krankheitsrelevante Informationen, einschließlich der krankheitsbedingten Symptome, der erhobenen Diagnosen und der angewendeten Behandlung, einheitlich indexiert und dadurch auch elektronisch in einer einheitlichen Datenstruktur gespeichert werden. Alle Versionen und Auflagen des Werks tragen einen Hinweis auf die von der Kl. in Anspruch genommene Rechtsinhaberschaft entweder als förmliche Urheberhinweise oder durch sonstige namentliche Nennung der Kl. Das Kompendium wird in der internationalen wissenschaftlichen Literatur umfassend besprochen und ausgewertet, teilweise bereits seit den 70er Jahren.

Die Kl. schloss am 15. 9. 1983 mit dem S-Verlag einen Lizenzvertrag, in dem die Übersetzung und Übernahme von „SNOMED II" sowie der weltweite Vertrieb der deutschsprachigen Fassung im eigenen Namen durch den S-Verlag vereinbart wurde. Die deutsche Ausgabe sollte unter dem Originaltitel „SNOMED" sowie mit folgendem Hinweis erscheinen:

„Copyright S-Verlag (...) Authorized translation from the English-language edition and updates published by the College .... Copyright 1979, 1982 The College .... All rights reserved."

Der S-Verlag erhielt eine Option für künftige Auflagen, die er aber nicht ausübte. Eine Unterlizenzierung Dritter war mit der Maßgabe untersagt, dass bei einem Verstoß alle mit dem Lizenzvertrag begründeten Rechte an die Kl. zurückfallen sollten. Die Kl. gestattete dem Verlag auch die Übersetzung und Veröffentlichung ihrer Publikation „SNOMED Coding Manual".

Der 1988 verstorbene W, der bereits in den 70er Jahren das Vorläuferwerk „SNOP" übersetzt hatte und 1975 an der „Field Trial Edition" beteiligt war, erstellte im Auftrag des S-Verlags Übersetzungen und Bearbeitungen, die 1984 im S-Verlag unter den Titeln „SNOMED Systematisierte Nomenklatur der Medizin Band I Numerischer Index", „SNOMED Systematisierte Nomenklatur der Medizin Band II Alphabetischer Index" und „SNOMED Manual" erschienen. Auf der Rückseite des Titelblattes befanden sich die Hinweise:

„American Original: SNOMED – Systematized Nomenclature of Medicine, Volume I, Numeric Index. Authorized translation from the English-language version and updates published by the College ...: Copyright 1979, 1982 The College .... All rights reserved. ... CIP-Kurztitelaufnahme der Deutschen Bibliothek Systematisierte Nomenklatur der Medizin; SNOMED / bearbeitet u. adaptiert nach der amerik. Ausg. von W".

Die Rechte aus den Verlagsverträgen mit W übertrug der S-Verlag am 4. 3. 1996 auf die Bekl. zu 1. Die Bekl. zu 1 ist eine am 12. 11. 1992 gegründete Stiftung zur Förderung wissenschaftlicher Forschungsprojekte auf den Gebieten Linguistik und Medizin und ging aus der am 17. 7. 1990 entstandenen F-Stiftung Gründungsgesellschaft mbH hervor. Vorstand und Beirat gehörten u. a. Wissenschaftler der medizinischen Informatik an. Bis zum 11. 11. 1997 war R

Mitglied der Stiftungskuratoriums. Die Bekl. zu 1 ist Inhaberin der am 15. 6. 1991 angemeldeten und am 16. 3. 1993 eingetragenen deutschen Marke Nr. DE 203 23 95 „SNOMED" für Computerprogramme, Magnetaufzeichnungsträger und Druckereierzeugnisse.

Die Bekl. zu 2 ist ein am 31. 8. 1990 gegründetes und am 15. 11. 1990 eingetragenes Unternehmen in Form einer GmbH, das sich mit der Entwicklung und dem Vertrieb von EDV-gestützten Verfahren, Instrumenten und Methoden der Information und Dokumentation für Aufgaben des Gesundheitswesens befasst, insbesondere unter Verwendung und Fortentwicklung des Produktes ID SNOMED. Sie meldete am 17. 12. 1998 „SNOMED" als Gemeinschaftsmarke für die Erstellung von Programmen für die Datenverarbeitung im Bereich der medizinischen und epidemiologischen Dokumentation an. Zuvor hatte sie sich 1996 bzw. 1997 die Marke auch in der Schweiz und in Österreich schützen lassen. Gegen die Gemeinschaftsmarkenanmeldung hat die Kl. Widerspruch eingelegt. Die beiden Bekl. sind personell und rechtlich miteinander verflochten; so ist die Bekl. zu 1 Gesellschafterin der Bekl. zu 2, und der geschäftsführende Gesellschafter der Bekl. zu 2 ist Vorstandsmitglied der Bekl. zu 1. Die Bekl. zu 1 hat der Bekl. zu 2 umfassende Nutzungsrechte an „SNOMED" (deutsche Fassung) eingeräumt.

Als in den 90er Jahren Planungen für eine deutsche Übersetzung des seit 1989 in den USA publizierten SNOMED III begannen und die Kl. erwog, evtl. nicht die Bekl. zu 1, sondern Dritte – insbesondere die Arbeitsgemeinschaft der Wissenschaftlichen Medizinischen Fachgesellschaften (AWMF) – mit der Übersetzung zu betrauen, wie sie der Bekl. zu 1 auch darlegte, kam es 1996 zu einer schriftlichen Auseinandersetzung der Kl. und der Bekl. zu 1 über die Rechte an SNOMED II, der Marke „SNOMED" und an künftigen Auflagen des Kompendiums im deutschsprachigen Bereich. Eine deutsche Fassung von SNOMED III erschien bisher nicht.

Die Kl. hat behauptet, das Kompendium SNOMED sei 1979 – wie schon 1975 die Field Trial Version – an beteiligte Wissenschaftler, auch in Deutschland, gelangt. Seit 1979 sei es in Deutschland gekauft und beworben worden, in Bibliotheken verfügbar und seit mindestens 1989 auch auf Diskette erhältlich gewesen (Beweis: Zeugnis A und C). Das Zeichen und der Werktitel SNOMED würden in den maßgeblichen Verkehrskreisen – also bei den Spezialisten der medizinischen Informatik – ihr, der Kl., zugeordnet (Beweis: Sachverständigengutachten). Das Werk SNOMED sei von C und R für sie verfasst worden, ohne dass dieser zu irgendeinem Zeitpunkt ihr Organ gewesen sei. Der Beitrag von W habe sich in der Übersetzung und Adaptierung (inkl. lateinischer Vokabeln) erschöpft. „SNOMED" sei immer in Alleinstellung oder grafisch besonders hervorgehoben verwendet worden. Das Produkt „ID SNOMED" der Bekl. zu 2 sei zwar nicht mit ihrem eigenen identisch, diene jedoch dem gleichen Zweck und richte sich an denselben Abnehmerkreis (Beweis: Sachverständigengutachten). Positive Kenntnis von der streitgegenständlichen Markeneintragung der Bekl. zu 1 habe sie erst durch eine eigene Markenrecherche im Frühjahr 1999 erhalten, die durch Hinweise Dritter Ende 1998/Anfang 1999 veranlasst worden sei. Benutzungshandlungen seien ihr nicht vor 1999 bekannt geworden.

Die Kl. hat u. a. beantragt,

1. die Bekl. zu 1 zu verurteilen, die für die Waren „Computerprogramme, Magnetaufzeichnungsträger und Druckereierzeugnisse" am 15. 6. 1991 beim DPA angemeldete und am 16. 3. 1993 in die Warenzeichenrolle beim DPA (jetzt: DPMA) eingetragene Marke Nr. DE 203 23 95 „SNOMED" auf die Kl. zu übertragen und gegenüber dem DPMA der Eintragung der Kl. als Rechtsnachfolgerin der Bekl. zu 1 zuzustimmen;

hilfsweise, die Bekl. zu 1 zu verurteilen, in die Löschung der für die Waren „Computerprogramme, Magnetaufzeichnungsträger und Druckereierzeugnisse" am 15. 6. 1991 beim DPA angemeldeten und am 16. 3. 1993 in die Warenzeichenrolle beim DPA eingetragene Marke Nr. DE 203 23 95 „SNOMED" gegenüber dem DPMA einzuwilligen,

II. die Bekl. zu 1 und zu 2 zu verurteilen,

1. es bei Meidung der gesetzlich vorgesehenen Ordnungsmittel zu unterlassen, im Bereich der Bundesrepublik Deutschland ohne Zustimmung der Kl. das Zeichen „SNOMED" und/oder „ID SNOMED" im geschäftlichen Verkehr für Computerprogramme, Magnetaufzeichnungsträger und/ Druckereierzeugnisse zu benutzen, insbesondere das vorstehend bezeichnete Zeichen auf den vorstehend bezeichneten Waren oder ihrer Aufmachung oder Verpackung anzubringen, unter den vorstehend bezeichneten Zeichen die vorstehend wiedergegebenen Waren anzubieten, in den Verkehr zu bringen oder zu den genannten Zwecken zu besitzen, einzuführen oder auszuführen und schließlich die vorstehend bezeichneten Zeichen in Geschäftspapieren oder in der Werbung zu benutzen,

III. die Bekl. zu 2 zu verurteilen,

1. es bei Meidung der gesetzlich vorgesehenen Ordnungsmittel zu unterlassen, im Bereich der Bundesrepublik Deutschland ohne Zustimmung der Kl. das Zeichen „SNOMED" und/oder „ID SNOMED" im geschäftlichen Verkehr für die Erstellung von Programmen für die Datenverarbeitung im Bereich der medizinischen Dokumenta-

tion zu benutzen, insbesondere unter den vorstehend bezeichneten Zeichen die vorstehend wiedergegebenen Dienstleistungen anzubieten und/oder in den Verkehr zu bringen und schließlich die vorstehend bezeichneten Zeichen in Geschäftspapieren oder in der Werbung für derartigen Dienstleistungen zu benutzen.

Das LG hat der Klage im Wesentlichen stattgegeben. Die Berufung des Bekl. blieb erfolglos.

Aus den Gründen: I. Die Kl. hat einen Anspruch auf Übertragung der streitgegenständlichen Marke der Bekl. zu 1 aus §§ 11, 17 I MarkenG.

1. Diese Vorschrift ist auf den vorliegenden Fall anwendbar. Nach § 152 MarkenG gilt dieses grundsätzlich auch für Marken, die vor dem 1. 1. 1995 angemeldet oder eingetragen worden sind, sowie für geschäftliche Bezeichnungen, die nach den bis dahin geltenden Vorschriften geschützt waren. Die Kl. war nach §§ 5 IV 2, 11 I Nr. 1 a WZG gegen die Eintragung einer Agentenmarke geschützt. Die Bekl. können sich nicht auf § 153 I MarkenG berufen, wonach dem Inhaber einer Marke, die er vor 1995 erworben hat, und dem nach dem bis dahin geltenden Recht gegen die Benutzung der Marke, die er nun angreift, keine Ansprüche wegen Verletzung zustanden, verwehrt ist, Rechte aus seiner Marke nunmehr gegen die Weiterbenutzung der angegriffenen Marke geltend zu machen (vgl. BGH, GRUR 1998, 165 [166] = NJW-RR 1998, 253 = LM H. 4/1998 § 16 UWG Nr. 157 – RBB), denn der Kl. zustand Ansprüche wegen der Verletzung ihrer Marke zu. Sie konnte als Inhaberin eines älteren ausländischen Zeichens Widerspruch einlegen (§ 5 IV 2 WZG) und Löschung der Agentenmarke verlangen (§ 11 I Nr. 1 a WZG), wenn der Agent das Zeichen – ohne Zustimmung – für gleiche oder gleichartige Waren angemeldet hat oder hat eintragen lassen.

Für §§ 11, 17 I MarkenG kommt es ebenso wenig wie für den vorherigen Rechtszustand darauf an, dass es sich um eine ausländische Marke handelt, denn deren Schutz war in Umsetzung der PVÜ beabsichtigt (Ingerl/Rohnke, MarkenG, 1998, § 11 Rdnr. 16). Es bedeutet keinen Unterschied, dass der Agent dort dadurch näher gekennzeichnet war, dass er auf Grund eines Vertragsverhältnisses die Interessen seines Partners im geschäftlichen Verkehr wahrzunehmen hatte. Für den heutigen § 11 MarkenG gilt nichts anderes, denn die §§ 5 IV 2, 11 I Nr. 1 a WZG entsprachen der Konventionsverpflichtung nach Art. 6septies PVÜ, zu deren Terminologie das Markengesetz zurückgekehrt ist (vgl. Ingerl/Rohnke, § 11 Rdnr. 7).

Ebenso wenig ist es von Bedeutung, dass das frühere Recht als Schutz gegen missbräuchliche Agentenmarken nur einen Löschungsanspruch vorsah, während § 17 MarkenG zusätzlich einen Übertragungsanspruch gibt. Darin liegt keine Erweiterung des Schutzrechtes, denn ein Recht zur „Weiterbenutzung" der Marke kam auch nach dem WZG angesichts des Löschungsanspruchs nicht in Betracht, so dass eine Änderung hinsichtlich der Rechtsfolgen einer Verletzung den Zweck der §§ 152, 153 MarkenG unberührt lässt. Sollte, wie die Bekl. meinen, Fezer (MarkenG, 2. Aufl. [1999], § 152 Rdnr. 6) insoweit einen gegenteiligen Standpunkt vertreten, wäre ihm jedenfalls nicht zu folgen.

2. Die Bekl. zu 1 ist hinsichtlich des Übertragungsanspruchs passivlegitimiert. Zwar existierte sie im maßgeblichen Zeitpunkt der Markenanmeldung (vgl. Ingerl/Rohnke, § 11 Rdnr. 8) noch nicht. Doch ist sie unstreitig in die Rechte und Pflichten ihrer Vorläuferin, der F-Gründungsgesellschaft, eingetreten, die die streitgegenständliche Marke am 15. 6. 1991 angemeldet hat. Sie selbst ist am 12. 11. 1992 gegründet worden, für sie ist die Marke eingetragen.

Der Gründungsgesellschaft kam eine Agentenstellung im Sinne des Gesetzes zu, denn sie hatte auf Grund eines bestehenden Vertragsverhältnisses die Interessen der Kl. im geschäftlichen Verkehr wahrzunehmen. Eben dies ziehen die Bekl. in Zweifel. Es habe keine vertragliche Beziehung zwischen der Kl. und der Bekl. zu 1 gegeben. Es fehle an einem Übertragungsakt, durch den die Pflichten von W auf sie

übergegangen seien. Das LG habe eine „faktische" Agentenstellung angenommen, die an dem Umstand scheitere, dass die Kl. nie beansprucht habe, „Prinzipal" der Kl. zu sein.

Ob mit den Erwägungen des LG eine Agentenstellung der Gründungsgesellschaft angenommen werden kann, bedarf keiner Prüfung, denn unbeschadet dessen bestanden zwischen ihr und der Kl. eigene vertragliche Beziehungen, die die Gründungsgesellschaft verpflichteten, die Interessen der Kl. zu wahren. Begriffe wie „Agent" und „Prinzipal" treffen zwar den Regelfall, etwa bei Handelsvertretern, auf Bezeichnungen kommt es aber nicht an. Entscheidend ist, ob sich aus dem Vertragsverhältnis eine Interessenbindung ergibt, die es verbietet, die Marke ohne Zustimmung des anderen eintragen zu lassen, weil eine über den bloßen Güteraustausch hinausgehende Geschäftsbeziehung mit der Verpflichtung besteht, die Interessen des anderen wahrzunehmen (vgl. Ingerl/Rohnke, § 11 Rdnr. 7).

Gegenstand der Gründungsgesellschaft war neben den Aktivitäten zur Gründung der Bekl.: zu 1 auch die „Förderung von Projekten zur Weiterentwicklung der „Systematisierten Nomenklatur der Medizin (SNOMED)" für den deutschsprachigen Raum" und die „Sicherstellung der Einheitlichkeit der Weiterentwicklung der „Systematisierten Nomenklatur der Medizin (SNOMED)"." Dieser Geschäftszweck ließ sich nur in Zusammenarbeit mit der Kl. verwirklichen, die Rechte an den bisherigen Ausgaben von SNOMED in den USA und (jedenfalls auch) Deutschland besaß. Diese Zusammenarbeit war seitens der Gründungsgesellschaft nicht etwa nur beabsichtigt, sondern bereits in die Tat umgesetzt worden. Es hatte sich ein Gedankenaustausch mit R entwickelt, der für die Kl. „SNOMED" betreute und herausgegeben hatte, und dieser Austausch hatte zu konkreten Maßnahmen geführt, die ohne Rechtsbindungswillen nicht erklärlich wären.

Dass R dabei die Kl. sprach, brauchte nicht besonders hervorgehoben zu werden, denn es versteht sich von selbst, dass seine Aktivitäten neben dem wissenschaftlichen Interesse, das ihn leitete, jedenfalls auch für die Rechtsinhaberin vorgenommen wurden, die mit seinem Handeln einverstanden sein musste, wenn „SNOMED III"´– in welcher Form auch immer – in Deutschland auf den Markt kommen sollte. Ihr Organ brauchte er dabei nicht zu sein, jede (auch konkludente) Bevollmächtigung genügte. Er war „the person to speak to regarding SNOMED", oder war – wie es die Bekl. in der Berufungsbegründung ausdrücken – „neben C die Zentralfigur der Kl. bei der Entwicklung des SNOMED-Projektes. Er und der Zeuge C steuerten damals alle Vorgänge bezüglich SNOMED im Hause der Kl."

Damit haben sich die Kl. und die Gründungsgesellschaft zusammengetan, um i. S. des § 705 BGB einen gemeinsamen Zweck zu erreichen und gemeinsam zu fördern (vgl. Palandt/ Sprau, BGB, 62. Aufl. [2003], § 705 Rdnr. 20 ff. m. w. Nachw.), indem „SNOMED III" im deutschsprachigen Raum erscheinen zu lassen. Die Bekl. zu 1 hat nach ihrem eigenen Bekunden „als das deutsche SNOMED-Komitee agiert" und dies auf ihren Briefbögen dokumentiert, und „die Kooperation der Parteien (wurde) ja auch laufend fortgesetzt, indem die Parteien nicht nur zu Fachkongressen zusammentrafen", wie es in der Berufungsbegründung heißt. Ein Schreiben wie das von R vom 7. 5. 1991 – also vor Anmeldung der streitgegenständlichen Marke – ist anders nicht zu erklären. Es ist an H gerichtet, den laut Registerauszug alleinigen Geschäftsführer der Gründungsgesellschaft, und behandelt nicht nur Fragen der zu errichtenden Stiftung, sondern auch Maßnahmen im Hinblick auf die deutsche Ausgabe von „SNOMED III" und das Treffen in Washington des zu formierenden „International SNOMED Committee", das ohne Beteiligung der Kl. nicht denkbar war. Dass dies letztlich auch aus Sicht der Bekl. ist, ergibt sich aus ihrer Einlassung, die Eintragung habe dazu gedient, die Verbreitung von „SNOMED"-Ausgaben im deutschsprachigen Raum abzusichern. Ohne Zustimmung derjenigen, die Rechte an dieser

Bezeichnung besaß, war dies ohnehin nicht möglich, die Eintragung sicherte also nur und gerade die Rechte der Kl. Dies macht deutlich, dass sich die Gründungsgesellschaft insoweit durchaus als „Agent" der Kl. betrachtete. In jedem Fall hatte sie bei dieser Konstellation die Belange der Kl. als ihrer Vertragspartnerin zu wahren. Es wäre auch nicht zu verstehen, warum sich die Bekl., wenn es an einer vertraglichen Beziehung zwischen der Kl. und der Bekl. zu 1 gefehlt hätte, auf eine konkludente Genehmigung der Markeneintragung berufen, wenn sie nicht selbst davon ausgehen, dass es eine solchen Zustimmung bedurfte, was wiederum eine vertragliche Beziehung voraussetzt. Eine solche wird auch nicht dadurch ausgeschlossen, dass ein oder beide Vertragspartner in erster Linie wissenschaftliche Ziele mit ihrer Kooperation verfolgen.

3. Die prioritätsältere US-amerikanische Wortmarke Nr. 1.278.742 „SNOMED" der Kl. ist für Magnetbänder und Microfiche eingetragen, die ein System für die Nomenklatur und Klassifikation medizinischer Terminologie enthalten. Die für die Bekl. zu 1 eingetragenen Wortmarke Nr. 203 23 95 betrifft Computerprogramme, Magnetaufzeichnungsträger und Druckereierzeugnisse.

Zu Unrecht meinen die Bekl., das LG hätte den Schutz der klägerischen Marke nicht auf Druckereierzeugnisse und Computerprogramme erstrecken dürfen. Auch im Rahmen des § 11 MarkenG gelten die allgemeinen Verletzungstatbestände. Die Ähnlichkeit von Waren und Dienstleistungen ist einheitlich zu bestimmen (Ingerl/Rohnke, § 11 Rdnr. 17, § 9 Rdnr. 9). Magnetbänder und Microfiches sind Medien, um gedankliche Inhalte dauerhaft zu speichern. Das gleiche gilt für Druckereierzeugnisse. Erscheinen sie unter derselben Marke, geht der Verkehr davon aus, dass ihre Herstellung unter einheitlicher Kontrolle steht (vgl. Ingerl/Rohnke, § 14 Rdnr. 236). So hat schon das BPatG die Ähnlichkeit von Druckereierzeugnissen und „Datenträgern in Form von Magnetbändern, -scheiben und platten" bejaht (zit. in GRUR 1997, 504). Ähnliches gilt für Computerprogramme. Programme sind zwar Steuerungssysteme und unterscheiden sich daher von reinen Speichermedien. Sie dienen aber dem Umgang mit gespeicherten Daten und deren Verarbeitung. Zudem muss ein Programm selbst auf einem Speichermedium fixiert werden. Dazu dienten früher vor allem auch Magnetbänder. Diesen Umstand berücksichtigt das LG, wenn es auf das Jahr 1984 abstellt, als die Marke der Kl. eingetragen worden ist. Damit hat es nicht zum Ausdruck gebracht, dass es damals keine Computerprogramme gegeben hätte, sondern was zum damaligen Zeitpunkt mit der Anmeldung für die Kl. geschützt werden sollte. Wer elektronische Datenträger unter der Marke SNOMED kennt, kann nicht ernsthaft zweifeln, dass ein mit SNOMED gekennzeichnetes Rechnerprogramm jedenfalls auch für den Umgang mit den unter dieser Marke bekannten elektronischen Speichermedien gedacht ist. Er wird deshalb wegen dieser Nähe selbstverständlich von geschäftlichen Beziehungen zwischen den herstellenden Unternehmen ausgehen.

4. Die Bekl. zu 1 hat ihre Marke 1991 ohne Zustimmung der Kl. angemeldet. Das ist unstreitig.

Die Bekl. berufen sich auf eine nachträgliche konkludente Genehmigung. Ob das tatsächliche Vorbringen ermöglicht, dies zu bejahen, kann dahinstehen, so dass auf die Kritik der Bekl. zu diesem Punkt im angefochtenen Urteil nicht weiter eingegangen werden muss. Eine solche Genehmigung berechtigt sie jedenfalls nicht, ihre Eintragung für alle Zeit gegenüber der Kl. zu behaupten, denn die Zustimmung muss für die Dauer der Eintragung bestehen und entfällt, wenn der Markeninhaber die Zustimmung widerruft (Fezer, § 11 Rdnr. 12). Jetzt ist die Kl. jedenfalls nicht mehr bereit, die Eintragung der Bekl. zu 1 hinzunehmen, und hat ihre Zustimmung – mindestens konkludent und jedenfalls spätestens in dem Augenblick, in dem sie die Übertragung verlangt hat – widerrufen.