UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——— ——— ——— ——— ——— ——— ———x

SOFTWARE AG, INC. and SOFTWARE AG,

        Plaintiffs,

      -against-

CONSIST SOFTWARE SOLUTIONS, INC.,
f/k/a/ CONSIST INTERNATIONAL, INC., and
NATALIO FRIDMAN,

        Defendants.

——— ——— ——— ——— ——— ——— ———x

```
╔══════════════════════════════╗
║ USDS SDNY                    ║
║ DOCUMENT                     ║
║ ELECTRONICALLY FILED         ║
║ DOC #: _____              ║
║ DATE FILED:  2/21/08         ║
╚══════════════════════════════╝
```

08 Civ. 389 (CM)(FM)

## DECISION AND ORDER GRANTING PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

McMahon, J.:

     This is an action for a declaratory judgment, temporary, preliminary and permanent injunctive relief, and compensatory damages, filed by plaintiffs Software AG, Inc. and Software AG (collectively, "Software AG") against defendant Consist Software Solutions, Inc. ("Consist") and its President, Natalio Fridman. The Court held an evidentiary hearing and heard oral argument on plaintiffs' motion for a preliminary injunction on January 24, 2008. For the reasons stated below, the motion is GRANTED.

## FINDINGS OF FACT

### The Parties

     1. Software AG, Inc. ("SAGA") is a corporation organized and existing under the laws of Virginia with its principal place of business in Virginia at 11700 Plaza America Drive, Suite 700, Reston, Virginia 20190.

     2. Software AG ("SAG") is SAGA's parent and is a corporation organized and existing under the laws of Germany with its principal place of business at Uhlandstrasse 12, 64297 Darmstadt, Germany. SAG and SAGA are referred to collectively as "Software AG."

1

3. Defendant Consist Software Solutions, Inc., f/k/a Consist International, Inc. ("Consist" or "Consist NY"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 10 East 53rd Street, New York, New York 10022. (*See* Transcript of 1/24/08 Hearing ("Tr.") at 87.)

4. Defendant Natalio Fridman is the President of Consist. He has resided in New York since 1988. (Tr. at 87.)

5. Consist Consultoria Sistemas e Representacoes Ltda. and Consist Software Ltda., which will be referred to collectively as "Consist-Brazil," are affiliates of Consist in the Territory. Fridman controls Consist-Brazil: At all times relevant to the issues in this case, Fridman had the authority to bind Consist and Consist's affiliates (including Consist-Brazil), and when Fridman executed the relevant agreements, he bound not only Consist but also Consist-Brazil. Fridman signed several of the representations at issue in this case as "Natalio Fridman, President CONSIST GROUP" and "President Grupo Consist do Brasil." Fridman has a broad power of attorney to appoint the officers of Consist-Brazil. (*See* Tr. at 88-89, 91, 96; *see also* Plaintiffs' Trial Exhibits 1-4, 7.)

## The History of the Relationship Between the Parties

6. Software AG is an enterprise integration software vendor that sells and markets a plethora of products, operates in approximately seventy countries, and has offices in fifty of those countries. Its customers include banks, governmental entities, and a variety of companies in such industries as insurance, telecommunications, and pharmaceuticals. (*See* Tr. at 52-54.)

7. Enterprise Transactions Systems ("ETS") is the largest part of Software AG's business. ADABAS (database management systems) and NATURAL (programming language) are the core products within ETS . For many large multi-national organizations, ADABAS and NATURAL are "mission critical" products, meaning that an organization's operations are totally reliant upon the effective performance of these products. (*See* Tr. at 52.)

8. The trademarks NATURAL and ADABAS are, and always have been, associated with products made by Software AG. For Software AG, part of the inherent value in its operating systems and associated products is being able to call those systems and products by the names that have become associated with them. (*See* Tr. at 75, 105-07.)

9. Since 1975, Consist or its predecessor in interest, Pan American Computers Systems, Inc. ("PACS") – of which Fridman was also the President – has been the exclusive distributor of SAG products in seven countries in South America, including Brazil (the Territory).

10. PACS was a U.S. corporation with its principal place of business at 150 Broad Hollow Road, Melville, New York 11747. (1/21/08 Fridman Dep. at 29, 69.)

2

11. The distributorship has been governed by a series of software distribution, licensing and maintenance agreements between Software AG and Consist (or, prior to January 1, 1998, between Software AG and PACS). Although Consist has elected to carry out its distributorship through the medium of wholly-controlled subsidiaries or affiliates in each of the relevant countries (notably, in Brazil, through Consist-Brazil), the U.S. corporation – whether Consist or its predecessor in interest, PACS – has always been the exclusive distributor, and so had all the distributor's contractual rights and was responsible for performing all the distributor's obligations. Consist-Brazil (and any other affiliate or subsidiary operating in the Territory) have at all times operated as the agent of the United States-based corporation (Consist or PACS) that held the actual distribution rights, and all actions taken by Consist-Brazil (and any other South American subsidiary or affiliate of Consist) in connection with the distributorship agreements were taken on behalf of, and pursuant to the rights granted to, Consist NY.

12. The most recent distributorship agreement became effective on January 1, 1998 (the "1998 Agreement"). The parties to that Agreement were SAG, SAGA and Consist, the New York corporation; however, the word "Consist," as used in the Agreement, was defined to include "all [Consist's] subsidiaries and affiliates." The initial term of the 1998 Agreement ran through December 31, 2007 and was renewable for successive five year terms, as long as either party did not provide a notice of cancellation in accordance with the Agreement's terms. The 1998 Agreement is governed by New York law.

13. On April 6, 2006, Software AG sent Consist a notice that it did not intend to renew the 1998 Agreement for an additional five year term. Consist took the position that this notice was ineffective to terminate the parties' relationship and asserted that the Agreement had been automatically renewed for a five year term commencing January 1, 2008, because Software AG had failed to comply with the Agreement's non-renewal provision.

14. On December 17, 2007, this Court, in a decision announced from the bench that is currently on appeal, ruled that Software AG's April 6, 2006 notice complied with the terms of the 1998 Agreement and so was effective to terminate the parties' relationship effective January 1, 2008. The parties are referred to the transcript of decision for the Court's findings and conclusions; they are deemed incorporated into this opinion, but will not be reiterated here. A Final Judgment was entered on this verdict on December 21, 2007. (No. 07-7047, Dkt. #60.)

15. One prior version of the parties' distributorship agreement is relevant to this action: the version that became effective on January 1, 1984 and ran through December 31, 1986 (The "1984 Agreement"). That Agreement, between Software AG and PACS, is governed by German law.

**The Terms of the 1984 and 1998 Agreements Relevant to This Lawsuit**

16. The 1984 Agreement provides as follows:

3

WHEREAS, SAG is the sole proprietor of certain software packages . . . hereinafter referred to as the "SYSTEMS";

and

WHEREAS, PACS want to market the SYSTEMS and to provide assistance to users of the SYSTEMS in Argentina, Brazil, Chile, Colombia and Uruguay, hereinafter called the "TERRITORY"

* * *

### Paragraph 5

(1)     PACS agrees to take all necessary and reasonable measures to ensure that the proprietary nature and integrity of the SYSTEMS are safeguarded against unauthorized use, duplication or modification.

PACS has the right to reproduce and, as necessary, translate SYSTEMS documentation, Manuals, etc. for use in the TERRITORY. Written material used by PACS for marketing or support to users of the SYSTEMS will refer to authorship of SAG and will show copyright and trademark of SAG.

PACS acknowledges the SYSTEMS and all documentation or information as a trade secret of SAG and undertakes to oblige also its own personnel to protect the SYSTEMS as well as their copyrights and trade marks and to prevent it from unauthorized use.

* * *

### Paragraph 10

PACS and Mr. Natalio S. Fridman and [Consist-Brazil] warrant fulfillment of PACS obligations.

17. The 1998 Agreement provides as follows:

"CONSIST" . . . shall include all CONSIST subsidiaries and

4

affiliates

* * *

## Paragraph 2

SAGA hereby authorizes CONSIST to enter into customer agreements in the TERRITORY for licensing, installing, technical assistance, training and maintenance of the SYSTEMS.

However, CONSIST is only authorized to give non-transferable use-licenses for SYSTEMS to customers. Giving any form of sublicense or distribution rights, such as a direct or indirect OEM arrangements, to any third party will require the prior written consent of SAGA.

Contracts for installations of the SYSTEMS outside the TERRITORY shall require the prior written consent of SAGA.

* * *

## Paragraph 3

For the right to grant perpetual or time-limited licenses, and/or maintenance agreements, CONSIST agrees to make payments to SAGA as provided in Exhibit A hereto.

Payments will be made within ten (10) days of the end of each quarter.

Any quarterly payment not received within the due date period above mentioned, shall bear interest at a rate of 3% p.a. above the prime commercial rate of Citibank in effect at that time.

SAGA will provide invoices to CONSIST for all payments made by CONSIST.

* * *

## Paragraph 5

(1)    CONSIST agrees to take all necessary and reasonable measures to ensure that the proprietary nature and integrity of the

SYSTEMS are safeguarded against unauthorized use, duplication or modification.

CONSIST has the right to reproduce and, as necessary, translate SYSTEM, documentation, Manuals, etc. for use in the TERRITORY. Written material used by CONSIST for marketing or support to users of the SYSTEMS will refer to authorship of SAGA and will show copyright and trademark of SAGA.

CONSIST acknowledges the SYSTEMS and all documentation or information as trade secrets of SAGA and undertakes to oblige its personnel to protect the SYSTEMS as well as their copyrights and trademarks and to prevent them from unauthorized use.

CONSIST agrees to refrain from implementing, or permitting the implementation of any modification to the SYSTEMS without the written notice to SAGA.

* * *

(4)    CONSIST agrees to be responsible for all technical assistance and support activities in the TERRITORY including maintenance services for both present and future users. This obligation of CONSIST will continue until termination of the agreement including any extension thereof.

18.  Under the 1998 Agreement, Software AG agreed to provide to Consist, at no additional cost, software updates and servicing materials, including: training in public classes held by Software AG for Consist staff; ten copies of the latest version of the SYSTEMS stored on magnetic tape; ten copies of complete sets of SYSTEMS documentation in English; and prompt correction of any errors in the SYSTEMS detected at the user's site and forwarded to Software AG.  The 1984 Agreement included a similar provision.

## Consist's Registration of NATURAL and ADABAS

19. As of the mid-1980s, when Consist had already been a distributor of Software AG products for a decade, Software AG had not registered any trademarks in Brazil, or anywhere else in the Territory.

20. Because the trademarks ADABAS and NATURAL (collectively, "Consist's Brazilian Trademarks") had never been registered in South America, Fridman advised Software AG's

then-Chairman, Peter Schnell, that he was concerned about piracy. Schnell told Fridman that, if he wanted ADABAS and NATURAL registered in the Territory, he should do it himself. (*See* 11/28/07 Fridman Dep. at 69, 73, 75.)

21. Following this discussion, and with the knowledge of Schnell (and hence, of Software AG), Consist/PACS (through Fridman) caused its agent, Consist-Brazil, to register Software AG's trademarks in accordance with Brazilian law. Consist-Brazil first registered NATURAL on March 25, 1986, and first registered ADABAS on November 25, 1986. (Schaffer Decl. Ex. D, Dkt. #14.)

22. Both marks were registered during the period when the 1984 Agreement was in effect. Therefore, while the law of Brazil governs the registration of the Brazilian marks as against the world, the law of Germany – which governed the interpretation of the 1984 Agreement – governs questions concerning the relative *contractual* rights and obligations of Consist and Software AG in the marks ADABAS and NATURAL, whether in Brazil or anywhere else.

23. Under German law, Consist's express contractual obligation to protect Software AG's trademarks meant that any trademark registration undertaken by Consist, or by any of its agents - including especially, Consist-Brazil, which had expressly warranted the obligations of PACS, Consist's predecessor in interest, at Paragraph 10 of the 1984 Agreement – meant that the registration was for the benefit of the owner of the marks that PACS had agreed to protect— Software AG. (*See* Fammler Decl. ¶¶ 5, 10, 11, 18-20, Dkt. #28.)

24. Fridman's expression of concern about piracy of the marks to Schnell indicates that he was aware of Consist's obligation to "protect [Software AG's] SYSTEMS as well as their copyrights and trademarks and to prevent it from unauthorized use" under Section 5(1) of the 1984 Agreement. Schnell's directive that the distributor register the marks was made against the backdrop of the contract then in force and the obligation undertaken by PACS/Consist to protect Software AG's marks, including NATURAL and ADABAS.

25. Software AG did not oppose Consist-Brazil's application for registration or file any action to cancel the registrations within the contestability period, which, under Brazilian law, is five years from the date of registration. (Do Nascimento Decl. ¶ 6; Dkt. #13.) Consist-Brazil's registration of the two marks has been a matter of public record in Brazil for more than two decades.

26. None of the Agreements between Consist and Software AG – in particular, none that was signed after the marks were registered in Brazil – makes express provision for the conveyance of the Brazilian trademarks to Software AG in the event that the parties' relationship terminated.

27. Software AG – relying on Consist's contractual obligation to protect its interests – did nothing to protect its worldwide, well-recognized trademarks "ADABAS" and "NATURAL"

in Brazil, or to police the use of those marks, from the time between the Fridman/Schnell conversation until just before the expiration of the 1998 Agreement.

## The End of Term Agreements

28. Consist has conceded that, beginning on January 1, 2008 and continuing at least until such time as the December 21, 2007 Final Judgment is reversed, it is no longer Software AG's exclusive distributor in the Territory. No evidence before the Court suggests that Consist has offered to license any Software AG products since January 1, 2008, and it has not entered into any licenses or maintenance agreements since January 1, 2008. However, between December 17, 2007, and the date of this opinion, Consist has taken a number of steps to frustrate the ability of Software AG to assume its rightful place as the distributor and maintainer of its own products in the Territory.

29. The 1998 Agreement authorizes Consist to provide maintenance for its customers' Software AG products, but only during the term of the Agreement. (See below for a fuller discussion of the contract provisions relating to this finding). Between December 21 and December 31, 2007, Consist (through the medium of its agent, Consist-Brazil) promised Companhia de Processamento de Dados do Estado de Sao Paulo ("PRODESP") that Consist could continue to provide maintenance services for their SAG Software Products after January 1, 2008. As a result, on December 28, 2007 – eleven days after this Court entered judgment in the 2007 action, and three days before Consist-Brazil's principal, Consist, was to lose all rights under the 1998 Agreement – Consist-Brazil and PRODESP entered into a contract agreement obligating Consist- Brazil to provide such services for a period of 24 months, commencing the date the agreement was signed. Under this agreement, Consist-Brazil agreed to provide PRODESP with new versions of seven Software AG computer programs, including ADABAS and NATURAL, as well as all alterations and improvements made to ADABAS and NATURAL. PRODESP agreed to pay Consist a monthly fee of $177,057 Reals (or about US $85,000) – more than $1 million per year – to provide these services. (*See* Compl. Ex. 7, Dkt. #1.)

30. In the PRODESP agreement, Consist-Brazil represented that it (Consist-Brazil) has "all rights, titles and interests" in those seven Software AG products, including ADABAS and NATURAL. In fact, neither Consist nor Consist-Brazil has, or ever had, all right or title to Software AG's products. Consist's only interest in those programs was as Software AG's exclusive South American distributor, and Consist-Brazil's only interest was derivative of Consist's, as the agent for its parent corporation and the medium through which Consist-NY carried out Consist-NY's contractual obligations. (*See* Compl. ¶ 53.)

31. Consist-Brazil, in its capacity as Consist's agent, has entered into 179 similar maintenance agreements with customers in the Territory that purport to obligate it to provide maintenance to its customers after the termination of the 1998 Agreement and Consist's distributorship on January 1, 2008. (Tr. at 101.)

32. Although Section 5(4) of the Agreement obligated Consist to provide maintenance to its customers in the Territory, as a practical matter, employees of Consist-Brazil were only able to provide basic maintenance (known as "Level 1 Support") for SAG Software Products. Most Level 2 Support (more complicated) and all Level 3 Support (most complicated) were actually provided by SAGA employees at Software AG's North American software support facility, which is located in Denver, Colorado. That facility employs 125 persons, who are available 24/7 to field maintenance requests from end-users of SAG Software Systems. When Consist needed to provide more complicated service during its tenure as Software AG's exclusive distributor in the Territory, it did so by using the Denver facility. (Tr. at 71-73.)

33. Software AG was obligated, under the various Agreements between it and Consist or PACS, to provide Consist with access to the North American software support facility. But since the 1998 Agreement was not renewed, and has now expired, Software AG no longer has any obligation to provide Consist with that resource, and Consist no longer has access to that facility, or any right to access that facility. Similarly, Software AG was obligated, under the various Agreements between it and Consist or PACS, to provide Consist, free of charge, with all software upgrades, alterations and improvements to SAG Software Products that Consist's customers required; but since January 1, 2008, Software AG no longer has any such obligation, because Consist is no longer authorized to distribute SAG Software Products anywhere in the world.

34. Without access to the Denver facility, SAG's online database or the source code for ADABAS and NATURAL, Consist does not have the capacity to offer anything other than the most rudimentary (Level 1) software support for SAG's products. Similarly, Consist's lack of access to product versions, upgrades and fixes, updated associated materials and training, and revisions to provide maintenance means that Consist cannot offer its customers meaningful support for the Software AG products they have purchased.

35. The 1998 Agreement anticipated that this would happen if the parties terminated their relationship and provided for that possibility. Paragraph 5(4) of the agreement explicitly states that Consist was responsible for providing maintenance to its customers, but only "... until termination of the Agreement including any extension thereof." At the trial of the prior lawsuit between the parties, the attorney who drafted the 1998 Agreement testified, under questioning by Consist's lawyer, that the eighteen month period between Software AG's notice of intent not to renew Consist's distributorship for another five years and the termination date, was to be used to transfer the distributorship (including the maintenance function) seamlessly from Consist to Software AG. (*See* 12/12/07 Hearing Transcript at 82, No. 07-7047, Dkt. #62.) Unfortunately, neither Consist nor Software AG took the timely action that was necessary to allow the parties to use that eighteen month period for the purpose for which it was intended.

36. Without access to adequate maintenance services, users of Software AG products could experience great technical difficulty with their computer software, which would result in their understandable dissatisfaction with Software AG products and serious injury to the

9

reputation of the products and of their producer, Software AG.

## The Notices

37. On or about January 8, 2008, Consist-Brazil posted two notices on its website in Brazil. The notices, which were in Portuguese, contained the following statements:

> We explained that all our contractual obligations assumed for our customers, including continuing Technical Updating and providing product support services for Software AG, will continue to be fully accomplished . . . . Such obligations for CONSIST are contractually backed by SAGA / Software AG, authorizing CONSIST to grant as many software use licenses as Technical Updating for temporary or perpetual periods (clause 3 of the contract: "... to grant perpetual or time-limited license, and/or maintenance agreements..."). Such being the case, we will make any (and all) software updates that are internationally released by Software AG available to our Technical Updating customers, just as we have been doing for 33 years with exclusive distribution of Software AG's software.

(*See* Compl. Ex. 6.) Fridman's electronic signature appears at the bottom of the notices.

38. The above-quoted statements are literally false. Under the 1998 Agreement, Consist's responsibility for providing maintenance services to its customers ended with the termination of the Agreement, per Paragraph 5(4) of the Agreement.

39. Despite Consist's contention, Paragraph 3 of the 1998 Agreement does not give Consist the right to enter into any maintenance agreements that extend beyond the expiration of the Agreement. Paragraph 3 authorizes Consist to grant "perpetual or time-limited licenses, and/or maintenance agreements." This does not authorize Consist to enter into "perpetual . . . maintenance agreements." The adjective "perpetual" modifies only the word "licenses;" it does not modify the phrase "maintenance agreements." Paragraph 5(4) of the Agreement specifically states that Consist's obligation to provide customer maintenance ends when the Agreement terminates. This specific reference renders impossible any reading of Paragraph 3 that authorizes Consist to enter into maintenance agreements that run beyond the expiration of the Agreement.

40. Consist well understands this; indeed, Fridman admitted under oath that he was unaware of any "perpetual" maintenance agreement between Consist and any of its customers. The concept of a "perpetual" maintenance agreement is unknown in the computer software industry— maintenance agreements ordinarily run for a term of years and end when a distributorship concludes. (*See* Tr. at 99; Paragraphs 18-21 of the Declaration of David A.

10

MacSwain in Support of Software AG's Motion for an Order to Show Cause for Temporary Restraining Order, A Preliminary Injunction and Expedited Discovery in Aid of the Injunction Hearing ("MacSwain Decl."), filed January 15, 2008.))

41. Although Consist argues that the notices constituted only statements of Consist's good faith belief about its rights under the Agreement, Consist could not have entertained any "good faith" belief that it was authorized to continue to provide maintenance to customers after the 1998 Agreement expired. Nor could Consist "in good faith" have entered into contracts that obligated it to provide maintenance services after the termination of the 1998 Agreement. Any such "good faith" belief is contradicted by the plain language of Paragraphs 3 and 5(4) of the Agreement (which must be read together, since Paragraph 5(4) specifically addresses the end of Consist's obligation to provide maintenance to Consist-Brazil's customers). It is also contradicted by the fact that the 1998 Agreement neither (I) obligates Software AG to provide post-termination access to products and services needed to provide customer maintenance, nor (ii) provides for payment to Software AG for post-termination access to those products and services (which had been provided without charge during the term of the 1998 Agreement), nor (iii) obligates the parties to negotiate in good faith to arrive at a schedule of payments to cover the cost of those goods and services following the expiration of the Agreement. Finally, any "good faith" belief in this bizarre interpretation of Paragraph 3 of the Agreement is also belied by the failure of Consist to enter into any "perpetual" maintenance agreements during the entire term of the 1998 Agreement.

## The Value of Software AG's Trademarks

42. The marks NATURAL and ADABAS have been used in the software industry for over forty years by Software AG and its contractually authorized distributors – and only by them – to refer to certain products created, manufactured and maintained by Software AG. These marks are associated with the products of Software AG throughout the world. The marks have never been used to refer to the distributors without the products, or to any products other than Software AG products that may be associated with the distributors. To the extent that the marks have been used by the distributors, they have been used to refer to Software AG's products; and to the extent that the marks have become identified with any distributor in any territory, it is as a distributor of the products manufactured by Software AG.

43. The inherent value of the trademarks was recognized in the series of distribution agreements between the parties. In the 1984 Agreement (Paragraph 5(1)), Consist's predecessor in interest, PACS, expressly covenanted to:

> ... refer to authorship of SAG and will show copyright and
> trademark of SAG ...

*     *     *     *     *     *     *     *     *     *     *

11

> . . . acknowledge[] the SYSTEMS [NATURAL and ADABAS] and
> all documentation or information as a trade secret of SAG and
> undertake[] to oblige also its own personnel to protect the
> SYSTEMS as well as their copyrights and trade-marks and to
> prevent it from unauthorized use.

44. When Schnell gave Fridman permission to register the NATURAL and ADABAS
marks in Brazil, it was against the backdrop of PACS' express contractual undertaking to protect
the NATURAL and ADABAS trademarks on behalf of Software AG, as well as to prevent any
unauthorized use of those trademarks – including unauthorized use by "its own personnel," who
were specifically obligated to protect Software AG's trademarks. One of "its own personnel," of
course, was and is Fridman, who is also the head of Consist Software Solutions, Inc. (f/k/a
Consist International, Inc.) and of Consist-Brazil. Because of the contractual obligation
undertaken by PACS – an obligation the fulfillment of which was expressly warranted by both
Fridman and by Consist-Brazil (1984 Agreement ¶ 10) – Schnell had no reason to believe that
Consist would attempt to assert ownership over the NATURAL and ADABAS marks otherwise
than as the agent for Software AG.

45. The parties reinforced their mutual understanding of the inherent value of the
trademarks in the 1998 Agreement (Paragraph 5(1)), in which Consist covenanted to:

> take all necessary and reasonable measures to ensure
> that the proprietary nature and integrity of the SYSTEMS
> are safeguarded against unauthorized use, duplication or
> modification . . .

> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

> acknowledge[] the SYSTEMS and all documentation or
> information as trade secrets of SAGA and undertake[] to
> oblige its personnel to protect the SYSTEMS as well as
> their copyrights and trademarks and to prevent them from
> unauthorized use.

This language – virtually identical to the language used in the 1984 Agreement – commits
Consist, as well as its wholly-controlled affiliate and agent, Consist-Brazil (which is expressly
included in the definition of "Consist" in the 1998 Agreement), to take whatever steps are
necessary to protect the trademarks NATURAL and ADABAS for the benefit of Software AG,
and not to perform any act that is inconsistent with, or in derogation of, the association between
those marks and the products of Software AG.

46. If Software AG were not to be permitted to use the trademarks NATURAL and

ADABAS in Brazil or elsewhere in the Territory to identify the computer software products with which those marks have been associated for over 30 years, it would wreak havoc in the international marketplace for Software AG products. Forcing Software AG to rebrand those products in South America would have monetary and economic costs that are impossible to estimate. Marketing identical Software AG products under different names in different countries would give rise to confusion among end users and would weaken the industry association between Software AG and its own products. The damage to Software AG's goodwill would be incalculable.

**Events Since the Hearing on the Application for a Preliminary Injunction**

47. The Court has been advised of several matters pertinent to Consist's good faith and bona fides that were not called to its attention at the hearing on Software AG's application for a preliminary injunction. First, Consist failed to comply with its discovery obligation to produce documents concerning the registration of Software AG trademarks within the Territory. On January 16, 2008, Software AG requested production of, "All documents concerning Consist's ownership of, right to, pursuit of or maintenance of any intellectual property tights in the Territory, including but not limited to the trademarks ADABAS and NATURAL." (Dkt. # 36, Gasparo Decl. Ex 1, RFP No. 15.) Two days later, in a memo-endorsed order, this Court directed Consist to comply with Software AG's document request. Despite this Court's explicit instruction, not to mention its obligations under the Federal Rules of Civil Procedure, Consist did not produce documents, or otherwise reveal (including at the hearing on Software AG's application for a preliminary injunction) that it had registered Software AG trademarks in two other countries within the Territory: Argentina and Uruguay. In preparing its submission to the Court's February 1, 2008 notice to counsel, Software AG discovered that Consist had registered NATURAL and ADABAS in Uruguay, and NATURAL, ADABAS, and four other Software AG products (TAMINO, ENTIRE, COM-PLETE, and PREDICT) in Argentina. (Dkt. #32, Salaverry Decl. ¶ 6; Dkt. #31, Malone Decl. ¶¶ 5-6.)

48. The Court has also been advised that, since the end of the preliminary injunction hearing, Consist and/or Consist-Brazil have gone to court in Brazil and have commenced two lawsuits: Consist Consultoria Sistemas E Representacoes LTDA v. Software AG Informatica E Servicos LTDA and Consist Consultoria Sistemas E Representacoes LTDA and Consist Software LTDA v. Software AG and Software AG Brazil Informatica E Servicos LTDA. In these actions, Consist has obtained, *ex parte*, orders that (1) enjoin Software AG from using its own trademarks, NATURAL and ADABAS, in connection with the distribution and maintenance of its own products in Brazil, and (2) direct Software AG to provide Consist with access to maintenance services and products that Software AG has no contractual obligation to provide and that Consist has no contractual right to receive. This Court does not know whether Consist has accurately and fully advised the Brazilian court about the pendency of this action, or about the fact that, even as its applications were being made, this Court was preparing a decision – after a full hearing at which both sides had every opportunity to present their positions – relating to the

13

very issues that were the subject of the *ex parte* applications in Brazil. However, the Court specifically finds that Consist, Fridman and their United States counsel, the law firm of Duane Morris LLP, acted in bad faith, and with the intent to compromise this Court's ability to rule on the matters before it and to issue effective relief, when Consist's counsel sought and received an adjournment of its obligation to respond to post-hearing questions from the Court without advising the Court that these applications had been or were about to be made.

## CONCLUSIONS OF LAW

### Likelihood of Success:  Breach of Contract Claim (Entering into Maintenance Agreements that Extend Beyond December 31, 2007)

1. To establish a claim for breach of contract under New York law, a plaintiff must prove: (1) the existence of a contract; (2) breach of the contract by the other party; and (3) damages resulting from the breach. *See, e.g.*, Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000).

2. Whether a contract term is unambiguous is a question of law to be resolved by the court, and evidence from outside the four corners of the document is generally inadmissible in resolving this question. Baum v. County of Rockland, 337 F. Supp. 2d 454, 466 (citing W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990)).  The Court finds that Paragraph 3 of the Agreement is unambiguous, for the reasons that follow.

3. Certain maxims of contract construction under the law of the State of New York must be kept in mind in construing the Agreement. Contracts will be construed so as to make sense and will not be construed so as to create ambiguities. *See* 22 N.Y. Jur. 2d Contracts §§ 214, 218 (2008).  Contracts will be construed in a manner that gives effect to every provision therein.  22 N.Y. Jur. 2d Contracts § 249 (2008).

4. Under the Uniform Commercial Code ("UCC") and relevant case law, evidence of industry custom, course of dealing, and course of performance may be considered, even without a determination by the court that the language used is ambiguous. *See* N.Y. U.C.C. Law § 2-202; Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F. Supp. 2d 377, 390 (S.D.N.Y. 2005).

5. Article 2 of the UCC applies to this Agreement – even though it is a mixed contract for goods and services – because the overall Agreement is predominantly one for the sale and delivery of goods— namely, Software AG's software products. *See, e.g.*, Long Island Lighting Co. v. Imo Industries Inc., 6 F.3d 876, 888 (2d Cir. 1993) (applying New York law); Coastal Aviation, Inc. v. Commander Aircraft Co., 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996).

6. Industry custom dictates that Paragraph 3 of the Agreement only grants to Consist the right to issue maintenance agreements during the term of the distributorship agreement.  With

enterprise software such as ADABAS, it is typical for a manufacturer or distributor to grant a perpetual license for the software, and then for the manufacturer or distributor to enter into a separate, fixed-term maintenance agreement with those customers. Perpetual maintenance agreements do not exist because they would result in an open-ended, potentially unlimited commitment of resources by the service provider. *(See* MacSwain Decl. ¶¶ 15-25.)

7. In light of the foregoing principles and Findings of Fact 16-17 & 38-41, this Court finds Paragraphs 3 and 5(4) of the 1998 Agreement, read together, to be unambiguous. Under those paragraphs, Consist was not authorized to provide maintenance to customers after the 1998 Agreement expired. Paragraph 3 authorizes Consist to grant "perpetual or time-limited licenses, and/or maintenance agreements, . . . ." Contrary to Consist's argument, this does not authorize Consist to enter into "perpetual . . . maintenance agreements." The adjective "perpetual" modifies only the word "licenses;" it does not modify the phrase "maintenance agreements." Consist could grant its customers perpetual use licenses for specific Software AG products, but not perpetual maintenance agreements.

8. This conclusion is further supported by the fact that the 1998 Agreement neither (i) makes provision for post-termination access to products and services needed to provide maintenance to customers, nor (ii) sets a schedule of payment for that access; nor (iii) obligates the parties to negotiate in good faith to arrive at a schedule of payments to cover the cost of those goods and services following the expiration of the Agreement. Such provisions would be highly material, because during the term of the 1998 Agreement, while Consist was generating income for Software AG, Consist had free access to maintenance services from Software AG. After the term expired, Consist was no longer making any payments to Software AG.

9. To the extent that Consist or Consist-Brazil has entered into agreements with customers that obligate it to provide maintenance to those customers on or after January 1, 2008, it was not contractually authorized to enter into those agreements and it did so at its peril.

10. Consist-Brazil has at all times operated as the agent of Consist (which holds the actual distribution rights under the 1998 Agreement and prior Agreements) in Brazil. Its rights are no greater than those of its principal, *cf.* RESTATEMENT (THIRD) OF AGENCY § 3.04 cmt. b (2007), and it is similarly bound by any restrictions agreed to by its principal. Therefore, Consist-Brazil's ability to enter into either supply or maintenance agreements is no greater than is Consist's, the company that, as a matter of New York contract law, was the exclusive distributor in the Territory.

11. By allowing its agent, Consist-Brazil, to enter into agreements that extend beyond the expiration of Consist's distributorship, Consist has breached the 1998 Agreement.

**Breach of Contract Claim: Irreparable Injury**

12. To the extent that Consist is paid money from its customers pursuant to such

15

unauthorized maintenance contracts – money that would otherwise have gone to Software AG under the new, post-expiration maintenance contracts it should have had the ability to enter – the amount of defendant's damage would appear to be readily ascertainable.

13. However, this is a rare breach of contract claim that carries with it the distinct possibility of irreparable injury. Consist has, through the medium of its agent, Consist-Brazil, entered into 179 contracts with Brazilian customers for the provision of maintenance services after January 1, 2008. This has led to substantial customer confusion. Moreover, because it is impossible for Consist-Brazil to provide adequate service to those customers, this particular breach of contract will inevitably injure Software AG's reputation in the Brazilian market. As the number of customers needing sophisticated maintenance and not receiving it grows – which will happen with the passage of time – the injury to Software AG's reputation will grow.

14. Furthermore, it appears that Consist-Brazil (which, as this Court has repeatedly found, has no rights beyond the rights of its principal, Consist) has gone to a Brazilian court and obtained an *ex parte* order obligating Software AG to provide it with access to goods and services so that Consist-Brazil can meet the obligations it undertook (on behalf of its principal, Consist) by improvidently entering into patently illegal and unauthorized "contracts." Software AG is now caught between a rock and a hard place, as vindication of its absolute right to be quit of any relationship with Consist will necessarily result in non-compliance with the order of the Brazilian court. Such non-compliance would lead to enforcement of the order by the Brazilian court, and would multiply the injury to Software AG's reputation in the Territory.

## Lanham Act False Advertising Claim: Likelihood of Success on the Merits

15. Section 43(a) of the Lanham Act prohibits the commercial use of any false or misleading representation of fact, which would either (1) cause confusion about the origin or affiliation of a product or service ("false designation of origin"), or (2) constitute a misleading representation about the nature or geographic origin of the product or service being offered ("false advertising"). 15 U.S.C. § 1125(a).

16. To succeed on a false advertising claim, a plaintiff must demonstrate that some aspect of a defendant's advertising practices is either (1) literally false, or (2) true, but nevertheless is likely to injure the plaintiff by misleading and confusing consumers concerning the nature and characteristics of the defendant's products or services. *See* Register.com, Inc. v. Domain Registry of Am., 2002 U.S. Dist. LEXIS 24795, *26-28 (S.D.N.Y. Dec. 27, 2002); *see also* Coca-Cola v. Tropicana Prods., Inc., 690 F.2d 312, 317 (2d Cir. 1982).

17. Plaintiff alleges that injunctive relief is necessary to prevent Consist from making representations about its ability to provide maintenance services to its customers after January 1, 2008 that are literally false. The statements made by Consist to its customers concerning its ability to provide maintenance to those customers after January 1, 2008 are literally false.

18. Although the literally false representations were made by Consist-Brazil on a Brazilian web site in Portuguese, they were made by Consist-Brazil with the knowledge and approval of defendants Consist International and at the specific behest of Fridman.

19. Where an advertisement is literally false, the court may enjoin its use without reference to its impact on the consumer. *See* McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991).

20. Fridman's purported good faith belief or opinion about the truthfulness of defendants' literally false representations would afford defendants no defense to a false advertising claim under the Lanham Act. A representation about a product is considered a statement of opinion, not fact, only when it is mere "puffery," *i.e.*, a statement about a product that is "not capable of objective verification" and is an "exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying." *See* Robert Groden v. Random House, Inc. et al., 1994 U.S. Dist. LEXIS 11794, at *17, 21 (S.D.N.Y. Aug. 22, 1994); Time Warner Cable, Inc. v. DirecTV, Inc., 497 F.3d 144, 160 (2d Cir. 2007).

21. Consist's statements about its ability to offer ongoing maintenance services for Software AG's products are misleading statements of fact, not puffery, in that they are not exaggerated boasts, but are, rather, capable of verification.

22. Moreover, the Court specifically finds that Consist did not have a good faith belief that these statements were true. It is the finding of this Court that Fridman at all times knew that the statements about Consist's ability to provide ongoing maintenance services after January 1, 2008 were absolutely false.

23. Because the statements in the advertisement are literally false, plaintiff has satisfied the standard for likelihood of success. However, since no literally false statement was directed into the United States or to a U.S. customer, the plaintiff's likelihood of success on the merits of this particular Lanham Act false advertising claim depends on whether the Lanham Act applies to literally false statements made extraterritorially.

24. The Lanham Act applies extraterritorially if and only if there is a substantial effect on United States commerce. *See* Atl. Richfield Co. v. ARCO Globus Int'l Co., 150 F.3d 189, 192 n.4 (2d Cir. 1998). In the Second Circuit, a three factor test is used to determine whether to apply the Lanham Act to extraterritorial conduct: (1) whether the defendants' conduct has a substantial effect on United States commerce; (2) whether the defendant is a United States citizen; and (3) whether there exists a conflict with trademark rights under foreign law. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 642 (2d Cir. 1956). None of these three factors is dispositive; rather, courts are to balance the factors in deciding whether the "contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction." Warnaco Inc. v. VF Corp., 844 F. Supp. 950 (S.D.N.Y. 1994). The Second Circuit has held that a minimum of two factors must be satisfied before courts will apply the Lanham Act

17

extraterritorially. *See* Totalplan Corp. of America v. Colborne, 14 F.3d 824, 831 (2d Cir. 1994).

25. Consist is a United States corporation with its principal place of business in New York City, and Fridman has resided in New York since 1988. Therefore, the "citizenship" factor of the Vanity Fair Mills test is satisfied.

26. There is no relevant conflict between United States and foreign law. Because Fridman's representations about Consist's ability to provide maintenance to its customers are literally false, such representations would contravene the purpose of the relevant laws both in Brazil and in the United States. Brazilian law prohibits the publication of false information in order to obtain a competitive advantage. (*See* Flesch Decl. ¶¶ 42-45, Dkt. #30; Industrial Property Law of Brazil, no. 9279/96 (May 14, 1996), as amended by Law 10.196 (February 14, 2001).) Like the Lanham Act's prohibition against false advertising, Brazil's law is intended to protect against deceit in the marketplace. Therefore, there is no indication of a conflict with foreign law which would be material to plaintiff's false advertising claim under the Lanham Act.

27. Finally, the defendants' continuing misconduct will have a substantial effect on U.S. commerce. Support services (beyond basic Level 1 support) for Brazilian users of Software AG products are provided out of SAG's North American support facility. This facility, which employs 125 persons, is located in Denver, Colorado. Without access to this facility and its staff, Consist cannot fulfill any obligation it may have undertaken pursuant to any contract to provide post-January 1, 2008 maintenance. Consist's misrepresentations about its ability to provide maintenance services after December 31, 2007, have substantially affected U.S. commerce by causing confusion among Brazilian customers about who can and cannot provide them with support for their products. *See* Tr. at 64-65, 72-73; *cf.* Warnaco, 844 F. Supp. at 951. As a result of this confusion, Brazilian consumers have been hesitant to enter into, and have refused to enter into, maintenance agreements with SAG. That hesitancy can only have been enhanced by the *ex parte* order of the Brazilian court that directed Software AG to continue providing Consist (through its agent, Consist-Brazil) with access to U.S.-based maintenance services. Were these customers to enter into maintenance contracts with Software AG as of January 1, 2008 – as is clearly contemplated by the 1998 Agreement – those contracts, worth many millions of dollars, would be performed in substantial part from the maintenance facility in Denver, by those United States workers. Even assuming that (i) the monthly fee under these 179 maintenance agreements is, on average, only $40,000 per month (about half of the PRODESP fee), and (ii) the agreements, on average, only post-date the expiration of the Agreement for half a year, the contracts would implicate more than $40 million in commercial activity that has a direct impact on the United States.

28. Having applied the Vanity Fair Mills factors to the facts of this case, I conclude that, on balance, extraterritorial application of the Lanham Act is appropriate. Software AG has demonstrated a likelihood of success on its claim for false advertising under the Lanham Act.

**Lanham Act False Advertising Claim: Irreparable Injury**

29. To obtain injunctive relief on a false advertising claim under the Lanham Act, a plaintiff must demonstrate that it is likely to suffer irreparable harm in the absence of injunctive relief. The Second Circuit has stated that a plaintiff, in demonstrating that it is likely to suffer irreparable harm, "'need not . . . point to an actual loss or diversion of sales'" because, "'[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement.'" Time Warner Cable, 497 F.3d at 161 (quoting Coca-Cola, 690 F.2d at 316).

30. This Court has been advised that, sometime between February 1 and February 14, 2008, a court in Brazil entered an *ex parte* injunction directing Software AG to provide Consist with access to maintenance products and services on an ongoing basis – even though Software AG has no contractual obligation to do so. (*See* 2/14/08 Letter to Court from James D. Jacobs.) The effect of this mandatory injunction (which was obtained without giving Software AG any notice or opportunity to be heard) will be three-fold. First, former customers of Consist will not enter into maintenance contracts with Software AG customers, even though Software AG is the only entity that can legally offer these services following the Agreement's expiration date. Second, Software AG's ability to become its own distributor in the Brazilian market – something it has the absolute right to become as of January 1, 2008 – will be gravely compromised if Software AG has to comply with this injunction in order to do business in Brazil. Third, because the 1998 Agreement contains neither an express provision about payment for such services (which were provided for free as long as Consist was the exclusive distributor for Software AG), nor any provision obligating the parties to negotiate in good faith for appropriate fees for such services (which is understandable, since no such services were contemplated by the parties when they entered into the 1998 Agreement), the net effect of the Brazilian injunction is to require Software AG to provide products and services to Consist for free without receiving any income from Consist, its former distributor. All of the above constitutes irreparable injury.

**Likelihood of Success: Breach of Contract Claim (Reassignment of Trademark/Specific Performance)**

31. This Court, in determining foreign law, may consider any relevant material or source, whether or not it is admissible evidence or submitted by a party. The foreign law determinations made by the Court are treated as rulings on questions of law. *See* Fed. R. Civ. P. 44.1.

32. German law governed the relationship between Software AG and Consist until January 1, 1995, when New York law was substituted as the governing law.

33. The nature of the agreement between Consist and Software AG regarding the registration of the trademarks in the Territory depends on the interpretation of the oral agreement between Mr. Fridman and Mr. Schnell, authorizing Consist to register the marks. Under German

law, fundamental principles of good faith and fair dealing must be considered in construing a contract or interpreting an oral agreement between parties. External circumstances surrounding an oral or written party declaration may be examined to determine the intent of that party. (*See* Fammler Decl. ¶¶ 5, 18.)

34. The 1984 agreement between PACS (Consist) and Software AG constitutes the external circumstances under which Consist and Software AG declared their intentions regarding the relationship between them. (*See* id. ¶ 19.) That agreement contractually obligated Consist (and Fridman and Consist-Brazil, which specifically guaranteed Consist's obligations) to protect Software AG's systems and their trademarks.

35. Therefore, when Consist-Brazil registered ADABAS and NATURAL in the Territory in its own name, it did so pursuant to Consist's contractual obligation to protect the trademarks and its own guarantee of that obligation. (*See* Fammler Decl. ¶ 20.)

36. Under German law, a distributor's right to use the principal's trademark ceases upon termination of the distribution agreement. (*See* Fammler Decl. ¶ 23; Stumpf, Der Vertragshandlervertrag, 3rd edition 1997, note 725.) Therefore, at the time the marks were registered by Consist-Brazil, the governing law required that the marks be conveyed back to Software AG upon termination of the relationship of distributor and principal.

37. Although the law governing the interpretation of the parties' contracts changed to New York law in 1995, the substance of the relative rights and obligations of the parties did not. Consist (through the medium of its agent, Consist-Brazil) had already registered the trademarks in the Territory pursuant to their mutual contractual obligation to protect Software AG's intellectual property. Accordingly, Consist continued to hold those trademark registrations (through its agent, Consist-Brazil) for the benefit of Software AG, and had an implied contractual obligation to transfer these trademark registrations to Software AG when the distribution relationship between the parties expired. (*See* Fammler Decl. ¶ 22-25, 28.)

38. No statute of limitations bars Software AG from obtaining an order directing Consist to cause Consist-Brazil (or any other Consist entity that has registered marks associated with Software AG products) to assign the trademarks to Software AG. While Consist-Brazil registered the marks in the mid-1980s, the breach of contract here alleged is the breach of the contractual obligation to turn the Brazilian trademarks over to the entity on whose behalf Consist (through Consist-Brazil) was protecting those marks. No breach of contract claim for failure to convey the trademarks accrued until January 1, 2008. Until then, Consist (through its agent, Consist-Brazil) rightfully held the registrations pursuant to the series of exclusive distributorship agreements under which it was obligated to protect the trademarks in the Territory. Only when the distributorship terminated on December 31, 2007 – and Consist refused to assign the Brazilian trademark registrations to Software AG – did Consist breach its duty of good faith and fair dealing to Software AG.

20

39. Defendants make much of the fact that consent to the registration of a trademark cannot subsequently be revoked, absent an explicit contractual provision allowing such revocation. But revocation of consent – or revocation of the trademark registrations in Brazil – is not at issue in this case. Rather, the issue is whether the Brazilian trademarks should be *conveyed* to Software AG upon termination of the relationship between the parties.

40. Defendants argue that, because Consist-Brazil has not been named or served as a defendant in this action, any order directing it to assign its ADABAS and NATURAL trademarks in Brazil to Software AG would deprive Consist-Brazil of property without due process of law. They contend that a trademark cannot be assigned without the goodwill associated with the trademark, and that the goodwill in the Brazilian trademark registrations for ADABAS and NATURAL resides with Consist-Brazil. To the contrary, the goodwill associated with the trademarks is the goodwill of Consist's business, not of Consist. The goodwill of the business associated with the trademarks NATURAL and ADABAS resides entirely in Consist's distribution of Software AG products. Consist no longer has the right to distribute Software AG products, so it no longer enjoys any rights to the goodwill of the business that is associated with the marks. As to Consist-Brazil, it acted at all times as the agent for Consist (the actual holder of the exclusive distributorship rights) in Brazil. It had no rights under either the 1984 Agreement or the 1998 Agreement that were not derivative of the rights of its principal, and its rights thereunder were no greater than the rights of its principal. Consist, the principal, has had a full and fair opportunity to litigate this claim in the jurisdiction chosen by the actual parties to the agreements, and under the law chosen by those parties. Therefore, it does not violate due process to direct Consist to cause Consist-Brazil, its wholly controlled affiliate and agent, to convey or assign the Brazilian trademarks to Software AG.

41. Under New York law, which governs the 1998 Agreement, implicit in all contracts is a covenant of good faith and fair dealing. *See* Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995); *accord* Filner v. Shapiro, 633 F.2d 139, 143 (2d Cir. 1980). This covenant encompasses the performance of "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" Dalton, 87 N.Y.2d at 389 (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69, 385 N.E.2d 566, 569 (1978)). This Court finds that Consist breached the implied covenant of good faith and fair dealing by refusing to convey the trademark registrations in the Territory to its rightful owner (Software AG) when the 1998 Agreement terminated.

42. Consist's rights to use Software AG's trademarks in the Territory ceased when the distribution relationship expired. Courts have held that, absent a clear manifestation of intent by a supplier to transfer ownership of a trademark to a distributor, the supplier remains the rightful owner of the trademark registrations upon termination of the distributorship relationship. *See, e.g.*, Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d. 329, 336 (S.D.N.Y. 1999); Columbia Nastri & Carta Carbone, S/p/A v. Columbia Ribbon & Carbon Mfg. Co., 1965 U.S. Dist. LEXIS 6862 (S.D.N.Y. Nov. 23, 1965), *aff'd* 367 F.2d 308 (2d Cir. 1966). There is no evidence in this record of any clear manifestation by Software AG to transfer ownership of the

marks associated with its products to a former distributor. Consist's trademark registrations in
the Territory do not trump Software AG's ownership rights as to its own products.

43. <u>Columbia Nastri</u> bears a strong factual resemblance to this case, and Judge Palmieri's
thoughtful decision in <u>Columbia Nastri</u> informs this Court's conclusions of law here. In
<u>Columbia Nastri</u>, an American company manufactured carbon copy materials throughout the
world and used an Italian company as its foreign manufacturer and distributor. The agreement
between the parties granted the Italian company exclusive permission to use certain trademarks
in Italy and obligated the American company to provide technical assistance. The trademark
registrations in Italy were held in the name of the Italian company. After multiple extensions to
the royalty agreement, the parties were unable to reach agreement on a further extension. The
Italian company asserted that the Italian trademarks were its property because they were
registered in its name, and under Italian law the registrant is the owner. However, the district
court held that: the foreign trademarks were the property of the supplier; the foreign trademark
registrations were held by the foreign company as nominee and trustee for the supplier; and the
foreign company was entitled to use the trademark only in accordance with the terms of the
agreements with the supplier, and only while those agreements remained in effect. The court
ordered the Italian company to assign the foreign trademark registrations to the supplier and
enjoined the Italian company from using the supplier's trademarks in the foreign territory. *See*
<u>Columbia Nastri</u>, 1965 U.S. Dist. LEXIS at *6, 18-20. Judge Palmieri's decision was affirmed by
the Second Circuit. *See* <u>Columbia Nastri</u>, 367 F.2d at 313-14.

44. Consistent with <u>Columbia Nastri</u>, this Court holds that Software AG's trademarks in
the Territory, although registered in the name of Consist's agent, Consist-Brazil, are the property
of Software AG. They are associated with Software AG's products and the goodwill appurtenant
to those products, and they were registered by Consist-Brazil (acting as the agent for Consist and
the guarantor of its obligations under the 1984 Agreement) pursuant to Consist's contractual
obligation to protect Software AG's trademarks. Now that the contractual relationship between
the parties has terminated, Consist must transfer the trademark registrations in the Territory to
their rightful owner, Software AG. By failing to do so, Consist has breached the implied
covenant of good faith and fair dealing inherent in the 1998 Agreement.

**Breach of Contract Claim (Reassignment of Trademark/Specific Performance):**
**Irreparable Injury**

45. The trademarks ADABAS and NATURAL have been used throughout the world for
more than three decades to identify products of Software AG, and are associated everywhere with
the products known as ADBAS and NATURAL, which are manufactured by Software AG. If
Consist (through its agent Consist-Brazil) were able to control the trademarks associated with
Software AG's products – which Consist and its agents no longer has any right distribute –
plaintiffs would be irreparably injured. They were unable to call their operating systems and
associated products by the names that have become associated with those operating systems and

associated products, and they would be subject to harassment from Consist. There is no way to calculate the damage to Software AG, most especially to its business reputation, resulting from its inability to identify its own products by the names that have been long associated with those products. Neither is there any way to calculate the damage to Software AG if it were to have to rebrand ADABAS and NATURAL and their associated products in order to sell those products in Brazil. (*See* Tr. at 75, 106-07; Pl. Ex. 10.)

### Likelihood of Success: Tortious Interference with Prospective Business Relations

46. To establish a claim for tortious interference with prospective business relations under New York law, a plaintiff must demonstrate that: it had a business relationship with a third party; the defendant knew of that relationship and intentionally interfered with it; the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and the defendant's interference caused injury to the relationship. *See, e.g.*, Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006).

47. By entering into a new contract with PRODESP to provide maintenance services after December 17, 2007, when this Court announced its decision in the prior lawsuit, Consist tortiously interfered with the prospective business relations of Software AG, in that Software AG would have entered into maintenance agreements with those customers if Consist did not do so.

48. Consist could not have entertained any good faith belief that it was authorized to provide service to any of its customers after the expiration of the 1998 Agreement, for the reasons stated above. Furthermore, by entering into a maintenance agreement with PRODESP, Consist – knowing that plaintiffs had the prospect of entering into a commercial relationship with PRODESP as a result of this Court's decision – intentionally interfered with that relationship and did so solely out of malice or via dishonest, unfair or improper means. Fraud or misrepresentations to consumers are recognized as "wrongful means" that support of claim for tortious interference with prospective business relations. *See, e.g.*, Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190-92, 818 N.E.2d 1100, 1103-05 (2004) (citing authorities).

49. Consist's claim that it was acting to protect its legitimate business interests – which would, if true, defeat malice – is specious. From and after the announcement of this Court's decision, Consist well knew that the Agreement was going to expire on January 1, 2008. Consist took no steps to enjoin the effectiveness of this Court's Final Judgment pending appeal; instead, it let the Agreement expire, while acting to undermine the ability of this Court to enforce its order, and doing so through the medium of an agent, Consist-Brazil, that was not a party to either action.

23

**Balance of Equities**

50. The Court has found that plaintiffs are likely to succeed on all of the above claims. But even if Software AG had only succeeded in raising serious questions going to the merits of its asserted claims, it would be entitled to a preliminary injunction, because the balance of equities tips decidedly in its favor. *See, e.g.*, Green Party v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004).

51. Software AG faces the loss of its right to use trademarks that have long been associated with its products – some for over 30 years – in a significant and growing market (South America) where hundreds of customers in seven countries use SAG software. It also faces the loss of goodwill associated with its products from rampant confusion over Consist's ongoing ability to provide maintenance services.

52. By contrast, no equities favor Consist. It waited until four months before the end of the 18 month notice period to bring an action to resolve whether it could continue as a Software AG distributor, eschewed this Court's offer to hold an expedited hearing on its application to enjoin the expiration of the 1998 Agreement (preferring a leisurely course that set the hearing for three weeks before the Agreement was to expire), and then declined to take an expedited appeal from the Court's final decision allowing the Agreement to expire. It entered into ongoing maintenance agreements with customers after it had been notified that its long-standing position as Software AG's distributor was about to expire. It took no steps to clarify its status in time to allow for a meaningful turnover of responsibility to Software AG. Knowing that its status as a Software AG distributor was imperiled, it undertook, through affiliates or subsidiaries, to register trademarks it was about to lose the right to use.

53. Finally, and most important, defendants deliberately altered the status quo during the pendency of the action by going, *ex parte*, to Brazilian courts (through the medium of their wholly controlled affiliates or subsidiaries in Brazil), to obtain orders relating to the matters in suit while those very issues were *sub judice*. This was done without notice to either Software AG or to this Court. As a result, this Court has no reason to believe that our esteemed colleagues in Brazil were apprised of the fact than this Court had already held full hearings on, and was in the process of deciding, issues that are relevant to the matters in suit in Brazil. As far as this Court is concerned, Consist and Fridman are here with unclean hands.

**A Mandatory Injunction to Restore the Status Quo *Pendente Lite* is Necessary and Appropriate**

54. The standards for granting a preliminary injunction are irreparable injury and either a likelihood of success on the merits or a sufficiently serious question going to the merits coupled with a balancing of the equities favoring the party seeking injunctive relief. *See, e.g.*, Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006). The burden of

proof rests with the party seeking the injunction.

55. To obtain mandatory injunctive relief, the party seeking the injunction must satisfy a higher burden than is necessary to obtain a preliminary injunction. A preliminary injunction is prohibitory, maintaining the status quo by restraining an actor from doing something, whereas a mandatory injunction compels an affirmative act or mandates a course of conduct. The Second Circuit has instructed that to obtain mandatory injunctive relief, a plaintiff must show a "clear" or "substantial" likelihood of success on the merits, not just a likelihood of success. *See, e.g.*, Louis Vuitton Malletier, 454 F.3d at 114 (citations omitted); Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004); Christie-Spencer Corp. v. Hausman Realty Co., Inc., 118 F. Supp. 2d 408, 418 (S.D.N.Y. 2000).

56. However, "'where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo.'" Moore v. Consol. Edison Co. of New York, Inc., 409 F.3d 506, 510 n.4 (2d Cir. 2005) (quoting Porter v. Lee, 328 U.S. 246, 251 (1946)). As discussed above, Fridman and Consist certainly had notice of the proceedings before this Court, yet they deliberately altered the status quo by seeking relief, *ex parte*, from courts in Brazil.

57. The Court finds that plaintiffs have shown, not just a likelihood of success on the merits, but a clear and substantial likelihood of success on the merits, of all their claims in suit. Therefore, mandatory injunctive relief is appropriate to restore the status quo.

58. In order to restore the status quo, the Court will have to order Consist and Fridman to cause Consist-Brazil, and any other foreign subsidiaries or affiliates of Consist who have been acting as its agents under the 1998 Agreement and its predecessors, to take certain actions, and refrain from taking certain actions, in courts and administrative or governmental agencies of the countries in the Territory.

59. The power of federal courts to enjoin foreign suits by persons subject to their jurisdiction is well established. China Trade and Development Corp. v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987) (citing U.S. v. Davis, 767 F.2d 1025, 1038 (2d Cir. 1985), and Laker Airways, Ltd. v. Sabena Belgian World Airlines, 731 F.2d 909, 926 (D.C. Cir. 1984)). Although an injunction operates only against the parties, and not directly against the foreign court, the need for due regard of international comity principles still exists because such an order effectively restricts the jurisdiction of the foreign court. *See* id. at 35-36 (citing Davis, 767 F.2d at 1038).

60. In China Trade, the district court (Motley, J.) had enjoined the defendant from proceeding with an action against plaintiffs in the courts of Korea. The district court granted the injunction because it found that (1) the parties in the Korean action were the same as in the New York action; (2) the issue of liability raised by defendant in the Korean court is the same issue of liability raised in New York; (3) the Korean litigation would be vexatious to the plaintiffs in the U.S. action, which was commenced first; and (4) allowing the Korean litigation to proceed would

result in a race to judgment. 837 F.2d at 34.

61. To determine whether to enjoin the foreign litigation, Judge Motley employed a test that had been used by some judges in the Southern District, and which is now known as the China Trade test. First, two threshold requirements for an anti-foreign-suit injunction must be met: (1) the parties must be the same in both matters, and (2) resolution of the case before the enjoining court must be dispositive of the action to be enjoined. If these two threshold requirements are met, five further factors should be considered: (1) frustration of a policy in the enjoining forum; (2) vexatiousness of the foreign action; (3) whether there is a threat to the issuing court's *in rem* or *quasi in rem* jurisdiction; (4) whether the proceedings in the other forum prejudice other equitable considerations; and (5) whether adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment. *See* China Trade, 837 F.2d at 35. The district court found that the two threshold requirements had been met, and that the vexatiousness and "race to judgment" factors were also satisfied. Considering these findings sufficient, the district court enjoined the foreign suit.

62. The Second Circuit reversed the district court, finding that the district court abused its discretion by issuing an anti-suit injunction because no important policy of the forum would be frustrated by allowing the Korean action to proceed, the Korean action posed no threat to the jurisdiction of the district court, and the equitable factors relied upon by the district court were not sufficient to overcome the restraint and caution required by international comity. Id. at 34, 37. The Second Circuit reasoned that the "vexatiousness" and "race to judgment" factors are likely to be present whenever parallel actions are proceeding concurrently, and therefore an anti-suit injunction grounded on these discretionary factors alone would undermine the policy that allows parallel proceedings and disfavors unnecessary anti-suit injunctions. The court then stated that a different two discretionary factors – whether the foreign action threatens (1) the jurisdiction of the enjoining forum, and (2) strong public policies of the enjoining forum – are more significant than the two factors relied upon in Judge Motley's decision. The Circuit noted that, while an anti-suit injunction may be appropriate when a party attempts to evade compliance with a statute of the forum that effectuates important public policies, an injunction is not appropriate merely to prevent a party from seeking "'slight advantages in the substantive or procedural law to be applied in a foreign court.'" China Trade, 837 F.2d at 37 (quoting Laker, 731 F.2d at 931 n.73). However, the Court of Appeals endorsed the application of the so-called China Trade test for deciding whether an injunction against foreign suits by persons subject to the jurisdiction of a U.S. court is appropriate.

63. The Second Circuit recently clarified the China Trade test in affirming the district court's issuance of an anti-foreign-suit injunction in Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111 (2d Cir. 2007). The Circuit first reiterated the essential elements of the test (i.e., an anti-suit injunction against foreign litigation may be imposed only if the two threshold requirements are met; if those two requirements are satisfied, then courts are directed to consider a number of additional factors, including whether the parallel litigation would: (1) frustrate a policy in the enjoining forum; (2) be vexatious; (3)

threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment). Karaha, 500 F.3d at 119 (citations and quotations omitted). The Second Circuit explained that although China Trade instructed that two of the five factors should be accorded greater significance, *all* of the additional factors should be considered when determining whether an anti-suit injunction is warranted. Karaha, 500 F.3d at 119.

64. The Karaha court made clear that the China Trade test applies to anti-foreign-suit injunctions both in cases where the parallel proceeding is initiated while a proceeding is pending in the domestic forum, as well as where a judgment has already been rendered in the domestic forum. *See* 500 F.3d at 120. The "discretionary" factors will tend to weigh in favor of an anti-foreign-suit injunction that is sought to protect a federal judgment, whereas principles of comity will weigh more heavily in the decision to impose a foreign anti-suit injunction where a judgment in the domestic forum has not yet been issued. Id.

65. The Second Circuit in Karaha found that the district court "properly considered" the discretionary factors under China Trade and found them supportive of injunctive relief. The Second Circuit then examined each of the threshold requirements (finding that they had been satisfied) and the discretionary factors (finding that they weighed in favor of entering an anti-suit injunction). Notably, the court stated that "'orders of foreign courts are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders.'" Karaha, 500 F.3d at 127 (quoting Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir. 2004) (internal quotations omitted) (citing Societe Internationale v. Rogers, 357 U.S. 197, 208-09 (1958))); *see also* Uzan, 388 F.3d at 60 (citing with approval Laker, 731 F.2d at 939-40, which refused to respect an English court's order where the "defendants involved in the American suit had . . . gone into the English courts to generate interference with the American courts").

66. In another recent case, International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd., 246 F. App'x 73 (2d Cir. 2007), the Second Circuit affirmed the district court's issuance of a preliminary injunction, finding that plaintiffs had satisfied the standard for obtaining a preliminary injunction, and that the anti-suit injunction analysis of China Trade tilted "strongly in plaintiffs' favor."

67. In this case, the two threshold China Trade factors are satisfied, and the remaining factors counsel strongly in favor of an anti-suit injunction addressed both to the existing lawsuits in Brazil and any pending administrative proceedings, as well as an injunction against the commencement of any further suits or proceedings in the Territory until such time as the contractual dispute between Software AG and Consist/Consist-Brazil is resolved.

68. The parties to all pending proceedings are the same. In order to obtain an anti-foreign-suit injunction, the moving party must show that "parties to both suits are substantially the same." Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc., 2003

WL 23641529, at *11 (S.D.N.Y. June 4, 2003). In Paramedics – a case which also involved a distributorship relationship, and a U.S. company with a Brazilian affiliate – the district court issued an injunction against prosecution of litigation in Brazil, finding that the China Trade factors were satisfied. Specifically, the district court stated that even though the parties were not identical in the Brazilian and U.S. proceedings (the Brazilian subsidiary was a party in Brazil, but not in the U.S.), the proceedings were "sufficiently similar in terms of parties to meet the first threshold criterion for an anti-foreign-suit injunction . . . ." Paramedics, 2003 WL 23641529 at *13. In reaching this conclusion, the court noted that the Brazilian subsidiary had "acted as [the U.S. company's] agent in [the U.S. company's] dealings . . ." Id. The Second Circuit upheld the anti-suit injunction, finding that the "district court did not abuse its discretion in ruling that the parties to the two actions are thus sufficiently similar to satisfy the first threshold requirement of China Trade." Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004). Other courts have endorsed similar reasoning. *See, e.g.*, Motorola Credit Corp. v. Uzan, 2003 WL 56998 (S.D.N.Y. Jan. 7, 2003) (finding sufficient similarity between parties, even though the parties to the two actions were not identical, because "the real parties in interest are the same in both matters"), *cited in* Paramedics, 369 F.3d at 652; SG Avipro Finance Ltd. v. Cameroon Airlines, 2005 WL 1353955, at *2 (S.D.N.Y. June 8, 2005) (same).

69. Consist has long insisted that Consist-Brazil is a separate entity, not before this Court; and Consist-Brazil is, as far as this Court is aware, the party plaintiff in the lawsuit or lawsuits in Brazil that resulted in the issuance of the *ex parte* orders. (*See* 2/20/08 Letter to Court from James D. Jacobs.) However, as is amply demonstrated above, there is no difference between Consist and Consist-Brazil. Consist – the party to the distribution agreements – has carried out its contractual obligations through the medium of its wholly controlled affiliate or subsidiary, Consist-Brazil. In other words, Consist-Brazil has at all times acted as the agent of Consist in the territory. Moreover, Consist-NY (through Fridman) controls and binds Consist-Brazil. Therefore, even though Consist-Brazil (as opposed to Consist NY) was the named plaintiff in the two lawsuits in Brazil, under the reasoning of Paramedics, the actions in Brazil and in this Court are "sufficiently similar in terms of parties" to satisfy the first threshold factor of China Trade.

70. Resolution of this case will be dispositive of the action to be enjoined. This Court has already decided that the 1998 Agreement was successfully terminated by Software AG and has now decided, preliminarily, that certain consequences flow from that fact. In particular, this Court has preliminarily determined that contracts entered into by Consist (through the medium of its agent, Consist-Brazil) and third parties are unauthorized beyond the date the distribution agreement was terminated, as is Consist-Brazil's claim to the Software AG trademarks in Brazil. Any preliminary or final injunction relating to these matters will be compromised by contrary orders from a foreign court – especially orders obtained *ex parte*, and without any assurance that our esteemed colleagues in Brazil have been fully advised of what is really going on here. This Court has been informed that the proceedings in Brazil pertain to precisely the same issues that are at the heart of the action here, namely, whether the trademarks in Brazil belong to Software

AG and whether Consist can continue to provide maintenance for Software AG products. (*See* 2/20/08 Letter to Court from James D. Jacobs, and accompanying Declaration of Marcio Polto.) The injunctions that Consist-Brazil has obtained *ex parte* interfere with this Court's ability to issue valid and binding orders directed to the same subject matter, and they expose Software AG to severe penalties and sanctions. (*See* id.) Resolution of the fully litigated proceedings currently before this Court would be dispositive of the proceedings that were just recently initiated in Brazil and that have not been fully litigated. Therefore, the second threshold factor of China Trade is satisfied.

71. Once past these two threshold requirements, courts are directed to consider additional, discretionary factors, including, *inter alia*, whether the foreign action threatens the enjoining court's jurisdiction and whether the foreign action would frustrate important policies of the enjoining forum. *See, e.g.*, Paramedics, 369 F.3d at 652; Suchodolski Assocs., Inc. v. Cardell Fin. Corp., 2006 WL 10886, at *2 (S.D.N.Y. Jan. 3, 2006). "[W]hen the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an [anti-suit] injunction . . . ." Paramedics, 2003 WL 23641529, at *14 (quotations and citation omitted). Consist should not be able to seek legal recourse from the Brazilian courts in a transparent attempt to deprive this Court of jurisdiction. This Court has already made a finding of bad faith with regard to Consist's actions in seeking and receiving an adjournment of its obligation to respond to post-hearing questions from the Court without advising the Court that *ex parte* applications for relief in the Brazilian courts were pending. (*See* Finding of Fact 48.) Moreover, as noted in the February 20, 2008 Declaration of Marcio Polto, the foreign injunctions obtained by Consist-Brazil pose a direct threat to this Court's jurisdiction. Defendants' "petition to the Brazilian courts was less of a 'parallel proceeding' entitled to comity and more of an attempt to defeat this Court's plain jurisdiction over their conduct." Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd., 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006). "Indeed, the justification for an anti-suit injunction crests when a party seeks the aid of a foreign proceeding in a blatant attempt to evade the rightful authority of the forum court." Id. at 563 (quotations and citation omitted); *see also* Uzan, 388 F.3d at 60.

72. Important policies of this forum are threatened by Consist's attempts to seek relief in Brazil. For example, Plaintiffs' claims implicate a federal statute, the Lanham Act, which embodies important public policies of the United States regarding trademarks and false advertising. *Cf.* Laker Airways Ltd., 731 F.2d at 931 n.73 ("An impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied . . . ."), *cited in* Paramedics, 2003 WL 23641529, at *15. There also exists a general policy interest in having the laws of New York – which the parties agreed would govern the 1998 Agreement – interpreted by a U.S. court, rather than a foreign court.

73. Other factors also counsel in favor of issuing an anti-foreign-suit injunction. The parallel proceedings have already prejudiced equitable considerations. Not only do the orders issued by the courts in Brazil undermine this Court's jurisdiction, but it is worth repeating that

Consist did not initiate proceedings in Brazil until after this Court held a full hearing on Software AG's motion for injunctive relief, and the matter was taken under advisement. Having observed Consist's and Fridman's tactics in this matter, it is likely the proceedings in Brazil will be vexatious. Moreover, requiring the re-litigation in Brazil of the same issues that are currently before this Court will surely result in inconvenience and unnecessary expense. Consist has already embarked on a race to judgment in the courts of Brazil, and the orders it obtained from those courts demonstrate that the risk of inconsistent rulings is real. Indeed, this Court's rulings, issued after a full hearing, are inconsistent with the Brazilian court's orders, which issued *ex parte* and without a full hearing.

74. Having found that the two threshold requirements are satisfied, and having considered the additional discretionary factors under China Trade and its progeny, this Court finds that an anti-foreign-suit injunction is appropriate.

75. This Court has the authority to order Consist-Brazil to withdraw the pending proceedings in Brazil. *See, e.g.*, Suchodolski Assocs., Inc. v. Cardell Fin. Corp., 2006 U.S. Dist. LEXIS 83169, at *11 (S.D.N.Y. Nov. 16, 2006).

76. To the extent Consist and Fridman are enjoined to keep their "100% controlled" affiliates from filing additional actions in South American courts, the anti-suit injunction doctrine of China Trade is not even implicated, because additional actions are not parallel proceedings. Nor is China Trade relevant to this Court's order requiring Consist to advise the Brazilian courts of the matters before this Court.

77. The preliminary injunction ordered below does not compel Consist to cause its affiliates to assign or convey any trademarks to Software AG *pendente lite*. Instead, the injunction is prohibitory in nature. It prohibits Consist and Fridman and their affiliates from taking any steps to prohibit Software AG from using the marks associated with its products in the Territory until a final judgment is entered in this matter. Such a prohibitory injunction should effectively preserve Software AG's rights *pendente lite*. If it does not, the Court will revisit the issue of mandatory relief relating to the reassignment of the marks.


## INJUNCTION

The Court, in view of the findings of fact and conclusions of law set forth above, ORDERS as follows:

*Pendente lite*, Consist NY and Fridman are enjoined, on pain of civil contempt, to cause Consist's wholly controlled affiliates or subsidiaries, Consist Consultoria Sistemas e Representacoes Ltda. and Consist Software Ltda. (collectively, "Consist-Brazil"), together with their agents, attorneys, subsidiaries and affiliates, or anyone purporting to act on behalf of or in

concert with Consist-Brazil, or any other wholly or partly owned subsidiary or affiliate located anywhere in the Territory, to refrain from any and all of the following activities:

(1) commencing or continuing to prosecute any proceeding in any court in the Territory that seeks to compel Software AG to abide by any purported obligation arising out of the exclusive distributorship agreements between Software AG and Consist, except to the extent specifically indicated below;

(2) registering, or seeking to register, or taking any further steps in connection with any pending action or proceedings relating to, any trademark associated with any products manufactured by Software AG and formerly distributed by Consist, including without limitation ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE, and PREDICT;

(3) prosecuting any action or judicial or administrative proceedings in any Court or with any agency in the Territory that seeks to vindicate any purported rights in any of the trademarks or trade names associated with products manufactured by Software AG and formerly distributed by Consist, including, without limitation, ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE, and PREDICT;

(4) taking any steps to prohibit Software AG from using in the Territory the trademarks and trade names associated with their products, including, without limitation, ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE, and PREDICT; or

(5) alienating or otherwise compromising the existing ownership of the trademarks and trade names associated with the products of Software AG or doing anything that would inhibit the ability of Consist- Brazil, or any other subsidiary or affiliate of Consist and Fridman within the Territory who is or may become the registered owner of any such mark, from transferring the trademark registrations for those trademarks and trade names to Software AG after a full trial on the merits or a decision on a motion for summary judgment;

*Pendente lite*, Consist NY and Fridman are enjoined, on pain of civil contempt, to cause Consist's wholly controlled affiliates or subsidiaries, Consist Consultoria Sistemas e Representacoes Ltda. and Consist Software Ltda.(collectively, "Consist-Brazil") and any other wholly or partly owned subsidiary or affiliate located anywhere in the Territory, together with their respective agents, attorneys, subsidiaries, affiliates, or anyone else purporting to act on their behalf or in concert with them, to take any and all steps necessary to procure the immediate vacatur of any order from any court or agency that:

(1) requires Software AG to provide Consist-Brazil with products and services, including access to Level 2 and Level 3 support from Software AG's facility in

31

Denver, Colorado, in order to enable Consist-Brazil to provide maintenance services for Software AG products to any of its customers anywhere in the Territory; or

(2) prohibits Software AG from using, in connection with its proprietary products, the trademarks ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE, and PREDICT, or any other mark the right to the use of which Consist obtained by virtue of its exclusive distributorship of Software AG products in the Territory pursuant to the 1998 Agreement and any and all predecessor Agreements. Consist NY and Fridman are also enjoined, on pain of civil contempt, to cause Consist-Brazil to withdraw or discontinue the actions entitled Consist Consultoria Sistemas E Representacoes LTDA v. Software AG Informatica E Servicos LTDA (filed January 28, 2008) and Consist Consultoria Sistemas E Representacoes LTDA and Consist Software LTDA v. Software AG and Software AG Brazil Informatica E Servicos LTDA (filed February 1, 2008), after obtaining vacatur of any orders previously entered therein;

*Pendente lite*, Consist NY and Fridman are enjoined, on pain of civil contempt, to cause Consist-Brazil and any other Consist subsidiary or affiliate, together with their agents, attorneys, subsidiaries, affiliates and anyone else purporting to act on their behalf or in concert with them, from registering, or attempting to register, or taking any action to continue any registration proceeding already commenced, relating to any trademark associated with any product manufactured or placed into commerce by Software AG, including, without limitation, ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE, and PREDICT, in any country in the Territory, and to cease using any of the trademarks or trade names in connection with their business in the Territory;

*Pendente lite*, Consist NY and Fridman are enjoined, on pain of civil contempt, to cause Consist, Consist-Brazil and any other Consist subsidiary or affiliate anywhere in the Territory to send by mail or similar delivery, and also to post on any web sites maintained by them, a full copy of this order, together with a statement indicating that this order is binding on Consist and Fridman unless and until such order is overturned by a court of competent jurisdiction in the United States of America. Said notice may indicate that Consist has taken an appeal from this order if Consist does in fact take an appeal;

*Pendente lite*, Consist NY and Fridman are enjoined, on pain of civil contempt, to cause Consist-Brazil, together with its agents, attorneys, subsidiaries, affiliates, and anyone else purporting to act on its behalf, to provide to any court or administrative agency from which it has procured any *ex parte* or other order relating to the above-described matters, or in which it presently has any proceeding pending that relates to these matters, with a copy of this Court's Findings of Fact and Conclusions of Law and of this Preliminary Injunction, translated into Portuguese or Spanish as appropriate; and

32

IT IS FURTHER ORDERED THAT Consist and Fridman shall, on the tenth day after the entry of this injunction, certify to this Court *under oath* that steps have been taken as outlined in this order, and shall describe in said certification, with particularity, exactly what has been done to comply with this injunction. Attached to the certification shall be copies of any and all papers filed with any court or administrative tribunal in Brazil or elsewhere in the Territory, including a certified copy of the translation of this Court's Findings of Fact, Conclusions of Law and Preliminary Injunction; a copy of the notice to customers mailed or sent, and web-posted, in compliance with this order; a copy of any press release issued by Consist and/or Fridman and/or any of their subsidiaries or affiliates relating to or discussing this Order. This deadline will not be extended for any reason.

TAKE NOTICE that the failure of Consist and Fridman to provide the Court with the necessary certification, showing substantial completion of all the actions ordered in this Injunction, shall result in the issuance of an order to show cause why defendants should not be held in civil contempt, and be subjected to fines and/or (in the case of Fridman) confinement, until such time as they comply, and cause Consist-Brazil and any other subsidiary or affiliate in the Territory to comply, with each and every term of this Preliminary Injunction.

Nothing in this Preliminary Injunction shall prohibit Consist, Consist-Brazil, Fridman, or any other subsidiary or affiliate (whether wholly or partly owned by Consist) from commencing any foreign action or proceeding in the future, should defendants prevail after the parties' rights under the 1998 Agreement are fully litigated in this action, or in the action styled Consist Software Solutions Inc. v. Software AG, Inc. et al, Civ. No. 07-7047.

This constitutes the decision and order of the Court.

Dated: New York, New York
February 21, 2008

Colle M. Mcl

U.S.D.J.

BY ECF TO ALL COUNSEL

33