DUANE MORRIS LLP
Hyman L. Schaffer
Fran M. Jacobs
Gregory P. Gulia
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Defendants*
*Consist Software Solutions, Inc. and*
*Natalio Fridman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

SOFTWARE AG, INC. and SOFTWARE AG,   :

    :    08 CV 00389 (CM) (FM)

           Plaintiffs,   :

       -against-   :

    :    **DECLARATION OF**

CONSIST SOFTWARE SOLUTIONS, INC.,   :    **NATALIO FRIDMAN**

f/k/a CONSIST INTERNATIONAL, INC.   :    **CERTIFYING COMPLIANCE**

and NATALIO FRIDMAN,   :    **WITH THE COURT'S**

    :    **FEBRUARY 21, 2008 ORDER**

           Defendants.   :

----------------------------------------------------------------x

      NATALIO S. FRIDMAN declares:

      1.     I certify that the following steps were taken by myself and Consist Software

Solutions, Inc., formerly known as Consist  International, Inc., ("Consist") and its affiliates to

comply with this Court's February 21, 2008 Decision and Order (the "Decision and Order").

      2.     In accordance with the Court's directive, the Decision and Order has been

translated into both Portuguese and Spanish.  A certified copy of the Portuguese translation of

the Decision and Order is annexed hereto as Exhibit A.  A certified copy of the Spanish

translation of the Decision and Order is annexed hereto as Exhibit B.

3.      On March 3, 2008, Brazilian counsel were instructed to file the Portuguese translation of the Decision and Order with the Brazilian courts in the actions entitled *Consist Consultoria Sistemas E Representaçoes LTDA v. Software AG Informatica E Servicos LTDA* (the "Brazilian Trademark Action"), and *Consist Consultoria Sistemas E Representaçoes LTDA and Consist Software LTDA v. Software AG and Software AG Brazil Informactica E Servicos LTDA* (the "Brazilian Maintenance Action").  I am informed and believe that the Portuguese translation of the Decision and Order was filed with both Brazilian courts.

4.      I am informed and believe that, prior to March 10, 2008, Software AG appeared in both the Brazilian Trademark Action and the Brazilian Maintenance Action and obtained vacatur or suspension of both preliminary injunctions.

5.      I have consulted with Consist Brazil and understand that Brazilian counsel have been instructed to file the documents necessary to dismiss the Brazilian Trademark Action and the Brazilian Maintenance Action.  I am informed and believe that since Software AG has appeared in both actions, consent of Software AG is required to dismiss these actions.  Consist's Brazilian counsel requested consent to dismiss from Software AG's counsel on March 10, 2008.

6.      In the Brazilian Trademark Action, I am informed and believe that counsel for Software AG has obtained authorization to dismiss the action and the final terms of the joint petition to dismiss are being negotiated between counsel for the parties.  Accordingly, I expect the joint petition to be filed shortly, and the action dismissed shortly thereafter.  A copy of the dismissal papers will be filed with this Court once they are received.

7.      In the Brazilian Maintenance Action, I am informed and believe that counsel for Software AG has obtained authorization to dismiss the action and the final terms of the joint petition to dismiss are being negotiated between counsel for the parties.  Accordingly, I expect

the joint petition to be filed shortly, and the action dismissed shortly thereafter.  A copy of the dismissal papers will be filed with this Court once they are received.

8.     On March 11, 2008, the South American affiliates of Consist were directed to post on their respective websites the Portuguese and Spanish translations of the February 21, 2008 Decision and Order.  In the "Notices" section of each affiliates home page, each affiliate posted a notice in either Portuguese or Spanish that states (translated to English) "Consist publishes preliminary verdict of New York Court" with a hyperlink to a separate notice page.

9.     Selecting that hyperlink directs the viewer to a separate "notice" page that contains a brief statement that (translated to English) states "In accordance with a preliminary verdict of the Court of New York, we are publishing a copy of the certified translation of the referenced decision." with hyperlink to the certified translation of this Court's February 21, 2008 decision and order.

10.    On March 12, 2008, the notice was amended to include (in Portuguese or Spanish as appropriate) the Court's mandatory disclosure statement "This decision is binding on Consist and Natalio Fridman unless and until such order is overturned by a court of competent jurisdiction in the United States of America."

11.    In addition, as web viewers navigate the various pages of the respective Consist affiliate web-sites (except Consist Paraguay which has a different web-layout), there is a navigation pane on the left-side of the web page that constantly displays recent Consist notices, including the notice of the publication of the New York decision.

12.    Annexed hereto as Exhibit C are copies of the home page for Consist Brazil and the notice page providing a hyperlink to the certified translations and the Court's mandatory disclosure as printed from the internet on March 13, 2008.

13.     Annexed hereto as Exhibit D are copies of the home page for Consist Argentina and the notice page providing a hyperlink to the certified translations and the Court's mandatory disclosure as printed from the internet on March 13, 2008.

14.     Annexed hereto as Exhibit E are copies of the home page for Consist Bolivia and the notice page providing a hyperlink to the certified translations and the Court's mandatory disclosure as printed from the internet on March 13, 2008.

15.     Annexed hereto as Exhibit F are copies of the home page for Consist Chile and the notice page providing a hyperlink to the certified translations and the Court's mandatory disclosure as printed from the internet on March 13, 2008.

16.     Annexed hereto as Exhibit G are copies of the home page for Consist Paraguay and the notice page providing a hyperlink to the certified translations and the Court's mandatory disclosure as printed from the internet on March 13, 2008.

17.     Annexed hereto as Exhibit H are copies of the home page for Consist Peru and the notice page providing a hyperlink to the certified translations and the Court's mandatory disclosure as printed from the internet on March 13, 2008.

18.     Annexed hereto as Exhibit I are copies of the home page for Consist Uruguay and the notice page providing a hyperlink to the certified translations and the Court's mandatory disclosure as printed from the internet on March 13, 2008.

19.     In addition to posting of this Court's decision, the South American affiliates have been instructed to cease use of the trademarks ADABAS, NATURAL, TAMINO, ENTIRE-X, COM-PLETE and PREDICT, or any other alleged trademark of Software AG, in connection with their business in the Territory.  All uses of the above trademarks have also been removed from the Consist affiliate's websites.

20.     On March 11, 2008, all of Consist's South American affiliates were directed to send a certified translation of the February 21, 2008 Decision and Order to all of Consist's customers in the Territory. The certified Portuguese translation was provided to customers of Consist Brazil. The certified Spanish translation was provided to customers of the other South American affiliates. The translations are being delivered with a cover letter, a sample copy of which is annexed hereto as Exhibit J.

21.     To the best of my knowledge, the notices to customers have been dispatched to all of Consist's customers in the Territory and are expected to be received by all customers by week's end.

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge information and belief.

Dated: March 13, 2008

_____

Natalio S. Fridman

5

# EXHIBIT A

 

**Arturo Ferrés**
Tradutor Público e Intérprete Comercial
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

1

*O abaixo assinado, Arturo Ferrés, Tradutor Público Juramentado, atesta que a*
*tradução seguinte, de um documento que lhe foi apresentado em inglês, é fiel e correta.*

Tribunal Distrital dos Estados Unidos
Distrito Sul de Nova York

SOFTWARE AG, INC. e SOFTWARE AG

     Autoras

contra

CONSIST SOFTWARE SOLUTIONS, INC., antigamente CONSIST INTERNATIONAL, INC.
e NATALIO FRIDMAN

     Rés

Protocolado em:     21 de fevereiro de 2008
Processo:     08 Civ 389 (CM) (FM)

DECISÃO E ORDEM OUTORGANDO ÀS AUTORAS
SEU PEDIDO DE MEDIDA LIMINAR

McMahon, J.:

Esta é uma ação de sentença declaratória e de medidas liminares, cautelares e de tutela antecipada, e de indenização compensatória, pedida pelas Autoras Software AG, Inc. e Software AG (coletivamente a "Software AG") contra a Ré, Consist Software Solutions, Inc. ("Consist") e seu Presidente, Natalio Fridman. O Tribunal realizou audiência de instrução e ouviu os argumentos orais sobre o pedido das autoras por uma medida liminar, em 24 de janeiro de 2008. Pelos motivos declarados a seguir, o pedido é CONCEDIDO.

**OS FATOS**

**As Partes**

1.     A Software AG, INc. ("SAGA") é uma empresa constituída e existente sob as leis da Virgínia, com sede principal no Estado da Virgínia no 11700 Plaza America Drive, Suite 700, Reston, Virgínia 20190.

2.     A Software AG ("SAG") é a matriz da SAGA e é uma empresa constituída e existente sob as leis da Alemanha e com sede principal na Uhlandstrasse 12, 64297 Darmstadt, Alemanha. A SAG e a SAGA são referidas coletivamente como a "Software AG".

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês • Francês • Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

2

3.  A Ré Consist Software Solutions, Inc., antigamente Consist International, Inc. ("Consist" ou "Consist NY") é uma empresa constituída e existente sob as leis do Estado de Delaware, com sede principal no 10 East 53rd Street, Nova York, Nova York 10022. (*Ver* Transcrição da Audiência de 24 de janeiro de 2008 ("Tr") no 87.)

4.  O Réu, Natalio Fridman é o Presidente da Consist. Reside em Nova York desde 1988. (Tr. no 87.)

5.  A Consist Consultoria Sistemas e Representações Ltda. e a Consist Software Ltda., que serão referidas coletivamente como "Consist-Brasil", são coligadas da Consist no Território. Fridman controla a Consist-Brasil. Em todas as ocasiões pertinentes às questões desta ação, Fridman tinha poder de vincular a Consist e as coligadas da Consist (incluindo a Consist-Brasil) e quando Fridman assinou os contratos pertinentes, ele obrigou, deste modo, não somente a Consist mas também a Consist-Brasil. Fridman assinou várias das declarações objeto desta ação como "Natalio Fridman, Presidente do GRUPO CONSIST" e "Presidente do Grupo Consist do Brasil". Fridman tem procuração ampla para nomear os administradores da Consist-Brasil. (*Ver* Tr. No 88-89, 91, 96; *ver também* os Documentos do Processo das Autoras 1-4, 7.)

**O Histórico do Relacionamento entre as Partes**

6.  A Software AG é uma vendedora de software de integração de empresas que vende e comercializa uma pletora de produtos, opera aproximadamente em setenta países, e tem escritórios em cinqüenta desses países. Seus clientes incluem bancos, entidades governamentais e uma série de empresas nos setores de seguros, telecomunicações e produtos farmacêuticos. (*Ver* Tr. no 52-54.)

7.  A Enterprise Transactions Systems ("ETS") é a parte principal do negócio da Software AG e o ADABAS (sistemas de administração de bancos de dados) e o NATURAL (linguagem de programação) são os principais produtos dentro da ETS. Para muitas grandes organizações multinacionais, o ADABAS e o NATURAL são produtos "fundamentais para a missão", significando que as operações de organização se baseiam totalmente no desempenho eficiente desses produtos (*Ver* TR. no 52.)

8.  As marcas registradas NATURAL e ADABAS são e sempre foram associadas com produtos feitos pela Software AG. Para a Software AG, parte do valor inerente de seus sistemas operacionais e produtos associados é a capacidade de denominar esses sistemas e produtos pelos nomes que ficaram associados com eles. (*Ver* TR. no 75, 105-07.)

9   Desde 1975, a Consist ou sua antecessora, a Pan American Computers Systems, Inc. ("PACS") – da qual Fridman também é Presidente – foi distribuidora

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês • Francês • Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

3

exclusiva dos produtos SAG em sete países da América do Sul, incluindo o Brasil (o Território).

10. A PACS era uma empresa dos Estados Unidos com sede principal no 150 Broad Hollow Road, Melville, Nova York 11747. (Depoimento de Fridman, em 21 de janeiro de 2008, no 29,69.)

11. A distribuição foi regida por uma série de contratos de distribuição, licenciamento e manutenção de software entre a Software AG e a Consist (ou, antes de 1º de janeiro de 1998, entre a Software AG e a PACS). Ainda que a Consist tenha sido escolhida para realizar a distribuição através de subsidiárias integrais ou coligadas, em cada um dos países (especificamente no Brasil, através da Consist-Brasil), a empresa dos EUA – seja a Consist ou sua predecessora a PACS – sempre foi distribuidora exclusiva, e deste modo tinha todos os direitos contratuais de distribuidora e era responsável pelo cumprimento de todas as obrigações da distribuidora. A Consist-Brasil (e qualquer outra coligada ou subsidiária operando no Território) em todas as ocasiões operava como agente da empresa com sede nos Estados Unidos (seja a Consist ou a PACS) que detinha os direitos de distribuição efetivos, e todas as medidas tomadas pela Consist-Brasil (e qualquer outra subsidiária coligada Sul-americana da Consist) em conexão com os contratos de distribuição, eram tomadas em nome, e de acordo com os direitos outorgados à Consist NY.

12. O contrato de distribuição mais recente entrou em vigor em 1º de janeiro de 1998 (o "Contrato de 1998"). As partes deste Contrato eram a SAGA e a Consist, a empresa em Nova York; contudo, o termo "Consist", conforme utilizado no Contrato, era definido como incluindo "todas as afiliadas e coligadas da [Consist]". O prazo inicial do Contrato de 1998 era até 31 de dezembro de 2007, e era renovável por prazos qüinqüenais e sucessivos, desde que nenhuma das partes desse à outra uma notificação de cancelamento, de acordo com os termos do Contrato. O Contrato de 1998 está regido pela lei de Nova York.

13. Em 6 de abril de 2006, a Software AG enviou à Consist uma notificação de que não pretendia renovar o Contrato de 1998 por um prazo qüinqüenal adicional. A Consist adotou a posição de que esta notificação era ineficiente para rescindir a relação entre as partes e afirmou que o Contrato tinha sido automaticamente renovado por um prazo de 5 anos a partir de 1º de janeiro de 2008, porque a Software AG tinha deixado de cumprir a disposição sobre não renovação do Contrato.

14. Em 17 de dezembro de 2007, este Tribunal, numa decisão judicial que está atualmente sob apelação, determinou que a notificação de 6 de abril de 2006 feita pela Software AG cumpria os termos do Contrato de 1998 e que portanto era válida para pôr fim à relação das partes com vigência a partir de 1º de janeiro de 2008. O Tribunal se reporta à transcrição da decisão para determinação das

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
www.andrart.com

4

conclusões do Tribunal; elas são consideradas incluídas neste parecer, mas não serão repetidas aqui. Uma Sentença Final foi proferida sobre este veredicto em 21 de dezembro de 2007. (No. 07-7047, Dkt nº 60).

15. Uma versão prévia do contrato de distribuição das partes é pertinente à esta ação: a versão que entrou em vigor em janeiro de 1984 e esteve em vigor até 31 de dezembro de 1986 (O "Contrato de 1984). Este Contrato entre a Software AG e a PACS, é regido pela lei alemã.

**Os Termos dos Contratos de 1984 e 1998 pertinentes a esta Ação**

16. O Contrato de 1984 estipula o que segue:

> CONSIDERANDO QUE, a SAG é a única proprietária de determinados pacotes de software...aqui referido como "SISTEMAS";
>
> e
>
> CONSIDERANDO QUE, a PACS deseja comercializar os "SISTEMAS" e fornecer assistência aos usuários dos SISTEMAS na Argentina, Brasil, Chile, Colômbia e Uruguai, a seguir referidos como o "TERRITÓRIO"
>
> ***
>
> **Parágrafo 5**
>
> (1) A PACS concorda em tomar todas as medidas necessárias e razoáveis para garantir que a natureza proprietária e a integridade dos SISTEMAS sejam salvaguardados contra qualquer uso, duplicação ou alterações não autorizados.
>
> A PACS tem o direito de reproduzir e, conforme necessário, traduzir a documentação dos SISTEMAS, Manuais, etc. para uso no TERRITÓRIO. O material escrito utilizado pela PACS para comercialização ou para dar suporte aos usuários dos SISTEMAS mencionará a autoria da SAG e exibirá os direitos autorais e a marca comercial da SAG.
>
> A PACS reconhece os SISTEMAS e toda a documentação ou informação como sigilo comercial

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

5

da SAG e se compromete a obrigar também o seu próprio pessoal a proteger os SISTEMAS bem como seus direitos autorais e marcas comerciais e impedir o seu uso não autorizado.

\*\*\*

**Parágrafo 10**

A PACS e o Sr. Natalio S. Fridman e a [Consist-Brasil] garantem o cumprimento das obrigações da PACS

17.    O Contrato de 1998 estipula o que segue:

Uma "CONSIST"... incluirá todas as subsidiárias e coligadas da CONSIST.

\*\*\*

**Parágrafo 2**

A SAGA pela presente autoriza a CONSIST a celebrar contratos com clientes no TERRITÓRIO para o licenciamento, instalação, assistência técnica, treinamento e manutenção dos SISTEMAS.

Contudo, a CONSIST está somente autorizada a conceder aos clientes licenças de uso intransferíveis para os SISTEMAS. A concessão de qualquer forma de sublicença ou direitos de distribuição, como por exemplo acordos OEM diretos ou indiretos, a qualquer terceiro requererá o consentimento prévio e por escrito da SAGA.

Os Contratos para a instalação dos SISTEMAS fora do TERRITÓRIO requererão o consentimento prévio e por escrito da SAGA.

\*\*\*

**Parágrafo 3**

Para o direito de outorgar licenças por prazo indeterminado ou por prazo limitado, e/ou contratos de manutenção, a CONSIST concorda em fazer pagamentos à SAGA conforme estipulado no Anexo A deste instrumento.



**Arturo Ferrés**
Tradutor Público e Intérprete Comercial
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.547.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-16036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

6

---

Os pagamentos serão efetuados no prazo de 10 (dez) dias a contar do encerramento de cada trimestre.

Qualquer pagamento trimestral não recebido dentro do prazo da data de vencimento acima referido, renderá juros a uma taxa de 3% a.a. acima da taxa comercial preferencial do Citibank, vigente nessa ocasião.

A SAGA providenciará faturas à CONSIST para todos os pagamentos efetuados pela CONSIST.

\*\*\*

Parágrafo 5

(1) A CONSIST concorda em tomar todas as medidas necessárias e razoáveis para garantir que a natureza proprietária e a integridade dos SISTEMAS sejam protegidos contra o uso, duplicação ou alteração não autorizados.

A CONSIST tem o direito de reproduzir e, quando necessário, traduzir o SISTEMA, documentação, Manuais, etc. para uso no TERRITÓRIO. O material escrito, utilizado pela CONSIST para comercialização ou suporte a usuários dos SISTEMAS, fará referência à autoria da SAGA e exibirá os direitos autorais e a marca comercial da SAGA.

A CONSIST reconhece que os SISTEMAS e toda a documentação e informação são segredos comerciais da SAGA e se compromete a obrigar seu pessoal a proteger os SISTEMAS, bem como seus direitos autorais e marcas comerciais e impedir qualquer uso não autorizado.

A CONSIST concorda em abster-se de implementar ou permitir a implementação de qualquer alteração nos SISTEMAS sem notificação por escrito à SAGA.

\*\*\*

(4)    A CONSIST concorda em ser responsável por toda a assistência técnica e atividade de suporte no TERRITÓRIO, incluindo serviços de manutenção para usuários tanto presentes quanto futuros. Esta obrigação da CONSIST continuará até a rescisão do contrato, incluindo qualquer prorrogação dele.

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matricula Nº 654 - JUCESP
RG Nº 29.621.199-0 · CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 · INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

7

18.    De acordo com o Contrato de 1998, a Software AG concordou em fornecer à Consist, sem nenhum custo adicional, atualizações de software e materiais de apoio, incluindo treinamento em aulas públicas dadas pela Software AG para o pessoal da Consist; dez vias da versão mais recente dos SISTEMAS armazenados em fita magnética; dez vias dos conjuntos completos da documentação dos SISTEMAS em inglês; e correção rápida de quaisquer erros nos SISTEMAS detectados no local do usuário e comunicados à Software AG. O Contrato de 1984 incluía uma disposição similar.

**Registro da NATURAL e da ADABAS pela Consist**

19.    Em meados dos anos 80, quando a Consist já era distribuidora dos produtos da Software AG por uma década, a Software AG não tinha registrado nenhuma marca comercial no Brasil ou em qualquer outra parte no Território.

20.    Como as marcas ADABAS e NATURAL (coletivamente, "as Marcas Comerciais Brasileiras da Consist") nunca tinham sido registradas na América do Sul, Fridman informou ao Presidente nesta ocasião da Software AG, Peter Schnell, que estava preocupado com pirataria. Schnell disse a Fridman que, se desejasse registrar a ADABAS e a NATURAL no Território, deveria fazê-lo ele mesmo. (*Ver* Depoimento de Fridman, em 28 de novembro de 2007, no 69, 73, 75.)

21.    Após esta discussão, e com o conhecimento de Schnell (e, portanto, da Software AG) a Consist/PACS (através de Fridman) fez com que seu agente, Consist-Brasil, registrasse as marcas comerciais da Software AG, de acordo com a lei brasileira. A Consist-Brasil registrou, pela primeira vez, a NATURAL em 25 de março de 1986 e registrou, pela primeira vez, a ADABAS em 25 novembro de 1986. (Declaração de Schaffer Ex. D, Dkt. nº 14.)

22.    Ambas marcas foram registradas durante o período em que o Contrato de 1984 estava em vigor. Portanto, ainda que a lei do Brasil disponha sobre o registro de marcas brasileiras perante quaisquer terceiros, a lei da Alemanha – que rege a interpretação do Contrato de 1984 – dispõe sobre as questões relativas aos direitos e obrigações *contratuais* da Consist e da Software AG sobre as marcas ADABAS e NATURAL, seja no Brasil ou em qualquer outra parte.

23.    De acordo com a lei alemã, a obrigação contratual expressa da Consist em proteger as marcas comerciais da Software AG significava que qualquer registro de marca comercial assumido pela Consist ou por qualquer de seus agentes – incluindo especialmente a Consist-Brasil, que tinha expressamente garantido as obrigações da PACS, antecessora da Consist, no parágrafo 10 do Contrato de 1984 – significava que o registro era para o benefício da proprietária das marcas que a PACS tinha concordado em proteger – a Software AG. (*Ver* Declaração de Fammler ¶¶ 5, 10, 11, 18-20, Dkt. nº 28.)



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula N° 654 - JUCESP
RG N° 29.621.199-0 - CPF N° 116.347.278-60
CCM N° 2.940.845-8 - INSS N° 112.299.981-22

**Inglês · Francês · Espanhol**

N° E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

8

---

24.    A declaração de preocupação de Fridman sobre pirataria das marcas a Schnell indica que estava consciente da obrigação da Consist de "proteger os SISTEMAS [da Software AG], bem como seus direitos autorais e marcas comerciais e impedir seu uso não autorizado", de acordo com o Item 5(1) do Contrato de 1984. A instrução de Schnell, de que a distribuidora registrasse as marcas, foi feita dentro do contexto do contrato então vigente e a obrigação assumida pela PACS/Consist, de proteger as marcas da Software AG, incluindo a NATURAL e a ADABAS.

25.    A Software AG não se opôs ao pedido de registro da Consist-Brasil, nem moveu nenhuma ação para cancelar os registros dentro do período em que podiam ser contestados, o qual, de acordo com a lei brasileira, é de cinco anos a contar da data de registro. (Declaração de Nascimento ¶ 6; Dkt. n° 13.) O registro das duas marcas pela Consist-Brasil é um assunto de registro público no Brasil a mais de duas décadas.

26.    Nenhum dos Contratos entre a Consist e a Software AG – em particular, nenhum que fosse assinado após as marcas estarem registradas no Brasil – tem qualquer disposição expressa para a transferência das marcas comerciais brasileiras para a Software AG, caso a relação jurídica entre as partes fosse rescindida.

27.    A Software AG – baseando-se na obrigação contratual da Consist em proteger seus interesses – nada fez para proteger suas marcas comerciais mundiais, bem reconhecidas no Brasil, a ADABAS e a NATURAL, ou para supervisionar o uso dessas marcas, desde o momento da conversa entre Fridman/Schnell até e imediatamente antes do vencimento do Contrato de 1998.

## O Vencimento dos Contratos por Prazo

28.    A Consist reconheceu que, a partir de 1° de janeiro de 2008 e continuando até pelo menos à ocasião em que a Sentença Final de 21 de dezembro de 2007 seja revertida, não é mais distribuidora exclusiva da Software AG no Território. Nenhuma evidência perante o Tribunal sugere que a Consist tenha oferecido licenciar quaisquer produtos da Software AG a partir de 1° de janeiro de 2008 e não celebrou quaisquer contratos de licenças ou manutenção a partir de janeiro de 2008. Contudo, entre 17 de dezembro de 2007 e a data deste parecer, a Consist tomou uma série de medidas para frustrar a capacidade da Software AG de assumir o direito que lhe corresponde como distribuidora e encarregada da manutenção de seus próprios produtos no Território.

29.    O Contrato de 1998 autoriza a Consist a fornecer manutenção para os produtos da Software AG de seus clientes, mas somente durante a vigência do Contrato. (Ver a seguir uma análise mais completa das disposições contratuais relativas a esta determinação.) Entre 21 de dezembro e 31 de dezembro de 2007, a Consist (através de seu agente, a Consist-Brasil) prometeu à Companhia de Processamento

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

9

de Dados do Estado de São Paulo ("PRODESP") que a Consist continuaria a fornecer serviços de manutenção para os Produtos de Software da SAG após 1º de janeiro de 2008. Como resultado disso, em 28 de dezembro de 2007 – onze dias depois que este Tribunal proferiu sentença da ação de 2007 e três dias antes de que a comitente da Consist-Brasil, ou seja a Consist, perdesse todos os direitos de acordo com o Contrato de 1998 – a Consist-Brasil e a PRODESP celebraram um contrato obrigando a Consist-Brasil a fornecer esses serviços por um prazo de 24 meses, começando na data em que o contrato foi assinado. De acordo com esse contrato, a Consist-Brasil concordou em fornecer à PRODESP novas versões de sete programas de computador da Software AG, incluindo o ADABAS e o NATURAL, bem como todas suas alterações e aperfeiçoamentos feitos no ADABAS e no NATURAL. A PRODESP concordou em pagar à Consist uma taxa mensal de R$ 177.057 reais (ou aproximadamente US$ 85.000 dólares americanos) – mais de US$ 1 milhão por ano – para fornecer esses serviços. (*Ver* Compl. Ex. 7, Dkt. Nº I.)

30.    No contrato da PRODESP, a Consist-Brasil declarou que ela (a Consist-Brasil) tem "todos os direitos, titularidade e interesse" sobre esses sete produtos da Software AG, incluindo o ADABAS e o NATURAL. De fato, nem a Consist nem a Consist-Brasil têm e nunca tiveram todos os direitos ou titularidades sobre os produtos da Software AG. O único interesse da Consist nesses programas era como distribuidora exclusiva para a América do Sul da Software AG e o único interesse da Consist-Brasil derivava do da Consist como agente de sua empresa matriz e o meio através do qual a Consist-NY realizava as obrigações contratuais da Consist-NY. (*Ver* Compl. ¶ 53.)

31.    A Consist-Brasil, na sua condição de agente da Consist, tinha celebrado 179 contratos de manutenção similares com clientes dentro do Território através dos quais pretendia se obrigar a fornecer manutenção a seus clientes após a rescisão do Contrato de 1998 e o Contrato de distribuição da Consist de 1º de janeiro de 2008. (Tr. no 101.)

32.    Ainda que o Item 5(4) do Contrato obrigasse a Consist a fornecer manutenção aos clientes no Território, do ponto de vista prático, os funcionários da Consist-Brasil somente podiam fornecer manutenção básica (conhecida como "Suporte de Nível 1") para os Produtos de Software da SAG. A maioria do Suporte de Nível 2 (mais complicado) e todo o Suporte de Nível 3 (o mais complicado de todos) eram, na prática, fornecidos por funcionários da SAGA nas instalações de suporte de software da Software AG nos Estados Unidos, localizadas em Denver, Colorado. Essas instalações empregam 125 pessoas que estão disponíveis 24 horas por dia/sete dias por semana para atender pedidos de manutenção de usuários finais dos Sistemas de Software da SAG. Quando a Consist necessitava fornecer serviços mais complicados, enquanto detinha a distribuição exclusiva da Software AG no Território, o fazia utilizando as instalações de Denver. (TR. no 71-73.)

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula N° 654 - JUCESP
RG N° 29.621.199-0 - CPF N° 116.347.278-60
CCM N° 2.940.845-8 - INSS N° 112.299.981-22

## Inglês · Francês · Espanhol

N° E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

10

33.    A Software AG estava obrigada, de acordo com os vários Contratos entre ela e a Consist, ou a PACS, a fornecer à Consist acesso às instalações de suporte de software norte americanas. Mas como o Contrato de 1998 não foi renovado, e agora venceu, a Software AG não tem nenhuma obrigação de fornecer à Consist esse recurso e a Consist não tem mais acesso a essas instalações nem qualquer direito de acessar a essas instalações. De modo similar, a Software AG estava obrigada, de acordo com os vários Contratos entre ela e a Consist, ou a PACS, a fornecer à Consist, gratuitamente, todas as atualizações, alterações e aperfeiçoamentos dos Produtos de Software da SAG, requeridos pelos clientes da Consist; mas a partir de 1° de janeiro de 2008, a Software AG não tem mais essa obrigação, porque a Consist não está mais autorizada a distribuir os Produtos de Software da SAG em nenhuma parte do mundo.

34.    Sem acesso às instalações da Denver, o banco de dados online da SAG ou código fonte para o ADABAS e o NATURAL, a Consist não tem a capacidade de oferecer nada além dos suportes de software mais rudimentares (Nível 1) para os produtos da SAG. Do mesmo modo, a falta de acesso, por parte da Consist, às versões, atualizações e soluções de problemas dos produtos, aos materiais e treinamentos relacionados e atualizados e a revisões para fornecer a manutenção significa que a Consist não pode oferecer a seus clientes suporte significativo para os produtos da Software AG que eles compraram.

35.    O Contrato de 1998 previa que isto ocorreria se as partes rescindissem sua relação e continha disposições a respeito dessa possibilidade. O parágrafo 5(4) do contrato explicitamente declara que a Consist era responsável pelo fornecimento de manutenção a seus clientes, mas somente "...até a rescisão do Contrato, incluindo qualquer prorrogação dele." No julgamento da ação anterior entre as partes, o advogado, que redigiu o Contrato de 1998, testemunhou, ao ser perguntado pelo advogado da Consist, que o prazo de dezoito meses, entre a notificação por parte da Software AG da sua intenção de não renovar o contrato de distribuição com a Consist por mais cinco anos e a data da rescisão, devia ser utilizado para transferir a distribuição (incluindo o elemento manutenção) sem problemas da Consist para a Software AG. (*Ver* Transcrição da Audiência de 12 de dezembro de 2007 no 82, N° 07-7047, Dkt. n° 62.). Lamentavelmente, nem a Consist nem a Software AG tomaram as medidas oportunas e necessárias para permitir que as partes utilizassem esse prazo de dezoito meses para a finalidade para o qual esse prazo se destinava.

36.    Sem acesso aos serviços de manutenção adequados, os usuários dos produtos da Software AG poderiam sofrer graves dificuldades técnicas com seus softwares o que resultaria em uma compreensível insatisfação com os produtos da Software AG e um grave dano à reputação dos produtos e a seu fabricante, a Software AG.

**As Notificações**



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

11

---

37. Em 08 de janeiro de 2008 ou em torno dessa data, a Consist-Brasil colocou dois avisos no seu web-site no Brasil. Os avisos, que estavam em português, continham as seguintes declarações:

> Explicamos que todas nossas obrigações contratuais assumidas com os nossos clientes, incluindo a continuação da Atualização Técnica e o fornecimento de serviços de suporte de produto para a Software AG, continuarão a ser plenamente cumpridas ... Essas obrigações para a Consist têm o apoio contratual da SAGA/Software autorizando a Consist a outorgar as licenças de uso de software, como Atualização Técnica, por prazos temporários ou perpétuos (cláusula 3 do contrato: "...outorgar licenças perpétuas ou limitadas no prazo e/ou contratos de manutenção..."). Como este é o caso, faremos (todas e) quaisquer atualizações de software, que sejam lançadas internacionalmente pela Software AG, disponíveis para nossos clientes de Atualização Técnica, como o fizemos durante 33 anos com a distribuição exclusiva do software da Software AG.

(*Ver* Compl. Ex. 6.) A assinatura eletrônica de Fridman aparece ao pé dessas notificações.

38. A declarações acima citadas são literalmente falsas. De acordo com o Contrato de 1998, a responsabilidade da Consist de fornecer serviços de manutenção a seus clientes se encerrava com a rescisão do Contrato, conforme o Parágrafo 5(4) do Contrato.

39. Apesar da alegação da Consist, o Parágrafo 3 do Contrato de 1998 não dá à Consist o direito de celebrar quaisquer contratos de manutenção que vão além do vencimento do Contrato. O Parágrafo 3 autoriza a Consist a outorgar licenças "perpétuas ou limitadas no prazo e/ou contratos de manutenção." Isto não autoriza a Consist a celebrar "contratos de manutenção perpétuos." O adjetivo "perpétuas" qualifica somente o substantivo "licenças"; não qualifica a locução substantiva "contratos de manutenção." O Parágrafo 5(4) do Contrato especificamente declara que a obrigação da Consist de fornecer manutenção aos clientes se encerra quando o Contrato for rescindido. Esta referência específica torna impossível qualquer leitura do Parágrafo 3 que autorize a Consist a celebrar contratos de manutenção que vão além do vencimento do Contrato.

40. A Consist entende bem isto; de fato, Fridman admitiu sob juramento que não tinha conhecimento de qualquer contrato de manutenção "perpétuo" entre a Consist e quaisquer de seus clientes. O conceito de contrato de manutenção "perpétuo" é desconhecido na área de software de computador — os contratos de manutenção ordinariamente operam por um prazo de anos e vencem quando termina um contrato de distribuição. (*Ver* Tr. no 99; Parágrafo 18-21 da Declaração de David A. MaxSwain, apoiando o pedido da Software AG que requer uma ordem judicial de apresentação de fundamentação para uma medida cautelar ou para uma medida



**Arturo Ferrés**
Tradutor Público e Intérprete Comercial
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.276-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

12

liminar e de obrigação de exibição de documentação pela parte contrária como auxílio probatório na audiência de julgamento da medida liminar ("Declaração de MaxSwain", protocolada em 15 de janeiro de 2008.)

41.    Ainda que a Consiste argumente que as notificações constituíam somente declarações do que a Consist acreditava em boa fé sobre os seus direitos de acordo com o Contrato, a Consist não poderia acreditar de "boa fé" que estava autorizada a continuar a fornecer manutenção aos clientes após ter vencido o Contrato de 1998. Nem poderia a Consist "de boa fé", ter celebrado contratos que a obrigavam a fornecer serviços de manutenção após a rescisão do contrato de 1998. Quaisquer alegações de acreditar de "boa fé" são contraditas pela linguagem simples dos Parágrafos 3 e 5 (4) do Contrato (que dever ser lidos juntos, dado que o Parágrafo 5 (4) especificamente aborda o vencimento da obrigação da Consist em fornecer manutenção para os clientes da Consist-Brasil). É também contradito pelo fato de que o Contrato de 1998 nem (I) obriga a Software AG a fornecer acesso após a rescisão do Contrato ao produtos e serviços necessários para fornecer a manutenção para os clientes, nem (ii) estipula o pagamento para a Software AG do acesso pós rescisão destes produtos e serviços (que haviam sido fornecidos sem encargos durante a vigência do Contrato de 1998), nem (iii) obriga as partes a negociar de boa fé para chegar a um programa de pagamentos para cobrir o custos destes bens e serviços após o vencimento do Contrato. Finalmente, qualquer "boa fé" nesta interpretação estranha do Parágrafo 3 do Contrato também é desmentida pelo fato de que a Consist não celebrou nenhum contrato de manutenção "perpétua" durante toda a vigência do Contrato de 1998.

**O Valor das Marcas Comerciais da Software AG**

42.    As marcas NATURAL e ADABAS foram utilizadas na indústria de software por mais de 40 anos pela Software AG e suas distribuidoras contratualmente autorizadas – e somente por elas – para referir-se a determinados produtos criados, fabricados e mantidos pela Software Ag. Estas marcas estavam associadas com os produtos da Software AG no mundo todo. As marcas nunca foram utilizadas para referir-se aos distribuidores sem os produtos, nem a quaisquer produtos que não sejam os produtos da Software AG que pudessem ser associados com estes distribuidores. Na medida em que as marcas foram utilizadas pelos distribuidores, foram utilizadas para referir-se aos produtos da Software AG; e na medida em que as marcas se identificaram com estes distribuidores em qualquer território, era como distribuidor dos produtos fabricados pela Software AG.

43.    O valor inerente das marcas foi reconhecido na série de contratos de distribuição celebrados entre as partes. No Contrato de 1984 (Parágrafo 5(1)), a predecessora da Consist, a PACS, expressamente se comprometeu a:

> ... fazer referência à autoria da SAG e a exibir os direitos autorais e a marca comercial da SAG...

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**
Nº E-15036/06

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel:** (55 11) 3259-7848
**Fax:** (55 11) 3259-9541
e-mail: mall@andrart.com
w w w . a n d r a r t . c o m

13

*   *   *   *   *   *   *   *   *

...reconhece [] os SYSTEMAS [NATURAL e ADABAS] e toda a documentação ou informação como segredo comercial da SAG e se compromete [] a obrigar também o seu próprio pessoal a proteger os SISTEMAS como seus direitos autorais e marcas comerciais e impedir qualquer uso não autorizado.

44. Quando Schnell deu a Fridman a permissão para registrar as marcas NATURAL e ADABAS no Brasil, era no contexto do compromisso contratual expresso da PACS de proteger as marcas comerciais NATURAL e ADABAS em nome da Software AG, bem como impedir qualquer uso não autorizado destas marcas comerciais – incluindo o uso não autorizado pelo "eu próprio pessoal", que estavam especificamente obrigadas a proteger as marcas comerciais da Software AG. Um do "seu próprio pessoal", obviamente, era e é Fridman, que também é chefe da Consist Software Solutions, Inc.(antigamente a Consist International, inc.) e da Consist-Brasil. Devido a obrigação contratual assumida pela PACS – uma obrigação pelo cumprimento que estava expressamente garantida tanto pelo Fridman quanto pela Consist-Brasil (Contrato de 1984 parágrafo 10) – Schnell não tem nenhum motivo para acreditar que a Consist estaria a afirmar a sua propriedade sobre as marcas NATURAL e ADABAS, a não ser como agente da Software AG.

45. As partes reforçaram o seu entendimento mútuo do valor inerente das marcas comerciais no Contrato de 1998 ( Parágrafo 5(I)), no qual a Consist se comprometeu a:

tomar todas as medidas necessárias e razoáveis para garantir que a natureza e integridade dos SISTEMAS fossem salvaguardados contra qualquer uso, duplicação ou alteração, não autorizados.

*   *   *   *   *   *   *   *   *

reconhecer [] os SISTEMAS e toda a documentação ou informação como segredos comerciais da SAGA e comprometer-se [] a obrigar o seu pessoal a proteger os SISTEMAS bem como seus direitos autorais e marcas comerciais e impedir qualquer uso não autorizado.

Esta linguagem – visualmente idêntica à linguagem usada no Contrato de 1984 – obriga a Consist, bem como sua subsidiária integral e agente, a Consist-Brasil (que está expressamente incluída na definição de "Consist" no Contrato de 1998), a tomar quaisquer medidas que sejam necessárias para proteger as marcas comerciais NATURAL e ADABAS para o benefício da Software AG,e não realizar qualquer ato ou que seja contraditório, ou que negue a associação entre estas marcas e os produtos da Software AG.



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula N° 654 - JUCESP
RG N° 29.621.199-0 - CPF N° 116.347.278-60
CCM N° 2.940.845-8 - INSS N° 112.299.981-22

**Inglês · Francês · Espanhol**

N° E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

14

---

46.    Se a Software AG não estivesse autorizada a utilizar as marcas comerciais NATURAL e ADABAS no Brasil ou em qualquer outra parte no Território para identificar os produtos de software com os quais estas marcas estiveram associados durante mais de 30 anos, isto criaria o caos no mercado internacional para os produtos da Software AG. Forçar a Software AG a dar outros nomes a estes produtos na América do Sul teria custos monetários e econômicos impossíveis de estimar. Comercializar produtos idênticos aos da Software AG sob nomes diferentes em diferentes países, daria ensejo a confusão entre os usuários finais e enfraqueceria a associação para os usuários entre a Software AG e seus próprios produtos. O dano para o fundo de comércio da Software AG seria incalculável.

**Fatos desde a Audiência sobre o Pedido de Medida Preliminar**

47.    O Tribunal foi informado de vários assuntos pertinentes à boa fé e bona fide da Consist, que não chegaram à sua atenção na audiência sobre o pedido da Software AG de medida preliminar. Em primeiro lugar, a Consist deixou de cumprir com a obrigação de apresentar documentos com relação ao registro das marcas comerciais da Software AG dentro do Território. Em 16 de janeiro de 2008 a Software AG pediu a apresentação de "Todos os documentos relativos à propriedade da Consist, seu direito, pedidos ou manutenção de quaisquer direitos de propriedade intelectual no Território, incluindo, mas sem limitação, sobre as marcas ADABAS e NATURAL" (Dkt. No. 36, Declaração de Gasparo Ex I, RFP No. 15). Dois dias mais tarde, em uma ordem com memorando justificativo, este Tribunal ordenou a Consist a cumprir com o pedido de apresentação de documentos da Software AG. Apesar da instrução explícita do Tribunal, para não mencionar suas obrigações de acordo com as Regras Federais de Processo Civil, a Consist não apresentou estes documentos, e não revelou (incluindo na audiência sobre o pedido da Software AG de medida preliminar) que tinha registrado as marcas comerciais da Software AG em dois outros países dentro do Território: Argentina e Uruguai. Na preparação de sua notificação do Tribunal ao advogado de 1° de fevereiro de 2008, a Software AG descobriu que a Consist tinha registrado as marcas NATURAL e ADABAS no Uruguai, e NATURAL, ADABAS e quatro outros produtos da Software AG (TAMINO, ENTIRE, COM-PLETE, e PREDICT) na Argentina (Dkt. N° 32, Declaração de Salaverry parágrafo 6; Dkt n° 31, Decl. de Malone ¶¶ 5-6).

48.    O Tribunal também foi informado que, desde o encerramento da audiência sobre a medida preliminar, a Consist e/ou Consist-Brasil recorreram ao Tribunal no Brasil e iniciaram duas ações: <u>A Consist Consultoria Sistemas e Representações Ltda v. Software AG Informática e Serviços Ltda</u> e <u>Consist Consultoria Sistemas e Representações Ltda e Consist Software Ltda v. Software AG e Software AG Brazil Informática e Serviços Ltda</u>. Nestas ações, a Consist teve, *ex parte\**, medidas preliminares para (1) Proibir a Software AG a utilizar as suas próprias marcas comerciais, NATURAL e ADABAS, em conexão com a distribuição e



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

15

manutenção dos seus próprios produtos no Brasil, e (2) obrigar a Software AG a fornecer à Consist acesso ao serviço de manutenção e produtos que a Software AG não tinha nenhuma obrigação de fornecer e que a Consist não tinha nenhum direito contratual de receber. Este Tribunal não sabe se a Consist informou de modo correto e completo o tribunal brasileiro esta ação pendente ou sobre o fato de que ao mesmo tempo em que seus pedidos estavam sendo feitos, este Tribunal estava preparando uma decisão, após uma audiência plena na qual ambas as partes tiveram todas as oportunidades de apresentar os seus argumentos com relação às mesmas questões que foram objetos dos pedidos *ex parte* no Brasil. Contudo, o Tribunal especificamente considera que a Consist, Fridman e seu advogados nos EUA, O Escritório de Advocacia de Dwan Morris LB agiram de má fé e com a intenção de prejudicar a capacidade deste Tribunal de julgar sobre os assuntos que foram apresentados perante ele e de proferir as medidas eficientes e quando o advogado da Consist requereu e recebeu uma prorrogação de responder às perguntas pós audiência do Tribunal, sem informar ao Tribunal estes pedidos tinham sido feitos ou estavam a ponto de serem feitos.

## CONCLUSÕES DO DIREITO

**Probabilidade de Sucesso: Reivindicação de Violação de Contrato (Celebração de Contratos de Manutenção que vão além de 31 de dezembro de 2007)**

1. Para estabelecer uma reivindicação de violação de contrato de acordo com a lei de Nova York, o autor deve comprovar: (1) a existência de um contrato; (2) a violação do contrato pela outra parte; e (3) danos resultantes da violação. *Ver por ex.*, <u>Terwilliger v. Terwilliger</u>, 206 F.3d 240, 245-46 (2 distrito Cir. 2000).

2. Se uma disposição contratual é ou não ambígua, é uma questão legal a ser resolvida pelo tribunal, e evidência que vai além do próprio documento de modo geral é inadmissível para resolver esta questão. <u>Baum v. Condado de Rockland</u>, 337 F. Supp. 2d 454, 466 (citando <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162, 566 N.E.2d 639,642 (1990)). O Tribunal determina que o Parágrafo 3 do Contrato não é ambíguo, pelos motivos a seguir.

3. Determinadas máximas da interpretação de um contrato, de acordo com a lei do Estado de Nova York, devem ser tidas presentes para a interpretação do Contrato. Os contratos devem ser interpretados de modo a que façam sentido e não serão interpretados de modo a criar ambigüidades. *Ver* 22 N.Y. Jur. 2d Contracts §§ 214, 218 (2008). Os contratos devem ser interpretados de modo que efetivem cada disposição deles. 22 N.Y. Jur. 2d Contracts § 249 (2008).

4. De acordo com o Código Comercial Uniforme ("UCC") e a lei jurisprudencial pertinente, as evidências dos costumes na área de informática, o desenvolvimento das negociações e o desenvolvimento do desempenho podem ser considerados inclusive sem uma determinação por parte do tribunal de que a linguagem utilizada

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

## Inglês · Francês · Espanhol

Nº E-15038/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

16

é ambígua. *Ver* Lei U.C.C. N.Y. § 2-202; <u>Bazak Int'l Corp. v. Tarrant Apparel Group</u>, 378 F. Supp. 2d 377, 390 (S.D.N.Y. 2005).

5.    O artigo 2 da UCC se aplica a este Contrato – ainda que é um contrato misto para bens e serviços – por que o Contrato de modo geral é predominantemente um para venda e entrega de mercadorias – especificamente, os produtos de software da Software AG. *Ver, por ex.*, <u>Long Island Lighting Co. v. Imo Industries Inc.</u> 6 F.3D 876, 888 (2d Circ. 1993) aplicando a lei de Nova York); <u>Coastal Aviation, Inc. v. Commander Aircraft Co.</u>, 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996).

6.    O costume neste setor de informática determina que o Parágrafo 3 do Contrato somente outorga à Consist o direito de fazer contratos de manutenção durante o prazo do contrato de distribuição. Com software empresarial como por exemplo o ADABAS, é típico que um fabricante ou distribuidor outorgue uma licença perpétua para o software, e a seguir que o fabricante ou distribuidor celebre um contrato de manutenção fixo, separado, com estes clientes. Os contratos de manutenção perpétuos não existem porque resultariam em um compromisso de recursos para o fornecedor de serviços potencialmente ilimitado e sem fim. (*Ver* Decl de MacSwain ¶¶ 15-25.)

7.    À luz dos princípios acima e os Fatos Verificados 16-17 e 38-41, este Tribunal considera que os Parágrafos 3 e 5(4) do Contrato de 1998, lidos juntos, não são ambíguos. De acordo com estes parágrafos, a Consist não está autorizada a fornecer manutenção aos clientes após o vencimento do Contrato de 1998. O Parágrafo 3 autoriza a Consist a "outorgar "licenças perpétuas ou limitadas no prazo, e/ou contratos de manutenção,....". Contrariamente ao argumento da Consist, isto não autoriza a Consist a celebrar "contratos de manutenção perpétuos." O adjetivo "perpétuo" qualifica somente o termo "licenças"; ele não qualifica os termos "contratos de manutenção." A Consist poderia outorgar a seus clientes licenças de uso perpétuas para produtos específicos da Software AG, mas não contratos de manutenção perpétuos.

8.    Esta conclusão é ainda corroborada pelo fato de que o Contrato de 1998 (i) nem contém uma disposição para o acesso pós-rescisão aos produtos e serviços necessários para fornecer manutenção aos clientes, nem (ii) estabelece um esquema de pagamentos para esse acesso; nem (iii) obriga as partes a negociar de boa fé para chegar a um esquema de pagamentos para cobrir os custos desses bens e serviços após o vencimento do Contrato. Estas disposições seriam extremamente importantes, porque durante toda a vigência do Contrato de 1998, enquanto a Consist gerava renda para a Software AG, a Consist tinha acesso <u>gratuito</u> para os serviços de manutenção da Software AG. Depois que o prazo venceu, a Consist não estava fazendo mais nenhum pagamento para a Software AG.

9.    Na medida em que a Consist ou a Consist-Brasil celebrou contratos com clientes que a obrigam a fornecer manutenção a esses clientes, a partir de 1º de janeiro de





# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matricula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel:** (55 11) 3259-7848
**Fax:** (55 11) 3259-9541
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

17

2008, não estava contratualmente autorizada a celebrar esses contratos e o fez por sua conta e risco.

10.   A Consist-Brasil em todas as ocasiões operou como agente da Consist (que detém os direitos de distribuição efetivos de acordo com o Contrato de 1998 e Contratos anteriores) no Brasil. Seus direitos não são maiores do que os da sua comitente, *ver* (TERCEIRO) RENOMEAÇÃO DE AGÊNCIA § 3,04 cmt. b (2007), e está similarmente obrigada por quaisquer restrições aceitas pela comitente. Portanto, a capacidade da Consist-Brasil de celebrar contratos de manutenção ou de fornecimento não é maior do que a da Consist, a empresa que, de acordo com a lei contratual do estado de Nova York, era a distribuidora exclusiva no Território.

11.   Ao permitir que o seu agente, a Consist-Brasil, celebrasse contratos que vão além do vencimento do contrato de distribuição da Consist, a Consist violou o Contrato de 1998.

**Reivindicação de Violação Contratual: Dano Irreparável**

12.   Na medida em que a Consist recebe dinheiro dos seus clientes de acordo com estes contratos de manutenção não autorizados – dinheiro que de outro modo teria ido para a Software AG, de acordo com os novos contratos de manutenção celebrados após o vencimento do contrato de distribuição, que a Software AG teria celebrado, o valor da indenização da ré pareceria fácil de determinar.

13.   Contudo, esta é uma reivindicação de violação contratual rara, que envolve a possibilidade clara de dano irreparável. A Consist, através de seu agente, a Consist-Brasil celebrou 179 contratos com clientes brasileiros para o fornecimento de serviços de manutenção após 1º de janeiro de 2008. Isto levou a uma substancial confusão por parte dos clientes. Além disto, como é impossível para a Consist-Brasil fornecer serviço adequado a estes clientes, esta violação contratual específica inevitavelmente prejudicará a reputação da Software AG no mercado brasileiro. A medida que o número de clientes que necessitam manutenção sofisticada e não a recebem cresce, o que ocorrerá com o passar do tempo – o dano para a reputação da Software AG crescerá.

14.   Além disto, parece que a Consist-Brasil (que, como este Tribunal repetidamente verificou, não tem nenhum direito além dos direitos da sua comitente, a Consist) foi a um tribunal brasileiro e obteve uma ordem *ex parte* obrigando a Software AG a fornecer a ela acesso a bens e serviços de modo que a Consist-Brasil possa cumprir as obrigações que assumiu (em nome de sua comitente, a Consist) ao celebrar imprudentemente "contratos" claramente ilegais e não autorizados. A Software AG está agora presa entre a espada e a parede, dado que o exercício do seu direito absoluto de ficar livre de qualquer relação com a Consist, necessariamente resultará na violação da ordem do tribunal brasileiro. Esta





# Arturo Ferrés
**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

18

violação levaria à execução da ordem pelo tribunal brasileiro e multiplicará o dano para a reputação da Software AG no Território.

**Reivindicação de Publicidade Falsa conforme a Lei Lanham: Probabilidade de Sucesso quanto ao Mérito**

15. O item 43(a) da Lei Lanham proíbe o uso comercial ou de qualquer apresentação falsa ou enganosa de um fato, que (1) cause confusão sobre a origem ou procedência de um produto ou serviço ("falsa designação de origem"), ou (2) constitua uma apresentação enganosa sobre a natureza ou a origem geográfica do produto ou serviço que está sendo oferecido ("publicidade falsa"). 15 U.S.C. § 1125(a).

16. Para ter sucesso em uma reivindicação de publicidade falsa, o autor deve demonstrar que algum aspecto das práticas de publicidade do réu é (1) literalmente falsa, ou (2) verdadeira, mas contudo provavelmente causará dano ao autor ao enganar e ao confundir os consumidores com relação à natureza e as características dos produtos e serviços do réu. *Ver* Register.com.Inc. v. Domain Registry of Am, 2002 U.S. Dist. LEXIS 24795, *26-28 (S.D.N.Y. 27 dez. 2002); *ver também* Coca-Cola v. Tropicana Prods., Inc., 690 F.2d 312, 317 (2d Cir. 1982).

17. O autor alega que uma medida preliminar é necessária para impedir a Consist de fazer declarações sobre a sua capacidade de fornecer serviços de manutenção a seus clientes após 1º de janeiro de 2008, que são literalmente falsas. As declarações feitas pela Consist a seus clientes com relação a sua capacidade de fornecer serviços de manutenção para esse clientes após 1º de janeiro de 2008 são literalmente falsas.

18. Ainda que declarações literalmente falsas tenham sido feitas pela Consist-Brasil em um web-site brasileiro em português, elas foram feitas pela Consist-Brasil com o conhecimento e a aprovação dos réus, a Consist International, e por determinação expressa de Fridman

19. Quando uma publicidade é inteiramente falsa, o Tribunal pode proibir seu uso sem fazer referência a seu impacto quanto ao consumidor. *Ver* McNeil-P.C.C.,Inc. v. Bristol-Myers Squibb Co., 938 F. 2d 1544, 1549 (2d Cir. 1991).

20. A convicção ou opinião alegadamente de boa-fé de Fridman sobre a veracidade das declarações literalmente falsas dos réus não propiciaria aos réus nenhuma defesa com relação a uma reivindicação de publicidade falsa, de acordo com a Lei Lanham. Uma declaração sobre um produto é considerada uma declaração de opinião, e não de fato, somente quando é propaganda "exagerada", ou seja, uma declaração sobre um produto que "não é passível de comprovação objetiva" e é uma "declaração exagerada, pretensiosa ou de ostentação, na qual nenhum comprador de bom senso poderia se basear seriamente." *Ver* Robert Groden v. Random House,



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 · CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 · INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 · CEP 01301-905
São Paulo · SP · Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

19

Inc., et al., 1994 U.S. Dist. LEXIS 11794, no 17, 21 (S.D.N.Y., 22 de agosto de 1994); Time Warner Cable, Inc. v. DirecTV, Inc., 497 F. 3rd 144, 160 (2d Cir.2007).

21.  As alegações da Consist sobre sua capacidade de oferecer a continuação dos serviços de manutenção para os produtos da Software AG são declarações enganosas de fato, e não exageradas, pelo fato de que não são ostentações exageradas, mas são, pelo contrário, passíveis de ser verificadas.

22.  Além disso, o Tribunal considera especificamente que a Consist não tinha uma convicção de boa-fé de que estas declarações fossem verdadeiras. E a conclusão deste Tribunal foi a de que Fridman, em todas as ocasiões, sabia que as declarações, sobre a capacidade da Consist em fornecer a continuação dos serviços de manutenção após 1º de janeiro de 2008, eram absolutamente falsas.

23.  Como as declarações na publicidade são literalmente falsas, a autora cumpriu os requisitos de probabilidade de sucesso. Além disso, como nenhuma declaração literalmente falsa foi dirigida para os Estados Unidos ou para um cliente dos Estados Unidos, a probabilidade de sucesso da autora, quanto ao mérito nesta reivindicação específica de publicidade falsa de acordo com a Lei Lanham, depende de se a Lei Lanham se aplica a declarações literalmente falsas feitas fora do território americano.

24.  A Lei Lanham se aplica fora do território americano se, e somente se, exista um efeito substancial sobre o comércio dos Estados Unidos. Ver Atl. Richfield Co. v. ARCO Globus Int'l Co., 150 F. 3d 189, 192, n.4 (2d Cir. 1998). No Segundo Distrito, um texto de três fatores é utilizado para determinar se a Lei Lanham se aplica a uma conduta extraterritorial: (1) se a conduta dos réus tem um efeito substancial sobre o comércio dos Estados Unidos; (2) se um réu é um cidadão dos Estados Unidos; e (3) se existe um conflito com direitos de marcas comerciais de acordo com uma lei estrangeira. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 f. 2d 633, 642 (2d Cir. 1956). Nenhum desses três fatores é determinante; pelo contrário, os Tribunais têm que equilibrar os fatores para decidir se os "contatos e interesses dos Estados Unidos são suficientes para fundamentar o exercício de uma jurisdição extraterritorial." Warnaco Inc. v. VF Corp., 844 F. Supp. 950 (S.D.N.Y. 1994). O Segundo Distrito tem mantido a posição de que um mínimo de dois fatores devem ser cumpridos antes que os Tribunais apliquem a Lei Lanham extra-territorialmente. Ver Totalplan Corp. of America v. Colborne, 14 F. 3d 824, 831 (2d Cir. 1994).

25.  A Consist é uma empresa dos Estados Unidos com sede na cidade de Nova York e Fridman residiu em Nova York desde 1988. Portanto, o fator "cidadania" no teste do caso Vanity Fair Mills está cumprido.



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
www.andrart.com

20



26. Não existe nenhum conflito significativo entre a lei dos Estados Unidos e uma lei estrangeira. Como as declarações de Fridman sobre a capacidade da Consist de fornecer manutenção a seus clientes são literalmente falsas, essas declarações violariam a finalidade das leis pertinentes tanto no Brasil quanto nos Estados Unidos. A lei brasileira proíbe a publicação de informação falsa de modo a obter uma vantagem competitiva. (*Ver* Declaração de Flesch, ¶¶ 42-45, Dkt. nº30; Lei da Propriedade Industrial do Brasil Nº 9.279/96 (14 de maio), conforme alterada pela Lei Nº 10.196 (14 de fevereiro de 2001.)) Como a proibição da Lei Lanham contra publicidade falsa, assim a lei brasileira pretende proteger contra o engano no mercado. Portanto, não existe nenhuma indicação de um conflito com a lei estrangeira que fosse significativo para a reivindicação da autora sobre publicidade falsa, de acordo com a Lei Lanham.

27. Finalmente, a contínua má conduta dos réus terá um efeito substancial sobre o comércio dos Estados Unidos. Os serviços de suporte (além do suporte básico de Nível 1) para os usuários brasileiros dos produtos do Software AG são fornecidos a partir das instalações de suporte norte americanas da SAG. Essas instalações, que empregam 125 pessoas, estão situadas em Denver, Colorado. Sem o acesso a essas instalações e a esse pessoal, a Consist não pode cumprir qualquer obrigação que possa ter assumido, de acordo com qualquer contrato, para fornecer manutenção após 1º de janeiro de 2008. As declarações falsas da Consist sobre sua capacidade de serviços de manutenção após 31 de dezembro de 2007 afetaram substancialmente o comércio dos Estados Unidos ao causar confusão entre os clientes brasileiros sobre quem pode e quem não pode fornecer-lhes o suporte para seus produtos. *Ver* Tr. no 64-65, 72-73; *cfr.* Warnaco, 884 F. Supl. no 951. Como resultado da confusão, os consumidores brasileiros estão hesitantes em celebrar e até recusaram celebrar contratos de manutenção com a SAG. Esta hesitação somente pode ser incrementada pela ordem *ex parte* do Tribunal brasileiro que obrigou a Software AG a continuar fornecendo à Consist (através de seu agente, a Consist-Brasil) o acesso aos serviços de manutenção baseados nos Estados Unidos. Se estes clientes fossem celebrar contrato de manutenção com a Software AG a partir de 1º de janeiro de 2008 — como é claramente contemplado no contrato de 1998 — esses contratos, que valem vários milhões de dólares, seriam realizados substancialmente a partir das instalações de manutenção em Denver por esse pessoal dos Estados Unidos. Ainda assumindo que (i) a taxa mensal, de acordo com esses 179 contratos de manutenção, seja em média somente US$ 40.000 por mês (quase a metade da taxa da PRODESP) e (ii) os contratos, em média, somente têm sua data de vencimento um semestre após a data de vencimento do Contrato, os contratos implicariam mais de US$ 40 milhões em atividades comerciais, o que têm um impacto direto nos Estados Unidos.

28. Tendo aplicado os fatores do caso Vanity Fair Mills aos fatos deste caso, concluo que, no conjunto, a aplicação extraterritorial da Lei Lanham é apropriada. A Software AG demonstrou a probabilidade de sucesso na sua reivindicação de publicidade falsa de acordo com a Lei Lanham.

**Arturo Ferrés** 
Tradutor Público e Intérprete Comercial
Matricula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**
Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

21

### Reivindicação de Publicidade Falsa de Acordo com a Lei Lanham: Dano Irreparável

29.  Para obter uma medida liminar sobre uma publicidade falsa de acordo com a Lei Lanham, um autor deve demonstrar que é provável que sofra dano irreparável na ausência da medida liminar. O Segundo Distrito afirma que um autor, para demonstrar que é provável que sofra dano irreparável, "não necessita ... apontar para um dano efetivo ou um desvio de vendas", porque "é virtualmente impossível comprovar que uma determinada quantidade das vendas de uma pessoa será perdida ou que o fundo de comércio de uma pessoa será danificado como resultado direto da publicidade de um concorrente." Time Warner Cable, 497 F. 3d no 161 (citando Coca-Cola, 690 F. 2d no 316).

30.  Este Tribunal recebeu a informação de que em uma ocasião, entre 1º de fevereiro e 14 de fevereiro de 2008, um Tribunal no Brasil concedeu uma medida liminar *ex parte* obrigando a Software AG a fornecer à Consist acesso aos produtos e serviços de manutenção de modo contínuo - ainda que a Software AG não tenha nenhuma obrigação contratual de fazê-lo. (*Ver* Carta de James D. Jacobs, de 14 de fevereiro de 2008, ao Tribunal.). O efeito desta ordem judicial obrigatória (que foi obtida antes de dar à Software AG nenhuma notificação ou oportunidade para ser ouvida) será triplo. Primeiro, os antigos clientes da Consist não celebrarão contrato de manutenção com a Software AG, ainda que a Software AG seja a única entidade que legalmente pode oferecer esses serviços após a data de vencimento do Contrato. Em segundo lugar, a capacidade da Software AG de tornar-se sua própria distribuidora no mercado brasileiro – algo para o qual ela tem o direito absoluto de tornar-se a partir de 1º de janeiro de 2008 – estará gravemente comprometida se a Software AG tem que cumprir esta ordem judicial para poder fazer negócios no Brasil. Terceiro, como o Contrato de 1998 não contém nenhuma disposição expressa sobre o pagamento desses serviços (que foram fornecidos gratuitamente enquanto a Consist era a distribuidora exclusiva da Software AG) e nenhuma disposição que obrigue as partes a negociar de boa-fé as taxas apropriadas para esses serviços (o que é compreensível, visto que esses serviços não estão contemplados pelas partes, quando celebraram o Contrato em 1998), o efeito direto da ordem judicial brasileira é obrigar a Software AG a fornecer produtos e serviços à Consist gratuitamente sem receber qualquer renda da Consist, sua ex-distribuidora. Todo o acima referido constitui dano irreparável.

### Probabilidade de Sucesso: Reivindicação de Violação de Contrato (Transferência da Marca Comercial/Cumprimento Específico)

31.  Este Tribunal, ao determinar a lei estrangeira, pode considerar qualquer matéria ou fonte pertinente, seja ela ou não prova admissível, ou seja ela ou não apresentada por uma das partes. As determinações da lei estrangeira feitas pelo Tribunal são tratadas como regras em questões legais. *Ver* Fed. R. Civ. P. 44.1.



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - J.U.C.E.S.P
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**
Nº E-15035/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel:** (55 11) 3259-7848
**Fax:** (55 11) 3259-9541
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

22

32.    A lei alemã regia as relação entre a Software AG e a Consist até 1º de janeiro de 1995, quando a lei de Nova York a substituiu como lei aplicável.

33.    A natureza do contrato entre a Consist e a Software AG com relação ao registro de marcas comerciais registradas no Território depende da interpretação do acordo verbal entre o Sr. Fridman e o Sr. Schnell, autorizando a Consist a registrar as marcas. De acordo com a lei alemã, os princípios fundamentais de boa-fé e procedimento justo devem ser considerados na interpretação de um contrato ou na interpretação de um acordo verbal entre as partes. As circunstâncias externas em torno de uma declaração verbal ou por escrito de uma das partes devem ser examinadas para determinar a intenção desta parte. (*Ver* Declaração de Fammler, ¶¶ 5, 18.)

34.    O contrato de 1984, entre a PACS (Consist) e a Software AG, materializa as circunstâncias externas sob as quais a Consist e a Software AG declararam suas intenções quanto ao relacionamento entre elas. (*Ver idem* ¶ 19.) Este contrato contratualmente obrigava a Consist (e Fridman e a Consist-Brasil, que especificamente garantia as obrigações da Consist) a proteger os sistemas da Software AG e suas marcas comerciais.

35.    Portanto, quando a Consist-Brasil registrou a ADABAS e a NATURAL no Território em seu próprio nome, o fez de acordo com a obrigação contratual da Consist de proteger as marcas comerciais e sua própria garantia desta obrigação. (*Ver* Declaração de Fammler, ¶ 20.)

36.    De acordo com a lei alemã, o direito de um distribuidor de utilizar a marca comercial da sua comitente cessa por ocasião da rescisão do contrato de distribuição. (*Ver* Declaração de Fammler, ¶ 23; Stumpf, Der Vertragshandlervertrag, 3ª edição 1997, nota 725.) Portanto, na época em que as marcas foram registradas pela Consist-Brasil, a lei aplicável requeria que as marcas fossem transferidas de volta para a Software AG, quando se encerrasse a relação de distribuidora e comitente.

37.    Ainda que a lei que rege a interpretação dos contratos das partes tenha mudado para a lei de Nova York, em 1995, a substância dos direitos e obrigações respectivos das partes não mudou. A Consist (através de seu agente, a Consist-Brasil) já tinha registrado as marcas comerciais no Território, de acordo com sua obrigação contratual mútua de proteger a propriedade intelectual da Software AG. Conseqüentemente, a Consist continuava a deter esses registros de marcas comerciais (através de seu agente, a Consist-Brasil) para o benefício da Software AG e tinha uma obrigação contratual implícita de transferir estes registros de marcas comerciais para a Software AG, quando a relação de distribuição entre as partes cessasse. (*Ver* Declaração de Fammler, ¶ 22-25, 28.)



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

## Inglês · Francês · Espanhol



Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

23

38. Nenhuma prescrição impede a Software AG de obter uma ordem judicial obrigando a Consist a fazer com que a Consist-Brasil (ou qualquer outra entidade Consist, que tenha marcas registradas associadas com os produtos da Software AG) ceda essas marcas comerciais para a Software AG. Ainda que a Consist-Brasil tenha registrado as marcas em meados de 1980, a violação do contrato aqui alegado é a violação da obrigação contratual de devolver essas marcas comerciais brasileiras para a entidade em cujo nome a Consist (através da Consist-Brasil) estava protegendo essas marcas. Nenhuma reivindicação de violação de contrato pela omissão de transferir as marcas comerciais surgiu até 1° de janeiro de 2008. Até essa ocasião, a Consist (através de seu agente, a Consist-Brasil) detinha corretamente os registros de acordo com a série de contratos de distribuição exclusiva, segundo os quais estava obrigada a proteger as marcas comerciais no Território. Somente quando o contrato de distribuição cessou em 31 de dezembro de 2007 – e a Consist recusou a ceder os registros das marcas comerciais brasileiras para a Software AG – é que a Consist violou seu dever de boa-fé e de procedimento justo com a Software AG.

39. Os réus insistem muito no fato de que o consentimento para o registro de uma marca comercial não pode ser subseqüentemente revogado, na ausência de uma disposição contratual explícita que permita esta revogação. Mas a revogação de um consentimento – ou revogação de registro de marca comercial no Brasil – não é a questão que está sendo discutida neste caso. Na realidade, a questão é se as marcas comerciais brasileiras registradas deveriam ser transferidas para a Software AG por ocasião da rescisão da rescisão da relação entre as partes.

40. Os réus argumentam que, como a Consist-Brasil não foi nomeada, nem foi intimada como ré nesta ação, qualquer ordem que determine a ela ceder suas marcas comerciais ADABAS e NATURAL no Brasil para a Software AG, privaria a Consist-Brasil de sua propriedade sem o devido processo legal. Eles alegam que uma marca comercial não pode ser cedida sem o fundo de comércio associado com a marca comercial, e que o fundo de comércio nos registros de marcas comerciais brasileiras para ADABAS e NATURAL corresponde à Consist-Brasil. Pelo contrário, o fundo de comércio associado com as marcas comerciais é o fundo de comércio do <u>negócio</u> da Consist, e não da Consist. O fundo de comércio do negócio associado com as marcas comerciais NATURAL e ADABAS reside inteiramente na distribuição pela Consist de produtos da Software AG. A Consist não tem mais o direito de distribuir os produtos da Software AG, portanto não usufrui mais de nenhum direito do fundo do comércio de negócio que está associado com as marcas. Com relação à Consist-Brasil, ela agiu em todas as ocasiões como agente da Consist (a efetiva titular dos direitos de distribuição exclusiva) no Brasil. Não tinha nenhum direito de acordo com o Contrato de 1984 ou o Contrato de 1998 que não derivasse dos direitos de sua comitente, e estes direitos não eram maiores do que os direitos de sua comitente. A Consist, a empresa comitente, teve uma oportunidade plena e justa de reivindicar este direito na jurisdição escolhida pelas partes reais dos Contratos, e de acordo com a lei

**Arturo Ferrés**
Tradutor Público e Intérprete Comercial
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

24

escolhida pelas partes. Portanto, não viola o processo devido obrigar a Consist a fazer com que a Consist-Brasil, sua subsidiária integral e agente, transfira ou ceda as marcas comerciais brasileiras para o Software Ag.

41. De acordo com a lei de Nova York que rege o Contrato de 1998, está implícito em todos os contratos um acordo de boa fé e tratamento justo. *Ver* Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995); *conforme* Filner v. Shapiro, 633 F.2d 139, 143 (2d Cir. 1980). Este acordo abrange o cumprimento de "quaisquer promessas que uma pessoa razoável na situação da pessoa que recebeu a promessa teria motivos para entender que estavam incluídas." Dalton, 87 N.Y. 2d em 389 (citando Rowe v. Great Alt. & Pac. Tea Co., 46 N.Y.2d 62,69, 385 N.E.2d 566, 569 (1978)). Este Tribunal considera que a Consist violou o acordo implícito de boa fé e tratamento justo ao recusar-se a transferir os registros de marcas comerciais no Território ao seu proprietário legítimo (a Software AG) quando o Contrato de 1998 foi rescindido.

42. Os direitos da Consist de utilizar as marcas comerciais da Software AG no Território cessaram quando cessou a relação de distribuição. Os Tribunais têm observado que, na ausência de uma manifestação clara de intenção por parte de um fornecedor de transferir a propriedade de uma marca comercial para o distribuidor. o fornecedor permanece o proprietário legítimo dos registros de marcas comerciais por ocasião da rescisão do relacionamento de distribuição. *Ver, por ex.* Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d 329, 336 (S.D.N.Y. 1999); Columbia Nastri & Carta Carbone, S/p/A v. Columbia Ribbon & Carbon Mfg. Co., 1965 U.S. Dist. LEXIS6862 (S.D.N.Y. 23 de nov. de 1965), *afirmado* 367 F.2d 308 (2d Cir. 1966). Não existe nenhuma prova neste autos de qualquer clara manifestação da Software AG de transferir a propriedade das marcas comerciais associadas com os produtos para uma ex distribuidora. Os registros de marcas comerciais da Consist no Território não afetam os direitos de propriedade da Software AG sobre os seus próprios produtos.

43. O caso Columbia Nastri tem uma forte semelhança factual com este caso, e a atinada decisão do Juiz Palmieri no caso Columbia Nastri informa as conclusões legais do Tribunal. No caso Columbia Nastri, uma empresa americana fabricava materiais para cópia carbono no mundo todo e utilizava uma empresa como sua fabricante de distribuidora estrangeira. O contrato entre as partes outorgava à empresa italiana a permissão exclusiva de utilizar determinadas marcas comerciais na Itália e obrigava a empresa americana a fornecer assistência técnica. Os registros da marca comercial na Itália foram feitos em nome da empresa italiana. Após múltiplas prorrogações do contrato de royalty, as partes foram incapazes de chegar a um acordo para mais uma prorrogação. A empresa italiana afirmou que as marcas comerciais italianas eram sua propriedade porque estavam registradas em seu nome, e de acordo com a lei italiana quem registra é o proprietário. Contudo, o tribunal determinou que: as marcas comerciais estrangeiras eram propriedade do fornecedor; os registros de marcas comercias

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 · CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 · INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 · CEP 01301-905
São Paulo · SP · Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

25

estrangeiros eram mantidos pela empresa estrangeira como representante e fiduciária do fornecedor; e que a empresa estrangeira tinha o direito de utilizar a marca comercial somente de acordo com os termos dos contratos com o fornecedor, e somente enquanto estes contratos permanecessem em vigor. O tribunal ordenou a empresa italiana a ceder de marcas comerciais estrangeiras ao fornecedor e proibiu a empresa italiana utilizar as marcas comerciais do fornecedor em território estrangeiro.*ver* Columbia Nastri, 1964 U.S. Dist. LEXIS at *6, 18-20. A decisão do Juiz Palmieri foi confirmada pelo Segundo Distrito. *Ver* Columbia Nastri, 367 F.2d em 313-14.

44.     De modo coerente com o caso Columbia Nastri, este Tribunal considera que as marcas comerciais da Software AG no Território, ainda que registradas em nome do agente da Consist, a Consist-Brasil, são a propriedade da Software AG. Elas estão associadas com os produtos da Software AG e o fundo de comércio que corresponde a estes produtos, e elas foram registradas pela Consist-Brasil (agindo como agente da Consist e avalista de suas obrigações de acordo com o Contrato de 1984) de acordo com a obrigação contratual da Consist de proteger as marcas comerciais da Software AG. Agora que a relação contratual entre as partes cessou, a Consist deve transferir os registros de marca comercial no Território para o seu verdadeiro proprietário, a Software AG. Ao deixar de fazê-lo, a Consist violou o acordo implícito de boa fé e de tratamento justo inerente ao Contrato de 1998.

**Reivindicação de Violação Contratual (Transferência de Marca Comercial/Desempenho Específico):**
**Dano Irreparável**

45.     As marcas comerciais ADABAS e NATURAL foram utilizadas no mundo durante mais de três décadas para identificar produtos da Software AG, e estão associadas em todas as partes com os produtos conhecidos como ADABAS e NATURAL, que eram fabricados pela Software AG. Se a Consist (através de seu agente Consist-Brasil) fosse capaz de controlar as marcas comerciais associadas com os produtos da Software AG – que a Consist e seus agentes não têm mais nenhum direito de distribuir - as autoras sofreriam um dano irreparável. Não teriam mais condições de denominar seus próprios sistemas operacionais e produtos associados pelos nomes que estão associados a estes sistemas operacionais e produtos associados, e estariam sujeitos a assédio por parte da Consist. Não existe nenhum modo de calcular o dano para a Software AG, mais especificamente a sua reputação comercial, resultante de sua incapacidade de identificar seus próprios produtos pelos nomes que por muito tempo estiveram associados com esses produtos. E não há também nenhum modo de calcular o dano para a Software AG se tivesse que dar outros nomes a ADABAS e NATURAL e seus produtos associados para poder vender esses produtos no Brasil. (*Ver* Tr. no 75, 106-07; Pl. Ex. 10)

**Probabilidade de Sucesso: Interferência Ilegal nas Potenciais Relações de Negócios**



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
www.andrart.com

26

46.  Para comprovar uma reivindicação de interferência ilegal com potenciais relações de negócios de acordo com a lei de Nova York, um autor deve demonstrar que: tinha uma relação comercial com um terceiro; o réu sabia da relação e intencionalmente interferiu nela; o réu agiu exclusivamente com dolo, ou utilizou meios desonestos, injustos, inapropriados; e a interferência do réu causou dano à relação. *Ver, por ex.*, Kirch vc Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006).

47.  Ao celebrar um novo contrato com a PRODESP para fornecer serviços de manutenção após 17 de dezembro de 2007, quando este Tribunal anunciou sua decisão na ação anterior, a Consist ilegalmente interferiu com as potenciais relações comerciais da Software AG., pelo fato de que a Software AG teria celebrado contratos de manutenção com estes clientes, se a Consist não o fizesse.

48.  A Consist não podia ter nenhuma convicção de boa fé de que estava autorizada a fornecer serviços a qualquer dos seus clientes após o vencimento do Contrato de 1998, pelos motivos acima declarados. Além disto, ao celebrar um contrato de manutenção com a PRODESP, a Consist – sabendo que as autoras tinham as perspectivas de celebrar uma relação comercial com a PRODESP como resultado desta decisão judicial – intencionalmente interferiu na relação e o fez exclusivamente por dolo ou através de meios desonestos, injustos ou inapropriados. A fraude e as declarações a clientes são reconhecidas como "meios inapropriados" que dão ensejo a uma reivindicação de interferência ilícita com potenciais relações comerciais. *Ver, por ex.*, Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190-92, 818 N.E.2d 1100, 1103-05 (2004) (citando autoridades).

49.  A reivindicação da Consist de que estava agindo para proteger os seus interesses comerciais legítimos – o que , se fosse verdadeiro, refutaria uma acusação de dolo – é enganosa. A partir do anúncio da decisão deste Tribunal, a Consist sabia muito bem que este Contrato ia expirar em 1º de janeiro de 2008. A Consist não tomou nenhuma medida para impedir a aplicação da Sentença Final deste Tribunal enquanto havia prazo para apelar; pelo contrário, deixou que o Contrato expirasse, e ao mesmo tempo agiu de modo a minar a capacidade deste Tribunal de fazer cumprir sua ordem, e fez isso através de um agente, a Consist-Brasil, que não era parte em nenhuma das ações.

**Princípio da Equidade**

50.  O Tribunal verificou que as autoras têm probabilidade de sucesso em todas as reivindicações acima referidas. Mas mesmo que a Software AG somente tivesse conseguido levantar sérias dúvidas quanto ao mérito das reivindicações que fez, ainda assim teria direito a uma medida liminar, porque o princípio da equidade se inclina decididamente para o lado dela. *Ver, p. ex.*, Partido Verde v. o Conselho Eleitoral do Estado de Nova York, 389 F.3d 411,418 (2d Cir. 2004).

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-16036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

27

51.    A Software AG enfrenta a perda de seu direito de utilizar marcas comerciais que há muito tempo estão associadas com os seus produtos – algumas há mais de 30 anos – em um mercado importante e crescente (a América do Sul) onde centenas de clientes em sete países utilizam o software da SAG. Também enfrenta a perda de fundo de comércio associado com seus produtos pela tremenda confusão com relação à continuação da capacidade da Consist em fornecer serviços de manutenção.

52.    Em contrapartida, o princípio da equidade não favorece a Consist. Esperou quatro meses antes do fim do período do prazo de dezoito meses para entrar com uma ação que visasse resolver se ela poderia continuar como distribuidora da Software AG; evitou a oferta deste Tribunal de fazer uma audiência rápida sobre seu requerimento para impedir o vencimento do Contrato de 1998 (preferindo um curso prolongado que acabou designando a audiência para um dia situado em três semanas antes da data na qual o Contrato venceria) e, a seguir, se recusou a apresentar uma apelação rápida contra a decisão final do Tribunal que permitia que o Contrato vencesse. Celebrou contratos de manutenção continuada com clientes, após ter sido informada que sua posição de longo prazo como distribuidora da Software AG estava a ponto de se expirar. Não tomou nenhuma medida para esclarecer sua situação a tempo, de modo a permitir até uma transferência significativa de responsabilidade para a Software AG. Sabendo que sua situação como distribuidora da Software AG estava em perigo, se comprometeu, através de coligadas ou subsidiárias, a registrar marcas comerciais justo no momento em que estava a ponto de perder o direito de utilizá-las.

53.    Finalmente, e o mais importante, os réus deliberadamente modificaram o *status quo* durante a pendência da ação, dirigindo-se, *ex parte*, aos Tribunais brasileiros (através de filiais ou subsidiárias integrais no Brasil), para obter ordens judiciais relativas a assuntos da ação, justo quando esses mesmos assuntos estavam *sub judice*. Isto foi feito sem informar a Software AG ou a este Tribunal. Como resultado, este Tribunal não tem razão para acreditar que nossos estimados colegas no Brasil não tivessem conhecimento do fato de que este Tribunal já tinha feito audiências inteiras sobre o caso e que estava na fase do procedimento de decisão de questões pertinentes aos assuntos quer foram objeto da ação iniciada no Brasil. No que toca a este Tribunal, a Consist e Fridman se comportaram inapropriadamente.

**Uma Ordem Judicial Liminar para Restaurar o *Status Quo*, enquanto a Sentença não é Proferida, é Necessária e Apropriada**

54.    Os critérios para outorgar uma ordem judicial liminar são o dano irreparável, a probabilidade de sucesso quanto ao mérito, ou uma questão suficientemente séria em conexão com o mérito e que, ao mesmo tempo, esteja ligada a um princípio de equidade que favoreça a parte impetrante da ordem judicial liminar. *Ver, p.ex.,*

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula N° 654 - JUCESP
RG N° 29.621.199-0 - CPF N° 116.347.278-60
CCM N° 2.940.845-8 - INSS N° 112.299.981-22

**Inglês · Francês · Espanhol**

N° E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

28

Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F 3d 108, 114 (2d Cir. 2006). O ônus da prova corresponde à parte que pede a medida liminar.

55. Para obter uma ordem judicial liminar com obrigação de fazer, a parte que solicita a medida deve cumprir um requisito maior do que o necessário para obter uma ordem judicial liminar com obrigação de não fazer. Uma ordem judicial liminar com obrigação de não fazer, mantém o *status quo* ao impedir que uma parte faça algo, enquanto que uma ordem judicial com obrigação de fazer obriga que uma parte faça um ato afirmativo ou lhe determina um tipo de conduta. O Segundo Distrito tem decidido que para obter uma ordem judicial liminar com obrigação de fazer, o autor deve mostrar uma probabilidade "clara" ou "substancial" de sucesso quanto ao mérito e não simplesmente uma probabilidade de sucesso. *Ver, p.ex.,* Louis Vuitton Malletier, 454 F. 3d no 114 (citações omitidas); Sunward Elecs., Inc. v. McDonald, 362 F. 3d 17, 24 (2d Cir. 2004); Christie-Spencer Corp.v. Hausman Realty Co., Inc., 118 F. Supl. 2d 408, 418 (S.D.N.Y. 2000).

56. Contudo, "quando um réu, notificado em um processo de ordem judicial liminar, executa atos que se procuram evitar, o Tribunal pode, através de uma ordem judicial liminar com obrigação de fazer, restaurar o *status quo*." Moore v. Consol. Edison Co. of New York, Inc., 409 F. 3d 506, 510 n. 4 (2d Cir. 2005) (citando Porter v. Lee, 328 U.S. 246, 251 (1946)). Conforme discutido acima, Fridman e a Consist com certeza tinham informação do processo perante este Tribunal, e ainda assim, deliberadamente, alteraram o *status quo*, solicitando *ex parte* medidas liminares dos Tribunais brasileiros.

57. O Tribunal considera que as autoras mostraram não simplesmente uma probabilidade de sucesso quanto ao mérito, mas uma probabilidade clara e substancial de sucesso quanto ao mérito em todas as suas reivindicações nesta ação. Portanto, uma ordem judicial liminar com obrigação de fazer é apropriada para restaurar o *status quo*.

58. Para restaurar o *status quo*, o Tribunal deverá ordenar à Consist e a Fridman que façam com que a Consist-Brasil e quaisquer sociedades estrangeiras, subsidiárias ou filiais da Consist, que tenham agido como agentes, de acordo com o Contrato de 1998 e os anteriores, tomem determinadas ações e se abstenham de tomar determinadas ações perante tribunais e perante repartições administrativas ou governamentais dos países, no Território.

59. O poder dos tribunais federais de proibir ações estrangeiras por pessoas sujeitas à sua jurisdição está bem estabelecido. China Trade and Developement Corp. v. M.V. Choong Yong, 837 F. 2d 33, 35 (2d Cir. 1987) (citando Estados Unidos v. Davis, 767 F. 2d 1025, 1038 (2d Cir. 1985) e Laker Airways, Ltd. v. Sabena Belgian World Airlines, 731 F. 2d 909, 926 (D.C. Cir. 1984)). Embora uma ordem judicial liminar opere somente contra as partes, e não diretamente contra o Tribunal estrangeiro, a necessidade da devida consideração para com os princípios de



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 · CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 · INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mall@andrart.com
www.andrart.com

29

civilidade mútua e internacional ainda existem, já que uma ordem assim efetivamente restringe a jurisdição do Tribunal estrangeiro. *Ver* idem no 35-36 (citando Davis, 767 F. 2d no 1038).

60.    No caso China Trade, o Tribunal distrital (Motley, J.) tinha proibido o réu de prosseguir na ação contra os autores perante os tribunais da Coréia. O Tribunal distrital outorgou a ordem judicial liminar, porque verificou que (1) as partes na ação da Coréia eram as mesmas que na ação de Nova York; (2) a questão de responsabilidade levantada pelo réu no Tribunal coreano é a mesma questão de responsabilidade discutida em Nova York; (3) o litígio coreano seria uma provocação aos autores da ação nos Estados Unidos, que foi iniciada primeiro; e (4) permitir que continuasse o litígio coreano resultaria numa corrida para se obter a primeira sentença. 837 F. 2d no 34.

61.    Para determinar sobre a proibição da ação no exterior, o Juiz Motley empregou um teste que pode ser utilizado por alguns juízes no Distrito Sul, e que é conhecido como o teste do China Trade. Primeiro, devem ser cumpridos os dois requisitos de limiar para uma ordem judicial proibindo uma ação judicial no exterior: (1) as partes devem ser as mesmas em ambos os casos, e (2) a resolução do caso no tribunal que está proibindo esta outra ação deve ser determinante para a ação a ser cumprida. Se estes dois requisitos de limiar forem cumpridos, cinco outros fatores devem ser considerados: (1) frustração de uma política no tribunal que faz a proibição; (2) caráter contrariante da ação estrangeira; (3) se existe uma ameaça à jurisdição do Tribunal que está emitindo a ordem quanto aos bens ou quanto ao interesse dos réus sobre o bem (jurisdição *in rem* ou *quasi in rem*); (4) se o processo em outro fórum prejudica outras considerações de equidade; e (5) se a adjudicação das mesmas questões em ações separadas poderia resultar em atraso, inconveniência, despesa, incoerência, ou uma corrida para obter a primeira sentença. *Ver* China Trade, 837 F.2d em 35. O tribunal distrital determinou que os dois requisitos de limiar estão cumpridos, e que os fatores de caráter contrariante e "a corrida para a obter uma sentença" também estavam cumpridos. Considerando estas determinações suficientes, o tribunal distrital proibiu a ação no exterior.

62.    O Segundo Distrito reverteu a solução do tribunal distrital, determinando que o tribunal distrital abusou do seu poder discricionário ao emitir uma medida preliminar proibindo a ação porque nenhuma política importante do fórum seria frustrada ao permitir que a ação coreana continuasse, a ação coreana não representava nenhuma ameaça à jurisdição do tribunal distrital, e os fatores de equidade nos quais se baseou o tribunal distrital não eram suficientes para superar a restrição e a precaução requeridas pela civilidade mútua internacional. Id em 34, 37. O Segundo Distrito argumentou que os fatores de "caráter contrariante" e "corrida para obter uma sentença" provavelmente estejam presentes sempre que ações paralelas estão sendo levadas adiante concomitantemente, e portanto que uma medida preliminar contra a continuação de processo no exterior baseada nestes fatores discricionários somente minaria a política que permite processos

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.547.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
www.andrart.com

30

paralelos e desfavorece medidas preliminares contra estas realizações de processos concomitantes desnecessariamente. O tribunal a seguir declarou que dois fatores discricionários diferentes – se a ação no exterior ameaça (1) a jurisdição do fórum que está fazendo a proibição, e (2) políticas públicas fundamentais do fórum que está fazendo a proibição – são mais significativas do que os dois fatores nos quais se baseou a decisão do Juiz Motley. O Tribunal observou que, ainda que uma medida proibindo uma ação concomitante possa ser apropriada quando a parte tenta evitar cumprir uma decisão do fórum que efetiva políticas públicas importantes, uma medida preliminar não é apropriada meramente para impedir uma parte de requerer "pequenas vantagens na lei substancial ou processual a ser aplicada em um tribunal estrangeiro" <u>China Trade</u> 837 F.2d em 37 (citando <u>Laker</u>, 731 F.2d em 931 nº 73).Contudo, o Tribunal de Apelações endossou a aplicação do assim chamado teste do <u>China Trade</u> para decidir se é apropriada uma medida preliminar contra ações judiciais no exterior por pessoas sujeitas a jurisdição de um tribunal nos EUA.

63. O Segundo Distrito recentemente esclareceu o teste do <u>China Trade</u> ao confirmar a emissão pelo tribunal distrital de uma medida preliminar contra um processo no exterior no caso <u>Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,</u> 500 F.3d 111 (2d Circ. 2007). O Tribunal primeiro reiterou os elementos essenciais do teste (ou seja, uma medida preliminar contra o processo no exterior pode ser imposta somente se os dois requisitos de limiar estão cumpridos; se estes dois requisitos estão cumpridos, então os tribunais devem considerar uma série de fatores adicionais, incluindo o litígio paralelo: (1) frustraria uma política do fórum que está emitindo a proibição; (2) for de caráter contrariante; (3) ameaça a jurisdição do tribunal que emite a medida preliminar, sobre o bem ou o direito do réu ao bem (*in rem* ou *quasi in rem*); (4) prejudica outras considerações eqüitativas; ou (5) resulta em atraso, inconveniência, despesa, incoerência, ou uma corrida para obter a sentença). <u>Karaha,</u> 500 F.3d em 119 (citações omitidas). O Segundo Distrito explicou que ainda que o caso <u>China Trade</u> determinasse que dois dos cinco fatores merecem um significado maior, *todos of* fatores adicionais devem ser considerados ao determinar se uma medida preliminar contra o processo no exterior deve ser concedida, <u>Karaha,</u> 500 F.3d em 119.

64. O tribunal de <u>Karaha</u> tornou claro que o teste do <u>China Trade</u> se aplica a medidas preliminares contra ações no exterior, tanto em casos em que o processo paralelo é iniciado enquanto o processo no exterior está pendente em um fórum nacional, bem como quando uma sentença já foi proferida em um fórum nacional. *Ver* 500 F.3d em 120. Os fatores "discricionários" tenderão a pesar a favor da medida preliminar contra ações no exterior, cuja intenção é proteger uma sentença federal, enquanto que os princípios de civilidade mútua pesarão mais a favor da decisão de impor uma medida preliminar contra uma ação no exterior quando ainda não foi proferida uma sentença em um fórum nacional. <u>Id</u>

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel:(55 11) 3259-7848**
**Fax:(55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

31

65. O Segundo Distrito em <u>Karaha</u> determinou que o tribunal distrital "considerou de modo apropriado" os fatores discricionários de acordo com o <u>China Trade</u> e verificou que eles apóiam a emissão de uma medida preliminar. O Segundo Distrito a seguir examinou cada um dos requisitos do limiar (verificando que estavam cumpridos) e os fatores discricionários (verificando que pesavam a favor de proferir uma medida preliminar contra o processo no exterior). Em particular, o tribunal observou que "as ordens dos tribunais estrangeiros não têm direito a civilidade mútua se os litigantes que procuram estes tribunais deliberadamente procuram impedimentos judiciais para cumprir as ordens de um tribunal federal." <u>Karaha</u> 500 F.3d em 127 (citando <u>Motorola Credit Corp. v. Uzan</u>, 388 F.3d 39, 60 (2d Cir. 2004) (citações internas omitidas) (citando <u>Societe Internationale v. Rogers</u>, 357 U.S. 197, 208-09 (1958)); *ver também* <u>Uzan</u>, 388 F.3d em 60 (citando com aprovação <u>Laker</u>, 731 F.2dem 939-40, que se recusou a respeitar a ordem de um tribunal inglês quando os "réus envolvidos na ação nos EUA tinham ...ido aos tribunais ingleses para gerar interferência com os tribunais americanos.")

66. Em um outro caso recente, <u>International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.</u>, 246 F. App'x 73 (2d Cir. 2007), o Segundo Distrito confirmou a emissão de uma medida preliminar pelo tribunal distrital verificando que os autores tinham cumprido os critérios para obter uma medida preliminar e que a análise da medida preliminar contra o processo no exterior do <u>China Trade</u> se inclinava "fortemente em favor dos autores".

67. Neste caso, os dois fatores do limiar do caso <u>China Trade</u> estão cumpridos, e os fatores restantes aconselham fortemente em favor de uma medida preliminar contra o processo no exterior endereçada tanto para as atuais ações no Brasil quanto a qualquer processo administrativo pendente, bem como uma medida preliminar contra mover quaisquer outras ações e processos no Território, até a ocasião em que a disputa contratual entre a Software AG e a Consist/Consist-Brasil esteja resolvida.

68. As partes de todos os processos pendentes são as mesmas. De modo a obter uma medida preliminar contra uma ação no exterior, a parte que a requer deve comprovar que as partes em ambas as ações são substancialmente as mesmas. "<u>Paramedics Electromedicina Comercial Ltda. v. GE Méd. Sys. Info. Techs., Inc.</u>, 2003 WL 23641529, em "11 (S.D.N.Y. 4 de junho de 2003).

No caso <u>Paramedics</u> – um caso que também envolvia uma relação de distribuição e uma empresa americana com uma empresa brasileira – o Tribunal distrital emitiu uma ordem judicial liminar contra a moção de uma ação judicial no Brasil, determinando que os fatores do <u>China Trade</u> estavam implementados. Especificamente o Tribunal distrital declarou que a ainda que as partes não fossem idênticas no processo brasileiro e americano (a subsidiária brasileira era parte no Brasil, mas não nos Estados Unidos), os processos eram suficientemente similares em termos de partes para atender ao critério de primeiro nível sobre uma ordem



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel:** (55 11) 3259-7848
**Fax:** (55 11) 3259-9541
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

32

judicial liminar visando impedir a moção de uma ação no exterior." Paramedics, 2003 WL 23641529 no *13. Para chegar a essa conclusão, o Tribunal observou que a subsidiária brasileira tinha "agido como agente [da empresa dos Estados Unidos] nos atos [da empresa americana] ..." Idem. O Segundo Distrito confirmou a ordem judicial liminar contra ação judicial no exterior, determinando que o "Tribunal distrital não abusou de seu poder ao decidir que as partes nas duas ações eram suficientemente similares para atender ao requisito de primeiro nível do caso China Trade." Paramedics Electromedicina Comercial Ldta. v. GE Med. Sys. Info. Techs., Inc., 369 F. 3d 645, 652 (2d Cir. 2004). Outros tribunais têm endossado argumentos similares. Ver, p. ex., Motorola Credit Corp. v. Uzan, 2003 WL 56998 (S.D.N.Y.,7 de janeiro de 2003) (determinando similaridade suficiente entre as partes, ainda que as partes nas duas ações não fossem idênticas, porque "as partes reais quanto ao interesse eram as mesmas em ambos os casos"), citado em Paramedics, 369 F. 3d no 652; SG Avipro Finance Ltd. v. Cameroon Airlines, 2005 WL 1353955, no * 2 (S.D.N.Y., 8 de junho de 2005) (o mesmo).

69.    A Consist tem insistido muito em que a Consist-Brasil é uma entidade separada, não perante este Tribunal; e a Consist-Brasil é, pelo que este Tribunal sabe, a autora na ação ou ações no Brasil que resultaram na emissão das ordens judiciais ex parte. (Ver Carta de James D. Jacobs ao Tribunal, em 20 de fevereiro de 2008). Contudo, como é amplamente demonstrado acima, não existe nenhuma diferença entre a Consist e a Consist-Brasil. A Consist, que é parte nos contratos de distribuição - cumpriu suas obrigações contratuais por meio de sua coligada, sua filial ou sua subsidiária integral, a Consist-Brasil. Em outros termos, a Consist-Brasil, em todas as suas ações, agiu como agente da Consist no Território. Além disso, a Consist-NY (através de Fridman) controla e obriga a Consist-Brasil. Portanto, ainda que a Consist-Brasil (e não a Consist-NY) fosse a autora nomeada nas duas ações no Brasil, de acordo com a fundamentação do caso Paramedics, as ações no Brasil e neste Tribunal são "suficientemente similares em termos de partes" para atender ao fator de primeiro nível do caso China Trade.

70.    A resolução deste caso será determinante quanto ao ato a ser proibido. Este Tribunal já decidiu que o contrato de 1998 foi rescindido de modo correto pela Software AG e agora decidiu liminarmente que determinadas consequências decorrem desse fato. Em particular, este Tribunal determinou liminarmente que contratos celebrados pela Consist (através de seu agente, a Consist-Brasil) com terceiros não estão autorizados após a data de rescisão do contrato de distribuição, assim como o direito da Consist-Brasil sobre as marcas comerciais da Software AG no Brasil. Qualquer medida liminar ou ordem judicial liminar relativas a esses assuntos deverá estar comprometida por ordens contrárias proferidas por um tribunal estrangeiro – especialmente ordens obtidas ex parte e sem qualquer garantia de que nossos estimados colegas do Brasil tenham sido plenamente informados do que realmente está acontecendo aqui. Este Tribunal foi informado de que os processos no Brasil tratam precisamente das mesmas questões que estão no cerne da ação aqui em andamento, ou seja, se as marcas comerciais no Brasil

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel:** (55 11) 3259-7848
**Fax:** (55 11) 3259-9541
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

33

pertencem à Software AG e se a Consist pode continuar a fornecer manutenção para os produtos da Software AG. *(Ver* a carta de 20 de fevereiro de 2008 ao Tribunal de James D. Jacobs, e a Declaração anexa de Marcio Polto.) As medidas preliminares que a Consist-Brasil obteve *ex parte* interferem com a capacidade deste Tribunal de emitir ordens válidas e vinculantes com relação ao mesmo assunto, e expõe a Software AG a severas penalidades e sanções. (*Ver* id.) A resolução, com relação aos processos completos, atualmente perante este Tribunal, será determinante dos processos que acabam de se iniciar no Brasil e cujo processo ainda não está completo. Portanto, está cumprido o segundo fator de limiar do China Trade.

71.    Após superar este dois requisitos de limiar, os tribunais devem considerar fatores adicionais, discricionários, incluindo, *entre outros*, se a ação estrangeira ameaça a jurisdição do tribunal que esta proferindo a ordem preliminar e se a ação no exterior frustraria políticas importantes do fórum que está proferindo a proibição. *Ver, por ex.*, Paramedics, 369 F.3d. em 652; Suchodolski Assocs., Inc. v. Cardell Fin. Corp., 2006 WL 10886, em *2 (S.D.N.Y. 3 de janeiro de 2006). "[Q]uando a ação de um litigante em um outro fórum ameaça paralisar a jurisdição do tribunal, o tribunal pode considerar a efetividade e propriedade de emitir uma medida contra a realização do processo no exterior ...." Paramedics, 2003 WL 23641529, em *14 (citações omitidas). A Consist não deveria estar em condições de pedir proteção judicial de tribunais brasileiros em uma tentativa clara de privar este Tribunal de sua jurisdição. Este Tribunal já fez uma determinação de má fé com relação aos atos da Consist ao procurar e ao receber uma prorrogação de sua obrigação de responder às questões pós audiência por parte do Tribunal, sem informar o Tribunal que estavam pendentes nos tribunais brasileiros pedidos de medidas preliminares *ex parte* (*Ver* Fatos 48). Além disto, conforme observado na Declaração de Marcio Polto de 20 de fevereiro de 2008, as medidas preliminares obtidas pela Consist-Brasil no exterior, colocam uma ameaça direta à jurisdição deste Tribunal. O "pedido aos tribunais brasileiros" por parte dos réus, "não era tanto um processo paralelo com direito à civilidade mútua e sim, pelo contrário, uma tentativa de rejeitar a jurisdição clara deste Tribunal sobre sua conduta."" Intl Equity Invs., Inc. v. Opportunity Equity Partners, Ltd., 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006). "De fato, a justificação para uma medida preliminar contra a realização do processo no exterior chega ao auge quando uma parte procura o auxílio de um processo no exterior em uma tentativa evidente de evadir o poder legítimo do tribunal competente." Id. Em 562 (citações omitidas); *ver também* Uzan, 388 F.3d em 60.

72.    Políticas importantes deste fórum estão ameaçadas pela tentativa da Consist de procurar proteção no Brasil. Por exemplo, as reivindicações das Autoras implicam numa lei federal, a Lei Lanham, que corporifica importantes políticas públicas dos EUA com relação a marcas comerciais e publicidade falsa. *Ver* Laker Airways Ltd., 731 F.2d em 931 no 73 ("Uma evasão não permissível é muito mais provável que aconteça quando a parte procura evitar cumprir uma lei de aplicação específica na



## Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula N° 654 - JUCESP
RG N° 29.621.199-0 - CPF N° 116.547.278-60
CCM N° 2.940.845-8 - INSS N° 112.299.981-22

**Inglês · Francês · Espanhol**

N° E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

34

---

qual se baseou a parte que está pedindo a medida preliminar...."), *citada no caso* Paramedics, 2003 WL 236 41529, em *15. Também existe um interesse de política geral em que as leis de Nova York – que as partes combinaram seriam as que regeriam o Contrato de 1998 – sejam interpretadas por um tribunal nos EUA, e não por um tribunal estrangeiro.

73.    Outros fatores também aconselham a favor de proferir uma medida preliminar contra uma ação no exterior. Os processos paralelos já prejudicaram as considerações de equidade. Não somente as ordens emitidas pelos tribunais no Brasil minam a jurisdição deste Tribunal, mas deve ser repetido que a Consist não iniciou o processo no Brasil senão após este Tribunal ter realizado uma audiência completa sobre o pedido de uma medida preliminar por parte da Software AG, e o assunto foi resolvido após consideração cuidadosa. Tendo observado as táticas da Consist e Fridman neste assunto, é provável que o processo no Brasil seja contrariante. Além disso, requerer um novo litígio no Brasil sobre a mesmas questões que estão atualmente perante este Tribunal, com certeza resultará em inconveniências e despesas desnecessárias. A Consist já embarcou em uma corrida para obter uma sentença nos tribunais brasileiros, e as ordens que obteve desses tribunais demonstram que o risco de determinações contraditórias é real. De fato, as regras deste Tribunal, emitidas após uma audiência completa, são contraditórias com as ordens do tribunal brasileiro, que as emitiu *ex parte* e sem uma audiência completa.

74.    Tendo verificado que dois requisitos de limiar estavam cumpridos, e tendo considerado que fatores discricionários adicionais, de acordo com o caso China Trade e os casos subseqüentes, este Tribunal determina que uma medida preliminar contra uma ação no exterior é apropriada.

75.    Este Tribunal tem autoridade para ordenar a Consist-Brasil retirar os processos pendentes no Brasil. *Vide, por exemplo,* Suchodolski Assocs., Inc. v. Cardell Fin. Corp., 2006 U.S. Dist. LEXIS 83169, em *11(S.D.N.Y, 16/11/2006).

76.    Na medida em que Consist e Fridman sejam obrigadas a fazer com que suas filiais, nas quais detém um "controle de 100%", movam ações adicionais em tribunais sul-americanos, a doutrina de medidas preliminares contra ações no exterior do caso China Trade não está ainda implicada porque ações adicionais não são processos paralelos. E o caso China Trade não diz respeito à ordem deste Tribunal, o que obriga a Consist a informar os tribunais brasileiros sobre os assuntos trazidos a este Tribunal.

77.    A medida preliminar ordenada a seguir não obriga a Consist a fazer com que suas coligadas cedam ou transfiram quaisquer marcas comerciais à Software AG *pendente lite.* Pelo contrário, a medida preliminar é proibitória por sua própria natureza. Proíbe a Consist e Fridman e suas coligadas de tomar qualquer passo para proibir a Software AG de utilizar as marcas associadas a seus produtos no

# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

35

Território, até que seja proferida a sentença final sobre este assunto. Essa medida proibitória deve, efetivamente, preservar o direito da Software AG *pendente lite*. Se não o fizer, o Tribunal reexaminará a questão de uma medida preliminar com obrigação de fazer relativa à transferência das marcas.

## MEDIDA PRELIMINAR

O Tribunal, em vista das determinações factuais e conclusões do direito acima estabelecidas, ordena o que segue:

*Pendente lite*, a Consist NY e Fridman são obrigadas, sob pena de contumácia civil, a fazer com que as coligadas ou subsidiárias integrais da Consist, a Consist Consultoria, Sistemas e Representações Ltda. e a Consist Software Ltda (coletivamente "Consist-Brasil"), junto com seus agentes, procuradores, subsidiárias e coligadas, ou qualquer pessoa que pretenda agir em nome ou em combinação com a Consist-Brasil, ou qualquer outra subsidiária ou coligada integral ou parcial, situada em qualquer parte no Território, se abstenham de todos e quaisquer dos seguintes atos:

(1) começar ou continuar qualquer ação, em qualquer tribunal do Território, em que procure obrigar a Software AG a observar qualquer obrigação alegada que surja dos contratos de distribuição exclusiva entre a Software AG e a Consist, exceto na medida especificamente indicada a seguir;

(2) registrar ou procurar registrar, ou tomar quaisquer outras medidas em conexão com qualquer ação ou processo pendente relativo a qualquer marca comercial associada a quaisquer produtos fabricados pela Software AG e anteriormente distribuídos pela Consist, incluindo, sem limitação o ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE e PREDICT;

(3) mover qualquer ação ou processo judicial ou administrativo, perante qualquer Tribunal ou qualquer agência no Território, que procure fazer valer quaisquer direitos alegados sobre quaisquer das marcas comerciais ou nomes comerciais associados a produtos fabricados pela Software AG e distribuídos anteriormente pela Consist, incluindo, sem limitação o ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE e PREDICT;

(4) tomar quaisquer medidas para proibir a Software AG de utilizar, no Território, as marcas comerciais e nomes comerciais associados a seus produtos, incluindo, sem limitação, o ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE e PREDICT; ou

(5) alienar ou, de outro modo, comprometer a propriedade existente das marcas comerciais e nomes comerciais associados aos produtos da Software AG, ou fazer qualquer coisa que possa inibir a capacidade da Consist-Brasil, ou qualquer outra subsidiária ou coligada da Consist e Fridman, dentro do Território, que seja ou que



# Arturo Ferrés

**Tradutor Público e Intérprete Comercial**
Matrícula N° 654 - JUCESP
RG N° 29.621.199-0 - CPF N° 116.347.278-60
CCM N° 2.940.845-8 - INSS N° 112.299.981-22
**Inglês · Francês · Espanhol**

N° E-15036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 5259-7848**
**Fax: (55 11) 5259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

36

possa vir a tornar-se proprietário registrado de qualquer dessas marcas, e de transferir os registros de marcas comercias para essas marcas comerciais e nomes comerciais para a Software AG, após a conclusão do julgamento quanto ao mérito ou uma decisão em um pedido de julgamento sumário;

*Pendente lite*, a Consist NY e Fridman deverão, sob pena de contumácia civil, fazer com que as filiais ou subsidiárias integrais da Consist, Consist Consultoria, Sistemas e Representações Ltda. e a Consist Software Ltda. (coletivamente "Consist-Brasil"), e qualquer outra subsidiária ou filial integral ou parcial situada em qualquer parte no Território, junto com seus agentes, procuradores, subsidiárias, coligadas respectivos, ou qualquer outra pessoa que pretenda agir em seu nome ou de acordo com eles, tomem todas e quaisquer medidas necessárias para obter o imediato cancelamento de qualquer ordem, de qualquer tribunal ou agência que:

(1) exija da Software AG o fornecimento, à Consist-Brasil, de produtos e serviços, incluindo o acesso ao suporte Nível 2 e Nível 3 das instalações da Software AG, em Denver, Colorado, de modo a permitir que a Consist-Brasil forneça serviços de manutenção para os produtos da Software AG para quaisquer de seus clientes, em qualquer parte do Território; ou

(2) proíba a Software AG utilizar, em conexão com os produtos de sua propriedade, as marcas comerciais ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE e PREDICT, ou qualquer outra marca, cujo direito de uso a Consist obteve em virtude do contrato de distribuição exclusivo para os produtos da Software AG no Território, de acordo com o Contrato de 1998 e todos e quaisquer outros Contratos anteriores. Também é ordenado à Consist NY e a Fridman, sob pena de contumácia civil, fazer com que a Consist-Brasil retire ou interrompa as ações com o título Consist Consultoria Sistemas e Representações Ltda. v. Software AG Informática e Serviços Ltda. (protocolada em 28 de janeiro de 2008) e Consist Consultoria Sistemas e Representações Ltda. e Consist Software Ltda. v. Software AG e Software AG Brasil Informática e Serviços Ltda. (protocolada em 1° de fevereiro de 2008), após obter o cancelamento de quaisquer ordens previamente proferidas nestas ações;

*Pendente lite*, a Consist NY e Fridman deverão, sob pena de contumácia civil, fazer com que a Consist-Brasil e qualquer outra subsidiária ou filial da Consist, junto com seus agentes, procuradores, subsidiárias, filiais e qualquer outra pessoa, que pretenda agir em seu nome ou em combinação com eles, se abstenham de registrar ou tentar registrar ou tomar qualquer medida para continuar qualquer processo de registro já iniciado, relativo a quaisquer marcas comerciais associadas com qualquer produto fabricado ou colocado no comércio pela Software AG, incluindo, sem limitação, a ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE e PREDICT, em qualquer país no Território, e cessem de usar quaisquer das marcas comerciais ou nomes comerciais em conexão com seu negócio no Território;



## Arturo Ferrés



**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22

**Inglês · Francês · Espanhol**

Nº E-15036/08

Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
www.andrart.com

37

*Pendente lite*, a Consist NY e Fridman deverão, sob pena de contumácia civil, fazer com que a Consist, a Consist-Brasil e qualquer outra subsidiária ou filial da Consist em qualquer parte no Território envie, por correio ou entrega similar, e, também, coloque em quaisquer web sites mantidos por elas, uma cópia completa desta ordem judicial, junto com uma declaração indicando que esta ordem judicial é vinculante para a Consist e Fridman, salvo e até que esta ordem judicial seja revertida por um tribunal competente nos Estados Unidos da América. Essa notificação poderá indicar que a Consist apelou contra esta ordem, caso a Consist tenha, de fato, apelado;

*Pendente lite*, a Consist NY e Fridman deverão, sob pena de contumácia civil, fazer com que a Consist-Brasil, junto com seus agentes, procuradores, subsidiárias, filiais e qualquer outra pessoa, que pretenda agir em seu nome, forneça a qualquer tribunal ou órgão administrativo, perante os quais tenha procurado obter uma ordem judicial *ex parte* ou uma outra ordem judicial com relação aos assuntos acima descritos, ou nos quais tenha atualmente qualquer processo pendente que diga respeito a esses assuntos, uma cópia das Determinações de Fato e Conclusões do Direito deste Tribunal e desta Ordem Judicial Liminar traduzida para o português ou espanhol, conforme apropriado; e

É ORDENADO AINDA QUE a Consist e Fridman, no décimo dia após ser proferida esta ordem judicial liminar, ateste, neste Tribunal, *sob juramento*, que medidas foram tomadas conforme determinado nesta ordem e descreverão, nesse certificado, em detalhes, exatamente o que fizeram para cumprir esta ordem. Anexo ao certificado, constarão cópias de todos e quaisquer documentos protocolados perante qualquer tribunal judicial ou administrativo no Brasil ou em qualquer outra parte no Território, incluindo uma cópia certificada da tradução das Determinações quanto aos Fatos, Conclusões do Direito e Medidas Liminares deste Tribunal; uma cópia da notificação aos clientes enviada por correio ou enviada e colocada na rede, de acordo com esta ordem; uma cópia de qualquer comunicado de imprensa emitido pela Consist e/ou Fridman e/ou quaisquer de suas subsidiárias ou coligadas relativa a esta ordem ou que discuta esta Ordem. O prazo de limite não será prorrogado por nenhum motivo.

OBSERVE-SE que, caso a Consist e Fridman deixem de fornecer a este Tribunal a certificação necessária, mostrando a conclusão substancial de todas as medidas ordenadas por esta Ordem judicial liminar, isto resultará na emissão de uma ordem judicial visando justificar por que os réus não devem ser considerados em contumácia civil e estarão sujeitos a multas e/ou (no caso de Fridman) a penas privativas de liberdade até a ocasião em que cumpram esta Ordem liminar, e façam com que a Consist-Brasil e qualquer outra subsidiária ou coligada no Território cumpram com cada um e com todos os termos desta Ordem judicial liminar.

Nada nesta Ordem liminar impedirá a Consist, a Consist-Brasil, Fridman ou qualquer outra subsidiária ou filial (seja ela sociedade integral ou parcial da Consist) de iniciar qualquer ação ou processo no exterior e no futuro, caso os réus venham a ser bem sucedidos após o julgamento completo dos direitos das partes, de acordo com o Contrato

# Arturo Ferrés
**Tradutor Público e Intérprete Comercial**
Matrícula Nº 654 - JUCESP
RG Nº 29.621.199-0 - CPF Nº 116.347.278-60
CCM Nº 2.940.845-8 - INSS Nº 112.299.981-22
**Inglês · Francês · Espanhol**
Nº E-16036/08



Rua da Consolação, 331
Sala 102 - CEP 01301-905
São Paulo - SP - Brasil
**Tel: (55 11) 3259-7848**
**Fax: (55 11) 3259-9541**
e-mail: mail@andrart.com
w w w . a n d r a r t . c o m

38

de 1998, nesta ação principal, ou na ação sob o nome Consist Software Solutions Inc. v. Software AG, Inc. et al., Civ. Nº 07-7047.

Isto constitui a decisão e a ordem do Tribunal.

Datada de Nova York, Nova York
21 de fevereiro de 2008
*(a.) (ilegível)*
Juiz Distrital dos Estados Unidos

POR ECF PARA TODOS OS ADVOGADOS

*\*(NdT: "ex parte" significa o pedido feito exclusivamente por uma das partes sem o conhecimento da outra parte.)*

*Nada mais. Conferi e achei conforme. Dou fé.*
*São Paulo, em 25 de fevereiro de 2008.*



*Arturo Ferrés*
*Tradutor Público Juramentado*

# EXHIBIT B

TRADUCCIÓN PÚBLICA. ------------------------------------------------
(En el encabezado de cada página del documento aparece la siguiente información: "Caso 1:08-cv-00389-CM. Documento 50. Presentado el 21/02/08. Página [1] de 33.) --------------
TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO SUR DE NUEVA YORK------------------------------------------------------------
(SELLO) *USDS SDNY.* DOCUMENTO PRESENTADO EN FORMA ELECTRÓNICA. DOCUMENTO N.° (ilegible) FECHA DE PRESENTACIÓN: 21/02/08.----------------
Actora: SOFTWARE AG, INC. y SOFTWARE AG.------------------------------
Contra ---------------------------------------------------------------
Demandada: SOLUTIONS, INC., anteriormente CONSIST INTERNATIONAL INC., y NATALIO FRIDMAN. -------------------------------------------------
08 Civ. 389 (CM)(FM) -------------------------------------------------
SENTENCIA Y ORDEN DE ACEPTACIÓN DE SOLICITUD DE MEDIDA CAUTELAR PRESENTADA POR LA ACTORA ------------------------------------------
McMahon, J.:------------------------------------------------------------
La presente es una acción de sentencia declarativa, de medida cautelar judicial temporaria, preliminar y permanente, e indemnización de daños y perjuicios, presentada por la actora Software AG, Inc. y Software AG (en forma conjunta denominadas "Software AG") contra el demandado Consist Software Solutions, Inc. ("Consist") y su Presidente, Natalio Fridman. El Tribunal mantuvo una audiencia de prueba y recibió los alegatos orales respecto de la solicitud de medida cautelar presentada por la actora el 24 de enero de 2008. Por las razones mencionadas a continuación, dicha solicitud es CONCEDIDA. ---------------------------------
DECISIÓN SOBRE UNA CUESTIÓN DE HECHO---------------------------------
Las Partes---------------------------------------------------------------
1. Software AG, Inc. ("SAGA") es una sociedad por acciones creada y existente en virtud de las leyes de Virginia, con sede en Virginia, en 11700 Plaza America Drive, Suite 700, Reston, Virginia 20190. -------------------------------------------------------
2. Software AG ("SAG") es la controlante de SAGA y es una sociedad creada y existente en virtud de las leyes de Alemania, con sede en Uhlandstrasse 12, 64297, Darmstadt, Alemania. SAG y SAGA son denominadas en forma conjunta "Software AG". --------------------------
3. El demandado Consist Software Solutions, Inc., anteriormente Consist International, Inc. ("Consist" o "Consist NY"), es una sociedad creada y existente en virtud de las leyes del Estado de Delaware, con sede en 10 East 53rd Street, Nueva York, Nueva York, 10022. (Ver trascripción de la audiencia del 24/01/08 ("Tr.") en 87.)---------------------------------
4. El demandado Natalio Fridman es Presidente de Consist. Reside en Nueva York desde 1988. (Tr. en 87.) ----------------------------------------------------
5. Consist Consultoria Sistemas e Representacoes Ltda. y Consist Software Ltda., en adelante denominados en forma conjunta "Consist-Brasil", son afiliadas de Consist dentro del Territorio. Fridman controla a Consist-Brasil. En todo momento con relación al presente caso, Fridman tuvo autoridad para obligar a Consist y a las afiliadas de Consist (incluida Consist-Brasil), y cuando Fridman celebró los correspondientes contratos, no sólo obligó a Consist sino también a Consist-Brasil. Fridman firmó varias declaraciones cuestionadas en el presente caso como "Natalio Fridman, Presidente de CONSIST GROUP" y "Presidente Grupo Consist do Brasil". Fridman posee poder amplio para designar a los funcionarios de Consist-Brasil. (Ver Tr. en 88-89, 91, 96; ver también prueba de la Actora en el juicio 1-4, 7).-------------------
Historial de la relación entre las partes ---------------------------------
6. Software AG es vendedora de software de integración empresarial que vende y comercializa una variedad de productos, opera en aproximadamente setenta países, en cincuenta de los cuales posee oficinas. Sus clientes incluyen bancos, entidades

gubernamentales, y varias compañías de las industrias del seguro, telecomunicaciones y farmacéutica. (Ver Tr. en 52-54) --------------------------------------------------------------------

7. Enterprise Transactions Systems ("ETS") es la parte más grande del negocio de Software AG. ADABAS (sistemas de gestión de bases de datos) y NATURAL (lenguaje de programación) son los productos centrales de ETS. Para muchas organizaciones multinacionales grandes, ADABAS y NATURAL son productos "esenciales", lo que significa que las operaciones de una organización dependen por completo del eficaz desempeño de estos productos. (Ver Tr. en 52) --------------------------------------------------------------------------

8. Las marcas NATURAL y ADABAS están, y han estado siempre, asociadas con productos hechos por Software AG. Para Software AG, parte del valor inherente de sus sistemas operativos y productos asociados consiste en ser capaces de denominar a dichos sistemas y productos por los nombres asociados a ellos. (Ver Tr. en 75, 105-07) ----------------------------

9. Desde 1975, Consist o sus antecesora en derechos, Pan American Computers Systems, Inc. ("PACS"), de la cual Fridman fue también presidente, ha sido la exclusiva distribuidora de productos SAG en siete países de América del Sur, incluido Brasil (el Territorio). --------------

10. PACS era una sociedad por acciones de los EE.UU. con sede en 150 Broad Hollow Road, Melville, Nueva York, 11747. (21/01/08, declaración de Fridman en 29, 69) ----------------------

11. La distribución se rigió por una serie de acuerdos de distribución, licenciamiento y mantenimiento de software entre Software AG y Consist (o, antes del 1 de enero de 1998, entre Software AG y PACS). A pesar de que Consist ha optado por llevar a cabo esta distribución a través de afiliadas o subsidiarias totalmente controladas en cada uno de los respectivos países (notablemente, en Brasil a través de Consist-Brasil), la sociedad estadounidense, ya sea Consist o su antecesora en derechos, PACS, ha sido siempre la distribuidora exclusiva, y por lo tanto tenía todos los derechos contractuales de distribuidor y era responsable del cumplimiento de todas las obligaciones del distribuidor. Consist-Brasil (y cualquier otra afiliada o subsidiaria que opera en el Territorio) ha actuado en todo momento como agente de la sociedad con base en los Estados Unidos (Consist o PACS) a cargo de los reales derechos de distribución, y todas las acciones realizadas por Consist-Brasil (y cualquier otra subsidiaria o afiliada de Consist en América del Sur) relacionadas con los acuerdos de distribución fueron tomadas en nombre de, y según los derechos otorgados a, Consist NY. ----

12. El contrato de distribución más reciente entró en vigencia el 1 de enero de 1998 (el "Contrato de 1998"). Las partes de dicho Contrato eran SAG, SAGA y Consist, la sociedad de Nueva York. Sin embargo, la palabra "Consist", según se la utiliza en el Contrato, fue definida de modo de incluir "todas las subsidiarias y afiliadas [de Consist]". El plazo inicial del Contrato de 1998 era hasta el 31 de diciembre de 2007, y renovable por períodos sucesivos de cinco años, salvo que alguna de las partes notificara su cancelación según los términos del Contrato. El Contrato de 1998 se rige por las leyes de Nueva York. -----------------

13. El 6 de abril de 2006, Software AG envió una notificación a Consist informando que no tenía intenciones de renovar el Contrato de 1998 por otros cinco años. Consist consideró que dicha notificación era ineficaz para terminar la relación entre las partes y sostuvo que el Contrato había sido automáticamente renovado por otros cinco años, a partir del 1 de enero de 2008, dado que Software AG no cumplió con la cláusula de no renovación del Contrato. ----------

14. El 17 de diciembre de 2007, este Tribunal, en una decisión anunciada por el juez, que actualmente se encuentra en apelación, sostuvo que la notificación del 6 de abril de Software AG cumplía con los términos del Contrato de 1998 y que por lo tanto era eficaz para terminar la relación entre las partes a partir del 1 de enero de 2008. Se remite a las partes a la transcripción de la decisión y conclusiones del Tribunal, las cuales se consideran incorporadas a la presente opinión, pero no serán aquí reiteradas. Se dictó una Sentencia Definitiva sobre este veredicto el 21 de diciembre de 2007. (N.° 07-7047, Expediente n.° 60) ----------------------

15. Una versión anterior del contrato de distribución entre las partes es relevante para la presente acción: la versión que entró en vigencia el 1 de enero de 1984, y duró hasta el 31 de diciembre de 1986 (el "Contrato de 1984"). Este Contrato, entre Software AG y PACS, se rige por la legislación alemana. ----------------------------------------------------------------------

**Disposiciones de los Contratos de 1984 y 1998 relevantes al presente juicio** ----------------

16. El Contrato de 1984 dispone lo siguiente:----------------------------------------------------

POR CUANTO, SAG es propietaria exclusiva de ciertos paquetes de software (en blanco) en adelante denominados los "SISTEMAS"; y ----------------------------------------------------

POR CUANTO, PACS desea comercializar los SISTEMAS y brindar asistencia a los usuarios de los SISTEMAS en la Argentina, Brasil, Chile, Colombia y Uruguay, en adelante denominado el "TERRITORIO" ----------------------------------------------------------------

**Párrafo 5** -------------------------------------------------------------------------------------

(1) PACS acuerda tomar todas las medidas necesarias y razonables a fin de asegurar que la naturaleza privada e integridad de los SISTEMAS sean protegidos contra su uso no autorizado, duplicación o modificación. ---------------------------------------------------------

PACS tiene derecho a reproducir y, de ser necesario, traducir documentación, Manuales, etc., de los SISTEMAS para su utilización en el TERRITORIO. El material escrito utilizado por PACS para comercializar o dar soporte a los usuarios de los SISTEMAS hará referencia a la autoría de SAG y deberá tener los símbolos de copyright y marca registrada de SAG. ----------

PACS reconoce los SISTEMAS y toda la documentación o información como secreto comercial de SAG, y se compromete a obligar también a su personal a proteger los SISTEMAS, así como también sus derechos de autor y marcas comerciales, y evitar su uso no autorizado. --------------------------------------------------------------------------------------

**Párrafo 10**------------------------------------------------------------------------------------

PACS y el Sr. Natalio S. Fridman y [Consist-Brasil] garantizan el cumplimiento de las obligaciones de PACS.---------------------------------------------------------------------------

17. El Contrato de 1998 dispone lo siguiente:----------------------------------------------------

"CONSIST" incluye todas las subsidiarias y afiliadas de CONSIST. --------------------------------

**Párrafo 2** -------------------------------------------------------------------------------------

SAGA por la presente autoriza a CONSIST a celebrar convenios con clientes en el TERRITORIO para el licenciamiento, instalación, asistencia técnica, entrenamiento y mantenimiento de los SISTEMAS. ----------------------------------------------------------------

Sin embargo, CONSIST está solamente autorizada a otorgar licencias de uso no transferibles de los SISTEMAS a clientes. La entrega de cualquier forma de sublicencia o derecho de distribución, tales como acuerdos OEM directos o indirectos, a un tercero requerirá el consentimiento previo por escrito de SAGA.------------------------------------------------------

Los contratos para la instalación de los SISTEMAS fuera del TERRITORIO requerirán el previo consentimiento por escrito de SAGA.-------------------------------------------------------

**Párrafo 3** -------------------------------------------------------------------------------------

Por el derecho de otorgar licencias perpetuas o limitadas, y/o contratos de mantenimiento, CONSIST acuerda realizar pagos a SAGA según el Anexo A del presente. ------------------------

Los pagos serán dentro de los diez (10) días posteriores a la finalización de cada trimestre. ----

Cualquier pago trimestral no recibido dentro del plazo mencionado precedentemente devengará intereses a una tasa del 3% anual sobre la tasa de interés preferencial del Citibank vigente en dicha oportunidad.------------------------------------------------------------------

SAGA entregará a CONSIST facturas por todos los pagos hechos por CONSIST. ---------------

**Párrafo 5** -------------------------------------------------------------------------------------

(1) CONSIST acuerda tomar todas las medidas necesarias y razonables a fin de asegurar que la naturaleza privada e integridad de los SISTEMAS sean protegidos contra su uso no autorizado, duplicación o modificación. ---------------------------------------------------------

CONSIST tiene derecho a reproducir y, de ser necesario, traducir documentación, Manuales, etc., de los SISTEMAS para su utilización en el TERRITORIO. El material escrito utilizado por CONSIST para comercializar o dar soporte a los usuarios de los SISTEMAS hará referencia a la autoría de SAGA y deberá tener los símbolos de copyright y marca registrada de SAGA. ------------------------------------------------------------------

CONSIST reconoce los SISTEMAS y toda la documentación o información como secreto comercial de SAGA, y se compromete a obligar también a su personal a proteger los SISTEMAS, así como también sus derechos de autor y marcas comerciales, y evitar su uso no autorizado. --------------------------------------------------------------------

CONSIST acuerda evitar implementar, o permitir la implementación de, toda modificación a los SISTEMAS sin notificación previa por escrito a SAGA. ---------------------------------

(4) CONSIST acuerda ser responsable de toda la asistencia técnica y actividades de soporte en el TERRITORIO, incluidos los servicios de mantenimiento tanto para usuarios presentes como futuros. Esta obligación de CONSIST continuará hasta la extinción del contrato, incluida cualquier prórroga del mismo. -----------------------------------------------------

18. En virtud del Contrato de 1998, Software AG acordó brindar a Consist, sin costo adicional alguno, actualizaciones de software y materiales de servicios, incluidos: capacitación en clases públicas brindadas por Software AG para el personal de Consist; diez copias de la última versión de los SISTEMAS almacenadas en cinta magnética; diez copias de juegos completos de documentación de los SISTEMAS en inglés; y la inmediata corrección de cualquier error en los SISTEMAS detectados en el sitio del usuario y reenviados a Software AG. El Contrato de 1984 incluía una disposición similar.------------------------------------

**Registro de NATURAL y ADABAS por parte de Consist** ---------------------------------

19. A partir de mediados de 1980, cuando Consist ya había sido distribuidor de productos de Software AG por una década, Software AG no había registrado ninguna marca en Brasil ni en ningún otro lado del Territorio. --------------------------------------------------------

20. Dado que las marcas ADABAS y NATURAL (en forma conjunta denominadas las "Marcas Brasileras de Consist") jamás habían sido registradas en América del Sur, Fridman le transmitió al entonces Presidente de Software AG, Peter Schnell, su preocupación por la piratería. Schnell le dijo a Fridman que si él quería que ADABAS y NATURAL estuvieran registradas en el Territorio, que lo hiciera él mismo. (Ver 28/11/07, Decl. De Fridman en 69, 73, 75) ---------------------------------------------------------------------

21. Tras esta discusión, y con el conocimiento de Schnell (y por lo tanto, de Software AG), Consist/PACS (a través de Fridman) hizo que su agente, Consist-Brasil, registrara las marcas de Software AG según la legislación brasilera. Consist-Brasil registró por primera vez NATURAL, el 25 de marzo de 1986, y registró por primera vez ADABAS el 25 de noviembre de 1986. (Declaración Schaffer, Ex. D, Expediente n.º 14). -------------------------------------

22. Ambas marcas fueron registradas durante el período en el cual el Contrato de 1984 estaba vigente. Por lo tanto, mientras que la legislación brasilera rige la registración de las marcas brasileras frente al mundo, la legislación alemana (que regía la interpretación del Contrato de 1984) rige las cuestiones sobre los derechos *contractuales* relativos y obligaciones de Consist y Software AG sobre las marcas ADABAS y NATURAL, tanto en Brasil como en cualquier otro lado. -----------------------------------------------------------------------

23. En virtud de la legislación alemana, la obligación contractual expresa de Consist de proteger las marcas comerciales de Software AG significaba que cualquier registro de marca adoptado por Consist, o por cualquiera de sus agentes, incluido especialmente Consist-Brasil, que había garantizado expresamente las obligaciones de PACS, la antecesora en derechos de Consist, en el Párrafo 10 del Contrato de 1984, significaba que el registro era en beneficio del titular de las marcas que PACS había acordado proteger: Software AG. (Ver declaración de Fammler ¶ ¶ 5, 10, 11, 18-20, Expediente n.º 28).------------------------------------------

24. La preocupación expresada por Fridman respecto de la piratería de las marcas a Schnell indica que estaba al tanto de la obligación de Consist de "proteger los SISTEMAS [de Software AG] así como también sus derechos de autor y marcas, y prevenir su uso no autorizado" en virtud del Artículo 5(1) del Contrato de 1984. La directiva de Schnell de que el distribuidor registrara las marcas ocurrió en el ámbito del contrato vigente en aquel momento y la obligación asumida por PACS/Consist de proteger las marcas de Software AG, incluidas NATURAL y ADABAS.--------------------------------------------------------------

25. Software AG no se opuso a la solicitud de registro de Consist de proteger sus intereses, no hizo nada para proteger sus marcas mundiales reconocidas "ADABAS" y "NATURAL" en Brasil, ni para monitorear el uso de dichas marcas desde la conversación entre Fridman/Schnell hasta antes de la extinción del Contrato de 1998.-----------------------

**Extinción de contratos a plazo**--------------------------------------------------------

28. Consist ha aceptado que, a partir del 1 de enero de 2008, y al menos hasta que se revierta la Sentencia Definitiva del 21 de diciembre de 2007, no es más distribuidor exclusivo de Software AG en el Territorio. Ninguna prueba ante el Tribunal sugiere que Consist ha ofrecido licenciar productos de Software AG desde el 1 de enero de 2008. Sin embargo, entre el 17 de diciembre de 2007 y la fecha de la presente opinión, Consist ha tomado una serie de recaudos para frustrar la capacidad de Software AG de asumir su legítimo lugar como distribuidor y conservador de sus propios productos en el Territorio.------------------------

29. El Contrato de 1998 autoriza a Consist a brindar mantenimiento para los productos de Software AG de sus clientes, pero sólo durante la vigencia del Contrato. (Ver debajo para mayor detalle acerca de las disposiciones del contrato relativas a esta decisión). Entre el 21 y el 31 de diciembre de 2007, Consist (a través de su agente, Consist-Brasil) prometió a Companhia de Processamento de Dados do Estado de Sao Paulo ("PRODESP") que Consist podría continuar brindando servicios de mantenimiento para sus Productos de Software SAG luego del 1 de enero de 2008. Como consecuencia de ello, el 28 de diciembre de 2007 –once días luego de que este Tribunal dictara sentencia en la acción del 2007, y tres días antes de que el mandante de Consist-Brasil, Consist, perdiera todos sus derechos en virtud del Contrato de 1998, Consist-Brasil y PRODESP celebraron un acuerdo en virtud del cual Consist-Brasil se obligaba a brindar dichos servicios por un período de 24 meses, a partir de la firma del acuerdo. En virtud de dicho acuerdo, Consist-Brasil acordó brindar a PRODESP nuevas versiones de siete programas de computación de Software AG, incluidas ADABAS y NATURAL, así como también todas las modificaciones y mejoras hechas a ADABAS y a NATURAL. PRODESP acordó pagar a Consist un honorario mensual de $ 177.057 Reales (o aproximadamente U$S 85.000), más de $ 1 millón por año, para brindar estos servicios. (Ver Ex. compl. 7, Expediente n.º 1).--------------------------------------------------

30. En el acuerdo con PRODESP, Consist-Brasil declaró que tenía (Consist-Brasil) "todos los derechos, títulos e intereses" sobre dichos siete productos de Software AG, incluidos ADABAS y NATURAL. De hecho, ni Consist ni Consist-Brasil tiene, ni ha tenido jamás, todos los derechos o títulos sobre los productos de Software AG. El único interés de Consist sobre dichos programas era como distribuidor exclusivo de Software AG para América del

Sur, y el único interés de Consist-Brasil se derivaba del de Consist, como agente de su sociedad controlante y el medio a través del cual Consist-NY cumplía con las obligaciones de Consist-NY. (Ver Compl. ¶ 53) ----------------------------------------------------------------

31. Consist-Brasil, en su calidad de agente de Consist, celebró 179 contratos de mantenimiento similares con clientes dentro del Territorio, que lo obligan a brindar mantenimiento a sus clientes luego de la extinción del Contrato de 1998 y la relación de distribución con Consist el 1 de enero de 2008. (Tr. en 101) ----------------------------------------

32. A pesar de que el Artículo 5(4) del Contrato obligaba a Consist a brindar mantenimiento a sus clientes en el Territorio, en la práctica los empleados de Consist-Brasil sólo podían brindar mantenimiento básico (conocido como "Soporte Nivel 1") para los Productos de Software de SAG. La mayoría del Soporte Nivel 2 (más complicado) y todo el Soporte Nivel 3 (el más complicado) fueron en realidad brindados por los empleados de SAGA en el establecimiento de soporte para software de América del Norte de Software AG, ubicado en Denver, Colorado. Dicho establecimiento tiene 125 empleados, disponibles las 24 horas del días, los 7 días de la semana, para atender pedidos de mantenimiento de usuarios finales de los Sistemas de Software de SAG. Cuando Consist necesitaba brindar un servicio más complicado durante su contratación como distribuidor exclusivo de Software AG en el Territorio, lo hacía utilizando el establecimiento de Denver. (Tr. en 71-73) ----------------------

33. Software AG estaba obligada, en virtud de varios acuerdos celebrados con Consist o PACS, a permitir a Consist el acceso al establecimiento de soporte para software de América del Norte. Sin embargo, dado que el Contrato de 1998 no fue renovado, y ahora expiró, Software AG ya no tiene ninguna obligación de brindar a Consist dicho recurso, y Consist no tiene más acceso a dicho establecimiento ni ningún derecho a acceder a dicho establecimiento. En forma similar, Software AG estaba obligada, en virtud de varios acuerdos celebrados con Consist o PACS, a brindar a Consist, sin cargo, todas las actualizaciones de software, alteraciones y mejoras a los Productos de Software de SAG requeridos por los clientes de Consist. Sin embargo, a partir del 1 de enero de 2008, Software AG ya no tiene dicha obligación dado que Consist no está más autorizada a distribuir los Productos de Software de SAG en ningún lugar del mundo. -------------------------------------------------------------

34. Sin acceso al establecimiento de Denver, a la base de datos en línea de SAG o al código fuente para ADABAS y NATURAL, Consist no tiene la capacidad de ofrecer más que el soporte de software más rudimentario (Nivel 1) para los productos de SAG. En forma similar, la falta de acceso de Consist a las versiones de los productos, actualizaciones y correcciones, materiales asociados actualizados y entrenamiento, y revisiones para brindar mantenimiento, significa que Consist no puede ofrecer a sus clientes soporte significativo para los productos de Software AG que han comprado. ------------------------------------------------------------

35. El Contrato de 1998 anticipó que esto sucedería si las partes terminaran su relación y previó dicha posibilidad. El Párrafo 5(4) del contrato menciona explícitamente que Consist era responsable de brindar mantenimiento a sus clientes, pero sólo "...hasta la extinción del Contrato, incluida cualquier prórroga del mismo". En el juicio de la demanda previa entre las partes, el abogado que redactó el Contrato de 1998 testificó, ante las preguntas del abogado de Consist, que el período de dieciocho meses entre la notificación por parte de Software AG de su intención de no renovar la relación de distribución con Consist por otros cinco años y la fecha de extinción sería utilizado para transferir la distribución (incluida la función de mantenimiento) directamente de Consist a Software AG. (Ver trascripción de la audiencia del 12/12/07 en el 82, n.º 07-7047, Expediente n.º 62). Lamentablemente, ni Consist ni Software AG tomaron las medidas oportunas necesarias para permitir a las partes utilizar el período de dieciocho meses para los fines para los cuales estaba previsto. ------------------------------------

36. Sin acceso a servicios de mantenimiento adecuados, los usuarios de productos de Software AG podrían experimentar una gran dificultad técnica con su software, que les generaría una

comprensible insatisfacción frente a los productos de Software AG y una seria lesión a la reputación de los productos y de su productor, Software AG. --------------------------------

Notificaciones --------------------------------

37. El o alrededor del 8 de enero de 2008, Consist-Brasil publicó dos notificaciones en su sitio web en Brasil. Las notificaciones, que estaban en portugués, contenían las siguientes declaraciones: --------------------------------

Hemos explicado que todas nuestras obligaciones contractuales asumidas para nuestros clientes, incluida la Actualidad Técnica continua y el ofrecimiento de servicios de soporte de producto para Software AG, continuarán siendo plenamente cumplidas. Dichas obligaciones para CONSIST están respaldadas contractualmente por SAGA / Software AG, que autorizan a CONSIST a otorgar licencias de uso de software y Actualización Técnica por períodos temporarios o perpetuos (cláusula 3 del contrato: "...otorgar licencias perpetuas o limitadas, y/o contratos de mantenimiento..."). Siendo este el caso, haremos disponibles a nuestros clientes de Actualización Técnica (todas y) cada una de las actualizaciones de software lanzadas por Software AG a nivel internacional del mismo modo que lo hemos venido haciendo durante 33 años con la distribución exclusiva del software de Software AG. - (Ver Ex. compl. 6.) La firma electrónica de Fridman aparece al pie de las notificaciones. ------

38. Las declaraciones citadas precedentemente son literalmente falsas. En virtud del Contrato de 1998, la responsabilidad de Consist de brindar servicios de mantenimiento a sus clientes concluía con la extinción del Contrato, según el Párrafo 5(4) del mismo. --------------------------------

39. A pesar de los argumentos de Consist, el Párrafo 3 del Contrato de 1998 no le da a Consist derecho de celebrar ningún contrato de mantenimiento más allá de la extinción del Contrato. El Párrafo 3 autoriza a Consist a otorgar "...licencias perpetuas o limitadas, y/o contratos de mantenimiento...". Esto no autoriza a Consist a celebrar "perpetuos ... contratos de mantenimiento". El adjetivo "perpetuo" modifica sólo a la palabra "licencias"; no modifica la frase "contratos de mantenimiento". El Párrafo 5(4) del Contrato menciona específicamente que la obligación de Consist de brindar mantenimiento al cliente finaliza con la extinción del Contrato. Esta referencia específica hace imposible cualquier lectura del Párrafo 3 de que autoriza a Consist a celebrar contratos de mantenimiento más allá de la extinción del Contrato. --------------------------------

40. Consist comprende esto; de hecho, Fridman admitió bajo juramento que no estaba al tanto de ningún contrato de mantenimiento "perpetuo" entre Consist y cualquiera de sus clientes. El concepto de un contrato de mantenimiento "perpetuo" es desconocido en la industria del software informático: los contratos de mantenimiento comúnmente duran unos años y finalizan cuando finaliza la distribución. (Ver Tr. en 99; Párrafos 18-21 de la Declaración de David A. MacSwain en respaldo de la solicitud de Software AG de una Orden para presentar justificaciones para un interdicto provisorio, una medida cautelar y una etapa de prueba expeditiva en subsidio de la audiencia de interdicto ("Decl. de MacSwain") presentada el 15 de enero de 2008.) --------------------------------

41. A pesar de que Consist sostiene que las notificaciones fueron únicamente declaraciones de Consist de su entendimiento de buena fe respecto de sus derechos en virtud del Contrato, Consist no pudo haber entendido de "buena fe" que estaba autorizado a continuar brindando mantenimiento a clientes luego de la extinción del Contrato de 1998. Tampoco pudo Consist "de buena fe" haber celebrado contratos que lo obligaran a brindar servicios de mantenimiento luego de la extinción del Contrato de 1998. Dicho entender de "buena fe" se contradice con el lenguaje simple de los Párrafos 3 y 5(4) del Contrato (que deben ser leídos en conjunto dado que el Párrafo 5(4) se refiere específicamente a la extinción de la obligación de Consist de brindar mantenimiento a los clientes de Consist-Brasil). También se contradice con el hecho de que el Contrato de 1998 (i) no obliga a Software AG a brindar acceso a productos y servicios necesarios para brindar mantenimiento a los clientes luego de la

extinción del Contrato, ni (ii) prevé ningún pago a Software AG por el acceso a dichos productos y servicios (que habían sido brindados sin cargo durante la validez del Contrato de 1998) luego de la extinción del Contrato, ni (iii) obliga a las partes a negociar de buena fe a fin de acordar un esquema de pagos para cubrir el costo de dichos bienes y servicios luego de la extinción del Contrato. Por último, cualquier entendimiento "de buena fe" en esta extraña interpretación del Párrafo 3 del Contrato también se contradice por la falta de celebración de contratos de mantenimiento "perpetuos" por parte de Consist durante la validez del Contrato de 1998. ------------------------------------------------------------------------------------------

Valor de las marcas comerciales de Software AG--------------------------------------------------

42. Las marcas NATURAL Y ADABAS han sido utilizadas en la industria del software por más de cuarenta años por Software AG y sus distribuidores contractuales autorizados, y sólo por ellos, para referirse a ciertos productos creados, fabricados y mantenidos por Software AG. Estas marcas están apsiadas a productos de Software AG en todo el mundo. Las marcas nunca han sido utilizadas para referirse a distribuidores sin los productos, o a ningún producto distinto de los de Software AG que pudieran estar asociados a los distribuidores. En la medida en que las marcas han sido utilizadas por los distribuidores, han sido utilizadas para referirse a los productos de Software AG, y en la medida en que las marcas han sido identificadas con un distribuidor en un territorio, lo han sido como distribuidor de productos fabricados por Software AG.--------------------------------------------------------------------------------------------

43. El valor inherente de las marcas fue reconocido en la serie de contratos de distribución celebrados entre las partes. En el Contrato de 1984 (Párrafo 5(1)), la antecesora en derechos de Consist, PACS, expresamente convino: ---------------------------------------------------------

... referirse a la autoría de SAG y mostrar los símbolos de copyright y marca registrada de SAG.. -----------------------------------------------------------------------------------------------------

... reconoce[] los SISTEMAS [NATURAL y ADABAS] y toda la documentación o información como secreta comercial de SAG, y se compromete[] a obligar también a su personal a proteger los SISTEMAS, así como también sus derechos de autor y marcas comerciales, y evitar su uso no autorizado.-----------------------------------------------------

44. Cuando Schnell le dio a Fridman permiso para registrar las marcas NATURAL y ADABAS en Brasil, fue en el ámbito de la obligación expresamente asumida por PACS de proteger las marcas NATURAL y ADABAS en nombre de Software AG, así como también de evitar cualquier uso no autorizado de dichas marcas –incluido el uso no autorizado por parte de "su propio personal", que estaba específicamente obligado a proteger las marcas de Software AG. Un integrante de "su propio personal", por supuesto, era y es Fridman, quien además es presidente de Consist Software Solutions, Inc. (anteriormente Consist International, Inc."), y de Consist-Brasil. Debido a la obligación contractual asumida por PACS –una obligación cuyo cumplimiento fue expresamente garantizado tanto por Fridman como por Consist-Brasil (Contrato de 1984, ¶ 10)- Schnell no tenía motivos para creer que Consist pretendería alegar titularidad alguna sobre las marcas NATURAL y ADABAS de un modo distinto que como agente de Software AG. -------------------------------------------------------

45. Las partes reforzaron su entendimiento mutuo del valor inherente de las marcas en el Contrato de 1998 (Párrafo 5(1)), en el cual Consist convino: tomar todas las medidas necesarias y razonables a fin de asegurar que la naturaleza privada e integridad de los SISTEMAS sean protegidos contra su uso no autorizado, duplicación o modificación.----------

reconoce[] los SISTEMAS o información como secreto comercial de SAGA, y se compromete[] a obligar también a su personal a proteger los SISTEMAS, así como también sus derechos de autor y marcas comerciales, y evitar su uso no autorizado.------

Esta redacción, virtualmente idéntica a la del Contrato de 1984, compromete a Consist, así como a su afiliada totalmente controlada y agente, Consist-Brasil (expresamente incluida en la definición de "Consist" del Contrato de 1998), a tomar las medidas que fueran necesarias para

proteger las marcas NATURAL y ADABAS en beneficio de Software AG, y a no realizar ningún acto en contradicción a dichas marcas, o derogando la asociación entre éstas y los productos de Software AG. ------------------------------------------------------------

46. Si Software AG no tuviera permitido utilizar las marcas NATURAL y ADABAS en Brasil o en cualquier otro lado en el Territorio para identificar productos de software informático con los cuales dichas marcas han sido asociadas por más de 30 años, causaría estragos en el mercado internacional de los productos de Software AG. Obligar a Software AG a volver a asignar una marca a dichos productos en América del Sur tendría costos monetarios y económicos imposibles de estimar. Comercializar productos de Software AG idénticos bajo nombres distintos en diferentes países generaría confusión entre los usuarios y debilitaría la asociación en la industria entre Software AG y sus propios productos. La lesión a la reputación comercial de Software AG sería incalculable.-------------------------------------

Acontecimientos desde la audiencia solicitada la medida cautelar: --------------------------

47. Se pusieron en conocimiento del Tribunal varios asuntos que conciernen los actos de buena fe de Consist los cuales no le habían sido informados en la audiencia de Software AG solicitando la medida cautelar. En primer lugar, Consist no cumplió con su obligación de descubrimiento de pruebas presentando documentos relacionados con el registro de las marcas de Software AG en el Territorio. El 16 de enero de 2008, Software AG solicitó la presentación de "Todos los documentos que estuvieran relacionados con la propiedad o derechos o solicitudes o mantenimiento de derechos intelectuales en el Territorio, incluyendo pero sin limitación, a las marcas ADABAS y NATURAL". (Expediente n.º 36, Gasparo Decl. Ex 1, RFP No. 15). Dos días después, mediante notificación, este Tribunal le ordenó a Consist que cumpla con la solicitud de presentación de los documentos realizada por Software AG. A pesar de la expresa directiva del Tribunal, y sin perjuicio de sus obligaciones según lo establecido en las Normas Federales del Procedimiento Civil, Consist no presentó los documentos ni reveló de otra forma (incluyendo en la audiencia de Software AG solicitando la medida cautelar) que había registrado las marcas de Software AG en dos países que no están dentro del Territorio: Argentina y Uruguay. Al preparar su presentación respecto de la notificación del Tribunal de fecha 1 de febrero de 2008 a sus abogados, Software AG tomó conocimiento de que Consist había registrado NATURAL y ADABAS en Uruguay, y NATURAL, ADABAS y otras cuatro marcas de Software AG (TAMINO, ENTIRE, COMPLETE y PREDICT) en Argentina. (Expediente n.º 32, Salaverry Decl. 6; Expediente n.º 31, Malone Decl. 5-6.). ----------------------------------------------------------------------

48. El Tribunal también ha sido informado de que, desde la finalización de la audiencia por la medida cautelar, Consist y/o Consist-Brasil se han presentado a la justicia en Brasil y han iniciado dos acciones legales:  Consist Consultoria Sistemas E Representacoes LTDA. c/ Software AG Informatica E Servicos LTDA. y Consist Consultoria Sistemas E Representacoes LTDA y Consist Software LTDA. c/ Software AG y Software AG Brazil Informatica E Servicios Ltda. En estas acciones, Consist ha obtenido, ex parte, ordenes judiciales para (1) prohibir el uso por parte de Software AG de utilizar sus propias marcas, NATURAL y ADABAS con relación a la distribución y mantenimiento de sus propios productos en Brasil y (2) obligar a Software AG a proveerle a Consist el acceso a los servicios de mantenimiento y productos sobre los cuales Software AG no tiene la obligación contractual de proveer y sobre los cuales Consist no tiene el derecho contractual de recibir. Este Tribunal desconoce si Consist le ha proporcionado información exacta y cabal al Tribunal de Brasil respecto de esta acción, o sobre el hecho de que, aún al momento de presentar sus solicitudes, este Tribunal estaba preparando una resolución, después de la realización de una audiencia en que ambas partes tuvieron la oportunidad de presentar sus argumentos, relacionada con los mismos temas que eran el objeto de las solicitudes ex parte en Brasil. Sin embargo, El Tribunal entiende que Consist, Fridman y su asesoría legal en los

Estados Unidos, el Estudio Duane Morris LLP actuaron de mala fe, y con la intención de obstaculizar las facultades de este Tribunal para tomar resoluciones sobre este asunto y otorgar un recurso efectivo, cuando la asesoría letrada de Consist solicitó y recibió un aplazamiento de su obligación de responder a preguntas del Tribunal posteriores a la audiencia sin informar al Tribunal que estas solicitudes estaban a punto de ser presentadas o habían sido presentadas. ---------------------------------------------------------------------

CONCLUSIONES DE LA LEY ------------------------------------------------------------------------

Posibilidades de Éxito: Reclamo por Incumplimiento de Contrato (Suscripción de Convenios de Mantenimiento con Vigencia Posterior al 31 de diciembre de 2007). ---------

1. A los efectos de realizar un reclamo por incumplimiento de contrato según las leyes de Nueva York, el actor debe probar (1) la existencia de un contrato; (2) el incumplimiento del contrato por la otra parte; y (3) los daños resultantes de dicho incumplimiento. Ver, por ej. Terwilliger c/ Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000). ------------------------------

2. El que una cláusula sea o no ambigua es una cuestión de derecho a ser resuelta por El Tribunal, y cualquier prueba que escape al contenido del documento en general es inadmisible para resolver dicha cuestión. Baum c/ County of Rockland, 337 F Supp. 2d 454, 466 (citando W., W.W. Assocs., Inc. c/ Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990)). El Tribunal entiende que el Párrafo 3 del Contrato no es ambiguo, por las siguientes razones.-----

3. Deben tenerse en cuenta ciertas premisas para la interpretación de contratos según la legislación del Estado de Nueva York al interpretar un contrato. Los contratos serán interpretados para que tengan sentido y no serán interpretados para crear ambigüedades. Ver 22 N.Y. Jur. 2d Contracts 214, 218, 218 (2008). Los contratos serán interpretados de una manera que otorgará efecto a cada disposición del mismo. 22 N.Y. Jur. 2d Contracts 249 (2008). -----------------------------------------------------------------------------------------

4. Según el Código Comercial Uniforme ("UCC" por sus siglas en inglés), y la jurisprudencia relacionada, la evidencia de costumbres de la industria, cursos de negociación y el curso de la ejecución podrán ser tomados en cuenta, aún sin una resolución del Tribunal de que el lenguaje utilizado es ambiguo. Ver N.Y. U.C.C. Law 2-202; Bazak Int'l Corp. c/ Tarrant Apparel Group, 378 F. Supp. 2 d. 377, 390 (S.D.N.Y. 2005). -----------------------------------

5. El Artículo 2 del UCC es aplicable a este Contrato, sin perjuicio de que se trata de un contrato mixto de bienes y servicios, porque el Contrato en su integridad, es mayormente para la venta y distribución de bienes, en específico, los productos de software de Software A.G. Ver, por ej., Long Lisland Lighting Co. c/ Imo Industries Inc., 6 F.3d 876, 888 (2d Cir. 1993) (aplicando la ley de Nueva York); Coastal Aviation Inc. c/ Commander Aircraft Co., 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996).-----------------------------------------------------------

6. La costumbre de la industria dicta que el Párrafo 3 del Contrato sólo le otorga a Consist el derecho de otorgar contratos de mantenimiento durante el plazo del contrato de distribución. Con software empresarial como ser ADABAS, es habitual que un fabricante o distribuidor otorgue licencias a perpetuidad para el software, y que luego el fabricante o distribuidor suscriba contratos de mantenimiento independientes, con plazo determinado con aquellos clientes. Los contratos de mantenimiento a perpetuidad no existen porque resultarían en compromisos de recursos potencialmente ilimitados para el proveedor del servicio (Ver MacSwain Decl. 15-25).--------------------------------------------------------------------

7. A la luz de los principios que anteceden y los "Hallazgos de Hecho" 16-17 & 38-41, este Tribunal entiende que los Párrafos 3 y 5(4) del Contrato de 1998, leídos en conjunto, no son ambiguos. Según esos párrafos, Consist no estaba autorizada a prestar mantenimiento a los clientes después de la expiración del Contrato en 1998. El Párrafo 3 le autoriza a Consist a otorgar "licencias a perpetuidad o por tiempo limitado, y/o contratos de mantenimiento...". Contrario al argumento de Consist, esto no autoriza a Consist a suscribir "contratos de mantenimiento...a perpetuidad". El adjetivo "perpetuo" se refiere únicamente a la palabra

"licencias", no se refiere a la frase "contratos de mantenimiento". Consist podía otorgar a sus clientes licencias de uso a perpetuidad específicamente para productos de Software AG, pero no contratos de mantenimiento perpetuos. ----------------------------------------------------

8. Esta conclusión está además fundamentada por el hecho de que el Contrato de 1998: (i) no tiene disposiciones para un acceso a los productos y servicios posteriores a la terminación para la prestación de servicios de mantenimiento a los clientes y (ii) no establece un cronograma de pagos por dicho acceso y (iii) no obliga a las partes a negociar de buena fe para arribar a un cronograma de pagos para cubrir el costo de aquellos bienes y servicios a partir de la expiración del Contrato. Dichas disposiciones hubieran sido muy relevantes, debido a que durante el plazo del Contrato de 1998, mientras que Consist generaba ingresos para Software AG, Consist tenía acceso gratuito a los servicios de mantenimiento de Software AG. Expirado el plazo, Consist ya no realizaba pagos a Software AG. ----------------------------

9. En la medida en que Consist o Consist-Brasil ha suscripto contratos con clientes que le obligan a prestar servicios de mantenimiento a aquellos clientes a partir del 1 de enero de 2008, no estaba contractualmente autorizada a hacerlo y lo hizo a su propio riesgo. -------------

10. Consist-Brasil ha operado en todo momento como representante de Consist (la cual posee los efectivos derechos de distribución según el Contrato de 1998 y contratos anteriores) en Brasil. Sus derechos allí no son superiores al de su mandante, cf. RESTATEMENT (THIRD) OF AGENCY 3.04 cmt. b (2007), y está obligada por cualesquiera limitaciones acordadas por su mandante. Por lo tanto, la facultad de Consist-Brasil de suscribir contratos sean de provisión o mantenimiento no es mayor que la de Consist, la compañía que, de acuerdo a la ley contractual de Nueva York, era la exclusiva distribuidora en el Territorio. ----------------

11. Al permitir que su representante, Consist-Brasil, suscriba contratos que exceden la expiración del contrato de distribución de Consist, Consist ha violado el Contrato de 1998. ----

**Reclamo por incumplimiento del Contrato. Daño irreparable**------------------------------

12. En la medida que los clientes le abonan dinero a Consist en concepto de los contratos de mantenimiento no autorizados, dinero que de otra forma hubiera sido abonado a Software AG a raíz de un nuevo contrato de mantenimiento posterior a la expiración que debió haber tenido la facultad de suscribir, el monto del daño al demandado resultaría verificable.------------------

13. Sin embargo, esto resulta un extraño incumplimiento de contrato que trae aparejado una posibilidad de daño irreparable. Consist a través de su representante, Consist-Brasil, ha suscripto 179 contratos con clientes brasileros para la prestación de servicios de mantenimiento posteriores al 1 de enero de 2008. Esto ha llevado a una sustancial confusión del consumidor. Además, dado que le resultará imposible a Consist-Brasil el prestar un servicio adecuado para dichos consumidores, este particular incumplimiento de contrato afectará de manera inevitable la reputación de Software AG en el mercado brasileño. Así como se incremente la cantidad de consumidores que necesiten un mantenimiento sofisticado y no lo reciban, lo cual sucederá con el paso del tiempo, se incrementará también el daño a la reputación de Software A.G. -------------------------------------------------------------------

14. Además, parece ser que Consist-Brasil (que, según ha podido comprobar el Tribunal en repetidas ocasiones, no tiene derechos más allá que los de su mandante, Consist) ha acudido a la justicia brasileña y ha obtenido una orden ex parte que obliga a Software AG a proveerle acceso a sus bienes y servicios permitiéndole a Consist-Brasil cumplir con las obligaciones que asumió (en representación de su mandante, Consist), suscribiendo de manera imprudente contratos evidentemente ilegales y no autorizados. Software AG está ahora entre la espada y la pared, ya que el reivindicar su absoluto derecho de rescindir cualquier relación con Consist, resultará en un incumplimiento de la orden del Tribunal de Brasil. Dicho incumplimiento conduciría a la ejecución de la orden del Tribunal de Brasil, lo cual multiplicaría el daño a la reputación de Software AG en el Territorio. --------------------------------------------------------

Reclamo de Publicidad Falsa de Lanham Act: Probabilidad de Éxito sobre los Méritos --

15. La Cláusula 43 (a) del Lanham Act prohíbe el uso comercial de cualquier manifestación falsa o engañosa de un hecho que (1) pudiera causar confusión respecto del origen o afiliación de un producto o servicio ("falsa designación de origen"), o (2) pudiera constituir una manifestación engañosa respecto de la naturaleza u origen geográfico del producto o servicio que se ofrece ("publicidad falsa"). 15 U.S.C. 1125 (a).----------------------------------------------------

16. Para tener éxito en un reclamo de publicidad falsa, el demandante debe demostrar que algunos aspectos de las prácticas publicitarias del demandado son (i) literalmente falsas o (2) verdaderas, pero sin embargo pasibles de perjudicar al demandante a través del engaño y confusión de consumidores respecto de la naturaleza o las características de los productos o servicios del demandado. Ver Register.com, Inc. c/ Domain Registry of Am., 20'02 U.S. Dist. LEXIS 24795, *26-28 (S.D.N.Y. Dec. 27, 2002),; ver también Coca-Cola c/ Tropicana Prods., Inc., 690 F. 2d 312, 317 (2d Cir. 1982).----------------------------------------------------

17. El actor alega que requiere el otorgamiento de una medida cautelar para prevenir que Consist continúe realizando manifestaciones que son literalmente falsas sobre su facultad de prestar servicios de mantenimiento a sus clientes con posterioridad al 1 de enero de 2008. Las manifestaciones realizadas por Consist a sus clientes con relación a su facultad para prestar mantenimiento a dichos ,consumidores con posterioridad al 1 de enero de 1998, son literalmente falsos.----------------------------------------------------

18. Aunque dichas manifestaciones literalmente falsas fueron realizadas por Consist-Brasil en una página web brasileña en portugués, fueron hechas por Consist-Brasil con el conocimiento y aprobación de los demandados Consist International y a instancias de Fridman. ----------

19. Cuando una publicidad es literalmente falsa, el Tribunal puede prohibir su utilización haciendo caso omiso a su impacto en el consumidor. Ver McNeil-P.C.C., Inc. c/ Bristol Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991).----------------------------------------------------

20. La presunta creencia u opinión de buena fe de Fridman respecto de la veracidad de las manifestaciones literalmente falsas del demandado no le representan al demandado defensa alguna contra un reclamo de falsa publicidad bajo el Lanham Act. Se considera que una manifestación sobre un producto es una opinión y no un hecho, únicamente cuando es mera exageración publicitaria, por ej., una declaración respecto de un producto que "no puede verificarse en forma objetiva" y que es "una manifestación exagerada, jactanciosa y alardosa que un comprador razonable no tomaría en cuenta". Ver Robert Groden c/ Random House, Inc. et. al., 1994 U.S. Dist. LEXIS 11794, en *17, 21 (S.D.N.Y. Agosto 22, 1994); Time Warner Cable, Inc. c/ DirecTV, Inc., 497 F.3d 144, 160 (2d Cir. 2007).----------------------------------

21. Las declaraciones de Consist respecto de su facultad de ofrecer servicios de mantenimiento continuos para los productos de Software AG son engañosas, no una exageración publicitaria, ya que son pasibles de ser verificados.--------------

22. Asimismo, el Tribunal específicamente entiende que Consist no creía de buena fe que estas manifestaciones fueran ciertas. Es el entendimiento de este Tribunal que Fridman en todo momento supo que estas manifestaciones sobre la facultad de Consist de prestar servicios de mantenimiento continuos con posterioridad al 1° de enero de 1998 eran absolutamente falsas. ----------------------------------------------------

23. Dado que las declaraciones de publicidad son literalmente falsas, el actor ha satisfecho el estándar para la probabilidad de éxito. Sin embargo, dado que no se dirigió ninguna declaración literalmente falsa en los Estados Unidos o a un consumidor estadounidense, la probabilidad de éxito del actor sobre los méritos de este particular reclamo de falsa publicidad del Lanham Act depende de si el Lanham Act es aplicable a declaraciones literalmente falsas realizadas en el exterior. --------------------------------------------------

24. El Lanham Act es aplicable fuera del territorio únicamente cuando produzca un efecto sustancial en el comercio de los Estados Unidos. Ver Atl. Richfield Co. c/ ARCO Globus

Int'l Co., 150 F.3d 189, 192 n.4 (2d Cir. 1998). En el Segundo Circuito, se utiliza un test de tres factores para determinar si se debe aplicar el Lanham Act a una conducta extraterritorial: (1) si la conducta del demandado ha tenido un sustancial efecto en el comercio de los Estados Unidos; (2) si el demandado es un ciudadano estadounidense y (3) si existe un conflicto de marcas de acuerdo a la ley extranjera. Vanity Fair Mills, Inc. c/ T. Eaton Co., 243 F.2d 633, 642 (2d Cir. 1956). Ninguno de estos factores es dispositivo, las cortes deben balancear los factores al decidir si "los contactos e intereses de los Estados Unidos son suficientes para apoyar el ejercicio de la jurisdicción extraterritorial". Warnaco Inc. c/ VF Corp., 844 F. Supp. 950 (S.D.N.Y. 1994). El Segundo Circuito ha sostenido que se deben cumplir como mínimo dos factores para que las cortes puedan aplicar el Lanham Act extraterritorialmente. Ver Totalplan Corp. of America c/ Colborne, 14 F.3d 824, 831 (2d Cir. 1994). --------------------------

25. Consist es una sociedad estadounidense con su sede social en Nueva York, y Fridman ha residido en Nueva York desde el año 1988. Por lo tanto, el factor "ciudadanía" del test de Vanity Fair Mills se cumple. ----------------------------------------------------------------------------

26. No existe un conflicto relevante entre los Estados Unidos y la ley extranjera. Dado que las declaraciones de Fridman respecto de la facultad de Consist de prestar mantenimiento a sus clientes son literalmente falsas, dichas declaraciones violan el propósito de las leyes respectivas tanto en Brasil como en los Estados Unidos. La ley brasileña prohíbe la publicación de información falsa realizada con el propósito de obtener una ventaja competitiva. (Ver Flesch Decl. 42-45, Expediente n.° 30; Ley de Propiedad Industrial de Brasil, No. 9279/96 (14 de mayo de 1996), y su modificación por Ley 10.196 (14 de febrero de 2001). Al igual que el Lanham Act prohíbe la publicidad falsa, la ley de Brasil protege contra el engaño en el mercado. Por lo tanto, no hay indicación de un conflicto con la ley extranjera que pudiera afectar el reclamo por falsa publicidad del actor según el Lanham Act.-

27. Finalmente, la continua conducta indebida de los demandados tendrá un efecto sustancial en el comercio de los Estados Unidos. Los servicios de soporte (más allá del soporte para Nivel 1 básico) para usuarios de Brasil de los productos de Software AG, son provistos fuera del complejo de SAG en Estados Unidos. Este complejo, que emplea 125 personas, está ubicado en Denver, Colorado. Sin acceso a este complejo o su personal, Consist no puede cumplir ninguna obligación que haya asumido en contrato alguno para prestar mantenimiento con posterioridad al 1.° de enero de 2008. Las falsas manifestaciones de Consist respecto de su facultad de prestar servicios de mantenimiento con posterioridad al 31 de diciembre de 2007, han afectado sustancialmente el comercio de los Estados Unidos causando confusión entre los consumidores de Brasil respecto de quién puede prestar los servicios de soporte de sus productos. Ver Tr. at 64-65, 72-73; cf. Warnaco, 844 F. Supp. at 951. Como resultado de esta confusión, los consumidores brasileños han tenido reservas y se han negado a suscribir contratos de mantenimiento con SAG. Estas reservas son exacerbadas por la orden ex parte del Tribunal brasileño que le ordenó a Software AG a continuar proveyéndole a Consist (a través de su representante, Consist-Brasil) el acceso a servicios de mantenimiento con base en los Estados Unidos. Si estos consumidores hubieran suscripto contratos de mantenimiento con Software AG desde el 1.° de enero de 2008, tal como lo contempla claramente el Contrato de 1998, estos contratos, con un valor de varios millones de dólares, hubieran sido ejecutadas en una parte sustancial desde el complejo de mantenimiento de Denver, por aquellos trabajadores estadounidenses. Aún asumiendo que (i) el honorario mensual de esos 179 contratos de mantenimiento es, en promedio, de sólo $ 40.000 por mes (aproximadamente la mitad del honorario PRODESP) y (ii) los contratos, en promedio, sólo desde la expiración del Contrato por seis meses, implicarían más de $ 40 millones en actividad comercial con un impacto directo en los Estados Unidos. ----------------------------------------------------------------------

28. Habiendo aplicado los factores de <u>Vanity Fair Mills</u> a este caso, concluyo que corresponde la aplicación del Lanham Act. Software AG ha demostrado una probabilidad de éxito en este reclamo de falsa publicidad según el Lanham Act. --------------------------------------------------

**Reclamo por Falsa Publicidad según el Lanham Act: Daño Irreparable** --------------------

29. A los efectos de obtener una medida cautelar para el reclamo de falsa publicidad del Lanham Act, el actor debe demostrar que es posible de sufrir un daño irreparable en ausencia de dicha medida. El Segundo Circuito ha sostenido que un demandante, al demostrar que es pasible de sufrir un daño irreparable, "puede no .... puntualizar una efectiva pérdida o desvío en las ventas" porque "es virtualmente imposible probar que una determinada cantidad de ventas será perdida o que la reputación del buen nombre será dañada como resultado directo de la publicidad del competidor". <u>Time Warner Cable</u>, 497 F.3d at 161 (citando <u>Coca-Cola</u>, 690 F.2d at 316). -------------------------------------------------------------------------------------

30. Este Tribunal ha sido advertido de que, en algún momento entre el 1 y 14 de febrero de 2008, una corte en brasil otorgó una medida cautelar ex parte ordenando a Software AG a proveerle a Consist el acceso a los productos y servicios de mantenimiento en forma continua, aún cuando Software AG ya no tenía una obligación contractual de hacerlo. (Ver la Carta al Tribunal del 14/2/08 de James D. Jacobs). El efecto de esta medida cautelar obligatoria (la cual fue obtenida sin corrersele traslado a Software AG y sin darle la oportunidad de ser oída) surtirá tres efectos. Primero, aquellos que eran consumidores de Consist no podrán suscribir contratos de mantenimiento con clientes de Software AG, aún siendo Software AG la única entidad que puede legalmente ofrecer estos servicios a partir de la fecha de expiración del Contrato. Segundo, la facultad de Software AG de convertirse su propio distribuidor en el mercado de Brasil, a lo que tiene absoluto derecho desde el 1 de enero de 2008, se ve seriamente obstaculizado si Software AG no cumple con esta medida cautelar para realizar actividades comerciales en Brasil. Tercero, porque el Contrato de 1998 no contiene una disposición expresa respecto del pago a realizarse por dichos servicios (los cuales fueron provistos en forma gratuita mientras Consist era el exclusivo distribuidor de Software AG), ni una disposición que obligue a las partes a negociar de buena fe para convenir honorarios adecuados por dichos servicios (esto es entendible, ya que las partes no contemplaron dichos servicios cuando suscribieron el Contrato de 1998), el efecto básico de la medida cautelar en Brasil es obligar a Software AG a que provea los productos y servicios a Consist en forma gratuita, sin recibir contraprestación por parte de Consist, su antiguo distribuidor. Todo lo anterior constituye daño irreparable. ----------------------------------------------------------------------------

**Probabilidades de Éxito: Reclamo por Incumplimiento de Contrato (Reasignación de Marcas/Ejecución Específica)** ----------------------------------------------------------------------------

31. Este Tribunal, al determinar la ley extranjera, podrá considerar cualquier material o fuente relevante sea o no prueba admisible o presentada por la parte. Las determinaciones de la ley extranjera realizadas por el Tribunal son tratadas como sentencias sobre cuestiones de derecho. Ver Fed. R. Civ. P.44.1. ------------------------------------------------------------------------------

32. La ley alemana es la que regía la relación contractual entre Software AG y Consist hasta el 1 de enero de 1995, la que luego fue sustituida por la legislación de Nueva York. ------------------

33. La naturaleza del contrato entre Consist y Software AG respecto del registro de marcas en el Territorio depende de la interpretación del acuerdo oral realizado entre el Sr. Fridman y el Sr. Schnell, autorizando a Consist a registrar las marcas. Según la ley alemana, se deben considerar los principios fundamentales de la buena fe y las sanas prácticas comerciales al interpretar un contrato o al interpretar un acuerdo oral entre partes. Se podrán analizar las circunstancias externas que rodean una declaración sea oral o escrita de la parte para determinar la intención de dicha parte. (Ver Fammler Decl. 5, 18). ----------------------------------------------

34. El contrato de 1984 entre PACS (Consist) y Software AG constituye una circunstancia externa sobre la cual Consist y Software AG manifestaron sus intenciones respecto de la

relación que los unía. (ver id. 19). Este contrato obligaba a Consist (y a Fridman y Consist.Brasil, que específicamente garantizaba las obligaciones de Consist) a proteger los sistemas y marcas de Software AG. ------------------------------------------------------------

35. Por lo tanto, cuando Consist-Brasil registró ADABAS y NATURAL en el Territorio a su propio nombre, lo hizo según la obligación contractual de Consist de proteger las marcas y su propia garantía de dicha obligación. (Ver Fammler Decl. 20). -----------------------------------

36. Según la ley alemana, el derecho de un distribuidor a utilizar la marca principal cesa a la terminación del contrato de distribución. (Ver Fammler Decl. 23, Stumpf, Der Vertragshandlervertrag, 3º edición 1997, nota 725). Por lo tanto, en el momento que las marcas fueron registradas por Consist-Brasil, la ley aplicable requería que las marcas le fueran reasignadas a Software AG a la terminación de la relación entre el distribuidor y el mandante.

37. Sin perjuicio de que la ley aplicable para la interpretación del contrato suscripto por las partes se modificó a la de Nueva York en 1995, la esencia de los derechos y obligaciones de las partes no se modificaron. Consist (a través de su representante intermediario Consist-Brasil) había ya registrado las marcas en el Territorio de acuerdo a la obligación contractual mutua de proteger la propiedad intelectual de Software AG. En consecuencia, Consist continuó siendo el titular de esos registros de marcas (a través de su representante, Consist-Brasil) en beneficio de Software AG, y tenía una obligación contractual implícita de transferir esos registros de marcas a Software AG cuando la relación por el contrato de distribución entre las partes expirara. (ver Fammler Decl. 22-25, 28). --------------------------------------------

38. No hay prescripción para las acciones que Software AG pueda tomar para obtener una orden para que Consist obligue a Consist-Brasil (o cualquier otra entidad de Consiste que haya registrado marcas asociadas a los productos de Software AG) a transferir las marcas a Software AG. Consist-Brasil registró las marcas a mediados de los años 80, sin embargo la violación del contrato que aquí se alega es el incumplimiento contractual de entregar las marcas brasileñas a la entidad en cuya representación Consist (a través de Consist-Brasil) estaba protegiendo aquellas marcas. No hubo lugar a reclamo por incumplimiento de entregar dichas marcas hasta el 1 de enero de 2008. Hasta entonces, Consist (a través de su representante, Consist-Brasil) tenía con derecho dichos registros a su nombre de acuerdo a los varios contratos de distribución exclusiva según los cuales se encontraba obligada a proteger las marcas dentro del Territorio. Fue en el momento en que expiraron dichos contratos de distribución el 31 de diciembre de 2007, y cuando Consist se negó a transferir los registros de marcas brasileñas a Software AG, que Consist violó su obligación de buena fe y las sanas prácticas comerciales hacia Software A.G. --------------------------------------------------------

39. Los demandados insisten en el hecho de que ausente una explícita disposición contractual que permita la revocación, el consentimiento a registrar la marca no puede ser revocado con posterioridad. Pero la revocación del consentimiento, o la revocación de los registros de marcas en Brasil, no es el asunto a tratar en este caso. El asunto a tratar es si las marcas brasileñas deben ser entregadas a Software AG a la terminación de la relación contractual entre las partes. --------------------------------------------------------------------------------

40. Los demandados argumentan que, debido a que Consist-Brasil no ha sido nombrada ni notificada como parte demandada en esta acción, cualquier orden dirigida a transferir sus marcas ADABAS y NATURAL en Brasil a Software AG implicaría un arrebato de su propiedad sin mediar el debido proceso legal. Sostienen que una marca no puede ser transferida sin el buen nombre asociado con la marca, y que el buen nombre de los registros de marcas brasileños ADABAS y NATURAL son de Consist-Brasil. Por el contrario, el buen nombre asociado con las marcas es el buen nombre de las actividades comerciales de Consist, no de Consist. El buen nombre de las actividades comerciales asociado con las marcas NATURAL y ADABAS reside enteramente en la distribución por parte de Consist de los productos de Software AG. Consist ya no tiene el derecho a distribuir los productos de

Software AG, por lo tanto ya no goza de ningún derecho al bueno nombre de las actividades comerciales que se encuentra asociado a las marcas. En cuanto a Consist-Brasil, actuó en todo momento como representante de Consist (el efectivo titular de los derechos de distribución) en Brasil. No tenía derecho alguno según el Contrato de 1984 ni del Contrato de 1998 que no fueran derechos derivados de su mandante, y sus derechos según estos contratos no eran mayores que los derechos de su mandante. Consist, el mandante, ha tenido una completa y justa oportunidad de litigar este reclamo en la jurisdicción elegida por las partes para los contratos, y según las leyes convenidas por las partes. Por lo tanto, no viola el proceso debido el ordenarle a Consist que obligue a Consist-Brasil, su representante afiliada enteramente controlada, a entregarle o transferir las marcas brasileñas a Software AG. ------------------------

41. Según la ley de Nueva York, la cual rige el Contrato de 1998, en todos los contratos existe un convenio implícito de buena fe y de sanas prácticas comerciales. Ver Dalton c/ Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995); acuerdo Filner c/ Shapiro, 633 F.2d 139, 143 (2 Cir. 1980). Este convenio comprende el cumplimiento de "cualesquiera promesas que una persona razonable en posición del receptor podría entender que están justificadamente incluidas". Dalton, 87 N.Y.2d at 389 (citando Rowe c/ Great Atl. & Pac. Tea Co., 46 N.Y.2d62, 69, 385 N.E.2d 566, 569 (1978). Este Tribunal entiende que Consist ha violado el convenio implícito de buena fe y sanas prácticas comerciales al negarse a entregar los registros de marcas en el Territorio a su titular legítimo (Software AG) a la terminación del Contrato de 1998. -------------------------------------------------------------------------

42. Los derechos de Consist para utilizar las marcas de Software AG en el Territorio cesaron al expirar el contrato de distribución. Las cortes han sostenido que, ausente una clara manifestación de intención por parte de un proveedor a transferir la titularidad de una marca al distribuidor, el proveedor se mantendrá como el titular legítimo de los registros marcarios a la terminación de la relación de distribución. Ver, por ej., Ushodaya Enerprises, Ltd. c/ V.R.S. Int'l. Inc., 63 F. Supp. 2d 329, 336 (S.D.N.Y. 1999); Columbia Nastri & Carta Carbne S.p.A. c/ Columbia Ribbon & Carbon Mfg. Co., 1965 U.S. Dist. LEXIS 6862 (S.D.N.Y. 23/11/1965), aff'd 367 F.2d 308 (2d. Cir. 1966). No existe prueba en este registro de una clara manifestación por parte de Software AG de transferir la titularidad de las marcas asociadas a sus productos a su anterior distribuidor. Los registros marcarios de Consist en el Territorio no prevalecen sobre los derechos a la titularidad que posee Software AG sobre sus propios productos. ----------------------------------------------------------------------------

43. Columbia Nastri posee una fuerte semejanza en los hechos con este caso, y la sentencia del Juez Palmieri en Columbia Nastri apoya las conclusiones de este Tribunal hace en este caso. En Columbia Nastri, una compañía estadounidense fabricaba materiales para la copia al carbón en todo el mundo y utilizaba a una compañía italiana como su fabricante y distribuidor extranjero. El contrato entre las partes le otorgaba a la empresa italiana un permiso exclusivo para utilizar ciertas marcas en Italia, y obligaba a la compañía estadounidense a proveerle asistencia técnica. Los registros marcarios en Italia estaban a nombre de la compañía italiana. Luego de varias renovaciones del contrato de regalías, las partes no pudieron llegar a un acuerdo para una nueva extensión del plazo. La compañía italiano argumentó que las marcas italianas eran de su propiedad porque estaban registradas a su nombre, y que según la ley de Italia, el registrante es el propietario. Sin embargo, el Tribunal de distrito sostuvo que: las marcas extranjeras eran propiedad del proveedor; los registros marcarios extranjeros eran propiedad de la compañía extranjera como representante y fideicomisaria para el proveedor; y la compañía extranjera estaba facultada a utilizar la marca únicamente de acuerdo a los términos de los contratos con el proveedor, y únicamente mientras dichos contratos continuaran en vigor. El Tribunal le ordenó a la compañía italiana a transferir los registros marcarios extranjeros al proveedor y le prohibió a la compañía italiana a utilizar las marcas del proveedor en el país extranjero. Ver Columbia Nastris, 1965 U.S.

Dist. LEXIS at *6, 18-20. La sentencia del Juez Palmieri fue confirmada por el Segundo Circuito. Ver Columbia Nastri, 367 F.2d at 313-14). ----------------------------------

44. En alineación con Columbia Nastri, este Tribunal sostiene que las marcas de Software AG en el Territorio, aunque estén registradas a nombre del representante de Consist, Consist-Brasil, son propiedad de Software AG. Están asociados con los productos y el buen nombre emergente de dichos productos, propiedad de Software AG, y fueron registradas por Consist-Brasil (actuando en calidad de representante de Consist y como garante de sus obligaciones según el Contrato de 1984) de acuerdo a la obligación contractual de Consist de proteger las marcas de Software AG. Dado que la relación contractual entre las partes ha terminado, Consist debe transferir los registros marcarios en el Territorio a su propietario legítimo, Software AG. Al negarse a hacerlo, Consist ha violado el convenio implícito de buena fe y sanas prácticas comerciales inherentes del Contrato de 1998. ------------------------------

**Reclamo de Incumplimiento Contractual (Reasignación de Marcas/Ejecución Específica)** ----------------------------------------------------------------------------

45. Las marcas ADABAS y NATURAL han sido utilizadas a nivel mundial por más de tres décadas para identificar los productos de Software AG, y están asociadas en todas partes con los productos conocidos como ADABAS y NATURAL, los cuales son fabricados por Software AG. Si Consist (a través de su representante Consist-Brasil) tuviera facultades para controlar las marcas asociadas a los productos de Software AG, cuyo derecho de distribución ya no poseen ni Consist ni ninguno de sus representantes, los actores sufrirían un daño irreparable. Se vieron imposibilitados de designar sus sistemas operativos y productos asociados con los nombres que han adquirido una asociación con dichos sistemas operativos y productos asociados, y estarían sujetos a un acoso por parte de Consist. No hay forma de calcular el daño a Software AG, especialmente hacia su reputación comercial, resultando de su incapacidad de identificar sus propios productos con los nombres que se encuentran asociados a dichos productos durante tanto tiempo. Tampoco existe forma de calcular el daño a Software AG si tuviera que designar sus productos ADABAS y NATURAL y productos asociados con marcas nuevas para poder venderlos en Brasil.-----------------------------

**Posibilidad de Éxito: Interferencia Ilícita con las Relaciones Comerciales Prospectivas---**

46. Para realizar un reclamo de interferencia ilícita con las relaciones comerciales prospectivas según la ley de Nueva York, el demandante debe demostrar que: ha tenido relaciones comerciales con un tercero; que el demandado conocía dicha relación e intencionalmente interfirió con la misma; que el demandado actuó exclusivamente con malicia, o utilizó medios deshonestos, injustos o impropios y que la interferencia del demandado le causó un perjuicio a la relación. Ver, por ej. Kirch c/ Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006). --------------------------------------------------------------

47. Al suscribir un nuevo contrato con PRODESP para proveer servicios de mantenimiento después del 17 de diciembre de 2007, cuando este Tribunal anunció su decisión en un juicio previo, Consist interfirió ilícitamente con las relaciones comerciales prospectivas de Software AG, en tanto Software AG podría haber suscripto contratos de mantenimiento con aquellos clientes si Consist no lo hubiera hecho. -----------------------------------------------

48. Consist no podría haber argumentado ninguna creencia de buena fe en el sentido de que se encontraba autorizada a proveer el servicio a los clientes a partir de la expiración del Contrato de 1998, por las razones esgrimidas arriba. Además, al suscribir un contrato de mantenimiento con PRODESP, Consist, sabiendo que los actores tenían proyectado el suscribir una relación comercial con PRODESP como resultado de la decisión del Tribunal, intencionalmente interfirió con la relación y lo hizo exclusivamente en forma maliciosa o a través de medios deshonestos, injustos o impropios. El fraude y las falsas manifestaciones hacia los consumidores son reconocidos como "medios indebidos" que fundan el reclamo por

interferencia ilícita con las relaciones comerciales prospectivas. Ver, por ej. <u>Carvel Corp. c/ Noonan</u>, 3 N.Y.3d 182, 190-92, 818 N.E. 2d 1100, 1103-05 (2004) (autoridades citantes). -----

49. El argumento de Consist en el sentido que actuaba para proteger sus legítimos intereses comerciales, lo cual si fuera cierto, anularía la malicia, es sospechoso. A partir del anuncio de la decisión de este Tribunal, Consist sabía muy bien que el Contrato iba a expirar el 1 de enero de 2008. Consist no tomó ninguna medida para impedir la efectividad de la sentencia final del Tribunal pendiente de apelación; en su lugar, permitió que el Contrato expirara, realizando acciones para impedir la facultad de este Tribunal para hacer valer su sentencia, y haciéndolo a través de un representante, Consist-Brasil, que no era parte en ninguna acción.---

**Balance de Equidades** -----------------------------------------------------------------

50. El Tribunal entiende que los actores tienen posibilidades de éxito en todos los reclamos mencionados anteriormente. Pero aún si Software AG hubiera tenido éxito únicamente en presentar serias cuestiones hacia los méritos de los reclamos realizados, hubiera estado facultada a obtener una medida cautelar, porque la balanza de equidades se inclina decididamente a su favor. Ver, por ej., <u>Green Party c/ N.Y. State Bd. Of Elections</u>, 389 F.3d 411, 418 (2d Cir. 2004). --------------------------------------------------------------

51. Software AG se enfrenta a la pérdida de su derecho a utilizar las marcas que por mucho tiempo han distinguido sus productos, algunos por más de 30 años, en un mercado creciente y significante (América del Sur) donde cientos de consumidores en siete países utilizan software de SAG. También enfrenta la pérdida del buen nombre que se encuentra asociado a sus productos por la flagrante confusión creada por la continua facultad de Consist de proveer servicios de mantenimiento. ------------------------------------------------------------

52. En contraste, no hay equidades en favor de Consist. Esperó hasta cuatro meses antes de la finalización del período de notificación de 18 meses para iniciar una acción para resolver si podía continuar como un distribuidor de Software AG, se negó al ofrecimiento de este Tribunal de mantener una audiencia urgente respecto de su solicitud de impedir la expiración del Contrato de 1998 (prefiriendo un curso más reposado que fijó la audiencia para tres semanas antes de la expiración del Contrato), y luego dejó de apelar la sentencia del Tribunal permitiendo que el Contrato expirara. Suscribió contratos de mantenimiento con consumidores luego de haber sido notificada que su posición de distribuidor estaba a punto de expirar. No tomó ningún recaudo para clarificar su situación a tiempo como para permitir una significativa entrega de la responsabilidad a Software AG. Sabiendo que su situación como distribuidor de Software AG estaba finalizando, se comprometió, a través de sus afiliadas o subsidiarias, a registrar marcas cuyo derecho a utilizar estaba a punto de perder. -----------------

53. Finalmente, y más importante aún, los demandados en forma deliberada alteraron el status quo durante el trámite de la acción acudiendo ex parte a las cortes brasileñas (a través de sus afiliadas o subsidiarias enteramente controladas en Brasil), para obtener órdenes respecto de asuntos en juicio mientras que esos mismos asuntos eran sub judice. Esto fue realizado sin notificación a Software AG o a este Tribunal. Como resultado, este Tribunal no tiene porqué creer que nuestros estimados colegas de Brasil estaban en conocimiento del hecho de que este Tribunal ya había mantenido audiencias completas y estaba en proceso de decisión sobre los asuntos que están relacionados con el proceso en Brasil. Hasta donde este Tribunal entiende, Consist y Fridman tienen las manos sucias. ------------------------------------------------

**Es Necesaria y Apropiada una Medida Cautelar Obligatoria para Restaurar el Status Quo Pendente Lite** ----------------------------------------------------------

54. Las pautas para el otorgamiento de una medida cautelar son el daño irreparable y ya sea una posibilidad de éxito sobre los méritos o una cuestión lo suficientemente seria hacia los méritos junto con un balance de las equidades favoreciendo a la parte que solicita la medida cautelar. Ver, por ej. <u>Louis Vuitton Malletier c/ Dooney & Bourke, Inc.</u>, 454 F.3d 108, 114 (2d Cir. 2006). La carga de la prueba recae sobre la parte que solicita la medida cautelar. ----------

55. Para obtener el remedio de la medida cautelar, la parte que solicita la misma debe satisfacer una carga superior a la necesaria para obtener dicha medida cautelar. Una medida cautelar implica una prohibición, manteniendo el status quo mediante la restricción de hacer algo, mientras que una medida cautelar obligatoria exige un acto afirmativo u obliga la realización de una conducta. El Segundo Circuito ha sostenido que para obtener un remedio de medida cautelar obligatoria, el demandante deberá demostrar una "clara" o "sustancial" posibilidad de éxito sobre los méritos, no únicamente una posibilidad de éxito. Ver por ej., Louis Vuitton Malletier, 454 F.3d at 114 (se omiten las citas); Sunward Elecs., Inc. c/ Mc Donald, 362 F.3d 17, 24 (2d Cir. 2004); Christie-Spencer Corp. c/ Hausman Realty Co., Inc., 1118 F.Supp.2d 408, 418 (S.D.N.Y. 2000). --------------------------------------------------------------

56. Sin embargo, "cuando un demandado notificado de un procedimiento de medida cautelar realiza actos que se busca prohibir el Tribunal podrá por medida cautelar obligatoria restaurar el status quo". Moore c/ Consol. Edison Co. de Nueva York, Inc., 409 F.3d 506, 510 n.4 (2d Cir. 2005) (citando Porter c/ Lee, 328 U.S. 246, 251 (1946)). Tal como se discute más arriba, Fridman y Consist ciertamente estaban notificados de los procedimientos que se tramitaban ante el Tribunal, sin embargo en forma deliberada alteraron el status quo solicitando un recurso, ex parte, ante las cortes de Brasil. ------------------------------------------------------------

57. El Tribunal entiende que los actores han demostrado no sólo una probabilidad de éxito sobre los méritos pero una clara y sustancial probabilidad de éxito sobre los méritos de todos los reclamos en cuestión. Por lo tanto, es apropiado otorgar una medida cautelar obligatoria para restaurar el status quo. -----------------------------------------------------------------------

58. A los efectos de restaurar el status quo, El Tribunal deberá ordenar a Consist y Fridman que obliguen a Consist-Brasil, y a cualquier otra subsidiaria o afiliada extranjera de Consiste que haya actuado como representante según el Contrato de 1998 y sus predecesores, a realizar ciertas acciones, y a abstenerse de realizar ciertas acciones, en las cortes y entidades administrativas o estatales de los países del Territorio. -------------------------------------------

59. La facultad de las cortes federales de impedir juicios extranjeros a personas sujetas a su jurisdicción se encuentra acabadamente establecida. China Trade and Development Corp. c/ M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987) (citando U.S. c/ Davis, 767 F.2D 1025, 1038 (2D cIR. 1985), y Laker Airways, Ltd. c/ Sabena Belgian World Airlines, 731 F.2d 909, 926 (D.C. Cir. 1984)). A pesar de que la medida cautelar concierne únicamente a las partes, y no directamente contra una corte extranjera, la necesidad de velar por los principios internacionales de cortesía aún existe porque una orden de dicha naturaleza efectivamente restringe la jurisdicción del Tribunal extranjero. Ver id. At 35-36 (citando a Davis, 767 F.2d at 1038). ----------------------------------------------------------------------------------

60. En China Trade, el tribunal de distrito (Motley, J.) le prohibió al demandado continuar con el procedimiento de una acción contra los actores en las cortes de Corea. El tribunal de distrito otorgó la medida cautelar porque (1) las partes de la acción en Corea eran las mismas partes que la acción en Nueva York; (2) la cuestión de responsabilidad esgrimida por el demandado en el tribunal de Corea era la misma cuestión de responsabilidad esgrimida en el tribunal de Nueva York; (3) el trámite judicial en Corea resultaría abusivo para los actores de la acción de Estados Unidos, la cual había sido presentada con anterioridad; y (4) permitir la continuación del trámite judicial en Corea hubiera resultado en una sentencia apresurada. 837 F.2d at 34. ---

61. Para determinar si debía impedirse la acción judicial extranjera, el Juez Motley utilizó un test que usan algunos jueces en el Distrito Sur, y que se conoce como el test China Trade. Primero, deben concurrir dos requisitos umbrales para que proceda una medida cautelar anti-litigio extranjero: (1) las partes deben ser las mismas en ambos casos y (2) la resolución del caso ante el tribunal que dispone la prohibición debe ser dispositiva de la acción a ser prohibida. Si concurren estos dos requisitos umbrales, entonces deberán considerarse cinco factores adicionales: (1) frustración de una política en el fuero de la prohibición; (2) que la

acción extranjera sea abusiva; (3) si la misma presenta una amenaza a la jurisdicción in rem o quasi in rem del tribunal; (4) si el procedimiento en el otro fuero perjudica otras consideraciones de equidad; y (5) si la adjudicación de las mismas cuestiones en acciones separadas resultaría en una demora, inconveniente, gasto, incongruencia o apresuramiento en la decisión. Ver China Trade, 837 F.2d at 35. El tribunal de distrito entendió que se habían cumplido dos requisitos, y que existían los factores de abuso y "apresuramiento" en la sentencia. Considerando esto como suficiente, el tribunal de distrito prohibió el litigio extranjero.------------------------------------------------------------------------------

62. El Segundo Circuito revocó la decisión del tribunal de distrito, entendiendo que se había excedido en otorgar la medida cautelar anti-litigio porque no se veía frustrada ninguna política importante del fuero al permitir que continúe a la acción de Corea, la acción de Corea no era una amenaza a la jurisdicción del tribunal de distrito, y los factores de equidad sobre las que se fundó el tribunal de distrito no eran suficientes para superar la limitación y precaución requerida por la cortesía internacional. Id. at 34, 37. El Segundo Circuito entendió que los factores de "abuso" y el "apresuramiento en la sentencia" eran pasibles de estar presentes siempre que hayan acciones paralelas tramitándose en forma concurrente, y que por lo tanto una medida cautelar anti-litigio basada únicamente en estos factores menoscabaría la política que permite los procesos paralelos y desfavorece medidas cautelares anti-litigios innecesarias. El tribunal entonces sostuvo que dos factores discrecionales distintos, si el litigio extranjero representa una amenaza para (1) la jurisdicción del fuero de prohibición y (2) las fuertes políticas públicas del fuero de prohibición, son más importantes que dos factores en los que se basó el Juez Motely en su decisión. El Circuito dejó sentado que, mientras que una medida cautelar anti-litigio podría ser apropiada cuando una parte intenta evadir el cumplimiento de una ley del fuero que efectiviza importantes políticas públicas, una medida cautelar no es apropiada meramente para prevenir que la parte busque "leves ventajas en la ley sustancial o de procedimiento a ser aplicada en el tribunal extranjero". Chine Trade 837 F.2d at 37 (citando Laker, 731 F.2d at 931 n. 73). Sin embargo, el Tribunal de Apelaciones respaldó la aplicación del llamado test de China Trade para decidir si es apropiado ordenar una medida cautelar anti-litigios extranjeros contra personas sujetas a la jurisdicción de las cortes de Estados Unidos. ---------------------------------------------------------------------

63. El Segundo Circuito recientemente clarificó el test de China Trade al confirmar la decisión del tribunal de Distrito al otorgar una medida cautelar anti-litigio extranjero en Karaha Bodas Co., L.L.C. c/ Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111 (2d Cir. 2007). El Circuito primero reiteró los elementos esenciales del test (es decir, una medida cautelar anti-litigio extranjero podrá ser impuesta únicamente si se cumplen dos requisitos umbrales; si esos dos requisitos se cumplen, las cortes deberán considerar una cierta cantidad de factores adicionales, incluyendo el hecho de si el litigio paralelo podría (1) frustrar la política del fuero de prohibición; (2) resultar abusivo; (3) amenazar la jurisdicción in rem o quasi in rem del tribunal; (4) perjudicar otras consideraciones de equidad; o (5) resultar en la demora, inconveniente, gasto, incongruencia o apresuramiento en la sentencia). Karah 500 F.3d at 119 (se omiten las citaciones). El Segundo Circuito explicó que a pesar de que China Trade dictaba que debía acordarse una mayor importancia a dos de los cinco factores, todos los factores adicionales debían considerarse al determinar si debía concederse una medida cautelar anti-litigio extranjero. Karaha, 500 F.3d at 119. --------------------------------

64. El tribunal del caso Karaha fue muy claro en que el test de China Trade se aplica a medidas cautelares anti-litigios extranjeros tanto en casos donde la acción paralela es iniciada mientras se encuentra pendiente de resolución la otra acción en el fuero local, como así también cuando ya haya sido dictada la sentencia en el fuero local. Los factores "discrecionales" tenderán a pesar en favor de la medida cautelar anti-litigios extranjero que busca proteger una sentencia federal, mientras que los principios de cortesía tendrán mayor

peso en la decisión de imponer una medida cautelar anti-litigio extranjero cuando la sentencia en el fuero local no ha sido dictada aún. Id. -------------------------------------------------------------------

65. El Segundo Circuito en el caso Karaha entendió que el tribunal de distrito "consideró apropiadamente" los factores discrecionales de China Trade y entendió que daban lugar a una medida cautelar. El Segundo Circuito entonces examinó cada uno de los requisitos umbrales (encontrando que habían sido satisfechos) y los factores discrecionales (encontrando que pesaban en favor de otorgar una medida cautelar anti-litigios). Notablemente, el tribunal sostuvo que "las órdenes de cortes extranjeras no merecen cortesía si los litigantes que las solicitan han deliberadamente buscado obstaculizar con impedimentos legales el cumplimiento de las órdenes de una corte federal". Karaha, 500 F.3d at 127 (citando a Motorola Credit Corp c/ Uzan, 388 F.3d 39, 60 (2d Cir. 2004) (se omiten las citaciones internas) (citando Societe Internationale c/ Rogers, 357 U.S. 197, 208-09 (1958)), ver también Uzan, 388 F.3d at 60 (citando con aprobación Laker, 731 F.2d at 939-40, que se negó a respetar una orden del tribunal británico en la cual "los demandados involucrados en un juicio estadounidense habían...acudido a las cortes inglesas para generar interferencia con las cortes estadounidenses"). -------------------------------------------------------------------

66. En otro caso reciente, International Equity Investments Inc. c/ Opportunity Equity Partners Ltd., 246 F. App'x 73 (2d Cir. 2007), el Segundo Circuito confirmó la concesión de la medida cautelar por parte del tribunal de distrito, entendiendo que los actores habían satisfecho los requisitos para obtener una medida cautelar, y que el test de medida cautelar anti-litigios del China Trade se volcaba fuertemente en favor de los actores. -------------------

67. En este caso, se ven satisfechos dos factores umbrales del Chine Trade, y los factores remanentes se vuelcan fuertemente en favor del otorgamiento de la medida cautelar anti-litigios dirigida a los juicios existentes en Brasil y cualquier otro procedimiento administrativo pendiente, como así también como una medida cautelar contra el inicio de cualquier otro litigio o procedimiento en el Territorio tanto se resuelva la disputa contractual entre Software AG y Consist/Consist Brasil. -------------------------------------------

68. Las partes de todos los procedimientos pendientes son las mismas. A los efectos de obtener una medida cautelar contra un litigio extranjero, la parte solicitante deberá demostrar que "las partes de ambos juicios son sustancialmente las mismas" Paramedics Electromedicina Comercial Ltda. c/ GE Med. Sys. Info. Techs. Inc., 2003 WL 23641529 at *11 (S.D.N.Y. 4 de junio de 2003). En Paramedics, un caso que implicaba una relación contractual de distribución, y una sociedad estadounidense con una afiliada brasileña, el tribunal de distrito otorgó una medida cautelar contra el procedimiento litigioso en Brasil, entendiendo que se habían satisfecho los factores del China Trade. Específicamente, el tribunal de distrito sostuvo que aún si las partes no fueran idénticas en los procedimientos de Brasil y Estados Unidos (la subsidiaria brasileña era parte en Brasil, pero no así en los Estados Unidos), los procedimientos eran lo "suficientemente similares en lo que a las partes se refiere como para cumplir el primer criterio umbral para la medida cautelar anti-litigios extranjeras..." Paramedics, 2003 WL 23641529 at *13. Para llegar a esta conclusión, el Tribunal dejó sentado que la subsidiaria brasileña había "actuado como representante (de la compañía estadounidense) en las negociaciones (de la compañía estadounidense)...". Id. El Segundo Circuito confirmó la medida cautelar, entendiendo que "El tribunal de distrito no abusó de su discreción al ordenar que las partes de las dos acciones son lo suficientemente similares como para satisfacer el primer requisito umbral de China Trade". Paramedics Electromedicina Comercial Ltda. c/ GE Med. Sys. Info. Techs. Inc., 369 F.3d 645 (2d Cir. 2004). Otras cortes han adherido a este razonamiento. Ver, por ej., Motorola Credit Corp. c/ Uzan, 2003 WL 56998 (S.D.N.Y., 7 de enero de 2003) (encontrar la suficiente similitud entre las partes, aun si las partes en las dos acciones no fueran idénticas, porque "las verdaderas partes interesadas son las mismas en ambos casos"); citado en Paramedics, 369 F.3d at 652;

SG Avipro Finance Ltd. c/ Cameroon Airlines, 2005 WL 1353955 at *2 (S.D.N.Y. 8 de junio de 2005) (idem). --------------------------------------------------------------------------------

69. Consist ha insistido por largo tiempo que Consist-Brasil es una entidad separada, no ante este Tribunal; y Consist-Brasil es, hasta donde este Tribunal tiene conocimiento, la parte actora en el juicio o juicios en Brasil que resultaron en la emisión de órdenes ex-parte. (Ver la Carta al Tribunal de James D. Jacobs del 20/2/08). Sin embargo, según queda ampliamente demostrado precedentemente, no hay diferencia entre Consist y Consist-Brasil. Consist, la que es parte en los contratos de distribución, ha ejercido sus obligaciones contractuales a través de un intermediario que es una afiliada o subsidiaria totalmente controlada, Consist-Brasil. En otras palabras, Consist-Brasil actuó en todo momento como representante de Consist en el territorio. Además, Consist-NY (a través de Fridman) controla y obliga a Consist-Brasil. Por lo tanto, aún si Consist-NY (en oposición a Consist-NY) fuera el actor nombrado en los dos juicios de Brasil, según el razonamiento del caso Paramedics, las acciones en Brasil y en este Tribunal son "suficientemente similares en lo que a las partes se refiere" como para satisfacer el primer factor umbral del China Trade. ---------------------------------

70. La resolución de este caso será dispositivo de la acción a ser impedida. Este Tribunal ya ha decidido que el Contrato de 1998 fue exitosamente terminado por Software AG y ha decidido ahora, en forma preliminar, que fluyen ciertas consecuencias a raíz de ello. En particular, este Tribunal ha determinado en forma preliminar que los contratos suscriptos por Consist (a través de su representante, Consist-Brasil) y terceros, no estaban autorizados a partir de la fecha de la expiración del contrato de distribución, como tampoco lo está el reclamo de Consist-Brasil a las marcas de Software AG en Brasil. Cualquier medida cautelar, sea preliminar o definitiva, relacionada con dichos temas será obstaculizada por decisiones contrarias de una corte extranjera, especialmente órdenes obtenidas ex-parte, y sin la certeza de que nuestros estimados colegas de Brasil hayan sido advertidos de lo que realmente sucede en este caso. Este Tribunal ha sido informado que los procedimientos en Brasil involucran precisamente los mismos asuntos que son el corazón de esta acción, específicamente, si las marcas de Brasil le pertenecen a Software AG y si Consist puede continuar prestando servicios de mantenimiento para los productos de Software AG. (Ver Carta al Tribunal de James D. Jacobs del 20/2/08 y la Declaración adjunta de Marcio Polto). Las medidas cautelares que Consist-Brasil ha obtenido ex-parte interfieren con la facultad de este Tribunal de emitir órdenes válidas dirigidas hacia el mismo objeto, y exponen a Software AG a severas multas y sanciones. (Ver id.) La resolución de la causa que se tramita ante este Tribunal sería dispositiva de los procedimientos que fueron recientemente iniciados en Brasil y que no han sido enteramente tramitados. Por lo tanto, el segundo factor umbral del China Trade se encuentra satisfecho. --------------------------------------------------------------------------------

71. Una vez superados estos dos requisitos umbrales, los Tribunales deben considerar factores discrecionales incluyendo, inter alia, si el litigio extranjero representa una amenaza para la jurisdicción de la corte que decide la prohibición y si el litigio extranjero frustra políticas significativas del fuero de la prohibición. Ver., por ej., Paramedics, 369 F.3d at 652; Suchodolski Assoc., Inc. c/ Cardell Fin. Corp. 2006 WL 10866, at *2 (S.D.N.Y., 3 de enero de 2006). "Cuando la acción de un litigante en otro fuero amenaza con paralizar la jurisdicción de un tribunal, el tribunal podrá considerar la efectividad y propiedad de una medida cautelar (anti-litigio)." Paramedics, 2003 WL 23641529, at *14 (citas y citaciones omitidas). Consist no debería estar facultada a obtener un recurso legal de las cortes de Brasil en un claro intento de arrebatarle a este Tribunal su jurisdicción. Este Tribunal ya ha hallado mala fe con respecto a las acciones de Consist al solicitar y recibir un aplazo en su obligación de responder a las preguntas posteriores a la audiencia del Tribunal sin advertirle al Tribunal que se encontraban pendientes solicitudes de recursos legales ante las cortes de Brasil. (ver Hallazgo de Hecho 48). Además, según se deja sentado en la Declaración de

Marcio Polto del 20 de febrero de 2008, las medidas cautelares extranjeras obtenidas por Consist-Brasil representan una directa amenaza a la jurisdicción de este Tribunal. La "petición a las cortes de Brasil es menos un 'procedimiento paralelo' con derecho a la cortesía y más un intento de vencer la jurisdicción de este Tribunal respecto de su conducta". Int'l Equity Invs. Inc. c/ Opportunity Equity Partners, Ltd., 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006). "En efecto, la justificación para una medida cautelar anti-litigio se ve necesaria cuando una parte busca la asistencia de un litigio extranjero en un intento flagrante de evadir la autoridad legal del fuero de un tribunal". Id. at 563 (citas y citaciones omitidas); ver también Uzan 388 F.3d at 60.--------------------------------------------------------------------------------------------

72. Se ven amenazadas importantes políticas de este fuero por los intentos de Consist de obtener recursos legales en Brasil. Por ejemplo, los reclamos de los actores implican una ley federal, el Lanham Act que comprende importantes políticas públicas de los Estados Unidos respecto de marcas y publicidad falsa. Cf. Laker Airways Ltd., 731 F.2d at 931 n. 73 ("Es mucho más probable encontrar una evasión inadmisible cuando la parte intenta eludir el cumplimiento de una ley con aplicación específica sobre la cual la parte que solicita la medida cautelar se haya fundado..."), citado en Paramedics, 2003 WL 23641529, en *15. También existe un interés de política general en interpretar las leyes de Nueva York , las que las partes convinieron regirían el Contrato de 1998, en un Tribunal de Estados Unidos y no en un tribunal extranjero. --------------------------------------------------------------------------------------

73. Otros factores también aconsejan dictar la medida cautelar anti-litigio. Los procedimientos paralelos ya han perjudicado consideraciones de equidad. Las órdenes dictadas por las cortes de Brasil no sólo menoscaban la jurisdicción de este Tribunal, sino que vale la pena repetir que Consist no inició dichos procedimientos en Brasil hasta después de que este Tribunal realizó una completa audiencia a la petición de Software AG para obtener una medida cautelar, y el asunto fue tomado en conocimiento. Habiendo observado las tácticas de Consist y Fridman en este asunto, es probable que los procedimientos en Brasil resulten abusivos. Además, requerir otro litigio en Brasil respecto de los mismos asuntos que actualmente se tratan ante este Tribunal, seguramente resultará en un inconveniente o gasto innecesario. Consist ya se ha embarcado a obtener una sentencia apresurada en las cortes de Brasil, y las órdenes que obtuvo de dichas cortes demuestran que el riesgo de incongruencia en las sentencias es real. De hecho, las resoluciones de este Tribunal con emitidas con posterioridad a la audiencia, son incongruentes con las órdenes de la corte de Brasil, la cual emitió una orden ex-parte sin realizar una audiencia completa.------------------------------------------------------

74. Habiéndose encontrado que dos de los requisitos umbrales se cumplen, y habiendo considerado los factores discrecionales adicionales según China Trade y su progenie, este Tribunal entiende que una medida cautelar anti-litigio extranjero sería apropiada.-----------------

75. Este Tribunal tiene la facultad de ordenarle a Consist-Brasil que desista de los procedimientos pendientes en Brasil. Ver, por ej., Suchodolski Assoc., Inc. c/ Cardell Fin. corp., 2006 U.S. Dist. LEXIS 83169, at *11 (S.D.N.Y., 16 de noviembre de 2006). -------------

76. En la medida que Consist y Fridman se encuentren obligados a hacer que sus afiliadas "100% controladas" se abstengan de presentar acciones adicionales en las cortes de Sudamérica, no se encuentra implicada la doctrina de la medida cautelar anti-litigio de China Trade, porque las acciones adicionales no son acciones paralelas. Tampoco es relevante el China Trade para la orden de este Tribunal requiriéndole a Consist que le informe a las cortes de Brasil sobre los asuntos que se discuten ante este Tribunal.------------------------------------------

77. La medida cautelar ordenada más abajo no obliga a Consist a causar que sus afiliadas le transfieran o entreguen las marcas a Software AG pendente lite. En cambio, la medida cautelar es prohibitiva en su naturaleza. Le prohíbe a Consist y a Fridman y a sus afiliadas a tomar medidas que impidan a Software AG el utilizar las marcas asociadas con sus productos en el Territorio hasta que se dicte una sentencia definitiva en este caso. Dicha medida cautelar

prohibitiva debería efectivamente preservar los derechos pendente lite de Software AG. Si así no fuera, el Tribunal analizará nuevamente el asunto de recurso obligatorio relacionado con la reasignación de las marcas. -------------------------------------------------------------------------------------

**MEDIDA CAUTELAR** -------------------------------------------------------------------------------------------

El Tribunal, en virtud de los hechos y conclusiones de ley que se establecen precedentemente, ORDENA: -----------------------------------------------------------------------------------------------------

Pendente lite, se impone a Consist NY y Fridman, bajo apercibimiento de desacato, obligar a las afiliadas o subsidiarias enteramente controladas por Consist, Consist Consultoria Sistemas e Representacoes Ltda. Consist Software Ltda. (colectivamente, "Consist-Brasil"), conjuntamente con sus representantes, apoderados, subsidiarias y afiliadas o cualesquiera actuando en representación o en conjunto con Consist-Brasil o cualquier otra subsidiaria o afiliada parcial o totalmente controlada en cualquier parte del Territorio, a abstenerse de todas y cada una de las siguientes actividades: ----------------------------------------------------------------------

(1) iniciar o continuar el trámite de todo procedimiento en cualquier corte del Territorio que persiga el obligar a Software AG a cumplir con una obligación que emerja de los contratos de distribución exclusivos entre Software AG y Consist, excepto en la medida que específicamente se indica a continuación; ----------------------------------------------------------------------

(2) registrar, o solicitar el registro o tomar medidas relacionadas con cualquier acción pendiente o procedimientos relacionados con cualquier marca asociada con los productos fabricados por Software AG y que fueran con anterioridad distribuidos por Consist, incluyendo sin limitación, ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE y PREDICT; --------------------------------------------------------------------------------------------

(3) tramitar cualquier acción o procedimiento judicial o administrativo en cualquier corte o ante cualquier entidad del Territorio que pretenda reivindicar supuestos derechos a las marcas o nombres comerciales asociados con los productos fabricados por Software AG y fueran con anterioridad distribuidos por Consist, incluyendo, sin limitación, ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE y PREDICT; -----------------------------------------------

(4) tomar medidas para prohibir a Software AG que utilice en el Territorio las marcas o nombres comerciales asociados con sus productos, incluyendo, sin limitación, ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE y PREDICT; o, ------------------------------------------

(5) enajenarse o de otra forma comprometer la titularidad existente de las marcas y nombres comerciales asociados con los productos de Software AG o realizar cualquier acto que pudiera inhibir la facultad de Consist-Brasil o de cualquier subsidiaria o afiliada de Consist y Fridman dentro del Territorio o de quien sea o pudiera convertirse en el propietario de tal marca, de transferir los registros marcarios de dichas marcas y nombres comerciales a Software AG luego de que se haya realizado un juicio completo sobre los méritos o una decisión sobre petición de juicio sumario; ---------------------------------------------------------------------------------

Pendente lite, se impone a Consist NY y Fridman, bajo apercibimiento de desacato civil, obligar a las afiliadas o subsidiarias totalmente controladas por Consist, Consist Consultoria Sistemas e Representacoes Ltda. Y Consist Software Ltda. (colectivamente "Consist-Brasil") y cualquier otra subsidiaria o afiliada parcial o totalmente controlada ubicada en el Territorio, junto con sus respectivos representantes, apoderados, subsidiarias, afiliadas o cualquier otro que actúe en su presentación o en conjunto con ellas, a tomar todas y cada una de las medidas necesarias para la inmediata desestimación de cualquier orden de una corte o entidad que: -----

(1) requiera que Software AG le provea a Consist-Brasil sus productos y servicios, incluyendo el acceso al soporte de Nivel 2 y Nivel 3 de las instalaciones de Software AG en Denver, Colorado, tendiente a facultar a Consist-Brasil a prestar servicios de mantenimiento para los productos de Software AG a cualquiera de sus consumidores en cualquier parte del Territorio, o, -------------------------------------------------------------------------------------------------

(2) prohíba a Software AG la utilización, con relación a los productos de su propiedad, de las marcas ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE y PREDICT, o cualquier otra marca cuyo derecho de usar haya obtenido Consist en virtud del contrato exclusivo de distribución de los productos de Software AG en el Territorio según el Contrato de 1998 y cualquier otro contrato predecesor. También se impone a Consist NY y Fridman, bajo apercibimiento de desacato civil, el obligar a Consist Brasil a desistir o descontinuar las acciones caratuladas: Consist Consultoría Sistemas E Representacoes Ltda. c/ Software AG Informatica e Servicios Ltda. (presentada el 28 de enero de 2008) y Consist Consultoría Sistemas E Representacoes Ltda. Y Consist Software Ltda. c/ Software AG y Software AG Brazil Informatica E Servicios LTDA (presentada el 1° de febrero de 2008), luego de obtener una desestimación de cualesquiera de las ordenes allí dictadas;----------------------------------
Pendente lite, se impone a Consist NY y Fridman, bajo apercibimiento de desacato civil, obligar a Consist Brazil o cualquier otra subsidiaria o afiliada de Consist, junto con sus representantes, apoderados, subsidiarias, afiliadas o cualquiera actuando en su representación o en conjunto con ellas, a desistir del registro o intento de registro o a tomar cualquier acción para continuar con cualquier procedimiento de registro ya iniciado, relacionado con cualquier marca asociada con los productos fabricados o colocados en el comercio por Software AG incluyendo sin limitación, ADABAS, NATURAL, TAMINO, ENTIRE, COM-PLETE y PREDICT, en cualquier país del Territorio, y obligarlas a cesar en la utilización de cualesquiera marcas o nombres comerciales relacionados con sus actividades comerciales en el Territorio. ------------------------------------------------------------------------------
Pendente lite, se impone a Consist NY y a Fridman, bajo apercibimiento de desacato civil, a obligar a Consist, Consist-Brasil o cualquier subsidiaria o afiliada en cualquier parte del Territorio a enviar por correo o envío similar, y también a publicar en sus sitios web, una copia completa de esta sentencia, junto con la declaración que indica que esta orden es obligatoria para Consist y Fridman excepto que tal orden sea revocada por una corte de jurisdicción competente en los Estados Unidos de América. Dicha notificación deberá indicar que Consist ha apelado esta decisión si es que Consist presenta tal apelación; --------------------
Pendente lite, se impone a Consist NY y a Fridman, bajo apercibimiento de desacato civil, a obligar a Consist-Brasil, sus representantes, apoderados, subsidiarias, afiliadas y cualquier tercero que actúe en su representación, a proveer a cualquier corte o entidad administrativa en la que ha procurado cualquier orden ex parte o cualquier otro tipo de orden relacionada con los asuntos descriptos en la presente, o en los cuales actualmente tenga un procedimiento pendiente relacionados con estos asuntos, una copia de Los Hallazgos de Hecho y Conclusiones de Ley y Medida Cautelar de este Tribunal, traducida al portugués y al castellano según corresponda; y, -----------------------------------------------------------------
ASIMISMO SE ORDENA QUE Consist y Fridman deberán, al décimo día de la entrada en vigencia de la medida cautelar, certificar a este Tribunal bajo juramento que se han tomado las medidas que se detallan en esta orden, y describirá en tal certificación, con particularidad, exactamente qué medidas se han tomado para cumplir con esta medida cautelar. Se adjuntarán a la certificación copias de todos los documentos presentados en cualquier corte o tribunal administrativo sea de Brasil o de cualquier otro país del Territorio, incluyendo una copia certificada de la traducción de estos Hallazgos de Hecho y Conclusiones de Ley y Medida Cautelar, una copia de la notificación a los clientes enviada sea por correo o por otro medio, y publicada en la web, en cumplimiento con esta orden, una copia de la declaración de prensa emitida por Consist y/o Fridman y/o sus subsidiarias o afiliadas relacionada, o en la que se discuta esta orden. Este plazo de vencimiento no será extendido por ninguna razón.-------------
NOTIFÍQUESE que el incumplimiento por parte de Consist y Fridman de proveer al Tribunal con la certificación necesaria que demuestre un sustancial cumplimiento con todas las acciones ordenadas en esta Medida Cautelar, resultará en la emisión de una orden contra la

cual deberá demostrarse la razón por la cual los demandados no deberían ser acusados de desacato, y ser impuestos con multas y/o (en el caso de Fridman) prisión, hasta tanto cumplan con lo ordenado, y obliguen a Consist-Brasil o cualquier otra subsidiaria o afiliada en el Territorio a cumplir con todos y cada uno de los términos de esta Medida Cautelar. --------------
Nada de lo contenido en esta Medida Cautelar prohibirá que Consist, Consist-Brasil, Fridman o cualquier otra subsidiaria o afiliada (sea propiedad total o parcial de Consist) de iniciar cualquier litigio extranjero en el futuro, en el caso que los demandados resulten exitosos luego de que se discutan los derechos de las partes según el Contrato de 1998 en forma total en esta acción, o en la acción caratulada Consist Software Solutions Inc c/ Software AG. Inc. y otros, Civ. No. 07-7047. --------------
Esto constituye la sentencia y orden del Tribunal. --------------
Fecha: Nueva York, Nueva York. --------------
21 de febrero de 2008. --------------
(Hay una firma ilegible seguida de la expresión "Juez de Tribunal de Distrito de los Estados Unidos".) --------------
Vía registro electrónico de casos (ECF) a todos los abogados. --------------
ES TRADUCCIÓN FIEL al idioma español del documento en idioma inglés que tuve a la vista y al cual me remito. En Buenos Aires, el 28 de febrero de 2008. --------------





COLEGIO DE TRADUCTORES PUBLICOS
DE LA CIUDAD DE BUENOS AIRES
Corresponde a la Legalización
Nº ...TY-72K/08
CARLOS CHRISTIAN CHÁVEZ

MARIA EUGENIA DEYA
TRADUCTORA PUBLICA
IDIOMA INGLES
MAT. TXXI Fº412 CAPITAL FEDERAL
IDIOMA PORTUGUES
MAT. Tº XXI Fº 194 CAPITAL FEDERAL
INSCRIP. C.T.P.C.B A. Nº... #599





COLEGIO  DE  TRADUCTORES  PÚBLICOS
DE  LA  CIUDAD  DE  BUENOS  AIRES

REPÚBLICA ARGENTINA
LEY 20.305

# L E G A L I Z A C I Ó N

Por la presente, el COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES,

en virtud de la facultad que le confiere el artículo 10, inc. d) de la Ley 20.305, certifica únicamente que la

firma y el sello que aparecen en la traducción adjunta, concuerdan con los correspondientes

al/la Traductor/a Público/a    DEYÁ, MARÍA EUGENIA

que obran en los registros de esta Institución en el Folio                    del  Tomo

en el Idioma:  INGLES                                    412                          13

Legalización Número:  7215 / 2008 / T4

Buenos Aires,
                28/02/2008

MARCELO F. SIGALOFF
Encargado Dto. de Legalizaciones
Colegio de Traductores Públicos
de la Ciudad de Buenos Aires

ESTA LEGALIZACIÓN NO SE CONSIDERARÁ VÁLIDA SIN EL CORRESPONDIENTE
TIMBRADO  EN LA ÚLTIMA HOJA DE LA TRADUCCIÓN ADJUNTA

Av. Corrientes 1834 - C1045AAN - Ciudad Autónoma de Buenos Aires - 4373 - 7173 y líneas rotativas

Pursuant to Section 10, Paragraph D of Act 20.305, the *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Sworn Translators Association of the City of Buenos Aires) hereby certifies that the signature and seal affixed hereto appear to match the specimen signature and seal of the *Traductor Público* (Sworn Translator) whose name is subscribed to the attached translation, as such specimen signature and seal are kept on file in our office.
THIS CERTIFICATION IS NOT VALID WITHOUT THE STAMP ON THE LAST PAGE OF THE ATTACHED TRANSLATION.

Vu par le *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Ordre de Traducteurs Officiels de la ville de Buenos Aires), en vertu des attributions qui lui ont été accordées par l'article 10, alinéa d) de la Loi n° 20.305, pour la seule légalisation matérielle de la signature et du sceau du *Traductor Público* (Traducteur Officiel) apposé sur la traduction du document ci-joint, qui sont conformes à ceux déposés aux archives de cette Institution.
LE TIMBRE APPOSÉ SUR LA DERNIÈRE PAGE DE LA TRADUCTION FERA PREUVE DE LA VALIDITÉ DE LA LÉGALISATION.

Con la presente il *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Collegio dei Traduttori Giurati della Città di Buenos Aires) ai sensi della facoltà conferitagli dall'articolo 10, comma d), della Legge 20.305, CERTIFICA, esclusivamente, la firma ed il timbro del *Traductor Público* (Traduttore Giurato), apposti in calce alla qui unita traduzione, in conformità alla firma ed al timbro depositati nei propri registri.
LA PRESENTE LEGALIZZAZIONE SARÀ PRIVA DI VALIDITÀ OVE NON VENGA TIMBRATA NELL'ULTIMO FOGLIO DELLA TRADUZIONE.

Através da presente o *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Colégio de Tradutores Públicos da Cidade de Buenos Aires), em virtude das atribuições conferidas pelo art. 10 inc. d) da Lei 20.305, certifica unicamente que a assinatura e o carimbo do *Traductor Público* (Tradutor Público) que subscreve a tradução adjunta conferem com a assinatura e o carimbo arquivados nos registros desta instituição.
A PRESENTE LEGALIZAÇÃO SÓ SERÁ CONSIDERADA VÁLIDA COM A CORRESPONDENTE CHANCELA MECÂNICA APOSTA NA ÚLTIMA FOLHA DA TRADUÇÃO.

Kraft der Befugnis, die ihr durch Art. 10, Abs. d) im Gesetz 20.305 verliehen wird, bestätigt hiermit der *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Kammer der Vereidigten Übersetzer der Stadt Buenos Aires) lediglich, dass Unterschrift und Siegel, des *Traductor Público* (Vereidigten Übersetzers), mit denen die beigefügte Übersetzung versehen ist, mit den entsprechenden Registereintragungen dieser Institution übereinstimmen.
VORLIEGENDE BEGLAUBIGUNG IST UNGÜLTIG OHNE DEN ENTSPRECHENDEN GEBÜHRENSTEMPEL AUF DEM LETZTEN BLATT DER BEIGESCHLOSSENEN ÜBERSETZUNG.

# EXHIBIT C



# Flexibilidade

### é administrar funcionários
### em diversos países simultaneamente.



**Pesquisa**

Selecione um País

Sites Internacionais

**CONSIST**
Contate a CONSIST
Institucional
Oportunidade de Trabalho
Grupo de Usuários

**Serviços**
Capacitação Corporativa
Centro de Serviços ao
Cliente
Centro Educacional

**Notícias e Eventos**
Eventos
Notícias

**Press Room**
Press Release

**Comunidades**
ANE
GRAM

**Casos de Clientes**



**Produtos**    **Soluções**    **Mercados Verticais**

## Notícias

**CONSIST publica liminar da Corte de Nova York.**

**Sistema de Gestão da Eletrosul é destaque do IDG**

**CONSIST leva os 3 principais prêmios no evento de 40 anos da SUCESU**

**Nicoló Mazzola recebe título de Cidadão Paulistano**

**CONIP 2007 - Ozires Silva visita estande da CONSIST**

## Casos de Clientes

**Solução da CONSIST oferece autonomia para área de Recursos Humanos da CESP**
CONSIST HR processa folha de pagamento para 1.390 empregados e viabiliza informações importantes com rapidez e simplicidade

**CONSIST eCRM garante a qualidade do atendimento aos clientes da Bristol-Myers Squibb**
Cerca de cinco mil chamados são atendidos, gerenciados e respondidos mensalmente pelo SAC da companhia, com total integração entre as áreas

revista **CONSIST** CONNECT

Business Information Technology    Mapa do Site   Termos Legais    Powered by eGen **Content Manager**





Produtos    Soluções    Mercados Verticais

Pesquisa

Home / News / Notícias

# Notícias

Selecione um País
Sites Internacionais

| Notícias 2008
**Notícias - Anos Anteriores**
| Notícias 2007    | Notícias 2006    | Notícias 2005

☒ Contato
☎ 0800 011 23 33
🖨 Imprimir
✉ Enviar por email

CONSIST
Serviços
Notícias e Eventos
Press Room
Comunidades
Casos de Clientes

11 de Março de 2008

## CONSIST publica liminar da Corte de Nova York.

Em cumprimento a uma liminar da Corte de Nova York, estamos publicando cópia com tradução juramentada da referida decisão.

Essa decisão é vinculante para a CONSIST e o Sr Natalio Fridman, a menos e até que tal decisão seja reformada pelo tribunal competente do Estados Unidos da América.



Notícias

CONSIST publica liminar da Corte de Nova York.

Sistema de Gestão da Eletrosul é destaque do IDG

CONSIST leva os 3

revista
CONSIST
CONNECT

Business Information Technology    Mapa do Site   Termos Legais     Powered By Consist Content Manager

# EXHIBIT D





## Gestión y Automatización de Procesos Administrativos

CONSIST GPA

↑ Productos | ↓ Soluciones | ↑ Mercados Verticales

**Buscar**

→



Seleccione un País

Sitios Internacionales

**Consist**
Contáctenos
Institucional

**Servicios**
Soporte Técnico
Harvard Business School
Publishing
Academia XML
Centro Educacional Consist

**Noticias y Eventos**
Noticias
Eventos
Consist News

**Press Room**
Press Releases

**Casos de Exito**

Administración de Documentos
Administración de Impresión
Auditoría y Seguridad Lógica
Business Intelligence
Business Process Management
(BPM)
Capacitación Ejecutiva - HBSP

Centro Educacional Consist
Clipping
Conferencia Web
Conferencia e-Learning
Gestión de Procesos Administrativos
Gestión de Salud

Recursos Humanos
Seguros
Soluciones para Gobierno
Solución CRM

## Noticias

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**CONSIST publica medida cautelar de la Corte de Nueva York**

**Evento para Empresas de Seguros**
"Conozca la Rentabilidad de su Compañía en Tiempo Real", organizado por CONSIST

**Consist participó como Sponsor de Usuaria 2007 – "Construyendo la Agenda Digital para una Argentina Competitiva"**
Este importante evento contó con la participación de personalidades destacadas del mercado argentino e internacional

**Profesionales de CONSIST se reúnen en la Conferencia Anual de Applix**
En esta oportunidad, profesionales de CONSIST de varios países participaron de la conferencia anual de Applix realizada entre los días 15 y 18 de mayo en Orlando, USA.

**Alico Seguros (AIG International) Adquirió Interwise "Web Conference"**

**Consist Lanza al Mercado una Nueva Versión de su Tecnología BPM**
ConsistGPA 3.0 incorpora mejoras funcionales en el monitoreo de los procesos, que permiten el seguimiento del negocio en tiempo real, entre otras novedades.

**Monitoreo del Uso de las Aplicaciones: Mucho más que una Auditoria!**

**CONSIST participó como Sponsor de la VI Conferencia General de Estrategas del Seguro**

## Press Releases

**Consist presente en Segurinfo 2008 con "IntellinX",
Solución para Monitoreo y Control de Fraudes**

**Cómo Operan los Proveedores de Tecnología para
Aseguradoras - En Argentina y el Mundo**
Opinión de los players tecnológicos líderes del sector.

**Negocios, Tecnología y Telecomunicaciones**

**Consist Lanza sus Servicios de Conferencias Web**

**El Producto iET ITSM Logró la Certificación más Alta
de Mejores Prácticas de Negocio**

**Consist Actualizó su Solución ConsistGPA**
Nueva Versión

**Solución para Monitoreo y Control de Fraudes**
Consist presente en Segurinfo 2008 con "INTELLINX"

**Conozca la Rentabilidad de su Empresa en Tiempo
Real**

**Los CIO´s eligen a los Mejores Proveedores**
Según precio, producto, soporte, estrategia e innovación

**El Producto iET ITSM, que Comercializa Consist en la
Región, Logró la Certificación más Alta de Mejores
Prácticas de Negocio**
La certificación representa el mayor nivel "ITIL Service
Support Enhanced" otorgado por la Consultora Pink
Elephant





# EXHIBIT E



**CONSIST** CM    La más avanzada y flexible herramienta de administración de contenidos para crear, administrar y distribuir información de forma ágil y sencilla.



↑ Productos    ↓ Soluciones    ↑ Mercados Verticales

Buscar

Seleccione un País

Sitios Internacionales

**Consist**
Contáctenos
Institucional

**Servicios**
Harvard Business School
Publishing
Academia XML
Soporte Técnico
Centro Educacional Consist

**Noticias y Eventos**
Eventos
Noticias

**Press Room**
Press Releases

**Casos de Exito**

Administración de Documentos
Administración de Impresión
Auditoría y Seguridad Lógica
Business Intelligence
Capacitación Ejecutiva - HBSP

Centro Educacional Consist
Clipping
Conferencia Web
Conferencia e-Learning
Gestión de Procesos Administrativos

Gestión de Salud
Recursos Humanos
Seguros
Soluciones para Gobierno
Solución CRM

## Noticias

**CONSIST publica medida cautelar de la Corte de Nueva York**

**Consist participó como Sponsor de Usuaria 2007 – "Construyendo la Agenda Digital para una Argentina Competitiva"**
Este importante evento contó con la participación de personalidades destacadas del mercado argentino e internacional

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**Monitoreo del Uso de las Aplicaciones: Mucho más que una Auditoría!**

**CONSIST participó como Sponsor de la VI Conferencia General de Estrategas del Seguro**

**Evento para Empresas de Seguros**
"Conozca la Rentabilidad de su Compañía en Tiempo Real", organizado por CONSIST

**Consist Lanza al Mercado una Nueva Versión de su Tecnología BPM**
ConsistGPA 3.0 incorpora mejoras funcionales en el monitoreo de los procesos, que permiten el seguimiento del negocio en tiempo real, entre otras novedades.

**Profesionales de CONSIST se reúnen en la Conferencia Anual de Applix**
En esta oportunidad, profesionales de CONSIST de varios países participaron de la conferencia anual de Applix realizada entre los días 15 y 18 de mayo en Orlando, USA.

**Consist participa como Sponsor de "Business Intelligence" en la IV Conferencia Regional de ERP**

## Press Releases

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**Consist Lanza sus Servicios de Conferencias Web**

**El Producto iET ITSM Logró la Certificación más Alta de Mejores Prácticas de Negocio**

**Mundo de Papel**

**Sistemas de Calidad**

**El Producto iET ITSM, que Comercializa Consist en la Región, Logró la Certificación más Alta de Mejores Prácticas de Negocio**
La certificación representa el mayor nivel "ITIL Service Support Enhanced" otorgado por la Consultora Pink Elephant

**Solución para Monitoreo y Control de Fraudes**
Consist presente en Segurinfo 2008 con "INTELLINX"

**Conozca la Rentabilidad de su Empresa en Tiempo Real**

**Gestión de Performance**
Cómo enfocar a mi corporación en el logro de resultados

**PrintBOS de Consist Obtiene Certificación SAP**
Una solución para optimización en información  impresa

Business Information Technology    Mapa del Sitio  Datos Legales    Powered by CONSIST Content Manager



# CONSIST
*Business Information Technology*

La evolución en tecnología de información

Cada vez más cerca de su empresa

↑ **Productos**    ↑ **Soluciones**    ↑ **Mercados Verticales**



Home

Home / Noticias y Eventos / **Noticias**

## Noticias

**Buscar**

→

Seleccione un País

Sitios Internacionales

Consist
Servicios
Noticias y Eventos
Press Room
Casos de Éxito

**CONSIST publica medida cautelar de la Corte de Nueva York**

**Consist participó como Sponsor de Usuaria 2007 – "Construyendo la Agenda Digital para**

⁞ Noticias 2008

**Noticias de Años Anteriores**

⁞ Noticias 2007    ⁞ Noticias 2006    ⁞ Noticias 2005

✉ Contacto
☏ +591 (2) 220-3486
Para Bajar
🖨 Imprimir
Enviar por email

11 de Marzo de 2008

### CONSIST publica medida cautelar de la Corte de Nueva York

En cumplimiento con la medida cautelar de la Corte de Nueva York, estamos publicando la copia de la traducción legalizada de la referida decisión.

La orden obliga legalmente a CONSIST y Fridman a menos que y hasta que dicha orden sea cambiada por una corte con jurisdicción competente en los Estados Unidos de América

Business Information Technology    Mapa del Sitio  Datos Legales    Powered by CONSIST Content Manager

# EXHIBIT F



## CONSIST
*Business Information Technology*

## Gestión y Automatización de Procesos Administrativos

**CONSIST GPA**

| Productos | Soluciones | Mercados Verticales |



**Buscar**

Seleccione un País

Sitios Internacionales

**Consist**
Institucional
Contáctenos

**Servicios**
Harvard Business School Publishing
Academia XML
Soporte Técnico
Centro Educacional Consist

**Noticias y Eventos**
Eventos
Noticias

**Press Room**
Press Releases

**Casos de Exito**

Administración de Documentos
Administración de Impresión
Auditoría y Seguridad Lógica
Business Intelligence
Capacitación Ejecutiva - HBSP
Centro Educacional Consist
Clipping
Conferencia Web

Conferencia e-Learning
Contabilidad Electrónica
Cuadro de Mando Integral
Customer Relationship Management / CRM & ITIL
Factoring Electrónico
Factura Electrónica
Gestión de Procesos Administrativos
Gestión de Salud

Gobierno Electrónico e Interoperabilidad
Planeamiento y Control de Gestión Estratégico
Recursos Humanos
Seguros
Soluciones para Gobierno
Solución CRM

## Noticias

**Consist Lanza al Mercado una Nueva Versión de su Tecnología BPM**
ConsistGPA 3.0 incorpora mejoras funcionales en el monitoreo de los procesos, que permiten el seguimiento del negocio en tiempo real, entre otras novedades.

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**CONSIST publica medida cautelar de la Corte de Nueva York**

**Monitoreo del Uso de las Aplicaciones: Mucho más que una Auditoría!**

**CONSIST participó como Sponsor de la VI Conferencia General de Estrategas del Seguro**

**Evento para Empresas de Seguros**
"Conozca la Rentabilidad de su Compañía en Tiempo Real", organizado por CONSIST

**Consist participó como Sponsor de Usuaria 2007 – "Construyendo la Agenda Digital para una Argentina Competitiva"**
Este importante evento contó con la participación de personalidades destacadas del mercado argentino e internacional

**Profesionales de CONSIST se reúnen en la Conferencia Anual de Applix**
En esta oportunidad, profesionales de CONSIST de varios países participaron de la conferencia anual de Applix realizada entre los días 15 y 18 de mayo en Orlando, USA.

**Consist participa como Sponsor de "Business Intelligence" en la IV Conferencia Regional de ERP**

## Press Releases

**Solución para Monitoreo y Control de Fraudes**
Consist presente en Segurinfo 2008 con "INTELLINX"

**Consist Lanza sus Servicios de Conferencias Web**

**El Producto iET ITSM Logró la Certificación más Alta de Mejores Prácticas de Negocio**

**Mundo de Papel**

**Sistemas de Calidad**

**El Producto iET ITSM, que Comercializa Consist en la Región, Logró la Certificación más Alta de Mejores Prácticas de Negocio**
La certificación representa el mayor nivel "ITIL Service Support Enhanced" otorgado por la Consultora Pink Elephant

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**Conozca la Rentabilidad de su Empresa en Tiempo Real**

**Gestión de Performance**
Cómo enfocar a mi corporación en el logro de resultados

**PrintBOS de Consist Obtiene Certificación SAP**
Una solución para optimización en información impresa

Business Information Technology      Mapa del Sitio  Datos Legales                Powered by consist Content Manager

**CONSIST**
Business Information Technology

La evolución
en tecnología
de información

Cada vez más cerca de su empresa

Productos    Soluciones    Mercados Verticales

Home

Home / Noticias y Eventos / **Noticias**

## Noticias

Buscar

Seleccione un País

Sitios Internacionales

Consist
Servicios
Noticias y Eventos
Press Room
Casos de Exito

Evento para Empresas
de Seguros

Consist Lanza al
Mercado una Nueva
Versión de su
Tecnología BPM

Consist presente en

| Noticias 2008

**Noticias de Años Anteriores**

| Noticias 2007    | Noticias 2006    | Noticias 2005

✉ Contacto
☎ +56-2-233-5901
⬇ Para Bajar
🖨 Imprimir
✉ Enviar por email

11 de Marzo de 2008

### CONSIST publica medida cautelar de la Corte de Nueva York

En cumplimiento con la medida cautelar de la Corte de Nueva York, estamos publicando la copia de la traducción legalizada de la referida decisión.

La orden obliga legalmente a CONSIST y Fridman a menos que y hasta que dicha orden sea cambiada por una corte con jurisdicción competente en los Estados Unidos de América.

Business Information Technology    Mapa del Sitio  Datos Legales    Powered by CONSIST Content Manager

# EXHIBIT G



## noticias

▸ CONSIST publica medida cautelar de la Corte de Nueva York.

▸ CONSIST auspició la Cuarta Conferencia General de Seguros.

▸ CONSIST implementa con éxito en el mercado Argentino, su Solución Integral para el Mercado Asegurador.

## eventos

▸ CONSIST dicta en mayo y junio

Seminarios sobre IT aplicada a Soluciones de Negocios.

## historias de clientes

▸ "O Grupo Estado de São Paulo" adopta ConsistCCM para la publicación y distribución de información.







| oportunidades laborales | mapa del sitio | soporte técnico on-line |
| :-- | :-- | :-- |
| Soluciones y Servicios | Noticias y Eventos | Busca y Contratos | Historias de Clientes |

Consist Paraguay > Noticias



**Noticias**
Ver todas las noticias

Buenos Aires, 11 de marzo de 2008

CONSIST publica medida cautelar de la Corte de Nueva York.

**En cumplimiento con la medida cautelar de la Corte de Nueva York, estamos publicando la copia de la traducción legalizada de la referida decisión.**

La orden obliga legalmente a CONSIST y Fridman a menos que y hasta que dicha orden sea cambiada por una corte con jurisdicción competente en los Estados Unidos de América

subir

home          consist worldwide          datos legales

POWERED BY
Content Manage

# EXHIBIT H

**CONSIST**
Business Information Technology

## Interacción
# Web OnLine
con Productores / Brokers

Solución tecnológica que permite a la Empresa de Seguros integrar a sus socios de negocio (Productores / Brokers), a los procesos operacionales dentro de un entorno web seguro en tiempo real.

| Productos | Soluciones | Mercados Verticales |

Buscar

Seleccione un País
Sitios Internacionales

Consist
Institucional
Contáctenos

Servicios
Centro Educacional Consist
Academia XML
Soporte Técnico
Harvard Business School Publishing

Noticias y Eventos
Eventos
Noticias

Press Room
Press Releases

Casos de Exito

Administración de Documentos
Administración de Impresión
Auditoría y Seguridad Lógica
Business Intelligence
Business Process Management (BPM)

Capacitación Ejecutiva - HBSP
Centro Educacional Consist
Clipping
Conferencia Web
Conferencia e-Learning

Gestión de Salud
Recursos Humanos
Seguros
Soluciones para Gobierno
Solución CRM

## Noticias

**CONSIST publica medida cautelar de la Corte de Nueva York**

**Consist Lanza al Mercado una Nueva Versión de su Tecnología BPM**
ConsistGPA 3.0 incorpora mejoras funcionales en el monitoreo de los procesos, que permiten el seguimiento del negocio en tiempo real, entre otras novedades.

**Evento para Empresas de Seguros**
"Conozca la Rentabilidad de su Compañía en Tiempo Real", organizado por CONSIST

**Profesionales de CONSIST se reúnen en la Conferencia Anual de Applix**
En esta oportunidad, profesionales de CONSIST de varios países participaron de la conferencia anual de Applix realizada entre los días 15 y 18 de mayo en Orlando, USA.

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**Monitoreo del Uso de las Aplicaciones: Mucho más que una Auditoria!**

**CONSIST participó como Sponsor de la VI Conferencia General de Estrategas del Seguro**

**Consist participó como Sponsor de Usuaria 2007 – "Construyendo la Agenda Digital para una Argentina Competitiva"**
Este importante evento contó con la participación de personalidades destacadas del mercado argentino e internacional

## Press Releases

**El Producto iET ITSM, que Comercializa Consist en la Región, Logró la Certificación más Alta de Mejores Prácticas de Negocio**
La certificación representa el mayor nivel "ITIL Service Support Enhanced" otorgado por la Consultora Pink Elephant

**Solución para Monitoreo y Control de Fraudes**
Consist presente en Segurinfo 2008 con "INTELLINX"

**Consist Lanza sus Servicios de Conferencias Web**

**Mundo de Papel**

**Sistemas de Calidad**

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**Conozca la Rentabilidad de su Empresa en Tiempo Real**

**El Producto iET ITSM Logró la Certificación más Alta de Mejores Prácticas de Negocio**

**Gestión de Performance**
Cómo enfocar a mi corporación en el logro de resultados

**PrintBOS de Consist Obtiene Certificación SAP**
Una solución para optimización en información impresa

Business Information Technology       Mapa del Sitio  Datos Legales       Powered by coveo Content Manager





**CONSIST**
Business Information Technology

Cada vez más cerca de su empresa

↑ Productos        ↑ Soluciones        ↑ Mercados Verticales



Home

Home / Noticias y Eventos / Noticias

# Noticias

┊ Noticias 2008
**Noticias de Años Anteriores**
┊ Noticias 2007        ┊ Noticias 2006        ┊ Noticias 2005

Buscar

→

Seleccione un País

Sitios Internacionales

Consist
Servicios
Noticias y Eventos
Press Room
Casos de Exito

✉ Contacto
☏ +54 11 - 4313-1747 ext.125
⇲ Para Bajar
🖨 Imprimir
✉ Enviar por email

11 de Marzo de 2008

### CONSIST publica medida cautelar de la Corte de Nueva York

En cumplimiento con la medida cautelar de la Corte de Nueva York, estamos publicando la copia de la traducción legalizada de la referida decisión.

La orden obliga legalmente a CONSIST y Fridman a menos que y hasta que dicha orden sea cambiada por una corte con jurisdicción competente en los Estados Unidos de América

**CONSIST publica medida cautelar de la Corte de Nueva York**

**Consist Lanza al Mercado una Nueva Versión de su Tecnología BPM**

Business Information Technology        Mapa del Sitio, Datos Legales        Powered by consist Content Manager

# EXHIBIT I





# Evolución hacia la Gestión de Servicios IT

Mayor Información

**CONSIST ITSM**
Basado en ITIL

 **Productos**    **Soluciones**    **Mercados Verticales**

**Buscar**

Seleccione un País

Sitios Internacionales

**Consist**
Institucional
Contáctenos

**Servicios**
Harvard Business School
Publishing
Academia XML
Soporte Técnico
Centro Educacional Consist

**Noticias y Eventos**
Eventos
Noticias

**Press Room**
Press Releases

**Casos de Exito**

Administración de Documentos
Administración de Impresión
Auditoría y Seguridad Lógica
Business Intelligence
Capacitación Ejecutiva - HBSP
Centro Educacional Consist

Clipping
Conferencia Web
Conferencia e-Learning
Gestión de Procesos Administrativos
Gestión de Salud
Recursos Humanos

Seguros
Soluciones para Gobierno

## Noticias

**Consist Lanza al Mercado una Nueva Versión de su Tecnología BPM**
ConsistGPA 3.0 incorpora mejoras funcionales en el monitoreo de los procesos, que permiten el seguimiento del negocio en tiempo real, entre otras novedades.

**Evento para Empresas de Seguros**
"Conozca la Rentabilidad de su Compañía en Tiempo Real", organizado por CONSIST

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**CONSIST en Jiap 2007**
Las JIAP (Jornadas de Informática de la Administración Pública y Privada) son el mayor evento anual de difusión y capacitación en Tecnologías de la Información y las Comunicaciones organizada por ASIAP (Asociación de Informáticos de la Administración Pública y Privada).

**Profesionales de CONSIST se reúnen en la Conferencia Anual de Applix**
En esta oportunidad, profesionales de CONSIST de varios países participaron de la conferencia anual de Applix realizada entre los días 15 y 18 de mayo en Orlando, USA.

**CONSIST publica medida cautelar de la Corte de Nueva York**

**Consist Participó como Sponsor en Seminario "Marketing de Respuesta – Objetivo Cliente"**

**Consist participó como Sponsor de Usuaria 2007 – "Construyendo la Agenda Digital para una Argentina Competitiva"**
Este importante evento contó con la participación de personalidades destacadas del mercado argentino e internacional

**Monitoreo del Uso de las Aplicaciones: Mucho más que una Auditoria!**

## Press Releases

**Solución para Monitoreo y Control de Fraudes**
Consist presente en Segurinfo 2008 con "INTELLINX"

**Consist Lanza sus Servicios de Conferencias Web**

**El Producto iET ITSM Logró la Certificación más Alta de Mejores Prácticas de Negocio**

Mundo de Papel

Sistemas de Calidad

**El Producto iET ITSM, que Comercializa Consist en la Región, Logró la Certificación más Alta de Mejores Prácticas de Negocio**
La certificación representa el mayor nivel "ITIL Service Support Enhanced" otorgado por la Consultora Pink Elephant

**Consist presente en Segurinfo 2008 con "IntellinX", Solución para Monitoreo y Control de Fraudes**

**Conozca la Rentabilidad de su Empresa en Tiempo Real**

**Gestión de Performance**
Cómo enfocar a mi corporación en el logro de resultados

**PrintBOS de Consist Obtiene Certificación SAP**
Una solución para optimización en información impresa

Business Information Technology    Mapa del Sitio   Datos Legales      Powered by CORET Content Manager

**CONSIST**
*Business Information Technology*

La evolución
en tecnología
de información

Cada vez más cerca de su empresa

⬆ Productos          ⬆ Soluciones          ⬆ Mercados Verticales

Home

Home / Noticias y Eventos / **Noticias**

# Noticias

⫶ Noticias 2008

**Noticias de Años Anteriores**

⫶ Noticias 2007          ⫶ Noticias 2006          ⫶ Noticias 2005

✉ Contacto
☎ +598-2-9026-449
⬇ Para Bajar
🖨 Imprimir
✉ Enviar por email

Buscar

➡

Seleccione un País

Sitios Internacionales

Consist
Servicios
Noticias y Eventos
Press Room
Casos de Exito

11 de Marzo de 2008

## CONSIST publica medida cautelar de la Corte de Nueva York

En cumplimiento con la medida cautelar de la Corte de Nueva York, estamos publicando la copia de la traducción legalizada de la referida decisión.

La orden obliga legalmente a CONSIST y Fridman a menos que y hasta que dicha orden sea cambiada por una corte con jurisdicción competente en los Estados Unidos de América.

Consist Lanza al
Mercado una Nueva
Versión de su
Tecnología BPM

Evento para Empresas
de Seguros

CONSIST publica

Business Information Technology          Mapa del Sitio Cláusulas Legales

Powered by CONSIST Content Manager

# EXHIBIT J

São Paulo, 11 de março de 2008

Ao
**BANCO DO BRASIL S/A**
Quadra B
Brasília/DF

Prezado Cliente

Em cumprimento a uma liminar da Corte de Nova York, estamos enviando em anexo, cópia com tradução juramentada da referida decisão.

Atenciosamente

**CONSIST CONSULTORIA, SISTEMAS E REPRESENTAÇÕES LTDA**
e
**CONSIST SOFTWARE LTDA**

*Pablo A. Kipersmit*
*Presidente Executivo*

Protocolo de recebimento

Recebido em _____/_____/_____

Visto: _____
*Nome:*
*Função:*